1        UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

3        HONORABLE JOSEPHINE L. STATON, DISTRICT JUDGE

4

5  IN RE: VIZIO, INC., CONSUMER        )
   PRIVACY LITIGATION,                 )
6                                      )
                                       ) CASE NO.
7                                      ) SAML 16-02693-JLS(KESx)
   _____ )
8  AND ALL RELATED ACTIONS.           )
   _____ )
9

10

11

12            REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS
13                  SANTA ANA, CALIFORNIA
                   FRIDAY, DECEMBER 16, 2016
14                       2:00 P.M.

15

16

17

18

19

20

21

22  _____
            ADELE FRAZIER, CSR 9690, CRR, RMR
23          Federal Official Court Reporter
            United States District Court
24              3470 Twelfth Street
            Riverside, California 92501
25            adelefraziercsr@gmail.com

1 | **APPEARANCES OF COUNSEL:**

2

3 | **For the Plaintiffs:**

4 |     GIRARD GIBBS, LLP
        BY:  ERIC H. GIBBS
5 |          ANDRE MURA
        505 14th Street, Suite 1110
6 |     Oakland, California 92612

7 |     COTCHETT, PITRE & McCARTHY
        BY:  ADAM J. ZAPALA
8 |          GWENDOLYN R. GIBLIN
        840 Malcolm Road, Suite 200
9 |     Burlingame, California 94010

10 |     AITKEN, AITKEN & COHN
        BY:  DARREN O. AITKEN
11 |     3 MacArthur Place, Suite 800
        Santa Ana, California 92707

12

13

     | **For the Defendants:**
14

        AKIN, GUMP, STRAUSS, HAUER & FELD
15 |     BY:  ANTHONY T. PIERCE
        1333 New Hampshire Avenue NW, SUITE 1500
16 |     Washington, D.C. 20036
        BY:  HYONGSOON KIM
17 |     4 Park Plaza, Suite 1900
        Irvine, California 92614

18

19

20

21

22

23

24

25

```
 1              SANTA ANA, CALIFORNIA; FRIDAY, DECEMBER 16, 2016

 2                           2:00 P.M.

 3              THE COURTROOM DEPUTY:  Calling item number 4, SAML

 4  16-2693-JLS, Vizio, Incorporated, vs. Consumer Privacy

 5  Litigation.  Counsel, if you can, please, state your

 6  appearances for the record.

 7              MR. GIBBS:  Good afternoon, your Honor.  Eric Gibbs

 8  for the plaintiffs.

 9              MR. MURA:  Good afternoon, your Honor.  Andre Mura

10  for the plaintiffs.

11              MR. ZAPALA:  Good afternoon, your Honor.  Adam Zapala

12  for the plaintiffs.

13              THE COURT:  Speak up, please, for the court reporter,

14  especially if you're not near a mike.

15              MR. AITKEN:  Darren Aitken, Aitken, Aitken, and Cohn,

16  on behalf of plaintiffs.

17              MS. GIBLIN:  Good afternoon, your Honor.  Gwendolyn

18  Giblin, Cotchett, Pitre, and McCarthy, for plaintiff.

19              MR. PIERCE:  Good morning, your Honor -- good

20  afternoon, your Honor.  Anthony T. Pierce on behalf of the

21  Vizio defendants.

22              MR. KIM:  Good afternoon, your Honor.  Hyongsoon Kim

23  also for the defendants.

24              THE COURT:  All right.  Good afternoon to all of you.

25  And we're here on defendant's motion to dismiss.  We also have,
```

```
 1    at least technically, a case management conference on calendar
 2    as well; although, I don't think there's anything for me to
 3    manage at this point.  I will let you tell me if you think
 4    otherwise, but I didn't receive any kind of filing or any
 5    proposed status conference statement to tell me that we need to
 6    do anything other than pick another date, perhaps in March.
 7    But we'll get to that after we address the motion to dismiss.
 8    And maybe you wanted to hear what the result was of the motion
 9    to dismiss before we decide whether we need a status
10    conference, right?
11            MR. PIERCE:  Seems logical.
12            THE COURT:  All right.  With that in mind, let me
13    just hear from the parties on this.  I'm sure I'll have some
14    questions for you.
15            MR. PIERCE:  Your Honor, thank you.  On behalf of the
16    defendants we are here on our motion to dismiss the entirety of
17    the complaint for a number of reasons.  I am going to take it
18    that the Court is familiar with our papers.  And I want to
19    focus the Court on a few arguments that we think are paramount,
20    recognizing that the general theme here, your Honor, is that
21    what the plaintiffs in this particular case are trying to do is
22    to expand the statutory law here to the breaking point.  And
23    we've addressed that in our papers as a procedural issue.
24            Right now I'm going to just address the federal
25    claims, and my colleague, Hyongsoon Kim, to the extent you have
```

1    any questions on the state law claims will address those.  Is

2    that okay by the Court?

3             THE COURT:  That's fine.  Yes.  It's good to get that

4    out of the way at the outset, though, because you don't want to

5    hear me say only one person gets to argue.  Every once in a

6    while that's the case, but on a case like this I'll allow that.

7             Presumably, you're going to skip right over that

8    Article III standing argument based on *Spokeo*, right?

9             MR. PIERCE:  Well, your Honor, I'm going to first

10   address -- I think our papers are clear on that argument, so I

11   don't necessarily need to speak to it.  I can address it if the

12   Court would like.  I would like to focus, first, though, your

13   Honor, on the VPPA claim --

14            THE COURT:  Yes.

15            MR. PIERCE:  -- and the failure of the plaintiff to

16   adequately plead that.

17            As the Court knows there are three things that the

18   plaintiff has to show to have a valid VPPA claim.  They have to

19   show that Vizio is a videotape service provider, and they have

20   to show that the plaintiffs are consumers of such a provider,

21   and then they have to show that the defendants disclosed -- not

22   collected -- disclosed Personally Identifiable Information.

23   I'd like to address all of those in turn and take any questions

24   the Court has as well, and then I will turn to the Wiretap Act.

25            Your Honor, with respect to the first aspect of the

```
 1   VPPA, the defendants have, clearly, failed to show that Vizio
 2   is a videotape service provider.  First of all, there is no
 3   court that has held that a defendant in the position of Vizio,
 4   which by plaintiff's own complaint simply facilitates the
 5   transmission of video, is, indeed, a videotape service
 6   provider.  All the cases that have been cited by both sides
 7   involve cases where the defendant was actually in the business
 8   of producing and sending their own content within the video.
 9           THE COURT:  But what in the statutory language
10   requires me to limit, or requires anyone to limit, the
11   definition of a -- someone who's engaged in the business of
12   delivering video content to a creator of that video content?
13           MR. PIERCE:  Well, if you look at the express
14   language of the statute, there is nothing in the statute that
15   allows the Court to extend it to someone in Vizio's situation
16   as alleged by the plaintiffs.
17           THE COURT:  It means any person -- -
18           MR. PIERCE:  You notice in the case law --
19           THE COURT:  I'm just looking at the statute.  The
20   term *videotape service provider* means *any person engaged in the*
21   *business* -- engaged in the business -- *of delivery of*
22   *audio/visual materials similar to pre-recorded video cassette*
23   *tapes*.
24           MR. PIERCE:  Right, your Honor.  If you look at the
25   allegations of the complaint, what it boils down to is that
```

1    they say we facilitate that.  So the actual delivery occurs on

2    a Smart TV when you have the Hulu connection to it or the

3    YouTube connection to it.  They are delivering the video.

4            THE COURT:  There can only be one deliverer?  One

5    mechanism?  There can't be two?  It can't be Hulu and the Smart

6    TV?

7            MR. PIERCE:  There is no court, no case, no

8    legislative history, no aspect of the statute that has ever

9    extended it that far.  And so, your Honor, I would argue that

10   that is the case.

11           THE COURT:  So tell me -- provide -- is there --

12   provide me with the case that has said that it's not within the

13   scope.  What is the case that says that delivery in this manner

14   is not within the scope?

15           MR. PIERCE:  So let's look at the *Nickelodeon* case,

16   your Honor, because I think that gives, perhaps, one of the

17   better discussions.  And to the extent a statute is not clear

18   in the Court's mind -- it's, certainly, clear in my mind -- you

19   also might want to look to the legislative history.

20           So *Nickelodeon* states that the classic example of a

21   VPPA violation will always be a video clerk leaking an

22   individual customer's rental history.  Every step away from

23   that 1988 paradigm will be harder for plaintiff to make out a

24   successful claim.

25           So we are way away from the video clerk leaking the

```
 1    information for -- if you remember why the statute was enacted

 2    -- for Robert Bork's video rental --

 3             THE COURT:  If I didn't remember before reading every

 4    case involved -- involving this, it has reminded me of that.

 5             MR. PIERCE:  And in those cases you read, your Honor,

 6    you see the court struggling with this issue because they don't

 7    want to get into the slippery slope, which is where the

 8    plaintiffs are wanting to take us, of, basically, making every

 9    device out there that has the ability to deliver video or

10    facilitate the delivery or the transmission of video tying it

11    back to their complaint.

12             THE COURT:  Well, it's not facilitating.  This talks

13    about being engaged in the business of, right, delivering video

14    content, being engaged in the business of.  And if you look at

15    that advertisement of your Smart TV, your client's Smart TV,

16    doesn't it advertise it as being A passport to a world of

17    movies, TV shows, and other video content.

18             MR. PIERCE:  That's not a delivery, though.  So the

19    person delivering the video in that context is the content that

20    is coming through the Smart TV.  So if you have a YouTube

21    video, for example, it is -- and I am not hear to represent

22    YouTube.

23             THE COURT:  But you're not telling me why.  I mean,

24    any more than at a Blockbuster rental store I could see -- I

25    could see someone trying to argue that the delivery is based on
```

1    the company that creates the videotape and creates the content,

2    and we're just passing it along.  We're just facilitating

3    getting the video from the creator to the consumer.  We're

4    just -- we're just facilitators.  And that sounds very -- it

5    sounds very much like what you're telling me your client does.

6              MR. PIERCE:  So let's go back to the statute.  So

7    let's look at it in a bit of a hypothetical.  If Congress

8    wanted to get what you just defined, why not use the word

9    *provided*, right?  There are any number of ways -- and in 2012

10   the Congress was given the opportunity to expand a number of

11   the definitions in the statute and chose not to change that

12   language.  Because as the *Nickelodeon* case pointed out, the

13   Congress wanted -- the statute is narrow in its definition.

14             And so your Honor just think about that slippery

15   slope for a second, which you've seen in the case law --

16             THE COURT:  Did *Nickelodeon* really address the who is

17   a provider issue in a way that?

18             MR. PIERCE:  It addressed the meaning of videotape

19   service provider in the statute, your Honor.  And it talked

20   about -- or it hinted to the slippery slope that comes when you

21   go where the plaintiffs want to go with this.

22             So when you think about it --

23             THE COURT:  It really was focused -- when I think of

24   *Nickelodeon*, I think of the Personally Identifiable

25   Information.

1        MR. PIERCE:  It is very powerful on that too, but it

2   goes through the history of the statute and explains the

3   meaning -- the meaning of the statute.

4        Your Honor, what I just want to point out to you so

5   we just put this on the record, so if in this instance Vizio,

6   the seller, not even the manufacturer, the seller of a

7   television is a videotape service provider under their

8   allegations, then that computer on your desk there is one

9   because you could play video.  It has software on it that

10  allows you to play video from YouTube and Hulu.  If you drive a

11  nice car, like I'm sure my friend Mr. Gibbs does, his car

12  delivers video, just like my car delivers video, so the car

13  manufacturer is now a Video Service Provider.  A DVD

14  manufacturer is a service provider.

15       We've laid that concept out, but it shows the

16  absurdity and the extension I don't think the Court can get

17  that far into, and which requires them to amend -- I don't

18  think they can amend because then they're going to be talking

19  past themselves, but to allege something that shows Vizio

20  actually delivering video to be a VTSP.

21       So, your Honor, we can go through the case law, but I

22  think that if you look at the cases where the VPPA was extended

23  -- the definition of VTSP in the VPPA was extended to include

24  something other than the video store rental, if you look at the

25  *Nickelodeon* case, if you look at the *Ellis v. Cartoon Network*

1   case, *Rodriguez*, they all involved defendants who were actually

2   renting and selling movies and video in some form, in a format

3   that is akin to the rental store, perhaps it was online.  But

4   no manufacturer of a device that facilitates that transmission,

5   as they allege in the complaint, has ever been held to be a

6   VTSP.

7            THE COURT:  Okay.  So I'll have you move on to --

8            MR. PIERCE:  Thank you, your Honor.

9            THE COURT:  -- whether they're consumers.

10           MR. PIERCE:  Correct.

11           THE COURT:  I think they are relying on the

12  subscriber -- the subscriber language, correct?

13           MR. PIERCE:  There's one procedural deficit in that

14  argument as well, your Honor.  They don't allege the subscriber

15  argument in the actual complaint.  The first time you heard of

16  that was in the opposition brief.  If you look at the

17  complaint, they define themselves as *users*.  So recognizing

18  that they had some issues with that, they, then, in the

19  opposition began to describe themselves as *subscribers* for the

20  first time.

21           But even if you -- if you let them get away with

22  that, if you look at what is actually alleged, they're not

23  subscribers because they say they are subscribers solely

24  because defendants collected data, and that's insufficient in

25  our opinion to state a claim under the VPPA.

1    The courts have found that there's no subscriber

2   relationship even when the VTSP had collected and disclosed

3   information about the user.  And, actually, the cases cited by

4   the plaintiff illustrate this point.  If you look at the Ellis

5   v. Cartoon Network case, that claim was dismissed because the

6   user was not a subscriber even though the VTSP, the *Cartoon*

7   *Network*, again, not a Vizio-type seller or manufacturer of a

8   device, but somebody who actually has content, that that

9   subscriber -- even though that subscriber -- even though the

10  VTSP collected disclosed the Android ID and viewing history the

11  court dismissed that at a motion to dismiss stage.

12    Same with the *Austin-Spearman vs. AMC Network* where

13  the plaintiff was not a subscriber even though VTSP collected

14  and disclosed Facebook ID and viewing history.

15    So the fact that Vizio collects data does not make

16  the plaintiff a subscriber as they allege in the complaint.

17    Assuming no questions on that, your Honor, I'd like

18  to turn to the issue of the personally identifiable --

19    THE COURT:  Let me ask a question on that.  So how do

20  you address the *Yershov* case?

21    MR. PIERCE:  *Yershov*, I believe, is more of a PII

22  case.

23    THE COURT:  Actually, it talked about the

24  subscription.  It talked about a subscriber and the definition

25  of subscriber, and -- I mean, as well as personally identifying

1    information.  It went to both.

2          And here the plaintiffs purchase a Smart TV.

3          MR. PIERCE:  Correct.

4          THE COURT:  And they allege that they pay a premium

5    for its ability to deliver content.  This is their allegation,

6    that they pay a premium.  And over time they receive all of

7    this content through the Smart TV.  And why isn't that really a

8    subscription?

9          MR. PIERCE:  In *Yershov*, your Honor, and in the *Hulu*

10   *Privacy Litigation* case, which also discussed the subscriber

11   issue, and, in fact, in every case cited by plaintiffs where

12   the plaintiff was a subscriber, there was a reciprocal

13   agreement between the defendant and the user, and the user was

14   required to input personal information to access the content.

15         As alleged, that doesn't have to happen here.  That's

16   the -- that's the reciprocal agreement between -- if a

17   reciprocal agreement existed between Vizio and the plaintiffs,

18   then you might have a situation where they were a subscriber if

19   you follow the case law.  That's what *Yershov* said.  *Yershov*

20   said to use the app *Yershov* did, indeed, have to provide

21   Gannett with personal information, so there was that reciprocal

22   agreement.  There's no allegation of that.

23         THE COURT:  But I think I might be headed in a

24   slightly different direction maybe even than what the argument

25   of what the plaintiffs is, and so they can tell me if I'm off

1   base on this as well.  But -- because I know they've talked

2   about it as providing information, et cetera, but just at a

3   basic level, when they purchased the Smart TV, they thought

4   they were purchasing this content delivery system, and they say

5   they paid a premium to obtain this.  And it's an ongoing

6   relationship.  We paid it up front.  I mean, I know, for

7   example, you can have a subscription to a magazine.  It can be

8   a lifetime description.  You pay everything up front, and then

9   you continue to get the content over time.  Why is that not --

10  why does that not constitute a subscriber, a consumer as a

11  subscriber here?

12          MR. PIERCE:  The classic subscriber, in this

13  instance, would be the connection between Hulu -- if you have a

14  Hulu account, you have to subscribe to Hulu.  You pay a fee.

15  You pay a monthly fee.  There is an ongoing relationship.

16          THE COURT:  I understand that relationship.

17          MR. PIERCE:  Okay.

18          THE COURT:  I was talking about a, perhaps, a

19  separate relationship based on the advertising of -- by Vizio

20  that they're going to provide -- they're going to have a Smart

21  TV -- the consumer's going to get a Smart TV that allows them

22  to download content, that allows them to have access to all of

23  these --

24          MR. PIERCE:  But I don't think there's any ongoing

25  relationship in that instance when the -- whereas in the true

1    subscriber relationship that the case law talks about there is

2    a reciprocal ongoing agreement between the -- well, at this

3    point we're assuming it's a VTSP -- between the VTSP and the

4    consumer.  I don't know if I've answered your Honor's question.

5           THE COURT:  You may have.  Again, I'm going to ask

6    the plaintiffs this question because I think they framed it

7    more along those lines as well.  So we'll get there.

8           All right.  Personally Identifiable Information.

9           MR. PIERCE:  So again, your Honor, here there is an

10    attempt to expand that definition beyond anything in a statute

11    and anything in the case law.  The VPPA defines *Personally*

12    *Identifiable Information* as information which identifies a

13    person as having requested or obtained specific video materials

14    or services.

15           Going back to *Nickelodeon*, personal identifiable

16    information under the VPPA means the kind of information that

17    would readily permit an ordinary person to identify a specific

18    individual's video watching behavior.  Plaintiffs have failed,

19    your Honor, to allege any facts showing the defendants

20    disclosed information that identifies a person.  And that's an

21    important distinction.  I know the Court's read our papers, but

22    just to clarify, what they are alleging that defendants

23    disclosed IP addresses, MAC addresses, media access control

24    addresses.

25           THE COURT:  They do -- they do allege that it allows

```
 1    for -- it provides geolocation as well, that it's -- and

 2    doesn't that bring it into the purview, really, of the Yershov

 3    case?

 4              MR. PIERCE:  They very much attempt -- between the

 5    original filing of their complaints and the amended complaint,

 6    Yershov came out, and they stuck in geolocation data to try to

 7    fit it within Yershov.  But what they really say is that the

 8    MAC addresses could be used to develop geolocation data.

 9              If you look at -- I was just trying to struggle with

10    where the paragraph was.  If you look at paragraph 71 of the

11    complaint, the first sentence, MAC addresses can be used to

12    develop highly specific geolocation data.  It does not say, as

13    Yershov implied was possible, that we collect GPS coordinates

14    and -- excuse me, and, more importantly, that we disclose GPS

15    coordinates.

16              And so Yershov is just not this case.

17              THE COURT:  Well, Yershov does say, essentially, that

18    the information has to be reasonably and foreseeably likely to

19    reveal, in that instance, videos watched by a particular user.

20    So it's -- it's the reasonably and foreseeably likely language

21    that's different, I think, in Yershov and Nickelodeon.  Are

22    those two cases reconcilable?  Are they from different

23    circuits?

24              MR. PIERCE:  No.  In fact, that distinguishes

25    Yershov.  Yershov's holding -- first, it's an outlier case.
```

```
 1    There's no other case that goes that far.  It was -- it is at
 2    the motion to dismiss stage, and the court was speculating when
 3    it said, A smartphone may be more direct -- remember -- and
 4    that's another big distinction, your Honor, A smartphone may be
 5    more directly connected to a specific individual than even a
 6    residential address.  For example, people are much more likely
 7    to share their homes with other persons than their smartphones.
 8              So, remember, we don't have a smartphone here, your
 9    Honor.  We have a TV that's in a home.  It could be shared with
10    other people.  Or it's in a facility or it's in this courtroom
11    that could be shared with other people.  It is a different case
12    than what the plaintiffs are alleging here.
13              So I think Yershov is distinguished.  And if you --
14    if you look at the Nickelodeon case, when it, again, talks
15    about the -- I call it the slippery slope here that we're
16    there.  When it looks at the legislative history, it points
17    out, That our review of the legislative history convinces us
18    that Congress purpose in passing the VPPA was quite narrow, to
19    prevent disclosures of information that with little or no extra
20    effort permit an ordinary recipient to identify a particular
21    person.
22              THE COURT:  So I should look at the legislative
23    history?
24              MR. PIERCE:  If the Court is not clear on the -- I
25    think the language of the statute is dispositive.
```

1           THE COURT:  Okay.  So the language of the statute?

2    That's interesting because I think the reason that *Yershov* may

3    hit the nail on the head is if you look at the definitional

4    section of the VPPA --

5           MR. PIERCE:  Uh-huh.

6           THE COURT:  -- when they're defining *consumer* or

7    *ordinary course of business* or *videotape service provider*, it

8    says it means X, it means Y, it means Z.  And then you come to

9    Personally Identifiable Information and it just says, *includes*

10   *information which identifies a person as having requested or*

11   *obtained specific video materials*.  So it uses the broader

12   language.  Now, I have to assume that it used that broader

13   language for a particular reason.  It doesn't say it means this

14   information, it includes information.  And that's a floor,

15   right?

16          MR. PIERCE:  You have to match that broader language

17   up against what the plaintiffs actually allege.  They don't

18   allege that we are identifying a person.  They allege that if

19   you took certain unique identifiers as to the device, then some

20   third party could, then, identify the person.

21          THE COURT:  Right.  Like the playbook --

22          MR. PIERCE:  We're far away from that definition.

23          THE COURT:  Like the playbook that's referenced in

24   *Yershov*, where the -- you know, you identify the player out on

25   the football field as number 12 and anybody who has the program

1   for the -- for the game knows who player 12 is.

2         MR. PIERCE:  In the limited context of having a

3   mobile phone in your hand, because then with the mobile phone,

4   you might be able to get closer to an actual person.

5         We're talking about a television.  We're talking by

6   extension about a computer, about a CD player, about a car.

7   This is all -- all the plaintiffs have alleged is about

8   devices, identifying devices.  And then they take from that and

9   they leap to the idea that, oh, well, a third party can put all

10  that together, so, therefore, we should be under the VPPA

11  because now that's PII.  That is an incredible leap that no

12  court at the motion to dismiss stage has allowed to happen.

13        And if you look at our cases on that issue, if you

14  look at *Nickelodeon*, if you look at *Perry v. CNN*, if you look

15  at *Robinson v. Disney Online*, if you look at *Ellison (sic) v.

16  Cartoon Network*, if look at *Locklear v. Dow Jones*, if you look

17  at *Eichenberger v. ESPN*, all -- cases which some of the

18  plaintiff's counsel were involved in -- they all say that that

19  third party data process collection is not viable.

20        Just look at the allegations in *Nickelodeon.*  The

21  allegation that Google will assemble otherwise anonymous pieces

22  of data to unmask the identity of individual children is, at

23  least with respect to the kind of identifiers at issue here,

24  simply too hypothetical to support liability under the VPPA.

25        We're in the same situation where they've alleged a

1   number of unique identifiers to a device.  And now they're

2   saying, well, okay, we know that that's not PII.  We know that

3   MAC addresses are not PII.  We know IP addresses are,

4   generally, not PII.  But with all of this that they collect, a

5   third party can come in and put it together.  There's no case

6   in the country that I know of that has extended the VPPA

7   liability, the definition of PII, in that context.

8          And *Yershov*, first being an outlier, distinguished by

9   Nickelodeon, which came afterwards and is probably the latest

10  case on this issue, involves a unique set of factual

11  circumstances where the court is, basically, speculating that,

12  okay, maybe that's enough because it's a cell phone.  It's GPS

13  coordinates, not just geolocation data, whatever that means.

14  And then the court takes that and says, okay, I'll let this one

15  slide, and we'll see what happens in discovery.  And I would

16  argue, your Honor, this is not *Yershov* under the facts or the

17  law.

18          THE COURT:  All right.

19          MR. PIERCE:  Your Honor, if you have no further

20  questions.

21          THE COURT:  I'm going to let you move on.

22          MR. PIERCE:  Okay.  I'm sure you are.  Thank you,

23  your Honor.

24          Let's just turn, very briefly, your Honor, to the

25  Wire -- well, maybe not briefing -- to the Wiretap Act claim,

```
 1    which we also believe must be dismissed.  And the plaintiffs'
 2    claim under this particular statute needs to be dismissed
 3    because the plaintiffs have not -- and I strongly believe
 4    cannot -- adequately allege facts supporting that the
 5    defendants intentionally intercepted an electronic
 6    communication.  Secondly, none of the information allegedly
 7    intercepted constitutes content under the statute.
 8             So by the way, your Honor, just atmospherically, the
 9    plaintiffs have conceded that their California Invasion of
10    Privacy Act, which has very similar guidance, they've abandoned
11    those.  And I think they could abandon the Wiretap Act as well.
12             So let's talk about interception for a second.  First
13    of all, the plaintiffs do not dispute that intercept means to
14    acquire a communication during its transmission.  That's the
15    knot case which I'm sure the Court is familiar with.  And, you
16    know, Konop says the Wiretap Act applies only to acquisition
17    contemporaneous with transmission.  The complaint makes clear,
18    in my opinion, that any alleged acquisition of data was not
19    during transmission.  Plaintiffs instead allege that Inscape,
20    subsidiary of Vizio, takes only communications already being
21    displayed on their Smart TV's.  In other words, your Honor,
22    those are communications that have been received.
23             If you look at paragraph 50 and 52 -- and actually if
24    you look throughout the complaint, it is always talking about
25    this data in the past tense.  That it was received, that it was
```

1   viewed, that it was collected, all in the past tense, your

2   Honor, which means to mean that it was already on the TV and,

3   therefore, not in transit.

4           And if you, again, and this is -- this is, again, a

5   slippery slope-type argument, but if you take the plaintiffs'

6   interpretation of that term *intercept*, any collection of data

7   could be characterized as an interception, even if it had

8   already been received.  That can't be the case.  That can't be

9   what the statute meant.

10          The statute is designed to -- Mr. Gibbs and I are

11  having a conversation and I say Mr. Kim is a good guy.  The

12  interception is when I say Mr. Kim is a good guy, somebody

13  intercepts that and goes off it.  That's what the statute is

14  designed to attack, not when the data is on a television,

15  having been received, and then Vizio begins the process of

16  collecting that data.

17          So there is no interception here in my opinion, your

18  Honor.  And if you look at the case law, it supports that

19  theory.  If you look at the case that the plaintiffs cite in

20  their opposition, the *In re Carrier* case, that case says -- the

21  complaint at issue in that case made clear that before the text

22  message even appeared on the mobile device, the software had

23  intercepted the communication.  That's what the allegation was

24  at 78 F.Supp 1078, not after it arrived.  Before it even

25  appeared on the mobile device this particular defendant took

1    it.

2            Now, look, plaintiffs attempt to get around this by

3    focusing on the description of the software in question as

4    receiving this information in, quote, *real-time*, whatever that

5    means, but they ignore the fact that the complaint in Carrier

6    analogized the process in which the relevant technology

7    captured the communications to a fish net through which the

8    transmission passes.  There's no fish net here.  That data,

9    that viewing, is on the television, so there can't be, by

10   definition, an interception.

11           And, your Honor, I do agree that the plaintiffs make,

12   what I call, a conclusory allegation which, again, under the

13   supreme court's teaching here the Court should ignore, that

14   they say plaintiffs -- they make a conclusory allegation that

15   interception by -- interception by -- of defendants viewing

16   data was acquired during transmission.  They make that blanket

17   allegation.  But as the *Google Cookie Placement*, which was

18   cited by us, says, where they dismiss a Wiretap Act claim, the

19   court need not give legal effect to that because it is, in

20   fact, a conclusory allegation.

21           So, your Honor, I would turn the Court to the *DirecTV*

22   case, another motion to dismiss case, and it's -- it's almost

23   on par with our situation.  The court in that case said that

24   the defendants allegedly -- and I'm just quoting from it so

25   just so I get it right.  *Defendants allegedly rebroadcasted*

```
 1    DirecTV satellite programing using secondary receivers that
 2    mirrored DirecTV programing to other televisions.  The court
 3    focused on whether DirecTV has alleged that the defendants
 4    actually intercepted a DirecTV satellite signal within the
 5    meaning of the statute.  And the court did not find
 6    interception in that case, noting that DirecTV does not appear
 7    to be alleging that the defendants seized the satellite signals
 8    before arrival to DirecTV's receivers.
 9            And that's the same situation here.  Because they
10    talk about it in the complaint -- and I'll give you the quotes,
11    your Honor.  If you look at paragraphs 52 of the complaint --
12    hold on one second, your Honor.  Let me just make sure I get it
13    right here.  Using Smart Interactivity software the Inscape
14    program is able to collect, aggregate, and store data regarding
15    most content displayed on Vizio Smart TV's, not transmitted
16    with, not intercepted from, displayed.  So it's already there
17    by definition that that cannot be a Wiretap Act.
18            The other flaw here, your Honor, is on the content
19    question.  And as you know, the Wiretap Act --
20            THE COURT:  Before you move on to the --
21            MR. PIERCE:  Yes, your Honor.
22            THE COURT:  -- the content issue, I'm going to do
23    something very unfair.  I'm going to ask you if you know about
24    the Epstein v. Frank, Seventh Circuit case that was decided
25    yesterday.
```

1          MR. PIERCE:  I do not know about that case.

2          THE COURT:  All right.  That's why I said it's very

3     unfair.  It was yesterday.

4          MR. PIERCE:  If you had called me this morning, I'd

5     have known about it.

6          THE COURT:  And it's a set of facts that really in a

7     lot of way really have nothing to do with this, the kinds of

8     facts that we have in this sort of privacy litigation.  Perhaps

9     by the two names you can tell, two individuals.  It's an

10    off-shoot of a dissolution proceeding in which the husband

11    found out that his spouse had been intercepting his -- I think

12    if I have the right one, had been intercepting his emails

13    reflecting infidelity in advance.

14         And the question was when does the -- when did the

15    interception occur, whether it was during transmission or after

16    the electronic message had come to rest on the computer system?

17    And of course it cites the case that I will never be able to

18    pronounce, the *Szymuszkiewicz*.  Am I close?  Does anybody

19    recognize that one, the *Szymuszkiewicz* case?

20         MR. PIERCE:  Okay.

21         THE COURT:  Anyway.  But it talks about

22    contemporaneous interception.  And it talks about really it

23    being something that may not be able to be resolved at a motion

24    to dismiss stage unless you -- unless the complaint,

25    essentially, forecloses that.

1          And it's just something that -- if you haven't read

2     it, then maybe I'll think about whether you do briefing on it

3     afterwards.  It's only somewhat relevant, but it does talk

4     about all the cases -- some of the cases that are relevant

5     here, and it's -- it addresses the issue of contemporaneous

6     versus storage.

7          MR. PIERCE:  Well, your Honor, within the context of

8     our case with respect to whether they could amend, I don't

9     think they can because it's going to be inconsistent with the

10    rest of their complaint.  Because, again, they talk about it in

11    the context of displayed in the past tense, the information is

12    clearly, from reading the complaint, on the computer.  So I

13    would encourage the Court to go back look at what they actually

14    say as opposed to a case we haven't heard about -- but we're

15    willing to brief it on -- says.  And I think that will be

16    conclusive to your Honor about whether they could amend on that

17    point.

18          Your Honor, I'd like to --

19          THE COURT:  The Seventh Circuit is, essentially,

20    saying -- it kind of says it here, and it says it in the

21    *Szymuszkiewicz* case, which I mentioned, which is -- I don't

22    know, the IRS agent who was intercepting messages from his

23    supervisor.

24          MR. PIERCE:  Okay.

25          THE COURT:  In any event, I think probably because of

1    the *Konop* case, it's, kind of, along those lines.  But it talks

2    about, essentially, being interception at the time of receipt

3    satisfies the simultaneous transmission requirement.  And so --

4           MR. PIERCE:  Your Honor, not having read that case

5    but just listening to what you just said, interception at the

6    time of receipt --

7           THE COURT:  You're saying it's not this case.

8           MR. PIERCE:  On their own allegations, when they have

9    had full access to what you pointed out on our advertising,

10   advertising, websites, privacy policies, they've had full

11   access to that and they still define it as in the past tense as

12   being on the TV, because that's actually what happened.  And so

13   we have to accept all that as true.  And if you accept all that

14   as true, this case, that cause of action has to go because it

15   doesn't meet the requirements of the statute.

16          THE COURT:  All right.  Now, feel free to go on to

17   content.

18          MR. PIERCE:  On the content issue, your Honor, the

19   Ninth Circuit in the *Zynga* case, which I think is the case on

20   this issue, it has defined *content* as the intended message

21   conveyed by the communication.  So if I'm watching my

22   television and I'm watching Hogan's Heroes -- that dates me, I

23   know, but that is just what came into my mind.  But if I'm

24   watching Hogan's Heroes it wants to know -- the content has to

25   be what is Hogan's Heroes about.  And what it doesn't include,

1    as instructed by *Zynga*, is record information, and that's

2    exactly what the plaintiffs are alleging we collect and

3    supposedly have disclosed.

4         So the plaintiffs allege that the -- the information

5    plaintiff alleges is captured is not the content.  The

6    following types of information is alleged to be captured:

7    Viewing histories, preferences, IP addresses, MAC addresses,

8    zip code, product model numbers, hardware and software

9    versions, chipset IDs, and region and language settings in

10   paragraph 129 of the complaint.

11        Now, the majority of that I think the plaintiffs --

12   if you look at their opposition, they've conceded that's not

13   content.  So what they're trying to focus the Court on now is

14   this viewing history and preferences.  That's the alleged

15   content.  But the case law that we have cited, your Honor,

16   illustrates that viewing history does not constitute contact of

17   the Wire Act, but it was just the record information that was

18   at stake in *Zynga*.

19        THE COURT:  That's what --

20        MR. PIERCE:  And they don't even attempt to deal with

21   that authority.  They don't even address that authority.

22        THE COURT:  Well, you would acknowledge, though, that

23   *Zynga* is a little bit -- a little bit more precise than that.

24   I mean, it doesn't necessarily say that a certain kind of

25   information is always non-content and is always record related.

```
 1    Doesn't it say it's, kind of, a fact specific question and
 2    sometimes it is and sometimes it's not?
 3              MR. PIERCE:  But, again, if you -- if you look at the
 4    type of information involved in Zynga, and then we go to their
 5    own complaint, Zynga is dispositive in my view.
 6              If you look at Zynga, what it says that the reference
 7    hitter sent when Facebook used -- when the Facebook user
 8    clicked on the link, it included the user's Facebook ID and the
 9    address of the Facebook web page that the user was viewing, and
10    it concluded that that did not constitute content.  If that
11    doesn't constitute content, then what the plaintiffs have
12    alleged can't constitute content because that seems to me to be
13    far more detailed information than what the plaintiffs have
14    alleged.
15              Again, your Honor, if you look at -- and all of these
16    cases were at the motion to dismiss stage.  We can't lose sight
17    of that.  If you look at the Facebook Internet Tracking
18    Litigation case, the alleged interception of the user's
19    browsing histories and the, quote, identity of the web pages
20    that the users visited failed to state the claim under the
21    Wiretap Act.  That is because that has been defined as record
22    information.
23              Let's look at Burns v. Heyns, which is a Michigan
24    decision in 2015.  That was a case involving these prison
25    computers, if the Court may recall.  The time -- this is what
```

1    was involved in that:  The time, order, and duration the

2    computer spent on each web page, as well as which files were

3    accessed and/or downloaded.  That was not content because the

4    data merely, quote, *provides record information about a*

5    *prisoner's usage of the computer.*

6            So the data, as alleged, that we are supposedly

7    collecting, recognizing that they've conceded that all the

8    identifier stuff, the MAC address, not content, the viewing

9    history is very much like this data.  It's very much like --

10   and nothing in the complaint dissuades us from thinking

11   otherwise.  And they cite -- they cite the *Zynga* case, but,

12   again, the *Zynga* case concluded that that kind of information

13   was not content under the Wiretap Act.

14           What I think they are dealing with in *Zynga* is what I

15   call double dicta.  *Zynga* in a hypothetical cites to a case

16   called *Forrester*.  And in that case, which didn't even deal

17   with this issue, that case speculates and has further dicta on

18   a scenario that the plaintiffs thinks falls within this issue.

19   The hypothetical scenario in the *Forrester* case was a case

20   where someone used a search engine like Google and the entirety

21   of the search is revealed in the text of the UR.  The court

22   said this, quote, *might constitute contents of the*

23   *communication.*

24           Well, if you look at that, both *Zynga* citation to it

25   and Forrester's use of it, is all dicta, in my view it's double

dicta, and in my view is irrelevant.  I think that's where

plaintiffs are going.  And still this case does not involve the

capturing of text-based search requests to a search engine.

So, your Honor, I think that in the -- on the issue

of content and the hypothetical scenario that the plaintiffs

are trying to -- or I think they will argue.  I'm not sure, but

I think they're going to argue.  It is clear from *Zynga* that it

doesn't exist here, and, therefore, the content requirement is

not met.

Your Honor, I don't have anything else.  I'm more

than willing to talk to the Court about any questions that it

has.  If you'd like Mr. Kim to address the state law claims,

I'm more than willing to have him or if you want -- whatever

you want to do.

THE COURT:  All right.  I'm going to stick with the

federal claims right now.  And I'm going to turn to plaintiffs

and have you address those.

MR. MURA:  Thank you, your Honor.  Andre Mura for the

plaintiffs.  Your Honor, would you like me to address standing

or would you like me to go straight to --

THE COURT:  No.

MR. MURA:  Okay.  There is nothing extraordinary to

applying the VPPA to Vizio, which brings the video rental store

into the home through proprietary software that delivers

seamless access to video in exchange for certain personal

1    information and because plaintiffs paid a premium for that

2    subscription.  Your Honor mentioned that as a second theory for

3    subscription.  We do discuss that on page 14 of our brief.

4             THE COURT:  Oh.  So I didn't make that up?  Okay.

5             MR. MURA:  I think your Honor articulated that very

6    well.  We tried to as well.  We said that, *Access was not free*

7    *of a commitment to provide consideration in the form of the*

8    *information that Vizio is taking*.  And we said, *It is not free*

9    *in a different sense:  Plaintiffs allege they paid a premium*

10   *for this technology in order to have regular and easy access*,

11   in other words, for subscription.

12            THE COURT:  All right.

13            MR. MURA:  But it is not unprecedented either to

14   apply the statute here.  It applies to Vizio for the same

15   reasons it applied to Gannett in the *Yershov* case.  And to

16   understand why you should consider the terms *consumer* and

17   videotape service provider together.  These terms describe a

18   relationship that needs to exist for the statute to apply.  A

19   consumer is a renter, purchaser, or subscriber of goods or

20   services from a videotape service provider.

21            THE COURT:  So you're saying it's the combination of

22   those two that create the limiting principle?

23            MR. MURA:  Yes.  If you read the statute as a whole,

24   it's describing a relationship that needs to exist.  On the one

25   hand there's a consumer who's renting, purchasing, or

1    subscribing goods or services from the videotape service

2    provider, and on the other side, you look at the definition of

3    that term.  It says, *A videotape service provider is one who*

4    *rents, sells or delivers audio/visual goods or services to a*

5    *consumer*.  It doesn't use the words *to a consumer*, but that's

6    obviously the audience of the rental purchase, or delivery.

7          And that relationship exists in *Yershov* because the

8    defendant offered and the plaintiff accepted defendant's

9    proprietary mobile device application.

10         THE COURT:  Does it make a difference, I think in

11   Gannett, that the company -- well, Gannett -- that was offering

12   the app, was also creating the content?

13         MR. MURA:  It does not.  Because if you read the

14   plain text, VPPA is -- simply says, *The delivery of*

15   *audio/visual materials, similar audio/visual materials*.  It

16   doesn't say the delivery of *your audio/visual materials*.  You

17   don't have to produce the content.  Blockbuster didn't produce

18   content.  And so -- that's always, in their minds, the

19   quintessential example.  We don't think that is the

20   requirement.

21         They suggested the app was paid for.  I believe it

22   was free.  What the court said their that relationship existed

23   because the subscriber was directly receiving access to video

24   services through software which the plaintiff downloaded, and

25   it allowed them to receive video without going through other

1    distribution channels.  And in exchange, Gannett received

2    information whenever the app was used to watch video.  That was

3    video viewing histories and Android device ID and GPS

4    coordinates.  And this information was valuable to Gannett.

5    The plaintiff there didn't input personal information.  That

6    was the information that was exchanged.

7         And the same relationship exists here.  Plaintiffs

8    purchased Vizio Smart TV's.  They paid a premium for them.  And

9    the TVs come with Vizio's propriety software application, which

10   is a tool for directly receiving access to videos without going

11   through other channels.  And in exchange, Vizio both received

12   the money that plaintiffs paid a premium for this subscription

13   service and they receive information whenever the app is used

14   to watch video.  That includes personal video viewing

15   histories, MAC addresses, and other information which is of

16   value Vizio.

17        THE COURT:  And it doesn't matter that the consumer

18   doesn't -- at least according to your allegations, doesn't know

19   about that, right?  They don't know that they're sending off

20   this personal information?

21        MR. MURA:  I don't think it does matter because it's

22   just part of the nature of when you download an app, whether

23   you know or not, it's not unreasonable to assume that you're

24   collecting some information.  The purpose of the VPPA is that

25   they should not be disclosing that information without consent.

```
 1    So at least through the use of the proprietary app, I don't
 2    think it matters whether the plaintiffs know or not.  I don't
 3    think we've addressed that really in our complaint, but I think
 4    it's not material.
 5              And so when you understand the relationship in that
 6    context, that's a pretty clear answer to the many hypotheticals
 7    that Vizio is raising about Fedex or a car or a VCR.  In none
 8    of those examples is there the kind of relationship that you
 9    would need to trigger the VPPA.  You don't have the sort of
10    relationship that I just described here, that by receiving
11    seamless access to video through proprietary software, in
12    exchange for both a premium price and a collection of
13    information which is of value Vizio, that's not a relationship
14    that you would -- how you would describe the use of a VCR or a
15    car or Fedex.  Quite literally, simply to deliver video.
16              Now, Vizio makes the point that this technology
17    didn't exist in 1988 and 2012 Congress didn't amend the statute
18    to take account of new technologies.  *Yershov* considered both
19    these points, and it disagreed.  It said first, *The language* --
20              THE COURT:  I'm going to stop you because I've read
21    *Yershov*.
22              MR. MURA:  Okay.
23              THE COURT:  I could probably read it to you as we sit
24    here -- or quote it, so you don't have to quote that back.
25    I've read *In re Nickelodeon*.  It's a little longer, so I don't
```

 1   have that memorized as much.  But yeah, go ahead.

 2            MR. MURA:  Okay.  My only two points there was to say

 3   the language was broad.  And *Yershov* makes a point that even

 4   though the language wasn't amended in 2012 the inference -- the

 5   proper inference to draw there was that Congress already

 6   thought that the language was broad enough that it covered new

 7   technologies.  And there's a discussion there, and I won't go

 8   into it because your Honor's read it.  But we believe that

 9   helps us on both those points.

10            So unless your Honor has any questions about consumer

11   videotape service provider, I think we've properly alleged that

12   relationship here, and I can move on to Personally Identifiable

13   Information.

14            THE COURT:  You can move on.

15            MR. MURA:  Okay.

16            THE COURT:  Yes.  You can move on.

17            MR. MURA:  Thank you, your Honor.

18            So Vizio argues that Personally Identifiable

19   Information is information that, without more, identifies a

20   person.  The district courts, and the First Circuit in *Yershov*,

21   rejected that understanding.  The First Circuit instead held

22   that the disclosure of information reasonably and foreseeably

23   likely to reveal which videos a subscriber has obtained

24   triggers the act.

25            Now, Vizio's test is unrealistic in terms of its view

```
1    of personal identifier.  A social security number, an address,
2    a date of birth in isolation are anonymous.  But it would be
3    wrong to conclude that they cannot personally identify a person
4    as having requested or obtained specific video.  Even GPS data
5    is anonymous in isolation.  If you have GPS coordinates, you
6    still need to link those to an address and then to a person.
7              THE COURT:  So the defendant just cited a list of
8    cases saying I would just be such an outlier if I said that you
9    could piece together those different bits of information and
10   find that it's personally identifiable information.
11             MR. MURA:  You would be in good company, your Honor,
12   because you would have the district court and the First Circuit
13   in Yershov.  And even the Third Circuit in Nickelodeon said
14   that it was not expressly disagreeing with Yershov's analysis
15   of what qualifies as personally identifiable information.
16             And so -- and it did so because it said the First
17   Circuit's test.
18             THE COURT:  I think it would be hard to say In re
19   Nickelodeon -- I'd be in --
20             MR. MURA:  I do think there's some tensions in those
21   cases --
22             THE COURT:  Yes.
23             MR. MURA:  -- for the reasons I described.  The best
24   reasoned case -- and I can give you two reasons for that -- is
25   the First Circuit decision.  To the extent you think there are
```

1  differences that can't be ironed out between the case law, we

2  would urge you to follow the *Yershov* case.  Because for one it

3  takes into account context.  And you see this in the two

4  examples -- you gave one example about a referee, number 12, on

5  offense committing a foul.

6        THE COURT:  Which I stole from *Yershov*, I believe.

7        MR. MURA:  Yes.  I'm stealing it as well.  It's a

8  good example because it shows the information alone does not

9  itself do the identifying there.  But when the disclosure is

10  considered in context, there are people in the stands with the

11  game program, the identification is reasonably and foreseeably

12  likely.  So we're urging you to apply that test, which we think

13  our allegations meet.

14        THE COURT:  So let me ask, I think the only way that

15  this comes within the scope of In re *Nickelodeon* is that little

16  crack that it left with regard to GPS coordinates, because

17  that's how it kept itself from disagreeing with *Yershov*.

18        And so you have alleged something relating to GPS

19  coordinates.  The defense says not very clearly and it's just

20  thrown in there, you know, after the fact because of -- because

21  of *Yershov*.  So tell me what I should make of GPS coordinates

22  and whether that's dispositive?

23        MR. MURA:  Sure.  Your Honor, GPS is one type of

24  geopositioning system.  There are others.  So the fact that

25  they were talking about GPS, I don't think means that GPS --

```
 1    you have to allege GPS.  It's just a type of geopositioning
 2    systems.  There are other ways to identify location,
 3    technological ways.  One way is through a cell tower location.
 4    Another way is WI-FI positioning systems.  And that system is
 5    highly dependent on MAC addresses.  And so that's why when we
 6    talk about MAC addresses and we talk about location data, the
 7    MAC addresses that they collect for all the devices in the
 8    home, this is incredibly intrusive.  They've infiltrated the
 9    home network and provided MAC addresses, which reveal the
10    presence and location of all the devices within the home.
11            And so that's powerful location-based data that
12    allows you to link both the videos that are being watched at
13    that time as well as every single device that's in the home at
14    that time, and that provides a road map for figuring out -- for
15    linking specific videos to specific individuals.  This is the
16    only reason to go to these great lengths to take MAC addresses
17    information from every single device in the home that could be
18    on a network.  That is incredibly intrusive.
19            To give an example, if a MAC address of a particular
20    cell phone is registering at a location every single Monday at
21    9:00 p.m. when the television series Queerest Folk is playing,
22    that provides a game plan for identifying a specific person,
23    and that's one of the reasons why we focused on MAC address
24    information.  Now they want to make a technological dispute and
25    our allegations and whether the technology we're describing is
```

1    accurate.  That's simply not appropriate at the pleading stage.

2    We've sought to give the Court some comfort by citing, for

3    example, the *Nomi* example.  *Nomi* was a company that was working

4    with retailer using MAC addresses to track the location of

5    shoppers without their consent.  *Nomi* placed sensors in its

6    client's stores to collect all the MAC addresses of consumers'

7    mobile devices as the devices searched for WI-FI networks.

8           Vizio is using its Smart TV and technologies a sensor

9    to collect the MAC addresses of every device in the home as

10   they search for WI-FI networks, so this allows for location

11   based data.  And Vizio's only answer is that *Nomi* knew the

12   location of the WI-FI access point.

13          Well, we've alleged that because they're collecting

14   the MAC address information of every data point within the

15   home, including, presumably, the wireless router, and it is

16   disclosing all that MAC address information to these highly

17   sophisticated data brokers, that they can put the pieces

18   together quite easily.  It is foreseeably likely that they can

19   identify -- take that information and link it to a particular

20   person.

21          THE COURT:  All right.

22          MR. MURA:  So I think we can fit the idea of

23   location-based data.  I would not read *Nickelodeon* so narrowly

24   to only accept, for example, GPS.  I mean it's simply an

25   example of technology out there.  But we've sought to explain

```
 1    exactly how location-based data here can be revealed through

 2    the information that's being disclosed to these other

 3    individuals.

 4            THE COURT:  All right.  I don't have any other

 5    questions on that, so if you'd like to move on to the Wiretap

 6    Act.

 7            MR. MURA:  Yes, your Honor.  We have alleged that the

 8    information is captured in real-time using Vizio's own

 9    description of its technology.  And if you even look at the

10    diagrams of Vizio's data collection system -- we have one below

11    paragraph 52 of our complaint.

12            THE COURT:  Yes.  That's about all I could make out

13    from that, at least on my copy.  So I actually was -- I mean,

14    this is -- this is what I want you to answer:  The reason I

15    didn't ask that many questions of the -- of defense counsel on

16    simultaneous transmission is I want to get a really good sense

17    of what it is you're telling me you think happens, and point me

18    to where in the complaint you tell me that.

19            MR. MURA:  Sure.  Well, your Honor, when we're

20    talking about wiretap interception, we're talking about Vizio

21    intercepting -- requests for programing between them and cable

22    satellite providers, streaming devices, and media sources that

23    connect their TVs.

24            THE COURT:  Between them?  I'm sorry.

25            MR. MURA:  Between plaintiffs.
```

```
 1              THE COURT:  Okay.

 2              MR. MURA:  Between plaintiffs.

 3              THE COURT:  Okay.  Pronouns --

 4              MR. MURA:  Yes.  Between plaintiffs.

 5              THE COURT:  -- are difficult sometimes.  Okay.

 6              MR. MURA:  So if you look at page 52, we've sought to

 7   provide Vizio's own schematic of what's going on.  And I

 8   apologize if it's difficult to read.

 9              THE COURT:  Paragraph 52, right?  Not page 52?

10              MR. MURA:  Yes, your Honor.  Page 14, paragraph 52.

11   Yes, there is a diagram there.  You see the TVs on the bottom.

12   I will read it to you.  Hopefully I'm reading it correctly.  It

13   says, Real-Time unidentified data.  All the way on the left you

14   see, live broadcast, player devices, gaming consoles.  This is

15   what's so different about what Vizio is doing.  It's not only

16   collecting information when you're using the app, it's

17   collecting the information from every single device that you

18   could connect to the TV.  This is not something that an

19   ordinary consumer would expect.  And this is why the Wiretap is

20   implicated, because these are communications that have nothing

21   to do with Vizio.

22              And there we sought to explain that it's happening in

23   real-time.  That's Vizio's own word there.

24              And then they send the unidentified data to their

25   servers.  And that's where the matching servers --
```

1          THE COURT:  *They* being Vizio?

2          MR. MURA:  *They* being Vizio -- send the data to their

3     matching servers at the top.

4          And then they, Vizio, has its process for

5     identification of what it is plaintiffs are watching.  And so

6     that's the transmission that's happening in real-time and

7     that's the interception.

8          Now, Vizio wants to say that we've somehow alleged

9     that all of this is happening when it's reached its final

10    destination.  I would have thought the final destination would

11    be the matching servers, but Vizio is now suggesting it's the

12    television.  That is not how our complaint fairly reads.  And

13    it's not appropriate for Vizio to be drawing inferences in its

14    own favor or reading the complaint in the light most favorable

15    in the service of dismissal.

16         THE COURT:  Okay.  So let me ask one more question.

17         MR. MURA:  Yes, your Honor.

18         THE COURT:  Because, again, I want to make sure I get

19    this right.  Is there anywhere in narrative form that I get the

20    same thing that I get in graph form in paragraph -- under

21    paragraph 52?  I mean, that has got a lot of detail, but an

22    arrow with a caption doesn't fully explain to me.  So is there

23    someplace elsewhere I can look and see exactly, you know, what

24    is being -- what you think is being captured, where it's being

25    captured, you know, by whom, what was the intended delivery,

UNITED STATES DISTRICT COURT

 1    what's the point of the capture?

 2            I mean, visuals are helpful, but they're not all

 3    encompassing.  They're not as detailed as a narrative would be.

 4    Is there any place I can look where this graph, this chart, is

 5    expanded upon?

 6            MR. MURA:  Your Honor, in paragraph 128 on page 32

 7    where we're pleading the claim we sought to provide sort of a

 8    summary narrative of that.  I would have to make sure I'm not

 9    missing some other narrative for you.

10            THE COURT:  Okay.  Because I'm not sure that I -- let

11    me just ask, for example -- and I have -- I have reviewed the

12    complaint, but it's a long complaint, and I, certainly, may

13    have missed something.  For example, the terms *ingestion,*

14    *matching servers, real-time unidentified data*, all of those

15    terms, are those used anywhere else in the complaint?  Where

16    would I find what you mean when you say *matching servers*?

17            Because to me -- as I indicated when I was

18    questioning defense counsel, at least the case that I unfairly

19    sprang on him from the Seventh Circuit talked about the issue

20    of contemporaneous, you know, transmission and the fact that

21    it's not always easy to tell.  You need to know the

22    technicality of it.  And if I don't, I can't -- I don't know

23    the answer.  That's why I didn't ask a lot of questions of the

24    defendant because I need to ask those questions of you.

25    They're your allegations.

MR. MURA:  Your Honor, we've sought to describe it in -- within the claim itself.  If we haven't explicated the graph, then we should, and we can.  We can provide a narrative that accompanies the graph.  Perhaps we relied too much on the graph itself to provide the Court with the information.

But I don't think the point that the Seventh Circuit made yesterday or today is a new point.  We made it on page 19 of our brief when we discussed how many of the -- many of the cases that Vizio is relying on for interception are actually summary judgment rulings where there's a developed record about interception.  And so at the pleading stage we feel that so long as we adequately plead a real-time interception, and perhaps a narrative describing the graph that I pointed your Honor to with the matching servers and using those words will suffice -- and we're happy to do that.  And then we think that adequately states a claim under the Wiretap, at least insofar as the interception question is concerned.  We don't have to plead our evidence at this point, but we simply have to provide notice of that claim, and we think we can do that adequately and plausibly with a description of the graph that I've pointed your Honor to.

THE COURT:  All right.  And content.

MR. MURA:  Yes, your Honor.  I think that we all agree that content refers to the intended message conveyed by the communication.  I heard an example about Hogan's Heroes.

```
 1    I'm not sure I've ever seen that, but I believe if you walked
 2    up to -- sorry.
 3              THE COURT:  No.  That's all right.  I'm already
 4    feeling a little old today.
 5              MR. MURA:  Well, if you were -- our analogy here is
 6    that just as requesting in person to a video store clerk for a
 7    specific movie or here, Hogan's Heroes, that's the substance of
 8    the message.  So too is plaintiffs' request for programing
 9    through their Smart TV's, which Vizio intercepts.  That is not
10    record information.  That's a communication that's the
11    substance of the communication.  I would like to see Seinfeld
12    and they're intercepting that information.  They're doing it so
13    that they can develop what they said are intelligent insights
14    about what consumers are watching.  That, certainly, is not
15    something you could do from mere record information, which is
16    like dates and time and those things, those abstract things
17    that accompany a message.
18              Also, we just talked about how context is key, and so
19    it's difficult at the pleading stage to determine whether --
20    whether some of these elements are met under the Wiretap.  *In
21    re Google* makes this point.  It says, *Whether something is the
22    content of the message or record or record information, it
23    depends on the context.*  And so we think here too we've pled
24    enough to survive a motion to dismiss.  And we think it's more
25    appropriate for this to be determined at a later stage on a
```

1    developed record.

2              THE COURT:  All right.

3              MR. MURA:  The last point I'll make is *In re Zynga*

4    and *Forrester* are both well-described in *In re Google Cookies*.

5    In the *Zynga* case the court said that queried URL's are content

6    if they produce words from a search engine.  And *Forrester*

7    said, *A URL, unlike an IP address, identifies the particular*

8    *document within a website that a person views and, thus,*

9    *reveals much more information about the person's internet*

10   *activity.*

11             When they're intercepting a request for programing,

12   they're intercepting the content of the communication.  It's

13   much more than record information.  And although I heard that

14   this is dicta, we don't agree with that.  And even if it is

15   dicta, that doesn't mean it's not persuasive.  And we think it

16   is persuasive.

17             And the last point I'll make is that there is a

18   footnote in the reply brief, footnote 12, and what Vizio says

19   there it's only obtaining requests for videos through

20   SmartCast.  It says we're not doing this through Smart

21   Interactivity.  That is false.  The complaint alleges in

22   paragraphs 49 to 53 that Vizio is doing this for TVs equipped

23   with Smart Interactivity.  And so we just disagree with their

24   characterization of our own complaint.

25             THE COURT:  All right.  Thank you.  And I have one

```
 1   question with regard to the state claims, the intrusion upon,

 2   seclusion, invasion of privacy claim.  I think I'll ask of the

 3   defense counsel -- -

 4          MR. PIERCE:  Your Honor, is it the Court's position

 5   that we don't get to respond to that?

 6          THE COURT:  Well, I had you standing up there for an

 7   hour and I had plaintiffs counsel up there for only 25 minutes.

 8   If you think that they said something that you need to respond

 9   to, I might give you a couple minutes.

10          MR. PIERCE:  Okay.

11          THE COURT:  Just one question.

12          MR. KIM:  Yes.

13          THE COURT:  In paragraph 7 of the complaint, the

14   plaintiffs allege that that opt-out button didn't work for -- I

15   think it said months or years, something to that effect.  So

16   isn't that very similar to *In re Google* about the business that

17   holds itself out as respecting privacy and -- but collects the

18   information anyway?  Or -- and this may be a factual question,

19   so maybe it's not appropriate for a motion to dismiss.  Was it

20   obvious that the opt-out button was not working?  Or is it just

21   everybody thought that they were opting out and low and behold

22   no?

23          MR. KIM:  Your Honor, there's -- so I can -- I assume

24   the Court wants me to -- and I would want to go off the

25   plaintiff's allegations, which we're looking at here.
```

1          THE COURT:  And so maybe, I suppose, then, what you

2    could do is tell me, you know, why this wouldn't be very

3    similar to the *In re Google* decisions of the Third Circuit.

4          MR. KIM:  Understood, your Honor.  I think the

5    difference, your Honor, is that the *In re Google* case describes

6    a series of concerted actions, intentional, deceitful --

7    allegedly deceitful actions taken to circumvent a separate

8    privacy choice that the consumer had set up and a deliberate

9    defense mechanism that the consumer had set up to ensure that

10   the very type of information that Google collected was not

11   collected.

12          In *Google* what happened was -- and clearly your

13   Honor's well familiar with the case, but just to establish the

14   difference between these two scenarios -- because this is all a

15   matter of -- well, *In re Google* involved the consumer's use of

16   a cookie blocker that was available through certain web

17   browsers.  And the consumers had decided they were going to

18   block those cookies and had implemented the cookie blocker in

19   the web browser to ensure that they didn't get those cookies.

20          And the allegation in *In re Google* is that Google

21   explicitly, intentionally, with the goal of undermining that

22   specific privacy choice engineered code to do a work-around so

23   that -- and then sent to consumer essentially what was a fake

24   message that tripped that vulnerability in the cookie blocker.

25   And that those series of intentional actions undermined and

1    eliminated the consumer's privacy choice.

2           This, your Honor, at best, in this case, if you're

3    going to -- if you take paragraph 7 and you take it to its --

4    you give it the absolute benefit of the doubt, the allegation

5    is that the opt-out function was broken, your Honor.

6    There's -- and for what period of time it's not clear.  They

7    don't allege it.  Certainly not for the entire period of time.

8    They say much of the relevant time period.  We have to take the

9    allegation as it's pled.

10           But, your Honor, as your Honor knows invasion of

11   privacy is an incredibly high standard.  And the cases are

12   clear that collection of data, personal data, even intrusive

13   personal data, does not constitute invasion of privacy.  And I

14   think your Honor is exactly right to focus on *In re Google*

15   because it establishes the kind of conduct that rises to the --

16   at least alleged conduct that rises to the level of invasion of

17   privacy.

18           Paragraph 7, even giving it the absolute benefit of

19   the doubt, suggests none of that kind of coordinated, concerted

20   effort to undermine a consumer's privacy choice that they've

21   set up through a separate defense mechanism.  That, your Honor,

22   is the difference between the allegation here, the very vague

23   and kind of amorphous allegations in paragraph 7 and the *In re*

24   *Google* case.

25           THE COURT:  All right.

1          MR. KIM:  Your Honor, I'm -- I realize we've been

2    here for a little while.  If your Honor would indulge me just

3    five minutes I think I can hit some of the key points.  I'm not

4    going to repeat things that are in the brief.

5          THE COURT:  All right.

6          MR. KIM:  With respect to the fraud claims, we've

7    already noted that the standard for 9(b) requires who, what,

8    when.

9          THE COURT:  How do we deal with the fact that most of

10   the fraud claims seem to be fraudulent omissions?

11         MR. KIM:  Let's assume that that's the case.  If

12   that's the case, then at a minimum the plaintiffs need to tell

13   us when they bought the product?  Where they bought it?  What

14   store?  Did they buy it online?  Did they buy it at Vizio.com,

15   which links directly to the privacy policy?  Those are facts

16   entirely in the plaintiff's control, and they are not in the

17   complaint anywhere.  And the reason why I bring this up, and

18   the reason why it's important for us is that those facts lead

19   directly to potential defenses, which we don't know if we have.

20         Your Honor, for example, we don't know if because of

21   the -- because of the location where the data was -- where

22   the -- where the TVs were purchased or the timing, are any of

23   those plaintiffs subject to arbitration agreements.  That's

24   something that if we knew where they bought it, what mechanism

25   they bought it, online or in the store, and when they bought

1    it, we would be able to make those determinations.

2            THE COURT:  How does that go to -- that may go to

3    whether -- the application of your arbitration agreement, but

4    how does it go to the sufficiency of a fraudulent omission

5    claim?

6            MR. KIM:  Because, your Honor, in order to know what

7    it is we -- at minimum -- and even the cases that the plaintiff

8    cite establish this.  In a fraudulent omissions case the

9    defendant is entitled to know the details of the purchase of

10   the transaction.  The plaintiffs' suggestion is, well, we can't

11   tell you everything that you were supposed to tell us at every

12   point you were supposed to tell it to us.  But even in the

13   cases that the plaintiffs cite, in those cases the plaintiffs

14   actually provided the details of the transaction itself.

15           One of the cases involved the purchase of a car.

16   They described the -- where the purchase took place, the

17   specific location, not just the state; when the purchase was;

18   who they spoke with; what representations they actually

19   received, so that the defendant was able to adequately respond

20   and understand what is the underlying basis for the omissions

21   claim.

22           That information is clearly in the hands of the

23   plaintiffs, and it is not present in the complaint.  There's no

24   reason why it couldn't be in the complaint.  That's with

25   respect to fraud, your Honor, and fraudulent omission.

 1            The only other point I would make, your Honor, and

 2   this is specific to -- it's specific to standing, but it is

 3   specifically about SmartCast, because counsel had raised this

 4   point about SmartCast.  And I think, your Honor that

 5   actually -- and this relates, I think, to both the federal

 6   claims and the state law claims.  This is, I think, a

 7   fundamental example of how carefully and artfully this

 8   complaint has been pled to try to avoid dealing with the issues

 9   that your Honor's been grappling with all afternoon.

10            The complaint -- and this is why SmartCast standing,

11   your Honor, is so important, the fact that none of the

12   plaintiffs are alleged to have purchased a SmartCast product,

13   which is something conceded, I believe, in the plaintiff's

14   opposition brief.  The fact that the SmartCast product as

15   alleged is so significantly different from the Smart

16   Interactivity product.  Because unlike the Smart Interactivity

17   product, according to the plaintiffs, the SmartCast is an

18   interactive system where the consumer requests information,

19   provides information about preferences.  There is no such

20   allegation in the complaint, frankly nor could there be.  I

21   understand that's a matter of fact.  There is no such

22   allegation like that in the complaint regarding Smart

23   Interactivity.

24            And counsel when he was discussing some of the

25   elements of, for example, data collection and what data is

1    collected and that, for example, he analogized to the *Zynga*

2    case and that dicta in the *Zynga* case which talks about the URL

3    reflecting the contents of a search request.  The only

4    allegation in the complaint that -- that a user submits such a

5    search request and such information is captured by the -- by

6    this system is in relation to SmartCast.

7            And, your Honor, that is -- I can actually point the

8    Court to that paragraph.  It's paragraph 55, which specifically

9    talks about the information that SmartCast collects.

10           And, your Honor, that is precisely the situation

11   where -- that gives rise to the problem of standing for

12   different products.  When someone has not purchased the product

13   in question and there is, according to the complaint itself, a

14   significant difference between those products that could impact

15   the outcome of the claims that the plaintiffs have brought,

16   that is the situation where this standing issue becomes so

17   important.  Your Honor, I wanted to alert your Honor to that

18   critical distinction.

19           Unless the Court has further questions about the

20   state law claims.

21           THE COURT:  I don't.  Thank you.

22           MR. KIM:  Thank you.

23           THE COURT:  And you would like to be heard briefly

24   again?

25           MR. PIERCE:  As brief as I can be, your Honor.

1        My good friend, Mr. Kim, addressed that SmartCast

2   issue, which I think is very important on the standing

3   question.  And I ask the Court to take that very well under

4   consideration.

5        Just a couple of statements by the plaintiffs counsel

6   I think just highlight some things.  You asked the question

7   about in the *Yershov* case does it make a difference where

8   Gannett was the one involved and that is the very issue that

9   we've been trying to talk about here, your Honor, with respect

10  to that particular part of the statute.  There is no case where

11  the device manufacturer or seller, the DVD, the car, the

12  computer is the subject to these claims.  And *Yershov* is very

13  limited in its approach.

14       One of the other things that the plaintiffs talked

15  about was this prescription (sic) issue, and again, your Honor,

16  they talked about that they paid a premium for the TV.  And so

17  if you take that analogy to its extreme -- not very much to its

18  extreme -- the purchase of a product is -- to view -- to allow

19  them to view a video is a subscription, then the purchase of

20  any product that displays video creates a subscription and

21  creates liability.  That is not what the statute is designed to

22  do.  If the statute was designed to meet that, Congress could

23  have used the phrase *purchaser*.  They did not.  They used the

24  phrase *subscriber*.

25       Counsel also made reference to the seamless access to

1    video to support their claims, and, again, your Honor, any TV

2    or computer provides seamless access to video.  There's no case

3    that they can cite that extends liability under VPPA in that

4    situation.

5            Finally, your Honor, they talk about this *Nomi* case,

6    which I think we addressed -- we, sort of, guessed at what they

7    were talking about on our reply.  I believe we addressed it

8    fully in the reply.  I'm not going to detail it here.  But I

9    just ask the Court to focus on the reply as to what actually

10   happened in there.  We are not taking the location of the MAC

11   addresses.  In those instances the collection was the

12   equivalent -- was done by the actual -- how do I want to put

13   this? -- by the store in that particular instance because they

14   copied it.  They didn't get it because of the actual -- they

15   weren't copying the location of the person in that instance.

16   They were recognizing because they were in a particular place,

17   this device was close to them.

18           And so *Nomi* is just not the facts here at all.  And

19   we've addressed that completely in the reply, and I ask your

20   Honor to look at that quite closely.

21           And the last thing I will say, your Honor, is just

22   the *Zynga* case, which they rely on, that ended up in a

23   dismissal, and there's a reason why that is the case, because

24   the claim was not properly alleged.  And they don't properly

25   allege it here.

1          I'm looking at you and you're saying sit down.  I'm

2     going to sit down.

3          THE COURT:  I just have no more questions.

4          MR. PIERCE:  Thank you, your Honor, for taking the

5     time to listen to us.

6          THE COURT:  All right.  On privacy only.  Or any --

7     the issues that were not addressed before you sat down.

8          MR. MURA:  Yes, your Honor.  Should be very brief.

9     Just to address your question about *In re Google Cookie*, we do

10    believe that this is a serious breach of societal norms here.

11    And we think that there was subterfuge in Vizio's conduct, both

12    in the way that it buries what it's doing in privacy policies

13    that are difficult to find.  It's using an automatic opt-in

14    function when the rest of the entire industry, we've alleged,

15    uses an opt-out function and allows notice and consent.

16         The opt-out button didn't work for a considerable

17    amount of time.  What did they do with that data?  They took

18    advantage of that.

19         And there's another way in which the opt-out function

20    is completely inappropriately designed and that shows a

21    concerted effort to undermine efforts to opt out.  As we've

22    alleged in our complaint when there's a power outage or when

23    the TV might receive a factory update, it may reset to default

24    settings, and the default setting is data collection.  So even

25    if you turn it off, you may never know that it's turned back

1    on.  And they've designed it in that way.  And that is a

2    concerted effort to put themselves in a position to take data

3    even when a plaintiff or a consumer is trying to shut off that

4    pathway to their data collection.  So we think that is a

5    significant and serious breach of social norms.

6            To address 9(b), I was surprised to hear Vizio's

7    description of our complaint.  For example, plaintiff Chris

8    Rizzitello is a resident of Cairo, New York.  Mr. Rizzitello

9    purchased a Vizio Smart TV, model number, at Wal-Mart location

10   in Catskill.  Plaintiff William DeLaurentis is a resident of

11   Beverly Hills, Florida.  He purchased a Vizio Smart TV, model

12   number, in Lecanto, Florida.  So they're complaining about not

13   receiving the location of the purchase, but we gave them that

14   information.

15           We also had a meet and confer before the motion to

16   dismiss.  And so we were not informed that they needed certain

17   information that they now say they're entitled to.  And, you

18   know, we feel that we've completely provided them the

19   information necessary for them to answer the complaint in a way

20   that 9(b) requires.  If there's more information that we need

21   to provide, I think we can provide it.  But we think that we

22   have met Rule 9(b).  We've sought to provide them pictures of

23   the packaging, a description of what's been said.  But this is

24   primarily also an omissions case, and the case law provides a

25   sort of relaxed standard for 9(b), and we feel that we've met

1    that.

2          In terms of *substantially similar*, you were pointed

3    to a particular paragraph, it's the only paragraph where we

4    describe what SmartCast is doing, but our theories of

5    liability, our theories of injury, all our claims are based on

6    Smart Interactivity, and all the TVs in the product line have

7    Smart Interactivity.  A couple of the newer TVs have the

8    SmartCast function, which is, essentially, an app on a tablet

9    that allows you to cast what you're watching on the tablet to

10   the TV.  We've alleged they collect more data there, but we're

11   trying to make our case out based on Smart Interactivity, and

12   if we can do so, we can do so for the entire product line and

13   there's no difference with respect to any of the products in

14   terms of those allegations, and that's why we have standing to

15   sue for the entire product line.

16         And, finally, let me just close that we heard a few

17   times that this is an exceptional case, and there is one

18   respect in which I agree.  Vizio is doing something that no one

19   else is doing in terms of video viewing data collection.  It is

20   an outlier.  If it is not held accountable in this case, either

21   on federal privacy law or consumer protection or common law,

22   you will see the entire industry shift away from a notice and

23   consent regime to a data collection regime that is on by

24   default, and that would be quite exceptional and a real loss

25   for consumer protection and consumer privacy.

```
 1              So in sum, we ask that you deny Vizio's motion to
 2   dismiss in full or grant us leave to amend any claim that's
 3   dismissed.  Thank you, your Honor.
 4              THE COURT:  All right.  Thank you to all of you.
 5   Very helpful presentation of the parties' positions.  I
 6   appreciate that.  I will take the matter under submission.  I
 7   think I have yet more cases to review.  I think there were one
 8   or two that I had somehow missed that you identified.  And the
 9   ruling will be posted on the docket.  Have a nice weekend.  If
10   you think that -- well, we'll get to the rest of it when we get
11   to it.  Have a nice weekend.  I'll leave it at that.
12              MR. GIBBS:  Thank you, your Honor.
13              MR. PIERCE:  Thank you, your Honor.
14              (Proceedings Concluded.)
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4           I, ADELE C. FRAZIER, FEDERAL OFFICIAL REALTIME

 5   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

 6   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

 7   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

 8   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

 9   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

10   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

11   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

12   THE UNITED STATES.

13

14

15                  DATED THIS 28th DAY OF DECEMBER, 2016

16

17

18                  /s/ ADELE C. FRAZIER

19                  _____

20                  ADELE C. FRAZIER, CSR No. 9690, CRR, RMR

21                  FEDERAL OFFICIAL COURT REPORTER

22

23

24

25
```