1

2

3

4

5

6

7

8 UNITED STATES DISTRICT COURT

9 CENTRAL DISTRICT OF CALIFORNIA

10

11 CASE NO. 8:16-ml-02693-JLS-KES

12

13 **In Re: Vizio, Inc., Consumer Privacy** **ORDER GRANTING IN PART AND**
**DENYING IN PART DEFENDANTS'**
14 **Litigation** **MOTION TO DISMISS   (Doc. 116)**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.  **INTRODUCTION**

Before the Court is a Motion to Dismiss filed by Defendants VIZIO Inc., VIZIO Holdings, Inc., VIZIO Inscape Technologies, LLC, and VIZIO Inscape Services, LLC (collectively, "Vizio"). (Mot., Doc. 116.) Plaintiffs Dieisha Hodges, Rory Zufolo, William DeLaurentis, John Walsh, Chris Rizzitello, and Linda Thomson filed an Opposition, and Defendants replied. (Opp'n, Doc. 121; Reply, Doc. 123.) For the following reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss.

## II.  **BACKGROUND**

Vizio is the second-largest manufacturer of "Smart TVs," cutting-edge televisions equipped with integrated software that enables consumers to access the Internet and on-demand services such as Netflix, Hulu, and Pandora. (Compl. ¶¶ 33, 35, 45, Doc. 108.) Known as the "Vizio Internet Apps," "Internet Apps Plus," and "SmartCast," Vizio's content delivery software comes either preinstalled on its Smart TVs or is installed through software updates. (*Id.* ¶ 45.) Vizio markets its Smart TVs as a "passport to a world of entertainment, movies, TV shows and more" and charges a premium for them because they are designed to seamlessly deliver on-demand video content to consumers. (*Id.* ¶¶ 34, 81.)

Plaintiffs allege that, unbeknownst to them, Vizio's Smart TVs use automatic content recognition software to collect and report consumers' content viewing histories. (*Id.* ¶¶ 39, 50, 127.) This software, called "Smart Interactivity," collects up to 100 billion content "viewing data points" along with detailed information about a consumer's digital identity, such as consumers' IP addresses, zip codes, MAC addresses, product model numbers, hardware and software versions, chipset IDs, region and language settings, as well as similar information about other devices connected to the same network. (*Id.* ¶¶ 39, 42, 54, 62.) The Smart Interactivity software transmits this information to Vizio's Inscape data services platform, which identifies the content a consumer has been watching by comparing the "viewing data points" to a database of existing content. (*Id.* ¶¶ 50, 62.) Vizio then sells all of this information to advertisers and media content providers so that

they can deliver highly targeted advertisements to Vizio Smart TVs and any smartphones, tablets, or computers connected to the same network. (*Id.* ¶¶ 2, 5, 35, 41-42.)

Plaintiffs contend that the constellation of information Vizio shares about consumers' digital identities "provides a 'game plan' to associate individuals with their viewing habits." (*Id.* ¶ 72.) One digital identifier that Vizio discloses, a MAC address, is a unique 12-digit identifier assigned to every mobile device, computer, Smart TV, or other electronic device. (*Id.* ¶ 69.) Because a MAC address is tied to a device's embedded chipsets, the identifier remains unchanged throughout the life of the electronic device. (*Id.*) MAC addresses, Plaintiffs allege, are frequently linked to an individual's name and can be used to acquire highly specific geolocation data. (*Id.* ¶¶ 70-71.) And, even if a MAC address alone is insufficient to identify a person, the information can readily identify a person when combined with the other information that Vizio discloses, such as IP addresses, zip codes, product model numbers, hardware and software versions, chipset IDs, and region and language settings. (*Id.* ¶¶ 72-79.) To support their argument, Plaintiffs provide two case studies where researchers were able to identify a significant percentage of individuals by analyzing several details about them. (*Id.* ¶¶ 74-78.) Plaintiffs also point to a Vizio prospectus, which highlights how the Inscape data services platform is able to "provide[] highly specific viewing behavior data on a massive scale with great accuracy." (*Id.* ¶ 62.)

Vizio's data collection and dissemination practices, Plaintiffs contend, are not adequately disclosed in its marketing or privacy policies. (*Id.* ¶¶ 22, 81-94, 105.) The packaging for its Smart TVs highlights Vizio's Internet Apps and Internet Apps Plus without mentioning that, if consumers use these features, Vizio's Smart Interactivity software will collect and disseminate information about their viewing history and digital identity. (*Id.* ¶¶ 81-85.) Nowhere during the setup process for a Vizio Smart TV does Vizio reference its Smart Interactivity software. (*Id.* ¶ 85.) Vizio's Privacy Policy, which consumers can view in very small font under the "Reset & Admin" submenu, assuages

consumers that it collects only "non-personal" and "anonymous" information and does not reveal that Vizio sells the information it collects to third parties. (*Id.* ¶¶ 86, 89-91.)

Contrary to the industry's standard practice, Vizio's Smart TVs come with Smart Interactivity automatically enabled. (*Id.* ¶¶ 6, 61.) To turn off Smart Interactivity, consumers must navigate through the Smart TV's menu to an obscure settings option that does not describe what Smart Interactivity does. (*Id.* ¶¶ 7, 85.) If a Smart TV is reset to its factory default settings—either intentionally or inadvertently—the Smart Interactivity software reactivates without consumers receiving any notice. (*Id.* ¶ 66.) A 2015 report by the security software company Avast found that the "off" capability for Smart Interactivity was not functional "for months, if not years." (*Id.* ¶¶ 7, 65.) So, even if consumers believed they had disabled Smart Interactivity (and the feature appeared to be "off"), their Smart TVs were still transmitting their digital information without their knowledge. (*Id.*)

Vizio allegedly has a strong incentive to ensure that consumers do not disable its Smart Interactivity software. (*Id.* ¶ 44.) Vizio's business model relies on the profits from its sales of consumer data to compensate for its relatively slim margins on Smart TVs. (*Id.* ¶¶ 43-44.) Vizio distinguishes its Inscape data services platform from competitors such as A.C. Nielson and Rentrak based on its ability to provide highly detailed information about 8 million American consumers in "real time." (*Id.* ¶¶ 40, 42.) As Vizio noted in an SEC filing, if consumers objected to or opted out of its Smart Interactivity software, Vizio's growth strategy would be jeopardized. (*Id.* ¶¶ 43-44.)

Plaintiffs assert they purchased Vizio Smart TVs unaware of Vizio's data collection and dissemination practices. (*Id.* ¶¶ 16-21.) They provide details about their Vizio Smart TVs, such as the model numbers and cities where they purchased them, and describe how they used their Vizio Smart TVs to watch on-demand video content. (*Id.*) After learning about Vizio's Smart Interactivity software, Plaintiffs disconnected their Smart TVs from the Internet or ceased watching certain on-demand video content on them. (*Id.*) Plaintiffs allege that, had they known about Vizio's data collection and disclosure practices, they

would not have purchased their Vizio Smart TVs or would have paid less for them. (*Id.* ¶ 22.)

Based on these allegations, Plaintiffs bring various privacy and misrepresentation-based claims under both federal and state law. Plaintiffs allege federal claims under the Video Privacy Protection Act (VPPA) and the Wiretap Act. (*Id.* ¶¶ 111-32.) Under state law, Plaintiffs bring common law fraud and negligent misrepresentation claims as well as consumer protection claims under California's Consumers Legal Remedies Act, California's Unfair Competition Law ("UCL"), California's False Advertising Law, Florida's Deceptive and Unfair Trade Practices Act, New York's General Business Law sections 349 and 350, Massachusetts's Chapter 93A, and Washington's Consumer Protection Act. (*Id.* ¶¶ 150-241, 250-53, 263-87, 301-17.) As for their state law privacy claims, Plaintiffs allege intrusion upon seclusion claims as well as causes of action under the California Constitution,[1] California's Invasion of Privacy Act, the Massachusetts Privacy Act, and state video privacy statutes. (*Id.* ¶¶ 133-49, 242-49, 254-62, 294-300.) Finally, Plaintiffs allege common law claims for unjust enrichment. (*Id.* ¶¶ 288-93.)

## III.   <u>LEGAL STANDARD</u>

A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Fed. R. Civ. P. 12(b)(1). "Dismissal for lack of subject matter jurisdiction is appropriate if the complaint, considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984-85 (9th Cir. 2008). When considering a Rule 12(b)(1) motion, the Court "is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony,

---

[1] The parties briefed Plaintiffs' sixteenth cause of action, titled "Privacy Violation Based on Intrusion" (*see* Compl. ¶¶ 294-300), as a cause of action under both the California Constitution and state common law (*see* Mem. 34-37 & n.18; Opp'n at 31-35; Reply at 22-24), so the Court will treat it as such for purposes of this Motion. For clarity, Plaintiffs should specify in any amended complaint that they are alleging claims under both the California Constitution and common law.

to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). "The party asserting . . . subject matter jurisdiction bears the burden of proving its existence." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all "well-pleaded factual allegations" in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A court must draw all reasonable inferences in the light most favorable to the non-moving party. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). Yet, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

"[W]here a complaint includes allegations of fraud, Federal Rule of Civil Procedure 9(b) requires more specificity including an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). "A pleading is sufficient under [R]ule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

## IV.   **DISCUSSION**

In their Motion, Defendants contend that Plaintiffs have not suffered a concrete injury sufficient to confer Article III standing. (Mem. at 6-13.) Defendants also move to dismiss all of Plaintiffs' claims for failure to state a claim. (Mem. at 13-38.) The Court will

first examine whether Plaintiffs have Article III and statutory standing before turning to whether they have adequately pleaded their claims.

### A. Article III Standing

For Plaintiffs to have Article III standing, they must (1) have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) the harm must be "fairly trace[able]" to the defendants' conduct, and (3) the Court must be able to redress the claimed injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). At each stage of a suit, the elements of Article III standing must "be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. Hence, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.*; *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). Here, Defendants contest only whether Plaintiffs' averred injuries are sufficiently concrete to confer Article III standing. (Mem. 6-13.)

"For an injury to be 'concrete,' it must be 'real,' and not 'abstract.'" *Rodriguez v. El Toro Med. Inv'rs Ltd. P'ship*, No. SACV 16-59 (JLS) (KES), 2016 WL 6804394, at *3 (C.D. Cal. Nov. 16, 2016) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)). But an injury need not be tangible—some injuries, though unquantifiable, are sufficiently concrete to establish Article III standing. *Spokeo*, 136 S. Ct. at 1549; *Rodriguez*, 2016 WL 6804394, at *3. In determining whether an intangible injury satisfies Article III's case-or-controversy requirement, "both history and the judgment of Congress play important roles." *Spokeo*, 136 S. Ct. at 1549. Although its discretion is not absolute, Congress may properly "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law." *Id.* (quoting *Lujan*, 504 U.S. at 578).

### i.   The Video Privacy Protection Act and Wiretap Act Claims

1.   The Common Law History of the Right to Privacy

Plaintiffs' federal claims under the Wiretap Act bear a "close relationship" to the tort of invasion of privacy. *See Spokeo*, 136 S. Ct. at 1549. The invasion of person's privacy was first identified as an independent "legal *injuria*" in Samuel D. Warren and future-Justice Louis Brandeis's seminal article *The Right to Privacy*. *See* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890); William L. Prosser, *Privacy*, 48 Cal. L. Rev. 383, 384-85 (1960). Warren and Brandeis argued that certain lines of cases, although ostensibly sounding in intellectual property, contract, or fiduciary obligations are fundamentally irreconcilable with principles of those areas of the law and instead suggest a broader right "of the individual to be let alone." *See* Warren & Brandeis, *supra*, at 197-213. A natural development of the common law, Warren and Brandeis asserted, would be the recognition of a separate tort for invasion of privacy. *Id.* at 213-14. After some initial judicial trepidation, *see, e.g.*, *Roberson v. Rochester Folding Box Co.*, 64 N.E. 442 (N.Y. 1902), the tort quickly gained currency, such that the American Law Institute incorporated it in the First Restatement. *See* Restatement (First) of Torts § 867 (1939). As articulated in the First Restatement, an invasion of privacy is an "unreasonabl[e] and serious[] interfere[nce] with another's interest in not having his affairs known to others or his likeness exhibited to the public . . . ." *Id.*

Seventy years after the publication of Warren and Brandeis's original article, William Prosser added clarity to the field by identifying four distinct torts that fell under the general term "invasion of privacy": intrusion upon seclusion, public disclosure of private facts, false light, and appropriation of a person's name or likeness. *See* Prosser, *supra*, at 389-407. Of particular relevance here, Prosser found that intrusion upon seclusion covered a broad range of "offensive or objectionable" meddling, such as eavesdropping, harassing someone through incessant telephone calls, and prying into a person's private records. *See id.* at 389-91.

8

The Second Restatement adopted Prosser's interpretation of intrusion upon seclusion, defining the tort as the intentional intrusion "upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977). Like Prosser, the Second Restatement identified as examples of actionable conduct eavesdropping ("with or without mechanical aids"), examining a person's private correspondence or records without consent, and making repeated telephone calls. *See id.* at cmts. b, c. While the modern contours of the tort of intrusion upon seclusion—and invasion of privacy more broadly—may not encompass the kind of detailed collection of a consumer's content viewing history alleged here, the close similarity between the conduct proscribed under the Wiretap Act and the tort of intrusion upon seclusion confirms the concreteness of Plaintiffs' injury.

Plaintiffs' VPPA claims are even more deeply rooted in the common law. Warren and Brandeis traced the development of the tort of invasion of privacy in part to cases involving the disclosure of information in breach of a confidential relationship. *See* Warren & Brandeis, *supra*, at 207-11; Prosser, *supra*, at 389-407 (observing that there must be "some breach of contract, trust or confidential relation" for a disclosure of information to a limited group of people to be tortious). Here, like in many other circumstances, the duty of confidentiality is imposed by statute. *See In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 274 (3d Cir. 2016); *see also, e.g.*, 5 U.S.C. § 552a(g)(1) (Privacy Act); 12 U.S.C. § 3417(a) (Right to Financial Privacy Act); 18 U.S.C. § 2724(a) (Driver's Privacy Protection Act of 1994).

### 2.  Congress's Judgement

Besides the close relationship between Plaintiffs' federal causes of action and well-established torts, Congress has determined that the interception of a person's electronic communications and the unauthorized disclosure of a person's video viewing history are sufficiently harmful to warrant private causes of action. "[B]ecause Congress is well positioned to identify intangible harms that meet minimum Article III requirements," its

conclusion is "instructive and important." *Spokeo, Inc.*, 136 S. Ct. at 1549. Defendants counter that the information they disclose is not personally identifiable, so Congress's creation of a private right of action for violations of the VPPA does not support Plaintiffs' claim of standing. (Reply at 3 n.1.) But this argument improperly conflates the merits of Plaintiffs' claims with their standing to bring suit. Taken to its logical conclusion, Defendants' argument absurdly implies that a court could never enter judgment against a plaintiff on a VPPA claim if it found that the disclosed information was not within the statutory definition of personally identifiable information; instead, it would have to remand or dismiss the action for lack of jurisdiction.[2] *Cf. Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 734 (9th Cir. 1979) ("[W]hen a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiffs' substantive claim for relief, a motion to dismiss for lack of subject matter jurisdiction rather than for failure to state a claim is proper only when the allegations of the complaint are frivolous").

In sum, both history and Congress's judgment demonstrate that Plaintiffs' claimed injuries are sufficiently concrete for Plaintiffs to have standing to bring suit under the Video Privacy Protection Act and Wiretap Act.

### ii.   State Law Privacy Claims

For similar reasons, Plaintiffs have Article III standing to pursue their state law claims for invasion of privacy and intrusion upon seclusion. *See Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1057 (N.D. Cal. 2014) ("It is beyond meaningful dispute that a plaintiff alleging invasion of privacy as Plaintiffs do here presents a dispute the Court is permitted to adjudicate."); 13A Charles Alan Wright & Arthur R. Miller et al., Federal

---

[2] The only case Defendants cite in which a district court dismissed a VPPA claim for lack of standing involved a complaint so inadequately pleaded that there was no support for the plaintiffs' claimed injury. *See Mendoza v. Microsoft Inc.*, No. C14-316-MJP, 2014 WL 4540213, at *3 (W.D. Wash. Sept. 11, 2014) ("Plaintiffs do not allege a single fact to support their allegation that Microsoft allegedly retained and disclosed personally identifiable information."). By contrast, Plaintiffs' 61-page complaint is well pleaded.

10

Practice & Procedure § 3531.4 (3d ed. 2017). As noted earlier, the tort of invasion of privacy has been firmly established in the American common law for approximately a century. Regardless of whether the alleged conduct ultimately states a claim, "the events that the complaint describes are concrete, particularized, and actual as to the plaintiffs." *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 134-35 (3d Cir. 2015).

### iii.    Consumer Protection Claims

As for their state consumer protection claims, Plaintiffs' allege that they "would not have purchased, or would have paid less for, their Vizio Smart TVs had Defendants not concealed their collection and disclosure of Plaintiffs' personal information. (Compl. ¶¶ 14, 22, 180, 188, 192, 200, 212, 214, 219, 225, 235, 237, 273, 278, 286.) Such "palpable economic injuries have long been recognized as sufficient to lay the basis for standing." *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972). Indeed, in *Hinojos v. Kohl's Corp.*, the Ninth Circuit found "no difficulty" in concluding that the plaintiffs had Article III standing based on their assertion that they "paid more for [a product] than they otherwise would have paid, or bought it when they otherwise would not have done so." 718 F.3d 1098, 1104 n.3 (9th Cir. 2013) (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012)). Defendants unpersuasively attempt to distinguish *Hinojos* by arguing that Plaintiffs do not allege that Vizio misrepresented its "product's quality or ability to perform an intrinsic function." (Mem. at 11 n.5.) In other words, Defendants argue that the only factors material to a consumer's purchasing decision are whether the Smart TV performs its "television-related functions" and is not "defective" (*see id.*), terms that Defendants do not define. The Court cannot conclude that materiality should be so narrowly defined for the purpose of determining subject matter jurisdiction. Accordingly, Plaintiffs have Article III standing to bring their consumer protection claims.

### iv.    Scope of Named Plaintiffs' Article III Standing

Defendants finally contend that Plaintiffs lack Article III standing to bring claims on behalf of consumers who purchased Smart TVs with SmartCast because Plaintiffs did

1  not purchase Smart TVs with this software. (Mem. at 12-13; Reply at 4.) Plaintiffs respond

2  that the products and operative facts at issue are sufficiently similar to give them standing

3  to bring claims on behalf of purchasers of Vizio TVs with SmartCast as well. (Opp'n at

4  10.)

5       Courts have taken three broad positions on how related the product purchased by

6  the named plaintiff and putative class members must be. Some courts find that the named

7  plaintiff can represent only those who purchased the exact same product. *See, e.g.*, *Kisting*

8  *v. Gregg Appliances, Inc.*, No. 16-CV-141, 2016 WL 5875007, at *5 (E.D. Wis. Oct. 7,

9  2016). These courts often rely heavily on language from the Supreme Court's decision in

10  *Lewis v. Casey*, 518 U.S. 343 (1996). *See, e.g.*, *Kisting*, 2016 WL 5875007, at *4-5;

11  *Ferrari v. Best Buy Co.*, No. CIV. 14-2956 MJD/FLN, 2015 WL 2242128, at *7 (D. Minn.

12  May 12, 2015). Other courts hold that the relatedness of the putative class representative's

13  and proposed class members' claims implicates only Rule 23's adequacy and typicality

14  requirements—not Article III standing—and accordingly reserve judgment until a class

15  certification motion. *See, e.g.*, *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 291

16  (S.D.N.Y. 2015); *Cardenas v. NBTY, Inc.*, 870 F. Supp. 2d 984, 992 (E.D. Cal. 2012). Still

17  others allow a named plaintiff to assert claims on behalf of absent class members if the

18  products that the putative class members bought are "substantially similar" to the product

19  the named plaintiff purchased. *Coleman-Anacleto v. Samsung Elecs. Am., Inc.*, No. 16-CV-

20  02941-LHK, 2016 WL 4729302, at *10 (N.D. Cal. Sept. 12, 2016).

21       The first approach, which holds that a putative class member has standing to

22  represent only those who purchased the exact same model, is irreconcilable with the

23  Supreme Court's decision in *Gratz v. Bollinger*, 539 U.S. 244 (2003). In *Gratz*, Justice

24  Stevens argued in dissent that the University of Michigan's treatment of race in transfer

25  admissions differed from its treatment of race in freshmen admissions, so the class

26  representative—who intended to submit a transfer application—lacked standing to seek an

27  injunction on behalf of the freshmen applicants. 539 U.S. at 286-87 (Stevens, J.,

28  dissenting). The *Gratz* majority acknowledged that "there is tension in our prior cases"

over whether this is properly considered a question of standing or the propriety of class certification under Rule 23(a). *Id.* at 263 & n.15. Either way, the class representative could represent the freshman applicants because the freshman admissions process "[did] not implicate a *significantly different* set of concerns." *Id.* at 265 (emphasis added).

The second approach, which characterizes the question as one solely of adequacy and typicality under Rule 23(a), is also difficult to square with Supreme Court precedent. In *Blum v. Yaretsky*, the Supreme Court held that nursing home patients, though having standing to represent a class of patients threatened with discharges or transfers to lower levels of care, did not have standing to represent those threatened with transfers to higher levels of care. 457 U.S. 991, 1001 (1982). The Supreme Court held that "the conditions under which such transfers occur are sufficiently different from" those faced by the named plaintiffs "that any judicial assessment of their procedural adequacy would be wholly gratuitous and advisory." *Id.* Similarly, in *Lewis*, the Supreme Court held that an illiterate prisoner lacked standing to challenge other prisoners' lack of access to courts where the other class members' claims were unrelated to the inability to read legal materials. 518 U.S. at 358. Specifically, the Supreme Court held that the class representative could not represent non-English speakers, prisoners in lockdown, or the inmate population at large. *Id. Blum* and *Lewis* thus treated the relatedness of a named plaintiff's claims to those of the class as implicating standing as well as the propriety of class certification. *See Blum*, 457 U.S. at 1001; *Lewis*, 518 U.S. at 358; *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158-59 n.13 (1982) (evaluating the question under Rule 23(a)'s adequacy, typicality, and commonality requirements). *Lewis* further suggests—albeit in dicta—that, although a motion to dismiss typically addresses only a named plaintiff's individual claims, a named plaintiff's standing to seek relief on behalf of putative class members can be raised on a motion to dismiss. *See Lewis*, 518 U.S. at 357.

The Court, therefore, finds that the third approach most closely accords with *Blum*, *Lewis*, and *Gratz*. Using the "substantially similar" standard, the overarching question is whether the plaintiff's averred injury is substantially similar to the claims of those she

seeks to represent.[3] At the motion to dismiss stage, however, the Court's review of the scope of a named plaintiff's Article III standing is necessarily limited. Like any other question of standing resolved at the pleading stage, "general factual allegations" that raise a reasonable inference that the products are substantially similar "may suffice." *Lujan*, 504 U.S. at 561. The Supreme Court observed as much in *Lewis*, stating, "[t]he general allegations of the complaint in the present case may well have sufficed to claim injury by named plaintiffs, and hence standing to demand remediation" on behalf of the various putative class members. 518 U.S. at 357. And, by the class certification stage, this standing question becomes effectively subsumed into Rule 23(a)'s "rigorous" typicality and adequacy requirements. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011); *Falcon*, 457 U.S. at 158-59 n.13.

Here, Plaintiffs allege that their Smart TVs and those with SmartCast collect and disclose the same information through Vizio's Smart Interactivity software. (Compl. ¶¶ 55, 58.) While Plaintiffs' Complaint includes a few paragraphs alleging additional information collected by Vizio's SmartCast software (*id.* ¶¶ 48, 55, 57), none of Plaintiffs' alleged injuries hinge on the collection of this additional information. Plaintiffs, therefore, have adequately alleged that Vizio's SmartCast-enabled Smart TVs and their Smart TVs are "sufficiently similar" for Plaintiffs to have Article III standing to represent a class encompassing purchasers of both types of televisions.

In sum, because Plaintiffs have adequately pleaded Article III standing, the Court DENIES Defendants' Motion to Dismiss for lack of subject matter jurisdiction.

---

[3] While the similarity of the products at issue is one important factor to consider, the similarity of the operative facts that give rise to the putative class representative and putative class's claims is equally important. *See In re L'Oreal Wrinkle Cream Mktg. & Sales Practices Litig.*, No. CIV. 2:12-03571 WJM, 2013 WL 6450701, at *4 (D.N.J. Dec. 9, 2013).

## B. <u>Statutory Standing</u>

Unlike Article III standing, statutory standing is not a question of subject matter jurisdiction but rather an element of a plaintiff's cause of action. As such, statutory standing is properly scrutinized under Rule 12(b)(6). *See Maya*, 658 F.3d at 1067. In this case, Plaintiffs plausibly allege that they would not have purchased or would have paid less for their Vizio Smart TVs had Vizio properly disclosed its consumer data collection and disclosure practices. (Compl. ¶¶ 22, 161, 164-69, 180, 182-88, 192-93, 200-01, 212-15, 219, 225, 233-38, 272-74, 278, 286.) This price premium theory is cognizable under California's UCL, CLRA, and FAL; Florida's FDUTPA; and Massachusetts's Chapter 93A. *See Kwikset Corp. v. Super. Ct.*, 246 P.3d 877, 881 (Cal. 2011) ("[P]laintiffs who can truthfully allege they were deceived by a product's label into spending money to purchase the product, and would not have purchased it otherwise, have 'lost money or property' within the meaning of [the UCL.]"); *Smith v. Wm. Wrigley Jr. Co.*, 663 F. Supp. 2d 1336, 1339 (S.D. Fla. 2009) ("Florida courts have allowed diminished value to serve as 'actual damages' recoverable in a FDUTPA claim."); *Ferreira v. Sterling Jewelers, Inc.*, 130 F. Supp. 3d 471, 479 (D. Mass. 2015) ("Overpayment can constitute an economic loss that is cognizable under [Massachusetts's] chapter 93A where the consumer continues to own the misrepresented product 'whose value was artificially inflated by a deceptive act or practice at the time of purchase.'" (citation omitted)).

While the viability of a price premium theory may be less settled under New York's General Business Law sections 349 and 350, *see In re: Lenovo Adware Litigation*, No. 15-MD-02624-RMW, 2016 WL 6277245, at *10-11 (N.D. Cal. Oct. 27, 2016), the case law on balance recognizes that a plaintiff has statutory standing if she paid a premium due to the defendant's deceptive practice. In *Koenig v. Boulder Brands, Inc.*, the district court found plaintiffs' allegations that they paid a premium for a product based on its "fat free" label sufficient to establish statutory standing under General Business Law sections 349 and 350. 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014). Citing *Koenig* with approval, the Second Circuit subsequently held in *Orlander v. Staples, Inc.* that plaintiffs have statutory

15

standing under New York's General Business Law sections 349 and 350 if they "paid more

than they would have for the good but for the deceptive practices of the defendant-sellers."

802 F.3d 289, 302 (2d Cir. 2015); *see also Small v. Lorillard Tobacco Co.*, 720 N.E.2d

892, 898 & n.5 (N.Y. 1999). New York Plaintiff Chris Rizzitello indicates that, after

purchasing his Vizio Smart TV at a Walmart in Catskill, New York, he used the Smart

TV's features to stream videos from YouTube and other content providers. (Compl. ¶ 20.)

After learning about Vizio's data collection and disclosure practices, he stopped streaming

content, disconnected his Smart TV from the Internet, and, after learning how to turn off

the Smart Interactivity feature, did so. (*Id.* ¶ 20.) Thus, like the other named Plaintiffs,

Rizzitello plausibly alleges that, had he been informed about Vizio's data collection and

disclosure practices, he would have paid less for the Smart TV or not purchased the

product at all. (*Id.* ¶¶ 14, 20, 22, 235.)

Accordingly, Defendants' Motion to Dismiss Plaintiffs' state consumer protection

claims for lack of statutory standing is DENIED.

### C. Video Privacy Protection Act (VPPA) Claims

Enacted in 1988, the Video Privacy Protection Act provides that "[a] *video tape

service provider* who knowingly discloses, to any person, *personally identifiable

information* concerning any *consumer* of such provider shall be liable to the aggrieved

person . . . ." 18 U.S.C. § 2710(b)(1) (emphasis added); *see* Video Privacy Protection Act

of 1988, S. 2361, 100th Cong., 102 Stat. 3195 (1988). Defendants seek to dismiss

Plaintiffs' VPPA claims, arguing that they are not "video tape service provider[s]," that

Plaintiffs are not "consumer[s]" as defined by the statute, and that Defendants do not

disclose "personally identifiable information." (Mem. at 12-21.)

"[W]hen [a] statute's language is plain, the sole function of the courts—at least

where the disposition required by the text is not absurd—is to enforce it according to its

terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins.

Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000)). "The plainness or ambiguity of

statutory language is determined by reference to the language itself, the specific context in

1    which that language is used, and the broader context of the statute as a whole." *Robinson v.*

2    *Shell Oil Co.*, 519 U.S. 337, 341 (1997). A statute is not ambiguous merely because it is

3    awkward or even ungrammatical. *Lamie*, 540 U.S. at 534. By striving to interpret a statute

4    based on its text, a court "avoid[s] the pitfalls that plague too quick a turn to the more

5    controversial realm of legislative history." *Id.* at 536.

### i.    "Video Tape Service Provider"

7        The VPPA provides that a "'video tape service provider' means any person,

8    engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or

9    delivery of prerecorded video cassette tapes or similar audio visual materials . . ." 18

10    U.S.C. § 2710(a)(4). Defendants contend that they are not "engaged in the business . . . of

11    . . . delivery of . . . similar audio visual materials." (Mem. at 13-16.)

12        The plain text of the statute provides otherwise. As an initial matter, Congress's use

13    of a disjunctive list (*i.e.*, "engaged in the business . . . of . . . rental, sale, *or* delivery")

14    unmistakably indicates that Congress intended to cover more than just the local video

15    rental store. Indeed, lest the word "delivery" be superfluous, a person need not be in the

16    business of either renting or selling video content for the statute to apply. Further,

17    Congress's use of the phrase "similar audiovisual materials" indicates that the definition is

18    medium-neutral; the defendant must be in the business of delivering video content, but that

19    content need not be in a particular format. *See, e.g.*, *In re Hulu Privacy Litig.*, No. C 11-

20    03764 LB, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012).

21        Finally, to be a "video tape service provider," a defendant must be "*engaged in the*

22    *business . . . of . . .* delivery of" video content. 18 U.S.C. § 2710(a)(4) (emphasis added).

23    When used in this context, "business" connotes "a particular field of endeavor," *i.e.*, a

24    focus of the defendant's work. *See* Webster's Third New International Dictionary 302

25    (1981) (def. 1d); *see also* The American Heritage Dictionary: Second College Edition 220

26    (1991) (defs. 1a, 1b); 2 Oxford English Dictionary 695 (1989) (def. 14b); Webster's New

27    World Dictionary: Third College Edition 189 (1988) (def. 1). Under this definition, a

28    defendant can be "engaged in the business" of delivering video content even if other actors

*also* take part in the delivery of the same video content. But, for the defendant to be engaged in the business of delivering video content, the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose.

Take, for instance, a letter carrier who physically places a package that happens to contain a videotape into a consumer's mailbox. No person is more obviously "delivering" a video tape to a consumer than this employee. Yet, the letter carrier could not be characterized as "engaged in *the business*" of delivering video content because her job responsibilities are in no way tailored to delivering packages that contain videotapes as opposed to any other package. In the same way, the developers of many other products or services that might be peripherally or passively involved in video content delivery do not fall within the statutory definition of a video tape service provider.

In keeping with this statutory definition, Plaintiffs plausibly allege that Vizio's Internet Apps and Internet Apps Plus are designed to enable consumers to seamlessly access Netflix, Hulu, YouTube, and Amazon Instant Video content in their homes. (Compl. ¶¶ 33-34, 45-46, 81.) A reasonable inference is that Vizio enters into agreements with these content providers to enable consumers to access their programming on Vizio's Smart TVs. (*See id.* ¶ 45; Opp'n at 12-13.) Vizio then advertises its Smart TVs as "a passport to a world of entertainment, movies, TV shows and more," and charges consumers a premium for its Vizio Smart TVs specifically because these Smart TVs are designed to stream video content through Vizio's Internet Apps and Internet Apps Plus software. (Compl. ¶¶ 34, 81.) Essentially, Vizio has designed its Smart TVs to perform all the same functions of—and its Smart TVs are in direct competition with—Roku's devices (*see id.* at ¶ 18; Opp'n at 11); that Vizio has integrated what others sell as a separate device into its televisions makes no meaningful difference.

Vizio's alternative construction of the statute starts with the implicit premise that there can be only one video tape service provider in any transaction, and, because the content provider (like Hulu or Netflix) does fit within the statutory definition of a video

18

tape service provider, Vizio cannot. (*See* Mem. 14-16.) But such a limitation is found nowhere in the text of the statute, and Vizio's construction fails to give the phrase "engaged in the business . . . of" any real meaning.

Defendants also resort to parade of horribles, arguing that if Vizio is considered a video tape service provider, "[c]ountless products and services," such as "shipping services, Blu-Ray players, smartphones, app stores, cable boxes, wireless routers, personal computers, video game consoles, and even cars" would also fall within the statutory definition of video tape service providers. (Mem. at 16; Reply at 5-7.) But the statute's text once again alleviates Vizio's concerns. Most of these products or services are far too peripherally or passively involved in the delivery of video content to reasonably constitute "the business" of delivering video content. By contrast, Plaintiffs allege that Vizio has developed a product intimately involved in the delivery of video content to consumers, has created a supporting ecosystem to seamlessly deliver video content to consumers (including entering into agreements with content providers such as Netflix and Hulu), and has marketed its product to consumers as a "passport" to this video content. Other textual limitations further cabin the scope of the Act: The VPPA applies only if the consumer is a "renter, purchaser, or subscriber of goods or services" from the video tape service provider. 18 U.S.C. §§ 2710(a)(1), (b). And a video tape service provider is liable only if it releases personally identifiable information without the consent of the consumer. *Id.* §§ 2710(a)(3), (b). Accordingly, Vizio's policy-laden argument cannot overcome the statute's plain meaning.

### ii.  "Consumer"

The VPPA defines a "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). Thus, unlike its definition of "video tape service provider," the statute's definition of "consumer" is somewhat narrower than the word's ordinary meaning. Because Plaintiffs do not contend they are renters or purchasers, they must be "subscribers" for the VPPA to apply.

1    In *Ellis v. Cartoon Network, Inc.*, the Eleventh Circuit held that "a person who

2   downloads and uses a free mobile application on his smartphone to view freely available

3   content, without more, is not a 'subscriber' . . . under the VPPA." 803 F.3d 1251, 1252

4   (11th Cir. 2015). After analyzing various definitions of "subscriber," the Eleventh Circuit

5   concluded that that a "'subscription' involves some type of commitment, relationship, or

6   association (financial or otherwise) between a person and an entity." *Id.* at 1256. While a

7   "payment is not a necessary element of subscription," it is "one factor a court should

8   consider when determining whether an individual is a 'subscriber' under the VPPA." *Id.*

9   Besides payment, other factors to consider are "registration, commitment, delivery,

10   [expressed association,] and/or access to restricted content." *Id.* (citation omitted).

11    By contrast, in *Yershov v. Gannett Satellite Information Network, Inc.*, the First

12   Circuit concluded that a consumer need not make a monetary payment in return for a

13   mobile application to be considered a "subscriber." 820 F.3d 482, 488-89 (1st Cir. 2016).

14   Instead, the plaintiff's provision of personal information in return for the defendant's video

15   content was sufficient consideration for the plaintiff to be a "subscriber." *Id.* at 489. And,

16   by downloading the defendant's application, the plaintiff "established a relationship with

17   [the defendant] that [was] materially different from what would have been the case had

18   [the defendant's publication] simply remained one of millions of sites on the web that [the

19   plaintiff] might have accessed through a web browser." *Id.*

20    Here, Plaintiffs are more plausibly "subscribers" than the plaintiffs in either *Ellis* or

21   *Yershov* because they allege that they *do* pay for Vizio's applications. Plaintiffs contend

22   that Vizio charges a premium for its Smart TVs because of their ability to seamlessly

23   deliver video content to consumers through Vizio's Internet Apps, Internet Apps Plus, and

24   SmartCast. (Compl. ¶¶ 22, 33.) After consumers purchase their Smart TVs, Vizio

25   continues to service them by pushing software updates that improve security and provide

26   additional features. (*See id.* ¶¶ 45, 59, 66, 92.) Thus, under either *Ellis* or *Yershov*'s

27   holdings, Plaintiffs plausibly allege an association with Vizio that is sufficiently substantial

28   and ongoing to constitute a subscription.

20

### iii.   "Personally Identifiable Information"

Defendants' finally contend that they do not disclose "personally identifiable information" because "Plaintiffs have alleged . . . only that Defendants have disclosed device identifying information." (Mem. at 17-21; Reply 7-9.) For their part, Plaintiffs assert that the array of data Vizio purportedly discloses about them—including MAC addresses, IP addresses, zip codes, chipset IDs, product model numbers, hardware and software versions, region and language settings, viewing history, purchase history, and "the presence of other devices connected to [the same] network"—falls within the statutory definition of "personally identifiable information." (Opp'n 15-18; Compl. ¶¶ 63, 72.)

By its own terms, the VPPA prohibits the disclosure of "personally identifi*able* information." 18 U.S.C. § 2710(a)(3) (emphasis added). The suffix "able" means "capable of," so "personally identifiable information" plainly extends beyond a consumer's name. Webster's Third New International Dictionary 4, 1123 (1981). Indeed, had Congress intended to limit the statute to protecting the disclosure of an individual's name (when linked to particular video rentals), it could have easily done so and avoided the Act's broader—and admittedly clunky—phrasing. *See Yershov*, 820 F.3d at 486. Turning to the VPPA's defined terms, three of the four statutory definitions use the word "means" to restrict the defined term to the statutory definition. *See* 18 U.S.C. §§ 2710(a)(1), (a)(2), (a)(4). "As a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated." *Burgess v. United States*, 553 U.S. 124, 130 (2008) (citation omitted). But Congress chose the word "includes" instead for the definition of "personally identifiable information." *See* 18 U.S.C. § 2710(a)(3). This word "normally implies that the proffered definition falls short of capturing the whole meaning."[4] *Yershov*, 820 F.3d at

---

[4] Although the Court does not believe that resorting to the legislative history is necessary, the Senate Report on the VPPA confirms that this different wording (*i.e.*, "includes" instead of "means") was intentional. S. Rep. No. 100-599, at 12 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 4342-1, 4342-9 ("[P]aragraph (a)(3) uses the word "includes" to establish a minimum, but not exclusive, definition of personally identifiable information.").

486; *see, e.g.*, *United States v. Angelilli*, 660 F.2d 23, 31 (2d Cir. 1981) ("The use of the word 'includes,' rather than a more restrictive term such as 'means,' 'indicates that the list is not exhaustive but merely illustrative.'" (citation omitted)). Hence, while "information which identifies a person as having [selected] a video" surely is covered, "personally identifiable information" is not restricted to such information. *See* 18 U.S.C. § 2710(a)(3); *Yershov*, 820 F.3d at 486.

The statutory structure confirms that Congress intended "personally identifiable information" to encompass more than a person's name and physical address. In the original Act, Congress included both an opt-out and opt-in disclosure process.  If a consumer opted in to a disclosure, a video tape service provider could reveal any type of personally identifiable information. Video Privacy Protection Act of 1988, S. 2361, 100th Cong. § 2, 102 Stat. 3195 (1988). But if the consumer had to opt out of the disclosure, the video tape service provider could disclose only the consumer's name and address. *See id.* Thus, Congress contemplated that the Act would protect more than just a person's name or physical address. *Yershov v. Gannett Satellite Info. Network, Inc.*, 104 F. Supp. 3d 135, 140 (D. Mass. 2015), *rev'd in part on other grounds*, 820 F.3d 482 (1st Cir. 2016).

Based on many of these textual clues, the First Circuit in *Yershov* concluded that "personally identifiable information" extends beyond a person's name to embrace "information reasonably and foreseeably likely to reveal which . . . videos [the plaintiff] has obtained." 820 F.3d at 486. While at some point "the linkage of information to identity becomes too uncertain, or too dependent on too much yet-to-be-done, or unforeseeable detective work," the court found the plaintiff's allegations that the defendant disclosed his phone's GPS coordinates from the moment when he watched videos to be personally identifiable information. *Id.*

By contrast, the Third Circuit in *In re Nickelodeon* held that IP addresses do not constitute personally identifiable information under the VPPA. *See* 827 F.3d at 290. While recognizing that the "text itself is . . . amenable" to a broader interpretation, the Third Circuit relied heavily on statements by Senator Patrick Leahy and Representative Robert

Kastenmeier at a joint hearing to conclude that personally identifiable information covers only "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Id.* at 285-86, 290.

The Court finds *Yershov* to be a more persuasive interpretation of the VPPA than *In re Nickelodeon*. First, *Yershov* focused foremost on the text of the statute, while *In re Nickelodeon* turned quickly to "the more controversial realm of legislative history." *See Lamie*, 540 U.S. at 536. Perhaps, if the statutory language were particularly indecipherable and the legislative history decisively resolved the issue, this approach might be understandable. But *In re Nickelodeon* recognized that "portions" of the legislative history suggested a *broader* interpretation of personally identifiable information and the statutory text was "amenable" to such an interpretation. 827 F.3d at 286-86.[5] Second, *In re Nickelodeon* relied heavily on Congress's decision *not* to amend the statute substantially in 2002. As the Supreme Court has instructed, this kind of "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). Indeed, *Yershov* examined the same Congressional inaction and reached the exact *opposite* conclusion about its proper meaning. *See* 820 F.3d at 488. Third, under the Third Circuit's "ordinary person" test it would be highly questionable whether even social security numbers would constitute personally identifiable information because, as the Third Circuit itself recognized, this information "might not be easily matched to . . . persons without consulting another entity, such as a credit reporting agency or government bureau." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 283.

---

[5] The Third Circuit's legislative history analysis focused on two statements made at a joint hearing that do not obviously concern the proper scope of the term "personally identifiable information" and relate to a prior version of the bill that also covered libraries. *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 285-86. The Supreme Court has repeatedly criticized attempts to divine Congressional intent from "highly generalized, conflicting statements in the legislative history." *Rust v. Sullivan*, 500 U.S. 173, 185 (1991).

1    Yet, the Court need not disagree with *In re Nickelodeon* because Plaintiffs allege

2   that Vizio's Inscape platform discloses even more about their digital identities—in

3   particular, consumers' MAC addresses and information about other devices connected to

4   the same network. Plaintiffs allege that MAC addresses are frequently linked to an

5   individual's name and can be used to acquire highly specific geolocation data. (Compl. ¶¶

6   69-71.) MAC addresses allegedly can also identify a person when combined with Vizio's

7   disclosure of consumers' IP addresses, zip codes, product model numbers, hardware and

8   software versions, chipset IDs, and region and language settings. (*Id.* ¶¶ 72-79.) Besides

9   collecting and disclosing extensive information regarding consumers' Smart TVs, Vizio

10  supposedly collects and discloses information about all other devices connected to the

11  same network. (*Id.* ¶¶ 63, 72.) Plaintiffs have thus plausibly alleged that Vizio's provision

12  of—to quote its own prospectus—"highly specific viewing behavior data on a massive

13  scale with great accuracy" amounts to the disclosure of personally identifiable

14  information.[6] (*Id.* ¶ 62.)

15    The Court stresses the posture of this case: Ultimately, Plaintiffs will have to

16  demonstrate that Vizio's disclosures are "reasonably and foreseeably likely to reveal" what

17  video content Plaintiffs have watched. *Yershov*, 820 F.3d at 486. But this is a factual

18  inquiry ill-suited for resolution on a motion to dismiss. *Yershov*, 104 F. Supp. 3d at 145

19  (observing that a "factual record would need to be developed before concluding that an

20  Android ID is not PII"). The Court simply cannot accept Vizio's offer to engage in judicial

21  fact-finding or make sweeping determinations as a matter of law on this Motion to

22  Dismiss. Because Plaintiffs have plausibly alleged that the array of information Vizio

23

24

25 _____

26    [6] While this Motion was pending, the FTC, in conjunction with a consent decree, filed a complaint against Vizio regarding its collection and disclosure practices. (*See* Notice of Pendency,

27  Doc. 128.) Because the FTC's allegations have not been incorporated into Plaintiffs' Complaint, the Court does not consider them in determining the plausibility of Plaintiffs' claims.

28

1    discloses about them is personally identifiable information, the Court must DENY Vizio's

2    Motion to Dismiss Plaintiffs' VPPA claims.[7]

3                      **D.   <u>Wiretap Act Claims</u>**

4            The Wiretap Act affords a private right of action to "any person whose wire, oral, or

5    electronic communication is intercepted, disclosed, or intentionally used in violation of

6    this chapter . . . ." 18 U.S.C. § 2520(a). Defendants argue that Plaintiffs' Wiretap Act

7    claims should be dismissed because Defendants do not "intercept" any electronic

8    communications and the messages they collect do not constitute the "contents" of an

9    electronic communication. (Mem. at 23-27.) For the reasons elaborated below, the Court

10   concludes that Plaintiffs have inadequately pleaded interception.

11           The Wiretap Act proscribes the "intentional[] intercept[ion] . . . [of] any wire, oral,

12   or electronic communication." 18 U.S.C. § 2511(1)(a). In *Konop v. Hawaiian Airlines,*

13   *Inc.*, the Ninth Circuit held that, for an electronic communication "to be 'intercepted' in

14   violation of the Wiretap Act, it must be acquired during transmission, not while it is in

15   electronic storage." 302 F.3d 868, 878 (9th Cir. 2002). In so holding, *Konop* strove to

16   distinguish between information acquired *contemporaneously* to its transmission and

17   information that resides in electronic storage. *Id.*; *see Theofel v. Farey-Jones*, 359 F.3d

18   1066, 1077 (9th Cir. 2004) ("We . . . held in *Konop v. Hawaiian Airlines, Inc.* . . . that the

19   Act applies only to "acquisition contemporaneous with transmission." (citation omitted)).

20   Access to information maintained in electronic storage is governed by the Stored

21   Communications Act, while the Wiretap Act regulates access to information acquired

22   contemporaneously to its transmission. *See Konop*, 302 F.3d at 878.

23           While some language in *Konop* suggests that information cannot be "intercepted"

24   within the meaning of the Wiretap Act if it is acquired *simultaneously* with its arrival, *see*

25   *id.* at 879-880, the issue was not squarely presented in the case. The plaintiff in *Konop*

26   _____

27           [7] Plaintiffs have chosen to abandon their state law video privacy claims (Opp'n at 3 n.2),

28   so the Court DISMISSES Plaintiffs' fourth, tenth, and twelfth causes of action.

alleged that his former employer used another employee's password to access disparaging posts that the plaintiff kept on his online bulletin board. *Id.* at 873. Thus, the information the employer acquired had been in electronic storage for a considerable period before his employer accessed it. Like *Konop*, most of the decisions in this Circuit addressing the simultaneous transmission requirement involve the collection of emails or other communications that were unquestionably in electronic storage for a substantial period before the defendants collected them. *See, e.g.*, *Theofel v. Farey-Jones*, 359 F.3d 1066, 1077 (9th Cir. 2004) (stored emails); *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938, 953 (N.D. Cal. 2014) (stored emails); *see also Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 460 (5th Cir. 1994) (stored unread emails).

In *United States v. Szymuszkiewicz*, the Seventh Circuit concluded that information acquired "within a second of each message's arrival and assembly" satisfies the contemporaneous interception requirement. 622 F.3d 701, 706 (7th Cir. 2010). In *Szymuszkiewicz*, the defendant inserted a command into his supervisor's copy of Microsoft Outlook that directed a copy of all incoming messages to him. *Id.* at 703. The defendant argued that "he did not 'intercept' anything, for (at least in football) 'interception' means catching a thing in flight, and any message would have reached its destination ([his supervisor's] inbox) before a copy was made for him." *Id.* Judge Easterbrook observed that it did not matter whether his supervisor's computer or an intermediary diverted the information:

> Several circuits have said that, to violate § 2511, an interception must be "contemporaneous" with the communication. . . . [The defendant] sees this as support for his "in flight" reading, but it is not. "Contemporaneous" differs from "in the middle" or any football metaphor. Either the server in Kansas City or [his supervisor's] computer made copies of the messages for [the defendant] within a second of each message's arrival and assembly; if both [the defendant and his supervisor] were sitting at their computers at the same

26

time, they would have received each message with no more than an eyeblink in between. That's contemporaneous by any standard. Even if [the supervisor's] computer (rather than the server) was doing the duplication and forwarding, it was effectively acting as just another router, sending packets along to their destination . . . .

*Id.* at 705-06 (citations omitted). In reaching this conclusion, the Seventh Circuit cited *Konop*, *see id.* at 706, indicating that the court found its decision consistent with the Ninth Circuit's simultaneous transmission requirement.[8]

*Szymuszkiewicz* emphasized that its holding was necessary to keep modern telephonic communications within the purview of the Wiretap Act. *Id.* Interception of telephone calls made through modern "packet switching" technology "must be done by programming a computer to copy the contents [of packets] it sends along . . . ." *Id.*  So, if interception "within a second of each message's arrival and assembly" did not qualify as "simultaneous," the Wiretap Act would no longer govern phone calls—the very communications Congress had in mind when it enacted the Wiretap Act. *Id.* at 704, 706; *see In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1076-81 (N.D. Cal. 2015) (concluding that *Konop*'s simultaneous transmission requirement does not place packet switching technology outside the ambit of the Wiretap Act). A contrary holding would also mean that different substantive rules would apply to those engaged in the same real-time electronic conversation based on whose electronic device was bugged and who was sending or receiving the particular message in question. If, say, Person A's device was bugged, all of

---

[8] *DirecTV, LLC v. Wright*, No. 15-CV-474-FPG, 2016 WL 3181170 (W.D.N.Y. June 3, 2016) is not to the contrary. In *DirecTV*, the district court stressed that the defendant "*legitimately received*" the plaintiff's satellite signals and then illegally rebroadcasted them. *Id.* at *6. As the district court observed, "numerous courts have focused on this distinction in finding that [the Wiretap Act] requires the unauthorized receipt, not simply the unauthorized redistribution." *Id.* at *6.

the messages she *sends* to Person B would be subject to the Wiretap Act, while all the message she *receives*—even if immediately collected—would be subject to the Stored Communications Act. Nothing in the text or structure of the Wiretap Act or Stored Communications Act suggests such a hopelessly convoluted legal framework.

But, even if the Court were to accept *Szymuszkiewicz*'s reasoning, Plaintiffs have not articulated with sufficient clarity when Vizio supposedly intercepted their communications. Besides their conclusory allegation that Vizio intercepted their electronic communications "during transmission" (Compl. ¶ 128.), Plaintiffs rely on a rather inscrutable graphic with no textual explanation (*id.* ¶ 52) and vague allegations about how Vizio's data collection occurs "in real time" (*id.* ¶¶ 39, 41-42, 49, 62). While Plaintiffs need not prove their theory of interception on a motion to dismiss, Plaintiffs must provide fair notice to Defendants of when they believe Vizio intercepts their communications. A written explanation of Plaintiffs' theory of interception is particularly important in this case because the graphic Plaintiffs include in their Complaint suggests that Vizio transmits their data to its Inscape platform significantly after the data arrive at their Smart TVs. (*See id.* ¶ 52.) The Court, therefore, DISMISSES with LEAVE TO AMEND Plaintiffs' Wiretap Act claims. As Plaintiffs have inadequately pleaded interception, the Court need not address Defendants' alternative argument that Vizio does not collect the "contents" of any electronic communications.[9]

_____

[9] Courts have generally construed the California Invasion of Privacy Act ("CIPA") as coextensive with the Wiretap Act, *Sunbelt Rentals, Inc. v. Victor*, 43 F. Supp. 3d 1026, 1033 (N.D. Cal. 2014); *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938, 954 (N.D. Cal. 2014), and Plaintiffs have offered no reason why the Court's analysis would be any different under the CIPA (*see* Opp'n at 21). The Court, therefore, DISMISSES with LEAVE TO AMEND Plaintiffs' CIPA claims.

## E. Fraud Claims

Defendants move to dismiss Plaintiffs' fraud-based claims[10] for failure to satisfy Rule 9(b). (Mem. at 28-33.) Plaintiffs contend that Defendants overstate Plaintiffs' burden in alleging claims based on fraudulent omissions and that both their fraudulent omission and affirmative misrepresentation theories are well pleaded. (Opp'n at 21-27.)

### i. Fraudulent Omission-Based Claims

Under Rule 9(b), a party must plead allegations of fraud, whether through affirmative misrepresentations or omissions, "with particularity." Fed. R. Civ. P. 9(b). To satisfy this Rule, a plaintiff must generally allege the "'who, what, when, where, and how' of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). "However, in the context of a fraudulent omission claim, a plaintiff cannot plead a specific time or place of a failure to act." *Peel v. BrooksAmerica Mortg. Corp.*, 788 F. Supp. 2d 1149, 1160 (C.D. Cal. 2011). In such circumstances, "a plaintiff may plead fraud by alternative means." *Id.* The purpose of Rule 9(b)'s heightened pleadings standard is "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted).

Relying on *Marolda v. Symantec Corp.*, Defendants assert that to satisfy Rule 9(b), a fraudulent omission claim "must describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009). "As other courts have recognized, however, 'the *Marolda*

---

[10] By "fraud-based claims," the Court refers to Plaintiffs' fifth, sixth, eighth, ninth, eleventh, fourteenth, and eighteenth causes of action to the extent that these claims sound in fraud. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). The Court addresses Plaintiffs' FAL claims separately.

1   requirements are not necessarily appropriate for all cases alleging a fraudulent omission.'"

2   *Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, 2015 WL 4111448, at *12 (N.D. Cal.

3   July 7, 2015). Rather, courts have applied Rule 9(b)'s "who, what, when, where, and how"

4   test mindful of the "the inherent limitations of an omission claim." *MacDonald v. Ford*

5   *Motor Co.*, 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014); *Velasco v. Chrysler Grp. LLC*,

6   No. CV 13-08080 DDP VBKX, 2014 WL 4187796, at *5 (C.D. Cal. Aug. 22, 2014);

7   *Philips*, 2015 WL 4111448, at *12.

8        Here, Plaintiffs allege that Vizio ("who") failed to disclose to consumers that its

9   Smart Interactivity software collects and discloses consumers' viewing histories as well as

10  personally identifiable information related to their Vizio Smart TVs and other devices

11  connected to the same Wi-Fi network ("what"). (Compl. ¶¶ 35-42, 45-73.) This material

12  information, Plaintiffs allege, was not disclosed prior to their purchase of their Smart TVs

13  or while they used their Smart TV's capabilities ("when") on the product packaging, in

14  Vizio's Privacy Policy, or on Vizio's website ("where"). (*Id.* ¶¶ 81-94.) Besides providing

15  the exact model numbers for their televisions and where they purchased them, Plaintiffs

16  provide a representative sample of a Vizio Smart TV's product packaging that omits any

17  mention of Vizio's Smart Interactivity software. (*Id.* ¶¶ 16-21, 81-84.) Plaintiffs further

18  contend that, when using a Vizio Smart TV, the only reference to Smart Interactivity is

19  "deeply imbedded in an obscure settings menu" and "does not explain what Smart

20  Interactivity is." (*Id.* ¶¶ 7, 85.) Viewed together, Plaintiffs' allegations are as well pleaded,

21  if not more detailed, than those found sufficient in *Velasco*, *Philips*, and *MacDonald*. *See*

22  2015 WL 4111448, at *12; 2014 WL 4187796, at *5; 37 F. Supp. 3d 1087, 1096. Contrary

23  to Defendants' assertion, Plaintiffs do not need to specify the precise date they purchased

24  their Smart TVs to state a fraudulent omission claim, because Vizio's fraudulent omissions

25  allegedly continued from the launch of its Smart Interactivity software through Plaintiffs'

26  purchases of their Smart TVs. Thus, Defendants' Motion to Dismiss Plaintiffs' claims

27  based on fraudulent omissions is DENIED.

28

### ii.  Affirmative Fraud-Based Claims

In contrast to Plaintiffs' omission-based fraud claims, Plaintiffs' affirmative fraud-based claims are devoid of the "who, what, where, when, and how" allegations required by Rule 9(b). For instance, Plaintiffs contend that certain language in Vizio's Privacy Policy and on Vizio's website is misleading, but none of the Plaintiffs allege that they even viewed these purported misrepresentations. (*See* Compl. ¶¶ 22, 88.) *See, e.g.*, *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 694 (Ct. App. 2010) ("[T]he SAC does not allege [plaintiff] ever visited Sharp's Web site or even that he ever read the Agreement for Services"). Plaintiffs also reference certain statements on the Smart TV packaging that they contend are misleading "in light of the information not provided." (Opp'n at 25.) Besides Plaintiffs' failure to provide the "who, what, where, when, and how" allegations necessary to support this theory, the statements Plaintiffs reference on Vizio's product packaging about a Vizio Smart TV's functions have little to do consumers' data security or privacy. (*See* Compl. ¶¶ 81-84.) Therefore, to the extent that Plaintiffs' fraud claims are based on supposed affirmative misrepresentations, Defendants' Motion to Dismiss is GRANTED with LEAVE TO AMEND. In any amended complaint, Plaintiffs must plead the necessary "who, what, where, when, and how" allegations necessary to state a claim for affirmative fraud.

### F.  Negligent Misrepresentation Claims

Under California law, "[a] negligent misrepresentation claim 'requires a positive assertion,' not merely an omission." *Lopez v. Nissan N. Am., Inc.*, 135 Cal. Rptr. 3d 116, 136 (Ct. App. 2011) (quoting *Vega v. Jones, Day, Reavis & Pogue*, 17 Cal. Rptr. 3d 26, 32 (Ct. App. 2004). "An 'implied' assertion or representation is not enough." *Wilson v. Century 21 Great W. Realty*, 18 Cal. Rptr. 2d 779, 783 (Ct. App. 1993). Similarly, under Washington law, "[a]n omission alone cannot constitute negligent misrepresentation, since the plaintiff must justifiably rely on a misrepresentation." *Ross v. Kirner*, 172 P.3d 701, 704 (Wash. 2007); *see Trimble v. Washington State Univ.*, 993 P.2d 259, 264 (Wash.

1   2000) (holding that failing to discuss the downsides of an offer of employment did not

2   create the false impression necessary to state a claim for negligent misrepresentation).

3          Plaintiffs' negligent misrepresentation claims under California and Washington law

4   are inadequately pleaded for much the same reason why Plaintiffs' affirmative fraud

5   claims fail: Plaintiffs allege that Vizio's Smart TV packaging is misleading because Vizio

6   advertises how its Smart TVs are ideal for watching programming from cable, satellite,

7   and streaming content providers as well from devices connected to the Smart TV without

8   disclosing that utilizing these features could result in Vizio collecting and disclosing

9   consumers' personally identifiable information. (*Id.* ¶¶ 81-84.) None of the statements on

10  the product packing, however, relate to Vizio's privacy policies or the security of

11  consumers' personal information more broadly. Thus, because any alleged statements on

12  Vizio's product packaging are too remotely related to Vizio's treatment of consumers' data

13  to amount to the "positive assertion" necessary to state a claim for negligent

14  misrepresentation, the Court DISMISSES these claims under California and Washington

15  law with LEAVE TO AMEND. *See Lopez*, 135 Cal. Rptr. 3d at 136 (holding, in a case

16  involving odometers that supposedly overregistered the number of miles driven, that

17  "innocuous statements . . . about the basic function of odometers" did not amount to the

18  "positive assertion" necessary to state a claim for negligent misrepresentation); *Ross v.*

19  *Kirner*, 172 P.3d at 704.

20                          **G. False Advertising Law Claims**

21          The False Advertising Law (FAL) prohibits making or disseminating "any

22  statement" in the course of "dispos[ing]" of any property, product, or service that "is

23  untrue or misleading, and which is known, or which by the exercise of reasonable care

24  should be known, to be untrue or misleading . . . ." Cal. Bus. & Prof. Code § 17500. Under

25  the FAL, courts apply the "reasonable consumer" test, which requires a plaintiff to show

26  that "members of the public are likely to be deceived." *Williams v. Gerber Products Co.*,

27  552 F.3d 934, 938 (9th Cir. 2008) (quotation marks omitted). The FAL proscribes "not

28  only advertising which is false but also advertising which[,] although true, is either

actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Williams*, 552 F.3d at 938 (quoting *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002)).

At first glance, districts courts seem to be divided over whether a plaintiff can predicate a FAL claim on a defendant's failure to disclose certain information. *Compare Handy v. LogMeIn, Inc.*, No. 1:14-CV-01355-JLT, 2015 WL 1729681, at *5 (E.D. Cal. Apr. 15, 2015) ("[A] a plaintiff may state a claim under the FAL for fraudulent omissions by a defendant."); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 991 (S.D. Cal. 2014) (finding that "fraud-based omission claims" under the FAL were adequately pleaded) *with Norcia v. Samsung Telecommunications Am.*, LLC, No. 14-CV-00582-JD, 2015 WL 4967247, at *8 (N.D. Cal. Aug. 20, 2015) ("There can be no FAL claim where there is no 'statement' at all."); *Stanwood v. Mary Kay, Inc.*, 941 F. Supp. 2d 1212, 1222 (C.D. Cal. 2012). In practice, though, the disagreement seems largely superficial: Courts reject FAL claims premised solely on a defendant's omissions, but a plaintiff may base a FAL claim on an affirmative statement that is misleading in light of the information omitted. *Hodsdon v. Mars, Inc.*, 162 F. Supp. 3d 1016, 1023 (N.D. Cal. 2016); *see In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 991 (S.D. Cal. 2014); *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1157-59, 1173 (C.D. Cal. 2011). This approach comports with the text of the False Advertising Law, which prohibits false or misleading "statement[s]," not omissions. *See* Cal. Bus. & Prof. Code § 17500.

Plaintiffs allege that their FAL claims are premised on "partial representations . . . as well as omissions." (Opp'n at 28 (citing Compl. ¶¶ 8, 10, 72-79, 84, 90-91.)) But none of the Plaintiffs allege that they were aware that Vizio had represented that it collects only anonymous data, which would be necessary for Plaintiffs to satisfy the FAL's standing requirement. *See In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009) (holding that a plaintiff must demonstrate "actual reliance" to show that he lost "money or property as a result of" the allegedly unlawful conduct); *Kwikset Corp.*, 246 P.3d at 888 (applying the same

standard to the FAL). And, as the Court has already noted, the statements Plaintiffs did see on Vizio's product packaging about the Smart TV's functionality are too tangentially related to consumers' personal privacy or security to be misleading in light of Vizio's failure to disclosure its data collection and disclosure practices. To be clear, as *In re Tobacco II Cases* instructs, Plaintiffs do not have to allege they "relied on particular advertisements or statements," especially if they allege a lengthy pattern of misrepresentations by Vizio, 207 P.3d at 40, but Plaintiffs must allege at least that they were generally familiar with Vizio's statements about its data privacy or security practices. Thus, because Plaintiffs have not plausibly alleged that they relied on any affirmative misstatements by Vizio, the Court DISMISSES with LEAVE TO AMEND Plaintiffs' FAL claims.

## H. Invasion of Privacy and Intrusion Upon Seclusion Claims

The elements of intrusion upon seclusion and invasion of privacy are similar in each of the states included in Plaintiffs' Complaint. California, Florida, and Washington have all endorsed the definition of the tort found in the Second Restatement, which requires (1) an intentional intrusion, physical or otherwise, "upon the solitude or seclusion of another," (2) in a manner "highly offensive to a reasonable person." *Deteresa v. Am. Broad. Companies, Inc.*, 121 F.3d 460, 465 (9th Cir. 1997) (quoting *Miller v. Nat'l Broad. Co.*, 232 Cal. Rptr. 668, 678 (Ct. App. 1986)); *Taus v. Loftus*, 151 P.3d 1185, 1212 (Cal. 2007); *Purrelli v. State Farm Fire & Cas. Co.*, 698 So. 2d 618, 620 (Fla. Dist. Ct. App. 1997); *Mark v. Seattle Times*, 635 P.2d 1081, 1094 (Wash. 1981); *see also* Restatement (Second) of Torts § 652B (1977).

The California Constitution and Massachusetts Privacy Act create similar causes of action for invasion of privacy. A cause of action under the California Constitution for invasion of privacy requires: (1) "the identification of a specific, legally protected privacy interest," (2) a reasonable expectation of privacy under the circumstances presented, and (3) a "sufficiently serious" intrusion upon the privacy interest by the defendant. *Hill v. Nat'l Collegiate Athletic Assn.*, 865 P.2d 633, 654-55 (Cal. 1994). California has

recognized two broad categories of legally protected privacy interests: "(1) interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy'); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')." *Id.* at 654.[11] If a plaintiff satisfies these threshold requirements, the privacy interest must be balanced against a defendant's countervailing interests. *Id.* at 655-57. Like its California counterpart, the Massachusetts Privacy Act creates "a right against unreasonable, substantial or serious interference with [a person's] privacy." Mass. Gen. Laws ch. 214, § 1B. The invasion of privacy "must be both unreasonable and substantial or serious" to violate the Act. *Polay v. McMahon*, 10 N.E.3d 1122, 1126 (Mass. 2014). The Massachusetts Supreme Judicial Court has clarified that a plaintiff need not allege a public disclosure of the private information; an unreasonable intrusion upon a person's "solitude" or "seclusion" may suffice. *Id.*

  As an initial matter, the Court rejects Vizio's argument that Plaintiffs have no cognizable interest in keeping detailed data about what video content they watch private. (Mem. at 36-37.) Defendants provide no reason why this information would be any less sensitive than the URL information that the Third Circuit found legally protected in *In re Google Inc. Cookie Placement*. *See* 806 F.3d at 151. To the contrary, the various federal and state statutes that specifically protect video viewing histories make Plaintiffs' assertion of a protected privacy interest here stronger than the claimed privacy interest in *In re Google Inc. Cookie Placement. See, e.g.*, 18 U.S.C. § 2710; Cal. Civ. Code § 1799.3; Mass. Gen. Laws ch. 93, § 106; N.Y. Gen. Bus. Law § 673. Nor does *In re Yahoo Mail Litigation*, 7 F. Supp. 3d 1016 (N.D. Cal. 2014), hold otherwise. *In re Yahoo Mail Litigation* found that there is no "legally protected privacy interest [or] reasonable

---

[11] Because of the substantial overlap between the constitutional and common law causes of action under California law, California courts have examined claims brought under both sources together. *See Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1073-74 (Cal. 2009).

1   expectation of privacy in email *generally . . . ." Id.* at 1040. There, the court determined

2   that allegations that an email service provider scanned, stored, and distributed to third

3   parties the content of emails between users and non-users of its service were insufficient

4   because the plaintiffs failed to allege the specific content of the emails at issue. *Id.*

5   Whether or not this Court agrees with this holding in *In re Yahoo Mail Litigation*, it does

6   not apply here. Unlike in *In re Yahoo Mail Litigation*, Plaintiffs identify a discrete type of

7   sensitive information (video viewing history) that is legally protected, rather than arguing

8   they have a legally protected interest in a method of communication. *See id.* at 1040-41.

9       Courts have been hesitant to extend the tort of invasion of privacy to the routine

10  collection of personally identifiable information as part of electronic communications. *See,

11  e.g., Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012); *Yunker v.

12  Pandora Media, Inc.*, No. 11-CV-03113 JSW, 2013 WL 1282980, at *15 (N.D. Cal. Mar.

13  26, 2013). By contrast, collection of intimate or sensitive personally identifiable

14  information may amount to a highly offensive intrusion. *See Goodman v. HTC Am., Inc.*,

15  No. C11-1793MJP, 2012 WL 2412070, at *14-15 (W.D. Wash. June 26, 2012). Further,

16  more routine data collection practices may be highly offensive if a defendant disregards

17  consumers' privacy choices while simultaneously "h[olding] itself out as respecting'

18  them." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 292 (quoting *In re Google

19  Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 151 (3d Cir. 2015)). As the

20  Third Circuit observed, "[w]hether or not data-based targeting is the internet's pole star,

21  users are entitled to deny consent, and they are entitled to rely on the public promises of

22  the companies they deal with." *In re Google Inc. Cookie Placement Consumer Privacy

23  Litig.*, 806 F.3d at 151.

24      Plaintiffs have plausibly alleged a pattern of "highly offensive" conduct. Plaintiffs

25  point to a report by the security software company Avast, which concluded that Smart

26  Interactivity's "off" function was not operational "for months, if not years." (Compl. ¶¶ 7,

27  65.) So, even if consumers believed they had opted out of Vizio's data collection practices,

28  Vizio was still collecting their data for a considerable period. (*See id.*) In addition, Vizio's

1    Smart Interactivity software switches back on without warning if the Smart TV ever

2    reverts to the factory settings—as can occur through Vizio's software updates. (*Id*. ¶ 66.)

3    Consumers would likely not realize for a significant period that Vizio's collection and

4    disclosure software has been re-enabled because the opt-out feature is allegedly buried in

5    an obscure settings menu. (*Id.* ¶¶ 7, 85.) Further, Vizio's disclosure practices are far less

6    routine than, say, the use of cookies at issue in *In re Google Inc. Cookie Placement*

7    *Consumer Privacy Litigation*: Plaintiffs allege not only that Vizio collects an exceptionally

8    vast array of information about their digital identities and viewing histories, but also that

9    the standard industry practice is not to collect viewing history data unless a consumer

10   affirmatively opts in. (*Id.* ¶¶ 6, 61.) Considering the quantum and nature of the information

11   collected, the purported failure to respect consumers' privacy choices, and the divergence

12   from the standard industry practice, Plaintiffs plausibly allege Vizio's collection practices

13   amount to a highly offensive intrusion. Defendants' Motion to Dismiss Plaintiffs' intrusion

14   upon seclusion, Massachusetts's Privacy Act, and California Constitution claims is

15   accordingly DENIED.

16                                I.  <u>Unjust Enrichment Claims</u>

17            Defendants contend that the Court should dismiss Plaintiffs' unjust enrichment

18   claims because they have adequate remedies at law. The Court finds no basis for doing so.

19   The Ninth Circuit has instructed district courts to construe claims for unjust enrichment

20   under California law as quasi-contract claims. *Astiana v. Hain Celestial Grp., Inc.*, 783

21   F.3d 753, 762 (9th Cir. 2015); *see Brazil v. Dole Packaged Foods, LLC*, No. 14-17480,

22   2016 WL 5539863, at *3 (9th Cir. Sept. 30, 2016) (reversing a district court's dismissal of

23   a claim for unjust enrichment). Similarly, under Florida law, an unjust enrichment claim

24   fails "only upon a showing that an express contract exists [between the parties.]" *State*

25   *Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, 427 F. App'x 714, 722 (11th

26   Cir. 2011), *rev'd in part sub nom. State Farm Mut. Auto. Ins. Co. v. Williams*, 824 F.3d

27   1311 (11th Cir. 2014) (quoting *Williams v. Bear Stearns & Co.*, 725 So. 2d 397, 400 (Fla.

28   Dist. Ct. App. 1998)); *accord Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d

696, 697 (Fla. Dist. Ct. App. 2008). As for Plaintiffs' unjust enrichment claims under New York, Washington, and Massachusetts law, "[w]hether plaintiffs [have] an adequate remedy at law remains to be seen."[12] *Fenerjian v. Nongshim Co., Ltd*, 72 F. Supp. 3d 1058, 1086 (N.D. Cal. 2014). Because Plaintiffs can plead in the alternative under Rule 8(d)(3), it would be "premature to dismiss the unjust enrichment claims on that basis at this point." *Id.* Defendants' Motion to Dismiss Plaintiffs' unjust enrichment claims, therefore, is DENIED.

## V.   **CONCLUSION**

For the foregoing reasons, Defendants' Motion is GRANTED IN PART and DENIED IN PART. Plaintiffs' Wiretap Act claims, California Invasion of Privacy Act claims, False Advertising Law claims, negligent misrepresentation claims under California and Washington law, and state law video privacy claims are DISMISSED with LEAVE TO AMEND. To the extent that Plaintiffs' fifth, sixth, eighth, ninth, eleventh, fourteenth, and eighteenth causes of action are premised on allegations of affirmative fraudulent

---

[12]  Defendants contend that "in Massachusetts, New York, Florida, and Washington . . . an unjust enrichment claim *cannot* be pleaded when an adequate remedy at law exists." (Reply at 25.) The Court finds no basis in the cases Defendants cite for a rule holding that a court must determine on a motion to dismiss whether an adequate remedy at law exists; rather, the decisions Defendants reference merely support the uncontroversial proposition that in some circumstances the remedy at law is so obvious from the allegations in a complaint that the question may be resolved on a motion to dismiss. For instance, one of the decisions Defendants reference, *Go2Net, Inc. v. Freeyellow.com, Inc.*, 109 P.3d 875 (Wash. Ct. App. 2005), merely held in an unpublished part of the opinion that the trial court properly dismissed an unjust enrichment claim after determining that the plaintiff's claim "sounded in contract and thereby provided him an adequate remedy at law." *Id.* at 881. Similarly, another case Defendants cite, *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611 (2d Cir. 2010), addressed an attempt "to evade the statute of limitations applicable to a tortious interference with contract claim" by artfully pleading it as an unjust enrichment claim. *Id.* at 614. To the extent that *Licul v. Volkswagen Group of America* holds that a plaintiff must allege distinct predicate facts merely to plead a claim for unjust enrichment, *see* 2013 WL 6328734, at *7 (S.D. Fla. Dec. 5, 2013), that decision finds little support in the common law and "improperly require[s] a complete absence of an adequate remedy at law to state a claim for unjust enrichment." *Harris v. Nordyne, LLC*, No. 14-CIV-21884, 2014 WL 12516076, at *7 n.5 (S.D. Fla. Nov. 14, 2014).

conduct, they are DISMISSED with LEAVE TO AMEND. Defendants' Motion is otherwise DENIED. Plaintiffs are given leave to file a Second Consolidated Complaint within 21 days of this Order. Failure to file a Second Consolidated Complaint by that date shall be deemed consent to the dismissal of Plaintiffs' claims against Defendants with prejudice.

DATED: March 2, 2017

_____

JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE