Julie Shepard (Cal. Bar. No. 175538)
JENNER & BLOCK LLP
633 West Fifth Street
Suite 3600
Los Angeles, California 90071
Telephone:(213) 239-5100
Facsimile: (213) 239-5199
jshepard@jenner.com

Adam Unikowsky (*pro hac vice* application forthcoming)
JENNER & BLOCK LLP
1099 New York Ave, NW
Washington, DC 20001
Telephone: (202) 639-6041
Facsimile: (202) 661-4925
aunikowsky@jenner.com

*Attorneys for Amicus Curiae Chamber of Commerce of the United States of America in Support of Defendants*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# SANTA ANA DIVISION

| | |
|---|---|
| **In re: Vizio, Inc. Consumer Privacy Litigation**<br><br>This document relates to:<br><br>ALL ACTIONS | MDL Case No. 8:16-ml-02693-JLS-KES<br><br>**AMICUS BRIEF BY THE CHAMBER OF COMMERCE IN SUPPORT OF DEFENDANTS' MOTION TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL**<br><br>Judge: Hon. Josephine L. Staton:<br>Date: July 14, 2017<br>Time: 2:30 p.m.<br>Courtroom: 10A |

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ................................................................................. 1

SUMMARY OF ARGUMENT ...................................................................................... 1

ARGUMENT .................................................................................................................. 2

    I.   This Case is Highly Important and Worthy of an Interlocutory Appeal ................... 2

    II.  Plaintiffs' Theory Incorrectly Interprets the VPPA and Undermines Congress' Central Role in Regulating Internet-Enabled Devices ............................. 4

-i-

AMICUS BRIEF BY THE CHAMBER OF COMMERCE IN SUPPORT OF DEFENDANTS' MOTION TO CERTIFY
ORDER FOR INTERLOCUTORY APPEAL
MDL Case No. 8:16-ml-02693-JLS-KES

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*AT&T Mobility LLC v. Concepcion*,
    131 S. Ct. 1740 (2011) ................................................................................................... 3

*Eubank v. Pella Corp.*,
    753 F.3d 718 (7th Cir. 2010) ........................................................................................ 3

*Glickman v. Wileman Bros. & Elliott*,
    521 U.S. 457 (1997) ...................................................................................................... 7

*In re Nickelodeon Consumer Privacy Litigation*,
    827 F.3d 262 (3d Cir. 2016) ............................................................................ 5, 6, 7, 8

*United States v. Topco Asosciates, Inc.*,
    405 U.S. 596 (1972) ...................................................................................................... 7

**STATUTES**

18 U.S.C. § 2710 ........................................................................................................*passim*

-ii-

AMICUS BRIEF BY THE CHAMBER OF COMMERCE IN SUPPORT OF DEFENDANTS' MOTION TO CERTIFY
ORDER FOR INTERLOCUTORY APPEAL
MDL Case No. 8:16-ml-02693-JLS-KES

## INTEREST OF AMICUS CURIAE

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest federation of businesses and associations. It represents three hundred thousand direct members and indirectly represents an underlying membership of more than three million U.S. businesses and professional organizations of every size, in every economic sector, and from every geographic region of the country. One important function of the Chamber is to represent the interests of its members in matters before the courts, Congress, and the Executive Branch. To that end, the Chamber regularly files amicus curiae briefs in cases that raise issues of concern to the nation's businesses.[1]

The Chamber has a substantial interest in the resolution of this case, which raises issues at the heart of the Internet economy. Many of the Chamber's members sell integrated devices that connect consumers to the Internet. The Chamber thus understands the way that Plaintiffs here, and other plaintiffs in similar lawsuits, seek to impose far-reaching liability on the developers of these technologies—and thus seek to alter their business models. The Chamber respectfully submits that its views on the implications of this case shed light on whether this case warrants certification for interlocutory appeal.

## SUMMARY OF ARGUMENT

This case warrants certification for interlocutory appeal. The issues presented by this case may radically affect business models for developers of Internet-enabled devices and other technologies. Given the rapid pace of innovation—and developers' need for clarity as to the VPPA's scope—immediate guidance from the Ninth Circuit is needed.

Plaintiffs' effort to apply the Video Protection Privacy Act ("VPPA") to Vizio's Smart TVs cannot be reconciled with the statutory text. Vizio is nothing like the paradigm wrongdoer covered by VPPA—a video-store clerk who reveals information about consumers' viewing habits. Vizio is not a "video tape service provider" because it

---

[1] No party counsel authored this brief in whole or in part. No one other than the Chamber, its members, or its counsel contributed any money to fund its preparation or submission.

-1-

does not provide content; rather, it provides an app that allows third parties to provide content. Vizio does not share "personally identifiable information"; rather, it shares MAC addresses that, to a lay person, are unintelligible strings of numbers. And customers who buy a Smart TV with pre-installed software are not "subscribers" to a videotape service.

Moreover, the VPPA should not be applied to the sharing of electronic data for targeted advertising—a business model that did not exist at the time of the VPPA's enactment. The debate over the balance between privacy and advertiser efficiency on the Internet should occur in Congress, not in a class action lawsuit. Indeed, Congress has held these debates, but has declined to modify the VPPA to cover companies like Vizio. Plaintiffs' arguments thus attempt to tread in an area where Congress has steered clear.

## ARGUMENT

### I.   This Case is Highly Important and Worthy of an Interlocutory Appeal.

The Court should certify its decision for interlocutory appeal because its decision addresses three distinct issues that have enormous implications for developers of Internet-enabled devices and other Internet technologies.

First: What is a "video tape service provider" under 18 U.S.C. § 2710(a)(4)? Does that term encompass only content providers, as Vizio contends? Or does it encompass sellers of hardware with pre-installed apps, as Plaintiffs contend? Many products exist containing apps that allow content delivery, ranging from Smart TVs to cell phones. Thus, the scope of "video tape service provider" has profound impact on the VPPA's coverage.

Second: What is "personally identifiable information" under 18 U.S.C. § 2710(a)(3)? Is it information like a person's name or address from which ordinary people can discern a person's identity, as Vizio contends? Or does it encompass information like IP addresses, from which identity can be reverse-engineered only through data-mining techniques that analyze disparate strands of information, as Plaintiffs contend? Without exaggeration, the answer to this question may radically affect the operation of the Internet. Every major Internet content provider—including Google, Facebook, Twitter, and YouTube, Hulu—

employ targeted advertising-based business models. Depending on the scope of "personally identifiable information," all, some, or none of those services could be deemed to share "personally identifiable information" in violation of the VPPA—and all, some, or none of those services could be forced to change their fundamental business models.

Third: What is a "consumer" under 18 U.S.C. § 2710(a)(1)? Is it a person who actually subscribes to a content delivery service, as Vizio contends? Or does it cover a person who buys a device with pre-installed apps, as Plaintiffs contend? Further, when does an app service transform into a video service to which a consumer "subscribes"? The scope of "consumer" will substantially affect the scope of services that may trigger VPPA liability.

These questions should be answered by the Ninth Circuit as quickly as possible. Technology companies innovate rapidly. They need to know whether their advertising models will expose them to millions of dollars in class action liability. Guidance from the Ninth Circuit is badly needed to ensure that fundamental questions about the legality of the Internet's core business models are not relitigated in district court after district court. Yet review after final judgment may be unrealistic. VPPA cases are typically class actions, and few class actions proceed to trial. *See AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1752 (2011) ("[W]hen damages allegedly owed to tens of thousands of potential claimants are aggregated and decided at once, the risk of an error will often become unacceptable. Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims."); *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2010) (noting that a "study of certified class actions in federal court in a two-year period (2005 to 2007) found that all 30 such actions had been settled"). Accordingly, it is likely that if review of these issues is to occur, it must occur now.

This is the ideal VPPA case to certify for interlocutory appeal, because it presents three important issues simultaneously. It will allow the Ninth Circuit to address the scope of "video tape service provider," "personally identifying information," and "consumer."

Thus, certifying this case for interlocutory appeal will allow the Ninth Circuit to provide significant guidance as to the VPPA's scope in the Internet era.

## II. Plaintiffs' Theory Incorrectly Interprets the VPPA and Undermines Congress' Central Role in Regulating Internet-Enabled Devices.

Plaintiffs' position in this case is that the VPPA—a statute designed to ensure that brick-and-mortar video stores do not release its customers' names—applies to advertising-based business models, which deploy technology that would have been unthinkable at the time the VPPA was enacted. That position incorrectly interprets the statutory text and improperly diverts policy issues appropriately reserved for Congress to class action litigation. At a minimum, Plaintiffs' arguments are sufficiently debatable that this Court's order on Defendants' motion to dismiss warrants certification for interlocutory appeal.

The VPPA prohibits "video tape service providers" from disclosing "personally identifiable information" of "consumers." 18 U.S.C. § 2710. That statute was enacted in 1988 in response to a specific incident: the publication of Judge Robert Bork's video rental history during his Supreme Court confirmation hearings. It is easy to see how the statute prevents such incidents from recurring. A video store is undoubtedly a "video tape service provider": it is an entity "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Judge Bork's video store identified Judge Bork by name when it disclosed his viewing history, and thus undoubtedly disclosed "personally identifying information": "information which identifies a person as having requested or obtained specific video materials or services." *Id.* § 2710(a)(3). And Judge Bork was undoubtedly a "consumer": he was a "renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1).

Thus, the VPPA fits a video store's disclosure of video rentals like a glove. But it does not fit companies like Vizio, for at least three reasons. First, unlike a video store, companies like Vizio do not sell "prerecorded video cassette tapes or similar audio visual materials." They sell TVs with software that allow third parties to offer audio visual

materials. For instance here, Vizio's software is neither "audio visual material[]" nor "similar to" "prerecorded video cassette tapes." Indeed, modern integrated technology companies like Vizio far more closely resembles a manufacturer of VHS or DVD players than a Blockbuster store. Like a VHS or DVD manufacturer, Vizio does not own the content that viewers consume; instead it facilitates a wide variety of third parties to make use of its hardware. Moreover, as with a VHS or DVD manufacturer, after a consumer purchases the hardware, the financial relationship between Vizio and the consumer ends. Vizio's TVs simply act as neutral conduits that facilitate the sale of content by third parties.

Second, unlike a video store clerk who discloses a consumer's name, companies like Vizio do not disclose any information that an ordinary person could use to identify a person. Rather, they disclose information such as MAC addresses, which are unintelligible strings of numbers. There is no inherent meaning to these random numbers, and therefore even a computer cannot identify a specific person based on this information; rather, Plaintiffs' theory is that a recipient can compare these identifiers with other information and crunch them to infer a person's presumed identity. But the allegation that a recipient of information will "assemble anonymous pieces of data to unmask the identity" of individual consumers is "simply too hypothetical to support liability under the Video Privacy Protection Act." *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 290 (3d Cir. 2016).

Third, a Smart TV purchaser is nothing like the "consumers" that Congress had in mind when it enacted the VPPA. The VPPA applies to "subscriber[s] of goods or services from a video tape service provider," 18 U.S.C. § 2710(a)(1). This definition naturally encompasses a person who periodically receives videos from a content provider. It does not naturally encompass the purchaser of a Smart TV with a pre-installed content app. Consumers do not provide a username or other personal information to Vizio; they do not make regular payments to Vizio, beyond the price of the TV itself; and they do not receive any content from Vizio. Thus, they are not "subscribers" to a "video tape service" provided by Vizio under the natural meaning of those words.

Plaintiffs' attempts to extend the VPPA to companies like Vizio have a deeper flaw. The VPPA was enacted before Smart TVs, or advertising-based business models, existed. Congress did not contemplate the policy issues presented by this case and courts should not retrofit a statute addressing a different problem to the delicate issue of Internet privacy.

The Third Circuit's decision in *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262 (3d Cir. 2016), is directly on point. In that case, the Third Circuit held that "Congress's purpose in passing the Video Privacy Protection Act was quite narrow: to prevent disclosures of information that would, with little or no extra effort, permit an ordinary recipient to identify a particular person's video-watching habits." It rejected the view that "when Congress passed the Act, it intended for the law to cover factual circumstances far removed from those that motivated its passage." *Id.* at 284. As the Court explained, the VPPA applies to disclosures of "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior. The classic example will always be a video clerk leaking an individual customer's video rental history. Every step away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim." *Id.* at 290. The Court found that disclosures of digital identifiers such as IP addresses "are simply too far afield from the circumstances that motivated the Act's passage to trigger liability." *Id.* Similarly, there are vast differences between companies like Vizio and Judge Bork's rogue video store clerk, and a statute designed to apply to the latter should not be extended to the former.

Further, as previously explained, Plaintiffs' arguments have implications far beyond this case. Plaintiffs' core theory is that Vizio violates the VPPA because it shares electronic information so as to facilitate the delivery of targeted advertising. Yet the business model of sharing information for purposes of targeted advertising is the business model underlying many of the Internet's most widely used services. That business model is ubiquitous in the "Internet of things"—the network of physical devices, connected to the Internet, that collect data—and the Court's decision may have major ramifications to such technologies. And of

course, that business model is even more common outside the context of physical devices. Content providers like YouTube, Google, and Facebook provide a host of services—search engines, email, and social media, to take but a few examples. Users of those services provide data about their browsing habits, on which content providers rely to offer more effective advertising. If these providers could not share data about browsing habits to facilitate advertising, their business models would fundamentally change.

Whether such advertising-based business models improperly impinge on users' privacy is a difficult and nuanced policy debate. But that debate should occur in Congress, not in litigation under a statute enacted before those technologies existed. *See, e.g.*, *Glickman v. Wileman Bros. & Elliott*, 521 U.S. 457, 468 (1997) (declining to address an issue because it represented "a question of economic policy for Congress and the Executive to resolve"); *United States v. Topco Asosciates, Inc.*, 405 U.S. 596, 611-12 (1972) ("To analyze, interpret, and evaluate the myriad of competing interests and the endless data that would surely be brought to bear on such [economic policy] decisions … the judgment of the elected representatives of the people is required."). Congress is better positioned to undertake the extensive fact-finding that would be necessary in weighing the benefits of advertising-based business models against concerns about privacy. And given that advertising-based business models vary considerably—content providers like YouTube, cell phone providers like Apple, and Smart TV providers like Vizio, all rely on advertising in different ways—Congress is in the best position to analyze these disparate services and decide what privacy regulation is appropriate for each one.

Moreover, Congress has devoted scrupulous attention in recent years to privacy issues surrounding Internet-based services. For instance, Congress amended the VPPA in 2013 to "modify[] those provisions of the law governing how a consumer can consent to the disclosure of personally identifiable information." 827 F.3d at 287. The legislative history of those amendments "demonstrates that Congress was keenly aware of how technological changes have affected the original Act." *Id.* at 288. As the Senate Report

explained: "At the time of the [VPPA's] enactment, consumers rented movies from video stores. The method that Americans used to watch videos in 1988—the VHS cassette tape—is now obsolete. In its place, the Internet has revolutionized the way that American consumers rent and watch movies and television programs. Today, so-called 'on-demand' cable services and Internet streaming services allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." *Id.* (quoting S. Rep. No. 112-258, at 2 (2012)). Yet Congress did not amend the statutory definitions so as to regulate the sale of Smart TVs—which is why Plaintiffs resort to arguing that the archaic definitions of the original VPPA can be stretched to cover companies such as Vizio. Given that "Congress has recently revisited the [VPPA] and … left the law almost entirely unchanged," *id.*, a ruling that radically expands its coverage is sufficiently debatable and significant to warrant Ninth Circuit review.

Because there are substantial grounds for disagreement with the Court's ruling and because this case presents issues of great importance, the appeal should be certified.

Dated:  May 12, 2017

JENNER & BLOCK LLP

By:   /s/ Julie Shepard

Julie Shepard
Adam Unikowsky

*Attorneys for Amicus Curiae Chamber of Commerce of the United States of America in Support of Defendants*

# **CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains ___ words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.

AMICUS BRIEF BY THE CHAMBER OF COMMERCE IN SUPPORT OF DEFENDANTS' MOTION TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL
MDL Case No. 8:16-ml-02693-JLS-KES