# EXHIBIT 1

1   Joseph W. Cotchett (Bar No. 36324)
    jcotchett@cpmlegal.com
2   Adam J. Zapala (Bar No. 245748)
    azapala@cpmlegal.com
3   Gwendolyn Giblin (Bar No. 181973)
    ggiblin@cpmlegal.com
4   Mark Ram (Bar No. 294050)
    mram@cpmlegal.com
5   **COTCHETT, PITRE & McCARTHY, LLP**
    840 Malcolm Road, Suite 200
6   Burlingame, CA 94010
    Telephone: 650-697-6000
7   Facsimile: 650-697-0577

8   Eric H. Gibbs (Bar No. 178658)
    ehg@classlawgroup.com
9   Andre Mura (Bar No. 298541)
    amm@classlawgroup.com
10  Linda Lam (Bar No. 301461)
    lpl@classlawgroup.com
11  **GIRARD GIBBS LLP**
    One Kaiser Plaza, Suite 1125
12  Oakland, CA 94612
    Telephone: (510) 350-9700
13  Facsimile: (510) 350-9701

14  *Interim Co-Lead Counsel for Plaintiffs*

15                  **UNITED STATES DISTRICT COURT**

16               **CENTRAL DISTRICT OF CALIFORNIA**

17                      **SANTA ANA DIVISION**

18  | **In re: Vizio, Inc., Consumer Privacy Litigation** | Case No. 8:16-ml-02693-JLS-KES |
19  | | [Discovery Document: Referred to Magistrate Judge Karen E. Scott] |
20  | This document relates to: | **DECLARATION OF ADAM J. ZAPALA IN SUPPORT OF PLAINTIFFS' POSITION IN JOINT STIPULATION RE DEFINITION OF "TRACKED DATA" [LOCAL RULE 37-2]** |
21  | ALL ACTIONS | |
22  | | |
23  | | |
24  | | **Date: June 27, 2017** **Time: 10:00 am** **Discovery Cutoff: n/a** |
25  | | **Pretrial Conference: n/a** **Trial: n/a** |
26  | | **Judge: Hon. Karen E. Scott** |

27       **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED**
28                            **UNDER SEAL**

**DECLARATION OF ADAM J. ZAPALA IN SUPPORT OF PLAINTIFFS' POSITION IN JOINT STIPULATION RE DEFINITION OF "TRACKED DATA" [LOCAL RULE 37-2]; Case No. 8:16-ml-02693-JLS-KES**

I, Adam J. Zapala, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California and this Court. I am a partner at the law firm of Cotchett, Pitre & McCarthy, LLP.

2.      I submit this declaration in support of Plaintiffs' Position in the Joint Stipulation Pursuant to Local Rule 37-2 Regrading the Appropriate Definition for "Tracked Data."

3.      I make this declaration pursuant to 28 U.S.C. § 1746. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

4.      Attached hereto as **Exhibit A** is a true and correct copy of the Scheduling Order and Order Approving Stipulation, Order No. 4, issued by Judge Josephine L. Staton in the above-captioned action on October 14, 2016 (ECF No. 120).

5.      Attached hereto as **Exhibit B** is a true and correct copy of Plaintiffs' Request for Production of Documents and Defendants' Responses thereto, Set One, in the above-captioned action.

6.      Attached hereto as **Exhibit C** is a true and correct copy of the Complaint for Permanent Injunction and Other Equitable and Monetary Relief, filed on February 6, 2017 in *Federal Trade Commission, et al. v. Vizio, Inc. et al.*, in the United States District Court for the District of New Jersey, Case No. 2:17-cv-00758 (ECF Nos. 1, 1-1, and 1-2).

7.      Attached hereto as **Exhibit D** is a true and correct copy of the Stipulated Order for Permanent Injunction and Monetary Judgment, entered on February 14, 2017 in *Federal Trade Commission, et al. v. Vizio, Inc. et al.*, in the United States District Court for the District of New Jersey, Case No. 2:17-cv-00758 (ECF No. 9).

**DECLARATION OF ADAM J. ZAPALA IN SUPPORT OF PLAINTIFFS' POSITION IN JOINT STIPULATION RE DEFINITION OF "TRACKED DATA" [LOCAL RULE 37-2]; No. 8:16-ml-02693-JLS-KES** **1**

8.      Attached hereto as **Exhibit E** is a true and correct copy of the operative Second Consolidated Complaint, filed March 23, 2017 in the above-captioned action (ECF No. 136).

9.      Attached hereto as **Exhibit F** is a true and correct copy of a document produced in discovery in the above-captioned action by Defendants VIZIO, Inc., VIZIO Holdings, Inc., VIZIO Inscape Technologies, LLC, and VIZIO Inscape Services, LLC (collectively, the "VIZIO Defendants") that bears the bates numbers VIZ-0001702 – VIZ-0001713.

10.      Attached hereto as **Exhibit G** is a true and correct copy of a document produced in discovery in the above-captioned action by the Vizio Defendants that bears the bates numbers VIZ-0003859 – VIZ-0003863.

11.      Attached hereto as **Exhibit H** is a true and correct copy of a document produced in discovery in the above-captioned action by the Vizio Defendants that bears the bates numbers VIZ-0003909 – VIZ-0003910.

12.      Attached hereto as **Exhibit I** is a true and correct copy of a document produced in discovery in the above-captioned action by the Vizio Defendants that bears the bates numbers VIZ-0003911 – VIZ-0003913.

13.      Attached hereto as **Exhibit J** is a true and correct copy of a document produced in discovery in the above-captioned action by the Vizio Defendants that bears the bates numbers VIZ-0003879 – VIZ-0003883.

14.      Attached hereto as **Exhibit K** is a true and correct copy of a document produced in discovery in the above-captioned action by the Vizio Defendants that bears the bates numbers VIZ-0001666 – VIZ-0001687.

15.      Attached hereto as **Exhibit L** is a true and correct copy of the Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, issued by Judge Josephine L. Staton on March 2, 2017 in the above-captioned action (ECF No. 130).

**DECLARATION OF ADAM J. ZAPALA IN SUPPORT OF PLAINTIFFS' POSITION IN JOINT STIPULATION RE DEFINITION OF "TRACKED DATA" [LOCAL RULE 37-2]; No. 8:16-ml-02693-JLS-KES**          **2**

16.     Attached hereto as **Exhibit M** is a true and correct copy of the Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Second Consolidated Complaint and Motion to Strike Class Allegations, filed by the Vizio Defendants on April 13, 2017 in the above-captioned action (ECF No. 145-1).

17.     Attached hereto as **Exhibit N** is a true and correct copy of an Order Granting in Part and Denying in Part Defendant Ebay Inc.'s Motion to Compel Responses and Interrogatory and Requests for Production, issued on September 15, 2016 as Document Number 116 in *Wimo Labs, LLC v. Ebay, Inc., et al.*, in the United States District Court for the Central District of California, Case No. 15-cv-01330-JLS-KES.

18.     Attached hereto as **Exhibit O** is a true and correct copy of a Minute Order entered on October 12, 2016 as Document Number 55 in *Ecojet, Inc. v. Luraco, Inc.*, in the United States District Court for the Central District of California, Case No. 16-cv-00487-AG-KES.

19.     Attached hereto as **Exhibit P** is a true and correct copy of Plaintiffs' Opposition to Vizio Defendants' Motion to Dismiss and Strike, filed in the above-caption action on May 4, 2017 (ECF No. 154).//

20.     Attached hereto as **Exhibit Q** is a true and correct copy of Defendants' Response to Plaintiffs' Further Case Management Conference Statement, filed in the above-captioned action on April 18, 2017 (ECF No. 149).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on May 16, 2017 in Washington, D.C.

**COTCHETT, PITRE & McCARTHY, LLP**

_____*/s/ Adam J. Zapala*_____
Adam J. Zapala

DECLARATION OF ADAM J. ZAPALA IN SUPPORT OF PLAINTIFFS' POSITION IN JOINT STIPULATION RE DEFINITION OF "TRACKED DATA" [LOCAL RULE 37-2]; No. 8:16-ml-02693-JLS-KES          3

# EXHIBIT A

1

2

3

4

5

6

7

8    **UNITED STATES DISTRICT COURT**

9    **CENTRAL DISTRICT OF CALIFORNIA**

10   **SANTA ANA DIVISION**

11   **In re: Vizio, Inc., Consumer Privacy**          MDL Case No. 8:16-ml-02693-JLS-KES
     **Litigation**
12                                                     **SCHEDULING ORDER AND**
13                                                     **ORDER APPROVING STIPULATION**

14                                                     **ORDER NO. 4**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Court has received and reviewed the parties' Joint Rule 26(f) Report (Doc. 106) and their Stipulation regarding the reservation of claims not asserted under state law (Doc. 106-1). Pursuant to Federal Rule of Civil Procedure 16(b), the Court issues the following Scheduling Order, and as set forth below, the Court APPROVES the parties' Stipulation.

## I. SCHEDULING ORDER

The Court ADOPTS the parties' proposed schedule, set forth below. When a date or deadline identified below relative to another date becomes a date certain, the parties shall file a joint notice so advising the Court. For example, within seven days of the filing of an Answer, the parties shall file a joint notice identifying specific dates for the filing of a Motion for Class Certification and all other dates that are identified in this Order relative to the filing of an Answer.

The Court declines to bifurcate discovery. However, the parties are encouraged to prioritize discovery in a manner they find to be efficient and mutually agreeable.

The expert deadlines set forth below are for experts who will offer opinions regarding the merits of this case. For experts who will offer opinions related to issues of class certification, the expert reports shall be disclosed no later than the filing of the motion (Plaintiff) and the opposition brief (Defendants).

The dates below will not be continued absent a showing of good cause. *See* Fed. R. Civ. P. 16(b)(4).

**Deadline for Filing Motions to Add Parties or Amended Pleadings**

December 14, 2016

**Motion to Dismiss**

| | |
|---|---|
| Defendants' Motion to Dismiss filed: | September 19, 2016 |
| Opposition: | November 3, 2016 |
| Reply: | November 23, 2016 |

| | |
|---|---|
| Hearing: | December 16, 2016 at 2:30 p.m. |

**Motion for Class Certification**

| | |
|---|---|
| Motion to Class Certification: | 210 days from Answer |
| Opposition to Motion for Class Certification: | 75 days from Motion |
| Reply in Support of Motion for Class Certification: | 60 days from Opposition |
| Hearing: | 28 days from Reply |

**Merits Experts**

Disclosure of Merits Experts and Reports

>60 days from Order re Class Certification Motion

Disclosure of Rebuttal Merits Expert and Rebuttal Expert Reports

>105 days from Order re Class Certification Motion

Expert Discovery Cut-Off

>120 days from Order re Class Certification Motion

**Fact Discovery**

Fact Discovery Cut-off

>120 days from Order re Class Certification Motion

**Other Motions**

Last day to file motions other than *Daubert* and motions *in limine*:

**Settlement Discussions/Mediation**

Last day to Conduct Settlement Discussions

>150 days from Order re Class Certification Motion

**Case Management Conferences**

As suggested by the parties, a case management conference shall be held at the same time and date as the hearing on the pending Motion to Dismiss, December 16, 2016 at 2:30 p.m. The Court agrees that quarterly case management conferences should be scheduled; however, the Court sees no need for such a conference on January 12, 2017. The parties are directed to confer and propose

3

conference dates and times for a case management conference in March 2017, and quarterly thereafter.

## II. ORDER APPROVING STIPULATION

The Court APPROVES the parties' Stipulation to toll state-law claims other than those arising under the laws of California, Florida, Massachusetts, New York or Washington.  (Doc. 106-1.)  Accordingly, the Court ORDERS:

Until otherwise ordered by the Court, the Consolidated Complaint and all future pleadings shall assert on behalf of Plaintiffs and the proposed class(es) against the Defendants only those claims that arise under federal, California, Florida, Massachusetts, New York and Washington law. To the extent any named Plaintiff or other member of a proposed class in this multidistrict litigation may have a claim against the Defendants that relates to the subject matter of this litigation (as set forth in the present complaints filed by the various Plaintiffs included in this MDL or any future tag-along action(s)), which pleads a claim or claims arising under the law of a state or territory other than California, Florida, Massachusetts, New York or Washington, those claims will be tolled until the earlier of: (1) a final dismissal of all of Plaintiffs' claims in the consolidated complaint with prejudice, including after the resolution of any appeals affirming such a dismissal with prejudice; (2) a period of one year from the date of this stipulation; or (3) until an order of this Court directs otherwise.

IT IS SO ORDERED.

Dated:  October 14, 2016

_____
Hon. Josephine L. Staton
United States District Judge

# EXHIBIT B

1  **AKIN GUMP STRAUSS HAUER & FELD LLP**
   ANTHONY T. PIERCE (*admitted pro hac vice*)
2  apierce@akingump.com
   1333 New Hampshire Avenue NW, Suite 1500
3  Washington, DC 20036
   Tel: 202-887-4000
4  Fax: 202-887-4288

5  HYONGSOON KIM (SBN 257019)
   kimh@akingump.com
6  4 Park Plaza, Suite 1900
   Irvine, CA 92614
7  Tel: 949-885-4100
   Fax: 949-885-4101

8
   PATRICK EOGHAN MURRAY (SBN 293765)
9  pmurray@akingump.com
   1999 Avenue of the Stars, Suite 600
10 Los Angeles, CA 90067
   Tel: 310-229-1000
11 Fax: 310-229-1001

12 *Attorneys for Defendants VIZIO Holdings, Inc.,*
   *VIZIO, Inc., VIZIO Inscape Services, LLC,*
13 *and VIZIO Inscape Technologies, LLC*

14

15                **UNITED STATES DISTRICT COURT**

16               **CENTRAL DISTRICT OF CALIFORNIA**

17                      **SANTA ANA DIVISION**

18

19 | In re: Vizio, Inc., Consumer Privacy | MDL Case No. 8:16-ml-02693-JLS-KES
   | Litigation

20                                       **DEFENDANTS' OBJECTIONS AND**
                                          **RESPONSES TO PLAINTIFFS'**
21                                        **REQUEST FOR PRODUCTION OF**
   This document relates to:             **DOCUMENTS, SET ONE**
22

23 ALL ACTIONS                           Judge: Hon. Josephine L. Staton

24

25

26

27

28

1   Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendants VIZIO,
2   Inc., VIZIO Holdings, Inc., VIZIO Inscape Technologies, LLC (f/k/a Cognitive Media
3   Networks, Inc.), and VIZIO Inscape Services, LLC (collectively, "Defendants"), by and
4   through their undersigned counsel, hereby respond and object to Plaintiffs' Request for
5   Production of Documents, Set One (the "Requests") as follows:

6   **RESERVATION OF RIGHTS**

7       1.   Defendants provide these responses and objections without waiving or
8   intending to waive, and, on the contrary, preserving and intending to preserve:

9           a.   the right to object on any ground to the use of these responses and
10  objections or the subject matter thereof in any proceeding in this or any other action;

11          b.   the right to object on any ground to a request for further responses to
12  the Requests or any other discovery request involving or relating to the subject matter of
13  the Requests responded to herein; and

14          c.   the right at any time to supplement, amend, correct, add to, or clarify
15  any of the responses and objections provided herein.

16      2.   In responding to the Requests, Defendants do not admit, concede, or
17  acquiesce in the accuracy of any definitions of terms or descriptions of any facts, events,
18  pleadings, or documents contained therein.  Defendants specifically do not waive their
19  objections to any definition as vague, ambiguous, or overbroad and reserve the right to
20  define terms differently or more specifically from the way they are defined in the
21  Requests.

22      3.   In each and every instance in which Defendants assert an objection to a
23  Request, such objection shall be construed to preserve all of Defendants' rights to make
24  similar objections in any future supplemental response to the Requests.  Moreover, a
25  failure to object herein shall not constitute a waiver of any objections that Defendants
26  may make in future supplemental responses.

27      4.   Any agreement by Defendants to produce documents in response to a
28  Request does not necessarily mean that any responsive documents actually exist in

2

1  Defendants' possession, custody, or control.  To the extent Defendants determine, after
2  conducting a reasonably diligent search and to the best of their knowledge, that they
3  agreed to produce documents in response to a Request when in fact no such documents
4  exist in their possession, custody, or control, Defendants will amend these responses
5  accordingly.

6       5.     Inadvertent production or disclosure of information or documents otherwise
7  protected from discovery under the attorney-client privilege, the work product doctrine,
8  or any other applicable privilege, immunity, or protection from disclosure, shall not
9  constitute a waiver of such privilege, immunity, or protection, either generally or
10  specifically, with respect to such document or information or any other document or
11  information, or with respect to the subject matter thereof, and Defendants reserve the
12  right to request the return of any such documents or information and all copies thereof in
13  accordance with the Stipulated Protective Order.  Defendants reserve the right to object to
14  the use of any such documents or information at any time during this action or in any
15  subsequent proceeding.

16       6.     Defendants' responses and objections to the Requests are based upon
17  information currently available to Defendants, and are made subject to the Specific
18  Objections below.  Defendants reserve the right to alter, amend, supplement, or revise any
19  responses or objections as further information is discovered.

20  **SPECIFIC OBJECTIONS TO DEFINITIONS**

21       The following Specific Objections to Definitions apply to each and every Request
22  for Production that includes any of the following defined terms, and shall have the same
23  force and effect as if fully set forth in Defendants' responses to each Request.

24       1.     Defendants object to the Definition of "Complaint" because it misstates the
25  date Plaintiffs' Consolidated Complaint was filed in this action.  For purposes of these
26  responses and objections, Defendants will interpret "Complaint" to mean the
27  Consolidated Complaint filed by Plaintiffs on August 15, 2016 in *In re Vizio, Inc.,*
28  *Consumer Privacy Litigation*, No. 8:16-ml-02693-JLS-KES as Docket Number 108.

2.      Defendants object to the Definition of "Vizio," "Defendants," "You," and "Your" as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it includes persons or entities not currently within Defendants' control.

3.      Defendants object to the Definition of "Document" to the extent it purports to impose any obligations on Defendants beyond those required by the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the Central District of California, or any other applicable law or rules.

4.      Defendants object to the Definition of "Electronic Media" to the extent it purports to impose any obligations on Defendants beyond those required by the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the Central District of California, any other applicable law or rules, or any stipulation or order entered in this action governing the preservation and production of documents and electronically stored information, including the final and executed version of the ESI protocol the parties are currently negotiating.

5.      Defendants object to the Definition of "Communications" to the extent it purports to impose any obligations on Defendants beyond those required by the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the Central District of California, or any other applicable law or rules.

6.      Defendants object to the Definition of "Electronically Stored Information" and "ESI" to the extent it purports to impose any obligations on Defendants beyond those required by the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the Central District of California, any other applicable law or rules, or any stipulation or order entered in this action governing the preservation and production of documents and electronically stored information, including the final and executed version of the ESI protocol the parties are currently negotiating.

7.      Defendants object to the Definitions of "Identify" to the extent they purport to impose any obligations on Defendants beyond those required by the Federal Rules of

1  Civil Procedure, the Local Rules for the United States District Court for the Central
2  District of California, or any other applicable law or rules.

3      8.    Defendants object to the Definitions of "Referring," "Concerning,"
4  "Relating to," and "Regarding" on the grounds that they are indefinite, uncertain, and,
5  when applied to the Requests, fail to describe or designate the documents sought with
6  reasonable particularity. Defendants will apply a common sense test in good faith when
7  interpreting the reasonable scope of any Requests that use these terms.

8      9.    Defendants object to the Definition of "Smart TV" as vague, ambiguous,
9  overly broad, unduly burdensome, and as seeking information that is not relevant to any
10  claim or defense in this action or proportional to the needs of the case. This term could,
11  for instance, be interpreted to include Smart TVs sold by companies other than Vizio.
12  For purposes of these responses and objections, Defendants will interpret "Smart TV" to
13  have the same meaning as "Vizio Smart TV," which is discussed below.

14      10.   Defendants object to the Definition of "Tracked Data" as vague, ambiguous,
15  overly broad, unduly burdensome, and as seeking information that is not relevant to any
16  claim or defense in this action or proportional to the needs of the case. This term could,
17  for instance, be interpreted to include every piece of "information" relating in any way to
18  Vizio Smart TVs—including information relating to systems other than Smart
19  Interactivity, such as Vizio's Internet Apps, Internet Apps Plus, and SmartCast, as well as
20  information such as ordinary viewer registration data and other similar information that is
21  not the subject of Plaintiffs' lawsuit—which far exceeds the primary and reasonable
22  scope of the Complaint (i.e., the collection, retention, and use of viewer data and
23  associated data collected through Smart Interactivity on Vizio Smart TVs). For purposes
24  of these responses and objections, Defendants will interpret "Tracked Data" to mean the
25  information collected through Smart Interactivity on Vizio Smart TVs.

26      11.   Defendants object to the Definition of "Vizio Smart TV" to the extent it
27  incorporates the Definitions of "Smart TV" and "Tracked Data," Specific Objections to
28  which are discussed above. For purposes of these responses and objections, Defendants

5

1 | will interpret "Vizio Smart TV" to mean any Smart TV sold by Vizio that collects
2 | information through Smart Interactivity.

### SPECIFIC OBJECTIONS TO INSTRUCTIONS

1. Defendants object to each and every Instruction to the extent it purports to impose any obligations on Defendants beyond those required by the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the Central District of California, any other applicable law or rules, or any stipulation or order entered in this action governing the preservation and production of documents and electronically stored information, including the final and executed version of the ESI protocol the parties are currently negotiating.

2. Defendants object to the time for production stated in the Requests as unreasonable, unduly burdensome, and not proportional to the needs of the case. Defendants will provide Plaintiffs with a list of proposed search terms within 30 days of serving these responses and objections. Defendants anticipate that they will begin producing documents in response to the Requests on a rolling basis within 60 days after the parties agree to a final list of search terms relating to the Requests, and Defendants anticipate that they will complete their production of documents in response to the Requests within 60 days after making their first document production. Defendants will notify Plaintiffs should additional time be required to complete the production.

### SPECIFIC OBJECTIONS TO RELEVANT TIME PERIOD

1. Defendants object to the Relevant Time Period as overbroad, unduly burdensome, and as seeking information that is not relevant to any claim or defense in this proceeding or proportional to the needs of the case. Plaintiffs allege in the Complaint that "Vizio initiated Smart Interactivity in or about February 2014," and therefore have not and cannot justify a Relevant Time Period that extends over two years prior to that date. Compl. ¶ 59. Unless otherwise specified in the responses below, Defendants will consider the Relevant Time Period for each Request as January 1, 2013 through the present.

6

1

## RESPONSES TO REQUESTS FOR PRODUCTION

2  **REQUEST FOR PRODUCTION NO. 1:**

3       All documents regarding the development and/or content of any messages
4  designed to reach consumers regarding Smart Interactivity or any other function of Vizio
5  Smart TV's related to Tracked Data, whether the messages were designed to reach
6  consumers within the TV itself (for example, at startup or within a screen menu), in sales
7  and marketing materials, in materials found at retail or wholesale locations where
8  consumers purchase televisions, or on the packaging of any Smart TV.

9  **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

10      Defendants object to this Request as overly broad, unduly burdensome, and as
11  seeking information that is not relevant to any claim or defense in this action or
12  proportional to the needs of the case. In particular, this Request purports to seek *every*
13  document regarding "messages" to consumers concerning any function of Vizio Smart
14  TVs that relate to "Tracked Data"—including functions unrelated to Smart
15  Interactivity—which far exceeds the scope of the Complaint. Moreover, Defendants
16  incorporate by reference their Specific Objection to the Definition of "Tracked Data."
17  Defendants also object to this Request on the grounds that the phrase "any messages
18  designed to reach consumers" is vague, ambiguous, and cannot be understood with
19  reasonable certainty because it is not clear what constitutes a "message" for purposes of
20  this Request. Defendants further object to this Request to the extent it seeks information
21  not in the possession, custody, or control of Defendants, such as information solely in the
22  possession of retailers and wholesalers. In addition, Defendants object to this Request to
23  the extent it seeks information protected by the attorney-client privilege, the work
24  product doctrine, or any other applicable privilege, protection, or immunity.

25      Subject to and without waiving the foregoing Specific Objections, Defendants will
26  produce all disclosures to Vizio Smart TV users regarding Smart Interactivity, including
27  sales and marketing materials, product packaging, and disclosures displayed on Vizio

28

1  Smart TVs regarding Smart Interactivity to the extent such documents exist and are in
2  their possession, custody, or control.

3  **REQUEST FOR PRODUCTION NO. 2:**

4      All documents regarding the development and/or content of any messages
5  designed to reach retailers or wholesalers regarding Smart Interactivity or any other
6  function of Vizio Smart TV's related to Tracked Data, whether the messages were
7  designed to reach consumers within the TV itself (for example, at startup or within a
8  screen menu), in sales and marketing materials, in materials found at retail or wholesale
9  locations where consumers purchase televisions, or on the packaging of any Smart TV.

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

11      Defendants object to this Request as overly broad, unduly burdensome, and as
12  seeking information that is not relevant to any claim or defense in this action or
13  proportional to the needs of the case. In particular, this Request purports to seek *every*
14  document regarding "messages" to retailers or wholesalers concerning any function of
15  Vizio Smart TVs that relate to "Tracked Data"—including functions unrelated to Smart
16  Interactivity—which far exceeds the scope of the Complaint. Moreover, Defendants
17  incorporate by reference their Specific Objection to the Definition of "Tracked Data."
18  Defendants also object to this Request on the grounds that the phrase "any messages
19  designed to reach retailers or wholesalers" is vague, ambiguous, and cannot be
20  understood with reasonable certainty because it is not clear what constitutes a "message"
21  for purposes of this Request. Defendants further object to this Request to the extent it
22  seeks information not in the possession, custody, or control of Defendants, such as
23  information solely in the possession of retailers and wholesalers. In addition, Defendants
24  object to this Request to the extent it seeks information protected by the attorney-client
25  privilege, the work product doctrine, or any other applicable privilege, protection, or
26  immunity.

27      Subject to and without waiving the foregoing Specific Objections, Defendants will
28  produce all disclosures to retailers and/or wholesalers regarding Smart Interactivity,

8

1 including sales and marketing materials, product packaging, and disclosures displayed on
2 Vizio Smart TVs regarding Smart Interactivity to the extent such documents exist and are
3 in their possession, custody, or control.

4 **REQUEST FOR PRODUCTION NO. 3:**

5     All documents regarding the development and/or content of any messages to
6 investors regarding Smart Interactivity or any other function of Vizio Smart TV's related
7 to Tracked Data.

8 **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

9     Defendants object to this Request as overly broad, unduly burdensome, and as
10 seeking information that is not relevant to any claim or defense in this action or
11 proportional to the needs of the case. In particular, this Request purports to seek *every*
12 document regarding "messages" to investors concerning any function of Vizio Smart TVs
13 that relate to "Tracked Data"—including functions unrelated to Smart Interactivity—
14 which far exceeds the scope of the Complaint. Indeed, Plaintiffs do not even allege that
15 Defendants made false statements to investors. Moreover, Defendants incorporate by
16 reference their Specific Objection to the Definition of "Tracked Data." Defendants also
17 object to this Request on the grounds that the phrase "any messages to investors" is
18 vague, ambiguous, and cannot be understood with reasonable certainty because it is not
19 clear what constitutes a "message" for purposes of this Request. Defendants further
20 object to this Request to the extent it seeks information protected by the attorney-client
21 privilege, the work product doctrine, or any other applicable privilege, protection, or
22 immunity.

23 **REQUEST FOR PRODUCTION NO. 4:**

24     All documents identifying or describing the specific types of data or information
25 that are monitored, tracked, collected, aggregated, stored, and/or exfiltrated by any Vizio
26 Smart TV.

27

28

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Defendants object to this Request as overly broad, unduly burdensome, and as seeking information that is not relevant to any claim or defense in this action or proportional to the needs of the case. In particular, this Request purports to seek *every* document that identifies or describes any piece of "data" or "information" relating to Vizio Smart TVs—including data or information relating to systems other than Smart Interactivity, such as Vizio's Internet Apps, Internet Apps Plus, and SmartCast, as well as information such as ordinary viewer registration data and other similar information that is not the subject of Plaintiffs' lawsuit—which far exceeds the scope of the Complaint. Defendants also object to this Request to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, or immunity.

Subject to and without waiving the foregoing Specific Objections, Defendants will produce non-privileged documents sufficient to identify the specific types of information collected through Smart Interactivity on Vizio Smart TVs to the extent such documents exist and are in their possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 5:**

All documents identifying or describing the location(s) where Vizio sends, stores, or maintains Tracked Data, and the period of time Vizio retains or stores such Tracked Data.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Defendants object to this Request as overly broad, unduly burdensome, and as seeking information that is not relevant to any claim or defense in this action or proportional to the needs of the case. In particular, Defendants incorporate by reference their Specific Objection to the Definition of "Tracked Data." Defendants also object to this Request on the grounds that the term "location(s)" is vague, ambiguous, and cannot be understood with reasonable certainty because it is not clear whether Plaintiffs are seeking documents identifying physical or technical "locations." Defendants further

10

1  object to this Request to the extent it seeks information protected by the attorney-client
2  privilege, the work product doctrine, or any other applicable privilege, protection, or
3  immunity.

4       Subject to and without waiving the foregoing Specific Objections, Defendants will
5  produce non-privileged documents sufficient to identify the databases where Vizio retains
6  information collected through Smart Interactivity on Vizio Smart TVs, and the amount of
7  time Vizio retains such information, to the extent such documents exist and are in their
8  possession, custody, or control.

9  **REQUEST FOR PRODUCTION NO. 6:**

10      All documents regarding the period of time Vizio has tracked, collected,
11  aggregated, stored, and/or exfiltrated Tracked Data.

12  **RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

13      Defendants object to this Request as overly broad, unduly burdensome, and as
14  seeking information that is not relevant to any claim or defense in this action or
15  proportional to the needs of the case.  In particular, Defendants incorporate by reference
16  their Specific Objection to the Definition of "Tracked Data."  Defendants also object to
17  this Request to the extent it seeks information protected by the attorney-client privilege,
18  the work product doctrine, or any other applicable privilege, protection, or immunity.

19      Subject to and without waiving the foregoing Specific Objections, Defendants will
20  produce non-privileged documents sufficient to establish when Vizio began collecting
21  information through Smart Interactivity on Vizio Smart TVs to the extent such
22  documents exist and are in their possession, custody, or control.

23  **REQUEST FOR PRODUCTION NO. 7:**

24      All documents regarding the manner in which Vizio stores Tracked Data that it
25  collects, aggregates, or exfiltrates, including documents regarding the physical or
26  technological systems where Tracked Data is stored, what personnel or departments
27  within Vizio have access to the Tracked Data and for what purpose, and security efforts
28  undertaken with respect to the Tracked Data.

11

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Defendants object to this Request as overly broad, unduly burdensome, and as seeking information that is not relevant to any claim or defense in this action or proportional to the needs of the case. In particular, this Request purports to seek *every* document regarding any "manner in which Vizio stores Tracked Data"—including the manner in which Vizio stores information relating to systems other than Smart Interactivity—which far exceeds the scope of the Complaint. Likewise, to the extent this Request seeks information regarding "security efforts," it also far exceeds the scope of the Complaint because Plaintiffs do not assert any claims concerning Defendants' efforts to secure information collected through Smart Interactivity. Moreover, Defendants incorporate by reference their Specific Objection to the Definition of "Tracked Data." Defendants also object to this Request on the grounds that the phrase "the manner in which Vizio stores Tracked Data" is vague, ambiguous, and cannot be understood with reasonable certainty because it is not clear what constitutes a "manner" of storage for purposes of this Request. Defendants further object to this Request to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, or immunity.

Subject to and without waiving the foregoing Specific Objections, Defendants will produce non-privileged documents sufficient to identify the databases where Vizio retains information collected through Smart Interactivity on Vizio Smart TVs to the extent such documents exist and are in their possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 8:**

All documents regarding any manner in which Vizio utilizes Tracked Data to its economic advantage.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Defendants object to this Request as overly broad, unduly burdensome, and as seeking information that is not relevant to any claim or defense in this action or proportional to the needs of the case. In particular, this Request purports to seek *every*

12

1  document with any connection whatsoever to Vizio's use of "Tracked Data"—including
2  information unrelated to Smart Interactivity, such as ordinary viewer registration data and
3  other similar information that is not the subject of Plaintiffs' lawsuit—which far exceeds
4  the scope of the Complaint.  Moreover, Defendants incorporate by reference their
5  Specific Objection to the Definition of "Tracked Data."  Defendants also object to this
6  Request on the grounds that the phrase "any manner in which Vizio utilizes Tracked Data
7  to its economic advantage" is vague, ambiguous, and cannot be understood with
8  reasonable certainty because it is not clear what constitutes an "economic advantage" for
9  purposes of this Request.  Defendants further object to this Request to the extent it seeks
10 information protected from disclosure pursuant to agreements with other parties,
11 including but not limited to confidentiality agreements.  In addition, Defendants object to
12 this Request to the extent it seeks information protected by the attorney-client privilege,
13 the work product doctrine, or any other applicable privilege, protection, or immunity.

14      Subject to and without waiving the foregoing Specific Objections, Defendants will
15 produce non-privileged documents sufficient to establish how Vizio sells or licenses the
16 information collected through Smart Interactivity on Vizio Smart TVs to the extent such
17 documents exist and are in their possession, custody, or control.

18 **REQUEST FOR PRODUCTION NO. 9:**

19      All documents regarding why Vizio tracks, collects, aggregates, stores, and/or
20 exfiltrates Tracked Data.

21 **RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

22      Defendants object to this Request as overly broad, unduly burdensome, and as
23 seeking information that is not relevant to any claim or defense in this action or
24 proportional to the needs of the case. In particular, this Request could be read as seeking
25 *every* document and communication, including engineering, technical, and financial data,
26 that has some connection, however tangentially, to the "tracking," "collecting" and
27 "storing" of any "Tracked Data," which is clearly not relevant to this action. Moreover,
28 Defendants incorporate by reference their Specific Objection to the Definition of

1  "Tracked Data." Defendants also object to this Request to the extent it seeks information

2  protected from disclosure pursuant to agreements with other parties, including but not

3  limited to confidentiality agreements. Defendants further object to this Request to the

4  extent it seeks information protected by the attorney-client privilege, the work product

5  doctrine, or any other applicable privilege, protection, or immunity.

6       Subject to and without waiving the foregoing Specific Objections, Defendants will

7  produce non-privileged documents sufficient to establish how Vizio analyzes, stores, sells

8  or licenses the information collected through Smart Interactivity on Vizio Smart TVs to

9  the extent such documents exist and are in their possession, custody, or control.

10  **REQUEST FOR PRODUCTION NO. 10:**

11       All documents regarding the authority (legal or otherwise) that Vizio possesses, if

12  any, to track, collect, aggregate, store, and/or exfiltrate Tracked Data.

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

14       Defendants object to this Request as overly broad, unduly burdensome, and as

15  seeking information that is not relevant to any claim or defense in this action or

16  proportional to the needs of the case. In particular, Defendants incorporate by reference

17  their Specific Objection to the Definition of "Tracked Data." Defendants also object to

18  this Request on the grounds that "the authority (legal or otherwise) that Vizio possesses"

19  is vague, ambiguous, and cannot be understood with reasonable certainty because it is not

20  clear what constitutes "authority" for purposes of this Request. Defendants further object

21  to this Request to the extent it seeks information protected by the attorney-client

22  privilege, the work product doctrine, or any other applicable privilege, protection, or

23  immunity.

24  **REQUEST FOR PRODUCTION NO. 11:**

25       All documents regarding what Vizio does with Tracked Data, for example, whether

26  Vizio analyzes, stores, sells, licenses, or monetizes Tracked Data in any way, and if it

27  does, how Vizio does so.

28

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Defendants object to this Request as overly broad, unduly burdensome, and as seeking information that is not relevant to any claim or defense in this action or proportional to the needs of the case. In particular, this Request purports to seek *every* document with any connection whatsoever to Vizio's use of "Tracked Data" —including information unrelated to Smart Interactivity, such as ordinary viewer registration data and other similar information that is not the subject of Plaintiffs' lawsuit—which far exceeds the scope of the Complaint. Moreover, Defendants incorporate by reference their Specific Objection to the Definition of "Tracked Data." Defendants also object to this Request on the grounds that the term "monetizes" is vague, ambiguous, and cannot be understood with reasonable certainty. Defendants further object to this Request to the extent it seeks information protected from disclosure pursuant to agreements with other parties, including but not limited to confidentiality agreements. In addition, Defendants object to this Request to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, or immunity.

Subject to and without waiving the foregoing Specific Objections, Defendants will produce non-privileged documents sufficient to establish how Vizio analyzes, stores, sells or licenses the information collected through Smart Interactivity on Vizio Smart TVs to the extent such documents exist and are in their possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 12:**

Documents sufficient to identify any individual or entity that has purchased, licensed, or otherwise obtained Tracked Data from Vizio, and the details of what data each individual or entity has specifically obtained, and the amounts paid by each such entity for the data.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Defendants object to this Request as overly broad, unduly burdensome, and as seeking information that is not relevant to any claim or defense in this action or

15

1 proportional to the needs of the case.  In particular, Defendants incorporate by reference

2 their Specific Objection to the Definition of "Tracked Data."  Defendants also object to

3 this Request to the extent it seeks information protected from disclosure pursuant to

4 agreements with other parties, including but not limited to confidentiality agreements.

5 Defendants further object to this Request to the extent it seeks information protected by

6 the attorney-client privilege, the work product doctrine, or any other applicable privilege,

7 protection, or immunity.

8       Subject to and without waiving the foregoing Specific Objections, Defendants will

9 produce non-privileged documents sufficient to identify any individual or entity that has

10 purchased or licensed information collected through Smart Interactivity on Vizio Smart

11 TVs to the extent such documents exist and are in their possession, custody, or control.

12 **REQUEST FOR PRODUCTION NO. 13:**

13       Documents sufficient to show how many Smart TV's Vizio sold on a monthly

14 basis during the Relevant Time Period.

15 **RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

16       Defendants object to this Request as overly broad, unduly burdensome, and as

17 seeking information that is not relevant to any claim or defense in this action or

18 proportional to the needs of the case.  In particular, Plaintiffs allege that Vizio initiated

19 Smart Interactivity "in or about February 2014," thus the number of Vizio Smart TVs

20 sold prior to that date fall outside the reasonable scope of the Complaint.

21       Subject to and without waiving the foregoing Specific Objections, Defendants will

22 produce non-privileged documents sufficient to show the number of Vizio Smart TVs

23 that Vizio sold on a monthly basis from February 2014 to the present to the extent such

24 documents exist and are in their possession, custody, or control.

25 **REQUEST FOR PRODUCTION NO. 14:**

26       Documents sufficient to show the gross revenue and net revenue (profits) Vizio

27 obtained from the sale of Smart TV's, on a monthly basis during the Relevant Time

28 Period.

16

1  **RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

2      Defendants object to this Request as overly broad, unduly burdensome, and as

3  seeking information that is not relevant to any claim or defense in this action or

4  proportional to the needs of the case.  Defendants also incorporate by reference their

5  Specific Objection to the Relevant Time Period.

6  **REQUEST FOR PRODUCTION NO. 15:**

7      Documents sufficient to show the amount of gross revenue and net revenue

8  (profits) generated from the sale, license, or other conveyance of Tracked Data, on a

9  monthly basis during the Relevant Time Period.

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

11      Defendants object to this Request as overly broad, unduly burdensome, and as

12  seeking information that is not relevant to any claim or defense in this action or

13  proportional to the needs of the case.  Defendants also incorporate by reference their

14  Specific Objection to the Definition of "Tracked Data."  Defendants further incorporate

15  by reference their Specific Objection to the Relevant Time Period.

16  **REQUEST FOR PRODUCTION NO. 16:**

17      Documents sufficient to show the percentage of Vizio's overall revenue

18  attributable to the sale of Smart TV's during the Relevant Time Period.

19  **RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

20      Defendants object to this Request as overly broad, unduly burdensome, and as

21  seeking information that is not relevant to any claim or defense in this action or

22  proportional to the needs of the case.  Defendants also incorporate by reference their

23  Specific Objection to the Relevant Time Period.

24  **REQUEST FOR PRODUCTION NO. 17:**

25      Documents sufficient to show the percentage of Vizio's overall revenue

26  attributable to the sale, lease, or license of Tracked Data, on a yearly basis during the

27  Relevant Time Period.

28

DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS'
REQUEST FOR PRODUCTION OF DOCUMENTS. SET ONE                    MDL Case No. 8:16-ml-02693-JLS-KES

1 **RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

2       Defendants object to this Request as overly broad, unduly burdensome, and as

3 seeking information that is not relevant to any claim or defense in this action or

4 proportional to the needs of the case. Defendants also incorporate by reference their

5 Specific Objection to the Definition of "Tracked Data." Defendants further incorporate

6 by reference their Specific Objection to the Relevant Time Period.

7 **REQUEST FOR PRODUCTION NO. 18:**

8       All Documents regarding how menu options on Vizio Smart TV's were designed

9 with respect to the description, enabling, or disabling of Smart Interactivity or any other

10 menu option or description related to the collection or tracking of data generated by the

11 TV or by anyone accessing the TV. This includes, but is not limited to, how the text or

12 location of any menu options or descriptions was initially decided and how the text or

13 location changed over time.

14 **RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

15       Defendants object to this Request as overly broad, unduly burdensome, and as

16 seeking information that is not relevant to any claim or defense in this action or

17 proportional to the needs of the case. In particular, this Request purports to seek *every*

18 document with any connection whatsoever to the design of menu options related to "the

19 collection or tracking of data generated by the TV or by anyone accessing the TV"—

20 which could be read to include anything from the software code to the choice of font, and

21 would apply to data unrelated to Smart Interactivity—which far exceeds the reasonable

22 scope of the Complaint. Defendants also object to this Request on the grounds that the

23 phrase "by anyone accessing the TV" is vague, ambiguous, and cannot be understood

24 with reasonable certainty. Defendants further object to this Request to the extent it seeks

25 information protected by the attorney-client privilege, the work product doctrine, or any

26 other applicable privilege, protection, or immunity.

27       Subject to and without waiving the foregoing Specific Objections, Defendants will

28 produce all menu options displayed on Vizio Smart TVs regarding the description,

18

1 │ enabling, or disabling of Smart Interactivity to the extent such documents exist and are in
2 │ their possession, custody, or control.

3 │ **REQUEST FOR PRODUCTION NO. 19:**

4 │     All Documents regarding any federal or state investigation (at any level including
5 │ by state or federal agencies) regarding Vizio's collection, aggregation, storage,
6 │ exfiltration, sale, or conveyance of Tracked Data.

7 │ **RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

8 │     Defendants object to this Request as overly broad, unduly burdensome, and as
9 │ seeking information that is not relevant to any claim or defense in this action or
10 │ proportional to the needs of the case. In particular, Defendants incorporate by reference
11 │ their Specific Objection to the Definition of "Tracked Data." Defendants also object to
12 │ this Request to the extent it seeks information protected by the attorney-client privilege,
13 │ the work product doctrine, or any other applicable privilege, protection, or immunity.

14 │ **REQUEST FOR PRODUCTION NO. 20:**

15 │     All Documents regarding any complaint received by Vizio from any consumer or
16 │ any other source regarding its collection, aggregation, storage, exfiltration, sale, or
17 │ conveyance of Tracked Data.

18 │ **RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

19 │     Defendants object to this Request as overly broad, unduly burdensome, and as
20 │ seeking information that is not relevant to any claim or defense in this action or
21 │ proportional to the needs of the case. In particular, Defendants incorporate by reference
22 │ their Specific Objection to the Definition of "Tracked Data." Defendants also object to
23 │ this Request on the grounds that "any other source" is vague, ambiguous, and cannot be
24 │ understood with reasonable certainty because it is not clear what constitutes "other
25 │ source[s]" for purposes of this Request. Defendants further object to this Request to the
26 │ extent it seeks information protected by the attorney-client privilege, the work product
27 │ doctrine, or any other applicable privilege, protection, or immunity.

28 │

19

1    Subject to and without waiving the foregoing Specific Objections, Defendants will
2    produce any consumer complaints regarding Smart Interactivity to the extent such
3    documents exist and are in their possession, custody, or control.

4    **REQUEST FOR PRODUCTION NO. 21:**

5    All employee organizational charts for Vizio, Inc.; Vizio Holdings, Inc.; Vizio
6    Inscape Technologies, LLC; Vizio Inscape Services, LLC, and Cognitive Media
7    Networks, Inc.

8    **RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

9    Defendants object to this Request on the grounds that "employee organizational
10   charts" is vague, ambiguous, and cannot be understood with reasonable certainty.

11   Subject to and without waiving the foregoing Specific Objections, Defendants will
12   produce corporate organizational charts for Vizio, Inc.; Vizio Holdings, Inc.; Vizio
13   Inscape Technologies, LLC; and Vizio Inscape Services, LLC to the extent such
14   documents exist and are in their possession, custody, or control.

15   **REQUEST FOR PRODUCTION NO. 22:**

16   All documents regarding the extent to which Vizio's ability to monetize Tracked
17   Data impacts the price Vizio charges for Vizio Smart TV's.

18   **RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

19   Defendants object to this Request as overly broad, unduly burdensome, and as
20   seeking information that is not relevant to any claim or defense in this action or
21   proportional to the needs of the case.  In particular, this Request could be read as seeking
22   *every* document regarding the pricing of Vizio Smart TVs, which far exceeds the scope of
23   the Complaint.  Moreover, Defendants incorporate by reference their Specific Objection
24   to the Definition of "Tracked Data."  Defendants also object to this Request on the
25   grounds that the phrase "ability to monetize" is vague, ambiguous, and cannot be
26   understood with reasonable certainty.  Defendants further object to this Request to the
27   extent it seeks information protected by the attorney-client privilege, the work product
28   doctrine, or any other applicable privilege, protection, or immunity.

20

1 | **REQUEST FOR PRODUCTION NO. 23:**

2 All document retention policies for Vizio, Inc.; Vizio Holdings, Inc.; Vizio Inscape

3 Technologies, LLC; Vizio Inscape Services, LLC, and Cognitive Media Networks, Inc.

4 | **RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

5 Defendants object to this Request to the extent it seeks information protected by

6 the attorney-client privilege, the work product doctrine, or any other applicable privilege,

7 protection, or immunity.

8 Subject to and without waiving the foregoing Specific Objections, Defendants will

9 produce non-privileged document retention policies for Vizio, Inc.; Vizio Holdings, Inc.;

10 Vizio Inscape Technologies, LLC; and Vizio Inscape Services, LLC to the extent such

11 documents exist and are in their possession, custody, or control.

12 | **REQUEST FOR PRODUCTION NO. 24:**

13 All documents regarding the ability of owners of Vizio Smart TVs to opt out of or

14 otherwise disable Smart Interactivity or any other function of Vizio Smart TV's related to

15 Tracked Data, including but not limited to any current or prospective analysis of the

16 potential number of such opt outs, or any analysis of how to prevent or dissuade owners

17 from opting out of or disabling such functions.

18 | **RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

19 Defendants object to this Request as overly broad, unduly burdensome, and as

20 seeking information that is not relevant to any claim or defense in this action or

21 proportional to the needs of the case. In particular, this Request purports to seek *every*

22 document regarding the ability of consumers to disable essentially any function on Vizio

23 Smart TVs—including functions relating to systems other than Smart Interactivity—

24 which far exceeds the reasonable scope of the Complaint. Moreover, Defendants

25 incorporate by reference their Specific Objection to the Definition of "Tracked Data."

26 Defendants also object to this Request to the extent it seeks information protected by the

27 attorney-client privilege, the work product doctrine, or any other applicable privilege,

28 protection, or immunity.

21

1    Subject to and without waiving the foregoing Specific Objections, Defendants will

2    produce non-privileged documents sufficient to establish the methods by which

3    consumers can disable Smart Interactivity on Vizio Smart TVs to the extent such

4    documents exist and are in their possession, custody, or control.

5    **REQUEST FOR PRODUCTION NO. 25:**

6    All documents concerning the development of the opt-out procedure to otherwise

7    disable Smart Interactivity or any other function of Vizio Smart TV's related to Tracked

8    Data.

9    **RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

10   Defendants object to this Request as overly broad, unduly burdensome, and as

11   seeking information that is not relevant to any claim or defense in this action or

12   proportional to the needs of the case. In particular, this Request purports to seek *every*

13   document regarding the development of any procedure to disable essentially any function

14   on Vizio Smart TVs—including functions relating to systems other than Smart

15   Interactivity—which far exceeds the reasonable scope of the Complaint. Moreover,

16   Defendants incorporate by reference their Specific Objection to the Definition of

17   "Tracked Data." Defendants also object to this Request to the extent it seeks information

18   protected by the attorney-client privilege, the work product doctrine, or any other

19   applicable privilege, protection, or immunity.

20   Subject to and without waiving the foregoing Specific Objections, Defendants will

21   produce non-privileged documents sufficient to establish the methods by which

22   consumers can disable Smart Interactivity on Vizio Smart TVs to the extent such

23   documents exist and are in their possession, custody, or control.

24   **REQUEST FOR PRODUCTION NO. 26:**

25   All documents regarding the ability of owners of Vizio Smart TVs to opt into or

26   otherwise enable Smart Interactivity or any other function of Vizio Smart TV's related to

27   Tracked Data, including but not limited to any analysis of the potential number of such

28

22

1    opt ins, or any analysis of how to encourage or enable owners to opt in or enable such

2    functions.

3    **RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

4            Defendants object to this Request as overly broad, unduly burdensome, and as

5    seeking information that is not relevant to any claim or defense in this action or

6    proportional to the needs of the case.  In particular, this Request purports to seek *every*

7    document regarding the ability of consumers to enable essentially any function on Vizio

8    Smart TVs—including functions relating to systems other than Smart Interactivity—

9    which far exceeds the reasonable scope of the Complaint.  Moreover, Defendants

10   incorporate by reference their Specific Objection to the Definition of "Tracked Data."

11   Defendants also object to this Request to the extent it seeks information protected by the

12   attorney-client privilege, the work product doctrine, or any other applicable privilege,

13   protection, or immunity.

14           Subject to and without waiving the foregoing Specific Objections, Defendants will

15   produce non-privileged documents sufficient to establish the methods by which

16   consumers can enable Smart Interactivity on Vizio Smart TVs to the extent such

17   documents exist and are in their possession, custody, or control.

18   **REQUEST FOR PRODUCTION NO. 27:**

19           All documents regarding owners of Vizio Smart TVs actually opting out of or

20   otherwise disabling Smart Interactivity or any other function of Vizio Smart TV's related

21   to Tracked Data, including the number of owners who actually opted out or disabled such

22   functions, any analysis of the number of such owners, or any analysis of how to prevent

23   or dissuade owners from opting out or disabling such functions.

24   **RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

25           Defendants object to this Request as overly broad, unduly burdensome, and as

26   seeking information that is not relevant to any claim or defense in this action or

27   proportional to the needs of the case.  In particular, this Request purports to seek *every*

28   document regarding consumers disabling essentially any function on Vizio Smart TVs—

1   including functions relating to systems other than Smart Interactivity—which far exceeds
2   the reasonable scope of the Complaint.  Moreover, Defendants incorporate by reference
3   their Specific Objection to the Definition of "Tracked Data."  Defendants also object to
4   this Request to the extent it seeks information protected by the attorney-client privilege,
5   the work product doctrine, or any other applicable privilege, protection, or immunity.

6       Subject to and without waiving the foregoing Specific Objections, Defendants will
7   produce non-privileged documents sufficient to identify the number of Vizio Smart TVs
8   that disabled Smart Interactivity to the extent such documents exist and are in their
9   possession, custody, or control.

10  **REQUEST FOR PRODUCTION NO. 28:**

11      All documents regarding any ability by Vizio to use Vizio Smart TV to access,
12  collect, aggregate, store, or exfiltrate any type of information from outside a Vizio Smart
13  TV, such as through a consumer's IP address, a consumer's other computers or devices
14  connected to the same IP address, or otherwise.

15  **RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

16      Defendants object to this Request as overly broad, unduly burdensome, and as
17  seeking information that is not relevant to any claim or defense in this action or
18  proportional to the needs of the case.  In particular, this Request purports to seek *every*
19  document concerning Vizio's ability to "access, collect, aggregate, store, or exfiltrate"
20  any type of information through Vizio Smart TVs—including engineering, technical, and
21  other similar information that is not the subject of Plaintiffs' lawsuit—which far exceeds
22  the reasonable scope of the Complaint.  Defendants also object to this Request on the
23  grounds that "outside a Vizio Smart TV" is vague, ambiguous, and cannot be understood
24  with reasonable certainty because it is not clear what constitutes "outside" of a Vizio
25  Smart TV for purposes of this Request.  Defendants further object to this Request to the
26  extent it seeks information protected by the attorney-client privilege, the work product
27  doctrine, or any other applicable privilege, protection, or immunity.

28

1       Subject to and without waiving the foregoing Specific Objections, Defendants will

2 produce non-privileged documents sufficient to identify the specific types of information

3 collected through Smart Interactivity on Vizio Smart TVs to the extent such documents

4 exist and are in their possession, custody, or control.

5 **REQUEST FOR PRODUCTION NO. 29:**

6       All documents regarding any analysis, study, or discussion regarding any business

7 advantage of Smart Interactivity or the potential or actual monetization of Tracked Data

8 for any business purpose.

9 **RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

10       Defendants object to this Request as overly broad, unduly burdensome, and as

11 seeking information that is not relevant to any claim or defense in this action or

12 proportional to the needs of the case.  In particular, this Request could be read as seeking

13 every document with any connection whatsoever to Vizio's use of "Tracked Data"—

14 including information unrelated to Smart Interactivity, such as ordinary viewer

15 registration data and other similar information that is not the subject of Plaintiffs'

16 lawsuit—which far exceeds the scope of the Complaint.  Moreover, Defendants

17 incorporate by reference their Specific Objection to the Definition of "Tracked Data."

18 Defendants also object to this Request on the grounds that "business advantage" is vague,

19 ambiguous, and cannot be understood with reasonable certainty because it is not clear

20 what constitutes a "business advantage" for purposes of this Request.  Defendants further

21 object to this Request on the grounds that the term "monetization" is vague, ambiguous,

22 and cannot be understood with reasonable certainty.  In addition, Defendants object to

23 this Request to the extent it seeks information protected by the attorney-client privilege,

24 the work product doctrine, or any other applicable privilege, protection, or immunity.

25       Subject to and without waiving the foregoing Specific Objections, Defendants will

26 produce non-privileged documents sufficient to establish how Vizio sells or licenses the

27 information collected through Smart Interactivity on Vizio Smart TVs to the extent such

28 documents exist and are in their possession, custody, or control.

1   **REQUEST FOR PRODUCTION NO. 30:**

2       All documents regarding any reasons why any non-Vizio entity has obtained
3   Tracked Data from Vizio, or may obtain Tracked Data from Vizio in the future.
4   Specifically, this Request seeks information regarding Vizio's awareness of, analysis of,
5   or discussion of, how any third party makes use of Tracked Data after obtaining it from
6   Vizio.

7   **RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

8       Defendants object to this Request as overly broad, unduly burdensome, and as
9   seeking information that is not relevant to any claim or defense in this action or
10   proportional to the needs of the case. In particular, this Request could be read as seeking
11   *every* document with any connection whatsoever to any third party's use of "Tracked
12   Data"—including information unrelated to Smart Interactivity that is not the subject of
13   Plaintiffs' lawsuit—which far exceeds the scope of the Complaint. Moreover,
14   Defendants incorporate by reference their Specific Objection to the Definition of
15   "Tracked Data." Defendants also object to this Request on the grounds that the phrase
16   "why any non-Vizio entity has obtained Tracked Data from Vizio" is vague, ambiguous,
17   and cannot be understood with reasonable certainty because it is not clear what satisfies
18   the term "why" for purposes of this Request. Defendants further object to this Request to
19   the extent it seeks information protected from disclosure pursuant to agreements with
20   other parties, including but not limited to confidentiality agreements. In addition,
21   Defendants further object to this Request to the extent it seeks information protected by
22   the attorney-client privilege, the work product doctrine, or any other applicable privilege,
23   protection, or immunity.

24   **REQUEST FOR PRODUCTION NO. 31:**

25       All documents regarding any disclosures by Vizio to purchasers of Vizio Smart
26   TV's, potential purchasers of Vizio Smart TV's, or the public regarding Smart
27   Interactivity or Tracked Data.

28

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

Defendants object to this Request as overly broad, unduly burdensome, and as seeking information that is not relevant to any claim or defense in this action or proportional to the needs of the case. In particular, Defendants incorporate by reference their Specific Objection to the Definition of "Tracked Data." Defendants also object to this Request to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, or immunity.

Subject to and without waiving the foregoing Specific Objections, Defendants will produce all disclosures to Vizio Smart TV users regarding Smart Interactivity, including sales and marketing materials, product packaging, and disclosures displayed on Vizio Smart TVs regarding Smart Interactivity to the extent such documents exist and are in their possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 32:**

All documents regarding any plaintiff who filed any lawsuit against Vizio based upon allegations similar to those alleged in the Consolidated Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32:**

Defendants object to this Request to the extent it seeks documents that are already within Plaintiffs' possession, custody, or control. Defendants also object to this Request to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, or immunity.

Based on the foregoing Specific Objections, Defendants will produce all non-privileged documents regarding any named plaintiff in this action or any MDL member case consolidated into this action to the extent such documents exist and are in their possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 33:**

All documents regarding price analyses of Smart TV's as compared to non-Smart TV's.

1 | **RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**

2 | Defendants object to this Request as overly broad, unduly burdensome, and as
3 | seeking information that is not relevant to any claim or defense in this action or
4 | proportional to the needs of the case. In particular, this Request could be read as seeking
5 | *every* document regarding the pricing of Smart TVs, including Smart TVs manufactured
6 | and sold by companies other than Vizio, which far exceeds the scope of the Complaint.
7 | Defendants also object to this Request on the grounds that "price analyses" is vague,
8 | ambiguous, and cannot be understood with reasonable certainty because it is not clear
9 | what constitutes "price analyses" for purposes of this Request. Defendants further object
10 | to this Request to the extent it seeks information protected by the attorney-client
11 | privilege, the work product doctrine, or any other applicable privilege, protection, or
12 | immunity.

13 | **REQUEST FOR PRODUCTION NO. 34:**

14 | All documents regarding Vizio presentations, analyses, or marketing documents
15 | aimed at purchasers, lessors, or licensors of Tracked Data regarding the quality of
16 | Tracked Data obtained from Vizio.

17 | **RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

18 | Defendants object to this Request as overly broad, unduly burdensome, and as
19 | seeking information that is not relevant to any claim or defense in this action or
20 | proportional to the needs of the case. In particular, this Request far exceeds the
21 | reasonable scope of the Complaint because Plaintiffs do not allege that Defendants made
22 | any false statements to purchasers, lessors, or licensors. Moreover, Defendants
23 | incorporate by reference their Specific Objection to the Definition of "Tracked Data."
24 | Defendants also object to this Request on the grounds that the phrase "quality of Tracked
25 | Data" is vague, ambiguous, and cannot be understood with reasonable certainty because
26 | it is not clear what constitutes "quality" for purposes of this Request. Defendants further
27 | object to this Request to the extent it seeks information protected from disclosure
28 | pursuant to agreements with other parties, including but not limited to confidentiality

28

1  agreements.  In addition, Defendants object to this Request to the extent it seeks

2  information protected by the attorney-client privilege, the work product doctrine, or any

3  other applicable privilege, protection, or immunity.

4  **REQUEST FOR PRODUCTION NO. 35:**

5      All contracts with purchasers, lessors, or licensors of Tracked Data.

6  **RESPONSE TO REQUEST FOR PRODUCTION NO. 35:**

7      Defendants object to this Request as overly broad, unduly burdensome, and as

8  seeking information that is not relevant to any claim or defense in this action or

9  proportional to the needs of the case.  In particular, Defendants incorporate by reference

10 their Specific Objection to the Definition of "Tracked Data."  Defendants also object to

11 this Request to the extent it seeks information protected from disclosure pursuant to

12 agreements with other parties, including but not limited to any confidentiality agreements

13 with third parties.  Defendants further object to this Request to the extent it seeks

14 information protected by the attorney-client privilege, the work product doctrine, or any

15 other applicable privilege, protection, or immunity.

16     Subject to and without waiving the foregoing Specific Objections, Defendants will

17 produce any licensing agreements with third parties concerning the information collected

18 through Smart Interactivity on Vizio Smart TVs to the extent such documents exist and

19 are in their possession, custody, or control.

20 **REQUEST FOR PRODUCTION NO. 36:**

21     All documents regarding any decision whether to set the default status of Smart

22 Interactivity or any similar data collecting program to "on" instead of "off" on any Vizio

23 Smart TV.

24 **RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

25     Defendants object to this Request as overly broad, unduly burdensome, and as

26 seeking information that is not relevant to any claim or defense in this action or

27 proportional to the needs of the case.  In particular, this Request purports to seek *every*

28 document with any connection whatsoever to the default status of Smart Interactivity—

29

1  and systems unrelated to Smart Interactivity that are not the subject of Plaintiffs'

2  lawsuit—which far exceeds the scope of the Complaint.  Defendants also object to this

3  Request to the extent it seeks information protected by the attorney-client privilege, the

4  work product doctrine, or any other applicable privilege, protection, or immunity.

5  **REQUEST FOR PRODUCTION NO. 37:**

6      All documents regarding the ability or inability of any purchaser, lessor, or licensor

7  of Tracked Data to directly or indirectly associate the Tracked Data with specific

8  consumers from whom the Tracked Data is obtained.

9  **RESPONSE TO REQUEST FOR PRODUCTION NO. 37:**

10      Defendants object to this Request as overly broad and unduly burdensome to the

11  extent it purports to require Defendants to produce documents not currently within their

12  possession, custody, or control.  In particular, Defendants incorporate by reference their

13  Specific Objection to the Definition of "Tracked Data."  Defendants also object to this

14  Request on the grounds that "directly or indirectly associate" is vague, ambiguous, and

15  cannot be understood with reasonable certainty because it is not clear what constitutes an

16  "associat[ion]"of data for purposes of this Request.  Defendants further object to this

17  Request to the extent it seeks information protected from disclosure pursuant to

18  agreements with other parties, including but not limited to any confidentiality agreements

19  with third parties.  In addition, Defendants object to this Request to the extent it seeks

20  information not in the possession, custody, or control of Defendants.  Moreover,

21  Defendants object to this Request to the extent it seeks information protected by the

22  attorney-client privilege, the work product doctrine, or any other applicable privilege,

23  protection, or immunity.

24      Subject to and without waiving the foregoing Specific Objections, Defendants will

25  produce any licensing agreements with third parties concerning the information collected

26  through Smart Interactivity on Vizio Smart TVs to the extent such documents exist and

27  are in their possession, custody, or control.

28

**REQUEST FOR PRODUCTION NO. 38:**

All documents regarding federal, state, or local regulations or rules regarding the collection, storage, exfiltration, sale, lease, license, or use of Tracked Data.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38:**

Defendants object to this Request as overly broad, unduly burdensome, and as seeking information that is not relevant to any claim or defense in this action or proportional to the needs of the case. In particular, Defendants incorporate by reference their Specific Objection to the Definition of "Tracked Data." Defendants also object to this Request to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, or immunity.

**REQUEST FOR PRODUCTION NO. 39:**

All documents regarding any Vizio privacy policy, including all iterations of any privacy policies during the Relevant Time Period, documents and communications regarding the development of or changes to any privacy policies, and documents and communications regarding how to deliver privacy policies to persons to whom any privacy policies were applicable or potentially applicable.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 39:**

Defendants object to this Request as overly broad, unduly burdensome, and as seeking information that is not relevant to any claim or defense in this action or proportional to the needs of the case. In particular, this Request purports to seek *every* document concerning "any Vizio privacy policy"—including any privacy policies (or document concerning any privacy policies) unrelated to the collection, retention, and use of viewer data and associated data collected through Smart Interactivity on Vizio Smart TVs—which far exceeds the scope of the Complaint. Defendants also incorporate by reference their Specific Objection to the Relevant Time Period. Defendants further object to this Request to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, or immunity.

31

1    Subject to and without waiving the foregoing Specific Objections, Defendants will
2  produce any iterations of Vizio's privacy policy concerning Smart Interactivity from
3  February 2014 to the present to the extent such documents exist and are in their
4  possession, custody, or control.

5  **REQUEST FOR PRODUCTION NO. 40:**

6    All documents regarding any computer data breaches or data security deficiencies
7  during the Relevant Time Period.

8  **RESPONSE TO REQUEST FOR PRODUCTION NO. 40:**

9    Defendants object to this Request as overly broad, unduly burdensome, and as
10 seeking information that is not relevant to any claim or defense in this action or
11 proportional to the needs of the case. In particular, this Request far exceeds the scope of
12 the Complaint because Plaintiffs do not assert any claims regarding "computer data
13 breaches or data security deficiencies." Defendants also object to this Request to the
14 extent it seeks information protected by the attorney-client privilege, the work product
15 doctrine, or any other applicable privilege, protection, or immunity. Defendants further
16 incorporate by reference their Specific Objection to the Relevant Time Period.

17 **REQUEST FOR PRODUCTION NO. 41:**

18    All documents related to due diligence performed in connection with Vizio's
19 purchase of Cognitive Media Networks, Inc.

20 **RESPONSE TO REQUEST FOR PRODUCTION NO. 41:**

21    Defendants object to this Request as overly broad, unduly burdensome, and as
22 seeking information that is not relevant to any claim or defense in this action or
23 proportional to the needs of the case. In particular, this Request far exceeds the scope of
24 the Complaint because Plaintiffs do not allege any claims relating to Vizio's acquisition
25 of Cognitive Media Networks, Inc. Defendants also object to this Request to the extent it
26 seeks information protected from disclosure pursuant to agreements with other parties,
27 including without limitation any confidentiality agreements. Defendants further object to

28

1  this Request to the extent it seeks information protected by the attorney-client privilege,

2  the work product doctrine, or any other applicable privilege, protection, or immunity.

3  **REQUEST FOR PRODUCTION NO. 42:**

4        All documents concerning the purported anonymized nature of the Tracked Data

5  collected by Vizio, including what steps, if any, Vizio takes to purportedly make Tracked

6  Data anonymous.

7  **RESPONSE TO REQUEST FOR PRODUCTION NO. 42:**

8        Defendants object to this Request as overly broad, unduly burdensome, and as

9  seeking information that is not relevant to any claim or defense in this action or

10 proportional to the needs of the case.  In particular, this Request purports to seek *every*

11 document concerning the "anonymized nature of the Tracked Data collected by Vizio"—

12 which could be read to include every document with any connection whatsoever to any

13 anonymous data collected by Vizio, regardless of whether it concerns the data at issue in

14 this action (i.e., viewer data and associated data collected through Smart Interactivity on

15 Vizio Smart TVs)—which far exceeds the scope of the Complaint.  Moreover,

16 Defendants incorporate by reference their Specific Objection to the Definition of

17 "Tracked Data."  Defendants also object to this Request on the grounds that the term

18 "anonymized nature" is vague, ambiguous, and cannot be understood with reasonable

19 certainty.  Defendants further object to this Request to the extent it seeks information

20 protected by the attorney-client privilege, the work product doctrine, or any other

21 applicable privilege, protection, or immunity.

22       Subject to and without waiving the foregoing Specific Objections, Defendants will

23 produce non-privileged documents sufficient to establish the steps Vizio takes to collect

24 anonymous information through Smart Interactivity on Vizio Smart TVs to the extent

25 such documents exist and are in their possession, custody, or control.

26 **REQUEST FOR PRODUCTION NO. 43:**

27       To the extent not called for or produced pursuant to Fed. R. Civ. P. 26(a)(1), a

28 copy of all insurance policies and declaration pages for any insurance that could be used

1  to satisfy a settlement or judgment in this Action, including any acceptance or declination

2  of coverage.

3  **RESPONSE TO REQUEST FOR PRODUCTION NO. 43:**

4     Defendants object to this Request to the extent it purports to impose obligations

5  beyond those required by the Federal Rules of Civil Procedure, including in particular

6  Rule 26(a)(1)(A)(iv) of the Federal Rules of Civil Procedure.

7     Subject to and without waiving the foregoing Specific Objections, Defendants will

8  produce any insurance agreements required for disclosure under Rule 26(a)(1)(A)(iv) of

9  the Federal Rules of Civil Procedure to the extent such documents exist and are in their

10  possession, custody, or control.

11

12  Dated: November 17, 2016                AKIN GUMP STRAUSS HAUER & FELD LLP

13

14                                         By:
                                           Anthony T. Pierce (*admitted pro hac vice*)
15                                         apierce@akingump.com
                                           1333 New Hampshire Avenue NW
16                                         Suite 1500
                                           Washington, DC 20036
17                                         Tel:   202-887-4000
                                           Fax:  202-887-4288

18                                         Hyongsoon Kim (SBN 257019)
                                           kimh@akingump.com
19                                         4 Park Plaza, Suite 1900
                                           Irvine, CA  92614
20                                         Tel:   949-885-4100
                                           Fax:  949-885-4101

21                                         Patrick Eoghan Murray (SBN 293765)
22                                         pmurray@akingump.com
                                           1999 Avenue of the Stars, Suite 600
23                                         Los Angeles, CA  90067
                                           Tel:   310-229-1000
24                                         Fax:  310-229-1001

25                                         *Attorneys for Defendants VIZIO Holdings, Inc.,*
                                           *VIZIO, Inc., VIZIO Inscape Services, LLC,*
26                                         *and VIZIO Inscape Technologies, LLC*

27

28
                                           34

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 1999 Avenue of the Stars, Suite 600, Los Angeles, California 90067. On November 17, 2016, I served the foregoing document described as: **DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS, SET ONE** on the interested parties below, using the following means:

### SEE ATTACHED SERVICE LIST

☒ BY UNITED STATES MAIL. I enclosed the document in a sealed envelope or package addressed to the respective addresses of the parties stated above and placed the envelopes for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at Los Angeles, California.

☒ BY ELECTRONIC MAIL OR ELECTRONIC TRANSMISSION. I caused the document to be sent to the respective e-mail addresses of the parties as stated above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ (STATE) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☒ (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 17, 2016, at Los Angeles, California.


Serena L. Steiner

**SERVICE LIST**

1

2 Joseph W. Cotchett
3 Adam J. Zapala
Cotchett, Pitre & McCarthy, LLP
4 840 Malcolm Road, Suite 200
5 Burlingame, CA 94010
jcotchett@cpmlegal.com
6 azapala@cpmlegal.com

7
Eric H. Gibbs
8 Andre Mura
9 Linda Lam
Girard Gibbs LLP
10 505 14th Street, Suite 1110
11 Oakland, CA 94612
ehg@classlawgroup.com
12 amm@classlawgroup.com
13 lpl@classlawgroup.com

14 Brian C. Gudmundson
15 Zimmerman Reed, LLP
1100 IDS Center, 80 South 8th St.
16 Minneapolis, MN 55402
17 brian.gudmundson@zimmreed.com

Gary F. Lynch
Carlson Lynch Sweet & Kilpela, LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
glynch@carlsonlynch.com

Andrew N. Friedman
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005
afriedman@cohenmilstein.com

Ashleigh E. Aitken
Aitken Cohn
3 MacArthur Pl. #800
Santa Ana, CA 92707
ashleigh@aitkenlaw.com

18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **FEDERAL TRADE COMMISSION, CHRISTOPHER S. PORRINO,** Attorney General of the State of New Jersey, and **STEVE C. LEE,** Director of the New Jersey Division of Consumer Affairs, <br><br>                    **Plaintiffs,** <br><br>        **v.** <br><br> **VIZIO, INC.,** a Delaware corporation, and **VIZIO INSCAPE SERVICES, LLC,** a Delaware limited liability company, <br><br>                   **Defendants.** | Case No._____ <br><br> **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE AND MONETARY RELIEF** |

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"), located at 600 Pennsylvania Avenue NW, Washington, D.C., Christopher S. Porrino, Attorney General of the State of New Jersey ("Attorney General") located at the Richard J. Hughes Justice Complex, 25 Market Street, Trenton, New Jersey, and Steve C. Lee, Director of the New Jersey Division of Consumer Affairs ("Director"), located at 124 Halsey Street, 7th Floor, Newark, New Jersey (collectively, "Plaintiffs"), for their Complaint against defendants VIZIO, Inc. ("VIZIO") and VIZIO Inscape Services, LLC ("VIZIO Inscape Services"), with principal places of business at 39 Tesla, Irvine, California 92618 (collectively, "Defendants"), allege:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. §53(b) ("FTC Act"), to obtain injunctive relief against Defendants to prevent them from engaging in unfair and deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15. U.S.C. §45(a), and to obtain other relief, including rescission, restitution and

disgorgement, as is necessary to redress injury to consumers and the public interest resulting from Defendants' violation of the FTC Act.

2.      The Attorney General and the Director bring this action under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq.*, ("CFA") to obtain injunctive relief against Defendants and to prevent them from engaging in unconscionable commercial practices, misrepresentations, false promises and/or omissions of material fact in violation of the CFA, N.J. Stat. Ann. § 56:8-2, and to obtain other relief, including civil penalties, N.J. Stat. Ann. § 56:8-13, consumer restitution, N.J. Stat. Ann. § 56:8-14, and reimbursement of attorneys' fees, N.J. Stat. Ann. § 56:8-14, and investigative costs, N.J. Stat. Ann. § 56:8-11.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over the FTC's claims pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

4.      This Court has supplemental jurisdiction over the Attorney General and Director's claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this District under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

## PLAINTIFFS

6.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair and deceptive acts or practices in or affecting commerce. The FTC is authorized to initiate federal district court proceedings by its own attorneys to enjoin violations of the FTC Act and to secure such relief as may be appropriate in each case, including injunctive

relief, rescission or reformation of contracts, restitution, the refund of monies paid and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b).

7.      The Attorney General is charged with the responsibility of enforcing the CFA. The Director is charged with the responsibility of administering the CFA on behalf of the Attorney General.  The Attorney General and the Director are authorized to initiate proceedings to enjoin violations of the CFA and to seek injunctive relief, restitution, civil penalties, and reimbursement of attorneys' fees and investigative costs.  N.J. Stat. Ann. § 56:8-8, -11, -13, -14 and -19.

## DEFENDANTS

8.      Defendant VIZIO is a Delaware corporation with its principal office or place of business at 39 Tesla, Irvine, California 92618.  VIZIO transacts or has transacted business in this District.

9.      Defendant VIZIO Inscape Services is a Delaware limited liability company with its principal office or place of business at 39 Tesla, Irvine, California 92618.  VIZIO Inscape Services is a wholly-owned subsidiary of VIZIO, and the successor entity to Cognitive Media Services, Inc., which developed proprietary automated content recognition ("ACR") software to detect the content on internet-connected televisions and monitors.  VIZIO Inscape Services transacts or has transacted business in this District.

## COMMERCE

10.      At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

11.     Since 2002, Defendant VIZIO has designed and sold televisions in the United States.  Since 2010, Defendant VIZIO has sold over 11 million  internet-connected televisions.

### Data Collection, Use, and Sale of Licenses

12.     Since February 2014, VIZIO has manufactured televisions that continuously track what consumers are watching, and transmit that information to Defendants through VIZIO Inscape Service's proprietary ACR software, which is turned on by default.

13.     Beginning in February 2014, Defendants also remotely installed ACR software on previously-sold televisions that did not originally have ACR software installed at the time of purchase.

14.     Through the ACR software, VIZIO's televisions transmit information about what a consumer is watching on a second-by-second basis.  Defendants' ACR software captures information about a selection of pixels on the screen and sends that data to VIZIO servers, where it is uniquely matched to a database of publicly available television, movie, and commercial content.  Defendants collect viewing data from cable or broadband service providers, set-top boxes, external streaming devices, DVD players, and over-the-air broadcasts.  Defendants have stated that the ACR software captures up to 100 billion data points each day from more than 10 million VIZIO televisions.  Defendants store this data indefinitely.

15.     Defendants' ACR software also periodically collects other information about the television, including IP address, wired and wireless MAC addresses, WiFi signal strength, nearby WiFi access points, and other items.

16.     VIZIO earns revenue by providing consumers' television viewing history to third parties through licensing agreements, on a television-by-television basis for three main uses, specified by contracts:

a. First, since at least May 2014, Defendants have provided consumers' viewing data to third parties for the purpose of audience measurement, *i.e.*, to determine in the aggregate what consumers watch and how they watch it. Defendants provide these third parties with a persistent identifier for each television (unique for each third party), along with the content (programs and commercials) viewed, when it was viewed, how long it was viewed for, and what channels it was on.

b. Second, since at least May 2015, Defendants have provided consumers' viewing data to third parties for the purpose of analyzing advertising effectiveness (the "data analytics program"). Defendants provide these third parties with IP addresses, so that the third parties can analyze a household's behavior across devices, in order to determine, for example, (a) whether a consumer has visited a particular website following a television advertisement related to that website, or (b) whether a consumer has viewed a particular television program following exposure to an online advertisement for that program. The data is used in the aggregate to evaluate the effectiveness of advertising campaigns.

c. Third, beginning in March 2016, Defendants have provided consumers' data to third parties for the purpose of targeting advertising to particular consumers on their other digital devices based on their television viewing data.

17. Defendants facilitate the provision of demographic information to third parties about VIZIO television viewers. Defendants do this by providing consumers' IP addresses to a data aggregator. The data aggregator uses the IP address information to identify a particular consumer or household, and then sends the third parties described in Paragraph 16 the demographic information associated with that consumer or household. Defendants' contracts with third-party users of the viewing data prohibit the re-identification of consumers and

households by name, but allow the following information to be appended: sex, age, income, marital status, household size, education, home ownership, and household value.

18.     For all of these uses, Defendants provide highly-specific, second-by-second information about television viewing.  Each line of a report provides viewing information about a single television.  In a securities filing, VIZIO states that its data analytics program, for example, "provides **_highly specific_** viewing behavior data on a massive scale with great accuracy, which can be used to generate intelligent insights for advertisers and media content providers." (emphasis added).

<u>Representations to Consumers</u>

19.     Consumers that purchased new VIZIO televisions beginning in August 2014, with ACR tracking preinstalled and enabled by default, received no onscreen notice of the collection of viewing data.

20.     For televisions that were updated in February 2014 to install default ACR tracking after purchase, an initial pop-up notification appeared on the screen that said:

> The VIZIO Privacy Policy has changed.  Smart Interactivity has been enabled on your TV, but you may disable it in the settings menu.  See www.vizio.com/privacy for more details.  This message will time out in 1 minute.

This notification provided no information about the collection of viewing data or ACR software.  Nor did it directly link to the settings menu or privacy policy.  *See* Exhibit A.

21.     In March 2016, while Plaintiffs' investigations were pending, Defendants sent another pop-up notification to televisions that, for the first time, referenced the collection of television viewing data.  This notification timed out after 30 seconds without input from the household member who happened to be viewing the screen at the time, and did not provide easy access to the settings menu.  *See* Exhibit B.

22. In all televisions enabled with ACR tracking, VIZIO televisions had a setting, available through the settings menu, called "Smart Interactivity." This setting included the description: "Enables program offers and suggestions." Similarly, in the manual for some VIZIO televisions, a section entitled "Smart Interactivity" described the practice as "Your TV can display program-related information as part of the broadcast." Neither description provided information about the collection of viewing data. Defendants have not provided any "program offers or suggestions" or "program-related information" for most televisions for more than two years, and did not update the disclosures.

<u>Consumer Understanding</u>

23. Consumers have no reason to expect that Defendants engaged in second-by-second tracking of consumer viewing data by surreptitiously decoding content and sending it back to their own servers. Further, Defendants' representations were not sufficiently clear or prominent to alert consumers to their practices related to data collection and sale of licenses. Consumers' viewing history is subject to certain statutory privacy protections, such as the Cable Privacy Act. 47 U.S.C. § 551.

24. Some consumers first learned of Defendants' practice of turning on "Smart Interactivity" by default through a news article published in November 2015. Consumers contacted VIZIO customer service to complain that ACR tracking was on by default.

**<u>VIOLATIONS OF THE FTC ACT AND THE CFA</u>**

25. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or unfair practices in or affecting commerce."

26. Misrepresentations or deceptive omission of material fact constitute deceptive acts or unfair practices prohibited by Section 5(a) of the FTC Act.

27.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

28.     The CFA, N.J. Stat. Ann. § 56:8-2, prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . .

29.     The CFA defines "merchandise" as "any objects, wares, goods commodities, services or anything offered, directly or indirectly to the public for sale." N.J. Stat. Ann. § 56:8-1(c).

30.     At all relevant times, Defendants have engaged in the advertisement, offering for sale and sale of merchandise within the meaning of N.J. Stat. Ann. § 56:8-1(c), specifically VIZIO televisions and "Smart Interactivity" services.

## COUNT I

## UNFAIR TRACKING

31.     Plaintiffs incorporate by reference all the foregoing paragraphs.

32.     Beginning in February 2014, Defendants use ACR technology to comprehensively collect the sensitive television viewing activity of consumers or households across cable or broadband services, set-top boxes, external streaming devices, DVD players, and over-the-air broadcasts, on a second-by-second basis and store this viewing data indefinitely. Defendants provided this viewing data to third parties, which used it to track and target advertising to individual consumers across devices. Defendants engaged in these practices

through a medium that consumers would not expect to be used for tracking, without consumers'
consent.

33.     Defendants' collection and sharing of sensitive data without consumers' consent
has caused or is likely to cause substantial injury to consumers that is not outweighed by
countervailing benefits to consumers or competition and is not reasonably avoidable by
consumers themselves.

34.     This is an unfair act or practice, in violation of Section 5(a) of the FTC Act, 15.
U.S.C. § 45(a).

35.     Further, such is also an unconscionable commercial practice in violation of the
CFA.  Each instance of Defendants' unfair tracking constitutes a separate violation under the
CFA, N.J. Stat. Ann. § 56:8-2.

## COUNT II

## DECEPTIVE OMISSION REGARDING SMART INTERACTIVITY

36.     Plaintiffs incorporate by reference all the foregoing paragraphs.

37.     Beginning in February 2014, Defendants represented, expressly or by implication,
that the "Smart Interactivity" feature of their televisions enabled program offers and suggestions
about what to watch.

38.     Defendants failed to adequately disclose that the "Smart Interactivity" feature
comprehensively collected and shared consumers' television viewing activity from cable boxes,
DVRs, streaming devices, and airwaves, which Defendants then provided on a household-by-
household basis to third parties.

39.     Defendants' failure to disclose adequately the material information described in
Paragraph 38, in light of the representation set forth in Paragraph 37, is a deceptive act or
practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

40.     Further, such are also unconscionable commercial practices and/or omissions of material fact in violation of the CFA.  Each instance of Defendants' deceptive omissions regarding "Smart Interactivity" constitutes a separate violation under the CFA, N.J. Stat. Ann. § 56:8-2.

## COUNT III

## DECEPTIVE REPRESENTATION REGARDING SMART INTERACTIVITY

41.     Plaintiffs incorporate by reference all the foregoing paragraphs.

42.     Beginning in February 2014, Defendants represented expressly or by implication that Defendants would provide program offers and suggestions to consumers with "Smart Interactivity" enabled on their televisions.

43.     In fact, Defendants did not provide program offers or suggestions to consumers with "Smart Interactivity" enabled on their televisions.

44.     This is a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

45.     Further, such is an unconscionable commercial practice and/or misrepresentation in violation of the CFA.  Each instance of Defendants' misrepresentation regarding "Smart Interactivity" constitutes a separate violation under the CFA, N.J. Stat. Ann. § 56:8-2.

## THE COURT'S POWER TO GRANT RELIEF

46.     Section 13(b) of the FTC Act, 15 U.S.C. §53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may remand ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

47.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow the Attorney General and the Director to enforce the CFA against Defendants in this Court and to grant such relief as provided under the CFA, including injunctive relief, N.J. Stat. Ann. § 56:8-8, civil penalties, N.J. Stat. Ann. § 56:8-13, reimbursement of attorneys' fees, N.J. Stat. Ann. § 56:8-14, investigative costs, N.J. Stat. Ann. § 56:8-11, and such other relief to which the Attorney General and the Director may be entitled.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs FTC, Attorney General and Director, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the CFA, N.J. Stat. Ann. § 56:8-1 et seq., and the Court's own equitable powers, request that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and the CFA by Defendants;

B.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and CFA, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, civil penalties, and disgorgement of ill-gotten monies; and

C.     Award Plaintiffs the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

FEDERAL TRADE COMMISSION

By: _____
    KEVIN H. MORIARTY
    MEGAN E. COX
    Federal Trade Commission
    600 Pennsylvania Avenue N.W.
    Washington, DC 20580
    kmoriarty@ftc.gov
    mcox1@ftc.gov
    Tel: (202) 326-2949

CHRISTOPHER S. PORRINO, Attorney
General of the State of New Jersey

By: _____
    KENT D. ANDERSON
    ELLIOTT M. SIEBERS
    RUSSELL M. SMITH, JR.
    Deputy Attorneys General
    State of New Jersey
    Department of Law & Public Safety
    Division of Law
    124 Halsey Street, 5th Floor
    Newark, New Jersey 07101
    Kent.Anderson@dol.lps.state.nj.us
    Elliott.Siebers@dol.lps.state.nj.us
    Russell.Smith@dol.lps.state.nj.us
    Tel: (973) 648-2689

*Attorneys for Plaintiff*
FEDERAL TRADE COMMISSION

*Attorneys for Plaintiff*
CHRISTOPHER S. PORRINO, Attorney
General of the State of New Jersey, STEVE
C. LEE, Director of the New Jersey Division
of Consumer Affairs

Dated: February 6, 2017

The VIZIO Privacy Policy has changed. Smart Interactivity has been enabled on your TV, but you may disable it in the settings menu. See www.vizio.com/privacy for more details. This message will time out in 1 minute.

OK

EXHIBIT A



EXHIBIT B

# EXHIBIT D

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **FEDERAL TRADE COMMISSION, CHRISTOPHER S. PORRINO, Attorney General of the State of New Jersey, and STEVE C. LEE, Director of the New Jersey Division of Consumer Affairs,** | **Case No.** _____ |
| **Plaintiffs,** | **STIPULATED ORDER FOR PERMANENT INJUNCTION AND MONETARY JUDGMENT** |
| **v.** | |
| **VIZIO, INC., a Delaware corporation, and VIZIO INSCAPE SERVICES, LLC, a Delaware limited liability company,** | |
| **Defendants.** | |

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"), Christopher S. Porrino, Attorney General of the State of New Jersey ("Attorney General"), and Steve C. Lee, Director of the New Jersey Division of Consumer Affairs ("Director") (collectively, "Plaintiffs"), filed a Complaint for permanent injunction and other equitable and monetary relief in this matter against defendants VIZIO, Inc. ("VIZIO") and VIZIO Inscape Services, LLC ("VIZIO Inscape Services") (collectively, "Defendants"). The FTC brought its claims pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b) ("FTC Act"), and the Attorney General and the Director brought their claims pursuant to the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq.* ("CFA").

Plaintiffs and Defendants stipulate to the entry of this Stipulated Order for Permanent Injunction and Monetary Judgment ("Order") to resolve all matters in dispute in this action.

**THEREFORE, IT IS ORDERED** as follows:

**FINDINGS**

1.       This Court has jurisdiction over this matter.

2.       The Complaint charges that Defendants participated in deceptive and unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and unconscionable commercial practices, misrepresentations, false promises, and omissions of material fact in violation of the CFA, N.J. Stat. Ann. § 56:8-2, in connection with Defendants' unfair collection and sharing of consumers' Viewing Data and deception concerning Defendants' "Smart Interactivity" feature.

3.       Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order. Only for the purpose of this action, Defendants admit the facts necessary to establish jurisdiction.

4.       Defendants waive any claim they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorneys' fees.

5.       The parties waive all rights to appeal or otherwise challenge or contest the validity of this Order.

**DEFINITIONS**

For purposes of this Order, the following definitions apply:

A.       "Covered Information" means information collected from a VIZIO internet-connected device, including, but not limited to, (1) product registration data; (2) Viewing Data; (3) Internet Protocol ("IP") address; (4) User ID or other identifiers; and (5) geolocation or

information that can be used to derive geolocation. Covered Information also means information combined with any of (1) through (5) above.

B.    "Defendants" means VIZIO, Inc., and its successors and assigns, and VIZIO Inscape Services, LLC, and its successors and assigns.

C.    "Smart TV" means any of Defendants' televisions or monitors that have the ability to connect to the internet.

D.    "Viewing Data" means any information or data collected or planned to be collected from a Smart TV about the content viewed on that television, or any reports or data derived therefrom and any information combined with such data.

## ORDER

### I.    PROHIBITED MISLEADING REPRESENTATIONS

**IT IS ORDERED** that Defendants and Defendants' officers, agents, employees, and attorneys, directly or through any corporation, subsidiary, division, website, or other device or affiliate owned or controlled by Defendants, in or affecting commerce, must not misrepresent in any manner, expressly or by implication:

A.    The extent to which Defendants collect, use, maintain, or protect the privacy, confidentiality, or security of any Covered Information; or

B.    The purpose of their collection, use, or disclosure of Covered Information.

### II.    NOTICE AND AFFIRMATIVE EXPRESS CONSENT PROVISION

**IT IS FURTHER ORDERED** that Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, in connection with any collection of Viewing Data for any product or service, prior to collecting any Viewing Data must:

A.      Prominently disclose to the consumer, separate and apart from any "privacy policy," "terms of use" page, or other similar document: (1) the types of Viewing Data that will be collected and used, (2) the types of Viewing Data that will be shared with third parties; (3) the identity or specific categories of such third parties; and (4) all purposes for Defendants' sharing of such information;

B.      Obtain the consumer's affirmative express consent (1) at the time the disclosure in Part II.A is made and (2) upon any material changes to the terms disclosed in Part II.A; and

C.      Provide instructions, at any time the consumer's affirmative express consent is sought under Part II.B, for how the consumer may revoke consent to collection of Viewing Data.

D.      For the purposes of this Order, "Prominently" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.      A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

2.      An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

3.      In any communication using an interactive electronic medium, such as in connection with an update to device firmware, the disclosure must be unavoidable.

4.      The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the triggering representation appears.

5.       The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

6.       The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

7.       When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

### III.    DATA DELETION

**IT IS FURTHER ORDERED** that within 120 days after entry of this Order, Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, must destroy Viewing Data that has been collected prior to March 1, 2016.  Provided, however, that such Viewing Data need not be destroyed, and may be disclosed, (A) to the extent requested by a government agency or required by law, regulation, or court order, including without limitation as required by rules applicable to the safeguarding of evidence in pending litigation, or (B) to the extent a user of a television associated with the Viewing Data has affirmatively consented to the collection, use, or disclosure thereof, consistent with Part II of this order.

### IV.    MANDATED PRIVACY PROGRAM

**IT IS FURTHER ORDERED** that Defendants must, no later than the effective date of this Order, establish and implement, and thereafter maintain, a comprehensive privacy program that is reasonably designed to (1) address privacy risks related to the development and management of new and existing products and services for consumers, and (2) protect the privacy and confidentiality of Covered Information collected directly or indirectly by

Defendants. Such program, the content and implementation of which must be documented in writing, must contain controls and procedures appropriate to Defendants' size and complexity, the nature and scope of Defendants' activities, and the sensitivity of the Covered Information, including:

      A.     The designation of an employee or employees to coordinate and be responsible for the privacy program;

      B.     The identification of reasonably foreseeable risks, both internal and external, that could result in Defendants' unauthorized collection, use, or disclosure of Covered Information and an assessment of the sufficiency of any safeguards in place to control these risks. At a minimum, this risk assessment should include consideration of risks in each area of relevant operation, including: (1) employee training and management, including training on the requirements of this Order, and (2) product design, development, and research;

      C.     The design and implementation of reasonable controls and procedures to address such risks and regular testing or monitoring of the effectiveness of those controls and procedures;

      D.     The development and use of reasonable steps to select and retain service providers capable of appropriately protecting the privacy of Covered Information they receive from Defendants and requiring service providers, by contract, to implement and maintain appropriate privacy protections for such Covered Information; and

      E.     The evaluation and adjustment of Defendants' privacy program in light of the results of the testing and monitoring required by sub-provision C, any changes to Defendants' operations or business arrangements, or any other circumstances that Defendants know or have reason to know may have an impact on the effectiveness of the privacy program.

## V. PRIVACY ASSESSMENTS BY A THIRD PARTY

**IT IS FURTHER ORDERED** that, in connection with its compliance with the Provision of this Order titled Mandated Privacy Program, Defendants must obtain initial and biennial assessments ("Assessments"):

A. The Assessments must be completed by a qualified, objective, independent third-party professional, who uses procedures and standards generally accepted in the profession. An individual qualified to prepare such Assessments must have a minimum of 3 years of experience in the field of privacy and data protection. All individuals selected to complete such Assessments must be approved by the Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission in his or her sole discretion. Any decision not to approve an individual selected to conduct such Assessments must be accompanied by a writing setting forth in detail the reasons for denying such approval.

B. The reporting period for the Assessments must cover: (1) the first 180 days after the issuance date of the Order for the initial Assessment, and (2) each 2-year period thereafter for 20 years after the issuance date of the Order for the biennial Assessments.

C. Each Assessment must:

1. Set forth the specific privacy controls that Defendants have implemented and maintained during the reporting period;

2. Explain how such privacy controls are appropriate to Defendants' size and complexity, the nature and scope of Defendants' activities, and the sensitivity of the Covered Information;

3.    Explain how the privacy controls that have been implemented meet or exceed the protections required by the Provision of this Order titled Mandated Privacy Program; and

4.    Certify that the privacy controls are operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of Covered Information and that the controls have so operated throughout the reporting period.

D.    Each Assessment must be completed within 60 days after the end of the reporting period to which the Assessment applies. Defendants must provide the initial Assessment to Plaintiffs within 10 days after the Assessment has been completed. Defendants must retain all subsequent biennial Assessments, at least until the Order terminates. Defendants must submit any biennial Assessments to Plaintiffs within 10 days of a request from a representative of Plaintiffs.

## VI.    MONETARY RELIEF

**IT IS FURTHER ORDERED** that:

A.    Defendants must pay to the Commission $1,500,000 within [8] days of the effective date of this Order by electronic fund transfer in accordance with instructions provided by a representative of the Commission.

B.    Defendants shall also pay the New Jersey Division of Consumer Affairs $1,000,000.00, which is comprised of $915,940.00 in civil penalties pursuant to N.J. Stat. Ann. § 56:8-13, and $84,060.00 in attorneys' fees and investigative costs pursuant to N.J. Stat. Ann. § 56:8-11, -19 ("New Jersey Monetary Relief").

C.    Defendants shall pay $700,000 of the New Jersey Monetary Relief to the New Jersey Division of Consumer Affairs within [8] days of the effective date of this Order by credit

card, wire transfer, bank check, money order, certified check, or cashier's check payable to "New Jersey Division of Consumer Affairs" and shall be forwarded to: Case Management Tracking, Division of Consumer Affairs, 124 Halsey Street – 7th Floor, Newark, New Jersey 07101.

      D.     The balance of the New Jersey Monetary Relief, totaling $300,000, shall be suspended and automatically vacated at the expiration of five (5) years from the effective date of this order ("Suspended Penalty"), provided:

          a.     Defendants comply in all material respects with Sections I through VI and Sections VIII through XI of this Order;

          b.     Defendants do not engage in acts or practices in violation of the CFA.

      E.     In the event Defendants fail to comply with Section VI, Paragraph D of this Order, the New Jersey Division of Consumer Affairs ("Division") shall provide Defendants with written notice of default or noncompliance, seeking payment of any unpaid portion of the New Jersey Monetary Relief, as well as the Suspended Penalty ("Notice of Noncompliance"). In any such Notice of Noncompliance, the Division shall provide Defendants with the specific details of the alleged default or noncompliance, as well as any supporting documents, and shall afford Defendants a fifteen (15) day period from receipt of the Notice of Noncompliance to cure the default or noncompliance. The Division may move on short notice or by Order to Show Cause to have a judgment entered for any unpaid portion of the New Jersey Monetary Relief as well as the Suspended Penalty.

## VII. ADDITIONAL MONETARY PROVISIONS

**IT IS FURTHER ORDERED** that:

      A.     Defendants relinquish dominion and all legal and equitable right, title, and interest

in all assets transferred pursuant to this Order and may not seek the return of any assets.

     B.     The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of any of Plaintiffs to enforce their rights to any payment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

     C.     The facts alleged in the Complaint establish all elements necessary to sustain an action by or on behalf of any of Plaintiffs pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

     D.     Defendants acknowledge that their Taxpayer Identification Numbers, which Defendants have previously submitted to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

## VIII.   ACKNOWLEDGMENTS OF THE ORDER

**IT IS FURTHER ORDERED** that Defendants obtain acknowledgments of receipt of this Order:

     A.     Defendants, within 10 days of entry of this Order, must submit to Plaintiffs an acknowledgment of receipt of this Order under sworn penalty of perjury.

     B.     For 5 years after the issuance date of this Order, Defendants must deliver a copy of this Order to: (1) all principals, officers, and directors; (2) all employees, agents, and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Provision titled Compliance Report and Notices. Delivery must occur within 10 days after the effective date of this Order for current personnel. For all others, delivery must occur before they assume their

responsibilities.

        C.      From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

### IX.    COMPLIANCE REPORTING

      **IT IS FURTHER ORDERED** that Defendants make timely submissions to Plaintiffs:

        A.      One year after the issuance date of this Order, Defendants must submit a compliance report, sworn under penalty of perjury, in which it must: (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of Plaintiffs may use to communicate with Defendants; (b) identify all of Defendants' businesses by all of their names; (c) describe the activities of each business, including the goods and services offered; (d) describe in detail whether and how Defendants are in compliance with each Provision of this Order, including a discussion of all of the changes Defendants made to comply with the Order; and (e) provide a copy of each Acknowledgment of the Order obtained pursuant to this Order to Plaintiffs, unless previously submitted.

        B.      Defendants must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following: (a) any designated point of contact; or (b) the structure of any Corporate Defendants or any entity that Defendants have any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

        C.      Defendants must submit notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendants within 14 days of its

filing.

D.    Any submission to Plaintiffs required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.    Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue, NW, Washington, DC 20580. The subject line must begin: *In re VIZIO, Inc.*

F.    Unless otherwise directed by an Attorney General and/or Director representative in writing, all submissions to the Attorney General and/or Director pursuant to this Order must be emailed to cmt@dca.lps.state.nj.us or sent by overnight courier (not the U.S. Postal Service) to: Case Management Tracking, Division of Consumer Affairs, 124 Halsey Street – 7th Floor, Newark, New Jersey 07101. The subject line must begin: *In re VIZIO, Inc.*

## X.    RECORDKEEPING

**IT IS FURTHER ORDERED** that Defendants must create certain records for 20 years after the issuance date of the Order, and retain each such record for 5 years, unless otherwise specified below. Specifically, Defendants, in connection with the collection, maintenance, or storage of personal information from or about consumers, must create and retain the following records:

A.    Accounting records showing the revenues from all goods or services sold, the

costs incurred in generating those revenues, and resulting net profit or loss;

B.     Personnel records showing, for each person providing services in relation to any aspect of the Order, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.     Copies or records of all consumer complaints regarding Defendants' collection, use, maintenance, or protection of the privacy, confidentiality, or security of any Covered Information, whether received directly or indirectly, such as through a third party, and any response;

D.     A copy of each representation by Defendants that describes Defendants' collection, use, maintenance, or protection of the privacy, confidentiality, or security of any Covered Information.

E.     For 5 years after the date of preparation of each Assessment required by this Order, all materials relied upon to prepare the Assessment, whether prepared by or on behalf of Defendants, including all plans, reports, studies, reviews, audits, audit trails, policies, training materials, and assessments, and any other materials concerning Defendants' compliance with related Provisions of this Order, for the compliance period covered by such Assessment; and

F.     All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to Plaintiffs.

## XI.     COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Defendants' compliance with this Order:

A.     Within 10 days of receipt of a written request from a representative of Plaintiffs,

Defendants must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury, and produce records for inspection and copying.

B.     For matters concerning this Order, representatives of the Plaintiffs are authorized to communicate directly with Defendants. Defendants must permit representatives of Plaintiffs to interview anyone affiliated with any Respondent who has agreed to such an interview. The interviewee may have counsel present.

C.     Plaintiffs may use all other lawful means, including posing through its representatives as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice. Nothing in this Order limits Plaintiffs' lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1, and the CFA, N.J. Stat. Ann. § 56:8-3, -4.

## XII.    RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retain jurisdiction of this matter for purposes of construction, modification and enforcement of this Order.

**SO ORDERED this** _13_ **day of** _Febry_____, 2017

_____
UNITED STATES DISTRICT JUDGE

**SO STIPULATED AND AGREED BY:**

**FOR PLAINTIFFS:**

**FEDERAL TRADE COMMISSION**

By: _____     Dated: _Feb 6_____, 2017
KEVIN H. MORIARTY
MEGAN E. COX
Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
kmoriarty@ftc.gov
mcox1@ftc.gov
Tel: (202) 326-2949

**CHRISTOPHER S. PORRINO, Attorney General of the State of New Jersey, and STEVE C. LEE, Director of the New Jersey Division of Consumer Affairs**

By: _____     Dated: _February 6_____, 2017
KENT D. ANDERSON
ELLIOTT M. SIEBERS
RUSSELL M. SMITH, JR.
Deputy Attorneys General
State of New Jersey
Department of Law & Public Safety
Division of Law
124 Halsey Street, 5th Floor
Newark, New Jersey 07101
Kent.Anderson@dol.lps.state.nj.us
Elliott.Siebers@dol.lps.state.nj.us
Russell.Smith@dol.lps.state.nj.us
Tel: (973) 648-2689

**FOR DEFENDANTS:**

**LATHAM & WATKINS LLP**

By: _____     Dated: _12/23/2016_____ , 2016

KEVIN M. MCDONOUGH
N.J. Bar No. 41892005
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
kevin.mcdonough@lw.com
Tel: (212) 906-1246

By: _____     Dated: _12/27/2016_____ , 2016

JENNIFER C. ARCHIE
(*pro hac vice to be filed*)
Latham & Watkins LLP
555 11th St. NW, Suite 1000
Washington D.C. 20004
jennifer.archie@lw.com
Tel: (202) 637-2205

**VIZIO, INC.**

By: _____, CAO     Dated: _DECEMBER 21_ , 2016

Name: Robert L. Brinkman

Title: Chief Administrative Officer and Assistant Secretary

Address: 39 Tesla, Irvine, California 92618

E-Mail: rob.brinkman@vizio.com

Tel: (949) 428-2585


**VIZIO INSCAPE SERVICES, LLC**

By: _____, CAO     Dated: _DECEMBER 21_ , 2016

Name: Robert L. Brinkman

Title: Chief Administrative Officer and Secretary

Address: 39 Tesla, Irvine, California 92618

E-Mail: rob.brinkman@vizio.com

Tel: (949) 428-2585

# EXHIBIT E

Eric H. Gibbs (Bar No. 178658)
Andre Mura (Bar No. 298541)
Linda Lam (Bar No. 301461)
**GIRARD GIBBS LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701
ehg@classlawgroup.com
amm@classlawgroup.com
lpl@classlawgroup.com

Joseph W. Cotchett (Bar No. 36324)
Adam J. Zapala (Bar No. 245748)
Gwendolyn R. Giblin (Bar No. 181973)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ggiblin@cpmlegal.com

*Co-lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| IN RE: VIZIO, INC., CONSUMER PRIVACY LITIGATION | Case No. 8:16-ml-02693-JLS (KESx) |
| | **SECOND CONSOLIDATED COMPLAINT** |
| This document relates to: | |
| ALL ACTIONS | Hon. Josephine L. Staton |

Plaintiffs Dieisha Hodges, Rory Zufolo, Mark Queenan,[1] John Walsh, Chris Rizzitello, and Linda Thomson on behalf of themselves and all others similarly situated, allege the following against Defendants VIZIO, Inc.; VIZIO Holdings, Inc.; VIZIO Inscape Technologies, LLC; and VIZIO Inscape Services, LLC (collectively referred to as "VIZIO") in this Consolidated Complaint:

## I. INTRODUCTION AND SUMMARY OF CASE

1.      If you own a VIZIO Smart TV, Friday night movie night in the privacy of your home is a surprisingly public affair. This is because VIZIO Smart TVs watch what you're watching while you're watching it.

2.      VIZIO collects highly specific data about consumers' viewing histories and preferences through invasive software secretly installed on millions of its Smart TVs. It then immediately discloses this data to advertisers and media content providers so they can deliver targeted advertisements and content in real-time, or on a second-by-second basis. These targeted ads and content are sent not just to the Smart TVs, but also to any smartphones, tablets, PCs, or other devices within the home that share the same Internet connection as the Smart TV.

3.      Monetizing consumer data is a critical part of VIZIO's business plan. The television market is saturated and highly competitive. VIZIO's growth strategy hinges not only on sales of its Smart TVs, but also on its ability to profit from the collection and disclosure of a rich portfolio of consumer data, including personal viewing habits and preferences, among other information.

---

[1] Defendants have provided written consent via e-mail that Plaintiffs may amend the consolidated complaint to add Mark Queenan as a named Plaintiff. Plaintiff Queenan's civil case is No. 8:17-cv-00462-JLS-KES (filed Mar. 15, 2017); he has filed a Notice of Related Case. Plaintiffs anticipate filing forthwith a stipulation and proposed order requesting leave to add Queenan as a named Plaintiff herein, and to list his underlying case as a member case.

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

4.      In essence, VIZIO's business plan treats consumers as VIZIO's very own Nielsen family. The critical difference is that, unlike VIZIO consumers, Nielsen family members agree to share their viewing habits and are paid for their participation.

5.      VIZIO single-handedly and deceptively created "a community of over 8 million VIZIO connected units, or VCUs," referring to Internet-connected Smart TVs that transmit data that is collected by VIZIO's Inscape software.[2]

6.      This is community by conscription, not consent.  The data collection software—Smart Interactivity—is turned "on" by default. Consumers of VIZIO's Smart TVs are therefore automatically included in this community. No other major television manufacturer—not Samsung, not LG Electronics— tracks users' viewing habits unless they affirmatively elect to share their sensitive information.

7.      Though consumers may turn off Smart Interactivity, VIZIO obscures that option to discourage opt-outs. Even assuming consumers discovered that VIZIO was collecting their viewing data and then managed to navigate the opt-out process, the opt-out function was broken during much of the relevant time period. An independent investigation by security software company Avast, published in the fall of 2015, found that the "off" function was not operational "for months, if not years. That means consumer data has been shared without consent for this entire span of time."[3]

8.      VIZIO disclosed extensive consumer data to advertisers, data brokers, media content providers, and other third parties. That information included viewing habits and other information particularly useful to uniquely identify individuals. Such information includes, but is not limited to, the online services a consumer visited and the presence of a consumer's other Internet-connected devices.  VIZIO also collected and disclosed consumers' Internet Protocol (IP) addresses, media access control (MAC) addresses, and

---

[2] VIZIO Form S-1 Registration Statement, https://www.sec.gov/Archives/edgar/data/1648158/000119312515262817/d946612ds1.htm#toc946612_2 (last visited Aug. 11, 2016).

[3] Aaron McSorley, *The Anatomy of an IoT Hack*, https://blog.avast.com/2015/11/11/the-anatomy-of-an-iot-hack/#more-38414 (last visited Aug. 11, 2016).

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

zip codes, among other information. This personally identifiable information can be used to pinpoint a consumer's physical location (*i.e.*, "geolocation" information).

9.    VIZIO knows advertisers and data brokers can and do connect these dots. And yet VIZIO falsely and deceptively tells consumers that the information it collects and discloses along with viewing habits cannot be traced back to them. For instance, it characterizes the information it discloses as "non-personal" or "anonymous" information even though it uniquely identifies individuals and their viewing habits.

10.    Because a large number of opt-outs would threaten VIZIO's ability to profit from its Inscape data services business, VIZIO purposefully omits information about Inscape data collection practices or Smart Interactivity in advertising, marketing, or television packaging. VIZIO's Smart TV packaging, for example, touts its "connectivity," by which it means the ability of the television to deliver programing available through the Internet and also from cable and satellite providers, streaming devices, and other connected media sources. Nowhere on its packaging, however, does VIZIO tell consumers that it discloses to advertisers and data brokers their viewing histories and information used to link them to their viewing histories. Neither does VIZIO disclose this in advertising and marketing.

11.    Any reference to Inscape data services or Smart Interactivity which may (or may not) be found in obscure sections of its website, in some (but not all) iterations of its privacy policies, or pop-ups which appear on the television screen and then quickly disappear, is not an adequate disclosure. Such disclosures are hard to find, tough to understand, fleeting, or buried alongside other ads or messages to minimize their significance and implications.

12.    Plaintiffs are consumers of VIZIO's Smart TVs who did not consent to this invasive data collection program. They bring this putative class action suit against VIZIO to enforce their and other VIZIO owners' privacy and consumer rights under federal and state law.

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

13. The privacy violations occur because VIZIO has collected and disclosed Plaintiffs' sensitive viewing histories and personal information without their consent, since at least May 2014. The movies or television consumers watch may reveal sensitive information suggestive of their politics, religious views, or sexuality—in other words, their most personal and intimate details. As Congress itself has recognized, "films are the intellectual vitamins that fuel the growth of individual thought."[4] The "intimate process" of "intellectual growth is one of privacy" which "should be protected from the disruptive intrusion of a roving eye."[5] VIZIO has violated the federal and state privacy rights of its consumers by, intercepting, collecting, and disclosing their sensitive viewing histories, and information capable of linking them to their viewing histories, without their consent.

14. In addition, VIZIO's material omissions regarding its data collection and dissemination programs and invasive tracking software are false, deceptive, and misleading in violation of state consumer protection laws. This includes the unauthorized collection and/or disclosure of information or data from a VIZIO Smart TV about the content viewed on that television, as well as the collection, combining and/or disclosure of data from a variety of sources such as product registration data; IP addresses; MAC addresses; User IDs or other identifiers; geolocation or information that can be used to derive geolocation; and reports or data derived therefrom or combined with such data. Combined data can come from third parties, and other sources of VIZIO data such as data collected by apps, smart phones, or other VIZIO products.

15. This data and information was collected, combined, and/or disclosed to spy on consumers' viewing habits and to deliver targeted ads through televisions and across a range of other electronic devices, as well as to determine the effectiveness of the ads. Had Plaintiffs known the truth about VIZIO's data collection and dissemination practices and

---

[4] Committee Report, S. Rep. 100-599, at 7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and the Law, Hearing Tr. at 10 (Aug. 3, 1988)).
[5] *Id.*

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

tracking software, they would not have purchased Smart TVs or would have paid less for them.

16. These harms are independently actionable and justify the relief sought here, including statutory damages, actual damages, and restitution. In addition, because VIZIO continues to collect sensitive consumer data without consent and has not changed its practice of automatically including consumers in the Inscape data collection program, equitable relief, including an injunction, is appropriate here.

## II. PARTIES

### A. Plaintiffs

17. Plaintiff Dieisha Hodges is a resident of Oakland, California. Ms. Hodges purchased a VIZIO Smart TV, Model No. E550i-A0, in Oakland, California. Ms. Hodges connected her VIZIO Smart TV to the Internet via a Wi-Fi connection shortly after purchasing it, and used the Netflix, Hulu, and YouTube "apps" on the television to stream video content. She also uses her Smart TV to watch cable provided by Xfinity. Ms. Hodges connects her Smart TV to a PlayStation 3 and Google Chromecast. When Ms. Hodges purchased her Smart TV, she was not aware that VIZIO would collect her viewing data or other information and data identified herein or would disseminate that information to third parties. After she learned of this by reading an online article, Ms. Hodges tried to find a way to disable the tracking software on her television.

18. Plaintiff Rory Zufolo is a resident of Oxnard, California. Mr. Zufolo purchased a VIZIO Smart TV, Model No. M552i-B2, in Oxnard, California. Mr. Zufolo connected his VIZIO Smart TV to the Internet via a Wi-Fi connection shortly after purchasing it and used the Netflix, Amazon, Hulu, and YouTube "apps" on the television to stream video content. Mr. Zufolo also uses his Smart TV to watch cable provided by Time Warner. Up until September 2015, he watched television provided by DirecTV. He occasionally connects his Smart TV to a Xbox or PlayStation. When Mr. Zufolo purchased his Smart TV, he was not aware that VIZIO would collect his viewing data or other information and data identified herein or would disseminate that information to

5

1  third parties. After he learned of this, he stopped using the television to stream videos
2  through Netflix and other apps.

3   19.   Plaintiff Mark Queenan is a resident of Plantation, Florida. Mr. Queenan
4  purchased a VIZIO Smart TV, Model No. M55-C2, in Miami, Florida. Mr. Queenan
5  connected his VIZIO Smart TV to the Internet via a Wi-Fi connection shortly after
6  purchasing it, and used the Netflix and YouTube "apps," among others, on the television
7  to stream video content. Mr. Queenan also connects his Smart TV to a DVD player and
8  cable box. When Mr. Queenan purchased his Smart TV, he was not aware that VIZIO
9  would collect his viewing data and other information and data identified herein or would
10  disseminate that information to third parties. After he learned of this on a local radio
11  news program, he proceeded to learn how to deactivate the data collection.

12   20.   Plaintiff John Walsh is a resident of Boston, Massachusetts. Mr. Walsh
13  purchased a VIZIO Smart TV, Model No. E400i-B2, in Boston, Massachusetts. Mr.
14  Walsh connected his Smart TV to the Internet via an Ethernet cable connection shortly
15  after purchasing it, and used it to stream video content from the Netflix and YouTube
16  "apps." Mr. Walsh also uses his Smart TV to watch cable provided by Comcast, and
17  connects his Smart TV to a DVD receiver that also has TiVo. When Mr. Walsh
18  purchased his Smart TV, he was not aware that VIZIO would collect his viewing data or
19  other information and data identified herein or would disseminate that information to
20  third parties. After he learned of this, he disconnected his Smart TV from the Internet in
21  order to prevent the collection of his viewing data. On January 13, 2016, Mr. Walsh,
22  through his counsel, sent VIZIO a written demand letter detailing the acts and practices
23  complained of herein and the injury suffered. VIZIO responded with a letter denying all
24  allegations.

25   21.   Plaintiff Chris Rizzitello is a resident of Cairo, New York. Mr. Rizzitello
26  purchased a VIZIO Smart TV, Model No. M422I-B1, at a Walmart location in Catskill,
27  New York. Mr. Rizzitello connected his VIZIO Smart TV to the Internet via a Wi-Fi
28  connection shortly after purchasing it, and used the YouTube and other media apps to

6

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

1    stream video content. Mr. Rizzitello also connects his Smart TV to a PlayStation 4 and

2    Raspberry PI3. When Mr. Rizzitello purchased his Smart TV, he was not aware that

3    VIZIO would collect his viewing data or other information and data as identified herein

4    or  would disseminate that information to third parties. After he learned of this, he

5    stopped using the Smart TV to watch videos on the YouTube app, disconnected the

6    television from the Internet, and, when he learned he could do so, turned off the Smart

7    Interactivity feature.

8        22.   Plaintiff Linda Thomson is a resident of Bellingham, Washington. Ms.

9    Thomson purchased a VIZIO Smart TV, Model No. M702iB3, in Bellingham,

10   Washington. Ms. Thomson connected her Smart TV to the Internet shortly after

11   purchasing it and has since used it to watch movies and television shows from the

12   Amazon app. She also uses her Smart TV to watch cable provided by Xfinity and/or

13   Comcast. When Ms. Thomson purchased her Smart TV, she was not aware that VIZIO

14   would collect her viewing data or other information and data as identified herein or

15   would disseminate that information to third parties. After she learned of this, she

16   refrained from using certain apps on her Smart TV. Shortly after she filed her lawsuit,

17   Ms. Thomson saw a message pop up on her Smart TV regarding privacy settings. The

18   message disappeared before should could read it through, and she has not found a way to

19   retrieve the message. She believes the message pertained to the privacy issues involved in

20   this case.

21       23.   When shopping for their Smart TVs, Plaintiffs looked at the description of the

22   televisions provided on the boxes in which their VIZIO Smart TVs were packaged. The

23   packaging for the VIZIO Smart TVs described its features and indicated that the

24   televisions were equipped to deliver video content through the Internet and could display

25   content from cable and satellite providers, streaming devices, and other connected media

26   sources. The packaging, however, failed to inform Plaintiffs that if they took advantage

27   of those features or watched live broadcast programming on their Smart TVs, their

28   viewing data would be collected by VIZIO and disseminated to third parties. Had

7

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

Plaintiffs known the truth about VIZIO's collection and dissemination of Plaintiffs' viewing data, Plaintiffs would not have purchased, or would have paid less for, their VIZIO Smart TVs.

24. At no time did Plaintiffs consent to having their viewing information, and other personally identifying data or information from their Smart TVs or other electronic devices, collected or disseminated to third parties.

**B. Defendants**

25. Defendant VIZIO, Inc. is a California corporation that maintains its principal place of business at 39 Tesla, Irvine, California. VIZIO, Inc. is registered to conduct business in California. VIZIO, Inc. designs, markets, and distributes for sale consumer electronic devices, including Smart TVs, throughout the United States, including in this District.

26. Defendant VIZIO Holdings, Inc. is a Delaware corporation that maintains its principal place of business at 39 Tesla, Irvine, California.

27. Defendant VIZIO Inscape Technologies, LLC, formerly known as Cognitive Media Networks, Inc., is a Delaware corporation that maintains its principal place of business at 39 Tesla, Irvine, California. VIZIO Inscape Technologies, LLC conducts business throughout the United States, including in this District.

28. Defendant VIZIO Inscape Services, LLC is a Delaware corporation that maintains its principal place of business at 39 Tesla, Irvine, California. VIZIO Inscape Services, LLC is registered to conduct business in California.

29. Defendants acted as one, jointly, collectively, or in concert unless a particular Defendant is identified by its full name.

### III.   JURISDICTION AND VENUE

30. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as this action arises under a federal statute. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

31.   This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (i) at least one Plaintiff is a citizen of a different state than the Defendants; (ii) the amount in controversy exceeds $5,000,000; and (iii) there are at least 100 individuals in the putative class that Plaintiffs seek to represent through this action.

32.   This Court has personal jurisdiction over Defendants because Defendants regularly conduct business in California, are present and licensed to conduct business in California, and because the events giving rise to this lawsuit occurred, in substantial part, in California.

33.   Venue is proper in this District pursuant to 28 U.S.C. 1391(b) because Defendant VIZIO is headquartered in this District, Defendants conduct substantial business in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## IV.   FACTUAL ALLEGATIONS

### Smart TVs

34.   Since the mid-2000s, Smart TVs have become increasingly popular in the United States. A Smart TV is essentially a technological cross between a computer and a television. Aside from the traditional function of a television set, a Smart TV is also equipped with integrated software applications that allow users to access the Internet, and on-demand services such as Netflix, Hulu, and Pandora, and other online media content, such as Facebook and Twitter.

35.   Although Smart TVs are more expensive than traditional television sets, Smart TVs are popular because they are equipped to deliver movies and television shows on an on-demand basis, including programming that may not be conventionally available (*e.g.*, broadcast on network or cable television).

### VIZIO's Business Platform

36.   VIZIO is a consumer electronics company headquartered in Irvine, California. Since its founding in 2002, it has sold over 65 million television and audio sets. VIZIO

9

sells its products in over 8,000 retail stores throughout the United States, including large chains such as Costco, Sam's Club, Walmart, and Best Buy. In 2014, it held the second-largest market share of Smart TVs in the country.

37.   VIZIO has developed a business platform that rests on three pillars.

38.   The first is its line of connected entertainment products, which include Smart TVs and audio products.

39.   The second is its discovery and engagement software, called either VIZIO Internet Apps (and Apps Plus) or SmartCast, which delivers video and audio content.

40.   The third is Inscape data services, which uses automatic content recognition technology to capture, in real time, up to 100 billion viewing data points each day from over 8 million VIZIO Smart TVs. VIZIO calls its automatic content recognition technology "Smart Interactivity."



41.   According to VIZIO, there is a market opportunity for audience and advertisement measurement. In 2014, the total global market spent on the industry was approximately $1.9 billion. Competitors in the market for viewing behavior data and analysis include well-established companies such as A.C. Nielsen and Rentrak.

10

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

42. VIZIO believes the principal competitive factors impacting the market for its Inscape data services are the quality and accuracy of its data, the timeliness of its data, and the amount and level of detailed information and insight its data provides. "Advertisers and media content providers are looking for access to accurate, real-time data regarding consumer preferences and behaviors so they can better measure and increase their return on content creation and advertising spend."[6] VIZIO has partnered with media and analytics companies to provide them with "actionable viewership insights" collected and delivered in real time to "create more relevant, personalized entertainment experiences and drive further engagement."[7]

43. To monetize its data collection platform, VIZIO has developed partnerships with advertisers, media content and analytics providers, and brands. VIZIO's business growth is, by its own account, highly dependent on the success of its Inscape data services. VIZIO has sought to distinguish itself from market competitors such as Nielsen

---

[6] VIZIO Form S-1 Registration Statement at 90, https://www.sec.gov/Archives/edgar/data/1648158/000119312515262817/d946612ds1.htm#toc946612_2 (last visited Aug. 11, 2016).

[7] *Id.* at 7.

11

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

by designing its Inscape data services to provide data of such quantity and quality to be highly valuable to advertisers. According to VIZIO, its current user base of 8 million Smart TVs reflects U.S. census demographics and provides more accurate viewing behavior data in real time than any other brand.

### VIZIO'S Collection and Dissemination of Viewing Histories and Personally Identifiable Information Is Critical to Its Business Model

44.   For the years 2013, 2014, and through the third quarter of 2015, VIZIO's reported net income was $25.7 million, $45.0 million, and $44.3 million, respectively.[6] VIZIO generates billions of dollars in annual revenues, demonstrating that it has slim margins. VIZIO attributes a substantial portion of its net income to sales of its Smart TVs. To make up for these slim margins, VIZIO sought to develop a new source of revenue by monetizing the viewing habits of its millions of customers and selling that information to advertisers without adequately disclosure to its customers.

45.   VIZIO has recognized the threat to its business model that exists if consumers were to understand its tracking software.  In an October 2015 filing with the Securities and Exchange Commission regarding its initial public offering, VIZIO revealed its concern that its customers might react negatively to the surreptitious collection of their data: "Our customers may also object to or opt out of the collection and use of their data, which may harm our business."

### VIZIO's Data Collection Software and Program

46.   *Discovery and engagement software.* VIZIO delivers video content through VIZIO Internet Apps, Internet Apps Plus, and SmartCast. This software allows consumers to access programming available on Netflix, Hulu, YouTube, and Amazon Instant Video, among others. VIZIO Internet Apps, Internet Apps Plus, and SmartCast are software that are pre-installed on the television or installed through software updates. In turn, Netflix, Hulu, YouTube and Amazon Instant Video and the like are entertainment companies that create, produce, or license video programming either for free, for rent, or as part of a paid subscription.

47.   The VIZIO Internet Apps and Internet Apps Plus user interface displays a streamlined App Launcher that allows users to select available programming. The app may also be accessed through the VIZIO Smart TV remote.

48.   Certain VIZIO Smart TVs use "SmartCast" to deliver movies, TV shows, live streams and more across multiple apps at once. SmartCast is VIZIO's latest delivery engagement software. It can be used on a tablet remote that comes with the television. This technology allows a user to watch programming on the tablet remote, or to "cast," or display, content from the tablet remote to the television display or speakers.

49.   This software is also available for use on a smartphone through the VIZIO SmartCast App, which is available for download for free from the Apple App Store or Google Play. This technology also "casts" content from a smartphone to the Smart TV.




SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

50.   *Inscape data services.* Inscape captures real-time viewing behavior data from VIZIO Smart TVs—up to 100 billion viewing data points each day—thereby enabling VIZIO to provide this "broader data set, at scale and with real-time delivery," to advertisers and media content providers, who in turn delivered and re-targeted advertisements.[8] Ad re-targeting is the process of pushing ads to consumers based on their previous interactions with that ad, in situations where the consumers' first view of the ad did not result in a sale or conversion.

51.   This data program is powered by automatic content recognition (ACR) technology, which is designed to recognize attributes of the content being displayed on VIZIO Smart TVs and match those attributes to a database of existing content, such as movies, TV shows, and games.

52.   A patent filed by Cognitive Networks, Inc. provides that in order to accomplish its "goal, the processing means within the TV device itself, or an associated device such as a set-top box, needs to have real time 'awareness' of what programming is being displayed on the TV screen at that moment."[9]  The technology "takes samples of the programming actually being displayed on that TV at any point in time and sends the fingerprints of those samples to the centralized fingerprint matching server to compare against already existing fingerprints in the database."[10]

53.   This second-by-second capture, collection, and analysis of content is required for "ACR detection [to operate] sufficiently fast for providing at least some context-sensitive content substantially simultaneously with at least one targeted video."[11] Cognitive Networks' ACR technology is capable of collecting, analyzing, and delivering such data "even when the television display is showing content where a user is changing

_____

[8] *Id.* at 97.

[9] U.S. Patent No. 9,071,868 (issued Jun. 30, 2015).

[10] *Id.*

[11] *Id.*

14

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

channels, rewinding, fast-forwarding or even pausing video from a digital video recorder."[12]  In fact, the technology can be used to collect and analyze data about what a viewer is *about to be* watching, "eliminat[ing] essentially all . . . delay by using a system and method that anticipates the arrival of a specific advertisement of interest so that the various required processes to confirm the arrival of the segment and locally generate and display the relevant graphics may be initiated slightly in advance of the actual arrival of the video segment of interest."[13]  Such instantaneous delivery is, of course, the point of the technology—maximizing the relevant content and advertising provided to consumers in real-time.

54.   VIZIO calls its ACR technology "Smart Interactivity." Smart Interactivity software was designed by Cognitive Media Networks, Inc. VIZIO acquired Cognitive Media in August 2015.

55.   Using Smart Interactivity software, the Inscape program is able, second-by-second or instantaneously, to collect, analyze, and deliver data regarding most content displayed on VIZIO Smart TVs, including content from cable and satellite providers, streaming devices, and gaming consoles. It is also able to aggregate and store such data. In fact, Inscape collects viewing data behavior from all media sources that connect via external input to the Smart TVs—for example, set top boxes, digital video recorders, streaming media players, Blu-ray and DVD players and gaming consoles.

---

[12] U.S. Patent No. 9,055,335 (issued Jun. 9, 2015).

[13] U.S. Patent No. 9,055,309 (issued Jun. 9, 2015).

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

56.  As depicted above, VIZIO's data collection includes, but is not limited to, data related to publicly available content displayed on VIZIO Smart TVs, such as the identity of a broadcast, cable, or satellite television provider, and the television programs and commercials viewed (including time, date, channel, and whether they were viewed live or at a later time).

57.  There is no lag time or delay between when data from (for example) a set-up cable box arrives at the Smart TV and when it is transmitted to the Inscape platform; the data is automatically captured and sent within the same second that it is displayed.

58.  Inscape also collects consumers' IP addresses (which are unique identifiers assigned to personal digital devices such as laptops, tablets, and Smart TVs), zip codes, and online services visited by the consumer, as well as MAC addresses, Wi-Fi access points and signal strength, product model numbers, hardware and software versions, chipset IDs, and region and language settings, among other information. In turn, this information can be used to learn even more about the user, including demographic details such as age, profession, and wealth indicators.

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

59.   For SmartCast users, Inscape collects the above and also:  (1) information about what video or audio is currently playing on the Smart TV, tablet remote, or mobile phone using the SmartCast App; and (2) programming choices requested, the date and time of these choices, user-initiated searches, content consumers browse while using the SmartCast tablet, or other commands communicated to the SmartCast Products through the SmartCast App.

60.   SmartCast app users may create a myVIZIO account or log into an existing myVIZIO/Fandemonium account.

61.    For SmartCast users, VIZIO associates the data collected with any myVIZIO account profile, which includes a first and last name and e-mail address.

62.   VIZIO then discloses the associated data described above along with other data to advertisers and data brokers, and other third parties, including its partners.

**Smart Interactivity**

63.   VIZIO initiated the Smart Interactivity feature in or about February 2014 through an "over-the-air" update. It also began pre-installing Smart Interactivity software on its Smart TVs in or around that same time.

64.   Unlike its competitors, VIZIO's default policy is to turn on this data collection feature on all of its Smart TVs.

65.   This default 'on' setting differentiates VIZIO from competing television manufacturers such as Samsung and LG Electronics, who only track users' viewing habits if users voluntarily turn the feature on. Unless a Samsung or LG consumer opts into the data collection program, those companies will not collect the consumer's personal viewing histories. VIZIO consumers, by contrast, must opt out of the data collection feature to avoid having their personal viewing habits collected.

66.   In its Prospectus, VIZIO brags about the scope and detail of the data collected and sold and its potential advertising profits as follows:

> Our Inscape data services capture, in real time, up to 100 billion
> anonymized viewing data points each day from our over 10 million

VCUs [(VIZIO connected units)]. Inscape collects, aggregates and stores data regarding most content displayed on VCU television screens, including content from cable and satellite providers, streaming devices and gaming consoles. Inscape provides **highly specific viewing behavior** data on a massive scale with great accuracy, which can be used to generate intelligent insights for advertisers and media content providers and to drive their delivery of more relevant, personalized content through our VCUs.

67.   VIZIO refers to the information it surreptitiously collects as "Non-Personal Information," which VIZIO describes as "data in a form that does not, on its own, permit direct association with any specific individual." As alleged, this includes, but is not limited to, the IP addresses products that are assigned to users' internet-connected devices, their zip codes, the online services they visit, information about their VIZIO products (such as MAC addresses, product model numbers, hardware and software versions, chipset IDs, and region and language settings), as well as information about the products users request or purchase, the presence of other devices connected to their local networks, and the number of users and frequency of use of VIZIO products and services. VIZIO also collects "anonymous information regarding customer activities on our websites, on Internet-connected products and services, and on VIZIO's Internet store.

68.   Although VIZIO claims that the information collected is non-personal, technical experts have challenged this characterization. For example, Extreme Tech's website contains the following excerpt from an article authored by Joel Hruska on November 10, 2015.

> "Non-personally identifiable information" is a contradiction in terms, particularly when the companies in question have access to mobile data. The entire point of VIZIO's advertising push is to sell this information to companies so they can track you on multiple devices. In order to do that, they're going to need to find those devices. If an advertiser can pick up on the fact that you watch, say, Arrow in order to send you ads enticing you to watch The Flash, then that advertiser effectively knows who you are.[14]

---

[14] Joel Hruska, "Vizio TVs Caught Tracking Viewing Habits, Selling Data to Advertisers." ExtremeTech (Nov. 10, 2015) (available at

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

69.   If a consumer wanted to opt out, that option was not functional for a considerable period of time during the relevant time period. According to an independent investigation by security software company Avast, published in the fall of 2015, the "off" function was not operational "for months, if not years. That means consumer data has been shared without consent for this entire span of time."[15]

70.   If a VIZIO Smart TV is ever reset to factory settings, either intentionally or inadvertently through an update or power failure, the TV will return to its default settings, thereby reactivating the Smart Interactivity feature.

71.   Although intending to profit from selling personal information to third parties without consent, VIZIO itself recognized potential privacy law concerns. VIZIO stated the following:

> We collect, process, store, use and to some extent disclose information collected from or about purchasers and users of our products, and from the devices themselves. **The collection and use of personal information**, and analysis and sharing of anonymous user data and unique identifiers to inform advertising or analyze viewing behaviors subject us to legislative and regulatory burdens, may expose us to liability, and our actual or perceived failure to adequately protect consumer data could harm our brand, our reputation in the marketplace and our business.

> Privacy laws and regulations, if drafted or interpreted broadly, could be deemed to apply to the technologies we use to collect, analyze and share viewing behaviors or other data collected from our Smart TVs or consumers, and could restrict our information collection methods or decrease the amount and utility of the information that we would be permitted to collect and share. . . . In addition, a determination by a court or government agency that any of our practices, or those of our agents, do not meet these standards could result in liability, or result in negative publicity, and adversely affect our business.

---

http://www.extremetech.com/internet/217762 viziotvs-caught-tracking-viewing-habits-selling-data-to-advertisers) (emphasis in original)

[15] Joel Hruska, *New Vizio hack reveals company shares your data whether you accept its privacy policy or not*, http://www.extremetech.com/extreme/217923-new-vizio-hack-reveals-company-shares-your-data-whether-you-accept-its-privacy-policy-or-not (last visited Aug. 11, 2016).

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

**VIZIO Knows the Information It Discloses Identifies Individual Viewers and Their Viewing Habits**

72.     As discussed, the consumer data VIZIO discloses to advertisers, data brokers, media content providers, and other third parties, such as its partners, includes viewing habits and information which identifies individuals. This information reveals sensitive geolocation information and is personally identifying.

73.     MAC addresses, for example, are unique 12-digit identifiers that are assigned to individual mobile devices, computers, Smart TVs, or other electronic devices. These addresses are tied to the devices' physical embedded chipsets and thus are persistent throughout the life of the device. MAC addresses are automatically broadcast when devices search for networks or communicate with other devices.

74.     MAC addresses often can be linked to individuals by name. For example, when you sign into a commercial Wi-Fi hotspot, your MAC address is tied to the information you use to sign up for the service. Additionally, automatic Wi-Fi probes also broadcast the names of the last networks a device has connected to, which can reveal additional information about the individual, such as the name of a home or work network.

75.     MAC addresses can be used to develop highly specific geolocation data. For example, retail analytics firms have used MAC addresses to pinpoint customer locations—a practice which the Federal Trade Commission ("FTC") has investigated.

76.     When VIZIO collects and discloses MAC addresses of all the devices that connect to the same network as a VIZIO Smart TV, along with IP addresses, Wi-Fi signal strength, nearby Wi-Fi access points, zip codes, the online services consumers visit, the presence of other devices connected to the consumer's local network, the number of users and frequency of use of VIZIO products and services, and other information, such as a persistent identifier for each television (which is a unique number for each third party), the disclosure provides a "game plan" to associate individuals with their viewing habits.

77.     Also, VIZIO provides third parties with data and information from other electronic devices on the same network, so that third parties can target consumers with

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

ads through their televisions or other digital devices. VIZIO also provides this data and information to third parties so they can analyze individual consumer behavior, such as responsiveness to targeted advertising, across a range of other personal devices that connect to the Internet. For instance, VIZIO provides third parties with data and information specific to consumers' viewing habits and their individual televisions so that these third parties can determine whether a consumer has visited a particular website following a television advertisement related to that website, or whether a consumer has viewed a particular television program following exposure to an online advertisement for that program.

78.    Consumers did not consent to this invasive monitoring or data collection program, including the collection and/or disclosure of information or data from a VIZIO Smart TV about the content viewed on that television, as well as the collection, combining and/or disclosure of data from a variety of sources such as product registration data; IP addresses; MAC addresses; User IDs or other identifiers; geolocation or information that can be used to derive geolocation; and reports or data derived therefrom or combined with such data.

79.    For SmartCast consumers, the association of myVizio account information, which includes first and last name and e-mail addresses along with viewing data and other personal information, makes it especially easy for third parties to associate viewing habits and other consumer behavior with actual persons.

80.    Though VIZIO falsely and misleadingly informs consumers that it provides only non-personal or anonymized information, and that viewing data cannot be linked to actual individuals, VIZIO knows that individuals and their viewing histories can be, and are easily being, identified and linked by the information VIZIO discloses.

81.    In fact, individuals can be identified with far less information than what VIZIO discloses. A groundbreaking study published in 2000 revealed that three pieces of information—zip code, birth date (including year), and sex—uniquely identified 87

percent of the U.S. population.[16] Other studies have found similarly high rates of identification.[17]

82.    At least since 2006, video service providers and data aggregators have known that the disclosure of viewing data not associated with individual names can nevertheless be associated with specific individuals. That year, Netflix released a data set representing the movies rated by over 480,000 Netflix customers and the date each rating was given. In an apparent effort by Netflix to anonymize the data, the company replaced customers' names with unique numbers and did not include addresses, phone numbers, or other direct identifiers.[18]

83.    Netflix released the data "as part of its Netflix Prize 1 contest ("Prize 1"), through which researchers competed to improve the algorithm Netflix uses to recommend movies to its subscribers. Netflix's algorithm takes into account past viewing habits and movie preferences of each of its subscribers."[19]

84.    Following the release of this data set, two researchers at the University of Texas announced that it was possible to identify a significant number of subscribers based on the data set released.[20] Using publicly-available movie reviews posted by Netflix subscribers on the popular site IMDb (www.imdb.com), "one could determine all of the Netflix movies that a subscriber had rated for a given period of time."[21] By way of

---

[16] Latanya Sweeney, *Uniqueness of Simple Demographics in the U.S. Population*, Carnegie Mellon University, School of Computer Science, Data Privacy Laboratory, Technical Report LIDAP-WP4 (2000).

[17] Philippe Golle, *Revisiting the Uniqueness of Simple Demographics in the US Population*, ACM Workshop on Privacy in the Elec. Society at 77, 78 (2006).

[18] March 12, 2010 Letter from Maneesha Mithal to Reed Freeman, https://www.ftc.gov/sites/default/files/ documents/closing_letters/netflix-inc. /100312netflixletter.pdf (last visited Aug. 11, 2016).

[19] *Id.*

[20] Arvind Narayanan & Vitaly Shmatikov, *Robust De-anonymization of Large Sparse Datasets*, Proceedings of the 2008 IEEE Symposium on Security and Privacy at 111-123 (hereinafter "Netflix Prize Study"), https://www.cs.utexas.edu/~shmat/shmat_oak08 netflix.pdf (last visited Aug. 11, 2016).

[21] Mithal Letter, *supra* note 8.

22

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

example, the researchers were able to identify one user's movie choices, which may suggest facts about his or her politics ("Fahrenheit 9/11"), religious views ("Jesus of Nazareth"), or sexual preference ("Queer as Folk").

85.     Netflix nevertheless announced a second Prize contest in 2009. This time it planned to release an even more comprehensive data set of viewing habits and demographic information. In response, a group of Netflix customers filed a class action lawsuit, and the FTC warned Netflix that the second Prize contest raised privacy concerns as well as questions regarding whether its representations to consumers about its privacy policies were false or misleading under federal law. Netflix ultimately settled the private suit and agreed not to proceed with the contest as planned.

86.     VIZIO thus knows that third parties to whom it discloses this information, which includes its partners, can and do connect these dots. The linkage between viewing data and individuals is firm and readily foreseeable to VIZIO, in particular because the information it discloses is effectively a correlated look-up table, complete with geolocation data.

87.     As discussed, VIZIO has acknowledged to investors, but not consumers, that its activities may violate various privacy laws and regulations: "[W]e cannot assure you that our privacy policies and other statements regarding our practices will be sufficient to protect us from liability or adverse publicity relating to the privacy and security of information about consumers or their devices." Further, VIZIO has informed investors that it may be the subject of litigation over these practices.

**VIZIO's Product Packaging, Advertising, Marketing, Website, and Privacy Policy Omit Material Information and Are Misleading**

88.     In advertising and marketing, and on product packaging, VIZIO promotes the connectivity of its Smart TVs in two critical ways. First, it tells consumers that its Smart TVs have built-in Wi-Fi and are Internet-enabled, and that its VIZIO Internet Apps (and Apps Plus), and SmartCast are a "passport to a world of entertainment, movies, TV shows and more." Next, it tells consumers its Smart TVs are "perfect for connecting all

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

your high definition entertainment devices to the TV." This feature is often promoted through pictures of HDMI and USB ports.

89.     But VIZIO does not disclose that if consumers take advantage of those features and/or watch live broadcast programming on their Smart TVs, their viewing data will be collected by VIZIO and disseminated to third parties.

90.     While the packaging on VIZIO's Smart TVs describe its features and indicate that the televisions are equipped to deliver video content through the Internet and can display content from cable and satellite providers, streaming devices, and other connected media sources, the packaging fails to inform (let alone adequately inform) consumers that if they take advantage of the TV's connectivity platform, their viewing data and personal information will be collected and shared with others.

91.     Neither is Smart Interactivity and Inscape data services disclosed, let alone adequately disclosed, during the set up process for VIZIO Smart TVs. On the televisions themselves, any reference to Smart Interactivity is deeply embedded in an obscure settings menu. This reference is displayed in small font that is limited to a fraction of the screen size. This reference does not explain what Smart Interactivity is. A consumer would have no reason to know to turn it off.

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

92.     Also, on the televisions, Smart Interactivity and Inscape are not adequately disclosed in any Privacy Policy which may be viewed on the screen. The Privacy Policy is buried within the "Reset & Admin" section of a Smart TV's settings menu, and is presented in extremely small font size.



93.     Smart Interactivity and Inscape are not adequately disclosed in marketing or advertising on VIZIO's website, either. VIZIO's website touts its Smart TVs connectivity but does not disclose that VIZIO will collect and disseminate viewing habits and personal information upon connection. In fact, Smart Interactivity and Inscape data services are conspicuously absent from VIZIO's online advertising for its entire M-Series and P-Series line.

94.     To find any mention of Smart Interactivity on VIZIO's website, a consumer would have to know to look for that term. What a consumer would find is VIZIO's statement that "Smart Interactivity intelligently recognizes the content on the screen in

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

order to determine which interactive features to display on your device. This allows viewers to enjoy additional, related content for a richer, more interactive TV experience." This statement is misleading and confusing in that it suggests that the collection and dissemination of viewing histories is for the benefit of the user, rather than a source of revenue for VIZIO, and does not disclose what Smart Interactivity actually does.

95. VIZIO's privacy policies have been updated over time and are available on its website. In all iterations in which VIZIO discusses its data collection practices, its statements omit material information.

96. VIZIO falsely and deceptively tells consumers in its privacy policy that the information it discloses along with viewing habits cannot be traced back to consumers. It characterizes the information it discloses as "non-personal" or "anonymous" even though the information is useful for uniquely identifying individuals and their viewing habits.

97. Relatedly, VIZIO also fails to adequately inform consumers about its data collection program, including that viewing data and personally identifiable information is being disclosed to third parties. The information disclosed is valuable and useful precisely because it is not anonymous but instead is personally identifying. VIZIO does not properly disclose that it sells this information to third party advertisers and data brokers.

98. VIZIO gives consumers a false sense of security when it informs them it 'hashes' (i.e., transforms a string of characters into a shorter, fixed-length value that represents the original string) and replaces parts of IP addresses before sharing them with media and analytics partners. The FTC has criticized hashing as ineffective because it is so easy to circumvent. "Free precomputed tables of known hashes (*i.e.*, rainbow tables) are available that make reversing known hashes practically instantaneous."[22] Also, hashing generates a unique number that can be used to identify a device throughout its

---

[22] Ashkan Soltani, *Privacy trade-offs in retail tracking*, Federal Trade Commission: Tech@FTC Blog (Apr. 30, 2015, 11:59 AM), https://www.ftc.gov/news-events/blogs/techftc/2015/04/privacy-trade-offs-retail-tracking.

lifetime and is a process that can easily be reversed. Though VIZIO tells consumers in certain privacy policies that it takes measures to ensure that the data it discloses is securely transmitted, in or around 2015, Avast security discovered that the information transmitted to Cognitive Networks was being transferred insecurely because of a "known exploit" in the software. According to VIZIO, that exploit was closed when the software was updated in 2015.

99.     Even today, Smart Interactivity and Inscape data services are also conspicuously absent from VIZIO's online advertising for entire product lines. VIZIO's website touts its Smart TVs connectivity but does not disclose that VIZIO will collect and disseminate viewing habits and personal information upon connection.

100.   Any reference to Inscape data services or Smart Interactivity which may (or may not) be found in obscure sections of its website, in some (but not all) iterations of its privacy policies, or pop-ups which appear on the television screen and then quickly disappear, are not adequate disclosures because they are hard to find, tough to understand, fleeting, or buried alongside other ads or messages in order to distract from the disclosures.

101.   This includes a pop-up notification that appeared on some televisions in March 2016, which obliquely referenced the collection of television viewing data. The pop-up disappeared after 30 seconds without any input from any household member who may or may not have been watching, and did not provide easy access to the settings menu.

## V.     CLASS ACTION ALLEGATIONS

102.   Pursuant to Rules 23(a), 23(b)(2), or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this class action on behalf of themselves and all Members of the Nationwide Class (the "Nationwide Class"), which shall initially be defined as:

> All individuals in the United States who purchased a VIZIO Smart TV with Smart Interactivity capability for personal or household use, and not for resale, during the applicable statute of limitations period.

103.     Additionally, or in the alternative, pursuant to Rules 23(a), 23(b)(2), or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this class action on behalf of themselves and all Members of the California Class (the "California Class"), which shall initially be defined as:

> All persons in California who purchased a VIZIO Smart TV with Smart Interactivity capability for personal or household use, and not for resale, during the applicable statute of limitations period.

104.     Additionally, or in the alternative, pursuant to Rules 23(a), 23(b)(2), or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this class action on behalf of themselves and all Members of the New York Class (the "New York Class"), which shall initially be defined as:

> All persons in New York who purchased a VIZIO Smart TV with Smart Interactivity capability for personal or household use, and not for resale, during the applicable statute of limitations period.

105.     Additionally, or in the alternative, pursuant to Rules 23(a), 23(b)(2), or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this class action on behalf of themselves and all Members of the Florida Class (the "Florida Class"), which shall initially be defined as:

> All persons who purchased a VIZIO Smart TV with Smart Interactivity capability in Florida for personal or household use, and not for resale, during the applicable statute of limitations period.

106.     Additionally, or in the alternative, pursuant to Rules 23(a), 23(b)(2), or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this class action on behalf of themselves and all members of the Massachusetts Class (the "Massachusetts Class"), which shall be initially defined as:

> All persons who purchased a VIZIO Smart TV with Smart Interactivity capability in Massachusetts for personal or household use, and not for resale, during the applicable statute of limitations period.

107.   Additionally, or in the alternative, pursuant to Rules 23(a), 23(b)(2), or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this class action on behalf of themselves and all Members of the Washington Class (the "Washington Class"), which shall initially be defined as:

> All persons who purchased a VIZIO Smart TV with Smart Interactivity capability in Washington for personal or household use, and not for resale, during the applicable statute of limitations period.

108.   Excluded from the Classes are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants; officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Classes are any judge, justice, or judicial officer presiding over this matter, and the members of their immediate families and judicial staff.

109.   The Classes described in this Complaint may be jointly referred to as the "Class" and proposed Members of the Classes may be jointly referred to as "Class Members."

110.   Plaintiffs reserve the right to amend or modify the Class and/or Subclass definitions with greater specificity, further division into subclasses, or with limitation to particular issues as discovery and the orders of this Court warrant.

111.   The Court can define the Class and create additional subclasses as may be necessary or desirable to adjudicate common issues and claims of the Class Members if, based on discovery of additional facts, the need arises.

112.   Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief and damages appropriate with respect to the Class as a whole. Specifically, Defendants continue to obtain and disseminate sensitive viewing histories and personal information on an opt-in basis and without consent, and to date have not adequately disclosed the true nature of the VIZIO Smart TVs with integrated Smart Interactivity technology, including that the TVs collect and disseminate consumers' personal information.

113. <u>Numerosity and Ascertainability</u>: The exact number of members of the Class is unknown as such information is unavailable to Plaintiffs at this time. However, Plaintiffs believe individual joinder in this case is impracticable. The Class likely consists of hundreds of thousands of individuals. These individuals can be readily ascertainable through Defendants or their agents' records and are obtainable to Plaintiffs only through the discovery process.

114. <u>Predominance of Common Questions of Fact and Law</u>: Questions of law and fact common to all Class members exist and predominate over any questions affecting only individual Class members, including, but not limited to, the following:

a.    Whether Defendants unlawfully collected and disseminated Plaintiffs' and Class members' personal information;

b.    Whether Defendants disclosed to Plaintiffs and Class members before the tracking software was activated on their VIZIO Smart TVs that their personal information would be collected and disseminated to third parties;

c.    Whether Defendants omitted material facts with regard to the Smart Interactivity feature of the Smart TVs;

d.    Whether Plaintiffs and Class members consented to the collection of their personal information and its sale to third parties;

e.    Whether Plaintiffs and Class members have a reasonable expectation of privacy in the information collected and disseminated by Defendants;

f.    Whether Defendants' conduct constitutes violations of the laws and statutes asserted herein;

g.    Whether Defendants' conduct was knowing;

h.    Whether, as a result of Defendants' conduct, Plaintiff and Class members are entitled to damages, including compensatory, statutory, or punitive, and the amount of such damages;

i.    Whether, as a result of Defendants' conduct, Plaintiffs and Class members are entitled to equitable relief, such as declaratory or injunctive relief;

30

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

j.  Whether Defendants were unjustly enriched by their conduct;

k.  Whether, for the Nationwide Class noted above, California has a significant contact to the claims of each class member to apply California law to all members of the Nationwide Class;

l.  Whether, for the Nationwide Class noted above, the Video Privacy Protection Act applies to all members of the Nationwide Class; and

m.  Whether, as a result of Defendants' conduct, Plaintiff and Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, or costs of suit.

115.  <u>Typicality</u>: Plaintiffs' claims, and Defendants' defenses, are typical of the claims and defenses of and to the Class. Every member of the Class was similarly affected by Defendants' course of conduct and experienced the same harm, damages and loss based on Defendants' unlawful conduct. As such, Plaintiffs and Class members must establish the same facts in order to prove the claims asserted herein.

116.  <u>Adequacy of Representation</u>: Plaintiffs do not have any conflicts with any other members of the Class, and will fairly and adequately represent and protect the interests of the members of the Class and any other subclass. Plaintiffs have retained counsel competent and experienced in consumer protection and class action litigation, trials, and appeals.

117.  <u>Superiority of a Class Action</u>: A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of the individual litigation would make it impracticable or impossible for the Class members to prosecute their claims individually. Absent a class action, Defendants likely will retain the benefits of its wrongdoing. Because of the small size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for these wrongs. Absent a representative action, the Class members will continue to suffer losses and Defendants will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains. The trial and litigation of Plaintiffs' and Class members'

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

claims are manageable. Individual litigation of the legal and factual issues raised by Defendants' conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform court judgment. Thus, the benefits of proceeding as a class action outweigh the difficulties.

## VI.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710**
**(On Behalf of All Plaintiffs and the Nationwide Class Against All Defendants)**

118.   Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

119.   VIZIO is a video tape service provider subject to 18 U.S.C. § 2710(a)(4) of the Video Privacy Protection Act ("VPPA"). VIZIO is "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials" by delivering videos to consumers through its Internet-connected Smart TVs. VIZIO facilitates the transmission of specific video titles to be made to consumers through its VIA and VIA Plus services that allow consumers to watch movies and TV shows, listen to music, and access applications on demand.

120.   As users of VIZIO's Smart TVs, Plaintiffs and members of the Class are consumers within the definition of 18 U.S.C. § 2710(a)(1) of the VPPA.

121.   The collection of consumers' viewing information – including movies, shows, and programs viewed, IP addresses, media access control (MAC) addresses, zip codes, computer names, and product serial numbers – constitutes the collection of personally identifiable information ("PII") within 18 U.S.C. § 2710(a)(3), because it "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

32

122.    VIZIO has disclosed, and continues to disclose, PII to third-parties, including data brokers and advertisers, to generate revenue and profit.

123.    VIZIO failed to solicit and/or obtain consent from Plaintiffs and the Class members to collect and disclose their PII, nor did VIZIO provide clear and conspicuous notice of the disclosure of PII, as defined in 18 U.S.C. § 2710 (b)(2)(B).

124.    VIZIO's disclosures were not made in the ordinary course of business as defined by 18 U.S.C. § 2710(a)(2), which limits disclosures to "debt collection activities, order fulfillment, request processing, and the transfer of ownership."

125.    The knowing disclosure and transmission of PII violates the VPPA within the meaning of 18 U.S.C § 2710(b)(1).

126.    Accordingly, Plaintiffs and members of the Class are entitled under 18 U.S.C. § 2710(c)(2) to an award of damages (actual, liquidated, or punitive), reasonable attorneys' fees, other litigation costs reasonably incurred, and such other preliminary and equitable relief as the Court deems appropriate.

## SECOND CLAIM FOR RELIEF

### Violation of the Wiretap Act, 18 U.S.C. § 2510 *et seq.*
### (On Behalf of All Plaintiffs and the Nationwide Class Against All Defendants)

127.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

128.    The Federal Wiretap Act, 18 U.S.C. § 2510 et seq., prohibits the interception of any wire, oral, or electronic communications. The statute confers a civil cause of action on "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

129.    "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce…" 18 U.S.C. § 2510(12).

130.   "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

131.   "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

132.   "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

133.   Plaintiffs and Class members are persons as defined under § 2510(6) of the Act.

134.   VIZIO's automated content recognition software, Smart Interactivity, is a device for purposes of the Wiretap Act because it is software used to intercept electronic communication.

135.   VIZIO, through its design, authorship, programming, knowing and intentional installation, activation, and/or other involvement with Smart Interactivity software and its Inscape data program has intentionally intercepted, endeavored to intercept, and/or procured others to intercept or endeavor to intercept, electronic communications as described herein, in violation of 18 U.S.C. § 2511(1)(a). This interception was acquired during transmission, as Smart Interactivity operated in real-time—or, in the FTC's words, "second-by-second information"—to acquire the content of Plaintiffs' and the Class members' electronic communications, including their viewing habits and identifying information, as described above.

136.   The contents intercepted include information concerning the substance, purport, or meaning of that communication, including, but not limited to, viewing habits, viewing requests, and viewing preferences, IP addresses, MAC addresses, zip codes, product model numbers, hardware and software versions, chipset IDs, and region and language settings.

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

137.   As alleged in Paragraphs 49 to 58, 76, 100, and 104, among others, Plaintiffs' and the Class members' electronic communications were intercepted during transmission, simultaneous with the communications' arrival, and/or within a second of the communications' arrival without their consent and for the unlawful and/or wrongful purpose of monetizing their private information, including by using their private information to create targeted advertisements for profit, without Class members' consent, and for tortious purposes and for the purpose of committing unfair business practices.

138.   As a result, Plaintiffs and Class members have suffered harm and injury, including due to the interception and transmission of private and personal, confidential, and sensitive communications, content, and data.

139.   Plaintiffs and the Class have been damaged by the interception or disclosure of their communications in violation of the Wiretap Act, as described herein, and are thus entitled to preliminary, equitable, or declaratory relief; statutory and punitive damages; and reasonable attorney's fees and litigations costs reasonably incurred. 18 U.S.C. § 2520(b).

## THIRD CLAIM FOR RELIEF

**Violation of California's Invasion of Privacy Act, Cal. Penal Code § 630, *et seq.*
(On Behalf Of Plaintiffs And The Nationwide Class
And Separately, On Behalf Of Plaintiffs Hodges and Zufolo And The California
Class Against All Defendants)**

140.   Plaintiffs incorporate all allegations of the preceding and succeeding paragraphs as though fully set forth herein.

141.   Under California's Invasion of Privacy Act ("CIPA"), it is unlawful to intentionally, willfully, and without consent tap or make any unauthorized connection by means of any machine, instrument, or contrivance, or in any other manner with any telegraph or telephone wire, line, cable, or instrument, in order to purposefully intercept a communication or its content that is in transit or passing over any wire, line, or cable, or is being sent from or received within California; and to use, attempt to use, or communicate any such information obtained by these means. *See* Cal. Penal Code § 631.

142.    As alleged in Paragraphs 49 to 58, 76, 100, and 104, among others, VIZIO, Cognitive Media Networks, and/or Inscape Technologies, LLC, which operate in California, intentionally, willfully, and without consent, made unauthorized connections with Plaintiffs' and Class members' Smart TVs to purposefully intercept communications in transit. *See* Cal. Penal Code § 631. The contents were then collected and/or analyzed by these entities.

143.    The contents intercepted include information concerning the substance, purport, or meaning of that communication, including, but not limited to, viewing histories, viewing requests, and viewing preferences, online services visited by the consumer, IP addresses, MAC addresses, zip codes, product model numbers, hardware and software versions, chipset IDs, and region and language settings.

144.    Furthermore, VIZIO used, attempted to use, and communicated the information it obtained, through Smart Interactivity software and using its Inscape data services program, to data brokers and advertisers.

145.    Plaintiffs' and the Class members' electronic communications were intercepted without their consent and for the unlawful and/or wrongful purpose of monetizing their private information, and for tortious purposes and for the purpose of committing unfair business practices.

146.    As an actual and proximate result of the above actions, Plaintiffs and Class members have been injured and suffered actual damages in an amount to be determined at trial. For each violation of CIPA by VIZIO, Plaintiffs and Class members are entitled to damages pursuant California Penal Code § 637.2 of $5,000 or three times the amount of their actual damages (at their election). *See* Cal. Penal Code § 637.2. Plaintiffs and Class members are also entitled to injunctive relief.

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

# FOURTH CLAIM FOR RELIEF

### Violation of California's Consumer Legal Remedies Act ("CLRA")
### Cal. Civ. Code §§ 1750, *et seq.*
### (On Behalf Of Plaintiffs And The Nationwide Class
### And Separately, On Behalf Of Plaintiffs Hodges and Zufolo And The California
### Class Against All Defendants)

147. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

148. Plaintiffs and each member of the Class are "consumers" as defined by Cal. Civ. Code § 1761(d).

149. Defendants are each a "person" as defined by Cal. Civ. Code § 1761(c).

150. Defendants' Smart TVs are "goods" as defined by Cal. Civ. Code § 1761(a).

151. Defendants' sale of Smart TVs, to wholesalers and retailers constitutes transactions that were intended to result, or did result, in the sale of goods to consumers within the meaning of Cal. Civ. Code §§ 1761(e) and 1770(a).

152. The CLRA protects consumers against unfair and deceptive practices, and is intended to provide an efficient means of securing such protection.

153. Defendants violated the CLRA by engaging in unfair and deceptive practices, and by causing harm to Plaintiffs and the Class.

154. Specifically, Defendants installed the tracking software on their Smart TVs, used that software to monitor and collect consumer data and viewing habits, and then sold the aggregated data to various third parties.

155. Defendants did not, however, disclose to consumers the existence of the tracking software or the fact that the software collected consumers' data, and never obtained consumer consent to monitor, collect, and/or sell consumers' data.

156. Defendants' failure to disclose the presence of the tracking software violated the CLRA in multiple ways:

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

a. In violation of Cal. Civ. Code § 1770(a)(5), Defendants represented that their Smart TVs had characteristics, ingredients, uses, benefits, or quantities which they did not have;

b. In violation of Cal. Civ. Code § 1770(a)(7), Defendants represented that their Smart TVs were of a particular standard, quality, or grade, when they were of another; and

c. In violation of Cal. Civ. Code § 1770(a)(9), Defendants advertised their Smart TVs with the intent not to sell them as advertised.

d. In violation of Cal. Civ. Code § 1770(a)(14), Defendants knowingly and intentionally withheld material information from Plaintiffs and the Class – namely that their Smart TV purchases would result in the collection and dissemination of their viewing history, in violation of their statutorily protected rights to privacy.

e. In violation of Cal. Civ. Code § 1770(a)(16), Defendants represented that their Smart TVs were in full compliance with all governing federal and state consumer protection and privacy laws, when in fact they were not.

157. Defendants' unfair or deceptive acts or practices were capable of deceiving a substantial portion of the purchasing public.

158. Defendants did not disclose facts about the tracking software to consumers who purchased the Smart TVs because they knew consumers would not purchase the Smart TVs if they knew of the tracking software, and how Defendants would use that software.

159. Defendants were under a duty to Plaintiffs and the Class to disclose that the Smart TVs contained the tracking software for several reasons including, but not limited to:

a. Defendants were in a superior position to know that the tracking software was installed on the Smart TVs;

38

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

b.   Plaintiffs and the Class could not reasonably have been expected to learn or discover that Defendant included the tracking software on the Smart TVs, especially given the practices of VIZIO's competitors;

c.   Defendants knew Plaintiffs and the Class members could not reasonably have been expected to learn or discover that Defendants included the tracking software on the Smart TVs; and

d.   Defendants knew that Plaintiffs and the Class members would not purchase, or would pay much less for, the Smart TVs if they knew of the tracking software.

160.   By failing to disclose the Smart TVs' tracking software, Defendants knowingly and intentionally concealed material facts and breached their duty to Plaintiffs and the Classes.

161.   The facts concealed or not disclosed by Defendants to Plaintiffs and the Class are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase, or how much to pay for, the Smart TVs.

162.   Plaintiffs and the Class reasonably expected that their televisions would be free from tracking software.

163.   The existence of tracking software on a television is a material term for the purchase of a television, and a primary reason not to purchase a particular television.

164.   Defendants did not disclose facts about the tracking software to consumers that purchased the Smart TVs because they knew consumers, acting reasonably under the circumstances, would not purchase, or would pay less for, the Smart TVs if the fact that tracking software was installed on the Smart TVs was disclosed prior to purchase.

165.   Through the omissions detailed herein, Defendants wrongfully induced Plaintiffs and the other members of the Class to purchase the Smart TVs when they otherwise would not have purchased, or paid less for, them.

39

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

166.   As a direct and proximate result of Defendants' violations of the CLRA, Plaintiffs and each Class member have suffered harm in the form of paying moneys to purchase the Smart TVs when they otherwise would not have purchased. Or paid less for, them.

167.   Pursuant to Cal. Civ. Code § 1780(a) and (b), Plaintiffs, individually and on behalf of the Classes, seek an injunction requiring Defendants to cease and desist the illegal conduct alleged in this Complaint, damages for Defendants' violations, and all other appropriate remedies for Defendants' violations of the CLRA.

168.   Pursuant to Cal. Civ. Code § 1782(a), Plaintiff Hodges served Defendants with notice of their alleged violations of the CLRA by certified mail return receipt requested on December 16, 2015.

169.   Defendants' conduct in (1) developing the software and technology capable of collecting consumers' viewing habits and personally identifiable information on a massive scale, and (2) their scheme in disclosing this information to third parties, including advertisers, data brokers and data aggregators for profit without adequate disclosure to consumers, all emanated from California and has a substantial connection to the State of California.

## FIFTH CLAIM FOR RELIEF
### Violation of California's Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (On Behalf Of Plaintiffs And The Nationwide Class,
### And Separately, On Behalf Of Plaintiffs Hodges and Zufolo And The California Class)

170.   Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

171.   The UCL protects consumers and competitors by promoting fair competition in commercial markets for goods and services.

172. The UCL prohibits any unlawful, unfair, or fraudulent business act or practice, including the employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact.

173. Defendants violated the UCL by engaging in unlawful, unfair and fraudulent business acts or practices.

174. Defendants' conduct is unlawful because, as explained above, it violates the Video Privacy Protection Act (18 U.S.C. § 2710), the Wiretap Act (18 U.S.C. § 2510 et seq.), California's Invasion of Privacy Act (Penal Code § 630 et seq.), Cal. Civ. Code § 1799.3(a), California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.), Florida's Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201 et seq.), New York General Business Law § 349, Massachusetts' Unfair and Deceptive Trade Practices Statute (Massachusetts General Laws ch. 93A et seq.), Massachusetts' Statutory Right to Privacy (Massachusetts General Laws ch. 214, § 1B), Washington's Consumer Protection Act (Wash Rev. Code § 19.86 et seq.) and constitutes unjust enrichment, privacy based on intrusion, and/or fraud by omission.

175. Defendants' conduct is unfair because it is substantially injurious to consumers, and is immoral, unethical, oppressive and unscrupulous. Defendants' conduct is not outweighed by any countervailing benefits to consumers or competition, and Defendants' conduct, and the harm it causes, is not reasonably avoidable by consumers.

176. Defendants monitor, collect, and record consumer viewing habits and other information in order to sell it to third parties for profit, and do so without disclosing their data practices to consumers or obtaining consumer consent for the collection or sale of consumer data.

177. Had consumers known Defendants' Smart TVs employed software that monitored, collected and disseminated consumer viewing habits and other data, consumers would not have purchased, or would have paid less for Defendants' Smart TVs.

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

178.   Moreover, by surreptitiously monitoring, collecting, and recording consumer viewing habits and other information, and by selling, or otherwise disclosing, that information to third parties without consumer knowledge or consent, Defendants prevent consumers from avoiding Defendants' data practices, and prevent consumers from protecting their right to privacy and their right to control the dissemination of their personal information.

179.   Defendants knew or had reason to know that Plaintiffs and the Class could not have reasonably known or discovered the existence of the tracking software, without disclosure by Defendants.

180.   The injury to consumer privacy rights, and the causing of consumers to buy products they otherwise would not have purchased, or would have paid less for, outweighs the profit motive for Defendants' unauthorized and secretive monitoring, collection and dissemination of consumer data.

181.   Defendants' conduct is fraudulent because it is reasonably likely to deceive consumers.

182.   The specifications of a consumer product are a material term of any transaction in that they directly affect a consumer's choice and conduct in purchasing product.

183.   Despite the importance of specifications to consumer purchase decisions, Defendants do not disclose that their Smart TVs have the tracking software installed, and that the tracking software monitors, collects and disseminates consumer data.

184.   Defendants' failure to disclose this specification of their Smart TVs, as well as Defendant's failure to gain consumer authorization to allow Defendants to monitor and collect consumer information by use of the tracking software, deceived consumers into believing they were merely purchasing a benign entertainment device.

185.   Had Defendants disclosed to consumers that their Smart TVs employed the tracking software, and that consumer viewing habits and other information would be collected without consent or knowledge, consumers would not have bought, or would

42

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

have paid less for, Defendants' Smart TVs, and also would have avoided Defendants' products and data practices.

186. Defendants' unlawful, fraudulent and unfair conduct occurred during the marketing, distribution, and sale of Smart TVs, and therefore occurred in the course of Defendants' business practices.

187. Defendants' conduct directly and proximately caused Plaintiffs and the Class actual monetary damages in the form of the price paid for the Smart TVs.

188. Defendants' also profited from their unlawful, fraudulent and unfair conduct in that they obtained the personal information of Plaintiffs and Class members without their knowledge or consent, and then sold that information to third parties for profit.

189. Had Defendants disclosed that their tracking software was installed and operating on the VIZIO Smart TVs, Plaintiffs and Class members would not have purchased the Smart TVs, or would have paid less for them.

190. In fact, Defendants did not disclose facts about the tracking software to consumers that purchased the Smart TVs because they knew consumers, acting reasonably under the circumstances, would not purchase, or would pay less for, the Smart TVs if the fact that tracking software was installed on the Smart TVs was disclosed prior to purchase.

191. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seeks an order (1) requiring Defendants cease the fraudulent and unfair practices described herein; (2) requiring Defendants to restore to Plaintiffs and each Class member any money acquired by means of unfair competition (restitution); and, (3) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

## SIXTH CLAIM FOR RELIEF

**Violation of Florida's Deceptive And Unfair Trade Practices Act ("FDUTPA")
Fla. Stat. § 501.201, *et seq.*
(On Behalf Of Plaintiff Mark Queenan and The Florida Class Against All
Defendants)**

192.   Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

193.   Plaintiffs and each member of the Class are "consumers" as defined by Fla. Stat. § 501.203(7).

194.   Defendants, through their conduct alleged herein, are engaged in "trade or commerce" as defined by Fla. Stat. § 501.203(8).

195.   The FDUTPA was enacted to protect consumers and businesses from unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

196.   To this end, the FDUTPA declares as unlawful all unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

197.   Defendants violated the FDUTPA because their conduct, as alleged herein, is deceptive and unfair.

198.   Defendants' conduct is deceptive because it is likely to mislead a reasonable consumer.

199.   The specifications of a consumer product are a material term of any transaction in that they directly affect a consumer's choice and conduct in purchasing a product.

200.   Despite the importance of specifications to consumer purchase decisions, Defendants do not disclose that their Smart TVs have the tracking software installed, and that the tracking software monitors, collects and disseminates consumer data.

201.   On the boxes in which the Smart TVs were packaged, Defendants informed Plaintiffs that one would be able to stream and view video content from the Smart TVs,

44

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

as well as connect the Smart TVs to other devices such as Blu-ray DVD players and gaming consoles. However, Defendants failed to inform Plaintiffs that if they take advantage of these features and/or watch live broadcast programming on their Smart TVs, their viewing data is collected and disseminated to third parties. Had Plaintiffs known the full truth about Defendants' collection and dissemination of Defendants' viewing data, Plaintiffs would not have purchased or would have paid less for their Smart TVs.

202.   Defendants' failure to disclose these specifications of their Smart TVs, as well as Defendants' failure to gain consumer consent to allow Defendants to monitor and collect consumer information by use of the tracking software, deceived consumers into believing they were purchasing a benign entertainment device.

203.   Had Defendants disclosed to consumers that their Smart TVs employed the tracking software, and that consumer viewing habits and other information would be collected and disseminated without consent or knowledge, consumers would not have bought, or would have paid less for, Defendants' Smart TVs and would have avoided Defendants' products and data practices.

204.   In fact, Defendants did not disclose facts about the tracking software to consumers that purchased the Smart TVs because they knew consumers, acting reasonably under the circumstances, would not purchase, or would pay less for, the Smart TVs if the fact that tracking software was installed on the Smart TVs was disclosed prior to purchase.

205.   Defendants' conduct is unfair because it offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

206.   Defendants' conduct offends established public policy because it violated 18 U.S.C. § 2710 and 18 U.S.C. § 2510 et seq., as explained above.

207.   Defendants' conduct is substantially injurious, and is immoral, unethical, oppressive and unscrupulous because Defendants monitor, collect, and record consumer

45

viewing habits and other information in order to sell it to third parties for profit, and does so without disclosing its data practices to consumers or obtaining consumer consent for the collection and sale of consumer data.

208.   Had consumers known Defendants' Smart TVs employed software that monitored, collected and disseminated consumer viewing habits and other data, consumers would not have purchased, or would have paid less for, Defendants' Smart TVs.

209.   Moreover, by surreptitiously monitoring, collecting, and recording consumer viewing habits and other information, and by selling, or otherwise disclosing, that information to third parties without consumer knowledge or consent, Defendants prevent consumers from avoiding its data practices and from protecting their right to privacy and their right to control the dissemination of their personal information.

210.   Defendants knew or had reason to know that Plaintiffs and the Class could not have reasonably known or discovered the existence of the tracking software, without disclosure by Defendants.

211.   The injury to consumer privacy rights, and the causing of consumers to buy products they otherwise would have avoided, outweighs the profit motive and ultimate goal for Defendants' unauthorized and secretive monitoring, collection and dissemination of consumer data.

212.   Defendants' deceptive and unfair conduct occurred during the marketing, distribution, and sale of Smart TVs, and therefore occurred in the course of Defendants' business practices.

213.   Defendants' conduct directly and proximately caused Plaintiffs and the Class actual monetary damages in the form of the price paid for the Smart TVs.

214.   If Defendants had disclosed that their tracking software was installed and operating on the VIZIO Smart TVs, Plaintiffs and Class members would not have purchased, or would have paid less for, the Smart TVs.

---

46

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

215.    Pursuant to Fla. Stat. § 501.211, Plaintiffs seek an order (1) requiring Defendants to cease the deceptive and unfair practices described herein; (2) requiring Defendants to pay damages to Plaintiffs and the Class; and (3) awarding attorney's fees and court costs.

## SEVENTH CLAIM FOR RELIEF
### Violation Of N.Y. Gen. Bus. Law § 349
### (On Behalf Of Plaintiff Chris Rizzitello And The New York Class
### Against All Defendants)

216.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

217.    N.Y. Gen. Bus. Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state.

218.    Defendants' conduct as alleged herein is covered under New York Gen. Bus. Law § 349 because such conduct is properly defined as consumer-oriented conduct.

219.    Defendants' uniform omission regarding the tracking software installed on its Smart TVs, and its disclosure of consumer information collected by its Smart TVs to third parties affects and deceives consumers at large, and has invaded the privacy rights of millions of consumers.

220.    Defendants violated N.Y. Gen. Bus. Law § 349 by engaging in conduct that is likely to mislead a reasonable consumer.

221.    The specifications of a consumer product are a material term of any transaction in that they directly affect a consumer's choice and conduct in purchasing a product.

222.    Despite the importance of specifications to consumer purchase decisions, Defendants do not disclose that their Smart TVs have the tracking software installed, and that the tracking software monitors, collects and disseminates consumer data.

223.    As discussed, on the boxes in which the Smart TVs were packaged, Defendants informed Plaintiffs that one would be able to stream and view video content

from the Smart TVs, as well as connect the Smart TVs to other devices such as Blu-ray DVD players and gaming consoles. However, Defendants failed to further inform Plaintiffs that if they take advantage of these features and/or watch live broadcast programming on their Smart TVs, their viewing data is collected and disseminated to third parties. Had Plaintiffs known the full truth about Defendants' collection and dissemination of Defendants' viewing data, Plaintiffs would not have purchased or would have paid less for their Smart TVs.

224.   Defendants' failure to disclose these specifications of their Smart TVs, as well as Defendants' failure to gain consumer authorization to allow Defendants to monitor and collect consumer information by use of the tracking software, deceived consumers into believing they were purchasing a benign entertainment device.

225.   Had Defendants disclosed to consumers that their Smart TVs employed the tracking software, and that consumer viewing habits and other information would be collected and disseminated without consent or knowledge, consumers would not have bought, and would have paid less for, Defendants' Smart TVs, and would have avoided Defendants' products and data practices.

226.   In fact, Defendants did not disclose facts about the tracking software to consumers that purchased the Smart TVs because they knew consumers, acting reasonably under the circumstances, would not purchase, or would pay less for, the Smart TVs if the fact that tracking software was installed on the Smart TVs was disclosed prior to purchase.

227.   Defendants' conduct directly and proximately caused Plaintiffs and the Class actual monetary damages in the form of the price paid for the Smart TVs.

228.   Defendants' conduct also caused direct harm to the privacy rights of Plaintiffs and the Class, and harmed the ability of Plaintiffs and Class members to control the dissemination of their private information.

229.   Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiffs seek an order: (1) requiring Defendants to cease the deceptive and unfair practices described herein; (2)

48

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

requiring Defendants to pay damages to Plaintiffs and the Class, or fifty dollars to Plaintiffs and each class member, whichever is greater; (3) treble damages for Defendants' knowing and willful violations; and (4) reasonable attorneys' fees.

## EIGHTH CLAIM FOR RELIEF

### Violation Of Massachusetts' Unfair and Deceptive Trade Practices Statute Massachusetts General Laws ch. 93A, et seq.
### (On Behalf Of Plaintiff John Walsh And The Massachusetts Class Against All Defendants)

230.   Plaintiffs incorporate by reference all the preceding allegations as if fully set forth herein.

231.   Defendants' acts and practices complained of herein—including but not limited to installing tracking software on its Smart TVs, surreptitiously monitoring and acquiring the personally identifiable information of Plaintiff Walsh and members of the Massachusetts Class, and selling that information to third parties without consent—amount to "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," as proscribed by Massachusetts General Laws ch. 93A, § 2(a). Pursuant to the notice requirement in Massachusetts General Laws ch. 93A, § 9(3), Plaintiff Walsh delivered a written demand letter detailing the acts and practices complained of herein and the injury suffered to Defendant thirty days before the filing of his underlying class action, *Walsh et. al v. VIZIO, Inc.*, Case No. 1:16-cv-10758-DJC (D. Mass). Defendant responded with a letter denying all allegations.

232.   Plaintiff Walsh and members of the Massachusetts Class suffered actual injury as the result of Defendant's acts, practices, and omissions described herein.

233.   As a result of Defendant's violations of Massachusetts' Unfair and Deceptive Trade Practices Statute, Plaintiff Walsh and members of the Massachusetts Class are entitled to—and accordingly seek—actual damages and attorneys' fees, pursuant to Massachusetts General Laws ch. 93A, § 9.

## NINTH CLAIM FOR RELIEF
### Violation Of Massachusetts' Statutory Right to Privacy
### Massachusetts General Laws ch. 214, § 1B
### (On Behalf Of Plaintiff John Walsh And The Massachusetts Class Against All Defendants)

234. Plaintiffs incorporate by reference all the preceding allegations as if fully set forth herein.

235. Pursuant to Massachusetts General Laws ch. 214, § 1B, Massachusetts guarantees persons freedom from unreasonable, substantial, or serious interference with their privacy.

236. Defendants' acts and practices complained of herein—including but not limited to installing tracking software on its Smart TVs, surreptitiously monitoring and acquiring the personally identifiable information of Plaintiff Walsh and members of the Massachusetts Class, and selling that information to third parties without consent—have violated the law guaranteeing the rights of Plaintiff Walsh and Members of the Massachusetts Class to be free from unreasonable, substantial, or serious interference with their privacy.

237. As a result of Defendants' acts and practices complained of herein, Plaintiff Walsh and Members of the Massachusetts Class have suffered and will continue to suffer actual and irreparable harm, and are entitled to (and accordingly seek) damages and equitable relief.

## TENTH CLAIM FOR RELIEF
### Violation of Washington's Consumer Protection Act ("WCPA")
### Wash Rev. Code §§ 19.86, et seq.
### (On Behalf Of Plaintiffs Linda Thomson And The Washington Class Against All Defendants)

238. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

239. Plaintiff Linda Thomson resides and bought her VIZIO Smart TV in the state of Washington. She brings this claim on behalf of Washington Class members who

live in the state of Washington or who purchased their VIZIO Smart TV in the state of Washington.

240. Plaintiffs, the Class members and Defendants are "persons" within the meaning of Wash. Rev. Code § 19.86.010(1).

241. Defendants conduct "trade" and "commerce" within the meaning of the Wash. Rev. Code § 19.86.010(2).

242. The WCPA declares as unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade of commerce.

243. Defendants violated the WCPA by engaging in deceptive and unfair acts or practices.

244. Defendants' conduct, as alleged herein, is deceptive because it has the capacity to deceive a substantial portion of the population.

245. The specifications of a consumer product are a material term of any transaction in that they directly affect a consumer's choice and conduct in purchasing a product.

246. Despite the importance of specifications to consumer purchase decisions, Defendants do not disclose that their Smart TVs have the tracking software installed, and that the tracking software monitors, collects and disseminates consumer data through the Inscape data collection program.

247. Defendants' failure to disclose these specifications of their Smart TVs, as well as Defendants' failure to gain consumer authorization to allow Defendants to monitor and collect consumer information by use of the tracking software, deceived consumers into believing they were purchasing a benign entertainment device.

248. Had Defendants disclosed to consumers that their Smart TVs employed the tracking software, and that consumer viewing habits and other information would be collected and disseminated without consent or knowledge, consumers would not have have bought, or would have paid less for, Defendants' Smart TVs and would have avoided Defendants' products and data practices.

51

249.   In fact, Defendants did not disclose facts about the tracking software to consumers that purchased the Smart TVs because they knew consumers, acting reasonably under the circumstances, would not purchase, or would pay less for, the Smart TVs if the fact that tracking software was installed on the Smart TVs was disclosed prior to purchase.

250.   Defendants' conduct is unfair because it offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

251.   Defendants' conduct offends established public policy because it violated 18 U.S.C. § 2710 as explained above.

252.   Defendants' conduct is substantially injurious, and is immoral, unethical, oppressive and unscrupulous because Defendants monitor, collect, and record consumer viewing habits and other information in order to sell it to third parties for profit, and do so without disclosing their data practices to consumers or obtaining consumer consent for the collection and sale of consumer data.

253.   Had consumers known Defendants' Smart TVs employed software that monitored, collected and disseminated consumer viewing habits and other data, consumers would not have purchased, or would pay less for, Defendants' Smart TVs.

254.   Moreover, by surreptitiously monitoring, collecting, and recording consumer viewing habits and other information, and by selling, or otherwise disclosing, that information to third parties without consumer knowledge or consent, Defendants prevent consumers from avoiding its data practices, and from protecting their right to privacy and their right to control the dissemination of their personal information.

255.   Defendants knew or had reason to know that Plaintiffs and the Class could not have reasonably known or discovered the existence of the tracking software, without disclosure by Defendants.

256.   The injury to consumer privacy rights, and the causing of consumers to buy products they otherwise would have avoided, outweighs the profit motive and ultimate

goal for Defendants' unauthorized and secretive monitoring, collection and dissemination of consumer data.

257.   Defendants' unfair acts and practices were capable of injuring a substantial portion of the public, and have caused widespread public injury.

258.   Defendants' unfair acts are ongoing and thus, have a substantial likelihood of continuing to harm the general consuming public.

259.   Defendants' deceptive and unfair conduct occurred during the marketing, distribution, and sale of Smart TVs, and therefore occurred in the course of Defendants' business practices.

260.   Defendants' conduct directly and proximately caused Plaintiffs' and the Class's actual monetary damages in the form of the price paid for the Smart TVs.

261.   If Defendants had disclosed that their tracking software was installed and operating on the VIZIO Smart TVs, Plaintiffs and Class members would not have purchased, or would have paid less for, the Smart TVs.

262.   Pursuant to Wash. Rev. Code § 19.86.090, Plaintiffs seek an order (1) requiring Defendants to cease the deceptive and unfair practices described herein; (2) requiring Defendants to pay actual and treble damages to Plaintiffs and the Class; and, (3) awarding attorneys' fees and court costs.

## ELEVENTH CLAIM FOR RELIEF
### Unjust Enrichment/Quasi-Contract

**(On Behalf of Plaintiffs Hodges, Zufolo, Queenan, Walsh, Rizzitello, and Thomson and the California, Florida, Massachusetts, New York, and Washington Classes Against All Defendants)**

263.   Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

264.   Plaintiffs and the California, Florida, Massachusetts, Washington, and New York Classes have conferred a benefit on VIZIO in the form of their personal information and viewing habits. Absent the unauthorized collection of such information and its disclosure to third parties, VIZIO would have had to pay Plaintiffs and the Classes money

53

in exchange for this viewing habits. In addition, Plaintiffs would not have purchased or would have paid less for their Smart TVs, had VIZIO disclosed that its Smart TVs collect user data and viewing habits for dissemination.

265.   VIZIO has obtained moneys which rightfully belong to Plaintiffs and the Classes to the detriment of Plaintiffs and the Classes.

266.   It would be inequitable and unjust for VIZIO to retain these wrongfully obtained profits and benefits at Plaintiffs' and the Classes' expense.

267.   VIZIO's retention of these wrongfully-obtained profits would violate the fundamental principles of justice, equity, and good conscience.

268.   Plaintiffs and the Classes are entitled to restitution of the profits unjustly obtained, plus interest.

### TWELFTH CLAIM FOR RELIEF
### Privacy Violation Based On Intrusion

**(On Behalf of All Plaintiffs and the Nationwide Class Against All Defendants, And Separately, On Behalf Of Plaintiffs Hodges, Zufolo, Queenan, Walsh, And Thomson on Behalf of their Respective State Classes, under the laws of California (both the California Constitution and common law), Florida, Massachusetts, and Washington Against All Defendants)**

269.   Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

270.   VIZIO, by collecting and disseminating Plaintiffs' viewing habits without their knowledge, intentionally intruded into a realm in which Plaintiffs have a reasonable expectation of privacy.

271.   VIZIO obtained unwanted access to Plaintiffs' data, including but not limited to, the media content Plaintiffs are viewing, when Plaintiffs are viewing it, and whether they are viewing it live or at a later time.

272.   VIZIO's intrusion into Plaintiffs' privacy would be highly offensive to a reasonable person, namely because it occurred without Plaintiffs' consent or knowledge.

273.   By invading Plaintiffs' privacy, VIZIO has obtained moneys which rightfully belong to Plaintiffs and the Class.

274.   It would be inequitable and unjust for VIZIO to retain these wrongfully obtained profits and benefits at Plaintiffs' and the Class's expense.

275.   Plaintiffs and the Class are entitled to restitution of the profits unjustly obtained (plus interest), as well as damages for VIZIO's invasion of privacy.

### THIRTEENTH CLAIM FOR RELIEF
### Fraud By Omission

**(On Behalf of Plaintiffs Hodges, Zufolo, Queenan, Walsh, Rizzitello, and Thomson and the California, Florida, Massachusetts, New York, and Washington Classes Against All Defendants)**

276.   Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

277.   Defendants concealed, suppressed, or omitted material facts concerning Vizio Smart TVs, to wit, the existence of the Smart Interactivity software that tracks and collects the users' information and viewing history as well as information from other devices that are connected to the user's Wi-Fi network and its disclosure of such viewing history, along with personally identifiable information.

278.   Defendants were under a duty to Plaintiff and Class members to disclose that the Smart TVs contained the pre-enabled tracking software and that VIZIO disclosed the information collected by that software and other software due to the following:

   a.   Defendant Vizio, as the manufacturer, was in a superior position to know of the existence of the pre-enabled tracking software on Vizio Smart TVs and its dissemination of such data;

   b.   The Video Protection Privacy Act prohibits the collection, interception, disclosure, and/or transmission of the information at issue without the prior, informed consent of Plaintiff and the Class

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

members or the opportunity, given in a clear and conspicuous manner, to prohibit the disclosure;

c.   Plaintiff and Class members could not reasonably have been expected to learn or discover that Vizio included pre-enabled tracking software on its TVs and its dissemination of such information;

d.   Vizio should have known that Plaintiff and Class members could not reasonably have been expected to learn or discover that Vizio included pre-enabled tracking software on its TVs, and in fact, Vizio took steps to actively conceal the tracking software; and

e.   Vizio should have known that the existence and nature of the pre-enabled software and the dissemination of such data was a material fact that influenced the purchasing decision of Plaintiff and Class members.

279.   Defendants intentionally concealed, suppressed, or omitted the material facts described above with the intent to defraud Plaintiff and Class members because Defendants knew or should have known that Plaintiff and Class members would not have purchased the Smart TVs, or would have paid less, if the existence of the software were disclosed.

280.   A significant part of Defendants' marketing of Vizio Smart TVs was informing consumers that the TVs could be connected to the internet through a home network, or to cable and satellite television, or to gaming consoles. Defendants deliberately chose, however, to omit the fact that connecting to the internet or these devices would allow Defendants to track, record, and disseminate for profit the personal viewing histories and personally identifiable information without the consumers' affirmative consent.

281.   Defendants recognize the materiality of the tracking software in Defendants' Prospectus, as set forth above, by admitting that if the public knew the truth, it could

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

significantly impact sales of its Smart TVs and its ability to profit from the sale of users' personally identifiable information to third parties.

282. Plaintiff and Class members were unaware of the existence of the tracking software on Vizio's Smart TVs at the time of the purchases. Had they known, Plaintiff and Class members would not have purchased Vizio Smart TVs, or would have paid less for them.

283. Defendants' conduct directly and proximately caused Plaintiff and Class members actual monetary damages as a result of the unauthorized use, and dissemination of, their personal information.

284. Plaintiff and Class members seek damages, including punitive damages, reasonable attorneys' fees, and costs as a result of Defendants' fraudulent omissions.

## VII.   PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

    a. Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs are proper class representatives, and appoint Plaintiffs' Counsel as counsel for the Class;

    b. Enter an order declaring Defendants' actions are unlawful;

    c. Award Plaintiffs and class members appropriate relief, including actual, statutory, and punitive damages;

    d. Award Plaintiffs and class members restitution, disgorgement, and other equitable relief as the Court deems proper;

    e. Award injunctive and declaratory relief as may be appropriate;

    f. Award attorneys' fees and all other costs of prosecuting this action;

    g. Award Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable;

    h. Grant additional legal or equitable relief as this Court may find just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

Dated: March 23, 2017

**GIRARD GIBBS LLP**

*/s/ Eric H. Gibbs*
Eric H. Gibbs
ehg@classlawgroup.com
Andre Mura
amm@classlawgroup.com
Linda Lam
lpl@classlawgroup.com
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701

**COTCHETT, PITRE & MCCARTHY, LLP**

*/s/ Joseph W. Cotchett*
Joseph W. Cotchett
jcotchett@cpmlegal.com
Adam J. Zapala
azapala@cpmlegal.com
Gwendolyn R. Giblin
ggiblin@cpmlegal.com
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577

*Co-lead Counsel for Plaintiffs*

Gary F. Lynch
glynch@carlsonlynch.com
**CARLSON LYNCH SWEET & KILPELA, LLP**

58

1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
Telephone: 412-322-9243
Facsimile: 412-231-0246

Andrew N. Friedman
afriedman@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL
PLLC**
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005
Telephone: 202-408-4600
Facsimile: 202-408-4699

Brian C. Gudmundson
brian.gudmundson@zimmreed.com
**ZIMMERMAN REED, LLP**
1100 IDS Center 80 South 8th St.
Minneapolis, MN 55402
Telephone: (612) 341-0400

Ashleigh E. Aitken
ashleigh@aitkenlaw.com
**AITKEN COHN**
3 MacArthur Pl #800
Santa Ana, CA 92707
Phone: (714) 434-1424
Fax: (714) 434-3600

*Plaintiffs' Interim Steering Committee*

SECOND CONSOLIDATED COMPLAINT
CASE NO. 8:16-ML-02693-JLS-KES

# EXHIBIT F

# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT G

# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT H

# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT I

# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT J

# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT K

# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT L

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CASE NO. 8:16-ml-02693-JLS-KES

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS   (Doc. 116)**

**In Re: Vizio, Inc., Consumer Privacy Litigation**

1

## I.   **INTRODUCTION**

Before the Court is a Motion to Dismiss filed by Defendants VIZIO Inc., VIZIO Holdings, Inc., VIZIO Inscape Technologies, LLC, and VIZIO Inscape Services, LLC (collectively, "Vizio"). (Mot., Doc. 116.) Plaintiffs Dieisha Hodges, Rory Zufolo, William DeLaurentis, John Walsh, Chris Rizzitello, and Linda Thomson filed an Opposition, and Defendants replied. (Opp'n, Doc. 121; Reply, Doc. 123.) For the following reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss.

## II.   **BACKGROUND**

Vizio is the second-largest manufacturer of "Smart TVs," cutting-edge televisions equipped with integrated software that enables consumers to access the Internet and on-demand services such as Netflix, Hulu, and Pandora. (Compl. ¶¶ 33, 35, 45, Doc. 108.) Known as the "Vizio Internet Apps," "Internet Apps Plus," and "SmartCast," Vizio's content delivery software comes either preinstalled on its Smart TVs or is installed through software updates. (*Id.* ¶ 45.) Vizio markets its Smart TVs as a "passport to a world of entertainment, movies, TV shows and more" and charges a premium for them because they are designed to seamlessly deliver on-demand video content to consumers. (*Id.* ¶¶ 34, 81.)

Plaintiffs allege that, unbeknownst to them, Vizio's Smart TVs use automatic content recognition software to collect and report consumers' content viewing histories. (*Id.* ¶¶ 39, 50, 127.) This software, called "Smart Interactivity," collects up to 100 billion content "viewing data points" along with detailed information about a consumer's digital identity, such as consumers' IP addresses, zip codes, MAC addresses, product model numbers, hardware and software versions, chipset IDs, region and language settings, as well as similar information about other devices connected to the same network. (*Id.* ¶¶ 39, 42, 54, 62.) The Smart Interactivity software transmits this information to Vizio's Inscape data services platform, which identifies the content a consumer has been watching by comparing the "viewing data points" to a database of existing content. (*Id.* ¶¶ 50, 62.) Vizio then sells all of this information to advertisers and media content providers so that

they can deliver highly targeted advertisements to Vizio Smart TVs and any smartphones, tablets, or computers connected to the same network. (*Id.* ¶¶ 2, 5, 35, 41-42.)

Plaintiffs contend that the constellation of information Vizio shares about consumers' digital identities "provides a 'game plan' to associate individuals with their viewing habits." (*Id.* ¶ 72.) One digital identifier that Vizio discloses, a MAC address, is a unique 12-digit identifier assigned to every mobile device, computer, Smart TV, or other electronic device. (*Id.* ¶ 69.) Because a MAC address is tied to a device's embedded chipsets, the identifier remains unchanged throughout the life of the electronic device. (*Id.*) MAC addresses, Plaintiffs allege, are frequently linked to an individual's name and can be used to acquire highly specific geolocation data. (*Id.* ¶¶ 70-71.) And, even if a MAC address alone is insufficient to identify a person, the information can readily identify a person when combined with the other information that Vizio discloses, such as IP addresses, zip codes, product model numbers, hardware and software versions, chipset IDs, and region and language settings. (*Id.* ¶¶ 72-79.) To support their argument, Plaintiffs provide two case studies where researchers were able to identify a significant percentage of individuals by analyzing several details about them. (*Id.* ¶¶ 74-78.) Plaintiffs also point to a Vizio prospectus, which highlights how the Inscape data services platform is able to "provide[] highly specific viewing behavior data on a massive scale with great accuracy." (*Id.* ¶ 62.)

Vizio's data collection and dissemination practices, Plaintiffs contend, are not adequately disclosed in its marketing or privacy policies. (*Id.* ¶¶ 22, 81-94, 105.) The packaging for its Smart TVs highlights Vizio's Internet Apps and Internet Apps Plus without mentioning that, if consumers use these features, Vizio's Smart Interactivity software will collect and disseminate information about their viewing history and digital identity. (*Id.* ¶¶ 81-85.) Nowhere during the setup process for a Vizio Smart TV does Vizio reference its Smart Interactivity software. (*Id.* ¶ 85.) Vizio's Privacy Policy, which consumers can view in very small font under the "Reset & Admin" submenu, assuages

3

consumers that it collects only "non-personal" and "anonymous" information and does not reveal that Vizio sells the information it collects to third parties. (*Id.* ¶¶ 86, 89-91.)

Contrary to the industry's standard practice, Vizio's Smart TVs come with Smart Interactivity automatically enabled. (*Id.* ¶¶ 6, 61.) To turn off Smart Interactivity, consumers must navigate through the Smart TV's menu to an obscure settings option that does not describe what Smart Interactivity does. (*Id.* ¶¶ 7, 85.) If a Smart TV is reset to its factory default settings—either intentionally or inadvertently—the Smart Interactivity software reactivates without consumers receiving any notice. (*Id.* ¶ 66.) A 2015 report by the security software company Avast found that the "off" capability for Smart Interactivity was not functional "for months, if not years." (*Id.* ¶¶ 7, 65.) So, even if consumers believed they had disabled Smart Interactivity (and the feature appeared to be "off"), their Smart TVs were still transmitting their digital information without their knowledge. (*Id.*)

Vizio allegedly has a strong incentive to ensure that consumers do not disable its Smart Interactivity software. (*Id.* ¶ 44.) Vizio's business model relies on the profits from its sales of consumer data to compensate for its relatively slim margins on Smart TVs. (*Id.* ¶¶ 43-44.) Vizio distinguishes its Inscape data services platform from competitors such as A.C. Nielson and Rentrak based on its ability to provide highly detailed information about 8 million American consumers in "real time." (*Id.* ¶¶ 40, 42.) As Vizio noted in an SEC filing, if consumers objected to or opted out of its Smart Interactivity software, Vizio's growth strategy would be jeopardized. (*Id.* ¶¶ 43-44.)

Plaintiffs assert they purchased Vizio Smart TVs unaware of Vizio's data collection and dissemination practices. (*Id.* ¶¶ 16-21.) They provide details about their Vizio Smart TVs, such as the model numbers and cities where they purchased them, and describe how they used their Vizio Smart TVs to watch on-demand video content. (*Id.*) After learning about Vizio's Smart Interactivity software, Plaintiffs disconnected their Smart TVs from the Internet or ceased watching certain on-demand video content on them. (*Id.*) Plaintiffs allege that, had they known about Vizio's data collection and disclosure practices, they

would not have purchased their Vizio Smart TVs or would have paid less for them. (*Id.* ¶ 22.)

Based on these allegations, Plaintiffs bring various privacy and misrepresentation-based claims under both federal and state law. Plaintiffs allege federal claims under the Video Privacy Protection Act (VPPA) and the Wiretap Act. (*Id.* ¶¶ 111-32.) Under state law, Plaintiffs bring common law fraud and negligent misrepresentation claims as well as consumer protection claims under California's Consumers Legal Remedies Act, California's Unfair Competition Law ("UCL"), California's False Advertising Law, Florida's Deceptive and Unfair Trade Practices Act, New York's General Business Law sections 349 and 350, Massachusetts's Chapter 93A, and Washington's Consumer Protection Act. (*Id.* ¶¶ 150-241, 250-53, 263-87, 301-17.) As for their state law privacy claims, Plaintiffs allege intrusion upon seclusion claims as well as causes of action under the California Constitution,[1] California's Invasion of Privacy Act, the Massachusetts Privacy Act, and state video privacy statutes. (*Id.* ¶¶ 133-49, 242-49, 254-62, 294-300.) Finally, Plaintiffs allege common law claims for unjust enrichment. (*Id.* ¶¶ 288-93.)

## III.   **LEGAL STANDARD**

A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Fed. R. Civ. P. 12(b)(1). "Dismissal for lack of subject matter jurisdiction is appropriate if the complaint, considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984-85 (9th Cir. 2008). When considering a Rule 12(b)(1) motion, the Court "is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony,

---

[1] The parties briefed Plaintiffs' sixteenth cause of action, titled "Privacy Violation Based on Intrusion" (*see* Compl. ¶¶ 294-300), as a cause of action under both the California Constitution and state common law (*see* Mem. 34-37 & n.18; Opp'n at 31-35; Reply at 22-24), so the Court will treat it as such for purposes of this Motion. For clarity, Plaintiffs should specify in any amended complaint that they are alleging claims under both the California Constitution and common law.

5

1 to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United*

2 *States*, 850 F.2d 558, 560 (9th Cir. 1988). "The party asserting . . . subject matter

3 jurisdiction bears the burden of proving its existence." *Chandler v. State Farm Mut. Auto.*

4 *Ins. Co*., 598 F.3d 1115, 1122 (9th Cir. 2010).

5       In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all

6 "well-pleaded factual allegations" in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679

7 (2009). A court must draw all reasonable inferences in the light most favorable to the non-

8 moving party. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

9 Yet, "courts 'are not bound to accept as true a legal conclusion couched as a factual

10 allegation.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v.*

11 *Allain*, 478 U.S. 265, 286 (1986)). "To survive a motion to dismiss, a complaint must

12 contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

13 on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has

14 facial plausibility when the plaintiff pleads factual content that allows the court to draw the

15 reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

16 *Twombly*, 550 U.S. at 556).

17       "[W]here a complaint includes allegations of fraud, Federal Rule of Civil Procedure

18 9(b) requires more specificity including an account of the 'time, place, and specific content

19 of the false representations as well as the identities of the parties to the

20 misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting

21 *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). "A pleading is

22 sufficient under [R]ule 9(b) if it identifies the circumstances constituting fraud so that a

23 defendant can prepare an adequate answer from the allegations." *Moore v. Kayport*

24 *Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

25     **IV.**    **DISCUSSION**

26       In their Motion, Defendants contend that Plaintiffs have not suffered a concrete

27 injury sufficient to confer Article III standing. (Mem. at 6-13.) Defendants also move to

28 dismiss all of Plaintiffs' claims for failure to state a claim. (Mem. at 13-38.) The Court will

first examine whether Plaintiffs have Article III and statutory standing before turning to whether they have adequately pleaded their claims.

### A. <u>Article III Standing</u>

For Plaintiffs to have Article III standing, they must (1) have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) the harm must be "fairly trace[able]" to the defendants' conduct, and (3) the Court must be able to redress the claimed injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). At each stage of a suit, the elements of Article III standing must "be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. Hence, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.*; *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). Here, Defendants contest only whether Plaintiffs' averred injuries are sufficiently concrete to confer Article III standing. (Mem. 6-13.)

"For an injury to be 'concrete,' it must be 'real,' and not 'abstract.'" *Rodriguez v. El Toro Med. Inv'rs Ltd. P'ship*, No. SACV 16-59 (JLS) (KES), 2016 WL 6804394, at *3 (C.D. Cal. Nov. 16, 2016) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)). But an injury need not be tangible—some injuries, though unquantifiable, are sufficiently concrete to establish Article III standing. *Spokeo*, 136 S. Ct. at 1549; *Rodriguez*, 2016 WL 6804394, at *3. In determining whether an intangible injury satisfies Article III's case-or-controversy requirement, "both history and the judgment of Congress play important roles." *Spokeo*, 136 S. Ct. at 1549. Although its discretion is not absolute, Congress may properly "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law." *Id.* (quoting *Lujan*, 504 U.S. at 578).

**i.  The Video Privacy Protection Act and Wiretap Act Claims**

1.  The Common Law History of the Right to Privacy

Plaintiffs' federal claims under the Wiretap Act bear a "close relationship" to the tort of invasion of privacy. *See Spokeo*, 136 S. Ct. at 1549. The invasion of person's privacy was first identified as an independent "legal *injuria*" in Samuel D. Warren and future-Justice Louis Brandeis's seminal article *The Right to Privacy*. *See* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890); William L. Prosser, *Privacy*, 48 Cal. L. Rev. 383, 384-85 (1960). Warren and Brandeis argued that certain lines of cases, although ostensibly sounding in intellectual property, contract, or fiduciary obligations are fundamentally irreconcilable with principles of those areas of the law and instead suggest a broader right "of the individual to be let alone." *See* Warren & Brandeis, *supra*, at 197-213. A natural development of the common law, Warren and Brandeis asserted, would be the recognition of a separate tort for invasion of privacy. *Id.* at 213-14. After some initial judicial trepidation, *see, e.g.*, *Roberson v. Rochester Folding Box Co.*, 64 N.E. 442 (N.Y. 1902), the tort quickly gained currency, such that the American Law Institute incorporated it in the First Restatement. *See* Restatement (First) of Torts § 867 (1939). As articulated in the First Restatement, an invasion of privacy is an "unreasonabl[e] and serious[] interfere[nce] with another's interest in not having his affairs known to others or his likeness exhibited to the public . . . ." *Id.*

Seventy years after the publication of Warren and Brandeis's original article, William Prosser added clarity to the field by identifying four distinct torts that fell under the general term "invasion of privacy": intrusion upon seclusion, public disclosure of private facts, false light, and appropriation of a person's name or likeness. *See* Prosser, *supra*, at 389-407. Of particular relevance here, Prosser found that intrusion upon seclusion covered a broad range of "offensive or objectionable" meddling, such as eavesdropping, harassing someone through incessant telephone calls, and prying into a person's private records. *See id.* at 389-91.

The Second Restatement adopted Prosser's interpretation of intrusion upon seclusion, defining the tort as the intentional intrusion "upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977). Like Prosser, the Second Restatement identified as examples of actionable conduct eavesdropping ("with or without mechanical aids"), examining a person's private correspondence or records without consent, and making repeated telephone calls. *See id.* at cmts. b, c. While the modern contours of the tort of intrusion upon seclusion—and invasion of privacy more broadly—may not encompass the kind of detailed collection of a consumer's content viewing history alleged here, the close similarity between the conduct proscribed under the Wiretap Act and the tort of intrusion upon seclusion confirms the concreteness of Plaintiffs' injury.

Plaintiffs' VPPA claims are even more deeply rooted in the common law. Warren and Brandeis traced the development of the tort of invasion of privacy in part to cases involving the disclosure of information in breach of a confidential relationship. *See* Warren & Brandeis, *supra*, at 207-11; Prosser, *supra*, at 389-407 (observing that there must be "some breach of contract, trust or confidential relation" for a disclosure of information to a limited group of people to be tortious). Here, like in many other circumstances, the duty of confidentiality is imposed by statute. *See In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 274 (3d Cir. 2016); *see also, e.g.*, 5 U.S.C. § 552a(g)(1) (Privacy Act); 12 U.S.C. § 3417(a) (Right to Financial Privacy Act); 18 U.S.C. § 2724(a) (Driver's Privacy Protection Act of 1994).

### 2. Congress's Judgement

Besides the close relationship between Plaintiffs' federal causes of action and well-established torts, Congress has determined that the interception of a person's electronic communications and the unauthorized disclosure of a person's video viewing history are sufficiently harmful to warrant private causes of action. "[B]ecause Congress is well positioned to identify intangible harms that meet minimum Article III requirements," its

9

conclusion is "instructive and important." *Spokeo, Inc.*, 136 S. Ct. at 1549. Defendants counter that the information they disclose is not personally identifiable, so Congress's creation of a private right of action for violations of the VPPA does not support Plaintiffs' claim of standing. (Reply at 3 n.1.) But this argument improperly conflates the merits of Plaintiffs' claims with their standing to bring suit. Taken to its logical conclusion, Defendants' argument absurdly implies that a court could never enter judgment against a plaintiff on a VPPA claim if it found that the disclosed information was not within the statutory definition of personally identifiable information; instead, it would have to remand or dismiss the action for lack of jurisdiction.[2] *Cf. Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 734 (9th Cir. 1979) ("[W]hen a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiffs' substantive claim for relief, a motion to dismiss for lack of subject matter jurisdiction rather than for failure to state a claim is proper only when the allegations of the complaint are frivolous").

In sum, both history and Congress's judgment demonstrate that Plaintiffs' claimed injuries are sufficiently concrete for Plaintiffs to have standing to bring suit under the Video Privacy Protection Act and Wiretap Act.

### ii.   State Law Privacy Claims

For similar reasons, Plaintiffs have Article III standing to pursue their state law claims for invasion of privacy and intrusion upon seclusion. *See Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1057 (N.D. Cal. 2014) ("It is beyond meaningful dispute that a plaintiff alleging invasion of privacy as Plaintiffs do here presents a dispute the Court is permitted to adjudicate."); 13A Charles Alan Wright & Arthur R. Miller et al., Federal

---

[2] The only case Defendants cite in which a district court dismissed a VPPA claim for lack of standing involved a complaint so inadequately pleaded that there was no support for the plaintiffs' claimed injury. *See Mendoza v. Microsoft Inc.*, No. C14-316-MJP, 2014 WL 4540213, at *3 (W.D. Wash. Sept. 11, 2014) ("Plaintiffs do not allege a single fact to support their allegation that Microsoft allegedly retained and disclosed personally identifiable information."). By contrast, Plaintiffs' 61-page complaint is well pleaded.

Practice & Procedure § 3531.4 (3d ed. 2017). As noted earlier, the tort of invasion of privacy has been firmly established in the American common law for approximately a century. Regardless of whether the alleged conduct ultimately states a claim, "the events that the complaint describes are concrete, particularized, and actual as to the plaintiffs." *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 134-35 (3d Cir. 2015).

### iii. Consumer Protection Claims

As for their state consumer protection claims, Plaintiffs' allege that they "would not have purchased, or would have paid less for, their Vizio Smart TVs had Defendants not concealed their collection and disclosure of Plaintiffs' personal information. (Compl. ¶¶ 14, 22, 180, 188, 192, 200, 212, 214, 219, 225, 235, 237, 273, 278, 286.) Such "palpable economic injuries have long been recognized as sufficient to lay the basis for standing." *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972). Indeed, in *Hinojos v. Kohl's Corp.*, the Ninth Circuit found "no difficulty" in concluding that the plaintiffs had Article III standing based on their assertion that they "paid more for [a product] than they otherwise would have paid, or bought it when they otherwise would not have done so." 718 F.3d 1098, 1104 n.3 (9th Cir. 2013) (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012)). Defendants unpersuasively attempt to distinguish *Hinojos* by arguing that Plaintiffs do not allege that Vizio misrepresented its "product's quality or ability to perform an intrinsic function." (Mem. at 11 n.5.) In other words, Defendants argue that the only factors material to a consumer's purchasing decision are whether the Smart TV performs its "television-related functions" and is not "defective" (*see id.*), terms that Defendants do not define. The Court cannot conclude that materiality should be so narrowly defined for the purpose of determining subject matter jurisdiction. Accordingly, Plaintiffs have Article III standing to bring their consumer protection claims.

### iv. Scope of Named Plaintiffs' Article III Standing

Defendants finally contend that Plaintiffs lack Article III standing to bring claims on behalf of consumers who purchased Smart TVs with SmartCast because Plaintiffs did

11

not purchase Smart TVs with this software. (Mem. at 12-13; Reply at 4.) Plaintiffs respond that the products and operative facts at issue are sufficiently similar to give them standing to bring claims on behalf of purchasers of Vizio TVs with SmartCast as well. (Opp'n at 10.)

Courts have taken three broad positions on how related the product purchased by the named plaintiff and putative class members must be. Some courts find that the named plaintiff can represent only those who purchased the exact same product. *See, e.g.*, *Kisting v. Gregg Appliances, Inc.*, No. 16-CV-141, 2016 WL 5875007, at *5 (E.D. Wis. Oct. 7, 2016). These courts often rely heavily on language from the Supreme Court's decision in *Lewis v. Casey*, 518 U.S. 343 (1996). *See, e.g.*, *Kisting*, 2016 WL 5875007, at *4-5; *Ferrari v. Best Buy Co.*, No. CIV. 14-2956 MJD/FLN, 2015 WL 2242128, at *7 (D. Minn. May 12, 2015). Other courts hold that the relatedness of the putative class representative's and proposed class members' claims implicates only Rule 23's adequacy and typicality requirements—not Article III standing—and accordingly reserve judgment until a class certification motion. *See, e.g.*, *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 291 (S.D.N.Y. 2015); *Cardenas v. NBTY, Inc.*, 870 F. Supp. 2d 984, 992 (E.D. Cal. 2012). Still others allow a named plaintiff to assert claims on behalf of absent class members if the products that the putative class members bought are "substantially similar" to the product the named plaintiff purchased. *Coleman-Anacleto v. Samsung Elecs. Am., Inc.*, No. 16-CV-02941-LHK, 2016 WL 4729302, at *10 (N.D. Cal. Sept. 12, 2016).

The first approach, which holds that a putative class member has standing to represent only those who purchased the exact same model, is irreconcilable with the Supreme Court's decision in *Gratz v. Bollinger*, 539 U.S. 244 (2003). In *Gratz*, Justice Stevens argued in dissent that the University of Michigan's treatment of race in transfer admissions differed from its treatment of race in freshmen admissions, so the class representative—who intended to submit a transfer application—lacked standing to seek an injunction on behalf of the freshmen applicants. 539 U.S. at 286-87 (Stevens, J., dissenting). The *Gratz* majority acknowledged that "there is tension in our prior cases"

over whether this is properly considered a question of standing or the propriety of class certification under Rule 23(a). *Id.* at 263 & n.15. Either way, the class representative could represent the freshman applicants because the freshman admissions process "[did] not implicate a *significantly different* set of concerns." *Id.* at 265 (emphasis added).

The second approach, which characterizes the question as one solely of adequacy and typicality under Rule 23(a), is also difficult to square with Supreme Court precedent. In *Blum v. Yaretsky*, the Supreme Court held that nursing home patients, though having standing to represent a class of patients threatened with discharges or transfers to lower levels of care, did not have standing to represent those threatened with transfers to higher levels of care. 457 U.S. 991, 1001 (1982). The Supreme Court held that "the conditions under which such transfers occur are sufficiently different from" those faced by the named plaintiffs "that any judicial assessment of their procedural adequacy would be wholly gratuitous and advisory." *Id.* Similarly, in *Lewis*, the Supreme Court held that an illiterate prisoner lacked standing to challenge other prisoners' lack of access to courts where the other class members' claims were unrelated to the inability to read legal materials. 518 U.S. at 358. Specifically, the Supreme Court held that the class representative could not represent non-English speakers, prisoners in lockdown, or the inmate population at large. *Id. Blum* and *Lewis* thus treated the relatedness of a named plaintiff's claims to those of the class as implicating standing as well as the propriety of class certification. *See Blum*, 457 U.S. at 1001; *Lewis*, 518 U.S. at 358; *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158-59 n.13 (1982) (evaluating the question under Rule 23(a)'s adequacy, typicality, and commonality requirements). *Lewis* further suggests—albeit in dicta—that, although a motion to dismiss typically addresses only a named plaintiff's individual claims, a named plaintiff's standing to seek relief on behalf of putative class members can be raised on a motion to dismiss. *See Lewis*, 518 U.S. at 357.

The Court, therefore, finds that the third approach most closely accords with *Blum*, *Lewis*, and *Gratz*. Using the "substantially similar" standard, the overarching question is whether the plaintiff's averred injury is substantially similar to the claims of those she

13

1   seeks to represent.[3] At the motion to dismiss stage, however, the Court's review of the

2   scope of a named plaintiff's Article III standing is necessarily limited. Like any other

3   question of standing resolved at the pleading stage, "general factual allegations" that raise

4   a reasonable inference that the products are substantially similar "may suffice." *Lujan*, 504

5   U.S. at 561. The Supreme Court observed as much in *Lewis*, stating, "[t]he general

6   allegations of the complaint in the present case may well have sufficed to claim injury by

7   named plaintiffs, and hence standing to demand remediation" on behalf of the various

8   putative class members. 518 U.S. at 357. And, by the class certification stage, this standing

9   question becomes effectively subsumed into Rule 23(a)'s "rigorous" typicality and

10  adequacy requirements. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011);

11  *Falcon*, 457 U.S. at 158-59 n.13.

12          Here, Plaintiffs allege that their Smart TVs and those with SmartCast collect and

13  disclose the same information through Vizio's Smart Interactivity software. (Compl. ¶¶ 55,

14  58.) While Plaintiffs' Complaint includes a few paragraphs alleging additional information

15  collected by Vizio's SmartCast software (*id.* ¶¶ 48, 55, 57), none of Plaintiffs' alleged

16  injuries hinge on the collection of this additional information. Plaintiffs, therefore, have

17  adequately alleged that Vizio's SmartCast-enabled Smart TVs and their Smart TVs are

18  "sufficiently similar" for Plaintiffs to have Article III standing to represent a class

19  encompassing purchasers of both types of televisions.

20          In sum, because Plaintiffs have adequately pleaded Article III standing, the Court

21  DENIES Defendants' Motion to Dismiss for lack of subject matter jurisdiction.

22

23

24

25

26          [3] While the similarity of the products at issue is one important factor to consider, the

27  similarity of the operative facts that give rise to the putative class representative and putative
    class's claims is equally important. *See In re L'Oreal Wrinkle Cream Mktg. & Sales Practices

28  Litig.*, No. CIV. 2:12-03571 WJM, 2013 WL 6450701, at *4 (D.N.J. Dec. 9, 2013).

14

1                      **B.**  <u>**Statutory Standing**</u>

2        Unlike Article III standing, statutory standing is not a question of subject matter

3 jurisdiction but rather an element of a plaintiff's cause of action. As such, statutory

4 standing is properly scrutinized under Rule 12(b)(6). *See Maya*, 658 F.3d at 1067. In this

5 case, Plaintiffs plausibly allege that they would not have purchased or would have paid

6 less for their Vizio Smart TVs had Vizio properly disclosed its consumer data collection

7 and disclosure practices. (Compl. ¶¶ 22, 161, 164-69, 180, 182-88, 192-93, 200-01, 212-

8 15, 219, 225, 233-38, 272-74, 278, 286.) This price premium theory is cognizable under

9 California's UCL, CLRA, and FAL; Florida's FDUTPA; and Massachusetts's Chapter

10 93A. *See Kwikset Corp. v. Super. Ct.*, 246 P.3d 877, 881 (Cal. 2011) ("[P]laintiffs who can

11 truthfully allege they were deceived by a product's label into spending money to purchase

12 the product, and would not have purchased it otherwise, have 'lost money or property'

13 within the meaning of [the UCL.]"); *Smith v. Wm. Wrigley Jr. Co.*, 663 F. Supp. 2d 1336,

14 1339 (S.D. Fla. 2009) ("Florida courts have allowed diminished value to serve as 'actual

15 damages' recoverable in a FDUTPA claim."); *Ferreira v. Sterling Jewelers, Inc.*, 130 F.

16 Supp. 3d 471, 479 (D. Mass. 2015) ("Overpayment can constitute an economic loss that is

17 cognizable under [Massachusetts's] chapter 93A where the consumer continues to own the

18 misrepresented product 'whose value was artificially inflated by a deceptive act or practice

19 at the time of purchase.'" (citation omitted)).

20        While the viability of a price premium theory may be less settled under New York's

21 General Business Law sections 349 and 350, *see In re: Lenovo Adware Litigation*, No. 15-

22 MD-02624-RMW, 2016 WL 6277245, at *10-11 (N.D. Cal. Oct. 27, 2016), the case law

23 on balance recognizes that a plaintiff has statutory standing if she paid a premium due to

24 the defendant's deceptive practice. In *Koenig v. Boulder Brands, Inc.*, the district court

25 found plaintiffs' allegations that they paid a premium for a product based on its "fat free"

26 label sufficient to establish statutory standing under General Business Law sections 349

27 and 350. 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014). Citing *Koenig* with approval, the

28 Second Circuit subsequently held in *Orlander v. Staples, Inc.* that plaintiffs have statutory

standing under New York's General Business Law sections 349 and 350 if they "paid more than they would have for the good but for the deceptive practices of the defendant-sellers." 802 F.3d 289, 302 (2d Cir. 2015); *see also Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 898 & n.5 (N.Y. 1999). New York Plaintiff Chris Rizzitello indicates that, after purchasing his Vizio Smart TV at a Walmart in Catskill, New York, he used the Smart TV's features to stream videos from YouTube and other content providers. (Compl. ¶ 20.) After learning about Vizio's data collection and disclosure practices, he stopped streaming content, disconnected his Smart TV from the Internet, and, after learning how to turn off the Smart Interactivity feature, did so. (*Id.* ¶ 20.) Thus, like the other named Plaintiffs, Rizzitello plausibly alleges that, had he been informed about Vizio's data collection and disclosure practices, he would have paid less for the Smart TV or not purchased the product at all. (*Id.* ¶¶ 14, 20, 22, 235.)

Accordingly, Defendants' Motion to Dismiss Plaintiffs' state consumer protection claims for lack of statutory standing is DENIED.

## C. Video Privacy Protection Act (VPPA) Claims

Enacted in 1988, the Video Privacy Protection Act provides that "[a] *video tape service provider* who knowingly discloses, to any person, *personally identifiable information* concerning any *consumer* of such provider shall be liable to the aggrieved person . . . ." 18 U.S.C. § 2710(b)(1) (emphasis added); *see* Video Privacy Protection Act of 1988, S. 2361, 100th Cong., 102 Stat. 3195 (1988). Defendants seek to dismiss Plaintiffs' VPPA claims, arguing that they are not "video tape service provider[s]," that Plaintiffs are not "consumer[s]" as defined by the statute, and that Defendants do not disclose "personally identifiable information." (Mem. at 12-21.)

"[W]hen [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in

which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). A statute is not ambiguous merely because it is awkward or even ungrammatical. *Lamie*, 540 U.S. at 534. By striving to interpret a statute based on its text, a court "avoid[s] the pitfalls that plague too quick a turn to the more controversial realm of legislative history." *Id.* at 536.

### i. "Video Tape Service Provider"

The VPPA provides that a "'video tape service provider' means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials . . ." 18 U.S.C. § 2710(a)(4). Defendants contend that they are not "engaged in the business . . . of . . . delivery of . . . similar audio visual materials." (Mem. at 13-16.)

The plain text of the statute provides otherwise. As an initial matter, Congress's use of a disjunctive list (*i.e.*, "engaged in the business . . . of . . . rental, sale, *or* delivery") unmistakably indicates that Congress intended to cover more than just the local video rental store. Indeed, lest the word "delivery" be superfluous, a person need not be in the business of either renting or selling video content for the statute to apply. Further, Congress's use of the phrase "similar audiovisual materials" indicates that the definition is medium-neutral; the defendant must be in the business of delivering video content, but that content need not be in a particular format. *See, e.g.*, *In re Hulu Privacy Litig.*, No. C 11-03764 LB, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012).

Finally, to be a "video tape service provider," a defendant must be "*engaged in the business . . . of . . .* delivery of" video content. 18 U.S.C. § 2710(a)(4) (emphasis added). When used in this context, "business" connotes "a particular field of endeavor," *i.e.*, a focus of the defendant's work. *See* Webster's Third New International Dictionary 302 (1981) (def. 1d); *see also* The American Heritage Dictionary: Second College Edition 220 (1991) (defs. 1a, 1b); 2 Oxford English Dictionary 695 (1989) (def. 14b); Webster's New World Dictionary: Third College Edition 189 (1988) (def. 1). Under this definition, a defendant can be "engaged in the business" of delivering video content even if other actors

17

*also* take part in the delivery of the same video content. But, for the defendant to be engaged in the business of delivering video content, the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose.

Take, for instance, a letter carrier who physically places a package that happens to contain a videotape into a consumer's mailbox. No person is more obviously "delivering" a video tape to a consumer than this employee. Yet, the letter carrier could not be characterized as "engaged in *the business*" of delivering video content because her job responsibilities are in no way tailored to delivering packages that contain videotapes as opposed to any other package. In the same way, the developers of many other products or services that might be peripherally or passively involved in video content delivery do not fall within the statutory definition of a video tape service provider.

In keeping with this statutory definition, Plaintiffs plausibly allege that Vizio's Internet Apps and Internet Apps Plus are designed to enable consumers to seamlessly access Netflix, Hulu, YouTube, and Amazon Instant Video content in their homes. (Compl. ¶¶ 33-34, 45-46, 81.) A reasonable inference is that Vizio enters into agreements with these content providers to enable consumers to access their programming on Vizio's Smart TVs. (*See id.* ¶ 45; Opp'n at 12-13.) Vizio then advertises its Smart TVs as "a passport to a world of entertainment, movies, TV shows and more," and charges consumers a premium for its Vizio Smart TVs specifically because these Smart TVs are designed to stream video content through Vizio's Internet Apps and Internet Apps Plus software. (Compl. ¶¶ 34, 81.) Essentially, Vizio has designed its Smart TVs to perform all the same functions of—and its Smart TVs are in direct competition with—Roku's devices (*see id.* at ¶ 18; Opp'n at 11); that Vizio has integrated what others sell as a separate device into its televisions makes no meaningful difference.

Vizio's alternative construction of the statute starts with the implicit premise that there can be only one video tape service provider in any transaction, and, because the content provider (like Hulu or Netflix) does fit within the statutory definition of a video

tape service provider, Vizio cannot. (*See* Mem. 14-16.) But such a limitation is found nowhere in the text of the statute, and Vizio's construction fails to give the phrase "engaged in the business . . . of" any real meaning.

Defendants also resort to parade of horribles, arguing that if Vizio is considered a video tape service provider, "[c]ountless products and services," such as "shipping services, Blu-Ray players, smartphones, app stores, cable boxes, wireless routers, personal computers, video game consoles, and even cars" would also fall within the statutory definition of video tape service providers. (Mem. at 16; Reply at 5-7.) But the statute's text once again alleviates Vizio's concerns. Most of these products or services are far too peripherally or passively involved in the delivery of video content to reasonably constitute "the business" of delivering video content. By contrast, Plaintiffs allege that Vizio has developed a product intimately involved in the delivery of video content to consumers, has created a supporting ecosystem to seamlessly deliver video content to consumers (including entering into agreements with content providers such as Netflix and Hulu), and has marketed its product to consumers as a "passport" to this video content. Other textual limitations further cabin the scope of the Act: The VPPA applies only if the consumer is a "renter, purchaser, or subscriber of goods or services" from the video tape service provider. 18 U.S.C. §§ 2710(a)(1), (b). And a video tape service provider is liable only if it releases personally identifiable information without the consent of the consumer. *Id.* §§ 2710(a)(3), (b). Accordingly, Vizio's policy-laden argument cannot overcome the statute's plain meaning.

### ii. "Consumer"

The VPPA defines a "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). Thus, unlike its definition of "video tape service provider," the statute's definition of "consumer" is somewhat narrower than the word's ordinary meaning. Because Plaintiffs do not contend they are renters or purchasers, they must be "subscribers" for the VPPA to apply.

In *Ellis v. Cartoon Network, Inc.*, the Eleventh Circuit held that "a person who downloads and uses a free mobile application on his smartphone to view freely available content, without more, is not a 'subscriber' . . . under the VPPA." 803 F.3d 1251, 1252 (11th Cir. 2015). After analyzing various definitions of "subscriber," the Eleventh Circuit concluded that that a "'subscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." *Id.* at 1256. While a "payment is not a necessary element of subscription," it is "one factor a court should consider when determining whether an individual is a 'subscriber' under the VPPA." *Id.* Besides payment, other factors to consider are "registration, commitment, delivery, [expressed association,] and/or access to restricted content." *Id.* (citation omitted).

By contrast, in *Yershov v. Gannett Satellite Information Network, Inc.*, the First Circuit concluded that a consumer need not make a monetary payment in return for a mobile application to be considered a "subscriber." 820 F.3d 482, 488-89 (1st Cir. 2016). Instead, the plaintiff's provision of personal information in return for the defendant's video content was sufficient consideration for the plaintiff to be a "subscriber." *Id.* at 489. And, by downloading the defendant's application, the plaintiff "established a relationship with [the defendant] that [was] materially different from what would have been the case had [the defendant's publication] simply remained one of millions of sites on the web that [the plaintiff] might have accessed through a web browser." *Id.*

Here, Plaintiffs are more plausibly "subscribers" than the plaintiffs in either *Ellis* or *Yershov* because they allege that they *do* pay for Vizio's applications. Plaintiffs contend that Vizio charges a premium for its Smart TVs because of their ability to seamlessly deliver video content to consumers through Vizio's Internet Apps, Internet Apps Plus, and SmartCast. (Compl. ¶¶ 22, 33.) After consumers purchase their Smart TVs, Vizio continues to service them by pushing software updates that improve security and provide additional features. (*See id.* ¶¶ 45, 59, 66, 92.) Thus, under either *Ellis* or *Yershov*'s holdings, Plaintiffs plausibly allege an association with Vizio that is sufficiently substantial and ongoing to constitute a subscription.

### iii. "Personally Identifiable Information"

Defendants' finally contend that they do not disclose "personally identifiable information" because "Plaintiffs have alleged . . . only that Defendants have disclosed device identifying information." (Mem. at 17-21; Reply 7-9.) For their part, Plaintiffs assert that the array of data Vizio purportedly discloses about them—including MAC addresses, IP addresses, zip codes, chipset IDs, product model numbers, hardware and software versions, region and language settings, viewing history, purchase history, and "the presence of other devices connected to [the same] network"—falls within the statutory definition of "personally identifiable information." (Opp'n 15-18; Compl. ¶¶ 63, 72.)

By its own terms, the VPPA prohibits the disclosure of "personally identifi*able* information." 18 U.S.C. § 2710(a)(3) (emphasis added). The suffix "able" means "capable of," so "personally identifiable information" plainly extends beyond a consumer's name. Webster's Third New International Dictionary 4, 1123 (1981). Indeed, had Congress intended to limit the statute to protecting the disclosure of an individual's name (when linked to particular video rentals), it could have easily done so and avoided the Act's broader—and admittedly clunky—phrasing. *See Yershov*, 820 F.3d at 486. Turning to the VPPA's defined terms, three of the four statutory definitions use the word "means" to restrict the defined term to the statutory definition. *See* 18 U.S.C. §§ 2710(a)(1), (a)(2), (a)(4). "As a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated." *Burgess v. United States*, 553 U.S. 124, 130 (2008) (citation omitted). But Congress chose the word "includes" instead for the definition of "personally identifiable information." *See* 18 U.S.C. § 2710(a)(3). This word "normally implies that the proffered definition falls short of capturing the whole meaning."[4] *Yershov*, 820 F.3d at

---

[4] Although the Court does not believe that resorting to the legislative history is necessary, the Senate Report on the VPPA confirms that this different wording (*i.e.*, "includes" instead of "means") was intentional. S. Rep. No. 100-599, at 12 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 4342-1, 4342-9 ("[P]aragraph (a)(3) uses the word "includes" to establish a minimum, but not exclusive, definition of personally identifiable information.").

486; *see, e.g.*, *United States v. Angelilli*, 660 F.2d 23, 31 (2d Cir. 1981) ("The use of the word 'includes,' rather than a more restrictive term such as 'means,' 'indicates that the list is not exhaustive but merely illustrative.'" (citation omitted)). Hence, while "information which identifies a person as having [selected] a video" surely is covered, "personally identifiable information" is not restricted to such information. *See* 18 U.S.C. § 2710(a)(3); *Yershov*, 820 F.3d at 486.

The statutory structure confirms that Congress intended "personally identifiable information" to encompass more than a person's name and physical address. In the original Act, Congress included both an opt-out and opt-in disclosure process. If a consumer opted in to a disclosure, a video tape service provider could reveal any type of personally identifiable information. Video Privacy Protection Act of 1988, S. 2361, 100th Cong. § 2, 102 Stat. 3195 (1988). But if the consumer had to opt out of the disclosure, the video tape service provider could disclose only the consumer's name and address. *See id.* Thus, Congress contemplated that the Act would protect more than just a person's name or physical address. *Yershov v. Gannett Satellite Info. Network, Inc.*, 104 F. Supp. 3d 135, 140 (D. Mass. 2015), *rev'd in part on other grounds*, 820 F.3d 482 (1st Cir. 2016).

Based on many of these textual clues, the First Circuit in *Yershov* concluded that "personally identifiable information" extends beyond a person's name to embrace "information reasonably and foreseeably likely to reveal which . . . videos [the plaintiff] has obtained." 820 F.3d at 486. While at some point "the linkage of information to identity becomes too uncertain, or too dependent on too much yet-to-be-done, or unforeseeable detective work," the court found the plaintiff's allegations that the defendant disclosed his phone's GPS coordinates from the moment when he watched videos to be personally identifiable information. *Id.*

By contrast, the Third Circuit in *In re Nickelodeon* held that IP addresses do not constitute personally identifiable information under the VPPA. *See* 827 F.3d at 290. While recognizing that the "text itself is . . . amenable" to a broader interpretation, the Third Circuit relied heavily on statements by Senator Patrick Leahy and Representative Robert

Kastenmeier at a joint hearing to conclude that personally identifiable information covers only "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Id.* at 285-86, 290.

The Court finds *Yershov* to be a more persuasive interpretation of the VPPA than *In re Nickelodeon*. First, *Yershov* focused foremost on the text of the statute, while *In re Nickelodeon* turned quickly to "the more controversial realm of legislative history." *See Lamie*, 540 U.S. at 536. Perhaps, if the statutory language were particularly indecipherable and the legislative history decisively resolved the issue, this approach might be understandable. But *In re Nickelodeon* recognized that "portions" of the legislative history suggested a *broader* interpretation of personally identifiable information and the statutory text was "amenable" to such an interpretation. 827 F.3d at 286-86.[5] Second, *In re Nickelodeon* relied heavily on Congress's decision *not* to amend the statute substantially in 2002. As the Supreme Court has instructed, this kind of "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). Indeed, *Yershov* examined the same Congressional inaction and reached the exact *opposite* conclusion about its proper meaning. *See* 820 F.3d at 488. Third, under the Third Circuit's "ordinary person" test it would be highly questionable whether even social security numbers would constitute personally identifiable information because, as the Third Circuit itself recognized, this information "might not be easily matched to . . . persons without consulting another entity, such as a credit reporting agency or government bureau." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 283.

---

[5] The Third Circuit's legislative history analysis focused on two statements made at a joint hearing that do not obviously concern the proper scope of the term "personally identifiable information" and relate to a prior version of the bill that also covered libraries. *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 285-86. The Supreme Court has repeatedly criticized attempts to divine Congressional intent from "highly generalized, conflicting statements in the legislative history." *Rust v. Sullivan*, 500 U.S. 173, 185 (1991).

1    Yet, the Court need not disagree with *In re Nickelodeon* because Plaintiffs allege

2 that Vizio's Inscape platform discloses even more about their digital identities—in

3 particular, consumers' MAC addresses and information about other devices connected to

4 the same network. Plaintiffs allege that MAC addresses are frequently linked to an

5 individual's name and can be used to acquire highly specific geolocation data. (Compl. ¶¶

6 69-71.) MAC addresses allegedly can also identify a person when combined with Vizio's

7 disclosure of consumers' IP addresses, zip codes, product model numbers, hardware and

8 software versions, chipset IDs, and region and language settings. (*Id.* ¶¶ 72-79.) Besides

9 collecting and disclosing extensive information regarding consumers' Smart TVs, Vizio

10 supposedly collects and discloses information about all other devices connected to the

11 same network. (*Id.* ¶¶ 63, 72.) Plaintiffs have thus plausibly alleged that Vizio's provision

12 of—to quote its own prospectus—"highly specific viewing behavior data on a massive

13 scale with great accuracy" amounts to the disclosure of personally identifiable

14 information.[6] (*Id.* ¶ 62.)

15    The Court stresses the posture of this case: Ultimately, Plaintiffs will have to

16 demonstrate that Vizio's disclosures are "reasonably and foreseeably likely to reveal" what

17 video content Plaintiffs have watched. *Yershov*, 820 F.3d at 486. But this is a factual

18 inquiry ill-suited for resolution on a motion to dismiss. *Yershov*, 104 F. Supp. 3d at 145

19 (observing that a "factual record would need to be developed before concluding that an

20 Android ID is not PII"). The Court simply cannot accept Vizio's offer to engage in judicial

21 fact-finding or make sweeping determinations as a matter of law on this Motion to

22 Dismiss. Because Plaintiffs have plausibly alleged that the array of information Vizio

23

24

25

_____

26    [6] While this Motion was pending, the FTC, in conjunction with a consent decree, filed a
complaint against Vizio regarding its collection and disclosure practices. (*See* Notice of Pendency,

27 Doc. 128.) Because the FTC's allegations have not been incorporated into Plaintiffs' Complaint,
the Court does not consider them in determining the plausibility of Plaintiffs' claims.

28

1    discloses about them is personally identifiable information, the Court must DENY Vizio's

2    Motion to Dismiss Plaintiffs' VPPA claims.[7]

3                        D.  **Wiretap Act Claims**

4          The Wiretap Act affords a private right of action to "any person whose wire, oral, or

5    electronic communication is intercepted, disclosed, or intentionally used in violation of

6    this chapter . . . ." 18 U.S.C. § 2520(a). Defendants argue that Plaintiffs' Wiretap Act

7    claims should be dismissed because Defendants do not "intercept" any electronic

8    communications and the messages they collect do not constitute the "contents" of an

9    electronic communication. (Mem. at 23-27.) For the reasons elaborated below, the Court

10   concludes that Plaintiffs have inadequately pleaded interception.

11         The Wiretap Act proscribes the "intentional[] intercept[ion] . . . [of] any wire, oral,

12   or electronic communication." 18 U.S.C. § 2511(1)(a). In *Konop v. Hawaiian Airlines,*

13   *Inc.*, the Ninth Circuit held that, for an electronic communication "to be 'intercepted' in

14   violation of the Wiretap Act, it must be acquired during transmission, not while it is in

15   electronic storage." 302 F.3d 868, 878 (9th Cir. 2002). In so holding, *Konop* strove to

16   distinguish between information acquired *contemporaneously* to its transmission and

17   information that resides in electronic storage. *Id.*; *see Theofel v. Farey-Jones*, 359 F.3d

18   1066, 1077 (9th Cir. 2004) ("We . . . held in *Konop v. Hawaiian Airlines, Inc.* . . . that the

19   Act applies only to "acquisition contemporaneous with transmission." (citation omitted)).

20   Access to information maintained in electronic storage is governed by the Stored

21   Communications Act, while the Wiretap Act regulates access to information acquired

22   contemporaneously to its transmission. *See Konop*, 302 F.3d at 878.

23         While some language in *Konop* suggests that information cannot be "intercepted"

24   within the meaning of the Wiretap Act if it is acquired *simultaneously* with its arrival, *see*

25   *id.* at 879-880, the issue was not squarely presented in the case. The plaintiff in *Konop*

26   _____

27         [7] Plaintiffs have chosen to abandon their state law video privacy claims (Opp'n at 3 n.2),
28   so the Court DISMISSES Plaintiffs' fourth, tenth, and twelfth causes of action.

1  alleged that his former employer used another employee's password to access disparaging
2  posts that the plaintiff kept on his online bulletin board. *Id.* at 873. Thus, the information
3  the employer acquired had been in electronic storage for a considerable period before his
4  employer accessed it. Like *Konop*, most of the decisions in this Circuit addressing the
5  simultaneous transmission requirement involve the collection of emails or other
6  communications that were unquestionably in electronic storage for a substantial period
7  before the defendants collected them. *See, e.g.*, *Theofel v. Farey-Jones*, 359 F.3d 1066,
8  1077 (9th Cir. 2004) (stored emails); *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp.
9  3d 938, 953 (N.D. Cal. 2014) (stored emails); *see also Steve Jackson Games, Inc. v. U.S.*
10  *Secret Serv.*, 36 F.3d 457, 460 (5th Cir. 1994) (stored unread emails).

11      In *United States v. Szymuszkiewicz*, the Seventh Circuit concluded that information
12  acquired "within a second of each message's arrival and assembly" satisfies the
13  contemporaneous interception requirement. 622 F.3d 701, 706 (7th Cir. 2010). In
14  *Szymuszkiewicz*, the defendant inserted a command into his supervisor's copy of Microsoft
15  Outlook that directed a copy of all incoming messages to him. *Id.* at 703. The defendant
16  argued that "he did not 'intercept' anything, for (at least in football) 'interception' means
17  catching a thing in flight, and any message would have reached its destination ([his
18  supervisor's] inbox) before a copy was made for him." *Id.* Judge Easterbrook observed that
19  it did not matter whether his supervisor's computer or an intermediary diverted the
20  information:

21

22      Several circuits have said that, to violate § 2511, an interception must be
23      "contemporaneous" with the communication. . . . [The defendant] sees this
24      as support for his "in flight" reading, but it is not. "Contemporaneous" differs
25      from "in the middle" or any football metaphor. Either the server in Kansas
26      City or [his supervisor's] computer made copies of the messages for [the
27      defendant] within a second of each message's arrival and assembly; if both
28      [the defendant and his supervisor] were sitting at their computers at the same

26

1   time, they would have received each message with no more than an eyeblink

2   in between. That's contemporaneous by any standard. Even if [the

3   supervisor's] computer (rather than the server) was doing the duplication and

4   forwarding, it was effectively acting as just another router, sending packets

5   along to their destination . . . .

7   *Id.* at 705-06 (citations omitted). In reaching this conclusion, the Seventh Circuit cited

8   *Konop*, *see id.* at 706, indicating that the court found its decision consistent with the Ninth

9   Circuit's simultaneous transmission requirement.[8]

10      *Szymuszkiewicz* emphasized that its holding was necessary to keep modern

11  telephonic communications within the purview of the Wiretap Act. *Id.* Interception of

12  telephone calls made through modern "packet switching" technology "must be done by

13  programming a computer to copy the contents [of packets] it sends along . . . ." *Id.*  So, if

14  interception "within a second of each message's arrival and assembly" did not qualify as

15  "simultaneous," the Wiretap Act would no longer govern phone calls—the very

16  communications Congress had in mind when it enacted the Wiretap Act. *Id.* at 704, 706;

17  *see In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1076-81 (N.D. Cal. 2015) (concluding that

18  *Konop*'s simultaneous transmission requirement does not place packet switching

19  technology outside the ambit of the Wiretap Act). A contrary holding would also mean that

20  different substantive rules would apply to those engaged in the same real-time electronic

21  conversation based on whose electronic device was bugged and who was sending or

22  receiving the particular message in question. If, say, Person A's device was bugged, all of

24  _____

25      [8] *DirecTV, LLC v. Wright*, No. 15-CV-474-FPG, 2016 WL 3181170 (W.D.N.Y. June 3,

26  2016) is not to the contrary. In *DirecTV*, the district court stressed that the defendant "*legitimately
    received*" the plaintiff's satellite signals and then illegally rebroadcasted them. *Id.* at *6. As the

27  district court observed, "numerous courts have focused on this distinction in finding that [the
    Wiretap Act] requires the unauthorized receipt, not simply the unauthorized redistribution." *Id.* at

28  *6.

the messages she *sends* to Person B would be subject to the Wiretap Act, while all the message she *receives*—even if immediately collected—would be subject to the Stored Communications Act. Nothing in the text or structure of the Wiretap Act or Stored Communications Act suggests such a hopelessly convoluted legal framework.

But, even if the Court were to accept *Szymuszkiewicz*'s reasoning, Plaintiffs have not articulated with sufficient clarity when Vizio supposedly intercepted their communications. Besides their conclusory allegation that Vizio intercepted their electronic communications "during transmission" (Compl. ¶ 128.), Plaintiffs rely on a rather inscrutable graphic with no textual explanation (*id.* ¶ 52) and vague allegations about how Vizio's data collection occurs "in real time" (*id.* ¶¶ 39, 41-42, 49, 62). While Plaintiffs need not prove their theory of interception on a motion to dismiss, Plaintiffs must provide fair notice to Defendants of when they believe Vizio intercepts their communications. A written explanation of Plaintiffs' theory of interception is particularly important in this case because the graphic Plaintiffs include in their Complaint suggests that Vizio transmits their data to its Inscape platform significantly after the data arrive at their Smart TVs. (*See id.* ¶ 52.) The Court, therefore, DISMISSES with LEAVE TO AMEND Plaintiffs' Wiretap Act claims. As Plaintiffs have inadequately pleaded interception, the Court need not address Defendants' alternative argument that Vizio does not collect the "contents" of any electronic communications.[9]

---

[9] Courts have generally construed the California Invasion of Privacy Act ("CIPA") as coextensive with the Wiretap Act, *Sunbelt Rentals, Inc. v. Victor*, 43 F. Supp. 3d 1026, 1033 (N.D. Cal. 2014); *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938, 954 (N.D. Cal. 2014), and Plaintiffs have offered no reason why the Court's analysis would be any different under the CIPA (*see* Opp'n at 21). The Court, therefore, DISMISSES with LEAVE TO AMEND Plaintiffs' CIPA claims.

## E. Fraud Claims

Defendants move to dismiss Plaintiffs' fraud-based claims[10] for failure to satisfy Rule 9(b). (Mem. at 28-33.) Plaintiffs contend that Defendants overstate Plaintiffs' burden in alleging claims based on fraudulent omissions and that both their fraudulent omission and affirmative misrepresentation theories are well pleaded. (Opp'n at 21-27.)

### i. Fraudulent Omission-Based Claims

Under Rule 9(b), a party must plead allegations of fraud, whether through affirmative misrepresentations or omissions, "with particularity." Fed. R. Civ. P. 9(b). To satisfy this Rule, a plaintiff must generally allege the "'who, what, when, where, and how' of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). "However, in the context of a fraudulent omission claim, a plaintiff cannot plead a specific time or place of a failure to act." *Peel v. BrooksAmerica Mortg. Corp.*, 788 F. Supp. 2d 1149, 1160 (C.D. Cal. 2011). In such circumstances, "a plaintiff may plead fraud by alternative means." *Id.* The purpose of Rule 9(b)'s heightened pleadings standard is "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted).

Relying on *Marolda v. Symantec Corp.*, Defendants assert that to satisfy Rule 9(b), a fraudulent omission claim "must describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009). "As other courts have recognized, however, 'the *Marolda*

---

[10] By "fraud-based claims," the Court refers to Plaintiffs' fifth, sixth, eighth, ninth, eleventh, fourteenth, and eighteenth causes of action to the extent that these claims sound in fraud. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). The Court addresses Plaintiffs' FAL claims separately.

1   requirements are not necessarily appropriate for all cases alleging a fraudulent omission.'"

2   *Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, 2015 WL 4111448, at *12 (N.D. Cal.

3   July 7, 2015). Rather, courts have applied Rule 9(b)'s "who, what, when, where, and how"

4   test mindful of the "the inherent limitations of an omission claim." *MacDonald v. Ford*

5   *Motor Co.*, 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014); *Velasco v. Chrysler Grp. LLC*,

6   No. CV 13-08080 DDP VBKX, 2014 WL 4187796, at *5 (C.D. Cal. Aug. 22, 2014);

7   *Philips*, 2015 WL 4111448, at *12.

8       Here, Plaintiffs allege that Vizio ("who") failed to disclose to consumers that its

9   Smart Interactivity software collects and discloses consumers' viewing histories as well as

10  personally identifiable information related to their Vizio Smart TVs and other devices

11  connected to the same Wi-Fi network ("what"). (Compl. ¶¶ 35-42, 45-73.) This material

12  information, Plaintiffs allege, was not disclosed prior to their purchase of their Smart TVs

13  or while they used their Smart TV's capabilities ("when") on the product packaging, in

14  Vizio's Privacy Policy, or on Vizio's website ("where"). (*Id.* ¶¶ 81-94.) Besides providing

15  the exact model numbers for their televisions and where they purchased them, Plaintiffs

16  provide a representative sample of a Vizio Smart TV's product packaging that omits any

17  mention of Vizio's Smart Interactivity software. (*Id.* ¶¶ 16-21, 81-84.) Plaintiffs further

18  contend that, when using a Vizio Smart TV, the only reference to Smart Interactivity is

19  "deeply imbedded in an obscure settings menu" and "does not explain what Smart

20  Interactivity is." (*Id.* ¶¶ 7, 85.) Viewed together, Plaintiffs' allegations are as well pleaded,

21  if not more detailed, than those found sufficient in *Velasco*, *Philips*, and *MacDonald*. *See*

22  2015 WL 4111448, at *12; 2014 WL 4187796, at *5; 37 F. Supp. 3d 1087, 1096. Contrary

23  to Defendants' assertion, Plaintiffs do not need to specify the precise date they purchased

24  their Smart TVs to state a fraudulent omission claim, because Vizio's fraudulent omissions

25  allegedly continued from the launch of its Smart Interactivity software through Plaintiffs'

26  purchases of their Smart TVs. Thus, Defendants' Motion to Dismiss Plaintiffs' claims

27  based on fraudulent omissions is DENIED.

28

### ii. Affirmative Fraud-Based Claims

In contrast to Plaintiffs' omission-based fraud claims, Plaintiffs' affirmative fraud-based claims are devoid of the "who, what, where, when, and how" allegations required by Rule 9(b). For instance, Plaintiffs contend that certain language in Vizio's Privacy Policy and on Vizio's website is misleading, but none of the Plaintiffs allege that they even viewed these purported misrepresentations. (*See* Compl. ¶¶ 22, 88.) *See, e.g.*, *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 694 (Ct. App. 2010) ("[T]he SAC does not allege [plaintiff] ever visited Sharp's Web site or even that he ever read the Agreement for Services"). Plaintiffs also reference certain statements on the Smart TV packaging that they contend are misleading "in light of the information not provided." (Opp'n at 25.) Besides Plaintiffs' failure to provide the "who, what, where, when, and how" allegations necessary to support this theory, the statements Plaintiffs reference on Vizio's product packaging about a Vizio Smart TV's functions have little to do consumers' data security or privacy. (*See* Compl. ¶¶ 81-84.) Therefore, to the extent that Plaintiffs' fraud claims are based on supposed affirmative misrepresentations, Defendants' Motion to Dismiss is GRANTED with LEAVE TO AMEND. In any amended complaint, Plaintiffs must plead the necessary "who, what, where, when, and how" allegations necessary to state a claim for affirmative fraud.

### F. Negligent Misrepresentation Claims

Under California law, "[a] negligent misrepresentation claim 'requires a positive assertion,' not merely an omission." *Lopez v. Nissan N. Am., Inc.*, 135 Cal. Rptr. 3d 116, 136 (Ct. App. 2011) (quoting *Vega v. Jones, Day, Reavis & Pogue*, 17 Cal. Rptr. 3d 26, 32 (Ct. App. 2004). "An 'implied' assertion or representation is not enough." *Wilson v. Century 21 Great W. Realty*, 18 Cal. Rptr. 2d 779, 783 (Ct. App. 1993). Similarly, under Washington law, "[a]n omission alone cannot constitute negligent misrepresentation, since the plaintiff must justifiably rely on a misrepresentation." *Ross v. Kirner*, 172 P.3d 701, 704 (Wash. 2007); *see Trimble v. Washington State Univ.*, 993 P.2d 259, 264 (Wash.

2000) (holding that failing to discuss the downsides of an offer of employment did not create the false impression necessary to state a claim for negligent misrepresentation).

Plaintiffs' negligent misrepresentation claims under California and Washington law are inadequately pleaded for much the same reason why Plaintiffs' affirmative fraud claims fail: Plaintiffs allege that Vizio's Smart TV packaging is misleading because Vizio advertises how its Smart TVs are ideal for watching programming from cable, satellite, and streaming content providers as well from devices connected to the Smart TV without disclosing that utilizing these features could result in Vizio collecting and disclosing consumers' personally identifiable information. (*Id.* ¶¶ 81-84.) None of the statements on the product packing, however, relate to Vizio's privacy policies or the security of consumers' personal information more broadly. Thus, because any alleged statements on Vizio's product packaging are too remotely related to Vizio's treatment of consumers' data to amount to the "positive assertion" necessary to state a claim for negligent misrepresentation, the Court DISMISSES these claims under California and Washington law with LEAVE TO AMEND. *See Lopez*, 135 Cal. Rptr. 3d at 136 (holding, in a case involving odometers that supposedly overregistered the number of miles driven, that "innocuous statements . . . about the basic function of odometers" did not amount to the "positive assertion" necessary to state a claim for negligent misrepresentation); *Ross v. Kirner*, 172 P.3d at 704.

### G. False Advertising Law Claims

The False Advertising Law (FAL) prohibits making or disseminating "any statement" in the course of "dispos[ing]" of any property, product, or service that "is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." Cal. Bus. & Prof. Code § 17500. Under the FAL, courts apply the "reasonable consumer" test, which requires a plaintiff to show that "members of the public are likely to be deceived." *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (quotation marks omitted). The FAL proscribes "not only advertising which is false but also advertising which[,] although true, is either

32

actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Williams*, 552 F.3d at 938 (quoting *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002)).

At first glance, districts courts seem to be divided over whether a plaintiff can predicate a FAL claim on a defendant's failure to disclose certain information. *Compare Handy v. LogMeIn, Inc.*, No. 1:14-CV-01355-JLT, 2015 WL 1729681, at *5 (E.D. Cal. Apr. 15, 2015) ("[A] a plaintiff may state a claim under the FAL for fraudulent omissions by a defendant."); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 991 (S.D. Cal. 2014) (finding that "fraud-based omission claims" under the FAL were adequately pleaded) *with Norcia v. Samsung Telecommunications Am.*, LLC, No. 14-CV-00582-JD, 2015 WL 4967247, at *8 (N.D. Cal. Aug. 20, 2015) ("There can be no FAL claim where there is no 'statement' at all."); *Stanwood v. Mary Kay, Inc.*, 941 F. Supp. 2d 1212, 1222 (C.D. Cal. 2012). In practice, though, the disagreement seems largely superficial: Courts reject FAL claims premised solely on a defendant's omissions, but a plaintiff may base a FAL claim on an affirmative statement that is misleading in light of the information omitted. *Hodsdon v. Mars, Inc.*, 162 F. Supp. 3d 1016, 1023 (N.D. Cal. 2016); *see In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 991 (S.D. Cal. 2014); *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1157-59, 1173 (C.D. Cal. 2011). This approach comports with the text of the False Advertising Law, which prohibits false or misleading "statement[s]," not omissions. *See* Cal. Bus. & Prof. Code § 17500.

Plaintiffs allege that their FAL claims are premised on "partial representations . . . as well as omissions." (Opp'n at 28 (citing Compl. ¶¶ 8, 10, 72-79, 84, 90-91.)) But none of the Plaintiffs allege that they were aware that Vizio had represented that it collects only anonymous data, which would be necessary for Plaintiffs to satisfy the FAL's standing requirement. *See In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009) (holding that a plaintiff must demonstrate "actual reliance" to show that he lost "money or property as a result of" the allegedly unlawful conduct); *Kwikset Corp.*, 246 P.3d at 888 (applying the same

33

standard to the FAL). And, as the Court has already noted, the statements Plaintiffs did see on Vizio's product packaging about the Smart TV's functionality are too tangentially related to consumers' personal privacy or security to be misleading in light of Vizio's failure to disclosure its data collection and disclosure practices. To be clear, as *In re Tobacco II Cases* instructs, Plaintiffs do not have to allege they "relied on particular advertisements or statements," especially if they allege a lengthy pattern of misrepresentations by Vizio, 207 P.3d at 40, but Plaintiffs must allege at least that they were generally familiar with Vizio's statements about its data privacy or security practices. Thus, because Plaintiffs have not plausibly alleged that they relied on any affirmative misstatements by Vizio, the Court DISMISSES with LEAVE TO AMEND Plaintiffs' FAL claims.

## H. <u>Invasion of Privacy and Intrusion Upon Seclusion Claims</u>

The elements of intrusion upon seclusion and invasion of privacy are similar in each of the states included in Plaintiffs' Complaint. California, Florida, and Washington have all endorsed the definition of the tort found in the Second Restatement, which requires (1) an intentional intrusion, physical or otherwise, "upon the solitude or seclusion of another," (2) in a manner "highly offensive to a reasonable person." *Deteresa v. Am. Broad. Companies, Inc.*, 121 F.3d 460, 465 (9th Cir. 1997) (quoting *Miller v. Nat'l Broad. Co.*, 232 Cal. Rptr. 668, 678 (Ct. App. 1986)); *Taus v. Loftus*, 151 P.3d 1185, 1212 (Cal. 2007); *Purrelli v. State Farm Fire & Cas. Co.*, 698 So. 2d 618, 620 (Fla. Dist. Ct. App. 1997); *Mark v. Seattle Times*, 635 P.2d 1081, 1094 (Wash. 1981); *see also* Restatement (Second) of Torts § 652B (1977).

The California Constitution and Massachusetts Privacy Act create similar causes of action for invasion of privacy. A cause of action under the California Constitution for invasion of privacy requires: (1) "the identification of a specific, legally protected privacy interest," (2) a reasonable expectation of privacy under the circumstances presented, and (3) a "sufficiently serious" intrusion upon the privacy interest by the defendant. *Hill v. Nat'l Collegiate Athletic Assn.*, 865 P.2d 633, 654-55 (Cal. 1994). California has

recognized two broad categories of legally protected privacy interests: "(1) interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy'); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')." *Id.* at 654.[11] If a plaintiff satisfies these threshold requirements, the privacy interest must be balanced against a defendant's countervailing interests. *Id.* at 655-57. Like its California counterpart, the Massachusetts Privacy Act creates "a right against unreasonable, substantial or serious interference with [a person's] privacy." Mass. Gen. Laws ch. 214, § 1B. The invasion of privacy "must be both unreasonable and substantial or serious" to violate the Act. *Polay v. McMahon*, 10 N.E.3d 1122, 1126 (Mass. 2014). The Massachusetts Supreme Judicial Court has clarified that a plaintiff need not allege a public disclosure of the private information; an unreasonable intrusion upon a person's "solitude" or "seclusion" may suffice. *Id.*

        As an initial matter, the Court rejects Vizio's argument that Plaintiffs have no cognizable interest in keeping detailed data about what video content they watch private. (Mem. at 36-37.) Defendants provide no reason why this information would be any less sensitive than the URL information that the Third Circuit found legally protected in *In re Google Inc. Cookie Placement*. *See* 806 F.3d at 151. To the contrary, the various federal and state statutes that specifically protect video viewing histories make Plaintiffs' assertion of a protected privacy interest here stronger than the claimed privacy interest in *In re Google Inc. Cookie Placement. See, e.g.*, 18 U.S.C. § 2710; Cal. Civ. Code § 1799.3; Mass. Gen. Laws ch. 93, § 106; N.Y. Gen. Bus. Law § 673. Nor does *In re Yahoo Mail Litigation*, 7 F. Supp. 3d 1016 (N.D. Cal. 2014), hold otherwise. *In re Yahoo Mail Litigation* found that there is no "legally protected privacy interest [or] reasonable

---

[11] Because of the substantial overlap between the constitutional and common law causes of action under California law, California courts have examined claims brought under both sources together. *See Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1073-74 (Cal. 2009).

1   expectation of privacy in email *generally* . . . ." *Id.* at 1040. There, the court determined

2   that allegations that an email service provider scanned, stored, and distributed to third

3   parties the content of emails between users and non-users of its service were insufficient

4   because the plaintiffs failed to allege the specific content of the emails at issue. *Id.*

5   Whether or not this Court agrees with this holding in *In re Yahoo Mail Litigation*, it does

6   not apply here. Unlike in *In re Yahoo Mail Litigation*, Plaintiffs identify a discrete type of

7   sensitive information (video viewing history) that is legally protected, rather than arguing

8   they have a legally protected interest in a method of communication. *See id.* at 1040-41.

9       Courts have been hesitant to extend the tort of invasion of privacy to the routine

10  collection of personally identifiable information as part of electronic communications. *See,*

11  *e.g.*, *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012); *Yunker v.*

12  *Pandora Media, Inc.*, No. 11-CV-03113 JSW, 2013 WL 1282980, at *15 (N.D. Cal. Mar.

13  26, 2013). By contrast, collection of intimate or sensitive personally identifiable

14  information may amount to a highly offensive intrusion. *See Goodman v. HTC Am., Inc.*,

15  No. C11-1793MJP, 2012 WL 2412070, at *14-15 (W.D. Wash. June 26, 2012). Further,

16  more routine data collection practices may be highly offensive if a defendant disregards

17  consumers' privacy choices while simultaneously "h[olding] itself out as respecting'

18  them." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 292 (quoting *In re Google*

19  *Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 151 (3d Cir. 2015)). As the

20  Third Circuit observed, "[w]hether or not data-based targeting is the internet's pole star,

21  users are entitled to deny consent, and they are entitled to rely on the public promises of

22  the companies they deal with." *In re Google Inc. Cookie Placement Consumer Privacy*

23  *Litig.*, 806 F.3d at 151.

24      Plaintiffs have plausibly alleged a pattern of "highly offensive" conduct. Plaintiffs

25  point to a report by the security software company Avast, which concluded that Smart

26  Interactivity's "off" function was not operational "for months, if not years." (Compl. ¶¶ 7,

27  65.) So, even if consumers believed they had opted out of Vizio's data collection practices,

28  Vizio was still collecting their data for a considerable period. (*See id.*) In addition, Vizio's

36

Smart Interactivity software switches back on without warning if the Smart TV ever reverts to the factory settings—as can occur through Vizio's software updates. (*Id*. ¶ 66.) Consumers would likely not realize for a significant period that Vizio's collection and disclosure software has been re-enabled because the opt-out feature is allegedly buried in an obscure settings menu. (*Id.* ¶¶ 7, 85.) Further, Vizio's disclosure practices are far less routine than, say, the use of cookies at issue in *In re Google Inc. Cookie Placement Consumer Privacy Litigation*: Plaintiffs allege not only that Vizio collects an exceptionally vast array of information about their digital identities and viewing histories, but also that the standard industry practice is not to collect viewing history data unless a consumer affirmatively opts in. (*Id.* ¶¶ 6, 61.) Considering the quantum and nature of the information collected, the purported failure to respect consumers' privacy choices, and the divergence from the standard industry practice, Plaintiffs plausibly allege Vizio's collection practices amount to a highly offensive intrusion. Defendants' Motion to Dismiss Plaintiffs' intrusion upon seclusion, Massachusetts's Privacy Act, and California Constitution claims is accordingly DENIED.

## I. <u>Unjust Enrichment Claims</u>

Defendants contend that the Court should dismiss Plaintiffs' unjust enrichment claims because they have adequate remedies at law. The Court finds no basis for doing so. The Ninth Circuit has instructed district courts to construe claims for unjust enrichment under California law as quasi-contract claims. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015); *see Brazil v. Dole Packaged Foods, LLC*, No. 14-17480, 2016 WL 5539863, at *3 (9th Cir. Sept. 30, 2016) (reversing a district court's dismissal of a claim for unjust enrichment). Similarly, under Florida law, an unjust enrichment claim fails "only upon a showing that an express contract exists [between the parties.]" *State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, 427 F. App'x 714, 722 (11th Cir. 2011), *rev'd in part sub nom. State Farm Mut. Auto. Ins. Co. v. Williams*, 824 F.3d 1311 (11th Cir. 2014) (quoting *Williams v. Bear Stearns & Co.*, 725 So. 2d 397, 400 (Fla. Dist. Ct. App. 1998)); *accord Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d

37

696, 697 (Fla. Dist. Ct. App. 2008). As for Plaintiffs' unjust enrichment claims under New York, Washington, and Massachusetts law, "[w]hether plaintiffs [have] an adequate remedy at law remains to be seen."[12] *Fenerjian v. Nongshim Co., Ltd*, 72 F. Supp. 3d 1058, 1086 (N.D. Cal. 2014). Because Plaintiffs can plead in the alternative under Rule 8(d)(3), it would be "premature to dismiss the unjust enrichment claims on that basis at this point." *Id.* Defendants' Motion to Dismiss Plaintiffs' unjust enrichment claims, therefore, is DENIED.

## V.   CONCLUSION

For the foregoing reasons, Defendants' Motion is GRANTED IN PART and DENIED IN PART. Plaintiffs' Wiretap Act claims, California Invasion of Privacy Act claims, False Advertising Law claims, negligent misrepresentation claims under California and Washington law, and state law video privacy claims are DISMISSED with LEAVE TO AMEND. To the extent that Plaintiffs' fifth, sixth, eighth, ninth, eleventh, fourteenth, and eighteenth causes of action are premised on allegations of affirmative fraudulent

---

[12]  Defendants contend that "in Massachusetts, New York, Florida, and Washington . . . an unjust enrichment claim *cannot* be pleaded when an adequate remedy at law exists." (Reply at 25.) The Court finds no basis in the cases Defendants cite for a rule holding that a court must determine on a motion to dismiss whether an adequate remedy at law exists; rather, the decisions Defendants reference merely support the uncontroversial proposition that in some circumstances the remedy at law is so obvious from the allegations in a complaint that the question may be resolved on a motion to dismiss. For instance, one of the decisions Defendants reference, *Go2Net, Inc. v. Freeyellow.com, Inc.*, 109 P.3d 875 (Wash. Ct. App. 2005), merely held in an unpublished part of the opinion that the trial court properly dismissed an unjust enrichment claim after determining that the plaintiff's claim "sounded in contract and thereby provided him an adequate remedy at law." *Id.* at 881. Similarly, another case Defendants cite, *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611 (2d Cir. 2010), addressed an attempt "to evade the statute of limitations applicable to a tortious interference with contract claim" by artfully pleading it as an unjust enrichment claim. *Id.* at 614. To the extent that *Licul v. Volkswagen Group of America* holds that a plaintiff must allege distinct predicate facts merely to plead a claim for unjust enrichment, *see* 2013 WL 6328734, at *7 (S.D. Fla. Dec. 5, 2013), that decision finds little support in the common law and "improperly require[s] a complete absence of an adequate remedy at law to state a claim for unjust enrichment." *Harris v. Nordyne, LLC*, No. 14-CIV-21884, 2014 WL 12516076, at *7 n.5 (S.D. Fla. Nov. 14, 2014).

conduct, they are DISMISSED with LEAVE TO AMEND. Defendants' Motion is otherwise DENIED. Plaintiffs are given leave to file a Second Consolidated Complaint within 21 days of this Order. Failure to file a Second Consolidated Complaint by that date shall be deemed consent to the dismissal of Plaintiffs' claims against Defendants with prejudice.

DATED: March 2, 2017

_____

JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE

# EXHIBIT M

1 | **AKIN GUMP STRAUSS HAUER & FELD LLP**
ANTHONY T. PIERCE (*admitted pro hac vice*)
2 | apierce@akingump.com
1333 New Hampshire Avenue NW, Suite 1500
3 | Washington, DC 20036
Tel: 202-887-4000
4 | Fax: 202-887-4288

5 | HYONGSOON KIM (SBN 257019)
kimh@akingump.com
6 | 4 Park Plaza, Suite 1900
Irvine, CA 92614
7 | Tel: 949-885-4100
Fax: 949-885-4101
8 |
9 | ALI R. RABBANI (SBN 253730)
arabbani@akingump.com
10 | PATRICK EOGHAN MURRAY (SBN 293765)
pmurray@akingump.com
11 | 1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067
12 | Tel: 310-229-1000
Fax: 310-229-1001

13 | Attorneys for Defendants VIZIO Holdings, Inc.,
VIZIO, Inc., VIZIO Inscape Services, LLC,
14 | and VIZIO Inscape Technologies, LLC

15 |

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| In re: Vizio, Inc., Consumer Privacy Litigation | MDL Case No. 8:16-ml-02693-JLS-KES |
|---|---|
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND CONSOLIDATED COMPLAINT AND MOTION TO STRIKE CLASS ALLEGATIONS** |
| This document relates to: | |
| ALL ACTIONS | Date: May 26, 2017 |
| | Time: 2:30 p.m. |
| | Place: Courtroom 10A |
| | Judge: Hon. Josephine L. Staton |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................1

II.  BACKGROUND ...................................................................................2

    A.   The Second Consolidated Complaint..........................................2

    B.   The FTC Action...........................................................................3

III. ARGUMENT..........................................................................................6

    A.   Plaintiffs' Request for Injunctive Relief Should Be Dismissed
       as Moot. ........................................................................................6

       1.   Legal Standard. ..................................................................6

       2.   The Consent Decree Renders Plaintiffs' Request for
           Injunctive Relief Moot.......................................................8

    B.   Plaintiffs' Wiretap Act and CIPA Claims Fail To Allege That
       VIZIO Intercepts the Contents of Any Communications. ..................11

    C.   Plaintiffs' Expanded Allegations Regarding Data Gathered
       From Other Sources Are Impermissibly Vague Under Both
       Rule 8 and Rule 9(b). .........................................................14

    D.   Plaintiffs' Class Allegations Should Be Struck under Rule
       12(f) Because They Fail to Exclude Proposed Class Members
       Subject to an Arbitration Agreement and Are Not Definite
       Enough to Meet the Requirements of Either Rule 23(b)(2)
       or 23(b)(3). .........................................................................16

IV. CONCLUSION ....................................................................................21

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Federal Cases**

*Arizonans for Official English v. Arizona*,
   520 U.S. 43 (1997)...................................................................................... 6

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ................................................................... 20

*Burns v. Heyns*,
   2015 WL 4391983 (W.D. Mich. July 15, 2015)......................................... 12

*Castle v. Wells Fargo Fin., Inc.*,
   No. C 06-4347 SI, 2007 WL 703609 (N.D. Cal. Mar. 5, 2007)................. 20

*Cousineau v. Microsoft Corp.*,
   992 F. Supp. 2d 1116 (W.D. Wash. 2012) ................................................ 11

*DeFazio v. Hollister, Inc.*,
   2008 WL 958185 (E.D. Cal. Apr. 7, 2008) ................................................ 18

*DirectTV, Inc. v. Imburgia*,
   136 S.Ct. 463 (2015)................................................................................... 17

*Environmental Conservation Org. v. City of Dallas*,
   529 F.3d 519 (5th Cir. 2008) ....................................................................... 7

*Erickson v. Elliot Bay Adjustment Co.*,
   No. C16-0391JLR, 2017 WL 1179435 (W.D. Wash. Mar. 30, 2017) ........ 20

*Everson v. Leis*,
   556 F.3d 484 .............................................................................................. 14

*In re Facebook Internet Tracking Litig.*,
   140 F. Supp. 3d 922, 935-36 (N.D. Cal. 2015) ......................................... 12

*Federal Trade Commission et al. v. VIZIO, Inc. et al.*,
   No. 2:17-cv-00758 (D.N.J.) .......................................................................... 3

*Frenzel v. AliphCom*,
   76 F. Supp. 3d 999, 1015 (N.D. Cal. 2014)............................................... 10

*In re Google Inc. Cookie Placement*,
   806 F.3d 125 (3d Cir. 2015) .......................................................................... 11

*Guzman v. Bridgepoint Educ., Inc.*,
   305 F.R.D. 594 (S.D. Cal. 2015) ................................................................... 21

*In re iPhone Application Litig.*,
   844 F. Supp. 2d 1040 (N.D. Cal. 2012) ......................................................... 12

*Jenkins v. Apple, Inc.*,
   No. 11-CV-01828-LHK, 2011 WL 2619094 (N.D. Cal. July 1, 2011) ..................... 10

*Kay v. Wells Fargo & Co. N.A.*,
   No. C 07-01351 WHA, 2007 WL 2141292 (N.D. Cal. July 24, 2007) ................ 17, 20

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) ...................................................................... 16

*Lewis v. Continental Bank Corp.*,
   494 U.S. 472 (1990) ........................................................................................ 6

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................ 6

*McMillan v. Lowe's Home Centers, LLC*,
   2016 WL 4899164 (E.D. Cal. Sept. 14, 2016) ............................................. 6, 8

*Mladenov v. Wegmans Food Mkts., Inc.*,
   124 F. Supp. 3d 360, 367-68 (D.N.J. 2015) .................................................. 20

*NASD Dispute Resolution, Inc. v. Judicial Council of State of Cal.*,
   488 F.3d 1065 (9th Cir. 2007) ........................................................................ 6

*Natto Iyela Gbarabe v. Chevron Corp.*,
   No. 14-cv-00173-SI, 2017 WL 956628 (N.D. Cal. Mar. 13, 2017) ................... 20

*In re: Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
   953 F. Supp. 2d 713 (N.D. Tex. 2013) ..................................................... 17, 20

*Pablo v. Servicemaster Glob. Holdings, Inc.*,
   No. C 08-03894 SI, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) .................... 19

*Parker v. Time Warner Entm't Co., L.P.*,
   239 F.R.D. 318 (E.D.N.Y. 2007) ................................................................... 10

*Phillips v. Apple Inc.*,
    No. 15-CV-04879-LHK, 2016 WL 1579693 (N.D. Cal. Apr. 19, 2016) ................... 10

*Probe v. State Teachers' Ret. Sys.*,
    780 F.2d 776 (9th Cir. 1986) ............................................................................... 20

*Shaw v. Veterans Health Admin.*,
    2013 WL 6909467 (S.D. Cal. Dec. 18, 2013) ...................................................... 15

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
    996 F. Supp. 2d 942 (S.D. Cal. 2014), *order corrected*, No. 11MD2258
    AJB (MDD), 2014 WL 12603117 (S.D. Cal. Feb. 10, 2014) ..................................... 10

*Spanish Action Committee v. Chicago*,
    811 F.2d 1129 (7th Cir. 1987) ............................................................................. 6

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
    760 F.2d 1347 (2d Cir. 1985), *aff'd*, 476 U.S. 409, 106 S. Ct. 1922, 90 L.
    Ed. 2d 413 (1986) ............................................................................................ 7

*Takeda Pharm. Co. v. Mylan Inc.*,
    62 F. Supp. 3d 1115, 1121 (N.D. Cal. 2014) ....................................................... 3

*Torres v. Nutrisystem, Inc.*,
    289 F.R.D. 587 (C.D. Cal. 2013) .......................................................................... 6

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices,
    & Prods. Liab. Litig.*,
    754 F. Supp. 2d 1145 (C.D. Cal. 2010) ............................................................. 18

*U.S. v. Reed*,
    575 F.3d 900 (9th Cir. 2009) ....................................................................... 11, 12

*Underwood v. Archer Management Servs. Inc.*,
    857 F. Supp. 96 (D.D.C. 1994) .......................................................................... 14

*United States v. Local 295 of Intern. Brotherhood of Teamsters*,
    1991 WL 35497 (E.D.N.Y. Mar. 8, 1991) ............................................................ 7

*Warren v. Fox Family Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir. 2003) ............................................................................ 3

*In re Zynga Privacy Litig.*,
    750 F.3d 1098 (9th Cir. 2014) ............................................................... 11, 12, 13

iv

**Federal Statutes**

Video Privacy Protection Act ................................................................................. 4

The Wiretap Act ..................................................................................................11-14

**State Statutes**

California Invasion of Privacy Act ................................................................. 11, 14

**Rules**

Fed. R. Civ. P. 8 ........................................................................................... 14, 15

Fed. R. Civ. P. 9 ....................................................................................... 14, 15, 16

Fed. R. Civ. P. 23 .......................................................................................*passim*

**Constitutional Provisions**

U.S. Const., Article III, § 2 ................................................................................. 6

# I.    **INTRODUCTION**

VIZIO[1] brings this motion to dismiss to address four specific deficiencies in Plaintiffs' Second Consolidated Complaint ("SCC").

*First*, Plaintiffs' request for injunctive relief has been rendered moot by VIZIO's agreement with the Federal Trade Commission to be bound by a Consent Decree, which, among other things, requires VIZIO to "prominently" disclose the details of its viewing data collection and disclosure practices, and to obtain affirmative express consent from consumers prior to collecting any viewing data—relief that directly benefits the putative class in this action and replicates the very relief Plaintiffs seek in the SCC.  Plaintiffs' claims for injunctive relief should therefore be dismissed, since the Court does not have jurisdiction to grant Plaintiffs relief they have already obtained.

*Second*, Plaintiffs have again failed to state a claim for violations of the Wiretap Act and the California Invasion of Privacy Act ("CIPA") because the SCC does not allege that VIZIO captures the "contents" of communications, instead alleging the capture of mere "record information."  The Court deferred a ruling on this issue when deciding VIZIO's prior motion to dismiss, but Plaintiffs' SCC does nothing to address the first Consolidated Complaint's deficiency.

*Third*, Plaintiffs' new, vague allegations purporting to cover the collection of data from "a variety of sources" other than VIZIO Smart TVs fail to give VIZIO the notice required under Rules 8 and 9(b) of the Federal Rules of Civil Procedure of the basis for Plaintiffs' claims.  Any claims relying on such allegations must be dismissed.

*Fourth*, Plaintiffs' class allegations should be struck because they fail to exclude putative class members subject to an enforceable and binding arbitration agreement, including all purchasers of SmartCast displays, and are not definite enough to meet the requirements of either Rule 23(b)(2) or 23(b)(3) of the Federal Rules of Civil Procedure.

---

[1]    Defendants VIZIO, Inc.; VIZIO Holdings, Inc.; VIZIO Inscape Technologies, LLC; and VIZIO Inscape Services, LLC are collectively referred to herein as "VIZIO."

For these reasons, the Court should dismiss Plaintiffs' injunctive relief claims, Wiretap Act and CIPA claims, and any claims that rely on vague allegations related to data collected from "other sources." The Court should also strike Plaintiffs' class allegations with leave to amend or alternatively issue an Order to Show Cause as to why such allegations should not be struck.

## II. BACKGROUND[2]

### A. The Second Consolidated Complaint.

On March 2, 2017, following full briefing and oral argument by the parties, the Court entered an order granting in part and denying in part VIZIO's motion to dismiss Plaintiffs' Consolidated Complaint ("MTD Order"). ECF No. 130. The Court dismissed with leave to amend Plaintiffs' Wiretap Act claims, CIPA claims, California False Advertising Law claims, negligent misrepresentation claims under California and Washington law, affirmative fraud-based claims, and state law video privacy claims. *See id.* at 38-39.

On March 23, 2017, Plaintiffs filed their Second Consolidated Complaint. ECF No. 136. In the SCC, Plaintiffs have not re-pled their state law video privacy claims, False Advertising Law claims, negligent misrepresentation claims, or affirmative fraud-based claims. Plaintiffs have, however, attempted to re-plead their Wiretap Act and CIPA claims. SCC ¶¶ 127-146. Plaintiffs have added new allegations relating to the element of "interception" (*see id.* ¶¶ 52-53, 57), but have made no material revisions regarding the "contents" of any electronic communication VIZIO allegedly collects from Smart TVs. Rather, Plaintiffs made only superficial changes by rebranding the term "viewing histories" as "viewing habits." *See id.* ¶¶ 3, 8, 72, 136.[3]

---

[2] VIZIO provided a thorough description of Plaintiffs' allegations in its prior motion to dismiss (ECF No. 116-1) and will not repeat that background here. The following additional background is relevant to the current motion.

[3] The Court did not previously address VIZIO's argument that it does not collect the "contents" of any electronic communications. MTD Order at 28.

The SCC also adds vague and unsupported allegations that impermissibly expand the scope of Plaintiffs' complaint beyond information collected *through* VIZIO Smart TVs. As this Court previously recognized in the MTD Order, Plaintiffs' first Consolidated Complaint focused on the collection of data *from VIZIO's Smart TVs.* MTD Order at 2. But Plaintiffs now seek to expand the scope of the SCC to the collection of unspecified data that VIZIO collects, combines, and/or discloses "*from a variety of sources,*" including "*other sources of VIZIO data* such as data collected by apps, smart phones, *or other VIZIO products.*" SCC ¶¶ 14, 78 (emphasis added). The SCC does not specify what data sources or products are at issue, the nature of the data collected, whether Plaintiffs purchased any such products, or how Plaintiffs were harmed by VIZIO's alleged collection of data from these unnamed sources and products.

## B. The FTC Action.[4]

On February 6, 2017, the Federal Trade Commission ("FTC"), the Attorney General of the State of New Jersey, and the Director of the New Jersey Division of Consumer Affairs simultaneously filed a complaint against VIZIO, Inc. and VIZIO Inscape Services, LLC[5] alleging certain claims under the FTC Act and the New Jersey Consumer Fraud Act ("FTC Complaint"), as well as a Proposed Stipulated Order for Permanent Injunction and Monetary Judgment ("Consent Decree") setting forth the parties' jointly proposed resolution of the action.[6] *See* RJN, Exs. A & B. On February 13, 2017, the court in that proceeding signed the Consent Decree and retained jurisdiction of the matter. *See* RJN, Ex. C.

---

[4] As explained in VIZIO's concurrently-filed Request for Judicial Notice ("RJN"), "[a] jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003); *see also Takeda Pharm. Co. v. Mylan Inc.*, 62 F. Supp. 3d 1115, 1121 (N.D. Cal. 2014) ("In resolving a factual dispute regarding subject matter jurisdiction, a court may review extrinsic evidence beyond the complaint without converting a motion to dismiss into one for summary judgment.").

[5] For purposes of this section only, "VIZIO" refers to VIZIO, Inc. and VIZIO Inscape Services, LLC.

[6] *Federal Trade Commission et al. v. VIZIO, Inc. et al.*, No. 2:17-cv-00758 (D.N.J.)

The FTC Complaint focuses on VIZIO's collection and use of "viewing data" and other information from VIZIO Smart TVs.  RJN, Ex. A ¶¶ 14-15.  The FTC Complaint alleges that VIZIO licensed viewing data to third parties "on a household-by-household" basis, and expressly acknowledges that VIZIO's "contracts with third-party users of the viewing data *prohibit the re-identification of consumers and households by name . . . .*" RJN, Ex. A ¶¶ 14-17, 32, 38.[7]  The FTC Complaint also focuses on the sufficiency of the disclosures by VIZIO to consumers about the above-described collection, use, and licensing of viewing data and associated data.  *Id.*, ¶¶ 12, 19-21, 23-24, 38.  The FTC Complaint does not allege that VIZIO sold or licensed consumers' names, addresses, email addresses, or phone numbers, or that VIZIO paired viewing data with any such information.

The simultaneously-filed Consent Decree provides a broad assortment of relief intended to benefit consumers like Plaintiffs and the putative class.  VIZIO agreed to implement new disclosure and consumer consent requirements relating to viewing data collection and sharing practices that go well beyond any legal requirements set forth in the Video Privacy Protection Act or other laws, as well as a comprehensive privacy program that significantly exceeds the scope of the allegations in either the FTC Complaint or this case.  In particular, VIZIO agreed to "*prominently disclose*" to consumers "(1) the types of Viewing Data that will be collected and used, (2) the types of Viewing Data that will be shared with third parties; (3) the identity or specific categories of such third parties; and (4) all purposes for Defendants' sharing of such information[.]" RJN, Ex. C at Section II.A (emphasis added).  Under the terms of the Consent Decree,

---

[7] According to the FTC Complaint, VIZIO provides consumers' television viewing history to third parties for three limited uses specified by contracts:  (1) measurement of audience viewing trends "*in the aggregate*" (*id.* ¶ 16.a) (emphasis added); (2) analysis of advertising effectiveness "*in the aggregate*" (id. ¶ 16.b) (emphasis added); and (3) beginning in March 2016, *after consumers were explicitly notified*, targeting advertising to consumers on other digital devices.  *Id.* ¶ 16.c.  In addition, the FTC Complaint alleges that VIZIO facilitates the provision of certain demographic information to third parties through a data aggregator.  *Id.* ¶ 17.

"prominently" has a specific meaning that dictates the disclosure's "size, contrast, location, the length of time it appears." *Id.* at Section II.D. VIZIO further agreed that any "disclosure must be unavoidable" and "must not be contradicted or mitigated by, or inconsistent with, anything else in the [disclosure] communication." *Id.* Moreover, VIZIO agreed that this prominent disclosure would be made "separate and apart from any 'privacy policy, 'terms of use' page or other similar document[.]" *Id.*

VIZIO also agreed to "[o]btain the consumer's ***affirmative express consent***" at the time of the above-described disclosure and "upon any material changes to the terms" of the collection of Viewing Data. *Id.* at Section II.B (emphasis added). In addition, VIZIO agreed to provide instructions "for how the consumer may revoke consent to collection of Viewing Data" whenever affirmative express consent is sought. *Id.* at Section II.C.

Finally, VIZIO agreed to establish and maintain a broad privacy program that, in addition to covering privacy concerns regarding "Viewing Data,"[8] also addresses numerous areas not covered by the FTC Complaint. *Id.* at Section IV. Specifically, VIZIO agreed to design the privacy program to "address privacy risks related to the development and management of new and existing products and services for consumers," as well as to "protect the privacy and confidentiality of Covered Information collected."[9] *Id.* In addition, VIZIO agreed to several compliance and monitoring obligations, including third-party, independent assessments of their compliance with the privacy policy on a biennial basis for the next 20 years. *Id.* at Section V, IX, X, XI.

---

[8] The Consent Decree defines "Viewing Data" as "any information or data collected or planned to be collected from a Smart TV about the content viewed on that television, or any reports or data derived therefrom and any information combined with such data."

[9] The Consent Decree defines "Covered Information" as "information collected from a VIZIO internet-connected device, including but not limited to, (1) product registration data; (2) Viewing Data; (3) Internet Protocol ("IP") address; (4) User ID or other identifiers; and (5) geolocation or information that can be used to derive geolocation. Covered Information also means information combined with any of (1) through (5) above." *Id.* at 2.

1  **III.   ARGUMENT**

2      **A.   Plaintiffs' Request for Injunctive Relief Should Be Dismissed as Moot.**

3          Plaintiffs seek injunctive relief requiring VIZIO to cease the allegedly illegal

4  conduct set forth in the SCC.  *See, e.g.*, SCC ¶¶ 146, 167, 191, 215, 229, 262.  But

5  Plaintiffs' request for injunctive relief is now moot for a simple reason:  Plaintiffs have

6  already received any injunctive relief tied to their allegations—and much more—under

7  the terms of the Consent Decree.  Accordingly, the Court should dismiss with prejudice

8  Plaintiffs' claims for injunctive relief.

9          **1.   Legal Standard.**

10         Article III limits the jurisdiction of all federal courts to resolving actual "Cases"

11  and "Controversies."  U.S. Const., Art. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S.

12  555, 560-61 (1992).  To satisfy this fundamental requirement, "an actual controversy

13  must be extant at all stages of review, not merely at the time the complaint is filed."

14  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (citation omitted).  "[I]t

15  is not enough that a dispute was very much alive when [the] suit was filed . . . . The

16  parties must continue to have a 'personal stake in the outcome' of the lawsuit" throughout

17  the time that the case is pending before the court.  *Lewis v. Continental Bank Corp.*, 494

18  U.S. 472, 477-78 (1990) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)).

19         This "personal stake" is lacking when a claim for relief is rendered moot by a

20  separate judicial proceeding, because courts lack jurisdiction to grant relief that has

21  already been obtained.  *See, e.g.*, *Spanish Action Committee v. Chicago*, 811 F.2d 1129,

22  1135-36 (7th Cir. 1987) ("[P]laintiff's demand for injunctive relief was mooted by"

23  consent decree entered in another case); *McMillan v. Lowe's Home Centers, LLC*, 2016

24  WL 4899164, at *3 (E.D. Cal. Sept. 14, 2016) (granting motion to dismiss pursuant to

25  Rule 12(b)(1) where stipulated final judgment in separate action mooted plaintiff's claim

26  for injunctive relief under CLRA and UCL); *see also NASD Dispute Resolution, Inc. v.*

27  *Judicial Council of State of Cal.*, 488 F.3d 1065, 1068 (9th Cir. 2007) ("We cannot give

28  the appellants any further relief because [the cases] *Grunwald* and *Jevne* have already

provided the relief sought by them in this case.  There is no live controversy, and the appeal is moot.").  Where a complaint seeks both injunctive relief and monetary damages, courts still determine whether injunctive or declaratory relief is mooted, even though other remedies remain.  *See Torres v. Nutrisystem, Inc.*, 289 F.R.D. 587, 595 (C.D. Cal. 2013) (plaintiffs' claim for injunctive relief under CIPA was moot because there was "no reasonable expectation" defendant would continue allegedly illegal practice).

Most relevant to this action, private suits seeking injunctive relief are routinely dismissed as moot where a defendant enters into a consent order with a government entity that provides for similar injunctive relief.  *See Environmental Conservation Org. v. City of Dallas*, 529 F.3d 519, 527-28 (5th Cir. 2008) (discussed below); *United States v. Local 295 of Intern. Brotherhood of Teamsters*, 1991 WL 35497, at *2 (E.D.N.Y. Mar. 8, 1991) (granting motion to dismiss portion of complaint where "the relief obtained in the Consent Judgment [with the United States] renders moot the injunctive relief sought in the present complaint. . . ."); *c.f. Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 760 F.2d 1347, 1365 (2d Cir. 1985), *aff'd*, 476 U.S. 409, 106 S. Ct. 1922, 90 L. Ed. 2d 413 (1986) ("To avoid waste of time and money, the district court may find it appropriate to address at the outset the issue of mootness raised by appellees on the basis of the Government consent decree.").  This is because a party to a consent order is legally bound to take the actions required under the consent order, which often overlap with the injunctive relief requested by private plaintiffs.  *See, e.g.*, *Environmental Conservation Org.*, 529 F.3d at 528.

The injunctive relief obtained in the government consent decree need not be identical to the relief sought by private plaintiffs to render their injunctive claims moot. In *Environmental Conservation Org. v. City of Dallas*, the defendant and the Environmental Protection Agency entered into a So-Ordered consent decree that required the defendant to take certain remedial actions.  529 F.3d at 523.  Plaintiffs argued that their claim was not moot because the consent judgment had not covered *everything* plaintiffs requested.  *Id.* at 530.  Specifically, Plaintiffs' complaint sought the "immediate

1  cessation of all violations" of the Clean Water Act, while the consent judgment permitted

2  cessation over a period of time.  *Id.*  But the court held that plaintiffs' claims for

3  injunctive relief were moot because there was no assurance that plaintiffs would have

4  obtained this additional relief in the trial court.  *Id.*  Here too, there is no assurance that

5  Plaintiffs would obtain additional relief in this case because the injunctive relief that

6  flows from Plaintiffs' claims and factual allegations has been achieved.

7        Where, as here, a case or controversy no longer exists, the underlying claim for

8  relief should be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

9  *See McMillan*, 2016 WL 4899164, at *3.

10                  **2.       The Consent Decree Renders Plaintiffs' Request for Injunctive**

11                            **Relief Moot.**

12        Plaintiffs' request for injunctive relief has been rendered moot because the Consent

13  Decree provides Plaintiffs with any injunctive relief they could reasonably obtain in this

14  action.  As discussed in Section II.B above, the Consent Decree provides a broad

15  assortment of relief for the benefit of consumers such as Plaintiffs and the putative class.

16  Under the terms of the Consent Decree, VIZIO agreed to provide consumers with

17  detailed, accurate, and contextual disclosures regarding its viewing data collection and

18  sharing practices, and to obtain affirmative express consent from consumers prior to the

19  collection of viewing data.  In particular, the Consent Decree requires that VIZIO:

20     • Not make any misleading representations, whether express or by implication,

21        with regard to its collection, use, or disclosure of viewing data and other

22        covered information;

23     • "Prominently disclose to the consumer . . . :  (1) the types of Viewing Data that

24        will be collected and used, (2) the types of Viewing Data that will be shared

25        with third parties; (3) the identity or specific categories of such third parties;

26        and (4) all purposes for Defendants' sharing of such information" and ensure

27        that this disclosure is not contradicted or mitigated in other VIZIO materials;

28

**MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF DEFS.' MOTION TO DISMISS AND STRIKE**
MDL Case No. 8:16-ml-02693-JLS-KES

- "Obtain the consumer's affirmative express consent (1) at the time the disclosure [in the bullet above] is made and (2) upon any material changes to the terms disclosed [in the bullet above]; and

- "Provide instructions, at any time the consumer's affirmative express consent is sought . . . , for how the consumer may revoke consent to collection of Viewing Data."

*See* RJN, Ex. C, Sections I, II.

This relief addresses the core issues underlying Plaintiffs' privacy and consumer fraud claims—namely, VIZIO's disclosure and consent practices concerning the collection and licensing of viewing data and any information paired with viewing data. Plaintiffs' allegations in the SCC focus on VIZIO's alleged collection of viewing data (or information paired with viewing data) and the licensing of said data to third parties, without adequate consumer disclosure and consent. *See, e.g.*, SCC ¶¶ 2, 6 ("VIZIO collects highly specific data about consumers' viewing histories and preferences" and "data collection software—Smart Interactivity—is turned 'on' by default"); *id.*, ¶12 ("Plaintiffs are consumers of VIZIO's Smart TVs who did not consent to this invasive data collection program."); *id.*, ¶¶ 102-107 (limiting classes to purchasers of "a VIZIO Smart TV with Smart Interactivity capability"); *id.*, ¶ 112 (seeking to establish a Rule 23(b)(2) class on the basis that "Defendants continue to obtain and disseminate sensitive viewing histories and personal information on an opt-in basis and without consent," and because "to date [VIZIO has] not adequately disclosed the true nature of the VIZIO Smart TVs with integrated Smart Interactivity technology, including that the TVs collect and disseminate consumers' personal information"); *see also id.* ¶¶ 13, 43-45, 50-55, 64, 65, 86, 89.

The Consent Decree also includes robust privacy controls that extend far beyond any injunctive relief Plaintiffs have actually sought or could reasonably obtain in this action, including the establishment of a broad privacy program and compliance reporting and monitoring obligations. *See* RJN, Ex. C at Sections V, IX, X, XI. As discussed in

9

1    Section II.B above, these privacy controls apply not only to "Viewing Data," but also

2    numerous areas not at issue in the FTC Complaint.  As with the disclosure and consent

3    requirements in the Consent Decree, Plaintiffs are well-served by these additional privacy

4    protections.  Indeed, these elements of the Consent Decree go beyond the factual

5    allegations in the SCC, which are tied to the collection of viewing data and information

6    paired to viewing data as described above.  Thus, under the terms of the Consent Decree,

7    Plaintiffs have not only obtained all injunctive relief tied to their claims in this action, but

8    significantly more.

9            Courts narrowly tailor injunctive relief to the scope of the claims pled in a given

10   action and do not generally grant expansive injunctive relief.  *See, e.g., Frenzel v.*

11   *AliphCom*, 76 F. Supp. 3d 999, 1015 (N.D. Cal. 2014) (in consumer protection context,

12   injunctive relief justified only if there is sufficient likelihood that plaintiff will be harmed

13   again and alleged harm is "likely to be redressed by the prospective injunctive relief");

14   *Parker v. Time Warner Entm't Co., L.P.*, 239 F.R.D. 318, 321 (E.D.N.Y. 2007) (Court

15   refused to certify class seeking injunctive relief in light of revised privacy disclosures

16   already made by defendant, because "[w]hile the relief offered is related to the privacy

17   rights violations alleged, it is not a reasonably necessary means of preventing continued

18   abuses or remedying past ones").  And in similar cases (where claims are based on failure

19   to disclose data practices and/or obtain consumer consent), plaintiffs typically seek

20   injunctive relief that requires defendants to implement disclosure and consent

21   requirements.  *See, e.g., Jenkins v. Apple, Inc.*, No. 11-CV-01828-LHK, 2011 WL

22   2619094, at *1 (N.D. Cal. July 1, 2011) (court addressed scope of plaintiffs' desired

23   injunctive relief in deciding 12(b)(1) motion; plaintiffs sought injunctive relief requiring

24   that Defendant "inform consumers about the transmissions if an app does transmit [a

25   consumer's] data"); *Phillips v. Apple Inc*., No. 15-CV-04879-LHK, 2016 WL 1579693,

26   at *8 (N.D. Cal. Apr. 19, 2016) (plaintiffs limited injunctive relief request to an

27   injunction requiring defendant to obtain permission from consumers before activating

28   particular feature on iPhone"); *In re Sony Gaming Networks & Customer Data Sec.*

1   *Breach Litig.*, 996 F. Supp. 2d 942, 999 (S.D. Cal. 2014), *order corrected*, No.

2   11MD2258 AJB (MDD), 2014 WL 12603117 (S.D. Cal. Feb. 10, 2014) (injunctive relief

3   was limited to preventing future misrepresentations regarding defendant's data security

4   capabilities).

5           Thus, the requirements of the Consent Decree agreed to by VIZIO go well-beyond

6   the relief that is typically sought and/or may be granted by courts in similar cases.

7   Accordingly, Plaintiffs' request for injunctive relief should be dismissed as moot.

8       **B.    Plaintiffs' Wiretap Act and CIPA Claims Fail To Allege That VIZIO**

9               **Intercepts the Contents of Any Communications.**

10          In its Order, the Court dismissed Plaintiffs' Wiretap Act and CIPA claims because

11  Plaintiffs had "inadequately pleaded interception." MTD Order at 28:16-19. In so doing,

12  the Court noted that it "need not address Defendants' alternative argument that Vizio

13  does not collect the 'contents' of any electronic communications." *Id.* Though Plaintiffs

14  have amended the SCC to address interception, the SCC still fails to allege that VIZIO

15  collects "content" under these statutes.

16          The Wiretap Act only prohibits the acquisition of "*the contents* of any wire,

17  electronic, or oral communication . . . ." 18 U.S.C. § 2510(4) (emphasis added). But the

18  information allegedly intercepted, such as "viewing habits, viewing requests, and viewing

19  preferences, IP addresses, MAC addresses, zip codes, product model numbers, hardware

20  and software versions, chipset IDs, and region and language settings" (SCC, ¶ 136), is

21  not the "content" of a communication for purposes of the Wiretap Act. Nor do Plaintiffs'

22  conclusory allegations that VIZIO collects "the content viewed on [Smart TVs]" (SCC, ¶

23  14) suffice to allege a violation of the Wiretap Act.

24          This is because the Ninth Circuit limits "content" to "the intended message

25  conveyed by the communication"; it "does not include record information regarding the

26  characteristics of the message that is generated in the course of the communication." *See*

27  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). None of the following is

28  "content" under the Wiretap Act: a telephone call's origination, length and time, *U.S. v.*

1    *Reed*, 575 F.3d 900, 917 (9th Cir. 2009); the geographic location of a mobile device,

2    *Cousineau v. Microsoft Corp.*, 992 F. Supp. 2d 1116, 1127 (W.D. Wash. 2012); and

3    routing or signaling information when performing a routing function (like telephone

4    numbers, URL addresses), *In re Google Inc. Cookie Placement*, 806 F.3d 125, 136-38

5    (3d Cir. 2015); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1062 (N.D. Cal.

6    2012) ("[P]ersonally identifiable information that is automatically generated by the

7    communication but that does not comprise the substance, purport or meaning of that

8    communication is not covered by the Wiretap Act.").

9           Plaintiffs allege no facts establishing that the data allegedly "intercepted"

10   constitutes the substance of any communication.  SCC, ¶ 136.  Plainly, "IP addresses,

11   MAC addresses, zip codes, product model numbers, hardware and software versions,

12   chipset IDs, and region and language settings" do not constitute "contents" of

13   communications.  Like routing and geographic information, *see Reed*, 575 F.3d at 917,

14   such record information is automatically generated in connection with Plaintiffs' usage of

15   their Smart TVs, and does not constitute the "substance, purport, or meaning," of the

16   communication itself.  *See e.g.* SCC, ¶ 73, 74 ("MAC addresses are automatically

17   broadcast when devices search for networks or communicate with other devices.")

18   ("*automatic* Wi-Fi probes also broadcast the names of the last networks a device has

19   connected to . . . .") (emphasis added).

20          Similarly, "viewing habits"—or "viewing histories," as Plaintiffs previously

21   described this category of information—and "viewing requests" do not constitute

22   "content" under the Wiretap Act but are instead mere "record" information excluded

23   from the Act's coverage.  *See In re Zynga Privacy Litig.*, 750 F.3d at 1102 (reference

24   header sent when Facebook user clicked on link that included "the user's Facebook ID

25   and the address of the Facebook webpage the user was viewing when the user clicked the

26   link" did not constitute "contents"); *In re Facebook Internet Tracking Litig.*, 140 F. Supp.

27   3d 922, 935-36 (N.D. Cal. 2015) (noting that *Zynga* was "a significant hurdle" to Wiretap

28   Act claim that interception of user's internet browsing history, including "the identity of

12

1  the webpages that the users visited" and "a Facebook user's unique identification

2  information," captures "content"; dismissing Wiretap Act claim); *Burns v. Heyns*, 2015

3  WL 4391983 (W.D. Mich. July 15, 2015) (information generated from prison computer

4  about "the time, order, and duration the computer spent on each web page as well as

5  which files were accessed and/or downloaded," was not content because data "merely

6  provides 'record information' about a prisoner's usage of the [computer]"). The SCC

7  does not include meaningful changes to the viewing history or habit allegations.

8  Plaintiffs have merely swapped the term "viewing habits" in for the previously used

9  "viewing histories"—a distinction without a difference through which Plaintiffs hope to

10  avoid the above line of cases. When the SCC is read in a light most favorable to them,

11  Plaintiffs are still essentially alleging that VIZIO collects only a list of what Plaintiffs

12  accessed on their Smart TV, not "the intended message conveyed" by the actual movies,

13  shows, or services themselves.

14      Plaintiffs' allegations regarding the mechanics of the collection support the

15  argument that Counts 2 and 3 should be dismissed. Plaintiffs allege that the "viewing

16  data points" allegedly collected are "*attributes* of the content being displayed on VIZIO

17  Smart TVs" (SCC, ¶ 51 (emphasis added)) or alternately, as "samples of the

18  programming" (*id.*, ¶ 52). According to Plaintiffs' own allegations then, the viewing data

19  points themselves are simply record information. And any actions taken by VIZIO after

20  collecting those data points, such as allegedly using Smart Interactivity to "match those

21  attributes to a database of existing content" or deriving personal information therefrom

22  are immaterial to the Wiretap Act analysis, which concerns the act of interception

23  (alleged here to be "on the screen" of Plaintiffs' Smart TVs (SCC, ¶ 94; *see also id.*, ¶

24  52)) and not later actions by a defendant. No court has ever suggested that whether

25  intercepted information constitutes "content" depends on what the recipient of the

26  information could do with it. Indeed, in *In re Zynga Privacy Litig.*, 750 F.3d 1098 (9th

27  Cir. 2014), the Ninth Circuit held that information collected was not "content" under the

28  Wiretap Act, *even though* "an enterprising advertiser could uncover the user's profile

13

page and any personal information made available to the public to that page" and link that information to that user's usage of Facebook and reactions to embedded advertisements. *Zynga*, 750 F.3d at 1107.

As the Court noted in its March 2, 2017 Order, "Courts have generally construed [the CIPA] as coextensive with the Wiretap Act . . . and Plaintiffs have offered no reason why the Court's analysis would be any different under the CIPA." MTD Order at 28 n.9. Because Plaintiffs have not alleged the collection of "content" under the Wiretap Act, their CIPA claim fails under the same analysis.

## C. Plaintiffs' Expanded Allegations Regarding Data Gathered From Other Sources Are Impermissibly Vague Under Both Rule 8 and Rule 9(b).

As described in Section II.A, Plaintiffs have for the first time attempted to expand their complaint to cover data not alleged to be collected either from a VIZIO Smart TV or by the ACR system, or information paired with such viewing data. *See* Section II.A, *supra*; *see also* SCC ¶¶ 14, 76, 78. It is unclear from the SCC what claims Plaintiffs' allegations relating to "the *collection*, combining *and/or* disclosure of data from a *variety of sources*[,]" including "*other* VIZIO products," support, and they thus vaguely expand the SCC and fail to put VIZIO on notice of Plaintiffs' claims as required by Rule 8 of the Federal Rules of Civil Procedure. *Id.* (emphasis added). Moreover, to the extent these new allegations seek to support Plaintiffs' fraudulent omission claims, they are not pled with the specificity required by Rule 9(b) of the Federal Rules of Civil Procedure.

First, Plaintiffs fail to meet Rule 8's notice pleading standard with respect to these new allegations. Fed. R. Civ. P. 8(a)(2) (Plaintiffs must include a "short and plain statement of the claim showing that the pleader is entitled to relief[.]"). Rule 8 "requires that a complaint must give the opposing party fair notice of what the plaintiff's claim is *and the grounds upon which it rests.*" *Underwood v. Archer Management Servs. Inc.*, 857 F. Supp. 96, 97 (D.D.C. 1994) (emphasis added). But Plaintiffs' vague allegations related to these new sources of data fail to put VIZIO on notice of both the factual bases of Plaintiffs' claims (i.e. what data they are alleging that VIZIO collects) and how those

1    facts support their claims, which are centered on the ACR sytem and VIZIO Smart TVs.

2    *Everson v. Leis*, 556 F.3d 484. 496 (6th Cir. 2009) (finding that one reference to

3    "training" in factual allegations of complaint was "insufficient to put [defendant] on

4    notice of any failure-to-train claim" under Rule 8's notice-pleading standard).  Indeed,

5    VIZIO does not even have notice of which claims these new allegations support.

6          For example, as they are pled, Plaintiffs' new allegations now purport to cover data

7    allegedly collected from VIZIO Sound Bars and/or Multi-Room Speakers, even though

8    Plaintiffs include no other allegations relating to such devices.[10]  And the new allegations

9    could also cover information that VIZIO receives from any source whatsoever –

10   *including from consumers who **voluntarily** submit information* through, for example,

11   VIZIO's website, or to VIZIO's customer support.  Clearly such information would not

12   be subject to disclosure requirements, and it is possible that Plaintiffs do not intend for

13   such information to be part of the SCC.  But the vague new language in the SCC purports

14   to cover the mere "***collection***" of such data and does not make clear what specific types

15   of data are in fact collected and how.  Because the new allegations are impermissibly

16   vague, any claims relying on them must be dismissed.  *See, e.g., Shaw v. Veterans Health*

17   *Admin.*, 2013 WL 6909467 at *4 (S.D. Cal. Dec. 18, 2013) (dismissing complaint under

18   Rule 8 where allegations were "confusing" and court found it "often unclear whether

19   Plaintiff [was] attempting to provide background or allege misconduct").

20         Second, any fraud claims based on the alleged collection of such data do not pass

21   muster under the heightened Rule 9(b) standards, and as such these claims must also be

22   dismissed.  It appears from the SCC that the claims Plaintiffs are asserting based on the

23   new allegations, if anything, are claims for fraudulent omission.  *See* SCC, ¶¶ 14

24   ("VIZIO's material omissions . . ."); *id.*, Claims 5 (violation of the UCL) and 13 (fraud

---

25

26   [10]    To the extent Plaintiffs intend to refer to the alleged collection of data *concerning* other devices ***through a VIZIO Smart TV*** (for example, the alleged collection of wireless

27   access points through a TV), such allegations were already in Plaintiffs' original Consolidated Complaint and this Motion is not directed to those allegations.  The

28   problem is that Plaintiffs' SCC now appears to go well beyond that to cover the direct collection of data from any "Internet-connected device," whatever that might be.

by omission).  But, as the Court noted in its prior Order, under Rule 9(b) "a party must plead allegations of fraud, whether through affirmative misrepresentations or omissions, 'with particularity.'  Fed. R. Civ. P. 9(b).  To satisfy this Rule, a plaintiff must generally allege the 'who, what, when, where, and how' of the misconduct charged.' *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)."  Order at 29:7-11.

The SCC does not anywhere explain how VIZIO's direct collection of data from sources other than a TV, or collection of data that neither constitutes viewing data nor is linked to viewing data, can form the basis of their fraud claims.  Indeed, the factual allegations in the SCC's fraud claims are based on VIZIO's alleged failure to disclose to consumers information concerning collection and transmission of specified viewing data and data associated or linked to such data.  *See* SCC, ¶ 177 (UCL claim based on VIZIO's Smart TV software "that monitored, collected and disseminated consumer viewing habits and other data"); *id.*, ¶ 277 ("Defendants concealed, suppressed, or omitted material facts concerning Vizio Smart TVs, to wit, the existence of the Smart Interactivity software that tracks and collects the users' information and viewing history . . . .").  Because Plaintiffs have not put VIZIO on notice of the basis for their allegations surrounding data collection from "other sources"—much less "the who, what, when, where and how" of the purported fraudulent conduct relating to said data collection— they have failed to meet the requirements of Rule 9(b) in pleading these claims.  To the extent these claims rely on the new allegations identified here, they must be dismissed.

**D.** **Plaintiffs' Class Allegations Should Be Struck under Rule 12(f) Because They Fail to Exclude Proposed Class Members Subject to an Arbitration Agreement and Are Not Definite Enough to Meet the Requirements of Either Rule 23(b)(2) or 23(b)(3).**

The Court's ruling on VIZIO's prior motion to dismiss held that Plaintiffs have "Article III standing to represent a class encompassing purchasers of" SmartCast-enabled Smart TVs.  MTD Order at 14.  In light of the Court's decision, Plaintiffs' proposed class definition now lacks the requisite specificity to meet the requirements of Rule 23 because

it fails to exclude an entire class of products subject to VIZIO's binding arbitration agreement—namely, all SmartCast-enabled Smart TVs.[11]  The Court should therefore strike Plaintiffs' class allegations and require amendment to exclude any putative class members subject to an enforceable arbitration provision, including all proposed class members whose claims are based solely on SmartCast-enabled Smart TVs.  Or, in the alternative, the Court should issue an Order to Show Cause as to why such allegations should not be struck.

"Rule 12(f) is a vehicle by which to 'avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial.'" *Kay v. Wells Fargo & Co. N.A.*, No. C 07-01351 WHA, 2007 WL 2141292, at *2 (N.D. Cal. July 24, 2007) (quoting *Sidney-Vinstein v. A.H. Robins Co., Inc.*, 697 F.2d 880, 885 (9th Cir. 1983)). While the plain terms of Rule 12(f) allow the court to strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" from a pleading, district courts within and outside the Ninth Circuit have also used Rule 12(f) to confront deficiencies in class action pleadings at the outset and thus conserve judicial and party resources.  *See, e.g., Kay*, 2007 WL 2141292, at *2; *In re: Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 953 F. Supp. 2d 713, 725 (N.D. Tex. 2013); *see also* Fed. R. Civ. P. 23(d)(1)(D) ("the court may issue orders that . . . require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly").  The Supreme Court has also expressed a "federal policy favoring arbitration."  *See, e.g., DirectTV, Inc. v. Imburgia*, 136 S.Ct. 463, 471 (2015).

---

[11]    As VIZIO noted in its prior motion to dismiss, certain VIZIO Smart TVs are sold with binding arbitration agreements.  ECF No. 116-1 at 3 n.2.  However, VIZIO does not and cannot litigate the enforceability of the arbitration provision in this Motion (and reserves its arguments on this issue) because no Plaintiff is alleged to have purchased a SmartCast product, and thus VIZIO does not at this time have information sufficient to determine that any named Plaintiff is subject to the arbitration agreement.  *See* SCC ¶¶ 17-24.  VIZIO seeks to strike Plaintiffs' class allegations to the extent they fail to exclude any putative class members who are bound by an enforceable arbitration agreement.

Here, Plaintiffs' class allegations are deficient and should be struck because they fail to exclude VIZIO Smart TVs that are subject to a binding and enforceable arbitration agreement.  VIZIO's Limited Warranty, which is included in the User Manual and/or Quickstart Guide provided in the packaging for VIZIO Smart TVs and SmartCast displays, has included an arbitration agreement since late 2015—before VIZIO began selling VIZIO SmartCast displays in the first half of 2016.  Declaration of Robert L. Brinkman ("Brinkman Dec."), ¶¶ 5, 6.[12]  Likewise, VIZIO's Terms of Service for the VIZIO SmartCast App has included an arbitration agreement since it first launched in the first half of 2016.  *Id.*, ¶ 7 & Ex. B.  The Terms of Service arbitration agreement states, in relevant part:

> Any controversy or claim relating in any way to your VIZIO product, including any controversy or claim arising out of or relating to these Terms of Service, any warranty, the collection, use or sharing of customer or viewing information collected from a VIZIO Product, a breach of these Terms of Service, or the VIZIO product's sale, condition or performance, will be settled by binding arbitration administered by the American Arbitration Association and conducted by a single arbitrator appointed by the American Arbitration Association, in accordance with its commercial arbitration rules and its supplementary procedures for consumer-related disputes.

---

[12]   In considering a motion to strike, the court may consider a document outside the pleadings where the complaint relies on the document and no party contests its authenticity or where the court agrees to take judicial notice of the document.  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.,* 754 F. Supp. 2d 1145, 1169 (C.D. Cal. 2010); *DeFazio v. Hollister, Inc.,* 2008 WL 958185, at *4 n.4 (E.D. Cal. Apr. 7, 2008).  Here, the SCC relies heavily on allegations about VIZIO's disclosures to customers, but does not attach any of these publications.  *See* SCC ¶¶ 88-101.  VIZIO thus requests the Court review this arbitration provision as part of the many publications relied upon for Plaintiffs' claims or in the alternative, take judicial notice of the document as detailed in VIZIO's concurrently filed Request for Judicial Notice.  *See* RJN, Ex. D.

Brinkman Dec., ¶ 7; *id.*, Ex. B, p. 4.[13]  For a user who sets up a VIZIO SmartCast display for the first time using the VIZIO SmartCast App, the App requires the user to accept the Terms of Service in order to use the App to stream content to the display.  *Id.*, ¶ 8.  A user who initially sets up the VIZIO SmartCast display without using the App would be presented with the Terms of Service on the display itself during the process of setting up the display to stream content.  *Id.*  Enforcement of VIZIO's arbitration agreement would preclude recovery in the class action setting for any proposed class members whose claims are based solely on the purchase of a VIZIO Smart TV subject to arbitration, including all SmartCast-enabled Smart TVs.

Plaintiffs' class allegations, however, fail to reflect this reality.  For instance, Plaintiffs' proposed class definition includes "All individuals in the United States who purchased a VIZIO Smart TV with Smart Interactivity capability . . . during the applicable statute of limitations period."  SCC ¶ 102; *see also id.* ¶¶ 103-107.  As a result, VIZIO now faces the substantial burden and significant cost of litigating Plaintiffs' claims relating to SmartCast-enabled Smart TVs, including discovery about products that likely will never be part of any certifiable class.  Plaintiffs should not be permitted to proceed with such an overbroad class definition, even on a proposed basis.  This Court should therefore strike Plaintiffs' class allegations and require amendment to exclude those class members subject to an enforceable and binding arbitration agreement.

In the alternative, VIZIO requests the Court issue an Order to Show Cause under Rule 23(c)(1) and Rule 23(d)(1)(D) allowing the parties to fully litigate the enforceability of the arbitration agreement prior to launching discovery efforts and litigating class certification concerning putative class members whose claims may be subject to arbitration.  *See Pablo v. Servicemaster Glob. Holdings, Inc*., No. C 08-03894 SI, 2011 WL 3476473, at *2-3 (N.D. Cal. Aug. 9, 2011) (holding that class certification could not

---

[13]    The arbitration agreement contained in the Limited Warranty differs slightly but also requires arbitration of claims, including those arising out of a "VIZIO product's sale, condition or performance."  *Id.*, ¶ 7; *id.*, Ex. A, p. 3.

1   be reached without first resolving whether arbitration provisions bound a significant

2   number of putative class members); *Castle v. Wells Fargo Fin., Inc*., No. C 06-4347 SI,

3   2007 WL 703609, at *3 (N.D. Cal. Mar. 5, 2007) (denying motion for conditional class

4   certification because "the better course is to first determine the enforceability of the

5   arbitration agreements before addressing the scope and management of the remainder of

6   this litigation"); *see also, e.g.*, *Mladenov v. Wegmans Food Mkts., Inc.*, 124 F. Supp. 3d

7   360, 367-68 (D.N.J. 2015) (discussing court's issuance of Order to Show Cause as to why

8   class allegations should not be stricken for lack of ascertainability).

9          At a bare minimum, Plaintiffs' proposed class definitions under Rule 23(b)(2) and

10  Rule 23(b)(3) must be "sufficiently definite" to conform to each rule's requirements.  *See*

11  *Briseno v. ConAgra Foods, Inc*., 844 F.3d 1121, 1124 n.4 (9th Cir. 2017) ("[W]e have

12  addressed the types of alleged definitional deficiencies other courts have referred to as

13  'ascertainability' issues . . . through analysis of Rule 23's enumerated requirements.")

14  (citing *Ruiz Torres v. Mercer Canyons Inc*., 835 F.3d 1125, 1136-39 (9th Cir. 2016)

15  (addressing argument that class definition was overbroad as a Rule 23(b)(3)

16  predominance issue) and *Probe v. State Teachers' Ret. Sys*., 780 F.2d 776, 780 (9th Cir.

17  1986) (recognizing that a class must not be vaguely defined and must be "sufficiently

18  definite to conform to Rule 23"); *see also Natto Iyela Gbarabe v. Chevron Corp.*, No. 14-

19  cv-00173-SI, 2017 WL 956628, at *30-31 (N.D. Cal. Mar. 13, 2017); *Erickson v. Elliot

20  Bay Adjustment Co*., No. C16-0391JLR, 2017 WL 1179435, at *11-12 (W.D. Wash. Mar.

21  30, 2017).

22         Indeed, several courts have rejected class allegations under Rule 23 for their failure

23  to clearly exclude class members subject to arbitration agreements, including at the

24  pleading stage.  *See, e.g.*, *In re : Online Travel Co. (OTC)*, 953 F. Supp. 2d at 725.  For

25  example, in *In re: Online Travel Co.*, a defendant travel company moved to strike

26  allegations at the pleading stage on behalf of putative class members on the grounds that

27  the putative class members were bound by the travel company's user agreement, which

28  contained a binding arbitration clause.  953 F. Supp. 2d at 725.  Relying on *Kay*, the court

granted the motion, reasoning that "[a]ny claims by absent class members bound by the User Agreement would be impertinent, as those class members would be bound to individually arbitrate their claims" and declaring that "[t]he class the Court considers at the certification stage will not include those claims subject to arbitration pursuant to this Order." *Id.* Similarly, in *Guzman*, the court rejected a class definition including all students enrolled in the defendant schools from 2005, after finding that between 16 and 96 percent of the students in the proposed class were subject to arbitration agreements beginning in 2007. *Guzman v. Bridgepoint Educ., Inc.*, 305 F.R.D. 594, 610-12 (S.D. Cal. 2015).

Far from short-circuiting the class certification process, requiring Plaintiffs to refine their class allegations at the pleadings stage will streamline issues for discovery and class certification later in the case. Accordingly, VIZIO requests the Court strike Plaintiffs' class allegations with leave to amend or alternatively issue an Order to Show Cause as to why such allegations should not be struck.

## IV.   **CONCLUSION**

For the reasons stated above, VIZIO respectfully requests that the Court dismiss Plaintiffs' claims for injunctive relief, Plaintiffs' Wiretap Act and CIPA claims, and Plaintiffs' claims based on data collected from sources other than VIZIO Smart TVs, and strike Plaintiffs' class allegations with leave to amend, or alternatively issue an Order to Show Cause as to why such allegations should not be stricken.

Dated:  April 13, 2017

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By:      */s/ Hyongsoon Kim*
Anthony T. Pierce (admitted pro hac vice)
apierce@akingump.com
1333 New Hampshire Avenue NW
Suite 1500
Washington, DC 20036
Tel:   202-887-4000
Fax:   202-887-4288

Hyongsoon Kim (SBN 257019)
kimh@akingump.com
4 Park Plaza, Suite 1900
Irvine, CA  92614
Tel:   949-885-4100
Fax:   949-885-4101

Ali R. Rabbani (SBN 253730)
arabbani@akingump.com
Patrick Eoghan Murray (SBN 293765)
pmurray@akingump.com
1999 Avenue of the Stars, Suite 600
Los Angeles, CA  90067
Tel:   310-229-1000
Fax:   310-229-1001

*Attorneys for Defendants VIZIO Holdings, Inc.,
VIZIO, Inc., VIZIO Inscape Services, LLC,
and VIZIO Inscape Technologies, LLC*

# EXHIBIT N

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

9

10

11

12

13

14

WIMO LABS, LLC,

                 Plaintiff,

    v.

EBAY, INC., et al.,

                Defendants.

Case No. 8:15-cv-01330-JLS-KES

**DISCOVERY MATTER**

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT EBAY INC.'S MOTION TO COMPEL RESPONSES TO INTERROGATORY AND REQUESTS FOR PRODUCTION**

15

16

17

Judge:       Hon. Karen E. Scott
Date:        September 13, 2016
Time:        10:00 a.m.
Courtroom:  6D

18

19

Discovery Cutoff:   January 17, 2017

Trial Date:        August 29, 2017

20

21

22

23

24

      The Joint Stipulation Regarding Defendant eBay, Inc.'s Motion to Compel Responses to Interrogatory and Requests for Production (the "Motion") was submitted on August 23, 2016.  (Dkt. 104.)  The Joint Stipulation contained Defendant eBay Inc.'s ("eBay") arguments in support of the Motion and Plaintiff Wimo Labs, LLC's ("Wimo") arguments in opposition to the Motion.

25

26

27

      After considering all the papers and arguments submitted in support of and in opposition to the Motion, and, after entertaining argument of counsel, **THE COURT HEREBY ORDERS AS FOLLOWS:**

28

/ / /

The operative First Amended Complaint ("FAC") alleges that eBay has infringed four of Wimo's registered trademarks.  (Dkt. 58, ¶ 16.)  The defined term "WIMO MARKS" is overly broad, and the Court limits all of the discovery requests discussed below to the four registered marks at issue (the "FOUR MARKS").

Any supplemental responses or document production ordered below shall be accomplished within thirty (30) days, unless otherwise stated, and subject to stipulated extensions or requests for additional time for "good cause."

**A.**    **Request for Production No. 2**

**DEFINED TERMS**

1.    WIMO," "YOU," or "YOUR" means Plaintiff Wimo Labs, LLC, its predecessors AND successors, its past AND present parents, subsidiaries, divisions, affiliates, assigns, its pasts AND present officers, directors, employees, agents, representatives—INCLUDING accountants, consultants AND attorneys—AND ANY other PERSON OR entity acting on WIMO'S behalf OR subject to WIMO'S control.

10.    "WIMO MARKS" means ANY use of a word, series of words, phrase, name, design, logo OR other combination thereof, that include "Lunatik," "Taktik," "Lunatik Epik" OR YOUR trademarked designs, INCLUDING, ALL trademarks owned OR exclusively licensed by YOU, INCLUDING the marks reflected in U.S. Registration Numbers 4,075,222, 4,296,576, 4,262,488, AND 4,542,506.

19.    "XPAL" means XPAL Power, Incorporated, its predecessors AND successors, its past AND present parents, subsidiaries, divisions, affiliates, assigns, its pasts AND present officers, directors, employees, agents, representatives—INCLUDING accountants, consultants AND attorneys—AND ANY other PERSON OR entity acting on XPAL'S behalf OR subject to XPAL'S control.

20.   "TENNRICH" means Tennrich International Corporation of Taiwan, its predecessors AND successors, its past AND present parents, subsidiaries, divisions, affiliates, assigns, its pasts AND present officers, directors, employees, agents, representatives—INCLUDING accountants, consultants AND attorneys—AND ANY other PERSON OR entity acting on TENNIRCH'S behalf OR subject to TENNRICH'S control.

**REQUEST FOR PRODUCTION NO. 2:**

DOCUMENTS sufficient to describe YOUR corporate relationship with XPAL AND TENNRICH, INCLUDING ANY responsibilities XPAL OR TENNRICH may have RELATED TO the enforcement OR policing of the WIMO MARKS AND the manufacture OR production of goods bearing OR market under said marks.

**WIMO'S RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Wimo incorporates each of its General Objections stated above.  Wimo specifically objects to this Demand on the grounds that it seeks non-privileged matter that is not relevant to any party's claim or defense and is not proportional to the needs of the pending Lawsuit.  Wimo also specifically objects to this Demand on the grounds the phrase "YOUR corporate relationship with XPAL AND TENNRICH, INCLUDING ANY responsibilities XPAL OR TENNRICH may have RELATED TO the enforcement OR policing of the WIMO MARKS AND the manufacture OR production of goods bearing OR market under said marks" is vague, ambiguous and overbroad and would call for an unduly burdensome search and production.  Wimo will construe that phrase as referring only to the responsibilities XPAL OR TENNRICH may have RELATED TO the enforcement OR policing of the intellectual property at issue in the Lawsuit.  Wimo further objects to this Demand to the extent that it calls for the production of documents that are protected by the attorney-client privilege, the work-product doctrine, or are

1   otherwise immune from discovery.

2         Wimo has conducted a reasonably diligent search, and does not have any

3   responsive documents in its possession, custody, or control.

4   **Ruling Regarding Request for Production No. 2:**

5         eBay requested documents sufficient to describe Wimo's corporate

6   relationship with XPAL and TENNRICH.  Wimo interpreted the RFP as limited to

7   documents evidencing the responsibilities XPAL or TENNRICH may have to

8   enforce or police the FOUR MARKS.  Thus limited, Wimo responded that it has no

9   responsive documents.  (Joint Stip. at 13.)  eBay counters that Wimo's LLC

10  operating agreement is, at a minimum, a responsive document that exists.  (Id. at

11  14.)  Wimo asserts that its shareholder agreement is confidential and irrelevant.  (Id.

12  at 15-16.)

13        Given the existence of a protective order in this case, the broad standard for

14  relevancy in discovery disputes, and the importance of understanding the corporate

15  structure of an LLC plaintiff like Wimo, the Court GRANTS eBay's Motion as to

16  RFP 2 and orders Wimo to produce (1) its current operating agreement and

17  (2) other non-privileged documents (if any) sufficient to show its corporate

18  relationship with XPAL or TENNRICH at all relevant times.

19  **B.**    **Request for Production Nos. 3-5**

20  **DEFINED TERMS**

21        10.    "WIMO MARKS" means ANY use of a word, series of words, phrase,

22  name, design, logo OR other combination thereof, that include "Lunatik," "Taktik,"

23  "Lunatik Epik" OR YOUR trademarked designs, INCLUDING, ALL trademarks

24  owned OR exclusively licensed by YOU, INCLUDING the marks reflected in U.S.

25  Registration Numbers 4,075,222, 4,296,576, 4,262,488, AND 4,542,506.

26

27

28

1 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:**

2      ALL DOCUMENTS RELATED TO YOUR ownership, right, title, AND

3 interest in the WIMO MARKS.

4 **RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:**

5      Wimo incorporates each of its General Objections stated above. Wimo

6 specifically objects to this Demand on the grounds that it seeks non-privileged

7 matter that is not relevant to any party's claim or defense and is not proportional to

8 the needs of the pending Lawsuit. Wimo also specifically objects to this Demand on

9 the grounds the phrase "WIMO MARKS" as defined in the Demand is overbroad,

10 potentially includes registered trademarks not at issue in the Lawsuit and would call

11 for an unduly burdensome search and production. Wimo will construe the phrase

12 "WIMO MARKS" as referring only to the registered trademarks at issue in the

13 lawsuit described in paragraph 16 of the FAC. Wimo further objects to this Demand

14 to the extent that it calls for the production of documents that are protected by the

15 attorney-client privilege, the work-product doctrine, or are otherwise immune from

16 discovery.

17      Wimo will search for and produce the trademark file wrappers for the

18 registered trademarks described in paragraph 16 of the FAC. Except as so stated,

19 Wimo will not search for or produce documents that might be encompassed by this

20 request or documents that cannot be located through a reasonable and proportional

21 search. Wimo anticipates completing its production of documents responsive to this

22 Demand by the end of March 2016.

23 **Ruling Regarding Request for Production No. 3:**

24      Wimo agreed to produce, and has produced, the trademark file wrappers for

25 the FOUR MARKS.  eBay contends this is insufficient, because the identified

26 documents do not show whether Wimo has maintained continuous ownership, i.e.,

27 whether Wimo ever assigned or alienated the FOUR MARKS.  (Joint Stip. at 20.)

28

Wimo counters that it has told eBay that it never assigned or alienated the FOUR MARKS. (Id. at 22.) While counsel for Wimo has represented that Wimo does not have any documents showing assignment or alienation of the FOUR MARKS, eBay has not received a discovery response so stating from a Wimo witness.

eBay's Motion as to RFP 3 is GRANTED but limited as follows: Wimo shall respond to RFP 3 as if it were an interrogatory asking Wimo if any documents showing assignment or alienation of the FOUR MARKS are in its possession, custody or control. If the answer is "yes," then such documents shall be produced.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:**

ALL DOCUMENTS RELATED TO the creation, acquisition, trademark applications, registration AND prosecution of the WIMO MARKS, INCLUDING copies of ALL deposit materials YOU provided in connection with such trademark applications and registration.

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:**

Wimo incorporates each of its General Objections stated above. Wimo specifically objects to this Demand on the grounds that it seeks non-privileged matter that is not relevant to any party's claim or defense and is not proportional to the needs of the pending Lawsuit. Wimo also specifically objects to this Demand on the grounds the phrase "WIMO MARKS" as defined in the Demand is overbroad, potentially includes registered trademarks not at issue in the Lawsuit and would call for an unduly burdensome search and production. Wimo will construe the phrase "WIMO MARKS" as referring only to the registered trademarks at issue in the lawsuit described in paragraph 16 of the FAC. Wimo further objects to this Demand to the extent that it calls for the production of documents that are protected by the attorney-client privilege, the work-product doctrine, or are otherwise immune from discovery.

Wimo will search for and produce the trademark file wrappers for the

registered trademarks described in paragraph 16 of the FAC. Except as so stated,
Wimo will not search for or produce documents that might be encompassed by this
request or documents that cannot be located through a reasonable and proportional
search. Wimo anticipates completing its production of documents responsive to this
Demand by the end of March 2016.

**Ruling Regarding Request for Production No. 4:**

Again, Wimo agreed to produce, and has produced, the trademark file
wrappers for the FOUR MARKS.  eBay contends this is insufficient for the same
reasons it challenged Wimo's response to RFP 3.  The entirety of the trademark
registration files for the FOUR MARKS has no demonstrated relevance where, as
here, Wimo is the original and continuing registered owner.  eBay's Motion as to
RFP 4 is DENIED.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:**

ALL DOCUMENTS RELATED TO the use, strength, AND enforcement of
the WIMO MARKS AND the public awareness and good will associated with said
marks, INCLUDING ALL studies, analyses, surveys, data, comparisons,
compilations, AND COMMUNICATIONS REFERRING to the use OR alleged
misuse of the WIMO MARKS.

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:**

Wimo incorporates each of its General Objections stated above. Wimo
specifically objects to this Demand on the grounds that it seeks non-privileged
matter that is not relevant to any party's claim or defense and is not proportional to
the needs of the pending Lawsuit. Wimo also specifically objects to this Demand on
the grounds the phrase "WIMO MARKS" as defined in the Demand is overbroad,
potentially includes registered trademarks not at issue in the Lawsuit and would call
for an unduly burdensome search and production. Wimo will construe the phrase
"WIMO MARKS" as referring only to the registered trademarks at issue in the

1   lawsuit described in paragraph 16 of the FAC. Wimo also objects to this Demand

2   on the ground that the phrase "use, strength, AND enforcement of the WIMO

3   MARKS AND the public awareness and good will associated with said marks,

4   INCLUDING ALL studies, analyses, surveys, data, comparisons, compilations,

5   AND COMMUNICATIONS REFERRING to the use OR alleged misuse of the

6   WIMO MARKS" is vague, ambiguous, overbroad and incomprehensible as written.

7   Wimo further objects to this Demand to the extent that it calls for the production of

8   documents that are protected by the attorney-client privilege, the work-product

9   doctrine, or are otherwise immune from discovery.

10      Wimo will produce all non-privileged documents dated during the period

11   January 1, 2012 to the date of production located after a reasonable search that

12   support the following allegations in paragraph 18 of the FAC: (1) The Lunatik

13   Marks are in full force and effect; (2) Lunatik has never abandoned the Lunatik

14   Marks nor has Lunatik were abandoned the goodwill of its businesses in connection

15   thereto; and (3) Lunatik intends to continue to preserve and maintain its rights with

16   respect to the Lunatik Marks, except as so stated, Wimo will not search for or

17   produce documents that might be encompassed by this request or documents that

18   cannot be located through a reasonable and proportional search. Wimo anticipates

19   completing its production of documents responsive to this Demand by the end of

20   April 2016.

21   **<u>Ruling Regarding Request for Production No. 5:</u>**

22      eBay contends that if Wimo has failed to police infringement or otherwise

23   abandoned the FOUR MARKS, that is an affirmative defense to infringement.

24   Accordingly, eBay seeks documents relevant to Wimo's potentially deficient

25   policing and abandonment.  The RFP is overly broad by requesting, among other

26   things, all documents related to the use of the FOUR MARKS.

27      Wimo stated in its response that it would produce documents that support its

28

1   contentions that it has policed infringement of the FOUR MARKS.  eBay contends

2   it is also entitled to responsive documents that show any failure to police.

3         In the Joint Stipulation, Wimo clarified that it has no studies, analyses,

4   surveys, data or comparisons that relate to the policing or enforcement of the FOUR

5   MARKs – regardless of whether they show Wimo's diligence or neglect.  (Joint

6   Stip. at 24.)  Wimo asserts that it has already produced the one responsive

7   compilation in its possession, custody or control.  (Id.)  Accordingly, eBay's motion

8   as to RFP 5 is DENIED.

9   **C.**     **Request for Production Nos. 10-11 and 13-14**

10  **DEFINED TERMS**

11        10.     "WIMO MARKS" means ANY use of a word, series of words, phrase,

12  name, design, logo OR other combination thereof, that include "Lunatik," "Taktik,"

13  "Lunatik Epik" OR YOUR trademarked designs, INCLUDING, ALL trademarks

14  owned OR exclusively licensed by YOU, INCLUDING the marks reflected in U.S.

15  Registration Numbers 4,075,222, 4,296,576, 4,262,488, AND 4,542,506.

16        11.     "FAKE LUNATIK PRODUCTS" shall have the same meaning as

17  ascribed to that term in the FAC.

18        14.     "AUTHORIZED" means ANY goods, products, sales, PERSONS, OR

19  uses approved, accredited, certified, licensed, commissioned, OR duly sanctioned

20  by YOU.

21        15.     "UNAUTHORIZED" means ANY goods, products, sales, PERSONS,

22  OR uses, which YOU have not approved, accredited, certified, licensed,

23  commissioned, OR duly sanctioned.

24  **REQUEST FOR PRODUCTION NO. 10:**

25        DOCUMENTS sufficient to identify ANY (a) AUTHORIZED users OR

26  licensees of ANY of the WIMO MARKS, (b) AUTHORIZED sellers, retailers,

27  dealers, distributors, OR marketers of goods bearing of ANY of the WIMO

28

1  MARKS, AND (c) manufacturers, factories, OR facilities used to manufacture OR
2  produce AUTHORIZED goods bearing ANY of the WIMO MARKS,
3  INCLUDING AUTHORIZED goods financed, offered, OR sold through OR on
4  kickstarter.com.
5  **WIMO'S RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**
6  Wimo incorporates each of its General Objections stated above. Wimo
7  specifically objects to this Demand on the grounds that it seeks non-privileged
8  matter that is not relevant to any party's claim or defense and is not proportional to
9  the needs of the pending Lawsuit. Wimo also specifically objects to this Demand
10  on the grounds the phrase "WIMO MARKS" as defined in the Demand is
11  overbroad, potentially includes registered trademarks not at issue in the Lawsuit
12  and would call for an unduly burdensome search and production. Wimo will
13  construe the phrase "WIMO MARKS" as referring only to the registered
14  trademarks at issue in the lawsuit described in paragraph 16 of the FAC. Wimo
15  further objects to this Demand to the extent that it calls for the production of
16  documents that are protected by the attorney-client privilege, the work-product
17  doctrine, or are otherwise immune from discovery.
18  Wimo will produce a list of the names the persons with whom Wimo has a
19  written agreement entered into during the period January 1, 2013 to the date of
20  production pursuant to which Wimo authorized the person(s) to manufacture, sell or
21  distribute the products described in paragraphs 16 to 32 of the FAC. Except as so
22  stated, Wimo will not search for or produce documents that might be encompassed
23  by this request or documents that cannot be located through a reasonable and
24  proportional search. Wimo anticipates completing its production by the end of
25  April 2016.

ORDER RE
EBAY'S MOT. TO COMPEL RESPONSES
TO INTERROG. AND RFPS
- 9 -
CASE NO. 8:15–CV–01330-JLS (KES)

**Ruling Regarding Request for Production No. 10:**

eBay wants documents sufficient to identify Wimo's authorized manufacturers, distributors, dealers, etc., because that information may reveal that the source of allegedly counterfeit goods were such licensees. Despite its initial answer offering to provide a list, Wimo has since withdrawn that offer and has not provided a list. (Joint Stip. at 30.) Wimo counters that it does not have one document containing the responsive information, and forcing it to draft a compilation would be unduly burdensome. It suggests that eBay propound an interrogatory instead. (Id. at 33.)

The Court sees little difference between drafting a compilation and responding to the suggested interrogatory. Thus eBay's Motion as to RFP 10 is GRANTED as follows: Limited to the FOUR MARKS, Wimo shall either (1) produce responsive documents or (2) respond to RFP 10 as if it were an interrogatory, citing by BATES number and producing the documents from which the responding witness derived the information in the response. Documents produced pursuant to RFP 10 may be redacted to shield from discovery all but those terms and conditions that relate to Wimo's trademark rights (e.g., conditions for authorized use, enforcement responsibilities, penalties for infringement, etc.).

**REQUEST FOR PRODUCTION NO. 11:**

DOCUMENTS sufficient to show of the terms, conditions, OR restrictions YOU instruct OR require be followed by ANY (a) AUTHORIZED users OR licensees of ANY of the WIMO MARKS, (b) AUTHORIZED sellers, retailers, dealers, distributors, OR marketers of goods bearing of ANY of the WIMO MARKS, AND (c) manufacturers, factories, OR facilities used to manufacture OR produce AUTHORIZED goods bearing ANY of the WIMO MARKS, INCLUDING AUTHORIZED goods financed, offered, OR sold through OR on kickstarter.com.

**WIMO'S RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Wimo incorporates each of its General Objections stated above. Wimo specifically objects to this Demand on the grounds that it seeks non-privileged matter that is not relevant to any party's claim or defense and is not proportional to the needs of the pending Lawsuit. Wimo also specifically objects to this Demand on the grounds the phrase "WIMO MARKS" as defined in the Demand is overbroad, potentially includes registered trademarks not at issue in the Lawsuit and would call for an unduly burdensome search and production. Wimo will construe the phrase "WIMO MARKS" as referring only to the registered trademarks at issue in the lawsuit described in paragraph 16 of the FAC. Wimo further objects to this Demand to the extent that it calls for the production of documents that are protected by the attorney-client privilege, the work-product doctrine, or are otherwise immune from discovery. No documents will be produced in response to this Request.

**Ruling Regarding Request for Production No. 11:**

eBay contends that the terms and conditions of Wimo's relationships with the various members of its distribution chain are relevant, because they may show "whether Wimo took adequate steps to police its marks and whether those third parties may be the source of the alleged counterfeits." (Joint Stip. at 31.)

The Court fails to see how all of the terms and conditions in such agreements would be relevant to the claims and defenses in this lawsuit. eBay's Motion as to RFP 11 is GRANTED but limited as follows: Wimo shall produce responsive agreements (1) only as to the FOUR MARKS and (2) may redact all but those terms and conditions that relate to Wimo's trademark rights (e.g., conditions for authorized use, enforcement responsibilities, penalties for infringement, etc.). Wimo's amended response and production shall be sufficient to enable eBay to

determine if Wimo possesses a signed "form" or unique agreement with each of the third parties at issue.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13:**

ALL COMMUNICATIONS RELATED TO ANY infringement of ANY of the WIMO MARKS, FAKE LUNATIK PRODUCTS, AND other uses OR products YOU contend violate ANY of YOUR rights, INCLUDING YOUR intellectual property rights, with ANY (a) AUTHORIZED users OR licensees of ANY of the WIMO MARKS, (b) AUTHORIZED sellers, retailers, dealers, distributors, OR marketers of goods bearing of ANY of the WIMO MARKS, AND (c) manufacturers, factories, OR facilities used to manufacture OR produce AUTHORIZED goods bearing ANY of the WIMO MARKS, INCLUDING COMMUNICATIONS RELATING TO goods financed, offered, OR sold through OR on kickstarter.com.

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13:**

Wimo incorporates each of its General Objections stated above. Wimo incorporates each of its General Objections stated above. (sic) Wimo specifically objects to this Demand on the grounds that it seeks non-privileged matter that is not relevant to any party's claim or defense and is not proportional to the needs of the pending Lawsuit. Wimo also specifically objects to this Demand on the grounds the phrase "WIMO MARKS" as defined in the Demand is overbroad, potentially includes registered trademarks not at issue in the Lawsuit and would call for an unduly burdensome search and production. Wimo will construe the phrase "WIMO MARKS" as referring only to the registered trademarks at issue in the lawsuit described in paragraph 16 of the FAC. Wimo further objects to this Demand on the grounds the phrase "ANY infringement of ANY of the WIMO MARKS, FAKE LUNATIK PRODUCTS, AND other uses OR products YOU contend violate ANY of YOUR rights, INCLUDING YOUR intellectual property rights, with ANY (a)

1   AUTHORIZED users OR licensees of ANY of the WIMO MARKS, (b)

2   AUTHORIZED sellers, retailers, dealers, distributors, OR marketers of goods

3   bearing of ANY of the WIMO MARKS, AND (c) manufacturers, factories, OR

4   facilities used to manufacture OR produce AUTHORIZED goods bearing ANY of

5   the WIMO MARKS, INCLUDING COMMUNICATIONS RELATING TO goods

6   financed, offered, OR sold through OR on kickstarter.com" is vague, ambiguous,

7   compound, overbroad and incomprehensible and would call for an unduly

8   burdensome search and production. Wimo will construe that phrase as referring to

9   FAKE LUNATIK PRODUCTS, as that term is defined in the Demand. Wimo

10   further objects to this Demand to the extent that it calls for the production of

11   documents that are protected by the attorney-client privilege, the work-product

12   doctrine, or are otherwise immune from discovery.

13       Wimo will produce all non-privileged documents located after a reasonable

14   search dated during the period January 1, 2013 to the date of production that relate

15   to the alleged infringement of the registered trademarks at issue in the lawsuit

16   described in paragraph 16 of the FAC. Except as so stated, Wimo will not search

17   for or produce documents that might be encompassed by this request or documents

18   that cannot be located through a reasonable and proportional search. Wimo

19   anticipates completing its production by the end of May 2016.

20   **Ruling Regarding Request for Production No. 13:**

21       Wimo offered to produce responsive documents from January 1, 2013 to the

22   date of production that relate to the FOUR MARKS.  To date, however, it has not

23   done so, and now suggests that eBay propound an interrogatory instead.  (Joint Stip.

24   at 33.)

25       The requested documents are relevant to the issue of Wimo's diligent

26   policing of infringement of the FOUR MARKS.  eBay's Motion as to RFP 13 is

27   GRANTED.

28

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14:**

ALL DOCUMENTS RELATED TO ANY manufacturers, factories, OR facilities that manufacture OR produce UNAUTHORIZED goods bearing ANY of the WIMO MARKS, FAKE LUNATIK PRODUCTS, OR other products YOU contend violate ANY of YOUR rights, INCLUDING YOUR intellectual property rights.

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14:**

Wimo incorporates each of its General Objections stated above. Wimo incorporates each of its General Objections stated above. Wimo specifically objects to this Demand on the grounds that it seeks non-privileged matter that is not relevant to any party's claim or defense and is not proportional to the needs of the pending Lawsuit. Wimo also specifically objects to this Demand on the grounds the phrase "WIMO MARKS" as defined in the Demand is overbroad, potentially includes registered trademarks not at issue in the Lawsuit and would call for an unduly burdensome search and production. Wimo will construe the phrase "WIMO MARKS" as referring only to the registered trademarks at issue in the lawsuit described in paragraph 16 of the FAC. Wimo further objects to this Demand on the grounds the phrase "RELATED TO ANY manufacturers, factories, OR facilities that manufacture OR produce UNAUTHORIZED goods bearing ANY of the WIMO MARKS, FAKE LUNATIK PRODUCTS, OR other products YOU contend violate ANY of YOUR rights, INCLUDING YOUR intellectual property rights" is vague, ambiguous, compound, overbroad and incomprehensible and would call for an unduly burdensome search and production. Wimo will construe that phrase as referring to FAKE LUNATIK PRODUCTS, as that term is defined in the Demand. Wimo further objects to this Demand to the extent that it calls for the production of documents that are protected by the attorney-client privilege, the work product doctrine, or are otherwise immune from discovery.

Wimo will produce all non-privileged documents located after a reasonable search dated during the period January 1, 2013 to the date of production that relate to the alleged infringement of the registered trademarks at issue in the lawsuit described in paragraph 16 of the FAC. Except as so stated, Wimo will not search for or produce documents that might be encompassed by this request or documents that cannot be located through a reasonable and proportional search. Wimo anticipates completing its production by the end of May 2016.

**Ruling Regarding Request for Production No. 14:**

Again, Wimo offered to produce responsive documents from January 1, 2013 to the date of production that relate to the FOUR MARKS. To date, however, it has not done so. The requested documents are relevant to the issue of Wimo's diligent policing of infringement of the FOUR MARKS. eBay's Motion as to RFP 14 is GRANTED.

**D.    Request for Production No. 15**

**DEFINED TERMS**

10.    "WIMO MARKS" means ANY use of a word, series of words, phrase, name, design, logo OR other combination thereof, that include "Lunatik," "Taktik," "Lunatik Epik" OR YOUR trademarked designs, INCLUDING, ALL trademarks owned OR exclusively licensed by YOU, INCLUDING the marks reflected in U.S. Registration Numbers 4,075,222, 4,296,576, 4,262,488, AND 4,542,506.

14.    "AUTHORIZED" means ANY goods, products, sales, PERSONS, OR uses approved, accredited, certified, licensed, commissioned, OR duly sanctioned by YOU.

**REQUEST FOR PRODUCTION NO. 15:**

DOCUMENTS sufficient to identify ALL distribution channels for AUTHORIZED goods bearing ANY of the WIMO MARKS, INCLUDING exportation, importation, AND internet sales.

**WIMO'S RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

Wimo incorporates each of its General Objections stated above. Wimo incorporates each of its General Objections stated above. Wimo specifically objects to this Demand on the grounds that it seeks non-privileged matter that is not relevant to any party's claim or defense and is not proportional to the needs of the pending Lawsuit. Wimo also specifically objects to this Demand on the grounds the phrase "WIMO MARKS" as defined in the Demand is overbroad, potentially includes registered trademarks not at issue in the Lawsuit and would call for an unduly burdensome search and production. Wimo will construe the phrase "WIMO MARKS" as referring only to the registered trademarks at issue in the lawsuit described in paragraph 16 of the FAC. Wimo further objects to this Demand on the grounds the phrase "ALL distribution channels for AUTHORIZED goods bearing ANY of the WIMO MARKS, INCLUDING exportation, importation, AND internet sales" is vague, ambiguous, compound, overbroad and incomprehensible and would call for an unduly burdensome search and production. Wimo will construe that phrase as referring to the distribution channels for the products described in paragraphs 21 to 30 of the FAC. Wimo further objects to this Demand to the extent that it calls for the production of documents that are protected by the attorney-client privilege, the work-product doctrine, or are otherwise immune from discovery.

Wimo will produce after a reasonable search for the period January 1, 2012 to the date of production a list that identifies the major distribution channels for the products described in paragraphs 16 to 32 of the FAC. Except as so stated, Wimo will not search for or produce documents that might be encompassed by this request or documents that cannot be located through a reasonable and proportional search. Wimo anticipates completing its production by the end of March 2016.

**Ruling Regarding Request for Production No. 15:**

Wimo offered to produce documents showing its "major" distribution

1  channels, but has not done so.  (Joint Stip. at 37.)  eBay argues that this discovery

2  concerning all authorized distribution channels is relevant to determining whether

3  the alleged counterfeit goods are counterfeits versus unauthorized resale of genuine

4  items.  (Id.)  Wimo counters that it does not have one document containing the

5  responsive information, and forcing it to draft a compilation would be unduly

6  burdensome.  It suggests that eBay propound an interrogatory instead.  (Joint Stip.

7  at 38.)

8  　　　Again, the Court sees little difference between drafting a compilation and

9  responding to the suggested interrogatory.  eBay's Motion as to RFP 15 is

10  GRANTED as follows:  Limited to the FOUR MARKS, Wimo shall either

11  (1) produce responsive documents or (2) respond to RFP 15 as if it were an

12  interrogatory, producing and citing by BATES number the documents from which

13  the responding witness derived the information in the response.  Documents

14  produced pursuant to RFP 15 may be redacted to shield from discovery all but those

15  terms and conditions that relate to distribution channels and Wimo's trademark

16  rights (e.g., conditions for authorized use, enforcement responsibilities, penalties

17  for infringement, etc.).

18  **E.  Request for Production Nos. 46 and 47**

19  **DEFINED TERMS**

20  　　　10.  "WIMO MARKS" means ANY use of a word, series of words, phrase,

21  name, design, logo OR other combination thereof, that include "Lunatik," "Taktik,"

22  "Lunatik Epik" OR YOUR trademarked designs, INCLUDING, ALL trademarks

23  owned OR exclusively licensed by YOU, INCLUDING the marks reflected in U.S.

24  Registration Numbers 4,075,222, 4,296,576, 4,262,488, AND 4,542,506.

25  　　　11.  "FAKE LUNATIK PRODUCTS" shall have the same meaning as

26  ascribed to that term in the FAC.

27  　　　12.  "COUNTERFEIT" or "COUNTERFEITS" shall have the same

28

ORDER RE
EBAY'S MOT. TO COMPEL RESPONSES        - 17 -        CASE NO. 8:15-CV-01330-JLS (KES)
TO INTERROG. AND RFPS

meaning as ascribed to that term in the FAC.

      17.    "THE COUNTERFEIT REPORT" means third-party EZ Software Corp. d/b/a The Counterfeit Report, its predecessors AND successors, its past AND present parents, subsidiaries, divisions, affiliates, assigns, its past AND present officers, directors, employees, agents, representatives—INCLUDING accountants, consultants AND attorneys—AND ANY other PERSON acting on its behalf OR subject to its control.

      18.    "CROSBY" means the individual Craig Crosby who, *inter alia*, purports to be the publisher of THE COUNTERFEIT REPORT AND ANY PERSON acting on his behalf OR subject to his control.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 46:**

      ALL DOCUMENTS RELATED TO purchases made by THE COUNTERFEIT REPORT, CROSBY, OR ANY third-party through ebay.com of goods bearing OR marketed under the WIMO MARKS, FAKE LUNATIK PRODUCTS, OR COUNTERFEITS of YOUR products.

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 46:**

      Wimo incorporates each of its General Objections stated above. Wimo specifically objects to this Demand to the extent that it calls for the production of documents that are protected by the attorney-client privilege, the work-product doctrine, or are otherwise immune from discovery. Wimo also specifically objects to this Demand on the grounds the phrase "WIMO MARKS" as defined in the Demand is overbroad, potentially includes registered trademarks not at issue in the Lawsuit and would call for an unduly burdensome search and production. Wimo will construe the phrase "WIMO MARKS" as referring only to the registered trademarks at issue in the lawsuit described in paragraph 16 of the FAC.

      Wimo will produce all non-privileged documents located after a reasonable search that reflect communications with the Counterfeit Report regarding purchases

made by the Counterfeit Report through ebay.com of FAKE LUNATIK PRODUCTS. Except as so stated, Wimo will not search for or produce documents that might be encompassed by this request or documents that cannot be located through a reasonable and proportional search. Wimo anticipates completing its production by the end of May 2016.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 47:**

ALL DOCUMENTS RELATED TO, INCLUDING COMMUNICATIONS with, THE COUNTERFEIT REPORT OR CROSBY.

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 47:**

Wimo incorporates each of its General Objections stated above. Wimo further objects to this Demand to the extent that it calls for the production of documents that are protected by the attorney-client privilege, the work-product doctrine, or are otherwise immune from discovery.

Wimo will produce all non-privileged documents located after a reasonable search that reflect communications with the Counterfeit Report regarding purchases made by the Counterfeit Report through ebay.com of FAKE LUNATIK PRODUCTS. Except as so stated, Wimo will not search for or produce documents that might be encompassed by this request or documents that cannot be located through a reasonable and proportional search. Wimo anticipates completing its production by the end of May 2016.

**Ruling Regarding Requests for Production Nos. 46 and 47:**

In its papers, Wimo asserts that documents responsive to RFP 46 and 47 are protected by the attorney work-product doctrine, because Wimo's attorney, Mike Turner, hired Craig Crosby, the principal of The Counterfeit Report ("TCR"), as a litigation consultant.  (Joint Stip. at 40, 43.)

eBay counters that Wimo stated in other discovery that it was unaware of any agreements between Wimo (defined to include counsel) and TCR.  (Joint Stip. at

41.)  The FAC, which frequently references TCR, describes TCR as an "independent third party."  (<u>Id.</u>, citing FAC ¶ 191.)  eBay also filed supplemental briefing which questions the veracity of a consulting relationship between Wimo and TCR.  eBay points to "meet and confer" correspondence between eBay and TCR dated 8/4/16 in connection with a subpoena to TCR.  (Dkt. 108-1 at 13.)  TCR claims that counsel for Wimo contemplating representing TCR, such that communications between them are protected by the attorney-client communication privilege.  (<u>Id.</u>)  TCR does not mention any "consulting" arrangement as a basis for asserting the attorney work-product privilege.  eBay also cites an arbitration decision dated 4/29/16 in which the arbitrator summarized Mr. Crosby's testimony as disclosing that he "was involved in one or more meetings relating to the origin" of the instant lawsuit.  (Dkt. 108-1 at 11.)  It says nothing about a consulting arrangement between Mr. Crosby and Wimo.  eBay urges the Court to find that any attorney work-product privilege claim has been waived by Wimo's failure to produce a timely privilege.  (<u>Id.</u> at 42.)

Mr. Turner provided a declaration explaining that he first became aware of TCR in February of 2015.  (Dkt. 104-8, ¶ 6.)  This lawsuit was filed in August of 2015.  Mr. Turner declares that prior to filing this action, but in the course of advising Wimo, he contacted TCR to gather information.  (<u>Id.</u>, ¶ 7.)  He does not otherwise describe an ongoing "consulting" relationship with TCR or Mr. Crosby.

At the hearing, counsel for Wimo asserted that some responsive records may be privileged attorney-client communications.

FRCP 26(b)(5) requires a privilege log when relevant, responsive documents are withheld on the basis of privilege.  Wimo has not produced a privilege log concerning its communications with TCR.  While the failure to produce a privilege log within 30 days does not trigger a <u>per se</u> waiver, delay in producing a privilege log may justify such a result.  <u>Burlington Northern & Santa Fe Ry. v. United States</u>

1  Dist. Court, 408 F.3d 1142 (9th Cir. 2005).  To rule on a question of waiver, the

2  Court must consider "the degree to which the objection or assertion of privilege

3  enables the litigant seeking discovery and the court to evaluate whether each of the

4  withheld documents is privileged (where providing particulars typically contained

5  in a privilege log is presumptively sufficient and boilerplate objections are

6  presumptively insufficient); the timeliness of the objection and accompanying

7  information about the withheld documents (where service within 30 days, as a

8  default guideline, is sufficient); the magnitude of the document production; and

9  other particular circumstances of the litigation that make responding to discovery

10  unusually easy (such as, here, the fact that many of the same documents were the

11  subject of discovery in an earlier action) or unusually hard."  Id. at 1149.

12       Here, the discovery at issue was served in January 2016.  (Dkt. 104-1 at 28.)

13  Wimo's objections assert the attorney work-product privilege and the attorney-

14  client communication privilege.  Wimo's response says nothing about the factual

15  basis for asserting either of these privileges.  Not only was Wimo's initial response

16  insufficient to determine the applicability of the privileges, but also Wimo failed to

17  provide more specific information for months, and to date has never produced a

18  privilege log.  The requested documents are largely "communications" which

19  typically can be located through an email search, and Wimo has now produced

20  other documents related to TCR.  Thus, all of the factors set forth in Burlington

21  weigh in favor of waiver.  This coupled with Wimo's inconsistent and unsupported

22  assertions of a "consulting" relationship with TCR causes the Court to conclude

23  that Wimo has waived any claim of attorney work-product privilege with regard to

24  its communications with TCR and/or Mr. Crosby.

25       eBay's Motion as to RFP 46 and 47 is GRANTED as follows:  within twenty

26  (20) days of this order, Wimo shall produce a privilege log identifying documents

27  responsive to RFP 46 or 47, but withheld on the basis of privilege.  The log shall

28

1  identify the privilege(s) claimed as to each document and the factual basis for the

2  assertion.  For document claimed to be privileged attorney-client communications,

3  Wimo shall identify the lawyer(s) involved, the client or prospective client(s)

4  involved, any other persons who were party to the communication and their role,

5  whether the communication occurred in the course of an actual or prospective

6  representation, the date of the communication, and the general subject matter of the

7  communication.

8      Due to the waiver discussed above, Wimo shall produce any logged

9  document claimed to protected by the attorney work-product privilege only.  After

10  reviewing the privilege log, counsel for the parties shall meet and confer

11  (telephonically or in person) concerning the other privilege log entries, if any.  If

12  they cannot reach an agreement, they may contact the Court for further assistance in

13  evaluating Wimo's assertion of the privilege protecting attorney-client

14  communications.

15  **F.    Request for Production Nos. 51-52 and 60**

16  **DEFINED TERMS**

17      1.    "WIMO," "YOU," or "YOUR" means Plaintiff Wimo Labs, LLC, its

18  predecessors AND successors, its past AND present parents, subsidiaries, divisions,

19  affiliates, assigns, its pasts AND present officers, directors, employees, agents,

20  representatives—INCLUDING accountants, consultants AND attorneys—AND

21  ANY other PERSON OR entity acting on WIMO'S behalf OR subject to WIMO'S

22  control.

23      2.    "EBAY" means Defendant eBay, Inc., its predecessors AND

24  successors, its past AND present parents, subsidiaries, divisions, affiliates, assigns,

25  its pasts AND present officers, directors, employees, agents, representatives—

26  INCLUDING accountants, consultants AND attorneys—AND ANY other

27  PERSON OR entity acting on EBAY'S behalf OR subject to EBAY'S control.

28

9. "FAC" means the Amended Complaint filed by YOU in the WIMO ACTION on November 20, 2015.

10. "WIMO MARKS" means ANY use of a word, series of words, phrase, name, design, logo OR other combination thereof, that include "Lunatik," "Taktik," "Lunatik Epik" OR YOUR trademarked designs, INCLUDING, ALL trademarks owned OR exclusively licensed by YOU, INCLUDING the marks reflected in U.S. Registration Numbers 4,075,222, 4,296,576, 4,262,488, AND 4,542,506.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 51:**

All DOCUMENTS RELATED TO, supporting, OR contradicting YOUR allegations in paragraphs 4, 5, 6, 29, 44, 58, 61, 68, 148, 149, 150, 151, 152, 153, 161, 163, 178, 186, 187, 189, 195, 286, 298, AND 326.

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 51:**

Wimo incorporates each of its General Objections stated above. Wimo further objects to this Demand on the grounds the phrase "RELATED TO, supporting, OR contradicting YOUR allegations in paragraphs 4, 5, 6, 29, 44, 58, 61, 68, 148, 149, 150, 151, 152, 153, 161, 163, 178, 186, 187, 189, 195, 286, 298, AND 326" is vague, ambiguous, compound, overbroad and incomprehensible and would call for an unduly burdensome search and production. Wimo further objects to this Demand to the extent that it calls for the production of documents that are protected by the attorney-client privilege, the work-product doctrine, or are otherwise immune from discovery. No documents will be produced in response to this Demand as now written.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 52:**

ALL DOCUMENTS RELATED TO, supporting OR contradicting YOUR contention that EBAY engages in ANY type of trademark infringement—INCLUDING direct infringement, indirect infringement, contributory trademark infringement, initial interest confusion, trademark dilution, unfair competition, false

1 advertising, OR deceptive advertising—with respect to the ANY of the WIMO

2 MARKS.

3 **RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 52:**

4      Wimo incorporates each of its General Objections stated above. Wimo

5 specifically objects to this Demand on the grounds that it seeks non-privileged

6 matter that is not relevant to any party's claim or defense and is not proportional to

7 the needs of the pending Lawsuit. Wimo also specifically objects to this Demand on

8 the grounds the phrase "WIMO MARKS" as defined in the Demand is overbroad,

9 potentially includes registered trademarks not at issue in the Lawsuit and would call

10 for an unduly burdensome search and production. Wimo will construe the phrase

11 "WIMO MARKS" as referring only to the registered trademarks at issue in the

12 lawsuit described in paragraph 16 of the FAC. Wimo further objects to this Demand

13 on the grounds the phrase "ALL DOCUMENTS RELATED TO, supporting OR

14 contradicting YOUR contention that EBAY engages in ANY type of trademark

15 infringement—INCLUDING direct infringement, indirect infringement,

16 contributory trademark infringement, initial interest confusion, trademark dilution,

17 unfair competition, false advertising, OR deceptive advertising" is vague,

18 ambiguous, compound, overbroad and incomprehensible and would call for an

19 unduly burdensome search and production. Wimo further objects to this Demand to

20 the extent that it calls for the production of documents that are protected by the

21 attorney-client privilege, the work-product doctrine, or are otherwise immune from

22 discovery. No documents will be produced in response to the Demand as now

23 written.

24 **Ruling Regarding Request for Production Nos. 51 and 52:**

25     The Court agrees that these RFPs are overly broad, unduly burdensome and

26 invade privileges by seeking counsel's selection or compilation of documents that

27 support or contradict particular claims.  eBay's Motion as to RFP 51 and 52 is

28

ORDER RE
EBAY'S MOT. TO COMPEL RESPONSES      - 24 -      CASE NO. 8:15–CV–01330-JLS (KES)
TO INTERROG. AND RFPS

1 DENIED.

2 **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 60:**

3 ALL DOCUMENTS used in, relied upon, OR referenced in the drafting the

4 FAC AND ANY allegations contained therein, INCLUDING ANY studies,

5 analyses, surveys, data, comparisons, compilations, correspondence, OR reports.

6 **RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 60:**

7 Wimo incorporates each of its General Objections stated above. Wimo

8 specifically objects to this Demand on the grounds that it seeks non-privileged

9 matter that is not relevant to any party's claim or defense and is not proportional to

10 the needs of the pending Lawsuit. Wimo also specifically objects to this Demand on

11 the grounds it calls for the production of documents that are protected by the

12 attorney-client privilege, the work-product doctrine, or are otherwise immune from

13 discovery. Wimo will produce all non-privileged documents located after a

14 reasonable search not within the possession, custody or subject to the control of

15 eBay that are specifically referred to in the FAC. Except as so stated, Wimo will not

16 search for or produce documents that might be encompassed by this request or

17 documents that cannot be located through a reasonable and proportional search.

18 Wimo anticipates completing its production of list responsive to this Demand by

19 the end of May 2016.

20 **Ruling Regarding Request for Production No. 60:**

21 Wimo has agreed to produce all documents cited or referenced in the FAC

22 and all documents compiled by counsel that support the factual allegations in the

23 FAC. (Joint Stip. at 50-51.) eBay contends this is insufficient, because Wimo

24 should also produce documents that tend to disprove the allegations in the FAC.

25 The parties cite Plumbers & Pipefitters Local 572 Pension Fund v. Cisco

26 Sys., 2005 U.S. Dist. LEXIS 43648 (N.D. Cal. June 21, 2005). Plumbers reiterates

27 that while "underlying fact documents cannot be shielded from discovery," a

28

ORDER RE
EBAY'S MOT. TO COMPEL RESPONSES       - 25 -       CASE NO. 8:15–CV–01330-JLS (KES)
TO INTERROG. AND RFPS

"selection and compilation of documents by counsel … in preparation for pretrial discovery may reveal an attorney's thought processes and fall within the protection of the work product doctrine." Id. at *22. In that case, the district court upheld the order of a special master compelling production of "documents actually referenced in the FAC or which otherwise constitute evidence supporting or relating to those allegations." Id. at *23. The rationale is that "Defendants are entitled to know the factual basis of Plaintiffs' claims in order to prepare for trial." Id.

The scope of production approved in Plumbers (i.e., all documents "relating to or supporting allegations made in their FAC") is slightly broader than what Wimo has agreed to provide, in that documents might "relate" to allegations in the FAC without "supporting" them. eBay's Motion as to RFP 60 is GRANTED but limited as follows: Wimo shall produce all non-privileged documents of which counsel was aware when drafting the FAC that relate to or support the allegations therein. In responding to RFP 60, Wimo has no obligation to include documents located, discovered, compiled or first reviewed by counsel after counsel drafted the FAC.

## G. **Interrogatory No. 1**
**DEFINED TERMS**

1. "WIMO," "YOU," or "YOUR" means Plaintiff Wimo Labs, LLC, its predecessors AND successors, its past AND present parents, subsidiaries, divisions, affiliates, assigns, its pasts AND present officers, directors, employees, agents, representatives—INCLUDING accountants, consultants AND attorneys—AND ANY other PERSON OR entity acting on WIMO'S behalf OR subject to WIMO'S control.

3. "WIMO MARKS" means any use of a word, series of words, phrase, name, design, logo or other combination thereof, that include "LUNATIK," "TAKTIK," "LUNATIK EPIK" or YOUR trademarked designs, INCLUDING all trademarks

owned or exclusively licensed by YOU, INCLUDING the marks reflected in U.S. Registration Numbers 4,075,222, 4,296,576, 4,262,488, and 4,542,506.

4.      "FAKE LUNATIK PRODUCTS" shall have the same meaning as ascribed to that term in the FAC.

5.      "COUNTERFEIT" or "COUNTERFEITS" shall have the same meaning as ascribed to that term in the FAC.

9.c.    "IDENTIFY" shall also mean that YOU are to provide the information specifically requested in the Interrogatory.

**INTERROGATORY NO. 1:**

        IDENTIFY EACH alleged infringement of ANY of the WIMO MARKS on OR through ebay.com, INCLUDING ANY unauthorized use of the WIMO MARKS, FAKE LUNATIK PRODUCTS, COUNTERFEITS, listings, offers to sell, sponsored links, advertisements, promotions, marketing, emails, AND use of key words OR search engines YOU contend violate YOUR rights, INCLUDING, as applicable:

        a.      date on which YOU first became aware of said infringement;

        b.      name of the infringing party;

        c.      item number;

        d.      the specific WIMO MARK OR right allegedly violated;

        e.      item description, INCLUDING materials, available colors, and
                compatible phone models, as applicable;

        f.      item price;

        g.      number of units available;

        h.      number of units sold; and

        i.      basis for claimed violation.

**WIMO'S RESPONSE TO INTERROGATORY NO. 1:**

Wimo incorporates each of its General Objections stated above. Plaintiff further objects to this Interrogatory on the grounds and the extent that it is vague and ambiguous, both as to a whole and through its incorporation of words and phrases which are susceptible to multiple interpretations and any one of which might change the nature of the question posed. Furthermore, Plaintiff objects to this Interrogatory on the ground and to the extent that it seeks information protected by the attorney-client privilege, the attorney work product doctrine and/or any other applicable privilege or protection. Plaintiff also objects to this Interrogatory on the grounds and to the extent that responding to this Interrogatory, in whole or in part, would impose an unfair, unnecessary and/or costly burden on Plaintiff. More specifically, Plaintiff objects to this Interrogatory on the grounds and to the extent that it requires Wimo to incur unnecessary and disproportionate burdens and costs for at least the following reasons. The Interrogatory (i) seeks information relating to more than 6,000 listings for FAKE LUNATIK PRODUCTS, as that term is defined in the First Amended Complaint ("FAC"), on ebay.com ("eBay Listings") that are equally available to eBay; (ii) the information sought relates to more than 6,000 Notices of Claimed Infringement ("NOCIs") that have been sent to eBay by Wimo that are equally available to eBay and include the eBay "item number" related to the eBay Listings at issue; (iii) seeks information that can be discovered from the eBay Listings which eBay Listings eBay has sought to discover from Wimo by means of eBay's First Demand for Production to Wimo which consists of 68 Demands for Production ("eBay DFP"), notwithstanding that the eBay Listings are equally available to eBay; and (iv) on or about November 25, 2015, Wimo produced to eBay a CD labeled Exhibit "A" on which is burned an excel spreadsheet that describes an estimated 6,000 eBay Listings known to Wimo on which its infringement claims ("Wimo Listing Summary") rely. Wimo further

1   objects to Interrogatory No. 1 on the grounds that it seeks information that is within

2   the possession, custody and subject to the control of eBay and is not information

3   within the possession, custody and subject to the control of Wimo and, therefore,

4   cannot be properly verified by Wimo.

5   Subject to and without waiving the foregoing General and Specific

6   Objections, Wimo responds as follows.  In addition to the listings identified in the

7   FAC, Wimo's infringement claims against eBay are based, *inter alia,* on more than

8   6,000 eBay Listings that have appeared and continue to appear on ebay.com, some

9   of which are specifically identified in the FAC and on the eBay direct email

10  solicitations described in paragraph 275 of the FAC ("eBay Solicitations"), a few of

11  which are specifically described in the FAC.  The eBay Solicitations are being

12  produced to all parties pursuant to paragraph 3 of Plaintiff's initial disclosures

13  pursuant to Federal Rules of Civil Procedure, Rule 26(a)(l) and in response to

14  eBay's First Demand for Production of Documents to Plaintiff Wimo.  Wimo does

15  not have in its possession, custody or subject to its control any additional eBay

16  Solicitations.  The eBay Solicitations are in the possession, custody and/or subject

17  to the control of eBay and possibly third parties, including the Counterfeit Report.

18  Wimo has propounded discovery to eBay requesting production of the eBay

19  Solicitations and is awaiting production of those documents.  The eBay Listings on

20  which Wimo's infringement claims rely are described in the above-described excel

21  spreadsheet which is regularly updated referred to herein as the Wimo Listing

22  Summary.  As stated, a version of the Wimo Listing Summary was provided to

23  eBay on or about November 25, 2015 in a CD labeled Exhibit "A".  The

24  information in the Wimo Listing Summary reflects information that appears on the

25  face of the listings to which the Wimo Listing Summary refers.  Wimo will provide

26  Defendants with an updated version of the Wimo Listing Summary by no later than

27  March 31, 2016.  In addition, Wimo will provide Defendants with copies of the

28

ORDER RE
EBAY'S MOT. TO COMPEL RESPONSES          - 29 -          CASE NO. 8:15–CV–01330-JLS (KES)
TO INTERROG. AND RFPS

listings on which Wimo Listing Summary and updated Wimo Listing Summary rely by no later than March 31, 2016 ("Wimo Produced eBay Listings"). Wimo has no written record of the date on which it first became aware of any particular listing identified on the Wimo Listing Summary. Wimo has no personal knowledge of any of the following: (i) name of the infringing party; (ii) item price, (iii) number of units available for sale on ebay.com; and/or (iv) number of units sold on ebay.com. This information is within the possession, custody or subject to the control of eBay. The ebay.com "item number" may be reflected on the eBay Listings, the Wimo Produced eBay Listings, the Wimo Listing Summary and on the eBay Solicitations. The WIMO MARK may be visible on the eBay Listings, the Wimo Produced eBay Listings, the Wimo Listing Summary and the eBay Solicitations. The description of the FAKE LUNATIK PRODUCT (as that term is defined in the Interrogatories), INCLUDING materials, available colors, and compatible phone models, as applicable, may be set forth in the eBay Listings, the Wimo Produced eBay Listings and on the eBay Solicitations. Wimo is informed and believes that it does not have in its possession, custody or subject to its control all of the listings on ebay.com for FAKE LUNATIK PRODUCTS, as that term is defined in the FAC. Those eBay Listings are in the possession, custody and/or subject to the control of eBay. Wimo has propounded discovery to eBay requesting production of those missing eBay Listings and is awaiting production of those documents. The basis for Wimo's infringement claims are detailed in the FAC.

**Ruling Regarding Request for Interrogatory No. 1:**

eBay has limited its Motion to subsections (a), (d), (e), (f) and (i). (Joint Stip. at 54.)

a. **date on which YOU first became aware of said infringement**

Wimo first responded by saying that it has "no written record" of this information. (Joint Stip. at 56.) Wimo now contends that it produced a master

NOCI list which "identifies the date on which Wimo first became aware of the alleged infringement." (Id. at 61.) It is unclear to the Court if Wimo is referring to the NOCI transmittal date as the date of Wimo's first awareness, and if so, if that is because of a policy or practice governing Wimo's transmittal of NOCIs.

eBay's Motion as to Rog 1(a) is GRANTED. As to each instance of alleged infringement, Wimo shall state either (1) the date it became aware of the infringement, or (2) that it does not know and cannot estimate when it became aware of the infringement, or (3) that it can estimate the date when it became aware of the infringement based on some general policy, practice or other information which it shall describe.

        d.      **the specific WIMO MARK OR right allegedly violated;**

eBay contends that just from looking at the auctions identified in each NOCI, it cannot tell which of the FOUR MARKS Wimo contends was infringed by any particular auction. (Joint Stip. at 59.) eBay's Motion as to Rog 1(d) is GRANTED. As to each instance of alleged infringement, Wimo shall state which of the FOUR MARKS Wimo contends was infringed.

        e.      **item description, INCLUDING materials, available colors, and compatible phone models, as applicable;**

eBay requests this information for each variation of each product at issue (i.e., the Taktik 4, Taktik 5, Taktik 360 and Epik) so that it can evaluate the claims of infringement. Wimo contends this is in the FAC (Joint Stip. at 61), but eBay contends the information in the FAC is not specific as to the variations of each model.

eBay's Motion as to Rog 1(e) is GRANTED. As to each product at issue, Wimo shall identify all variations during the relevant period, and then as to each variation, Wimo shall state its (1) available materials, (2) available colors and (3) compatible phone models, and any changes in this information over the relevant time period.

1                           f.     **item price;**

2       Wimo responded that it has no personal knowledge. (Joint Stip. at 56.) eBay

3 clarified that it wants to know the MSRP at the time of the alleged infringement,

4 not the price on eBay. (Id. at 60.) eBay's Motion as to Rog 1(f) is GRANTED. As

5 to each variation of each product at issue, Wimo shall state the MSRP during the

6 relevant time period, including any changes over time.

7                           i.     **basis for claimed violation.**

8       eBay wants to know if the claimed infringement is direct, contributory or

9 both. (Joint Stip. at 60.) Wimo asserts that it cannot provide that response until it

10 completes certain discovery regarding marketing emails. (Id. at 61.)

11       eBay's Motion as to Rog 1(i) is GRANTED. Wimo shall explain its theory

12 of how eBay engaged in direct or contributory infringement. In its response, as to

13 each instance of alleged infringement, Wimo shall state whether the claimed

14 infringement is direct, contributory, both, or unknown. For those identified as

15 "unknown," Wimo shall update its response no later than sixty (60) days before the

16 discovery cutoff to provide the information.

17

18 IT IS SO ORDERED.

19

20 Dated: September 15, 2016 _____

21                                     The Honorable Karen E. Scott

22                                     Magistrate Judge, United States
                                    District Court for the Central District

23                                     of California

24

25

26

27

28

# EXHIBIT O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
| Title | Ecojet, Inc. v. Luraco, Inc. | | |

Present: The Honorable    Karen E. Scott, United States Magistrate Judge

| Jazmin Dorado | n/a |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| n/a | n/a |

**Proceedings:**    (In Chambers) Ecojet's motion to compel production and obtain discovery sanctions (Dkt. 36); Luraco's discovery-related motions (Dkt. 50, 51)

## I.   PROCEEDINGS

Plaintiff Ecojet filed its Complaint on March 15, 2016, alleging that Defendant Luraco is infringing U.S. Patent No. RE45,844 ("Patent-in-Suit").   (Dkt. 1.)   The Patent-in-Suit is for a water jet pump for a "whirlpool foot bath for a pedicure chair" that can be "easily cleaned and sanitized."   (Dkt. 39 at 2.)   Defendant's defenses are that: (a) Plaintiff's patent is invalid due to prior art, and (b) Defendant is not infringing Plaintiff's patent's claims.   (Dkt. 42 at 4.)

The parties conducted their Rule 26 conference of counsel on June 3, 2016.   (Dkt. 22.) Per their Joint Report, the parties exchanged Rule 26(a)(1)(A) initial disclosures on June 9, 2016. (Id. at 3.)   The parties also stated that they "do not believe that discovery should be conducted in phases or otherwise limited."   (Id.)

Also on June 9, Plaintiff served its First Set of Requests for Production of Documents ("RFPs") on Defendant.   (Dkt. 36-2 at 5-15.)   After receiving initial responses (id. at 17-41) and amended responses (id. at 43-73), on September 13, 2016, Plaintiff filed a motion ("Motion to Compel" at Dkt. 36) to (1) compel Defendant to produce responsive documents and (2) obtain $4,150 in sanctions/expenses pursuant to FRCP 37(a)(5).

On September 14, 2016, the Court ordered the parties to meet and confer over each RFP at issue.   (Dkt. 38.)   The Court further instructed that if Defendant was withholding relevant, responsive documents on the basis of privilege, then Defendant should serve a privilege log on or before September 23, 2016.   (Id.)

On September 26, 2016, Defendant opposed Plaintiff's motion.   ("Oppo." at Dkt. 42.) Defendant attached second amended responses that it served on September 26, 2016.   (Dkt. 41-2.)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
|---|---|---|---|

| Title | Ecojet, Inc. v. Luraco, Inc. |
|---|---|

Defendant also produced 706 pages of documents. (Dkt. 46 at 3-4 [summarizing Defendant's production].) Defendant promised additional production during the first week of October. (Dkt. 42 at 5.)

On October 3, 2016, Plaintiff filed its Reply. (Dkt. 46.) Plaintiff pointed out that Defendant failed to serve a privilege log or request an extension of time in which to do so. (Id. at 4.) Plaintiff asserts that while Defendant's second amended responses resolved the dispute over RFPs 9 and 10 (id. at 6, n.1), the 30 other RFPs listed in the motion remain in dispute.

On October 9, 2016, Defendant filed a request to be excused from its inadvertently late compliance with the court-ordered privilege log deadline. (Dkt. 50.) Defendant attached its privilege log which identifies only documents post-dating the start of this litigation. (Dkt. 50-1.) Defendant also filed a 2-page motion seeking to bifurcate discovery between technical/merits issues and damages. ("Bifurcation Motion" at Dkt. 51.) The arguments raised are substantially identical to those raised in Defendant's opposition to the Motion to Compel. (Cf., Dkt. 42.)

On October 11, 2016, the Court conducted a hearing on the Motion to Compel. The Court indicated that it would also reach the Bifurcation Motion because the briefing did not add anything new to the objections and arguments that had already been raised by Defendant as a basis to oppose the RFPs at issue in the Motion to Compel.

## II. General Arguments

Regarding the Motion to Compel, the parties raise several arguments that apply to more than one of the RFPs in dispute. For efficiency, the Court addresses them here before discussing each RFP.

### A. Protective Order

Judge Guilford has adopted Standing Patent Rules ("S.P.R."). Per S.P.R. 1.5, "Absent a Court order, discovery cannot be withheld on the basis of confidentiality. The Court's Standing Protective Order shall govern discovery unless the Court enters a different protective order. The Standing Protective Order can be found on Judge Guilford's 'Frequently Asked Questions' webpage, available on the 'Judges' Procedures and Schedules' portion of the Central District of California's website."

Judge Guilford's Standing Protective Order permits the parties to produce discovery materials designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

On September 15, 2016, the Court repeated these rules, advising the parties that "No party

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
| Title | Ecojet, Inc. v. Luraco, Inc. | | |

shall claim that relevant, responsive documents are being withheld based on the lack of a protective order governing the production of documents designated confidential.   If the parties would prefer not to rely on Judge Guilford's standing protective order being enforceable … then the parties may promptly modify Judge Guilford's standing protective order to fit this case and submit it via stipulation to be approved by the Magistrate Judge."   (Dkt. 38.)

To date, neither party has submitted a proposed alternative to Judge Guilford's Standing Protective Order.   Based on these rules, any objection based on the purported lack of a protective order is OVERRULED.

### B.   Motive/Improper Purpose

Defendant argues that it should be excused from producing documents because "Ecojet seeks documents for an improper purpose in order to obtain a competitive advantage."   (Dkt. 42 at 3.)   Defendant has failed to demonstrate that producing appropriate documents marked "HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY" would be insufficient to protect its competitive interests.   Moreover, parties are entitled to discovery of materials that are relevant to the claims and defenses and proportional to the needs of the case, without any inquiry into their subjective motive.   FRCP 26(b)(1).   Any objection based on purportedly improper motive is OVERRULED.

### C.   Undue Burden/Not Proportional to the Needs of the Case

Defendant objected to many of the disputed RFPs on the grounds that responding would impose an undue burden disproportional to the needs of the case.   In support of its undue burden argument, Defendant explains, "Luraco is a small company with limited resources …."   (Dkt. 42 at 3.)   This kind of generalized statement is insufficient to sustain Defendant's undue burden objections.   Defendant may not withhold non-privileged, relevant documents responsive to the disputed RFPs on the grounds that producing them would impose an undue burden; that objection is OVERRULED.

### D.   Bifurcated Discovery

Defendant argues that "the documents sought include extensive financial documents that are not relevant to the threshold issue [of] infringement and should be deferred to a later date only after liability is established."   (Dkt. 42 at 3; see also p. 5 ["need to prioritize technical issues and to bifurcate them from financial"].)

The Court declines to bifurcate discovery between technical and financial issues.   First, Defendant did not propose bifurcation in the joint Rule 26 report.   Instead, Defendant stated that it did "not believe that discovery should be conducted in phases or otherwise limited."   (Dkt. 22.)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
|---|---|---|---|

| Title | Ecojet, Inc. v. Luraco, Inc. |
|---|---|

Second, the Court is not persuaded that bifurcation would promote the just, speedy and inexpensive determination of the case, consistent with FRCP 1. Bifurcation would likely lead to disputes over what discovery was merits-related versus damages-related and would require some witnesses to be deposed twice. For these reasons, Defendant's objections based on proposed bifurcation are OVERRULED. Defendant's motion for a protective order based on bifurcation is **DENIED.** (Dkt. 51)

E. Mootness.

Defendant argues that it "is requesting a re-examination of the United States Patent No. RE45,844, and, if successful, much if not all of the claims asserted here—as well as the discovery sought through the Motion—will be moot." (Dkt. 42 at 3.)

It is always within the case management discretion of the District Judge to stay an action. If it wishes to do so, Defendant may move the District Judge to stay this entire case, including all discovery, based on the strength of its arguments concerning the likely outcome of re-examination. Until such time as a stay is granted, however, the fact that Defendant has requested a re-examination has no relevance to the parties' discovery obligations. Defendant's objections on this ground are OVERRULED.

F. Place and Manner of Production.

Many of Defendant's supplemental responses offer to make discoverable items available for inspection in Texas. Defendant has not supplied any persuasive reason to impose this restriction, and it was untimely interposed in supplemental responses. For those items that Defendant is ordered to produce, Defendant shall produce copies or make the items available at a location in the Central District of California. For e-discovery, the parties should follow Judge Guilford's standing e-discovery rules.

G. Relevant Temporal Scope.

In its second supplemental responses to the RFPs, Defendants stated, "In responding to the Requests that fail to specify a time period, unless otherwise specified in its response, Luraco will interpret that Request as applying only to the present day." (Dkt. 41-2 at 6.) As to other RFPs, Defendant limited its response to "the relevant temporal scope of this matter-- September 25, 2012 to present."

Limiting the RFPs to records dating from September 25, 2012 to present appears consistent with FRCP 26(b)(1), and objections on that basis are SUSTAINED. Limiting the RFPs to "the present day" is not consistent with FRCP 26(b)(1), and Defendant's general objection is OVERRULED.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
| Title | Ecojet, Inc. v. Luraco, Inc. | | |

H. **Relevant Geographic Scope.**

Defendant stated that it limited its search for responsive documents to "the United States market." (Dkt. 41-2 at 6.) Again, this seems consistent with FRCP 26(b)(1), and objections on that basis are SUSTAINED.

I. **Rule 34(b)(2)(C) - Privilege.**

An objection to an RFP must "state whether any responsive materials are being withheld on the basis of that objection." FRCP 34(b)(2)(C). There are several ways to accomplish this. As to privilege objections, a party withholding relevant, responsive documents on the basis of privilege is required to identify them via a privilege log. FRCP 26(b)(5). Parties often stipulate that neither side needs to log post-litigation documents reflecting attorney-client communications or attorney work product arising out of litigation, because such materials are generally voluminous and there is no serious dispute over their privileged status. Pre-litigation relevant, responsive privileged documents that do not fall within any of the provisions of the Standing Patent Rules, however, should be identified on a log if they are withheld.

Defendant produced a privilege log on October 3, 2016. (Dkt. 50, ¶ 5.) The log identifies only documents that post-date the filing of this lawsuit. (Dkt. 50-1.) The Court **GRANTS** Defendant's motion to be excused for missing the court-ordered deadline by a few days due to inadvertence, and the privileges asserted in the log are not waived. (Dkt. 50.)

At the hearing, counsel for Defendant indicated that the log may not be complete, because privileged patent prosecution documents relevant to the instant dispute may exist. Defendant shall serve an updated, complete privilege log **on or before October 17, 2016**. For pre-litigation documents, the log shall separately identify each relevant document withheld on the basis of privilege and provide sufficient information to justify the claim of privilege. The Court does not reach whether or not any privilege claim as to pre-litigation documents not presently logged has been waived.

If a relevant, responsive document does not appear on Defendant's updated log, then it may not be withheld from production on the basis of a privilege objection, with this one exception: the Standing Patent Rules have provisions governing the timing of expert disclosures and discovery related to any "advice of counsel" defense. Defendant was not obligated to produce such materials earlier in response to Plaintiff's RFPs, and Defendant has not waived any privileges attached to such materials by failing to log them prior to the time set for their production by the S.P.R.s.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
|---|---|---|---|

| Title | Ecojet, Inc. v. Luraco, Inc. |
|---|---|

 

J.  Rule 34(b)(2)(C) - Vagueness.

Defendant raised a number of vagueness objections.   For some, Defendant explained how it was interpreting the vague term and for what records its custodians would search.   (See Dkt. 41-2 at 4, explaining how Defendant interpreted the defined terms "ACCUSED INSTRUMENTALITIES" and others.)   For those terms so explained, Defendant's vagueness objections are SUSTAINED and the RFPs are limited in the manner stated in Defendant's interpretation.

For other RFPs, however, Defendant objected to terms with plain and ordinary meanings (like research, technical drawings, technical specifications, design, etc.).   When Defendant made those objections, Defendant failed to explain how it interpreted those terms, or for what it instructed its custodians to search.   Such objections are OVERRULED.

K.  Rule 34(b)(2)(B) – Identifying Responsive Documents.

Parties responding to RFPs must state in their written response if inspection will be permitted (or copies of documents produced).   Here, Defendant stated in response to some RFPs that notwithstanding its objections, it would produce documents.   Defendant then stated in general objections (which were incorporated into all of its RFP responses), "By stating that it will produce documents or provide information in response to any particular topic, Luraco makes no representation that any such documents or information exist."   (Dkt. 41-2 at 3.)

This general objection is inconsistent with Rule 34 and it is OVERRULED.   Defendant shall not include this general objection in future discovery responses.   **Within three (3) weeks of this order**, Defendant will PROVIDE SUPPLEMENTAL WRITTEN RESPONSES that state, to the best of Defendant's knowledge as of the date of the response and after conducting a reasonable search consistent with its discovery obligations, whether relevant documents responsive to each RFP exist or whether they do not exist.   Where relevant, responsive documents exist, Defendant shall indicate whether they have already been produced or PRODUCE THEM WITH ITS SUPPLEMENTAL WRITTEN RESPONSES.   When the Court indicates below concerning particular RFPs that Defendant shall provide a Supplemental Response, the Court is referring to the directives in this Paragraph (K).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
| Title | Ecojet, Inc. v. Luraco, Inc. | | |

III. DISPUTED RFPs

**REQUEST FOR PRODUCTION NO. 1:**
Two samples of each [of] the ACCUSED INSTRUMENTALITIES.[1]

Defendant initially objected that this RFP seeks information "equally available" to Plaintiff. Defendant then offered to make the referenced items available for inspection in Texas, but asserted no obligation "to produce them for indefinite possession by its competitor."

Plaintiff's motion explains, "Plaintiff of course purchased what it believes to genuine copies of the accused product prior to bringing suit. However, in Request Number 1, Plaintiff demands Defendant to produce genuine copies so that there is no dispute regarding the pedigree of the device that Plaintiff will spend tens of thousands of dollars inspecting for the purposes of infringement and later learn that the device is not genuine. Indeed, in Plaintiff's August 22, 2016, meet and confer letter, Plaintiff offered to reimburse Defendant for any expense associated with providing the sample." (Dkt. 36 at 12.)

Defendant responded that it "has provided pricing for the products in its Exhibit 1, to alleviate any authenticity concerns." (Dkt. 41-2 at 6.) The parties confirmed at the hearing that Plaintiff is willing and able to purchase the requested samples from Defendant, and will do so.

For these reasons, no supplemental response to RFP 1 is required.

**REQUEST FOR PRODUCTION NO. 2:**
All DOCUMENTS, including COMMUNICATIONS, that CONCERN the PATENT-IN-SUIT.

Defendant objected but offered to produce relevant documents dating from September 25, 2012 to present. Defendant produced some documents with its second amended response as Exhibit 2. (Dkt. 41-2 at 7.)

Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 4:**
All DOCUMENTS CONCERNING the structure, design, and/or operation of the ACCUSED INSTRUMENTALITIES.

---

1 The term "ACCUSED INSTRUMENTALITIES" was defined to mean product, process, or technique that practices the invention claimed in the Patent-in-Suit and includes, without limitation, the water jet pumps identified by YOU on YOUR website as "Magna-JET," "Dura-JET III," and "Dura-JET 4," "Magna-JET with built in LED Lights" and "Dura-JET III with built in LED Lights." (Dkt. 36-2 at 6.)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
| Title | Ecojet, Inc. v. Luraco, Inc. | | |

Defendant agreed to produce documents "sufficient to show the structure, design, and/or operation of any aspects or elements of an Accused Instrumentality identified by Plaintiffs S.P.R. 2.1.3 chart upon entry of a Protective Order by the Court."   Defendant contends it produced these documents as Ex. 4 to its second supplemental responses.   (Dkt. 41-2 at 8.)

A S.P.R. 2.1.3 chart identifies "specifically where each limitation of each asserted claim is found within each Accused Instrumentality, including, for each limitation that such party contends is governed by 35 U.S.C. § 112(6)/(f), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function, and whether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality."

The parties' dispute was initially over the relevant (and thus permissible) scope of design-related discovery.   Plaintiff contends that Defendant "improperly limits its response to specific designs elements.   Plaintiff has identified whole products as infringing the Patent-in-Suit – not portions thereof.   In this patent infringement action, [Defendant] should be ordered to produce documents regarding the design of the accused products."   (Dkt. 36 at 15.)

Defendant counters, "Plaintiff's claims concern only the chamber and impeller of the water jet, two small parts of the jet.   However, the discovery seeks technical data for the entire jet manufactured by Defendant."   This documentation "would allow plaintiff to recreate defendant's entire water jet without further development, though the claims in question concern only a small section of part of the pump."   (Dkt. 42 at 8.)

Through its supplemental responses and at the hearing, Defendant clarified that it is no longer objecting that this discovery should be limited by the S.P.R. 2.1.3 chart, making this dispute moot.

Defendant shall provide a Supplemental Response.

### REQUEST FOR PRODUCTION NO. 5:
All design files, 3D renderings, 3D printer files, computer-aided design (CAD) drawings, illustrations, design parameters, or lab notebooks related to the ACCUSED INSTRUMENTALITIES.

The dispute over this RFP mirrored the dispute over RFP 4.   Defendant shall provide a Supplemental Response.

### REQUEST FOR PRODUCTION NO. 6:
All DOCUMENTS CONCERNING any and all research, development, and/or testing that

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
|---|---|---|---|

| Title | Ecojet, Inc. v. Luraco, Inc. |
|---|---|

resulted in development or design of the ACCUSED INSTRUMENTALITIES.

The dispute over this RFP mirrored the dispute over RFP 4. Defendant shall provide a Supplemental Response.

## REQUEST FOR PRODUCTION NO. 7:
All DOCUMENTS CONCERNING technical drawings and technical specifications corresponding to the ACCUSED INSTRUMENTALITIES.

The dispute over this RFP mirrored the dispute over RFP 4. Defendant shall provide a Supplemental Response.

## REQUEST FOR PRODUCTION NO. 8:
DOCUMENTS sufficient to identify articles, advertising and marketing of the ACCUSED INSTRUMENTALITIES including those concerning market approval, benefits, advantages, and superiority of the ACCUSED INSTRUMENTALITIES and features thereof.

Defendant shall provide a Supplemental Response. Defendant may produce exemplars of responsive advertising rather than copies of the same advertising run in different publications, but where it chooses to do so, it shall specify when and where the advertising was published.

## REQUEST FOR PRODUCTION NO. 11:
All DOCUMENTS CONCERNING the supply chain, sales, importation, and exportation of ACCUSED INSTRUMENTALITIES.

For this RFP, the phrase "All DOCUMENTS" shall be limited to "DOCUMENTS sufficient to identify." The phrase "ACCUSED INSTRUMENTALITIES" shall be limited to (1) the cap, and/or (2) wholly assembled devices.

With these limitations, Defendant shall provide a Supplemental Response.

## REQUEST FOR PRODUCTION NO. 12:
All DOCUMENTS CONCERNING YOUR acquisition of the ACCUSED INSTRUMENTALITIES, including purchase orders, invoices, and design or manufacturing requirements for the ACCUSED INSTRUMENTALITIES.

For this RFP, the phrase "All DOCUMENTS" shall be limited to "DOCUMENTS sufficient to identify." The phrase "ACCUSED INSTRUMENTALITIES" shall be limited to (1) the cap, and/or (2) wholly assembled devices.

With these limitations, Defendant shall provide a Supplemental Response.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
| Title | Ecojet, Inc. v. Luraco, Inc. | | |

## REQUEST FOR PRODUCTION NO. 13:

All COMMUNICATION with any third-parties from whom YOU acquired or purchased ACCUSED INSTRUMENTALITIES, including but not limited COMMUNICATIONS CONCERNING the design or manufacturing requirements of the ACCUSED INSTRUMENTALITIES.

For this RFP, the phrase "ACCUSED INSTRUMENTALITIES" shall be limited to (1) the cap, and/or (2) wholly assembled devices.

With this limitation, Defendant shall provide a Supplemental Response.

## REQUEST FOR PRODUCTION NO. 14:

All advertisements or COMMUNICATIONS with distributors and potential distributors CONCERNING the ACCUSED INSTRUMENTALITIES.

Defendant shall provide a Supplemental Response.    Defendant may produce exemplars of responsive advertising rather than copies of the same advertising run in different publications, but where it chooses to do so, it shall specify when and where the advertising was published.

## REQUEST FOR PRODUCTION NO. 16:

All DOCUMENTS CONCERNING meeting minutes, notes, documents, and communications related to all meetings, whether in person and/or telephonic, held by YOUR board of directors, officers, shareholders, distributors, employees, and/or investors concerning the ACCUSED INSTRUMENTALITIES.

Defendant shall provide a Supplemental Response.

## REQUEST FOR PRODUCTION NO. 17:

All DOCUMENTS concerning revenue generated from the sale or use of the ACCUSED INSTRUMENTALITIES.

As explained above, the Court declines to bifurcate discovery.    Defendant shall provide a Supplemental Response.

## REQUEST FOR PRODUCTION NO. 18:

All DOCUMENTS concerning anticipated revenue and sales projections for the ACCUSED INSTRUMENTALITIES.

As explained above, the Court declines to bifurcate discovery.    Defendant shall provide a Supplemental Response.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
|----------|-------------------------|------|------------------|

| Title | Ecojet, Inc. v. Luraco, Inc. |
|-------|------------------------------|

**REQUEST FOR PRODUCTION NO. 19:**

All DOCUMENTS relating to sales data for the ACCUSED INSTRUMENTALITIES, including costs, pricing, incentives, rebates, and exchange accounts.

As explained above, the Court declines to bifurcate discovery. Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 20:**

All DOCUMENTS relating to the costs associated with the ACCUSED INSTRUMENTALITIES, including the costs of goods, and any and all costs associated with selling the ACCUSED INSTRUMENTALITIES.

As explained above, the Court declines to bifurcate discovery. Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 21:**

All DOCUMENTS CONCERNING budget and business plans for the ACCUSED INSTRUMENTALITIES.

As explained above, the Court declines to bifurcate discovery. Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 22:**

All DOCUMENTS CONCERNING the market for water jet pumps and the actual and/or projected share for the ACCUSED INSTRUMENTALITIES.

As explained above, the Court declines to bifurcate discovery. Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 23:**

DOCUMENTS and things sufficient to identify the sales price, retail price, and wholesale price of the ACCUSED INSTRUMENTALITIES.

As explained above, the Court declines to bifurcate discovery. Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 24:**

DOCUMENTS CONCERNING the commercial success of the ACCUSED INSTRUMENTALITIES, including market approval, consumer approval, competitor praise, awards, articles, and all other indications of the commercial success of the ACCUSED INSTRUMENTALITIES.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
|---|---|---|---|

| Title | Ecojet, Inc. v. Luraco, Inc. |
|---|---|

As explained above, the Court declines to bifurcate discovery. Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 25:**
DOCUMENTS sufficient to show your organizational structure and corporate structure, including parent corporations, subsidiaries, and affiliates.

Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 26:**
DOCUMENTS sufficient to identify the hierarchy of YOUR employees, including the identity of any employee involved in the marketing, sales, design, engineering, manufacturing, research, development, importation, exportation, and commercialization of the ACCUSED INSTRUMENTALITIES, including but not limited to the reporting relationships of officers, directors, managers, research scientists, engineers, designers, employees, and agents of YOU whose duties and/or responsibilities relate in any way to the ACCUSED INSTRUMENTALITIES.

Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 27:**
All DOCUMENTS CONCERNING any testing, analysis, deconstruction, engineering, or investigation that YOU conducted into ECOJET UNIVERSAL MAGNETIC JET.[2]

Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 29:**
All DOCUMENTS CONCERNING the date that YOU first gained knowledge of the PATENT-IN-SUIT, and the circumstances under which YOU first gained knowledge of the PATENT-IN-SUIT, including, but not limited to the identity of the person(s) who gained the knowledge, the circumstances under which YOU gained the knowledge and any actions taken by YOU as a result of YOUR becoming aware of the PATENT-IN-SUIT.

Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 30:**
All DOCUMENTS CONCERNING YOUR knowledge or awareness of the PATENT-IN-SUIT.

---

2 The term "ECOJET UNIVERSAL MAGNETIC JET" was defined to mean the product marketed, distributed, and/or sold by PLAINTIFF under the title Universal Magnetic Jet. (Dkt. 36-2 at 7.)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
|----------|-------------------------|------|------------------|

| Title | Ecojet, Inc. v. Luraco, Inc. |
|-------|------------------------------|

Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 31:**
DOCUMENTS sufficient to identify the first instance in which you learned of the existence of the PATENT-IN-SUIT and/or the application giving rise to the PATENT-IN-SUIT.

Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 32:**
DOCUMENTS sufficient to show any licenses, cross-licenses, and/or agreements CONCERNING parts or equipment, including but not limited to water jet pump for use in spa or massage chairs.

The "parts or equipment" shall be limited to those relevant to the devices at issue. With this limitation, Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 33:**
DOCUMENTS sufficient to show YOUR document retention policies, including the author(s) of such policy, and the date in which it was implemented.

Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 34:**
All DOCUMENTS CONCERNING any testing, analysis, deconstruction, engineering, or investigation that YOU conducted into ECOJET UNIVERSAL MAGNETIC JET.

Defendant shall provide a Supplemental Response.

**REQUEST FOR PRODUCTION NO. 35:**
All COMMUNICATION with third-parties concerning this lawsuit.

Defendant shall provide a Supplemental Response.

IV. RECOVERY OF EXPENSES

If the Court grants a motion to compel discovery, or if the discovery requested is provided after the motion is filed, then the Court "must, after giving an opportunity to be heard, require the party … whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." FRCP 37(a)(5). The Court, however, must not order this payment if "(i) the movant filed

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 16-00487-AG (KESx) | Date | October 12, 2016 |
| Title | Ecojet, Inc. v. Luraco, Inc. | | |

the motion before attempting in good faith to obtain the disclosure or discovery without court action" or "(ii) the opposing party's nondisclosure, response, or objection was substantially justified." <u>Id.</u>

Here, the Court has largely **GRANTED** Plaintiff's motion to compel. The Court finds that many of the objections proffered by Defendant over time as reasons to withhold discovery (e.g., a proposal to bifurcate discovery that was contrary to the parties' joint Rule 26 report, the lack of a protective order, willingness to produce documents only in Texas, vagueness or overbreadth objections to RFPs that could have been easily modified through a robust "meet and confer" effort) lacked substantial justification. The facts remain that despite serving this discovery in June, Plaintiff had not received any documents when it filed the Motion to Compel on September 13, 2016. Plaintiff had attempted in good faith to obtain responses, but Defendant's first supplemental responses largely withdrew prior promises to produce and attempted to impose new conditions on production, such as the limitation that documents be provided for inspection only in Texas.

Plaintiff requests $4,150, which represents 10 hours of its counsel Mr. Grant's time at a rate of $415/hour. Ten hours does not exceed a reasonable amount of time to have spent on the Motion to Compel given that (1) more than 30 RFPs were in dispute, (2) Plaintiff filed moving papers and a reply, and (3) preparing for, travelling to and attending the 1-hour hearing would represent a substantial portion of this ten-hour request. Mr. Grant's rate is reasonable for an intellectual property litigator in the greater Los Angeles legal market who has been admitted to the California Bar more than ten years ago.

For these reasons, consistent with FRCP 37(a)(5)(A) and (C), the Court orders Defendant Luraco to pay Plaintiff's reasonable expenses incurred in making the Motion to Compel in the amount of $4,150.00.

IT IS SO ORDERED.

Initials of Deputy Clerk ___JD___

# EXHIBIT P

1  Eric H. Gibbs (Bar No. 178658)
2  Andre Mura (Bar No. 298541)
   Linda Lam (Bar No. 301461)
3  **GIRARD GIBBS LLP**
   505 14th Street, Suite 1110
4  Oakland, CA 94612
5  Tel: (510) 350-9700
   Fax: (510) 350-9701
6  ehg@classlawgroup.com
7  amm@classlawgroup.com
   lpl@classlawgroup.com
8
9  Joseph W. Cotchett (Bar No. 36324)
   Adam J. Zapala (Bar No. 245748)
10 Gwendolyn R. Giblin (Bar No. 181973)
11 **COTCHETT, PITRE & MCCARTHY, LLP**
   840 Malcolm Road, Suite 200
12 Burlingame, CA 94010
   Tel: (650) 697-6000
13 Fax: (650) 697-0577
14 jcotchett@cpmlegal.com
   azapala@cpmlegal.com
15
16 *Plaintiffs' Interim Co-lead Counsel*

17

18        **UNITED STATES DISTRICT COURT FOR THE**
          **CENTRAL DISTRICT OF CALIFORNIA**
19             **SANTA ANA DIVISION**

20 IN RE: VIZIO, INC., CONSUMER          Case No. 8:16-ml-02693-JLS (KESx)
   PRIVACY LITIGATION
21
                                         **PLAINTIFFS' OPPOSITION TO**
22 This document relates to:            **VIZIO DEFENDANTS' MOTION**
                                         **TO DISMISS AND STRIKE**
23 ALL ACTIONS
24                                       DATE:   May 26, 2017
25                                       TIME:   2:30 p.m.
                                         DEPT:   Courtroom 10-A
26                                       JUDGE:  Hon. Josephine L. Staton
27

28

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................... 1

I.    Vizio Cannot Meet Its Formidable Burden of Establishing that Plaintiffs' Request for Injunctive Relief Is Moot. ................................. 1

    A.    Vizio must show it is "absolutely clear" future violations will not occur *and* past effects of illegal acts are completely and irrevocably eradicated. ......................................................... 2

    B.    Vizio cannot establish mootness because it refuses to admit wrongdoing, it has a financial interest in continuing illegal conduct, and the consent decree fails to address all conduct challenged here. ................................................................. 3

    C.    Vizio also cannot establish mootness because it makes no showing that the effects of any past violation have been completely and irrevocably eradicated. ................................... 5

II.    Plaintiffs Sufficiently Allege Federal and California Wiretapping Claims by Alleging that Vizio Intercepted the "Contents" of Communications. ................................................................................ 8

    A.    "Contents" includes information revealing what persons watch on their television. .......................................................... 8

    B.    Plaintiffs allege Vizio intercepted actual samples of transmitted content. ............................................................................ 9

    C.    *A fortiori*, Plaintiffs adequately plead violations of the California Invasion of Privacy Act. ............................................. 11

III.    Vizio's Motion to Dismiss Factual Allegations, But Not Claims, Must Be Denied. ................................................................................ 12

i

A.    Dismissal under Rule 12(b)(6) is not an appropriate means to
           challenge factual allegations. ................................................ 12

     B.    The Court has already determined Plaintiffs' pleading satisfies
           applicable pleading requirements. ........................................ 14

IV.   Vizio's Preemptive Motion to Strike the Class Definitions Fails. ............... 16

     A.    The requests fail as an evidentiary matter. ........................... 17

     B.    The requests also fail on the merits. ..................................... 18

CONCLUSION ....................................................................................... 21

PLAINTIFFS' OPPOSITION TO DEFS.' MOTION TO DISMISS AND STRIKE
CASE NO. 8:16-ML-02693-JLS-KES

# TABLE OF AUTHORITIES

**CASES**

*Alexander v. American Exp. Co.*,
    No. SACV 11–0843–JST (MLGx),
    2011 WL 6046928 (C.D. Cal. Nov. 10, 2011) ............................................... 18, 20

*Already, LLC v. Nike, Inc.*,
    133 S. Ct. 721 (2013) .................................................................................. 2, 3

*Am. Cargo Transp., Inc. v. United States*,
    625 F.3d 1176 (9th Cir. 2010) ...................................................................... 4

*Am. Pipe & Constr. Co. v. Utah*,
    414 U.S. 538 (1974) ...................................................................................... 20

*Armster v. U.S. Dist. Court for Cent. Dist. of Cal.*,
    806 F.2d 1347 (9th Cir. 1986) ...................................................................... 3

*Barnes v. AT & T Pension Benefit Plan-Nonbargained Program*,
    270 F.R.D. 488 (N.D. Cal. 2010).................................................................. 20

*Bausch v. Stryker Corp.*,
    630 F.3d 546 (7th Cir. 2010) .................................................................. 15, 16

*Beal v. Lifetouch, Inc.*,
    No. CV 10–8454–JST (MLGx), 2011 WL 995884 (C.D. Cal. Mar. 15, 2011) ............. 18

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ...................................................................... 21

*Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*,
    50 F.3d 388 (7th Cir. 1995) .......................................................................... 16

*Cabral v. Supple, LLC*,
    No. 12-00085-MWF (OPx), 2012 WL 4343867 (C.D. Cal. Sept. 19, 2012) ................ 13

*Castle v. Wells Fargo Fin., Inc.*,
    No. C 06-4347 SI, 2007 WL 703609 (N.D. Cal. Mar. 5, 2007) ....................... 21

*Cheatham v. ADT Corp.*,
  161 F. Supp. 3d 815 (D. Ariz. 2016) ................................................................ 19

*Cholakyan v. Mercedes-Benz USA, LLC*,
  796 F. Supp. 2d 1220 (C.D. Cal. June 30, 2011) .............................................. 18

*City of Mesquite v. Aladdin's Castle, Inc.*,
  455 U.S. 283 (1982) ............................................................................................ 2

*Cohen v. Facebook, Inc.*,
  798 F. Supp. 2d 1090 (N.D. Cal. 2011) ........................................................... 18

*Coleman v. Gen. Motors Acceptance Corp.*,
  220 F.R.D. 64 (M.D. Tenn. 2004) ..................................................................... 20

*Comm. Ass'n for Restoration of the Env't., Inc. v. Cow Palace, LLC*,
  No. 13-CV-3016-TOR, 2013 WL 3179575 (E.D. Wash. June 21, 2013) ........... 5

*Coto Settlement v. Eisenberg*,
  593 F.3d 1031 (9th Cir. 2010) ........................................................................... 17

*Datel Holdings Ltd. v. Microsoft Corp.*,
  712 F. Supp. 2d 974 (N.D. Cal. 2010) ......................................................... 17, 20

*Davis v. Four Seasons Hotel Ltd.*,
  No. 08–00525 HG–BMK, 2011 WL 4590393 (D. Haw. Sept. 30, 2011) ........... 20

*Dorger v. City of Napa*, 12-CV-440 YGR,
  2012 WL 3791447 (N.D. Cal. Aug. 31, 2012) .................................................. 12

*Fant v. The City of Ferguson*,
  No. 4:15-CV-00253-AGF, 2016 WL 6696065 (E.D. Mo. Nov. 15, 2016) ........... 6

*Fraley v. Facebook, Inc.*,
  830 F. Supp. 2d. 785 (N.D. Cal. 2011) ....................................................... 17, 18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*,
  528 U.S. 167 (2000) ......................................................................................... 2, 6

*Gropper v. Fine Arts Housing, Inc.*,
  12 F. Supp. 3d 664 (S.D.N.Y. 2014) .................................................................. 6

iv

*Guzman v. Bridgepoint Educ., Inc.*,

    305 F.R.D. 594 (S.D. Cal. 2015) ........................................................................ 21

*Hall v. Beals*,

    396 U.S. 45 (1969) ............................................................................................... 19

*Hernandez v. Path, Inc.*, 12–CV–01515 YGR,

    2012 WL 5194120 n.7 (N.D. Cal. Oct. 19, 2012) ............................................. 12

*Herrera v. LCS Fin. Serv. Corp.*,

    274 F.R.D. 666 (N.D. Cal.2011) ........................................................................ 20

*Hild v. Bank of Am., N.A.*,

    No. EDCV 14-2126 JGB SPX, 2015 WL 1813571 (C.D. Cal. Apr. 21, 2015) ............ 15

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,

    806 F.3d 125 (3d Cir. 2015) ................................................................................. 9

*In re New Century*,

    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................. 17

*In re Online Travel Co.*,

    953 F. Supp. 2d 713 (N.D. Tex. 2013) ............................................................... 21

*In re U.S.*,

    791 F.3d 945 (9th Cir. 2015) ................................................................................ 4

*In re Zynga Privacy Litig.*,

    750 F.3d 1098 (9th Cir. 2014) .......................................................................... 8, 9

*Kennedy Bldg. Assocs. v. Viacom, Inc.*,

    375 F.3d 731 (8th Cir. 2004) ............................................................................ 6, 7

*Knox v. Serv. Employees Int'l Union, Local*,

    *1000*, 132 S. Ct. 2277 (2012) ........................................................................... 3, 4

*Kostok v. Thomas*,

    105 F.3d 65 (2d Cir. 1997) ................................................................................... 7

*Kurtz v. Kimberly-Clark Corp.*,

    No. 14-CV-1142, 2017 WL 1155398 (E.D.N.Y. Mar. 27, 2017) .................. 1, 2, 3, 4

v

1 | *Lao v. Green Tree Fin. Corp.*,
2 |   No. 11-01307-MWF (DTBx), 2012 WL 12055044 (C.D. Cal. Oct. 16, 2012).............. 13
3 | *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
4 |   478 U.S. 501 (1986) ................................................................................................... 3
5 | *Lopez v. County of Tulare*,
6 |   No. CV-F-11-1547-LJO-BAM, 2012 WL 33244 (E.D. Cal. Jan. 6, 2012)..............12, 13
7 | *Los Angeles Cty. v. Davis*,
8 |   440 U.S. 625 (1979) ..............................................................................................2, 5, 6
9 | *Lotes Co. v. Hon Hai Precision Indus. Co.*,
10 |   No. C 11-01036 JSW, 2011 WL 13152817 (N.D. Cal. July 14, 2011) .....................12, 14
11 | *Midland Funding, LLC v. Brent*,
12 |   2010 WL 4628593 (N.D. Ohio 2010) ........................................................................ 20
13 | *Mladenov v. Wegmans Food Mkts., Inc.*,
14 |   124 F. Supp. 3d 360 (D.N.J. 2015)............................................................................ 21
15 | *Moore v. Kayport Package Express, Inc.*,
16 |   885 F.2d 531 (9th Cir. 1989) ..................................................................................... 15
17 | *Mora v. Harley-Davidson Credit Corp.*, No. 1:08-CV-01453-AWI,
18 |   2012 WL 1189769 (E.D. Cal. Apr. 9, 2012) ...........................................................20, 21
19 | No. 1:08-CV-1453 AWI BAM,
20 |   2012 WL 3245518 (E.D. Cal. Aug. 7, 2012) .............................................................. 20
21 | *Norman-Bloodsaw v. Lawrence Berkeley,*
22 |   *Lab.*, 135 F.3d 1260 (9th Cir. 1998) ....................................................................... 2, 5
23 | *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*,
24 |   676 F.3d 829 (9th Cir. 2012) ................................................................................... 7, 8
25 | *Pablo v. ServiceMaster Glob. Holdings, Inc.*, No. C,
26 |   08-03894-SI, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ........................................ 21
27 | *RDF Media Ltd. v. Fox Broadcasting Co.*,
28 |   372 F. Supp. 2d 556 (C.D. Cal. 2005).......................................................................... 19

*Remington v. Mathson,*

    42 F. Supp. 3d 1256 (N.D. Cal. 2012) .................................................. 16

*Smith v. Bayer Corp.,*

    564 U.S. 299 (2011) ................................................................................. 20

*SocialApps, LLC v. Zynga, Inc.,* 4:11-CV-04910 YGR,

    2012 WL 381216 (N.D. Cal. Feb. 6, 2012) ........................................... 12

*Spears-Haymond v. Wells Fargo Bank, N.A.,*

    780 F.3d 1031 (11th Cir. 2015) ......................................................... 18, 19

*State of La., ex rel. Guste v. Fedders Corp.,*

    543 F. Supp. 1022 (M.D. La. 1982) ........................................................ 7

*Tait v. BSH Home Appliances Corp.,*

    289 F.R.D. 466 (C.D. Cal. 2012) ........................................................... 20

*Thompson v. Paul,*

    657 F. Supp. 2d 1113 (D. Ariz. 2009) .................................................... 13

*Torres v. Mercer Canyons, Inc.,*

    835 F.3d 1125 (9th Cir. 2016) ................................................................ 21

*United States v. FMC Corp.,*

    531 F.3d 813 (9th Cir. 2008) .................................................................... 7

*VMG Salsoul, LLC v. Ciccone,*

    824 F.3d 871 (9th Cir. 2016) .................................................................. 11

*Walter v. W. Indus., Inc.,*

    No. SACV 13-1503-JLS (ANx), 2013 WL 12137687 (C.D. Cal. Dec. 10, 2013) .......... 18

*Wool v. Tandem Computers, Inc.,*

    818 F.2d 1433 (9th Cir. 1987) ................................................................ 15

*Zamani v. Carnes,*

    491 F.3d 990 (9th Cir. 2007) .................................................................... 6

PLAINTIFFS' OPPOSITION TO DEFS.' MOTION TO DISMISS AND STRIKE
CASE NO. 8:16-ML-02693-JLS-KES

**STATUTES**

18 U.S.C. § 2510(8) .................................................................................... 8, 11

Cal. Penal Code § 630 .................................................................................. 12

**RULES**

Federal Rule of Civil Procedure 12 ............................................................. 22

Federal Rule of Civil Procedure 12(b)(6) ............................................. 12, 13

Federal Rule of Civil Procedure 12(f) ........................................................ 16

Federal Rule of Civil Procedure 23 ............................................................. 16

**OTHER AUTHORITIES**

2 Crim. Proc. § 4.4(d) .................................................................................. 9

# INTRODUCTION

The Court has already determined "Plaintiffs' 61-page complaint is well pleaded." Order on Mot. to Dismiss, Dkt. 130, at 10 n.2 (hereinafter "Order"). Plaintiffs' Second Consolidated Complaint drops a few claims and adds none; adds more detail about the Vizio Defendant's unauthorized data collection practices; and adds more meat to the bones of their federal and state wiretapping allegations. Dkt. 136 (hereinafter "SCC"); *compare* Consolidated Complaint, Dkt. 108 (hereinafter "CC"). These are modest changes. Vizio should have responded with an Answer—a filing that would have triggered deadlines for main events on the case management schedule.

Instead, another motion. Vizio gets one thing right—parties should "avoid the expenditure of time and money that must arise from litigating spurious issues[.]" Defs.' Mem. in Supp. Mot. to Strike or Dismiss, Dkt. 145-1, at 17 (citation omitted) (hereinafter "MTD"). But not otherwise. A close inspection of Vizio's asserted grounds to dismiss or strike brings in focus a catalog of misstatements about the law and reveals no reason to grant either request.

The motion should be denied in full, and Vizio should come to grips with this litigation and answer Plaintiffs' pleading.

# ARGUMENT

## I. Vizio Cannot Meet Its Formidable Burden of Establishing that Plaintiffs' Request for Injunctive Relief Is Moot.

Vizio's recent tactical maneuver of entering into a consent decree with the Federal Trade Commission (FTC) does not forever moot Plaintiffs' entitlement to any injunctive relief. As we will explain, Vizio simply cannot show, based on the consent decree or otherwise, that it is "absolutely clear" that "no violation has occurred or will occur or that the effects of any past violation have been completely and irrevocably eradicated." *Kurtz v. Kimberly-Clark Corp.*, No. 14-CV-1142, 2017 WL 1155398, at *51-52 (E.D.N.Y. Mar. 27, 2017) (rejecting argument FTC consent decree moots request for injunctive relief in

PLAINTIFFS' OPPOSITION TO DEFS.' MOTION TO DISMISS AND STRIKE
CASE NO. 8:16-ML-02693-JLS-KES

consumer class action). The Court's equitable power to protect the public thus lives on in this continuing case or controversy.

### A. Vizio must show it is "absolutely clear" future violations will not occur *and* past effects of illegal acts are completely and irrevocably eradicated.

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013). To ensure this does not happen, courts apply a "stringent" test: "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 189-90 (2000). In addition, the party asserting mootness must show "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979). Both showings are required, hence the "heavy" burden of demonstrating mootness. *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1274 (9th Cir. 1998).

Vizio completely glosses over its formidable burden. It doesn't even mention the voluntary-cessation doctrine, which clearly governs these circumstances. *Kurtz*, 2017 WL 1155398, at *52. It cannot "avoid this test" on the theory it has made a "judicially enforceable commitment," here through a consent decree; whether Vizio is "free to return to [its] old ways" "is the question the voluntary cessation doctrine poses[.]" *Already, LLC*, 568 U.S. at 727 (citations omitted).

Vizio's promises, memorialized in the consent decree, cannot automatically moot Plaintiffs' entitlement to injunctive relief. *See Already, LLC*, 133 S. Ct. at 727 ("defendant cannot automatically moot a case simply by ending its unlawful conduct once sued"). As

2

Judge Jack B. Weinstein recently explained in *Kurtz*: "The mere existence of [a] third-party agreement," such as an FTC consent order, "does not render moot [a] request for injunctive relief" by consumers in a class action. *Id.* "A promise made to an administrative agency to do something—or to refrain from doing something—does not assure that no violation has occurred or will occur or that the effects of any past violation have been completely and irrevocably eradicated." *Id.*; *see Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 522 (1986) (holding "consent decrees are not included among the 'orders' referred to in § 706(g) [of Title VII of the Civil Rights Act of 1964] "for the voluntary nature of a consent decree is its most fundamental characteristic").[1]

**B. Vizio cannot establish mootness because it refuses to admit wrongdoing, it has a financial interest in continuing illegal conduct, and the consent decree fails to address all conduct challenged here.**

Courts reject claims of mootness when a private party voluntarily ceases its conduct after being sued but refuses to admit its conduct was unlawful. This is so because "the likelihood of recurrence of challenged activity is more substantial when the cessation is not based upon a recognition of the initial illegality of that conduct." *Armster v. U.S. Dist. Court for Cent. Dist. of Cal.*, 806 F.2d 1347, 1359 (9th Cir. 1986). Recently, the Supreme Court rejected a litigant's attempt to moot an appeal by "sen[ding] out a notice offering a full refund to all class members." *Knox v. Serv. Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012). After inspecting these "maneuvers" "with a critical eye," the Court declined to find the appeal was moot in part because the litigant continued to defend the

---

[1] The Supreme Court so decided even though the consent decrees between the union and the United States in that case had been "adopted" by the district court and could be "modified" by the court in the future. *Id.* at 512, 523. These features did not "alter the fact that those obligations were created by agreement of the parties rather than imposed by the court." *Id.* at 523 (footnote omitted). Neither did the possibility that the consent decree could be enforced by a citation for contempt change the analysis; that choice, the Court reasoned, "is itself made voluntarily by the parties." *Id.*

PLAINTIFFS' OPPOSITION TO DEFS.' MOTION TO DISMISS AND STRIKE
CASE NO. 8:16-ML-02693-JLS-KES

practice's legality. *Id.*; *see also In re U.S.*, 791 F.3d 945, 952 (9th Cir. 2015) (finding live controversy remains absent acknowledgment of impropriety).

Courts also reject claims of mootness when the challenged conduct is highly profitable to a private party. In *Kurtz*, for example, the court declined to find mootness in part because "[t]here [was] too much money at stake for plaintiffs to assume defendants will 'do the right thing'" in the future. 2017 WL 1155398, at *52.

Here, Vizio has not admitted liability for violations of the Federal Trade Commission Act or New Jersey law. Consent Decree, Dkt. No. 146-3, at 3 ¶3 ("neither admit[ing] nor deny[ing] any of the allegations in the [FTC] Complaint, except as specifically stated in this Order"). And in this Court, Vizio contests its liability under federal and state privacy and state consumer-protections laws (none of which the FTC could even enforce).

Further, the discussion in the SCC concerning Vizio's own representations to potential investors leave little doubt Vizio may continue to collect and disclose consumer data. *See In re U.S.*, 791 F.3d at 952 (finding oral and written statements left little doubt objectionable conduct "may" continue). As the SCC recounts, slim margins in television sales are why Vizio turned to audience measurement data collection and sales in the first place; it wanted a share of a $1.9 billion global market. *Id.* at ¶¶ 41, 44. In fact, Vizio told investors the financial success of the data collection program was central to the company's continued growth. *Id.* at ¶¶ 3, 45.[2] Particularly concerning, Vizio readily acknowledged the legal risks of its data collection practices, *id.* ¶ 71—but proceeded anyway.

All of these developments raise too many red flags for a Court to accept a private party's promise that it will not return to its old ways. *See Am. Cargo Transp., Inc. v. United*

---

[2] *See also* VIZIO Form S-1 Registration Statement at 26 ("Our failure to successfully monetize our Inscape data services could materially and adversely harm our growth prospects."), *available at* http://bit.ly/2oUXHUt. This document is cited in the SCC, footnote 2 of ¶ 5.

*States*, 625 F.3d 1176, 1180 (9th Cir. 2010) (recognizing private parties are not entitled to presumption of good faith in mootness inquiry).

Lastly, courts reject mootness arguments based on a consent decree when its specific terms do not match the claims and legal theories in the pleading in question. *E.g.*, *Comm. Ass'n for Restoration of the Env't., Inc. v. Cow Palace, LLC*, No. 13-CV-3016-TOR, 2013 WL 3179575, at *6-7, 9 (E.D. Wash. June 21, 2013) (rejecting mootness argument; "Consent Order d[id] not encompass all relief [sought] in the lawsuit, nor d[id] it foreclose further injunctive relief as identified in the Complaint."). Vizio itself, in its Response to Plaintiffs' Further Case Management Statement, identifies what it believes is a major difference: "the Consent Decree does **not** explicitly cover Media Access Control (MAC) addresses." Dkt. No. 149, at 3 (emphasis in original). This is no small thing. A MAC address is one type of digital identifier discussed in the SCC, and it was also discussed by the Court in sustaining Plaintiffs' claims under the Video Privacy Protection Act. Order at 24.

Vizio's own reading of the consent decree thus dooms its argument that the decree goes "beyond" the SCC or already covers the misuse of data Plaintiffs target in their pleading. *See* MTD at 10.[3] And it reveals a behind-the-scenes look at how Vizio is closely scrutinizing the words of the decree to evade its spirit if not letter.

## C. Vizio also cannot establish mootness because it makes no showing that the effects of any past violation have been completely and irrevocably eradicated.

To prove mootness, Vizio must also show "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631, 633. This is not optional for the party seeking to prove mootness. *Id.*; *Norman-Bloodsaw*, 135 F.3d at 1274. It requires considerable proof of changed circumstances over a period

---

[3] Also, it is not apparent from the face of the consent decree that it covers chipset IDs, consumer activities on Vizio's websites or Internet store, or restarted or reset devices because of updates or power failures. *Compare* SCC ¶¶ 67, 70 *with* Dkt. No. 146-3 at 2-3. Nor does the consent decree indicate that Vizio has discontinued their use of hashing. *Compare* SCC ¶ 98 *with* Dkt. No. 146-3 at 2-3.

5

long enough to assure the changes are permanent. *Compare Davis*, 440 U.S. at 633 (finding mootness because of five-year, unblemished record of compliance); *with Fant v. The City of Ferguson*, No. 4:15-CV-00253-AGF, 2016 WL 6696065, at *4 (E.D. Mo. Nov. 15, 2016) (consent decree contains "future deadlines by which the City must make changes to policies and practices . . . [and] although the City may be able to prove mootness when it completes those future reforms, it has not done so yet"); *see generally Friends of the Earth*, 528 U.S. at 191–92 (recognizing question of mootness, unlike that of standing, is likely to be raised after years of litigation when the case is far advanced).

Vizio makes no evidentiary showing whatsoever; it merely summarizes the promises it has made. MTD at 8-10. Vizio's failure of proof, however, is not fixable—and not just because arguments raised for the first time in reply are waived. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). More critically, Vizio cannot establish mootness on the heels of making a promise to change business practices *in the future*. Put differently, it cannot prove a *lasting* change in the way it conducts business—a mere few months after signing the decree. "[E]ntering an administrative agreement to do something in the future" is not the same as "having already done the thing." *See Kennedy Bldg. Assocs. v. Viacom, Inc.*, 375 F.3d 731, 746 (8th Cir. 2004) (rejecting mootness even assuming such an equivalency). Too little time has passed for there to be any assurance Vizio will keep its promises to the FTC any longer than necessary to gain a tactical advantage in this suit and achieve its unlawful ends. *See Fant*, 2016 WL 6696065, at *8 (concluding party could not prove changed behavior warranting mootness shortly after signing consent decree imposing future obligations); *Gropper v. Fine Arts Housing, Inc.*, 12 F. Supp. 3d 664, 670 (S.D.N.Y. 2014) (voluntary consent agreement did not moot plaintiff's claims where the agreement "consists largely of promises that [litigant] will fulfill *in the future*") (emphasis in original). In fact, Vizio is moving to moot Plaintiffs' injunctive relief before any third-party privacy assessment specified under the consent decree would even be due. *See* Consent Decree, Dkt. 146-3, at 8 (requiring third-party privacy assessments within 180 days of February 13, 2017, and every 2 years thereafter for 20 years).

6

1    That Vizio would even try to establish mootness immediately after signing a consent

2    decree raises suspicions that it entered into the decree for the wrong reasons and may

3    only adhere to it for as long as it gives Vizio leverage in this suit—but not a moment

4    longer. The reason for such tactics is obvious: Plaintiffs here are not parties to Vizio's

5    "unperformed administrative consent agreement," which means if the FTC "fails to

6    devote the resources to see that [Vizio] eventually performs," *Kennedy Bldg. Assocs.*, 375

7    F.3d at 745, Plaintiffs arguably would not be allowed to enforce the decree. *Cf. United*

8    *States v. FMC Corp.*, 531 F.3d 813, 823 (9th Cir. 2008). Thus, Vizio—but not Plaintiffs or

9    the consumers they seek to represent—stands to gain from the early dismissal of

10   Plaintiffs' claim for injunctive relief because if "'some impediment arises or some

11   prolonged delay ensues' in the planned performance, [Plaintiffs] would be 'at square

12   one.'" *Kennedy Bldg. Assocs.*, 375 F.3d at 745 (quoting *Kostok v. Thomas*, 105 F.3d 65, 66 (2d

13   Cir. 1997)).

14   Lastly, even assuming Vizio could ever show full compliance, the "undertaking of the

15   remedial action called for under the consent decree [would have] no bearing on its

16   culpability for other actions, past or future," addressed in the SCC, which seeks to hold

17   Vizio accountable for violations of other federal and state laws and for data collection

18   practices not covered by the consent decree. *See State of La., ex rel. Guste v. Fedders Corp.*,

19   543 F. Supp. 1022, 1025 (M.D. La. 1982).

20                                    * * *

21   For all these reasons, the Court should reject Vizio's argument that Plaintiffs'

22   injunctive relief claims are moot and the Court is powerless to issue any injunction to

23   protect the public. Any further argument regarding the propriety of injunctive relief,

24   including what its scope may be, should await an actual motion by Plaintiffs requesting

25   such relief. *Cf. Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 838 (9th

26   Cir. 2012) ("The scope of any injunctive relief to which Plaintiffs might ultimately be

27   entitled may be determined at a later phase of the litigation.").

28

## II. Plaintiffs Sufficiently Allege Federal and California Wiretapping Claims by Alleging that Vizio Intercepted the "Contents" of Communications.

The Court dismissed with leave to amend Plaintiffs' federal Wiretap Act and California Invasion of Privacy Act (CIPA) claims, finding Plaintiffs had insufficiently alleged a qualifying "interception" of information as defined by these statutes. Plaintiffs repleaded the claim, adding allegations to support real-time interception. Vizio no longer disputes the sufficiency of the allegations in this regard. *See* MTD at 11-14. Instead, it now focuses only on whether Plaintiffs adequately allege that Vizio intercepted "contents" of any electronic communication. *Id.* Vizio's argument should be rejected because the SCC includes specific factual allegations that Vizio intercepted, and even took samples from, the actual programs displayed on Plaintiffs' Smart TVs.

### A. "Contents" includes information revealing what persons watch on their television.

Under the Wiretap Act, the "contents" of a communication are defined as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). The Ninth Circuit has held that, as used in the Wiretap Act, "the term 'contents' refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication" such as a name, address, or the identity of a subscriber or customer. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106–1107 (9th Cir. 2014). Thus, in *Zynga*, the court held that the portion of a webpage request message that provides the address of the webpage from which the request originated did not meet the Wiretap Act's definition of "contents" because it included only basic identification and address information. The court, however, was careful to say, "Under some circumstances, a user's request to a search engine for specific information could constitute a communication such that divulging a [Uniform Resource Locator (URL)] containing that search term to a third party could amount to disclosure of the contents of a communication." *Id.* at 1108-09.

8

Similarly, in *United States v. Forrester*, the Ninth Circuit suggested that warrantless capture of URLs generally "might be more constitutionally problematic" than warrantless capture of IP addresses because it thought "[a] URL, unlike an IP address, identifies the particular document within a website that a person views and thus reveals much more information about the person's Internet activity." 512 F.3d 500, 510 n.6 (9th Cir. 2008).

Courts have read *In re Zynga* and *Forrester* as "draw[ing] the 'content' line where they do . . . based on how much information would be revealed by disclosure." *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 138 (3d Cir. 2015), *cert. denied sub nom. Gourley v. Google, Inc.*, 137 S. Ct. 36 (2016). This makes sense: "routing information and content are not mutually exclusive categories." *Id.* a 139. Whether, for example, "an e-mail address is content or non-content information depends entirely on the circumstances." *Id.* at 137 (quoting Wayne R. LaFave, *et al.*, 2 Crim. Proc. § 4.4(d) (3d ed.)).

### B. Plaintiffs Allege Vizio Intercepted Actual Samples of Transmitted Content.

"Because the [SCC] pleads a broad scheme in which [Vizio] generally acquired and tracked" what Plaintiffs watch in real time, the Court should be "satisfied that this scheme, if it operated as alleged, involved the collection of at least some 'content' within the meaning of the Wiretap Act." *Id.* at 139.

Vizio's arguments to the contrary are blind to this Court's last Order. Although the Court did not address this aspect of the wiretapping laws, it sustained Plaintiffs' invasion of privacy and intrusion upon seclusion claims. In doing so, it "reject[ed] Vizio's argument that Plaintiffs have no cognizable interest in keeping detailed data about what video content they watch private." Order at 35. It should be obvious even to Vizio, then, that the interception of information that reveals what Plaintiffs are watching on their Smart TVs qualifies as the interception of "content." Whatever fine distinction might be drawn between content and record information, this case easily concerns information

PLAINTIFFS' OPPOSITION TO DEFS.' MOTION TO DISMISS AND STRIKE
CASE NO. 8:16-ML-02693-JLS-KES

that falls on the content-side of the line, because the information obtained is highly revealing in a personal way.

Vizio's discussion of Plaintiffs' pleading simply mischaracterizes the information Vizio obtains. Plaintiffs' allegations describe *how* Vizio's Smart Interactivity technology identified which programs Smart TV owners were watching. Plaintiffs allege that Vizio learned what movies and television shows were watched (*i.e.*, "viewing habits") not by analyzing external record information, but by capturing samples *directly from the transmissions*. As alleged in the SCC:

> 50. *Inscape data services.* Inscape captures real-time viewing behavior data from VIZIO Smart TVs—up to 100 billion viewing data points each day…
>
> 51. This data program is powered by automatic content recognition (ACR) technology, which is designed to recognize *attributes of the content being displayed* on VIZIO Smart TVs and match those attributes to a database of existing content, such as movies, TV shows, and games.
>
> 52. A patent filed by Cognitive Networks, Inc. provides that in order to accomplish its "goal, the processing means within the TV device itself, or an associated device such as a set-top box, *needs to have real time 'awareness' of what programming is being displayed on the TV screen at that moment." The technology "takes samples of the programming actually being displayed on that TV* at any point in time and sends the fingerprints of those samples to the centralized fingerprint matching server to compare against already existing fingerprints in the database."

SCC at ¶¶ 50–52 (emphasis added; footnotes omitted). Plaintiffs further allege that this technology collects data from any media source connected via external input, including cable or satellite set top boxes, digital video recorders, streaming media players, and gaming consoles. *Id.* at ¶ 55. Plaintiffs directly reference and incorporate these allegations within their Wiretap Act and CIPA counts. *Id.* at ¶¶ 137, 142.

PLAINTIFFS' OPPOSITION TO DEFS.' MOTION TO DISMISS AND STRIKE
CASE NO. 8:16-ML-02693-JLS-KES

In short, Plaintiffs allege that Vizio's technology tapped into transmissions to Smart TVs in real time and lifted samples of the content being transmitted so that Vizio could determine what Smart TV owners watch. The meaning of "sample" as used in the SCC is plain: samples are *portions of the actual content*, such as television shows and movies, transmitted to Smart TVs.[4] For purposes of the Wiretap Act, there is no meaningful difference between an electronically captured sample of a transmitted program and a traditional tape recording of snippets of a phone conversation. Both involve the interception of the communication itself.

Regardless of the size or exact nature of the samples (*i.e.*, whether the samples were of the program's audio, image data, or both), the samples were significant and distinct enough to allow Vizio to determine the entirety of the messages conveyed by matching the "fingerprints" of the samples against a database. It does not matter whether the samples taken were fragmentary bits of audio or visual data as opposed to lengthier, wholesale recordings. The Wiretap Act prohibits the interception of *any information* concerning the substance of an electronic communication. 18 U.S.C. § 2510(8) (defining "contents"). There is no safe harbor for interceptions of only parts, or samples, of a communication.

### C. *A fortiori*, Plaintiffs Adequately Plead Violations of the California Invasion of Privacy Act.

CIPA, California's anti-wiretapping and anti-eavesdropping statutes prohibit unauthorized interceptions of communications in order "to protect the right of privacy."

---

[4] Common definitions of "sample" are: "a representative part or single item from a larger whole…" or "an excerpt from a recording…" Sample, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/sample (accessed April 27, 2017). In the context of copyright litigation, where the use of samples is often a source of contention, "sampling" refers to the copying of a recorded sound for use in a new composition. *See VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 875 (9th Cir. 2016) ("'Sampling' in this context means the actual physical copying of sounds from an existing recording for use in a new recording…"); Sampling, Black's Law Dictionary (10th ed. 2014) (Westlaw version) ("The process of taking a small portion of a sound recording and digitally manipulating it as part of a new recording.").

PLAINTIFFS' OPPOSITION TO DEFS.' MOTION TO DISMISS AND STRIKE
CASE NO. 8:16-ML-02693-JLS-KES

Cal. Penal Code § 630. Vizio challenges Plaintiffs' CIPA claim on the same grounds as their federal Wiretap Claim, and does not make any new arguments. MTD at 14. For the reasons discussed above and incorporated here by reference, Plaintiffs have adequately plead interceptions of their communications in violation of CIPA.

## III. Vizio's Motion to Dismiss Factual Allegations, But Not Claims, Must Be Denied.

The SCC does not add any new claims but includes more detail about Vizio's unauthorized data collection practices. Except for the federal and state wiretapping claims, discussed above, all the other claims in the SCC have been sustained by the Court as well pleaded.

With no legitimate basis to seek dismissal of Plaintiffs' claims or reconsideration of the Court's Order, Vizio instead seeks dismissal of *factual allegations* concerning the collection of data "from a variety of other sources." SCC ¶¶ 14, 78. This transparent attempt to get the Court to revisit its prior ruling fails.

### A. Dismissal under Rule 12(b)(6) is not an appropriate means to challenge factual allegations.

It is black-letter law in the Ninth Circuit that a "motion under Rule 12(b)(6) may not be used to challenge only certain allegations within a claim." *SocialApps, LLC v. Zynga, Inc.*, 4:11-CV-04910 YGR, 2012 WL 381216, at *2 (N.D. Cal. Feb. 6, 2012); *Hernandez v. Path, Inc.*, 12–CV–01515 YGR, 2012 WL 5194120 at *6 n.7 (N.D. Cal. Oct. 19, 2012) ("Federal Rule of Civil Procedure 12(b)(6) is not an appropriate device to eliminate a portion of a claim."); *Dorger v. City of Napa*, 12-CV-440 YGR, 2012 WL 3791447 at *7 (N.D. Cal. Aug. 31, 2012) (rejecting a motion to dismiss factual allegations and finding "[p]rocedurally, the motion here does not appear to be on a sound footing. A motion under Rule 12(b)(6) may not be used to challenge only certain allegations within a claim . . . ."); *Lopez v. County of Tulare*, No. CV-F-11-1547-LJO-BAM, 2012 WL 33244 at *4 (E.D. Cal. Jan. 6, 2012) ("A motion to dismiss for failure to state a claim cannot be used to challenge individual allegations within a claim while the underlying claim is not itself challenged."); *Lotes Co. v.*

12

1    *Hon Hai Precision Indus. Co.*, No. C 11-01036 JSW, 2011 WL 13152817 at *2 (N.D. Cal. July

2    14, 2011) ("A claim is not a subdivision or subcategory of a cause of action. In essence,

3    Plaintiffs are seeking to strike certain allegations to the extent Defendants' breach of

4    contract claim is premised on them."); *accord Lao v. Green Tree Fin. Corp.*, No. 11-01307-

5    MWF (DTBx), 2012 WL 12055044 at *1-2 (C.D. Cal. Oct. 16, 2012) ("*Lao*"); *Cabral v.*

6    *Supple, LLC*, No. 12-00085-MWF (OPx), 2012 WL 4343867 at *3 (C.D. Cal. Sept. 19,

7    2012); *Thompson v. Paul*, 657 F. Supp. 2d 1113, 1129 (D. Ariz. 2009).

8         *Thompson* demonstrates the infirmity in Vizio's motion. 657 F. Supp. 2d at 1129-

9    1131. There, in a securities fraud lawsuit, defendants sought to dismiss two new factual

10   allegations added to an amended complaint after the Ninth Circuit had already found that

11   plaintiff's fraud claims were adequately pleaded. Defendants argued that the two new

12   factual allegations failed to satisfy the PSLRA's heightened pleading requirements. In

13   rejecting the motion, the district court stated that the court "is unaware, however, of any

14   situation in which a Rule 12(b)(6) motion may be used to strike certain allegations in

15   support of a claim, where the underlying claim itself is not challenged." *Id.* at 1129.

16        Similarly, in *Lopez v. County of Tulare*, defendants argued that a complaint should be

17   dismissed because its allegations were purportedly conclusory and insufficient. 2012 WL

18   33244 at *4. In relying on *Thompson*, the district court noted that there is no procedure

19   under Rule 12(b)(6) for the dismissal of factual allegations and further held:

20        "There is nothing per se wrong with including some conclusory language

21        in a complaint, so long as the complaint, overall, contains sufficient facts

22        to support the claims advanced. Defendants' listing of conclusory

23        language, without any discussion of whether the complaint in its entirety

24        provides factual support for each element of each underlying claim, does

25        not allow the Court to determine whether the complaint fails to allege a

26        cognizable legal theory or whether there is an absence of sufficient facts

27        alleged under a cognizable legal theory."

28   *Id.*

PLAINTIFFS' OPPOSITION TO DEFS.' MOTION TO DISMISS AND STRIKE
CASE NO. 8:16-ML-02693-JLS-KES

And in *Lotes*, just as Vizio does here, the plaintiffs sought to dismiss defendants' breach of contract counterclaim "to the extent it is premised upon certain allegations." 2011 WL 13152817 at *2; *compare* MTD at 1, 14 (seeking to dismiss claims "to the extent" they are based on the challenged factual allegations). The district court found that the motion sought to challenge factual allegations instead of claims and rejected it.

Because Vizio merely challenges factual allegations, not claims, its motion to dismiss is improper and must be denied.

## B. The Court has already determined Plaintiffs' pleading satisfies applicable pleading requirements.

Putting aside whether there is a legal basis for Vizio's motion (there is not), Vizio is mischaracterizing Plaintiffs' pleading as fundamentally different. Plaintiffs' claims have always been, and continue to be, based on purchases of Vizio Smart TVs. Plaintiffs' Consolidated Complaint set forth the Class Representatives' purchases. *See* CC ¶¶ 16-21 (class representative allegations concerning each Plaintiff's purchase of a VIZIO Smart TV). Plaintiffs' Second Consolidated Complaint does the same. *See* SCC ¶¶ 17-22. Similarly, both the Consolidated Complaint and the Second Consolidated Complaint define the classes as "[a]ll individuals in the [applicable jurisdiction] *who purchased a VIZIO Smart TV with Smart Interactivity capability* for personal or household use, and not for resale, during the applicable statute of limitations period." SCC ¶¶ 102-107 (emphasis added). Thus, there can be no real confusion by Vizio as to the proper scope of the classes alleged in the complaint.

Further, Plaintiffs' Consolidated Complaint set forth clear allegations that Vizio's data collection program collected data from *other* sources—indeed, such allegations were commonplace. *See* CC ¶¶ 2, 8, 40, 52, 54, 63, 69, 72 (discussing set top boxes, digital video recorders, streaming media players, Blu-ray and DVD players, gaming consoles, "online services visited by the consumer"). What's more, in listing other sources of data, Plaintiffs clearly alleged they were giving examples—not an exhaustive list. CC ¶ 52 ("for example"). Apart from *sources* of data, the allegations concerning *data* collected also do not purport to

14

provide an exhaustive list. *Id.* ¶ 53 ("VIZIO's data collection includes, but is not limited to, . . .."). Vizio, then, was already on notice that its challenged practices include data from other sources and other data.

More critically, the Court has already sustained Plaintiffs' pleading after careful consideration of Rules 8 and 9(b), finding the allegations suffice to allow Vizio to prepare its Answer. Order at 30 (holding Plaintiffs sufficiently alleged "who" "what" "when" "where" in pleading omissions-based claims). A reference to 'other sources' or 'other data' does not suddenly deprive Vizio of its ability to "prepare an adequate answer from the allegations." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). In all events, Vizio should not be permitted to file successive motions to dismiss in order to obtain reconsideration of issues already passed upon *or* consideration of issues it could have already pressed. *See Hild v. Bank of Am., N.A.*, No. EDCV 14-2126 JGB SPX, 2015 WL 1813571, at *4 (C.D. Cal. Apr. 21, 2015) ("party may [not] bring unlimited motions for failure to state a claim").[5]

Lastly, it bears observing that what appears to be driving Vizio's improper attempt to dismiss phrases in the SCC, as opposed to claims, is *not* Vizio's supposed inability to prepare an adequate answer. Rather, Vizio does not want "other sources" to include its Sound Bars and Speaker Systems. MTD at 15. There is nothing new to see here; the Consolidated Complaint already discussed "collect[ing] viewing data behavior from all media sources" connected to a Smart TV. CC ¶ 52.[6]

---

[5] In its misguided effort to revisit these issues, Vizio again misstates pleading standards. MTD at 15-17. Plaintiffs have described Vizio's systems and data collection in sufficient detail. Order at 30. Yet even more detail of Vizio's systems, data, and practices should not be required at this stage. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987) (Rule 9(b) relaxed where information is only within the opposing party's knowledge); *see generally Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010) (noting basic principle that "in analyzing the sufficiency of pleadings, 'a plaintiff's pleading burden should be commensurate with the amount of information available to them'") (citation omitted)); Pls.' Further Case Management Statement, Dkt. 148, at 1-2 (explaining Plaintiffs had not received documents related to the Federal Trade Commission's investigation or overview documents describing Vizio's data collection systems and practices, in a filing that *post*-dated the filing of the SCC).

[6] And for good reason. *See* Vizio Website ("Where you use multiple Vizio products

15

1    **IV.    Vizio's Preemptive Motion to Strike the Class Definitions Fails.**

2          The proposed classes are essentially defined as all individuals who purchased Vizio

3    Smart TVs with Smart Interactivity software in the United States. SCC ¶¶ 102-07; CC ¶¶

4    95-100 (same). According to Vizio, they "now" include an unspecified number of

5    unnamed class members who may be subject to arbitration agreements. Relying on

6    improper extrinsic evidence, Vizio tells the Court this includes purchasers of Smart TVs

7    sold around late 2015 and SmartCast-enabled TVs. MTD at 17-19. Vizio, however,

8    makes no showing that its arbitration agreement is valid and enforceable. *See id.* Sensing

9    thin ice, Vizio suggests alternatively that the Court issue an Order to Show Cause

10   "allowing the parties to fully litigate" the arbitration obligations of unnamed class

11   members before any motion for class certification is filed. MTD at 19.

12         In its first motion to dismiss, however, Vizio did not contest Plaintiffs' standing to

13   sue on behalf of Smart TV purchasers and *simultaneously* move to strike class allegations

14   on the theory some of these same purchasers must also arbitrate claims. *See* First Mot. to

15   Dismiss, Dkt. 116. Instead, Vizio "wanted to play heads I win, tails you lose," which "is

16   the worst possible reason" for failing to move to strike sooner than it did. *Cf. Cabinetree of*

17   *Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995). Given this

18   impropriety, the Court may decline to consider these requests. *See Remington v. Mathson*, 42

19   F. Supp. 3d 1256, 1275 (N.D. Cal. 2012), *aff'd*, 575 F. App'x 808 (9th Cir. 2014)

20   (recognizing court discretion to disregard late filings).

21         Regardless, Vizio's requests to strike the class allegations, and its related request to

22   show cause, are based on a profoundly mistaken view of Rule 12(f) and Rule 23 and may

23   be denied for improperly relying on extrinsic evidence or on the merits.

24

25   _____

26   and services (i.e., sound bars or speakers as well as SmartCast or Smart TV products and
     the SmartCast App), Vizio may combine or link information collected from these various
27   properties and use the information for the purposes outlined in the Vizio Privacy Policy,
     including this SmartCast Supplement and (when and if the ACR feature is activated) the
28   'Viewing Data Supplement to the Privacy Policy.'"), *available at*
     https://www.vizio.com/privacy (accessed May 4, 2017).

1          **A. The requests fail as an evidentiary matter.**

2     The requests to strike or show cause should be denied because they are based on

3     extrinsic evidence the Court cannot consider. To grant a request, the grounds for the

4     motion must be evident on face of pleadings, incorporated therein, or subject to judicial

5     notice. *See In re New Century*, 588 F. Supp. 2d 1206, 1220 (C.D. Cal. 2008). Here, Vizio

6     asks the Court to incorporate by reference or take judicial notice of a declaration of a

7     Vizio employee and copies of two webpages on Vizio's website. MTD at 18 n.12. But the

8     Court should decline this invitation because these exceptions do not apply to bring in

9     Vizio's evidence.

10     Incorporation by reference is only appropriate when a pleading "necessarily relie[d]"

11     on a document, or the document forms the basis of a claim. *See Coto Settlement v. Eisenberg*,

12     593 F.3d 1031, 1038 (9th Cir. 2010). Here, the SCC does not mention, let alone

13     "necessarily rel[y]" on, any arbitration agreement, warranty, or terms of service; and these

14     exhibits do not form the basis of Plaintiffs' claims. *See id.*; *see* SCC ¶¶ 88-101. What's

15     more, to the extent the SCC mentions Vizio's website or the privacy policy on the

16     website, it explains the website hides what Vizio is doing and misleads. The "mere

17     mention" of Vizio's website or a privacy policy, which in its online iteration is a *separate*

18     webpage from the terms of service or warranty webpages, is not grounds to incorporate

19     by reference these or any other website page of Vizio's choosing as it existed on April 13,

20     2017, the very day Vizio filed its motion. *See Coto Settlement*, 593 F.3d at 1038; *Fraley v.*

21     *Facebook, Inc.*, 830 F. Supp. 2d. 785, 795 (N.D. Cal. 2011) (finding reference to one

22     specific webpage did not incorporate other neighboring webpages not discussed in

23     pleading).

24     In addition, incorporation by reference and judicial notice are inappropriate when a

25     party contests the authenticity and relevance of the proffered evidence. *Id.* at 1038

26     (incorporation by reference); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974,

27     984 (N.D. Cal. 2010) (judicial notice). Here, the declarant provides copies of two

28     webpages accessed on April 13, 2017—not copies of any arbitration agreement in a user

17

manual/quick-start guide or on the SmartCast App display. This sleight of hand raises substantial questions about what these other materials may have said (and when), and it is alarming given Vizio's concession that there are "differ[ences]" in arbitration language appearing in different documents. MTD at 19 n.13; *see Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090, 1094–95 (N.D. Cal. 2011) (declining to take judicial notice of various Terms of Use documents because "substantial questions . . . remain . . . as to when various versions of the documents . . . appeared on the website and . . . necessarily bound all plaintiffs"); *Fraley*, 830 F. Supp. 2d. at 795 (declining to take judicial notice of webpages accessed on a single date before events in question).

## B. The requests also fail on the merits.

Courts—including this one—regularly refuse to strike or dismiss class allegations *before* the class certification stage, especially when, as here, the defendant has not answered the complaint and discovery on class certification is not complete. *Alexander v. American Exp. Co.*, No. SACV 11–0843–JST (MLGx), 2011 WL 6046928, at *2 (C.D. Cal. Nov. 10, 2011) ("it is rare to strike or dismiss class allegations in advance of a motion for class certification") (citing *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1245 (C.D. Cal. June 30, 2011) (surveying numerous cases denying such requests)); *see generally Walter v. W. Indus., Inc.*, No. SACV 13-1503-JLS (ANx), 2013 WL 12137687, at *2 (C.D. Cal. Dec. 10, 2013) ("Motions to strike are generally disfavored because of the limited importance of pleadings in federal practice and because it is usually used as a delaying tactic.") (citation omitted). Regardless, Plaintiffs' class definitions are "clearly relevant to the subject matter of the litigation, and do not amount to redundant, immaterial, impertinent, or scandalous matters." *Beal v. Lifetouch, Inc.*, No. CV 10–8454–JST (MLGx), 2011 WL 995884, at *7 (C.D. Cal. Mar. 15, 2011).

Vizio's motion fails for a more fundamental reason. Courts "lack[ ] jurisdiction to rule on the arbitration obligations of the unnamed putative class members." *Spears-Haymond v. Wells Fargo Bank, N.A.*, 780 F.3d 1031, 1039 (11th Cir. 2015). Any such ruling constitutes an "impermissible advisory opinion." *Id.* at 1037.

18

The Court, then, cannot order "the parties to fully litigate" the arbitration obligations of unnamed class members. MTD at 19. "Absent class certification, there is no justiciable controversy between [Vizio] and the unnamed putative class members." *Spears-Haymond*, 780 F.3d at 1037. For this same reason, the Court cannot strike the current class definitions and instruct that they be rewritten to "exclude*"* unnamed putative class members that Vizio may compel to arbitrate in the future. MTD at 17. "In the absence of both live claims and cognizable plaintiffs," a ruling excluding "the hypothetical claims that might be raised in the future by hypothetical plaintiffs" on the chance these claims may be arbitrated "cannot be regarded as anything but an impermissible 'advisory opinion[ ] on [an] abstract proposition[ ] of law." *Spears-Haymond*, 780 F.3d at 1037 (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969) (per curiam)) (alterations by court). These legal questions will not become justiciable unless and until Vizio moves to compel *parties* to this lawsuit to arbitrate *their* claims—for now, the named Plaintiffs; and later, after certification, class members.

The defects in Vizio's motion do not end there. Vizio simply asks the Court to assume its arbitration agreement is in fact valid and enforceable. MTD at 18. But a "successful motion to strike must show that the law is clear beyond reasonable dispute and that the relevant claim or defense could not succeed under any set of circumstances." *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 834 (D. Ariz. 2016) (citing *RDF Media Ltd. v. Fox Broadcasting Co.*, 372 F. Supp. 2d 556, 566 (C.D. Cal. 2005)). "The motion to strike 'was never intended to furnish an opportunity for the determination of disputed and substantial questions of law.'" *Id.* (citation omitted). Here, the validity and enforceability of Vizio's arbitration agreement is a substantial legal question that will be contested when Vizio moves to compel. These are not circumstances in which a motion to strike could ever be granted—and certainly not based on extrinsic evidence. *See* Sec. II.B; *Datel*

PLAINTIFFS' OPPOSITION TO DEFS.' MOTION TO DISMISS AND STRIKE
CASE NO. 8:16-ML-02693-JLS-KES

*Holdings*, 712 F. Supp. 2d at 984  (whether document is a valid and binding contract is not proper subject for judicial notice).[7]

Vizio ignores this established law and instead argues Plaintiffs will never certify the proposed classes because individual questions concerning the arbitration obligations of unnamed class members will overwhelm an overall finding of predominance.[8] MTD at 20. Quite the opposite. Time and again, courts have granted class certification even though some members of a putative class may have signed arbitration agreements or released claims against a defendant. *Mora v. Harley-Davidson Credit Corp.*, No. 1:08-CV-01453-AWI, 2012 WL 1189769, at *13 (E.D. Cal. Apr. 9, 2012), *report and recommendation adopted*, No. 1:08-CV-1453 AWI BAM, 2012 WL 3245518 (E.D. Cal. Aug. 7, 2012) (granting class certification; "possib[ility] certain Class members may be later excluded based on . . . arbitration . . . does not defeat [ ] predominance"); *Davis v. Four Seasons Hotel Ltd.*, No. 08–00525 HG–BMK, 2011 WL 4590393, at *4-*5 (D. Haw. Sept. 30, 2011) (same); *Herrera v. LCS Fin. Serv. Corp.*, 274 F.R.D. 666, 681 (N.D. Cal.2011) (same); *Midland Funding, LLC v. Brent*, 2010 WL 4628593, at *4 (N.D. Ohio 2010) (same); *Coleman v. Gen. Motors Acceptance Corp.*, 220 F.R.D. 64, 91 (M.D. Tenn. 2004) (same; collecting additional examples). Vizio, then, cannot show *any* deficiency in Plaintiffs' class definitions—let alone a clear, indisputable deficiency requiring the Court to strike them.

---

[7] Striking unnamed class members who may be subject to arbitration would deny them "certain benefits (such as the tolling of a limitations period) related to [this] proceeding." *Smith v. Bayer Corp.*, 564 U.S. 299, 313 n.10 (2011) (citing *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974)). The more considered course is to decide who is and isn't a class member when faced with a class certification motion. *See Alexander*, 2011 WL 6046928, at *2.

[8] Vizio does not say what percentage of the proposed classes it thinks may be bound by arbitration; it simply says it introduced arbitration in late 2015 for certain products and in the first half of 2016 for others. MTD at 18-19. The SCC alleges data collection "since at least May 2014." SCC ¶¶ 13. Assuming these facts, there can be no concern with numerosity. *See Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 473 (C.D. Cal. 2012) ("proposed class of at least forty members presumptively satisfies the numerosity requirement"). Or, for that matter, typicality. *See Barnes v. AT & T Pension Benefit Plan-Nonbargained Program*, 270 F.R.D. 488, 493-94 (N.D. Cal. 2010), *modified sub nom.* 273 F.R.D. 562 (N.D. Cal. 2011) (typicality not implicated by defenses that apply to absent class members rather than class representatives).

1   Vizio's authorities do not support its request to strike. None considered the Eleventh

2   Circuit's unassailable point that courts lack jurisdiction to decide the arbitration

3   obligations of unnamed class members, including *In re Online Travel Co.*, 953 F. Supp. 2d

4   713 (N.D. Tex. 2013). Several examined class allegations through the lens of

5   ascertainability standards the Ninth Circuit recently rejected in *Briseno v. ConAgra Foods,*

6   *Inc.*, 844 F.3d 1121 (9th Cir. 2017). *See* MTD at 20-21 (citing *Guzman v. Bridgepoint Educ.,*

7   *Inc.*, 305 F.R.D. 594, 610 (S.D. Cal. 2015) (denying class certification on ascertainability

8   grounds because large numbers of class members were subject to arbitration); *Mladenov v.*

9   *Wegmans Food Mkts., Inc.*, 124 F. Supp. 3d 360, 367-68 (D.N.J. 2015) (directing parties to

10  address how proposed class with persons subject to arbitration can be ascertainable;

11  Third Circuit courts apply heightened ascertainability standard)). What's more, *Castle v.*

12  *Wells Fargo Fin., Inc.*'s ruling denying conditional class certification is no help to Vizio,

13  because defendants there moved to compel the named plaintiffs to arbitrate, which is

14  why the issue was addressed before class certification. No. C 06-4347 SI, 2007 WL

15  703609, at *3 (N.D. Cal. Mar. 5, 2007). And *Pablo v. ServiceMaster Glob. Holdings, Inc.*, No.

16  C 08-03894-SI, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011), does not persuade; it "did

17  not rely on any authority for the proposition that the presence of arbitration agreements

18  in some unnamed class members' contracts precluded certification." *Mora*, 2012 WL

19  1189769, at *14. Lastly, *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125 (9th Cir. 2016),

20  undermines Vizio's position because *Torres* held Rule 23(b)(3) predominance is

21  maintained when plaintiffs' class definition is reasonably co-extensive with their theories

22  of liability. *Id.* at 1136-37. Plaintiffs' class definitions meet this standard.

23                          **CONCLUSION**

24  For the reasons just discussed, the Court should deny Vizio's motion to dismiss or

25  strike in its entirety. If any claim is dismissed, however, Plaintiffs request leave to amend.

26  To forestall any further delay, Plaintiffs propose that, if any Third Consolidated

27  Complaint is filed with leave of Court in order to cure any deficiency, the Court may wish

28

21

to direct Vizio to Answer those aspects of the pleading which it could not otherwise in good faith challenge under Fed. R. Civ. P. 12.

Dated: April 14, 2017

**GIRARD GIBBS LLP**

*/s/ Eric H. Gibbs*
Eric H. Gibbs
ehg@classlawgroup.com
Andre M. Mura
amm@classlawgroup.com
Linda Lam
lpl@classlawgroup.com
505 14th Street, Suite 1110
Oakland, CA 9461
Tel: (510) 350-9700
Fax: (510) 350-9701

**COTCHETT, PITRE & MCCARTHY, LLP**

*/s/ Joseph W. Cotchett*
Joseph W. Cotchett
jcotchett@cpmlegal.com
Adam J. Zapala
azapala@cpmlegal.com
Gwendolyn R. Giblin
ggiblin@cpmlegal.com
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577

*Interim Co-lead Counsel for Plaintiffs*

Ashleigh E. Aitken
ashleigh@aitkenlaw.com
**AITKEN COHN**
3 MacArthur Pl #800
Santa Ana, CA 92707
Phone: (714) 434-1424
Fax: (714) 434-3600

PLAINTIFFS' OPPOSITION TO DEFS.' MOTION TO DISMISS AND STRIKE
CASE NO. 8:16-ML-02693-JLS-KES

1  Gary F. Lynch
   glynch@carlsonlynch.com
2  **CARLSON LYNCH SWEET & KILPELA,**
   **LLP**
3  1133 Penn Avenue, 5th Floor
4  Pittsburgh, Pennsylvania 15222
   Telephone: 412-322-9243
5  Facsimile: 412-231-0246
6
7  Andrew N. Friedman
   afriedman@cohenmilstein.com
8  **COHEN MILSTEIN SELLERS & TOLL**
   **PLLC**
9  1100 New York Avenue, N.W.
10 West Tower, Suite 500
   Washington, DC 20005
11 Telephone: 202-408-4600
12 Facsimile: 202-408-4699
13
   Brian C. Gudmundson
14 brian.gudmundson@zimmreed.com
   **ZIMMERMAN REED, LLP**
15 1100 IDS Center 80 South 8th St.
16 Minneapolis, MN 55402
   Telephone: (612) 341-0400
17
18 *Plaintiffs' Interim Steering Committee*
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' OPPOSITION TO DEFS.' MOTION TO DISMISS AND STRIKE
CASE NO. 8:16-ML-02693-JLS-KES

# EXHIBIT Q

1   **AKIN GUMP STRAUSS HAUER & FELD LLP**
    ANTHONY T. PIERCE (*admitted pro hac vice*)
2   apierce@akingump.com
    1333 New Hampshire Avenue NW, Suite 1500
3   Washington, DC  20036
    Tel:   202-887-4000
4   Fax:   202-887-4288

5   HYONGSOON KIM (SBN 257019)
    kimh@akingump.com
6   4 Park Plaza, Suite 1900
    Irvine, CA 92614
7   Tel:   949.885.4100
    Fax:   949.885.4101
8
9   ALI R. RABBANI (SBN 253730)
    arabbani@akingump.com
    PATRICK EOGHAN MURRAY (SBN 293765)
10  pmurray@akingump.com
    1999 Avenue of the Stars, Suite 600
11  Los Angeles, CA  90067
    Tel:   310-229-1000
12  Fax:   310-229-1001

13  *Attorneys for Defendants VIZIO Holdings, Inc.,*
    *VIZIO, Inc., VIZIO Inscape Services, LLC, and*
14  *VIZIO Inscape Technologies, LLC*

15

16              UNITED STATES DISTRICT COURT

17              CENTRAL DISTRICT OF CALIFORNIA

18              SOUTHERN DIVISION - SANTA ANA

19

20  IN RE: VIZIO CONSUMER          MDL Case No. 8:16-ml-02693-JLS-KES
    PRIVACY LITIGATION,
21                                 **DEFENDANTS' RESPONSE TO**
                                   **PLAINTIFFS' FURTHER CASE**
22  This document relates to:      **MANAGEMENT STATEMENT**

23  ALL ACTIONS.                   Date:   April 21, 2017
                                   Time:   1:30 p.m.
24                                 Judge:  Hon. Josephine L. Staton

25

26

27

28

    _____
        DEFENDANTS' RESPONSE TO PLAINTIFFS' FURTHER CASE MANAGEMENT STATEMENT
                                      MDL Case No. 8:16-ml-02693-JLS-KES

Defendants hereby submit their response to Plaintiffs' Further Case Management Statement (ECF No. 148).[1]

On October 12, 2016, Plaintiffs served Defendants with their first set of Requests for Production of Documents ("Plaintiffs' Requests"). On November 17, 2016, Defendants timely served Objections and Responses to Plaintiffs' Requests for Production ("Defendants' Responses"). The parties have since met and conferred several times regarding the scope of Plaintiffs' Requests and Defendants' Responses, and have reached agreement with regard to all but 8 of Plaintiffs' Requests (out of 43 total).

Concurrently, the parties negotiated and, on March 14, 2017, ultimately agreed upon a Stipulation Regarding Preservation and Production of Documents and Electronically Stored Information ("ESI Stipulation," ECF No. 132). Pursuant to that Stipulation, on March 30, 2017, Defendants provided Plaintiffs with a proposed list of custodians and search terms, and the parties intend to schedule a meet and confer on this issue shortly. In addition, although the parties had agreed pursuant to the ESI Stipulation to meet and confer regarding search terms and custodians "*prior* to the production of documents" (ECF No. 132 at 4 (emphasis added)), Defendants nonetheless have produced certain categories of documents to Plaintiffs on a rolling basis, including data license agreements, privacy policies, notifications regarding Smart Interactivity, out-of-box set-up documents, data specifications, and customer communications relating to Smart Interactivity. To that end, Defendants have produced

---

[1] On April 14, the parties exchanged separately prepared drafts of the Joint Case Management Statement due later that day (ECF No. 147). Plaintiffs' draft, which Defendants received on the afternoon of April 14, included a statement of Plaintiffs' position on discovery issues that were the subject of ongoing meet-and-confer discussions. Because Defendants would not have time to respond to such a statement before filing that same day, Defendants requested that any briefing on both parties' discovery positions be included in a separate, joint supplemental filing. Plaintiffs instead chose to file their statement unilaterally in a Further Case Management Statement (ECF No. 148). Defendants now respectfully submit this Response to Plaintiffs' Further Case Management Statement.

over 1,600 pages of documents to date and intend to produce additional documents on a rolling basis.

Nonetheless, Plaintiffs have stated their intention to present certain discovery disputes to the Magistrate Judge, including the following:

*First*, as Plaintiffs mention in their statement, the parties have been unable to resolve the scope of the term "Tracked Data," which Plaintiffs use in 28 of their 43 Requests. Plaintiffs originally defined this term to mean, in relevant part, any information collected "from or through Vizio Smart TV's, Vizio's SmartCast, and Vizio's Internet Apps and Internet Apps Plus." Defendants objected to this definition as overly broad, unduly burdensome, and as seeking information that is not relevant to any claim or defense in this action, as Plaintiffs' definition would have included a host of information that has no relevance to this lawsuit. One example of this irrelevant information, among others, is data VIZIO uses to conduct diagnostics and provide technical support. Thus, when applied to Plaintiffs' Requests, which essentially seek every document relating to "Tracked Data," Plaintiffs' proposed definition would have proven overwhelmingly burdensome and disproportionate to the needs of the case.

On January 31, 2017, after several lengthy discussions between the parties, Plaintiffs agreed to reformulate their definition of "Tracked Data" and proposed the following definition: "Any information or data collected or disclosed by the interactivity software ecosystem, including any other information or data disclosed to third parties."

On February 28, 2017—after months of meet and confers that VIZIO had believed resulted in an agreement-in-principle to narrow the definition of "Tracked Data"—Plaintiffs suddenly and drastically **expanded** their definition of Tracked Data to include any information collected from any VIZIO internet-connected device, which would include products and data not at issue in this litigation. Plaintiffs contend that their newly proposed definition is appropriate because it is "coterminous" with the definition of "Covered Information" from the Consent Decree in the FTC Action.

However, as explained in Defendants' recently-filed motion to dismiss, the Consent Decree exceeds the scope of the allegations in this action. *See* ECF No. 145-1 at 3-11. In addition, unlike Plaintiffs' proposed Tracked Data definition, the definition of "Covered Information" in the Consent Decree does **not** explicitly reference Media Access Control (MAC) addresses. *Compare* ECF No. 148 at 1, *with* ECF No. 146-3 at 39-40. Accordingly, Defendants continue to object to Plaintiffs' "Tracked Data" definition.

In addition, Plaintiffs mischaracterize Defendants' proposed "Tracked Data" definition. Defendants' proposed definition is not "limited to data 'processed' by the ACR 'system' that identifies programming onscreen." ECF No. 148 at 1. Rather, Defendants proposed definition includes "Any data collected from Vizio Smart TVs and processed through Vizio's Automated Content Recognition ("ACR") system, **including any information derived from or combined with such data that VIZIO discloses to third parties**." This definition would include not just viewing data collected from VIZIO Smart TVs but also any information combined with such data and disclosed to third parties. Plaintiffs have rejected this proposal, claiming that their case now extends beyond data collected from a VIZIO Smart TV or the ACR system, or any information paired with such data. Plaintiffs also wrongly contend that "Vizio refuses to provide any overview documents describing its data collection systems or processes." As Plaintiffs are well aware, Defendants have already agreed to produce such documents.

***Second***, although Defendants have already agreed to the "Relevant Time Period" that Plaintiffs themselves proposed in their Requests (i.e., January 1, 2012 through the present), Plaintiffs now contend that the Relevant Time Period should begin when Defendants "began consideration of any data monitoring and advertising program." Defendants have not agreed to further extend the Relevant Time Period, since it already begins more than two years prior to the date VIZIO initiated the Smart Interactivity feature. *See* ECF No. 136 ¶ 63.

DEFENDANTS' RESPONSE TO PLAINTIFFS' FURTHER CASE MANAGEMENT STATEMENT
MDL Case No. 8:16-ml-02693-JLS-KES

1          *Lastly*, contrary to Plaintiffs' assertion, Defendants have agreed to complete their

2     production of all documents relating to Tracked Data that VIZIO produced to the FTC

3     in response to any FTC requests for production of documents, whether formal or

4     informal, in the investigation relating to *Federal Trade Commission et al. v. Vizio, Inc.*,

5     Case No. 2:17-cv-00758 by Friday, April 28.

6

7     Dated:  April 18, 2017              AKIN GUMP STRAUSS HAUER & FELD LLP
                                         Anthony T. Pierce (*admitted pro hac vice*)
8                                        Hyongsoon Kim
                                         Ali R. Rabbani
9                                        Patrick Eoghan Murray

10

11                                       By_____/s/ *Hyongsoon Kim*_____
                                              Hyongsoon Kim
12                                       Attorneys for Defendants VIZIO Holdings, Inc.,
                                         VIZIO, Inc., VIZIO Inscape Services, LLC, and
13                                       VIZIO Inscape Technologies, LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' RESPONSE TO PLAINTIFFS' FURTHER CASE MANAGEMENT STATEMENT
MDL Case No. 8:16-ml-02693-JLS-KES