UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: Vizio, Inc., Consumer Privacy Litigation | CASE NO. 8:16-ml-02693-JLS-KES<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND STRIKE (Doc. 145)** |

Before the Court is a renewed Motion to Dismiss and Strike filed by Defendants VIZIO, Inc.; VIZIO Holdings, Inc.; VIZIO Inscape Technologies, LLC; and VIZIO Inscape Services, LLC (collectively, the "Vizio Defendants" or "Vizio"). (Mot., Doc. 145.) Plaintiffs have submitted an Opposition (Opp'n, Doc. 154), and the Vizio Defendants have filed a Reply (Reply, Doc. 156). For the reasons detailed below, the Court DENIES the Vizio Defendants' Motion to Dismiss and Strike.

## I.  BACKGROUND

Because Plaintiffs' allegations about Vizio's Smart TV data collection and disclosure practices were examined at length in the Court's Order on Vizio's First Motion to Dismiss, *see In re Vizio, Inc., Consumer Privacy Litig.*, No. 8:16-ML-02693-JLS-KES, 2017 WL 1836366, at *1–2 (C.D. Cal. Mar. 2, 2017), the Court recounts only the developments in this multidistrict litigation since Vizio's First Motion.

On February 6, 2017, the Federal Trade Commission, New Jersey Attorney General, and Director of the New Jersey Division of Consumer Affairs filed suit in the District of New Jersey in conjunction with a consent decree. *FTC v. Vizio*, Complaint, Case No. 17-cv-00758-SRC-CLW (Feb. 6, 2017). In its complaint, the FTC and New Jersey regulators charged Vizio with violating the FTC Act and New Jersey Consumer Fraud Act by "transmit[ting] information about what a consumer is watching on a second-by-second basis" and then selling "consumers' television viewing history to third parties through licensing agreements, on a television-by-television basis." (*Id.* ¶¶ 14, 16.) The complaint further alleged that Vizio provides consumers' IP addresses to a data aggregator that "uses the IP address information to identify a particular consumer or household" and then provides this resulting demographic information to advertisers or other purchasers of consumers' video viewing histories. (*Id.* ¶¶ 16–17.) Although Vizio's contracts with third-party vendors prohibit them from identifying consumers by name, third parties may describe consumers by "sex, age, income, marital status, household size, education, home ownership, and household value." (*Id.* ¶ 17.)

On February 14, 2017, the New Jersey district court signed the parties' consent decree. (Consent Decree, Exh. C, Doc.146-3.) The consent decree bars Vizio from collecting consumers' "Viewing Data" (a defined term) unless Vizio obtains their express affirmative consent after disclosing "prominently" the data collected, the types of data shared with third parties, "the identity or categories of such third parties," and the purposes for these disclosures. (*Id.* § II.) Vizio also agreed to delete its stored viewing data within 120 days, complete a privacy assessment every two years for the next twenty years, and pay these regulators 2.2 million dollars (with an additional 300 thousand dollars in suspended penalties). (*Id.* §§ III–VI.) The New Jersey district court retains jurisdiction under the consent decree to construe, modify, or enforce the agreement. (*Id.* § XII.)

On March 2, 2017, this Court granted in part and denied in part the Vizio Defendants' Motion to Dismiss. *See In re Vizio, Inc., Consumer Privacy Litig.*, 2017 WL 1836366. The Court granted Vizio's Motion to Dismiss Plaintiffs' Wiretap Act, state law video privacy, negligent misrepresentation, affirmative fraud, and California False Advertising Law claims with leave to amend. *See id.* at *19. Vizio's Motion was denied as to Plaintiffs' Video Privacy Protection Act (VPPA), fraudulent omission, state privacy law, and unjust enrichment claims. *Id.* Plaintiffs filed a Second Consolidated Complaint that dropped all of the dismissed causes of action except Plaintiffs' Wiretap Act claims. (SCC, Doc. 136.) Vizio filed this Second Motion to Dismiss soon thereafter. (Mot.)

## II. LEGAL STANDARD

### A. Lack of Subject Matter Jurisdiction

A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Fed. R. Civ. P. 12(b)(1). "Dismissal for lack of subject matter jurisdiction is appropriate if the complaint, considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984–85 (9th Cir. 2008). When considering a Rule 12(b)(1) motion, the Court "is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony,

to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). "The party asserting [ ] subject matter jurisdiction bears the burden of proving its existence." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

### B. Failure to State a Claim

When evaluating a Rule 12(b)(6) motion, the Court must accept as true all allegations of material facts that are in the complaint and must construe all inferences in the light most favorable to the non-moving party. *See Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 556). A complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively[,]" and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "Although for the purposes of a motion to dismiss [the Court] must take all of the factual allegations in the complaint as true, [it] '[is] not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

### C. Motion to Strike

Under Rule 12(f), a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The

function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial . . . ." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (quoting *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994)).

"[M]otions to strike, as a general rule, are disfavored." *Wein v. Kaiser*, 647 F.2d 200, 201 (D.C. Cir. 1981). This is because they are "often used as delaying tactics, and because of the limited importance of pleadings in federal practice." *Bureerong v. Uvawas*, 922 F. Supp. 1450, 1478 (C.D. Cal. 1996) (citing Schwarzer, et al., Federal Civil Procedure § 9:375). "[M]otions to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Lilley v. Charren*, 936 F. Supp. 708, 713 (N.D. Cal. 1996).

### III. DISCUSSION

Vizio moves to dismiss Plaintiffs' demand for injunctive relief as moot, the Wiretap Act claims for failure to state a claim, and certain additional allegations about Vizio's alleged collection of data from sources other than its Smart TVs as too vague. (Mem. at 8–16, Doc. 145.) Vizio further moves to strike the class definition as overbroad. (*Id.* at 16–21.) The Court rejects each argument in turn.

#### A. Whether Plaintiffs' Demand for Injunctive Relief is Moot

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). Under the mootness doctrine, however, a case becomes nonjusticiable "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (quoting *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 306 (2012)). In deciding whether subsequent acts have rendered a request for injunctive relief moot, "the question is not whether the precise relief sought at

the time the application for an injunction was filed is still available.  The question is whether there can be *any* effective relief." *Oregon Nat. Res. Council v. U.S. Bureau of Land Mgmt.*, 470 F.3d 818, 820 (9th Cir. 2006) (quoting *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244–45 (9th Cir. 1988)).

Mootness should not be equated with "standing set in a time frame." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189–91 (2000).  Unlike standing, there are two long-recognized exceptions to mootness: The first exception, which the parties agree is not relevant here, concerns "situations that are 'capable of repetition, yet evading review.'" *United States v. Brandau*, 578 F.3d 1064, 1067 (9th Cir. 2009) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 n.11 (1975)).  Second, a defendant's voluntary cessation of activity "does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox*, 567 U.S. 307.  The defendant bears the "heavy burden" of showing "that it is 'absolutely clear' that the allegedly wrongful behavior will not recur if the lawsuit is dismissed."[1]  *Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1173 (9th Cir. 2009) (quoting *Friends of the Earth*, 528 U.S. at 189).  Even when a defendant's cessation is not entirely voluntary, a request for injunctive relief may not be moot if the alleged injury realistically could reoccur.  *See Demery v. Arpaio*, 378 F.3d 1020, 1026 (9th Cir. 2004) (holding that, even though the defendant's webpage had been taken down by a non-party, plaintiffs' motion for a preliminary injunction enjoining the webpage was not moot).

In *Already v. Nike*, the Supreme Court refused to craft an exception to the voluntary cessation doctrine "when a defendant makes a judicially enforceable commitment to avoid the conduct that forms the basis for an Article III controversy."  568 U.S. at 92 (citation omitted).  There, the respondent argued that such an exception is warranted because, when

---

[1] Some authorities add as a second element that "interim relief or events [must] have completely and irrevocably eradicated the effects of the alleged violation." *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979).

parties reach a "judicially enforceable commitment . . . , there is no reason to apply a special rule premised on the defendant's unfettered ability to 'return to [its] old ways.'" *Id.* (citation omitted). The Supreme Court rejected this argument, holding that a defendant "cannot avoid its 'formidable burden' by assuming the answer to" the question that the voluntary cessation test poses—namely, whether the "allegedly wrongful behavior reasonably [could] be expected to recur." *Id.* (quoting *Friends of the Earth*, 528 U.S. at 190).

A straightforward application of *Already* demonstrates that the voluntary cessation exception applies. A consent decree is "a judicial decree that sanctions a voluntary agreement between parties in dispute." Merriam-Webster's Collegiate Dictionary 265 (11th ed. 2003). As the Supreme Court has observed, "the voluntary nature of a consent decree is its most fundamental characteristic" because "the parties' agreement . . . serves as the source of the court's authority to enter any judgment at all." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 521–522 (1986); *see also id.* at 519 ("[B]ecause their terms are arrived at through mutual agreement of the parties, consent decrees . . . closely resemble contracts."). Because a consent decree is by its very nature voluntary, the voluntary cessation exception to mootness applies even though a consent decree, like a covenant not to sue, is "judicially enforceable." *See Already*, 568 U.S. at 92.

Vizio attempts to distinguish *Already* because it involved a covenant not to sue, not an agreement embodied in a court order. (Reply at 2–3 & n.1.) But Vizio's argument makes the same logical error that the Supreme Court identified in *Already*: A defendant "cannot avoid its 'formidable burden'" under the voluntary cessation doctrine "by assuming the answer to" the very question that doctrine asks. *See Already*, 568 U.S. at 92 (citation omitted). That a consent decree is enforceable through a court's contempt power as well as a separate suit is certainly probative of whether Vizio has *satisfied* the voluntary cessation standard, just as Plaintiffs' probable inability to enforce the consent decree would also be relevant. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975);

*United States v. FMC Corp.*, 531 F.3d 813, 819–24 (9th Cir. 2008). How easy a commitment would be to enforce, however, does not alter the framework for reviewing a defendant's voluntary cessation of activity.

Vizio also relies on the Fifth Circuit pre-*Already* opinion in *Environmental Conservation Organization v. City of Dallas*, which held that a court-approved consent decree does not prompt the strict voluntary cessation standard when determining whether a subsequent citizen suit under the Clean Water Act is moot. 529 F.3d 519, 528–529 (5th Cir. 2008). Instead, the burden shifts to the plaintiff to demonstrate a "realistic prospect that the violations alleged in its complaint will continue notwithstanding the consent decree." *Id.* at 528. The panel reasoned on policy grounds that a contrary holding "would discourage defendants in a citizen [*sic*] from entering a consent decree with federal or state enforcement agencies, because defendants would remain exposed to duplicative penalties." *Id.* In fashioning its burden-shifting framework, the Fifth Circuit relied in part on Justice Scalia's dissent in *Friends of the Earth*, which in turn cited several cases equating mootness with "standing set in a time frame." *See id.* at 528 n.4 (5th Cir. 2008) (citing *Friends of the Earth*, 528 U.S. at 214 (Scalia, J., dissenting)); *see also Friends of the Earth, Inc.*, 528 U.S. at 214 (Scalia, J., dissenting).

Though ostensibly decided on Article III grounds, the Fifth Circuit explicitly rested its decision on policy considerations unique to citizen suits under federal environmental protection statutes. *Id.* at 528–29. Because Congress intended "the citizen suit . . . to supplement rather than to supplant governmental action[,]" various provisions in these federal environmental statutes allow these suits to proceed only "when the government cannot or will not command compliance." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60, 62 (1987). The Fifth Circuit echoed these concerns, reasoning that it did not want to "discourage defendants in a citizen [*sic*] from entering a consent decree with federal or state enforcement agencies, because defendants would remain exposed to duplicative penalties." *Envtl. Conservation Org.*, 529 F.3d at 528. Like its policy underpinnings, *Environmental Protection Organization*'s doctrinal holdings do

8

not fit easily with basic constitutional mootness principles. For example, the panel held that the citizen-plaintiffs' demand for immediate injunctive relief was moot because the violations at issue in the complaint would be cured within "reasonable timetables." *Id.* at 530. Yet blackletter law instructs that "[p]artial relief in another tribunal—whether judicial, administrative, arbitral, or a combination—does not moot an action seeking additional relief, whether the other action involves the same parties or different parties." Charles Alan Wright et al., 13B Fed. Prac. & Proc. Juris. § 3533.2.1 (3d ed. 2017) (footnotes omitted); *Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 885 (9th Cir. 1992) ("Partial relief in another proceeding cannot moot an action that legitimately seeks additional relief."); *Corgain v. Miller*, 708 F.2d 1241, 1247 (7th Cir. 1983). Insofar as a court may not actually grant the remedy sought, the "argument goes to the merits rather than the threshold question of mootness." *Flagstaff Med. Ctr.*, 962 F.2d at 885.

For these reasons, *Environmental Protection Organization*'s less-stringent mootness standard—if reconcilable with *Already*—should not apply beyond citizen suits. Indeed, while the Fifth Circuit drew its "realistic prospect" standard in part from the Eighth Circuit's decision in *Comfort Lake Association, Inc. v. Dresel Contracting, Inc.*, *see Envtl. Conservation Org.*, 529 F.3d at 526 n.3, 528, that circuit subsequently applied the voluntary cessation standard in *Kennedy Building Associates v. Viacom* to hold that a consent agreement did not moot a plaintiff's demand for injunctive relief. 375 F.3d 731, 745 (8th Cir. 2004). In finding that the defendant had not satisfied its "'heavy' burden," the Eighth Circuit observed that an agreement to take certain steps in the future was not tantamount to actual performance. *Id.* at 745–46 (quoting *Los Angeles Cty.*, 440 U.S. at 631). Because the plaintiff was not a party to the consent agreement, it would have no recourse if the defendant shirked its promises and the state agency failed to enforce the agreement. *Id.* at 745. Even if the defendant had fully complied with the consent order, *Kennedy Building Associates* found that the request for injunctive relief remained justiciable because "[r]elief granted in another tribunal" only moots a request for injunctive relief "where the relief granted is complete." *Id.* at 746.

9

Applying the voluntary cessation framework, the Court concludes that Vizio has not yet satisfied its "formidable burden" of demonstrating that "subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)).  Vizio has not submitted a declaration or other evidence affirming that it has halted its data-collection practices; the only document before the Court is its consent decree with the FTC.  (Consent Decree, Exh. C.)  Therefore, the Court DENIES Vizio's Motion to Dismiss Plaintiffs' request for injunctive relief for lack of subject matter jurisdiction.

### B. Failure to State a Claim

#### 1. Wiretap Act Claims

In the Court's Order on Vizio's First Motion to Dismiss, the Court dismissed Plaintiffs' Wiretap Act claims for failure to adequately plead simultaneous interception and did not reach Vizio's argument that its collection and disclosure software does not capture the "contents" of any electronic communication.  *In re Vizio, Inc., Consumer Privacy Litig.*, at \*14.  Quoting one of the patents Cognitive Networks obtained for its automatic content recognition software, Plaintiffs now allege that Vizio's software "takes samples of the programming actually being displayed on that TV at any point in time and sends the fingerprints of those samples to the centralized fingerprint matching server[,]" a process that operates "sufficiently fast [to] provid[e] at least some context-sensitive content substantially simultaneously with at least one targeted video."  (SCC ¶¶ 52–53 (quoting U.S. Patent No. 9,071,868 (issued Jun. 30, 2015).)  In its Second Motion to Dismiss, Vizio renews its attack only on whether its software captures the "contents" of electronic communications.  (Mem. at 11–14.)

The Wiretap Act defines an "intercept" in relevant part as "the . . . acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).  Content, in turn, is defined as the "substance, purport, or meaning of that communication."  *Id.* § 2510(8).  In *In re Zynga*

1  *Privacy Litigation*, the Ninth Circuit held that "the term 'contents' refers to the intended
2  message conveyed by the communication, and does not include record information
3  regarding the characteristics of the message that is generated in the course of the
4  communication." 750 F.3d 1098, 1106 (9th Cir. 2014). Thus, certain basic URL referer
5  header information does not constitute "the 'substance, purport, or meaning' of a
6  communication." *Id.* at 1107 (citation omitted); *see also In re Facebook Internet Tracking*
7  *Litig.*, 140 F. Supp. 3d 922, 935 (N.D. Cal. 2015) (applying *In re Zynga Privacy Litigation*
8  to hold that the web addresses plaintiffs accessed do not qualify as the contents of an
9  electronic communication).

10         Relying on *In re Zynga Privacy Litigation*, Vizio argues that a user's viewing
11 history does not constitute the "content" of an electronic communication. (Mem. at 12–
12 14.) But *In re Zynga Privacy Litigation* did not hold that certain types of information are
13 unprotected in all contexts. If, for example, someone sent a message to a friend that
14 consisted entirely of a URL, the information would still be protected under the Wiretap
15 Act, even though the message happens to contain nothing else. *See Campbell v. Facebook*
16 *Inc.*, 315 F.R.D. 250, 265 (N.D. Cal. 2016) (holding that Facebook messages that consisted
17 solely of URLs still qualify as "content"). In the same way, if (hypothetically) a person's
18 viewing history does not constitute the "content" of any communication, it would be
19 because the intercepted information was "generated in the course of the communication,"
20 *In re Zynga Privacy Litig.*, 750 F.3d at 1107, not because a person's viewing history falls
21 categorically outside the scope of the Wiretap Act. Quoting the same patent mentioned
22 before, Plaintiffs allege that Vizio's Inscape software "takes samples of the programming
23 actually being displayed on that TV at any point in time and sends the fingerprints of those
24 samples to the centralized fingerprint matching server to compare against already existing
25 fingerprints in the database." (SCC ¶ 52 (quoting U.S. Patent No. 9,071,868 (issued Jun.
26 30, 2015).) When watching a program through a connected device or streaming service,
27 the "intended message conveyed by the communication" is the program that the consumer
28 is watching. *See In re Zynga Privacy Litig.*, 750 F.3d at 1106. Thus, Plaintiffs plausibly

1 allege that the intercepted data extends beyond metadata to "samples" of the actual content
2 displayed on a consumer's screen.  (SCC ¶ 53.)
3      Vizio next argues that its automated content recognition software does not collect
4 the contents of electronic communications, because the samples are "tiny" and
5 "unrecognizable."  (Reply at 10.)  This argument, however, reaches well beyond the
6 allegations in Plaintiffs' Second Consolidated Complaint.  Besides, nothing in *In re Zynga*
7 *Privacy Litigation* suggests that the standard for determining whether information qualifies
8 as record or content data depends on how much content is collected or whether the
9 intercepted information would be "recognizable."
10      Thus, Plaintiffs plausibly allege that Vizio intercepts the "content" of electronic
11 communications by using its automatic content recognition software to gather samples of
12 the programs consumers watch.
13      **2.   Allegations Regarding the Collection of Information from Other Sources**
14      Vizio next argues that Plaintiffs' Second Consolidated Complaint contains new
15 allegations that are impermissibly vague or, to the extent that they support Plaintiffs' fraud-
16 based claims, fail to meet the particularity requirements of Rule 9(b).  (Mem. at 14–16.)  In
17 particular, Vizio challenges Plaintiffs' mention of "the collection, combining and/or
18 disclosure of data from a variety of sources," a phrase that Plaintiffs follow with a list of
19 specific types of information allegedly collected.  (SCC ¶¶ 14, 78; Mem. at 14.)  As part of
20 this list, Plaintiffs allege that Vizio "combine[s]" data collected from consumers' Vizio
21 Smart TVs with information obtained from "apps, smart phones, or other Vizio products.
22 (SCC ¶ 14.)
23      In their original Consolidated Complaint, Plaintiffs alleged that Vizio collected
24 information not only from its Smart TVs, but also data from other sources as well.  (*See*
25 Compl. ¶¶ 2, 8, 40, 52, 63, 72, Doc. 108.)  Some of these allegations concerned Vizio's
26 collection of information from devices physically connected to Vizio Smart TVs (*id.* ¶ 52.),
27 while other allegations more broadly addressed Internet-connected devices within the same
28 household (*see id.* ¶ 2 ("any smartphones, tablets, PCs, or other devices within the home

that share the same Internet connection as the Smart TV"); *id.* ¶ 8 ("the presence of a consumer's other Internet-connected devices"); *id.* ¶ 40 (graphic showing the outline of "connected entertainment products" that resemble speakers); *id.* ¶ 62 ("the presence of other devices connected to their local networks"); *id.* ¶ 72 (same); *see also id.* ¶ 8 ("the online services a consumer visited"); *id.* ¶ 54 ("online services visited by the consumer"); *id.* ¶ 63 (quoting what appears to be a Vizio document that states that Vizio collects "anonymous information regarding customer activities on our [*i.e.*, Vizio's] websites" and "on Internet connected products and services"); *id.* ¶ 72 ("the online services consumers visit")). *Accord In re Vizio, Inc., Consumer Privacy Litig.*, 2017 WL 1836366, at *1 (noting that Plaintiffs alleged that Vizio also collected information from "other devices connected to the same network"). Thus, contrary to Vizio's position, Plaintiffs' reference to Vizio's collection of information from a "variety of sources[,]" such as "other Vizio products" does not break substantial new ground. Plaintiffs still bring suit on behalf of a putative class of Vizio Smart TV purchasers, alleging that Vizio collects "highly specific" information about their digital identities and viewing habits through information gathered directly from their Smart TVs and by combining that data with information gleaned from other Internet-connected devices. (SCC ¶¶ 14, 102–107.) Having already concluded that Plaintiffs' claims are well pleaded, the Court DENIES Vizio's Motion to Dismiss Plaintiffs' allegations regarding the collection of information from other devices.

### C. <u>Motion to Strike the Class Definition</u>

Vizio finally moves to strike the class definition because it introduced mandatory arbitration agreements for its Smart TV purchasers in 2015 and 2016. (Mem. at 16–21.) Because nothing in Plaintiffs' Complaint suggests that unnamed putative class members are subject to these mandatory arbitration agreements, Vizio submits a declaration asserting that it inserted mandatory arbitration provisions in its Limited Warranty in "late 2015" and that Vizio's Terms of Service for its "SmartCast App" have included a similar provision since the product debuted in "the first half of 2016." (Brinkman Decl. ¶¶ 5, 7, Doc. 145-2.) Along with this declaration, Vizio attaches print outs from its website that purport to reflect

the arbitration agreement that may bind some unknown fraction of putative class members. (Limited Warranty Vizio Website Print Out, Exh. A, Doc. 145-3; Terms of Service Website Print Out, Exh. B, Doc. 145-4.)

The obvious flaw with Vizio's Motion to Strike Plaintiffs' class definition is that "[m]atter outside the pleadings normally is not considered on a Rule 12(f) motion." Charles Alan Wright et al., 5C Fed. Prac. & Proc. Civ. § 1380 (3d ed. 2017); *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 301 F.R.D. 487, 489 (C.D. Cal. 2014) ("The grounds for a motion to strike must appear on the face of the pleading under attack."). Hence, "affidavits in support of . . . the motion typically may not be used." Wright, *supra* at § 1380. Although Vizio insists that the Court may overlook this deficiency by taking judicial notice of its website printouts and declaration, "adjudicative facts appropriate for judicial notice are typically different from facts found in affidavits supporting litigation positions, which often present facts subject to dispute." *Henderson v. Oregon*, 203 F. App'x 45, 52 (9th Cir. 2006). The website printouts Vizio has supplied are not even exact duplicates of its Limited Warranty and Terms of Service, and no discovery has taken place about the how these agreements were presented to Smart TV purchasers, whether Vizio's arbitration agreements differed over time, and what fraction of class members may be bound.

In the alternative, Vizio presses this Court to issue an order to show cause to litigate Plaintiffs' class definition before Plaintiffs' anticipated motion for class certification. (Mem. at 19–20.) The Court fails to see the point. While the Court cannot definitively adjudicate the enforceability of the arbitration agreement unless a class is ultimately certified, a motion for class certification is the proper juncture to determine whether the enforceability of unnamed class members' arbitration agreements undercuts Plaintiffs' ability to establish any of the requirements of Rule 23. *In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1039 & n.10 (11th Cir. 2015). Little will be gained by demanding two rounds of class certification briefing and discarding the Court's carefully planned Scheduling Order.

1  Vizio's cited authorities are not to the contrary.  (*Contra* Mem. at 19–20.)  In *Pablo v. ServiceMaster Global Holdings Inc.*, the district court declined Plaintiffs' request to certify a class without considering the effect of certain arbitration agreements on the propriety of class certification.  No. C 08-03894 SI, 2011 WL 3476473, at *2–3 (N.D. Cal. Aug. 9, 2011).  And in *Castle v. Wells Fargo Financial*, the district court stayed a case pending the outcome of a California Supreme Court decision that would affect the enforceability of the arbitration provision at issue.  No. C 06-4347 SI, 2007 WL 703609, at *4 (N.D. Cal. Mar. 5, 2007).  Neither suggests that issuing an order to show cause to litigate the class definition before a motion to certify a class is a prudent case management technique.  Admittedly, Vizio's out-of-circuit authority, *Mladenov v. Wegmans Food Markets, Inc.*, is more directly on point, but it primarily addresses the Third Circuit's unique heightened ascertainability requirement.  *See* 308 F.R.D. 127, 131–132 (D.N.J. 2015).  While this Court may not have *sua sponte* issued an order to show cause on the plaintiffs' class allegations, the Third Circuit's heightened ascertainability standard all but guaranteed that the type of claims alleged there could not be certified under any class definition.  *See id.*  So, the district court concluded that there was little point in requiring plaintiffs to mount a futile motion for class certification.  *See id.* at 129–30.

Accordingly, Vizio's Motion to Strike and request for an order to show cause are DENIED.

## IV. CONCLUSION

For the aforementioned reasons, the Vizio Defendants' Motion to Dismiss and Strike is DENIED.

DATED:  July 25, 2017

HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE

15