Joseph W. Cotchett (Bar No. 36324)
Adam J. Zapala (Bar No. 245748)
Adam J. Trott (Bar No. 275520)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
Facsimile: 650-697-0577
jcotchett@cpmlegal.com
azapala@cpmlegal.com
atrott@cpmlegal.com

Eric H. Gibbs (Bar No. 178658)
Andre M. Mura (Bar No. 298541)
Linda Lam (Bar No. 301461)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
amm@classlawgroup.com
lpl@classlawgroup.com


*Plaintiffs' Interim Co-Lead Counsel*

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| IN RE: VIZIO, INC., CONSUMER PRIVACY LITIGATION<br><br>This document relates to:<br><br>ALL ACTIONS | Case No. 8:16-ml-02693- JLS (KESx)<br><br>**JOINT DECLARATION OF ADAM J. ZAPALA AND ANDRE M. MURA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:        December 7, 2018<br>Time:        10:30 a.m.<br>Dept:        Courtroom 10-A<br>Judge:      Hon. Josephine L. Staton |

Plaintiffs' counsel Adam J. Zapala of Cotchett, Pitre & McCarthy, LLP and Andre M. Mura of Gibbs Law Group LLP declare as follows pursuant to 28 U.S.C. § 1746:

1.    Andre Mura and I, along with Eric Gibbs and Joseph Cotchett, represent Plaintiffs in this proposed class action and respectfully submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement.  We have personal knowledge of the facts set forth below and if called as witnesses, could and would testify competently to those facts.

2.    Attached hereto as Exhibit 1 is the proposed Settlement Agreement, entered into between Plaintiffs and Defendants.

### Complaint Allegations

3.    This case arises from allegations concerning Vizio's data collection practices with respect to the sale of their Smart TVs. Based in Irvine, California, Vizio has designed and sold televisions in the United States since 2002. This includes Internet-connected televisions, a key feature of which is the TV's ability to access online media content, including movies and music. These televisions are called (to use the parlance of our times) "Smart" TVs.

4.    Beginning in February 2014, Vizio remotely installed automated (or automatic) content recognition software on Smart TVs that had already been sold and that did not have such software when sold. In about August 2014, Vizio began selling Smart TVs with this software pre-installed. This technology monitors the video stream of all physical inputs and certain streamed content, by capturing real-time or near real-time data to construct a historical record of the content displayed on-screen with one-second granularity. A mathematical representation of a subsample of the viewing data, along with a unique identification number assigned to the TV, are sent to a server that operates as a match database.

5.    In addition to capturing information about what is displayed, the software collects the TV's Internet-protocol address and WiFi signal strength, among other

information. This information facilitates the delivery of advertisements to other electronic devices connected to the same network, such as a mobile device.

6.    Vizio earns revenue by licensing this data to third parties. During this time, the data was licensed to third parties under contracts that purport to bar them from associating viewing data with individuals or households by name or physical addresses. The contracts, however, allow third parties to associate viewing data with demographic information such as sex, age, income, marital status, and education.

7.    Between February 2014 and February 2017, third parties licensed viewing data for three purposes: to determine in the aggregate what consumers watch and how they watch it; to analyze the effectiveness of advertising; and, starting in 2016 (after a notification was displayed on-screen referencing explicitly the delivery of advertisements based on the collection of viewing data), to enable ad retargeting.

8.    Consumers who purchased Smart TVs that received this tracking software through a software update were presented with a message on the TV that said:

> The VIZIO Privacy Policy has changed. Smart Interactivity has been enabled on your TV, but you may disable it in the settings menu. See www.vizio.com/privacy for more details. This message will time out in 1 minute.

9.    Consumers who purchased Smart TVs with this software pre-installed also received this notice.

10.    "Smart Interactivity" referred to the collection of viewing data. The software was on by default and operated continuously unless it was turned off by the consumer.

11.    The settings menu of these TVs included the setting "Smart Interactivity" and the description, "Enables program offers and suggestions." Although Vizio maintains that it intended to and worked to develop certain program offers and suggestions during the class period, no program offers or suggestions were enabled for more than two years.

12.    To turn "Smart Interactivity" off, a consumer would have had to find this setting in the menu, click on it, and then click again to disable it.

13.    All Vizio TVs during the class period had automated content recognition software installed, including the SmartCast product line.  Vizio estimates that 16 million TVs connected to its servers during the settlement class period.

### Class Counsel's Work in Securing the Proposed Settlement

14.    During the course of this litigation working with Joseph W. Cotchett and Eric Gibbs, along with the court-appointed Plaintiffs' Steering Committee ("PSC"), we extensively investigated the facts, aggressively litigated the case, and developed a strong understanding of the strengths and weaknesses and value of the claims.

15.    In August 2016, Plaintiffs filed a consolidated class action complaint against several Vizio entities on behalf of a nationwide class of individuals who purchased affected Smart TVs, and on behalf of subclasses of individuals from California, Florida, Massachusetts, New York, and Florida. The complaint asserted a variety of federal and state privacy claims, and state consumer protection claims. The common thread linking all these claims was the allegation that "Vizio offered Smart TVs equipped with automatic content recognition software that collected consumers' viewing histories and then sold that information—along with 'highly specific' information about consumers' digital identities—to third parties, without consumers' knowledge or consent." (Dkt. 224 at 2 [Order Denying Motion to Certify Order for Interlocutory Appeal].)

16.    Vizio responded to the complaint by moving to dismiss, raising a litany of arguments as to why the case should not even get out of the starting gate.  Protracted and extensive briefing and argument occurred on Defendants' motion.  After the Court received outsized briefing and held oral argument, it granted and denied the motion in part, allowing Plaintiffs the opportunity to replead any dismissed claim.

17.    In March 2017, Plaintiffs filed a second consolidated complaint. Vizio again moved to dismiss. It argued that Plaintiffs' claims for injunctive relief were moot

because Vizio had entered into a consent decree with the Federal Trade Commission in February 2017 that required Vizio to change its business practices relating to the collection of viewing data. Vizio also contested certain legal claims as insufficiently pleaded, and it asked the Court to strike the class definition in the second consolidated complaint because it included consumers who might by bound by arbitration agreements that forbid class proceedings in any forum.

18.    After briefing and oral argument, the Court denied Vizio's motion in full. Vizio then filed an answer to the second consolidated complaint in August 2017.

19.    A few months later, the Court refused Vizio's separate request to certify an interlocutory appeal pursuant to 28 U.S.C. § 1292 regarding questions of law pertaining to its liability under the federal Video Privacy Protection Act.

20.    Thus, at the time the parties subsequently reached a settlement, many issues of law had been thoroughly been briefed, vetted, and aired.  The parties, therefore, had a strong understanding of the legal issues and causes of action—framed by this Court's decisions regarding the pleadings' challenges—involved in these case.

21.    And yet Plaintiffs not only engaged in pleadings work.  Plaintiffs also engaged in significant offensive and defensive discovery and motion practice before the Court.

22.    At the time the parties reached a settlement, Plaintiffs had served three comprehensive sets of Requests for Production of Documents on Defendants ("RFPs").  Defendants provided responses to these RFPs, and indeed, as a result of extensive meeting and conferring between the parties, served several amended, supplemental responses to take into account any agreements reached during the meet and confer process and to conform the responses to the agreements reached regarding Vizio's objections.

23.    As a result of these extensive efforts, by the time of settlement, Vizio had produced 14,564 documents, comprised of 76,962 pages.  More documents were scheduled to be produced, but the settlement obviated the need for the further production.

JOINT DECL. ISO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
Case No. 8:16-ml-02693-JLS (KESx)

24.     Plaintiffs also served, and received responses to, a comprehensive set of Interrogatories.  After extensive meeting and conferring, Vizio agreed to amend its responses multiple times to provide supplemental information important to Plaintiffs' case.

25.     In addition to the foregoing, Plaintiffs spent many (many) hours meeting and conferring with Defendants regarding the scope of the written discovery requests, the relevant sources and location for the collection of documents, including for electronically-stored information ("ESI"), appropriate document custodians, preservation issues, and search terms that might be utilized to return responsive documents.  All of this meeting and conferring resulted in Plaintiffs receiving additional formal and informal information concerning Vizio's business practices, and better informed the proposed settlement.

26.     Plaintiffs also engaged in extensive discovery motion practice before the Honorable Magistrate Judge Karen E. Scott.   For example, Plaintiffs engaged in extensive and protracted discovery proceedings before Judge Scott concerning the appropriate definition for "tracked data."  *See* ECF No. 169.  This was critical, since the definition "tracked data" would define the scope of documents and information Vizio collected.  The parties were forced to file supplemental briefing on this issue after extended motion practice and hearings on the matter.  *See, e.g.,* ECF Nos. 204, 207.

27.     The parties also briefed issues regarding Vizio's production of documents relating to Samba T.V., and alleged inappropriate assertions of privilege.  *See* ECF No. 231, 250.   Additionally, Plaintiffs brought a motion to compel regarding Vizio's licensing agreements, including supplemental briefing thereon.  *See* ECF Nos. 241, 251.

28.     Plaintiffs also filed a motion to compel regarding Defendants' communications with regulators concerning their privacy practices.  *See* ECF No. 264.

29.     Plaintiffs also utilized Magistrate Judge Scott's informal motion practice procedure on a number of occasions to resolve important discovery disputes.  In so doing, Plaintiffs briefed a number of disputes, including Vizio's production of FTC/New

JOINT DECL. ISO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
Case No. 8:16-ml-02693-JLS (KESx)

Jersey Attorney General documents; and the appropriate temporal scope for Vizio's production to ensure coverage of the relevant conduct, among other disputes.

## The Settlement Process

30. Plaintiffs engaged in extensive, arms' length settlement discussions with the Defendants in this action at all times.

31. The parties held in-person meetings, telephonic meetings, exchanged information, and exchanged settlement proposals. The proposed settlement was arrived at only after both sides had the opportunity to be fully informed of the relative strengths and weaknesses of their positions, litigation risks, and issues involving ability to pay. Settlements were only reached after substantial discovery in this action.

32. In the fall/winter of 2017, the parties explored the idea of engaging in mediation.

33. As a mediator, the parties jointly selected the former Chief Judge of the Northern District of California, the Honorable Judge Vaughn Walker, retired. The parties held a full-day mediation session in the winter of 2018, but were unable to reach an agreement at that time. The parties therefore scheduled a second mediation day.

34. Even after the formal second day of mediation, the case did not settle. The case only settled regarding the monetary terms several weeks later with the continued participation of Judge Walker, who oversaw all of the settlement negotiations. Plaintiffs can attest to the arms' length, hard fought negotiations regarding the monetary terms of the settlement.

35. Plaintiffs were not satisfied with merely a monetary recovery. Plaintiffs believed it was imperative to also obtain important injunctive relief concerning Defendants' business practices.

36. Thereafter, Plaintiffs engaged in extensive and laborious negotiations concerning injunctive relief and business practices changes. Those provisions are outlined in the parties' Settlement Agreement.

JOINT DECL. ISO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
Case No. 8:16-ml-02693-JLS (KESx)

37.     While Plaintiffs negotiated injunctive relief, Plaintiffs also took three Rule 30(b)(6) depositions to ensure that the scope of injunctive relief was appropriate. Plaintiffs also reviewed Vizio's privacy compliance report it provided to the Federal Trade Commission ("FTC").

38.     By the time we negotiated and reached the settlement agreement, we had litigated the case for a number of years. The resulting negotiations were at arms' length and hard fought at all times. Among many other items, we demanded and received from the Vizio Defendants revenue data regarding what it earned from its data collection practices and other financial information regarding its data collection operations. The parties argued about many terms of the settlement, including the appropriate settlement approach, the appropriate relationship of revenue to the settlement, the Vizio Defendants' payment to the Class, and other issues. Resolution of these issues required multiple conferences among counsel. Throughout this process, the Vizio Defendants have been represented by experienced, sophisticated counsel from the respected law firm of Akin Gump Strauss Hauer & Feld, LLP.

39.     There was no collusion or preference among counsel for the parties at any time during these negotiations. To the contrary, these were hard-fought, fully informed, and contentious negotiations, during which on behalf of the Class we sought to obtain the most monetary benefit from the Vizio Defendants that we possibly could. Throughout our negotiations, the Vizio Defendants continued to seek to defeat Plaintiffs' claims against it. There was no discussion or agreement regarding the amount of attorneys' fees Plaintiffs' counsel would seek in this case.

40.     Similarly, there are no undisclosed agreements that exist with respect to the Settlement Agreement.

41.     We have been in contact with all of the named Plaintiffs, and each of them support the settlement agreement, as memorialized in their declarations.

42.     Eric Gibbs, Joseph Cotchett, Andre Mura, and I are also highly-experienced, complex litigation lawyers, as the Court recognized when it appointed o

Eric Gibbs and Joseph Cotchett and our two firms as co-lead counsel to lead this ground-breaking litigation. We have collectively prosecuted many complex class actions, including class actions concerning privacy and unfair competition claims. During that time, we have collectively been involved with many settlement negotiations.

43. In our opinion, the proposed settlement with the Vizio Defendants is fair, adequate, and reasonable, provides substantial benefits to the Class, and avoids the delay and uncertainty of continued, protracted litigation with these particular Defendants. Attached hereto as Exhibit 2 and 3 are resumes in support of our application for class counsel.

44. Attached as Exhibit 4 are applications from potential cy pres recipients.

We declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge. Executed on October 3, 2018.

*/s/ Adam J. Zapala*
Adam J. Zapala
Cotchett, Pitre & McCarthy, LLP


*/s/ Andre Mura*
Andre M. Mura
Gibbs Law Group LLP

JOINT DECL. ISO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
Case No. 8:16-ml-02693-JLS (KESx)

## ATTESTATION OF E-FILED SIGNATURE

I, Andre Mura, am the ECF user whose ID and password are being used to file the foregoing document. In compliance with Local Rule 5-4.3.4, I hereby attest that the other signatories on whose behalf this filing is submitted concur in the filing's contents and authorized the filing.

Dated: October 3, 2018          */s/Andre Mura*
                                Andre Mura

JOINT DECL. ISO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
Case No. 8:16-ml-02693-JLS (KESx)

# EXHIBIT 1

## CLASS ACTION SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT ("Agreement") is entered into by and between (i) Plaintiffs Dieisha Hodges, Rory Zufolo, John Walsh, Chris Rizzitello, Linda Thomson, and Mark Queenan ("Plaintiffs"), on their own behalf and on behalf of all members of the Settlement Class, as defined below, on the one hand, and (ii) Defendants VIZIO, Inc., VIZIO Holdings, Inc., VIZIO Services, LLC (formerly known as "VIZIO Inscape Services, LLC"), and Inscape Data, Inc. (formerly known as "VIZIO Inscape Technologies, LLC") (collectively, "Defendants" or "VIZIO"), on the other hand, with reference to the Recitals set forth below.  This Agreement is effective as of its execution by Plaintiffs and Defendants through authorized representatives.

## RECITALS

**A.    Procedural Background**

1.      In or around April 2016, the U.S. Judicial Panel on Multidistrict Litigation centralized pretrial proceedings for certain putative class action lawsuits filed against VIZIO in the U.S. District Court for the Central District of California as part of a multidistrict litigation captioned *In re VIZIO, Inc., Consumer Privacy Litigation*, No. 8:16-ml-02693-JLS (KESx) (C.D. Cal.), before the Honorable Josephine L. Staton.

2.      On August 15, 2016, Plaintiffs Dieisha Hodges, Rory Zufolo, William DeLaurentis, John Walsh, Chris Rizzitello, and Linda Thomson, on behalf of themselves and all others similarly situated, filed their Consolidated Complaint in the Action (as defined below), alleging violations of federal and state privacy and consumer protection laws against VIZIO.

3.      On March 23, 2017, Plaintiffs Dieisha Hodges, Rory Zufolo, John Walsh, Chris Rizzitello, Linda Thomson, and Mark Queenan, on behalf of themselves and all others similarly situated, filed their Second Consolidated Complaint in the Action, alleging violations of (i) the Video Privacy Protection Act, 18 U.S.C. § 2710, (ii) the U.S. Wiretap Act, 18 U.S.C. § 2510, (iii) California's Invasion of Privacy Act, Cal. Penal Code § 630, (iv) California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq., (v) California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., (vi) Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq., (vii) N.Y. Gen. Bus. Law § 349, (viii) Massachusetts' Unfair and Deceptive Trade Practices Act, Mass. Gen. Laws Ch. 93A, et seq., (ix) Massachusetts' Statutory Right to Privacy, Mass. Gen. Laws Ch. 214 § 1B, and (x) Washington's Consumer Protection Act, Wash. Rev. Code §§ 19.86, et seq., as well as claims for (xi) unjust enrichment, (xii) intrusion, and (xiii) fraud by omission.

4.      On August 15, 2017, VIZIO filed an Answer to the Second Consolidated Complaint in the Action denying the material allegations of each of Plaintiffs' claims and alleging various affirmative defenses.

5.      Over the course of this Action, Plaintiffs and VIZIO, by and through their counsel, have engaged in extensive discovery, including the production and review of voluminous documents, interrogatories, depositions of all of the Plaintiffs, and one non-party deposition.

6.    Beginning in January 2018, co-lead counsel for Plaintiffs and counsel for Defendants engaged in extensive settlement negotiations before the Honorable Vaughn R. Walker, retired chief judge of the U.S. District Court for the Northern District of California.

7.    After extensive negotiations between the parties spanning two separate mediation dates and a number of follow up discussions all performed with the assistance of Judge Walker, the parties agreed to settle the case for monetary consideration in the amount of $17 million.

8.    Plaintiffs and VIZIO subsequently negotiated the terms of the settlement, including injunctive relief for the putative class. These negotiations were intensive, arms-length, and required significant time and resources of the parties.

9.    On June 27, 2018, co-lead counsel for Plaintiffs and counsel for Defendants entered into a settlement term sheet memorializing a settlement-in-principle for non-reversionary monetary relief and injunctive relief for the putative class.

**B.    Factual Background**

10.    In or around February 2014, VIZIO implemented Automatic Content Recognition ("ACR") technology on certain VIZIO Smart TVs, which allowed VIZIO to collect information about the content displayed on the screen of such devices (such information, together with any reports or data derived therefrom and any information combined with such data, is referred to herein as "Viewing Data").

11.    In or around December 2016, VIZIO issued revised disclosures to VIZIO Smart TV consumers regarding its collection of Viewing Data (the "Disclosures"), which included an on-screen interface by which consumers could affirmatively and expressly consent to VIZIO's collection, use, and disclosure of Viewing Data.

12.    Plaintiffs' filing of this Action was a substantial cause of VIZIO's implementation of the Disclosures.

13.    On February 6, 2017, the Federal Trade Commission ("FTC") and the State of New Jersey filed (i) a complaint against VIZIO under the FTC Act and the New Jersey Consumer Fraud Act, and (ii) a Proposed Stipulated Order for Permanent Injunction and Monetary Judgment ("Consent Decree") setting forth the parties' jointly proposed resolution of the action. *See Federal Trade Commission et al. v. VIZIO, Inc. et al.*, No. 2:17-cv-00758 (D.N.J.) (the "FTC Action").

14.    On or about February 7, 2017, VIZIO stopped collecting Viewing Data from Smart TVs that were unable to display the Disclosures.

15.    On February 13, 2017, the court in the FTC Action signed the Consent Decree.

16.    On February 14, 2018, a confidential compliance report prepared by VIZIO (along with the Disclosures and other exhibits) was submitted to the FTC for its review consistent with the Consent Decree.  To date, the FTC has taken no further enforcement action.

17.    As part of the settlement process, VIZIO has provided Plaintiffs with certain confidential information concerning VIZIO's financial condition, which the parties have taken into account in reaching agreement on the terms of the settlement, and which will be submitted to the Court in a Declaration subject to procedures for confidentiality set forth in the amended stipulated protective order.

**C.      This Settlement Agreement**

18.      By executing this Agreement, Plaintiffs and VIZIO intend to settle and dispose of, fully and completely, both individually and on a class wide basis, all claims, demands, and causes of action alleged in the Action, as more fully set forth in this Agreement.

19.      The Court will be asked to certify for settlement purposes only, in accordance with the terms of this Agreement, a Settlement Class, as defined below.

20.      Lead Counsel for the Plaintiffs are Gibbs Law Group LLP (Eric H. Gibbs and Andre M. Mura) and Cotchett, Pitre & McCarthy, LLP (Joseph W. Cotchett and Adam J. Zapala). VIZIO is represented by Akin Gump Strauss Hauer & Feld LLP (Anthony T. Pierce, Hyongsoon Kim, Ali R. Rabbani, and Kelsey S. Morris).

21.      Plaintiffs and VIZIO, through their respective counsel, have conducted extensive discovery as part of the Action, including through retained experts, and have thoroughly analyzed both the underlying events and claims alleged in the Action and the potential defenses thereto.

22.      The mutual costs, risks, and hazards of continuing to prosecute and defend the Action have led Plaintiffs and VIZIO to resolve the matter by way of settlement.

23.      Plaintiffs' attorneys have concluded, taking into account the benefits of the settlement set forth in this Agreement and the risks and delay of further litigation, as well as having evaluated the strengths and weaknesses of Plaintiffs' claims and VIZIO's defenses, that this settlement is fair, reasonable, and adequate and in the best interests of the Plaintiffs and all members of the Settlement Class.

24.      VIZIO has denied and continues to deny each and every claim and contention alleged in the Action. VIZIO asserts that it has complied with all applicable provisions of federal and state statutory and common law. Neither this Agreement, nor any document referred to or contemplated in this Agreement, nor any action taken to carry out this Agreement, is or may be construed or used in the Action or in any other action, litigation, or proceeding as an admission, concession, or indication by or against VIZIO of any fault, wrongdoing, or liability whatsoever.

25.      NOW, THEREFORE, subject to the approval of the Court, Plaintiffs, on the one hand, and VIZIO, on the other hand, wish to terminate the Action and effect compromise and settlement as set forth in this Agreement.

**I.      DEFINITIONS**

Unless otherwise defined in this Agreement, the following terms used in this Agreement will have the meanings ascribed to them as set forth below:

1.      "Action" means the Multi-District Litigation *In re VIZIO Consumer Privacy Litigation*, Case No. 8:16-ml-02693-JLS (KESx), which is pending in the United States District Court for the Central District of California, including all cases consolidated therein.

2.      "Agreement" means this Settlement Agreement, including, without limitation, all of the exhibits attached hereto.

3.      "Authorized Claimant" means any Claimant whose claim for recovery has been allowed pursuant to the terms of Plaintiffs' Plan of Allocation or by order of the Court.

4.    "Claimant" means any Settlement Class Member who files a Claim Form in such form and manner, and within such time, as set forth in this Agreement, or as the Court shall prescribe.

5.    "Class Counsel" means "Plaintiffs' Counsel," who shall seek formal appointment as Class Counsel in the Motion for Preliminary Approval.

6.    "Class Period" means February 1, 2014 through February 6, 2017.

7.    "Court" means the United States District Court for the Central District of California.

8.    "Date of Finality" means the date when the Final Approval Order becomes Final.

9.    "Defendants" means VIZIO, Inc., VIZIO Holdings, Inc., VIZIO Services, LLC (formerly known as "VIZIO Inscape Services, LLC"), and Inscape Data, Inc. (formerly known as "VIZIO Inscape Technologies, LLC").

10.    "Defendants' Counsel" means the attorneys of record for Defendant, who are:

Anthony T. Pierce
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue NW
Washington, DC 20036
Telephone: 202-887-4000
Facsimile: 202-887-4288

Hyongsoon Kim
Kelsey S. Morris
Akin Gump Strauss Hauer & Feld LLP
4 Park Plaza, Suite 1900
Irvine, CA 92614
Telephone: 949-885-4100
Facsimile: 949-885-4101

Ali R. Rabbani
Akin Gump Strauss Hauer & Feld LLP
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067
Telephone: 310-229-1000
Facsimile: 310-229-1001

11.    "Disposition" means the method by which the Court (i) adopts the terms of the Settlement and Agreement, which may be by judgment or other order, and (ii) retains jurisdiction over the enforcement, implementation, construction, administration, and interpretation of the Settlement and Agreement.

12.    "Escrow Agent" means the Settlement Administrator or its duly appointed agent(s).  The Escrow Agent shall perform duties as set forth in this Agreement.

13.    "Execution Date" means the date on which the last of the Parties to sign the Agreement signs it.

4

14.    "Final" means the later of (1) the date of final affirmance of the Disposition on an appeal of the Disposition, the expiration of the time for appeal of the Disposition, or the denial of a petition to review the Disposition, or, if review is granted, the date of final affirmance of the Disposition following review pursuant to that grant, or (2) the date of final dismissal of any appeal from the Disposition or the final dismissal of any proceeding to review the Disposition, provided that the Disposition is affirmed or not reversed in any part.

15.    "Final Fairness and Approval Hearing" means the hearing at or as a result of which the Court enters the Final Approval Order.

16.    "Final Approval Order" means the final formal court order and/or judgment that the Court signs and enters at or as a result of the Final Fairness and Approval Hearing approving this Agreement and the Parties' Settlement.

17.    "Judgment" means a final judgment entered by the Court in the Action.

18.    "Settlement Amount" means the amount of Seventeen Million Dollars ($17,000,000).

19.    "Notice Plan" means the Notice Plan attached to the preliminary approval motion.

20.    "Participating Settlement Class Member" means a Settlement Class Member who does not submit a valid and timely Request for Exclusion.

21.    "Parties" means Plaintiffs and Defendants, collectively.

22.    "Person" means any individual, corporation, partnership, limited liability company or partnership, limited partnership, professional corporation, association, joint stock company, trust, estate, unincorporated association, government, or any political subdivision or agency thereof, any other type of legal or political entity, any representative, and, as applicable, their respective spouses, heirs, predecessors, successors-in-interest, representatives, and assigns.

23.    "Plaintiffs" means Dieisha Hodges, Rory Zufolo, John Walsh, Chris Rizzitello, Linda Thomson, and Mark Queenan.

24.    "Plaintiffs' Counsel" means the Interim Co-Lead Counsel of record for Plaintiffs in the Action:

> Eric H. Gibbs
> Andre M. Mura
> Gibbs Law Group LLP
> 505 14th Street, Suite 1110
> Oakland, CA 94061
>
> Joseph W. Cotchett
> Adam J. Zapala
> Cotchett, Pitre & McCarthy, LLP
> 840 Malcolm Road, Suite 200
> Burlingame, CA 94010

25.    "Preliminary Approval Date" means the date the Court enters the Preliminary Approval Order.

26. "Preliminary Approval Order" means the order that the Court signs and enters approving preliminarily the Settlement embodied in this Agreement, including, without limitation, the Notice Plan and Plan of Allocation.

27. "Request for Exclusion" means a written notification stating that a person wants to be excluded from the Settlement Class.

28. "Response Deadline" is the deadline set by the Settlement Administrator and approved by the Court as the deadline by which Settlement Class Members must exclude themselves from the settlement or object.

29. "Settlement" means the resolution of this Action as provided for and effectuated by this Agreement.

30. "Settlement Administration Costs" means all costs incurred by the Settlement Administrator in administering the Settlement, including, without limitation, updating the email addresses on the Settlement Class List; preparing and publishing the notice and any other means of following up with Settlement Class Members, Settlement Class Settlement Distribution and any related documents or materials; receiving Requests for Exclusion; generating Settlement Class Settlement Distribution and related tax reporting forms; generating and mailing checks to Class Counsel for attorneys' fees and expenses and to Plaintiffs for Service Awards; performing administrative work related to unclaimed payment; reporting periodically to Class Counsel and Defendants' Counsel; and preparing and providing any declaration or reports required by this Agreement or the Court.

31. "Settlement Administrator" means the claims administration firm as appointed by Class Counsel in their discretion, subject to the approval of the Court.

32. "Settlement Class" means all individuals in the United States who purchased a VIZIO Smart Television for personal or household use, and not for resale, that was subsequently connected to the Internet at any time between February 1, 2014 and February 6, 2017. Excluded from the Settlement Class are:

    a.  Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries and assigns; and

    b.  Any judge, justice, or judicial officer presiding over the matter and the members of their immediate families and judicial staff.

33. "Settlement Class List" means a list of Settlement Class Members that Defendants will compile based on its own available records. It will be formatted in Microsoft Office Excel and include each Settlement Class Member's last known email address to the extent VIZIO possesses such information.

34. "Settlement Class Member" means a person who is a member of the Settlement Class.

35. "Settlement Class Net Settlement Sum" means the Settlement Amount less all of the following: (i) Class Counsel's attorneys' fees, (ii) Class Counsel's reasonable litigation expenses, (iii) Class Representative service award payments, as awarded by the Court, (iv) any notice and Settlement Administration Costs attributable to the administration of the Settlement

Class and (v) any taxes that are paid and due and owing from the Qualified Settlement Fund ("QSF").

36.     "Settlement Class Representative" means a person whom the Court appoints to act as a representative of the Settlement Class.

37.     "Settlement Class Settlement Distribution" means the amount of money from the Settlement Class Net Settlement Sum that will be paid to each Participating Settlement Class Member to be determined by dividing the Settlement Class Net Settlement Sum by the total number of Participating Settlement Class Members, in a form of payment to be determined.

38.     "Settlement Escrow Account" means the Account managed by the Escrow Agent for the benefit of the Class Representatives and the Settlement Class until the Date of Finality.

39.     "VIZIO" means VIZIO, Inc., VIZIO Holdings, Inc., VIZIO Services, LLC (formerly known as "VIZIO Inscape Services, LLC"), and Inscape Data, Inc. (formerly known as "VIZIO Inscape Technologies, LLC").

40.     "VIZIO Released Parties" means (i) Defendants and (ii) each of their respective owners, shareholders, parents, affiliates, subsidiaries, divisions, predecessors, successors, assigns, insurers, employees, administrators, agents, hardware suppliers, officers, directors, principals, law firms, and legal representatives, as well as the past and present heirs, personal representatives, executors, administrators, predecessors, successors, and assigns of each of the foregoing. The "VIZIO Released Parties" does not include any other individual or entity.

## II.     CERTIFICATION OF SETTLEMENT CLASS

1.     Plaintiffs will request the Court to certify the Settlement Class solely for purposes of the Settlement of the Action. Despite VIZIO's good faith belief that it is not liable for any of the claims asserted in the Action, VIZIO will not oppose the Court's certification of the Settlement Class for the purpose of the Settlement of the Action only. Other than for purposes of this Settlement, VIZIO does not waive its objections to certification of the Settlement Class, or any other class, in this Action.

2.     If the Court does not enter a Final Approval Order (or if a Final Approval Order is reversed on appeal), no Party will use the provisions of this Section II or the Court's certification of the Settlement Class for any purpose whatsoever in the Action or in any other action or proceeding.

## III.     APPOINTMENT OF SETTLEMENT CLASS REPRESENTATIVES AND CLASS COUNSEL

1.     Plaintiffs will request the Court to appoint Plaintiffs Dieisha Hodges, Rory Zufolo, John Walsh, Chris Rizzitello, Linda Thomson, and Mark Queenan as the Settlement Class Representatives for the purpose of the Settlement of the Action only.  VIZIO will not oppose Plaintiffs' request to have Plaintiffs appointed Settlement Class Representatives.

2.     Plaintiffs will request the Court to appoint Plaintiffs' Counsel as Class Counsel for the purpose of the Settlement of the Action only.  Defendants will not oppose Plaintiffs' request to have Plaintiffs' Counsel appointed as Class Counsel.

3.      If the Court does not enter a Final Approval Order (or if a Final Approval Order is reversed on appeal), no Party will use the provisions of this Section III or the appointment of any Settlement Class Representative or Class Counsel for any purpose whatsoever in the Action or in any other action or proceeding.

## IV.    APPOINTMENT OF SETTLEMENT ADMINISTRATOR

1.      Class Counsel will seek the Court's order appointing a Claims Administrator to act as the Settlement Administrator.

2.      The Settlement Administrator will agree to all of the terms and conditions of this Agreement relating to the administration of the Settlement.

3.      The Settlement Administrator will be responsible for the administration of the Settlement, which will include, among other tasks, updating the email addresses on the Settlement Class List; publishing the notice and any other means of following up with Settlement Class Members; receiving and processing Requests for Exclusion and objections; Settlement Class Settlement Distribution and related tax reporting forms; generating and payment to Class Counsel for attorneys' fees and expenses and to Plaintiffs for Service payments, if any such payments are approved by the Court; reporting periodically to Class Counsel; and preparing and providing any declaration or reports required by this Agreement or the Court.

## V.    CLASS LIST

1.      VIZIO will compile a Settlement Class List.

2.      VIZIO will provide the Settlement Class List to the Settlement Administrator within seven (7) days after the Preliminary Approval Date.

3.      VIZIO does not have any obligation to provide the Settlement Class List to Plaintiffs, Plaintiffs' Counsel, or Class Counsel.

4.      The Settlement Administrator will not provide a copy of the Settlement Class List to Plaintiffs, Plaintiffs' Counsel, or Class Counsel.

5.      Contemporaneously with providing the Settlement Class List to the Settlement Administrator, VIZIO will notify Plaintiffs in writing of the total number of persons included in the Settlement Class List.

## VI.    NOTICE OF SETTLEMENT TO THE SETTLEMENT CLASS

1.      The Parties agree to cooperate in facilitating the best settlement class notice that is practicable under the circumstances, including electronic notice or other appropriate means that may be used in place of traditional notice methods, subject to Court approval. The Notice Plan will include a robust process for encouraging class members to participate in the Settlement.

2.      The Parties agree that the best practicable notice is a combination of (1) notice through affected VIZIO televisions capable of displaying such notice; (2) notice by email for those email addresses that VIZIO possesses and that are reasonably accessible; and (3) notice through a social media or advertising campaign, as deemed appropriate by Plaintiffs' notice provider, and available on a case-specific website.

3.      Plaintiffs shall provide VIZIO with their Notice Plan, including the proposed forms of notice, and agree to consider in good faith any comments or edits VIZIO has to the Notice Plan and forms of notice.

4.      As part of the Notice Plan, VIZIO will transmit a message to Settlement Class Members via the internet directly to their televisions (the "TV Notice"), assuming that the Settlement Class Members' television is technically capable of displaying such notice. The TV Notice will be displayed up to a total of three times, with the first phase of notices commencing on the latter of (a) January 15-31, 2019 or (b) twenty days after the Preliminary Approval Date. The second and third phase will commence at the discretion of the Settlement Administrator and with input from the parties based on the Settlement Administrator's contemporaneous evaluation of the overall notice program's effectiveness, including the digital media campaign.  The TV Notice will be prominent in size, using easily legible fonts and will remain displayed for 45 seconds unless the class member selects a command button to remove it. In the event that the class member selects the command button to remove the notice, the TV Notice will be displayed on that television for a total of two times. In the event that the class member does not select the command button to remove the notice, the TV Notice will be displayed on that television for a total of three times. The TV Notice will inform recipients that they may be members of a Settlement Class, the anticipated monetary relief, claims deadlines, and the address for the settlement website established by the Settlement Administrator to obtain the long form of the class notice.

5. Subject to Court approval, the TV Notice and E-mail Notice shall be substantially in the forms attached as Exhibits A and B, respectively, to this Agreement. The more detailed Long Form Notice shall be substantially in the form attached as Exhibit C to this Agreement.

## VII.    NOTICES OF SETTLEMENT TO COURT AND GOVERNMENTAL AUTHORITIES

1.      Plaintiffs will file the Settlement Agreement, along with their motion for approval of a Notice Plan, including the proposed form of notice with their motion for preliminary approval of the settlement.

2.      VIZIO will serve the notice of settlement required by 28 U.S.C. § 1715 within ten (10) days after Plaintiffs file with the Court a motion for preliminary approval of the settlement.

## VIII.   RIGHT TO BE EXCLUDED FROM THE SETTLEMENT CLASS

1.      Each Settlement Class Member has the right to exclude himself or herself from the Settlement Class and from participating in the Settlement by sending a written Request for Exclusion to the Settlement Administrator that is postmarked no later than the Response Deadline.  Any Settlement Class Member who submits a valid, timely Request for Exclusion will not be entitled to any Settlement Class Settlement Distribution (or any other payment pursuant to this Agreement), will not be bound by the terms and conditions of this Agreement, and will not have any right to object to, appeal, or comment on the Settlement or this Agreement.

2.      To be a valid Request for Exclusion, the Settlement Class Member must provide the following information:

    a.      Your full name and mailing address, telephone number, and/or email address;

9

b.    The statement, "I wish to exclude myself from the Settlement Class and do not wish to participate in the settlement in *In re VIZIO, Inc., Consumer Privacy Litigation*, No. 8:16-ml-02693," or substantially similar clear and unambiguous language.

c.    Your handwritten or electronically imaged written (e.g., "DocuSign") signature. An attorney's signature, or a typed signature, is not sufficient.

d.    Your exclusion letter must be signed by you, personally, and not your lawyer or anyone else acting on your behalf. "Mass" or "class" opt-outs made on behalf of multiple persons or classes of persons will be deemed invalid.

3.    No Settlement Class Member can exclude himself or herself by mailing a notification to any other location or after the Response Date. No Settlement Class Member can exclude himself or herself by telephone or by email.

4.    If a Settlement Class Member submits a Claim Form and also a Request for Exclusion, the Request for Exclusion will be deemed invalid.

5.    The Response Deadline will be set forth in the Notice Plan.

6.    Any Settlement Class Member who does not send the Settlement Administrator a timely and sufficient Request for Exclusion will be bound by all the terms and conditions of this Agreement applicable to Settlement Class Members including, without limitation, the releases by Participating Settlement Class Members contained in this Agreement.

## IX.    PROCEDURE FOR COMMENTING ON OR OBJECTING TO THE SETTLEMENT

1.    Any Settlement Class Member who does not exclude himself or herself but wishes to comment on or object to the Settlement must do so in accordance with the terms of this Section IX, unless the Court determines otherwise.

2.    To comment on or object to the Settlement, a Settlement Class Member must mail a letter postmarked no later than the Response Deadline to the Settlement Administrator.

3.    A comment or objection must contain the following:

a.    The name and case number of this lawsuit, *In re VIZIO, Inc., Consumer Privacy Litigation*, No. 8:16-ml-02693;

b.    Your full name and mailing address, and email address or telephone number;

c.    An explanation of why you believe you are a Settlement Class Member;

d.    If you are objecting, a statement whether the objection applies only to the objector, or to a specific subset of the Class, or to the entire Class;

e.    All reasons for your objection or comment, stated with specificity;

f.    A statement identifying the number of class action settlements you have objected to or commented on in the last five years;

g.    Whether you intend to personally appear and/or testify at the Final Approval Hearing;

h. The name and contact information of any and all attorneys representing, advising, or assisting you, including any counsel who may be entitled to compensation for any reason related to your objection or comment;

i. Whether any attorney will appear on your behalf at the Final Approval Hearing, and if so the identity of that attorney;

j. The identity of any persons who wish to be called to testify at the Final Approval Hearing; and

k. Your handwritten or electronically imaged written (e.g. "DocuSign") signature. An attorney's signature, or a typed signature, is not sufficient.

4. Any lawyer asserting an objection on behalf of a Settlement Class Member must: (a) file a notice of appearance with the Court by the date set forth in the Preliminary Approval and Class Certification Order, or as the Court otherwise may direct; (b) file a sworn declaration attesting to representation of each Settlement Class Member on whose behalf the objection is being filed or file (in camera) a copy of the contract between that lawyer and each such Class Member; and (c) comply with the procedures described in Section IX.

5. No Settlement Class Member will be entitled to be heard at the Final Fairness and Approval Hearing (whether individually or through separate counsel) or to object to the Settlement, and no written objections or briefs submitted by any Settlement Class Member will be received or considered by the Court at the Final Fairness and Approval Hearing, unless written notice of the Settlement Class Member's intention to appear at the Final Fairness and Approval Hearing, and copies of any written objections or briefs, have been timely mailed and are postmarked no later than the Response Deadline.

6. Settlement Class Members who fail to submit timely written objections in the manner specified in this Section IX will be deemed to have waived any and all objections to the Settlement and Agreement and will be foreclosed and barred forever from making any objection (whether by appeal or otherwise) to the Settlement, or any aspect of the Settlement, including, without limitation, this Agreement.

7. If any Settlement Class Member validly and timely objects to the Settlement, Class Counsel will file a response to the objection. Defendants also may file a response to the objection before the date of the Final Fairness and Approval Hearing.

## X.    CONSIDERATION BY VIZIO

1. Subject to the terms of this Agreement, and in consideration for the releases and the dismissal or termination of the Action provided for in this Agreement, VIZIO will pay the Settlement Amount as follows: (i) no later than fourteen (14) days after the Preliminary Approval Date, Defendants shall cause to be wired $1,700,000 (One Million Seven Hundred Thousand Dollars) into the Settlement Escrow Account; and (ii) no later than thirty (30) days after the Court enters the Final Approval Order, Defendants shall cause to be wired the balance of the Settlement Amount, $15,300,000 (Fifteen Million Three Hundred Thousand Dollars), into the Settlement Escrow Account. VIZIO will not be entitled to retain any part of the Settlement Amount that is not paid out or distributed as part of the administration of the Settlement for any reason. To the extent, if any, that any unpaid or undistributed part of the Settlement Amount is held by the Settlement Administrator at the completion of the administration of the Settlement,

such remaining funds shall be subject to a *cy pres* distribution to be proposed by Plaintiffs and approved by the Court.

2.      Any and all payments provided for or contemplated by this Agreement (including, without limitation, Settlement Class Settlement Distributions, payments of attorneys' fees and expenses to Class Counsel, payment of the Settlement Administration Costs, and payment of Service Awards) will be made from the Settlement Amount.  Under no circumstances will Defendant be required to pay as part of the Settlement any more than the Settlement Amount.

## XI.    SETTLEMENT CLASS SETTLEMENT DISTRIBUTIONS

1.      The Settlement Class Net Settlement Sum will be distributed to Participating Settlement Class Members in accordance with the Plan of Allocation, as approved by the Court.

2.      Each Authorized Claimant will be responsible for remitting to federal, state, and local taxing authorities any taxes that may be due and owing as a result of his or her receipt of a Settlement Class Settlement Distribution.  Authorized Claimant will hold Plaintiffs' Counsel, VIZIO, and Defendants' Counsel harmless and indemnify each of them for any liabilities, costs, and expenses, including attorneys' fees, caused by any such taxing authority relating in any way to the tax treatment of the Settlement Class Settlement Distribution.

3.      No person, including, without limitation, an Authorized Claimant, will have any claim against VIZIO, Defendants' Counsel, Plaintiffs, the Settlement Class Members, Plaintiffs' Counsel, Class Counsel or the Settlement Administrator based on distributions and payments made in accordance with this Agreement.

## XII.    ADDITIONAL NON-MONETARY CONSIDERATION

1.      In consideration for the releases and the dismissal or termination of the Action provided for in this Agreement, VIZIO also agrees to make the following changes to its business practices:

    a.   After the Date of Finality, VIZIO's on-screen disclosures concerning VIZIO's practices relating to the collection, use, and/or sharing of Viewing Data will include, in addition to any other disclosures, revised disclosures in substantially the form attached to this Agreement as Exhibit D ("Revised Disclosures").  The Revised Disclosures shall not be combined in the same TV screen with other notices or disclosures unrelated to VIZIO's Viewing Data practices.

    b.   After the Date of Finality, VIZIO will also include additional disclosures concerning VIZIO's practices relating to the collection, use, and/or sharing of Viewing Data in its Quick Start Guides in substantially the form attached to this Agreement as Exhibit E.

    c.   The Disclosures in subparagraphs (a) and (b) will be implemented for a minimum of five years following the Date of Finality.

    d.   VIZIO will delete all Viewing Data collected during the Class Period within ninety (90) days of the Date of Finality.  Within ten (10) days after this deletion, VIZIO will provide Class Counsel with verification from an independent third party that this Viewing Data has been deleted. If Class Counsel does not receive such notification within ten (10) days after this deletion, Class Counsel shall

report this fact to the Court within the next seven (7) days thereafter, if verification from an independent third party that this Viewing Data has been deleted cannot be obtained within that additional seven (7) days. The Court retains jurisdiction to resolve any disputes regarding the deletion and verification of deletion of Viewing Data.

e. VIZIO will maintain a list of a representative sample of its current Viewing Data partners on its website for a minimum of five years following the Date of Finality.

## XIII.  SERVICE AWARD

1.      Class Counsel will file with the Court an application for approval of a Service Award in an amount up to Five Thousand Dollars ($5,000.00) per Plaintiff to be paid to Plaintiffs Dieisha Hodges, Rory Zufolo, John Walsh, Chris Rizzitello, Linda Thomson, and Mark Queenan. VIZIO will not object to such Service Award application.  Any Service Award is subject to the Court's supervisory discretion and, if any is approved by the Court, will be paid from the Settlement Amount.

2.      The Settlement Administrator will pay any such Court-approved Service Award no later than twenty-one (21) days after the Date of Finality by mailing to each Service Award recipient by first class United States mail a check in the approved amount payable to the Service Award recipient.  The Settlement Administrator will include with each Service Award check a Form 1099 to the extent such form is required.

3.      If the Court does not enter a Final Approval Order (or if a Final Approval Order is reversed on appeal), no Party will use the provisions of this Section XIII or the award of any Service Award for any purpose whatsoever in the Action or in any other action or proceeding.

## XIV.  ATTORNEYS' FEES AND COSTS

1.      Class Counsel will file with the Court an application for an award of attorneys' fees in an amount not to exceed 33.3% of the Settlement Amount and reimbursement of litigation expenses incurred in the prosecution of the Action for the benefit of the Plaintiffs and the Settlement Class.  Defendants will not object to such application for attorneys' fees and expenses. Any award of attorneys' fees and costs is subject to the Court's supervisory discretion.

2.      Any such attorneys' fees and expenses that the Court approves will be paid from the Settlement Amount immediately upon the entry of the order awarding fees and litigation expenses by means of a wire transfer by the Settlement Administrator or the Escrow Agent to an account that Class Counsel designates.

3.      Any payment of attorneys' fees and costs shall be subject to Plaintiffs' Counsel's obligation to make an appropriate refund or repayment if the award of attorneys' fees and litigation expenses is for any reason subsequently reduced or reversed.  Such repayment or refund shall be made no later than thirty (30) days after Plaintiffs' Counsel's receipt from the Court of notice of any order that revises or reduces the award of attorneys' fees or litigation expenses.

4.      If the Court does not enter a Final Approval Order (or if a Final Approval Order is reversed on appeal), no Party will use the provisions of this Section XIV or the Court's award of

attorneys' fees and expenses for any purpose whatsoever in the Action or in any other action or proceeding.

## XV.   MOTION FOR PRELIMINARY APPROVAL

1.      Plaintiffs will file a motion requesting the Court to grant preliminary approval of this Agreement and Settlement ("Preliminary Approval Motion") and to enter a Preliminary Approval Order, which will accomplish the following, among other matters:

    a.   Find that the requirements of the Federal Rules of Civil Procedure and any other requirements for certification of a settlement class have been satisfied, and certify the Settlement Class;

    b.   Provide that the Settlement will apply to the Settlement Class;

    c.   Preliminarily approve the Agreement as fair, reasonable, and adequate and in the best interest of the Settlement Class;

    d.   Find that the class notice procedure set forth in Section VI of this Agreement satisfies the requirements of due process and applicable law and procedure;

    e.   Approve all notice and related materials;

    f.   Appoint the Settlement Class Representatives and Class Counsel;

    g.   Set the time period for requesting exclusion from or objecting to the Settlement; and

    h.   Set a date for the Final Fairness and Approval Hearing at which the Court will finally determine the fairness, reasonableness, and adequacy of the proposed Settlement.

2.      It is anticipated that Plaintiffs will file the Preliminary Approval Motion on or before October 3, 2018.

3.      VIZIO will cooperate with Plaintiffs in the preparation and filing of the Preliminary Approval Motion.

4.      VIZIO will also participate in confirmatory discovery to be taken before the Preliminary Approval Motion.  The Parties will work in good faith to define the scope of confirmatory discovery.  In the event discovery does not confirm the material premises upon which this settlement is made, Plaintiffs retain the right to terminate the settlement in writing and with five business days' notice to Defendants.

## XVI.   FINAL FAIRNESS AND APPROVAL HEARING AND FINAL APPROVAL ORDER

1.      A Final Fairness and Approval Hearing will be held on a date approved by the Court no earlier than ninety (90) days after VIZIO completes serving the notices required by 28 U.S.C. § 1715.  The date, time and place of the Final Fairness and Approval Hearing will be set forth in the Notice Plan.

2.      At the Final Fairness and Approval Hearing, Class Counsel will request the Court, among other matters, to enter a Final Approval Order to:

a. Approve this Agreement without modification (except insofar as agreed upon by the Parties) as fair, reasonable, and adequate to and in the best interest of the Settlement Class, and direct its implementation according to its terms;

b. Find that the form and manner of class notice implemented pursuant to this Agreement (i) constitutes reasonable and the best practicable notice; (ii) constitutes notice that is reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Action, the terms of the proposed Settlement, the right to object to or exclude themselves from the proposed Settlement, and the right to appear at the Final Fairness and Approval Hearing; (iii) constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and (iv) meets the requirements of federal due process, the Federal Rules of Civil Procedure, and any other applicable state and/or federal laws;

c. Find that all Settlement Class Members except those who have properly excluded themselves will be bound by this Settlement and Agreement, including the release provisions and covenants not to sue;

d. Direct that judgment be entered immediately dismissing with prejudice all individual and class claims asserted in the Action and the MDL and ruling that no costs or fees be assessed on any Party beyond the attorneys' fees and expenses provided for in Section XIV of this Agreement;

e. Incorporate the releases and covenants not to sue and forever bar any claims, causes of action, or liabilities by Settlement Class Members that have been released by reason of this Agreement and Settlement;

f. Approve the payments provided for in this Agreement to the Settlement Class Members and the Service Awards to Plaintiffs and make any necessary findings with regard to these approvals;

g. Approve the attorneys' fees and costs to be paid to Class Counsel and make any necessary findings with regard to those approvals; and

h. Retain jurisdiction of all matters relating to the interpretation, administration, implementation and enforcement of this Agreement.

3. Also at the Final Fairness and Approval Hearing, the Settlement Administrator will submit its application for the approval and payment of Settlement Administration Costs.

## XVII. RELEASE BY PLAINTIFFS AND PARTICIPATING SETTLEMENT CLASS MEMBERS

1. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Plaintiffs and each of the Participating Settlement Class Members, on behalf of themselves, their current, former, and future heirs, executors, administrators, successors, attorneys, insurers, agents, representatives, and assigns, and any Person they represent, fully and forever release, acquit, and discharge the VIZIO Released Parties, collectively, separately, individually and severally, from, and covenant not to sue for, any and all claims, demands, rights, liabilities, grievances, damages, remedies, liquidated damages, punitive damages, attorneys' fees, penalties, losses, actions, and causes of action of every nature and

15

description whatsoever, whether known or unknown, suspected or unsuspected, asserted or unasserted, whether in tort, contract, statute, rule, ordinance, order, regulation, common law, public policy, equity, or otherwise, whether class, representative, individual or otherwise in nature, that were alleged in the Action or that arise out of or relate directly or indirectly in any manner whatsoever to facts alleged or that could have been alleged or asserted in the Action ("Released Claims").  It is expressly intended and understood by the Parties that this Agreement is to be construed as a complete settlement, accord, and satisfaction of the Released Claims.

2.      With respect to the Released Claims, Plaintiffs and the Participating Settlement Class Members, and each of them, will be deemed to have, and by operation of the Final Approval Order and Judgment will have, expressly waived and relinquished, to the fullest extent permitted by law, the provisions, rights and benefits of Section 1542 of the California Civil Code, and any other similar provision under federal or state law that purports to limit the scope of a general release.  California Civil Code section 1542 provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

3.      Plaintiffs and the Participating Settlement Class Members, and each of them, further covenant and agree (a) that they will not sue or bring any action, cause of action or claim including, without limitation, by way of third-party claim, cross-claim or counterclaim, against any of the VIZIO Released Parties in respect of any of the Released Claims; (b) they will not initiate or participate in bringing or pursuing any class action against any of the VIZIO Released Parties in respect of any of the Released Claims; (c) if involuntarily included in any such class action encompassing Released Claims, they will opt out of or request to be excluded from the action, if possible; and (d) they will not voluntarily and knowingly assist any third party in initiating or pursuing a class action suit in respect of any of the Released Claims.

4.      Settlement Class Representatives shall represent and warrant that they are the sole and exclusive owners of any and all claims that they personally are releasing under this Agreement. Settlement Class Representatives further acknowledge that they have not assigned, pledged, or in any manner whatsoever, sold, transferred, assigned or encumbered any right, title, interest or claim arising out of or in any way whatsoever pertaining to the Action, including without limitation, any claim for benefits, proceeds or value under the Action, and that Settlement Class Representatives are not aware of anyone other than themselves claiming any interest, in whole or in part, in any benefits, proceeds or values to which Settlement Class Representatives may be entitled as a result of the Action. Settlement Class Members submitting a Claim Form shall represent and warrant therein that they are the sole and exclusive owner of all claims that they personally are releasing under the Agreement and that they have not assigned, pledged, or in any manner whatsoever, sold, transferred, assigned or encumbered any right, title, interest or claim arising out of or in any way whatsoever pertaining to the Actions, including without limitation, any claim for benefits, proceeds or value under the Action, and that such Settlement Class Members are not aware of anyone other than themselves claiming any interest,

in whole or in part, in any benefits, proceeds or values to which those Settlement Class Members may be entitled as a result of the Action.

## XVIII.    RELEASE BY VIZIO

1.    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Defendants fully and forever release, acquit, and discharge Plaintiffs and Plaintiffs' Counsel ("Plaintiff Released Parties"), collectively, separately, individually and severally, from, and covenant not to sue for, any and all claims, demands, rights, liabilities, grievances, damages, remedies, liquidated damages, punitive damages, attorneys' fees, penalties, losses, actions, and causes of action of every nature and description whatsoever, whether known or unknown, suspected or unsuspected, asserted or unasserted, whether in tort, contract, statute, rule, ordinance, order, regulation, common law, public policy, equity, or otherwise, whether class, representative, individual or otherwise, including, without limitation, any and all claims that were alleged in in the Action, or that arise out of or relate directly or indirectly in any manner whatsoever to facts alleged or that could have been alleged or asserted in the Action (collectively, "Released VIZIO Claims").  It is expressly intended and understood by the Parties that this Agreement is to be construed as a complete settlement, accord, and satisfaction of VIZIO Released Claims.

2.    With respect to the Released VIZIO Claims, Defendants stipulate and agree that they and each of them will be deemed to have, and by operation of the Final Approval Order and Judgment will have, expressly waived and relinquished, to the fullest extent permitted by law, the provisions, rights and benefits of Section 1542 of the California Civil Code, or any other similar provision under federal or state law that purports to limit the scope of a general release. California Civil Code section 1542 provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

3.    Defendants, and each of them, further covenant and agree that they will not sue or bring any action, cause of action or claim including, without limitation, by way of third-party claim, cross-claim or counterclaim, against any of the Plaintiff Released Parties in respect of any of the Released VIZIO Claims.

## XIX.    NO ADMISSION BY THE PARTIES

1.    VIZIO and the VIZIO Released Parties, and each of them, deny any and all claims alleged in the Action and deny all wrongdoing whatsoever.  This Agreement is neither a concession nor an admission, and will not be used against VIZIO or any of the VIZIO Released Parties as an admission or indication with respect to any claim of any fault, concession or omission by VIZIO or any of the VIZIO Released Parties.  Whether or not the Settlement is finally approved, neither the Settlement, nor any document, statement, proceeding or conduct related to this Agreement, will in any event be:

    a.  construed as, offered or admitted in evidence as, received as, or deemed to be evidence for any purpose adverse to VIZIO and the VIZIO Released Parties, including, but not limited to, evidence of a presumption, concession, indication or admission by VIZIO or any of the VIZIO Released Parties of any liability, fault, wrongdoing, omission, concession or damage; or

    b.  disclosed, referred to or offered or received in evidence against VIZIO or any of the VIZIO Released Parties in any further proceeding in the Action, or any other civil, criminal or administrative action or proceeding, except for purposes of settling the Action pursuant to this Agreement or enforcing this Agreement.

## XX.  DISMISSAL

1.    Class Members who do not opt out expressly agree that this Agreement, and the Final Approval Order, is, will be, and may be raised as a complete defense to, and will preclude, any action or proceeding specified in, or involving claims encompassed by, this Agreement. Class Members who do not opt out shall not now or hereafter institute, maintain, prosecute, assert, and/or cooperate in the institution, commencement, filing or prosecution of any suit, action, and/or other proceeding, against the VIZIO Released Parties with respect to the claims, causes of action and/or any other matters subject to this Agreement. To the extent that they have initiated, or caused to be initiated, any suit, action, or proceeding not already encompassed by the Action, Class Members who do not opt out shall cause such suit, action, or proceeding to be dismissed with prejudice. If a Class Member who does not opt out commences, files, initiates, or institutes any new legal action or other proceeding for any Released Claim against any Released Party in any federal or state court, arbitral tribunal, or administrative or other forum, (1) such legal action or other proceeding shall be dismissed with prejudice and at that Class Member's cost; and (2) the respective Released Party shall be entitled to recover any and all reasonable related costs and expenses from that Class Member arising as a result of that Class Member's breach of his, her, or its obligations under this Agreement.

## XXI.  CONFIDENTIALITY

1.    Settlement Class Representatives, Class Counsel, Defendants, and Defendants' counsel agree not to make any statements, written or verbal, or to cause or encourage any other Person to make any statements, written or verbal, that defame, disparage or in any way criticize the personal or business reputation, practices, or conduct of the Parties and their respective counsel concerning all Released Claims, as well as the litigation of this Action, the Settlement, this Settlement Agreement, and any discussions, interactions, or negotiations of the Settlement by the Parties and their counsel.

2.    Class Counsel may disclose the Settlement and its terms on its website.

3.    Plaintiffs, Plaintiffs' Counsel, and Class Counsel agree to maintain the confidentiality of any sensitive or confidential information that VIZIO provides to them during settlement negotiations or through confirmatory discovery. If any such information is filed with the Court as part of the settlement approval process, such information will be filed under seal unless all Parties agree otherwise.

4.      All agreements and orders entered during the course of this Action relating to the confidentiality of information, including the Stipulated Protective Order, shall survive this Settlement.

## XXII.  DISPUTE RESOLUTION

1.      The Parties hereby irrevocably submit to the jurisdiction of the Court for any dispute arising out of or relating to this Agreement, the applicability of this Agreement, or the enforcement of this Agreement.

2.      The Parties, their successors and assigns, and their counsel undertake to implement the terms of this Agreement in good faith, and to use good faith in resolving any disputes that may arise in the implementation of the terms of this Agreement.

3.      The waiver by one Party of any breach of this Agreement by another Party shall not be deemed a waiver of any prior or subsequent breach of this Agreement.

4.      If one Party to this Class Action Agreement considers another Party to be in breach of its obligations under this Class Action Agreement, that Party must provide the breaching Party with written notice of the alleged breach and provide a reasonable opportunity to cure the breach before taking any action to enforce any rights under this Class Action Agreement.

## XXIII. NULLIFICATION OF AGREEMENT

If (a) the Court (1) does not enter the Preliminary Approval Order or the Final Approval Order or (2) does not enter a Judgment as provided in this Agreement that becomes final and not subject to any appeals, or (b) the Settlement does not become final for any other reason, this Agreement will be null and void and any order or judgment entered by the Court in furtherance of this Settlement will be treated as void *ab initio*.  In such event, the entire amount paid or caused to be paid by Defendants plus all accrued interest—but less the costs of administration, notice, any taxes and tax preparation—shall promptly be returned to Defendants, and the Parties will proceed in all respects as if this Agreement had not been executed. The Parties will then propose a new case schedule in which any class certification motion is due no sooner than 200 days from the termination of the Settlement.  An order denying the Preliminary Approval Motion without prejudice will not constitute a ground for nullifying or terminating the Settlement.  Nor will a change in the law constitute a ground for nullifying or terminating the Settlement.

## XXIV. RETURN OF DOCUMENTS AND INFORMATION

Plaintiffs, Settlement Class Members, Plaintiffs' Counsel, and Class Counsel will not use any of the documents and information provided to them by VIZIO in this Action or during settlement negotiations for any purpose other than in connection with this Settlement.  No later than ten (10) days after Class Counsel receives any Court-approved award of attorneys' fees and expenses, Plaintiffs' Counsel and Class Counsel will certify in writing to Defendants' Counsel that they have destroyed all originals and all copies of any documents that VIZIO produced or provided to Plaintiffs, Plaintiffs' Counsel and Class Counsel during the Action.

## XXV.  REPRESENTATIONS AND WARRANTIES

1.     Each Plaintiff represents and warrants that he or she has not heretofore assigned or transferred, or purported to assign or transfer, any of the claims released pursuant to this Agreement to any other person and that he or she is fully entitled to compromise and settle same.

2.     Class Counsel represents that: (1) they are authorized by the Settlement Class Representatives to enter into this Agreement with respect to the claims asserted in the Action and any other claims covered by the Release; and (2) they are seeking to protect the interests of the Settlement Class.

3.     Class Counsel further represents that the Settlement Class Representatives: (1) have agreed to serve as representatives of the Settlement Class proposed to be certified herein; (2) are willing, able, and ready to perform all of the duties and obligations of representatives of the Settlement Class; (3) have read the pleadings in the Action, including the Complaint, or have had the contents of such pleadings described to them; (4) have consulted with Class Counsel about the obligations imposed on representatives of the Class; (5) understand that they are entitled only to the rights and remedies of Settlement Class Members under this Agreement and not to any additional compensation by virtue of their status as Settlement Class Representatives; and (6) shall remain and serve as representatives of the Class until the terms of this Agreement are effectuated, this Agreement is terminated in accordance with its terms, or the Court at any time determines that said Settlement Class Representatives cannot represent the Class.

4.     VIZIO represents and warrants that the individual(s) executing this Class Action Agreement are authorized to enter into this Class Action Agreement on behalf VIZIO.

## XXVI. CALIFORNIA LAW

All questions with respect to the construction of this Agreement and the rights and liabilities of the Parties will be governed by the laws of the State of California applicable to agreements to be wholly performed within the State of California.

## XXVII. OWN COUNSEL

Each Party acknowledges that it has been represented by attorneys of its own choice throughout all of the negotiations that preceded the execution of this Agreement and in connection with the preparation and execution of this Agreement.

## XXVIII. COOPERATION BY THE PARTIES

1.     The Parties and their respective attorneys will cooperate fully with each other to promptly execute all documents and take all steps necessary to effectuate the terms and conditions of this Agreement and Settlement.

2.     The Parties and their respective attorneys will not seek to solicit or otherwise encourage any person to exclude himself or herself from the Settlement Class, object to the Settlement, or appeal from any order or judgment of the Court that is consistent with the terms of this Agreement.

## XXIX. NOTICE

All notices, requests, demands, and other communications required or permitted to be given pursuant to this Agreement (other than notice of settlement to Settlement Class Members) will be in writing and will be delivered by email and/ or by next-day express mail (excluding Saturday, Sunday, and federal holidays):

If to Class Counsel then:

>
> Eric H. Gibbs
> Andre M. Mura
> Gibbs Law Group LLP
> 505 14th Street, Suite 1110
> Oakland, CA 94061
>
> Joseph W. Cotchett
> Adam J. Zapala
> Cotchett, Pitre & McCarthy, LLP
> 840 Malcolm Road, Suite 200
> Burlingame, CA 94010

If to VIZIO then:

>
> Anthony T. Pierce
> Akin Gump Strauss Hauer & Feld LLP
> 1333 New Hampshire Avenue NW
> Washington, DC 20036
> Telephone: 202-887-4000
> Facsimile: 202-887-4288
>
> Hyongsoon Kim
> Akin Gump Strauss Hauer & Feld LLP
> 4 Park Plaza, Suite 1900
> Irvine, CA 92614
> Telephone: 949-885-4100
> Facsimile: 949-885-4101

## XXX. INCORPORATION OF EXHIBITS

The exhibits attached to this Agreement are hereby incorporated by reference as though set forth fully herein and are a material part of this Agreement. Any notice, order, judgment, or other exhibit that requires approval of the Court must be approved without material alteration from its current form in order for this Agreement to become effective.

## XXXI. ENTIRE AGREEMENT

This Agreement represents the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior oral and written agreements and discussions. Each Party covenants that it has not entered in this Agreement as a result of any representation, agreement, inducement, or coercion, except to the extent specifically provided herein. Each Party further covenants that the consideration recited herein is the only consideration for entering into this Agreement and that no promises or representations of another or further consideration have been made by any person. This Agreement may be amended only by an agreement in writing duly executed by all Parties; provided, however, that after entry of the Final Approval Order, the Parties may by written agreement effect such amendments, modifications, or expansions of this Agreement and its implementing documents (including all exhibits hereto) without further notice to the Settlement Class or approval by the Court if such changes are consistent with the Court's Final Approval Order and do not limit the rights of Settlement Class Members under this Agreement.

## XXXII. DRAFTING

Each Party has cooperated in the drafting and preparation of this Agreement. Hence, in any construction to be made of this Agreement, the same will not be construed against any Party as drafter of this Agreement.

## XXXIII. COUNTERPARTS

This Agreement may be executed with an electronic or facsimile signature and in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

## XXXIV. HEADINGS

The headings contained in this Agreement are for reference only and are not to be construed in any way as a part of the Agreement.

## XXXV. AUTHORITY

Each Party warrants and represents that the person executing this Agreement on its behalf is duly empowered and authorized to do so.

## XXXVI. BINDING EFFECT

This Agreement is binding upon and will inure to the benefit of the Parties and their respective heirs, assigns and successors-in-interest.

## XXXVII. SEVERABILITY

1.      If any covenant, condition, term or other provision in this Agreement is held to be invalid, void or illegal, the same will be deemed severed from the remainder of this Agreement

and will in no way affect, impair or invalidate any other covenant, condition, term or other provision in this Agreement.

2.     If any covenant, condition, term or other provision in this Agreement is held to be invalid due to its scope or breadth, such covenant, condition, term or other provision will be deemed valid to the extent of the scope or breadth permitted by law.

## XXXVIII. ADMINISTRATION OF SETTLEMENT AND COMPLIANCE

The Court will have continuing jurisdiction to resolve any dispute that may arise with regard to the terms and conditions of this Agreement and the Settlement effectuated by it.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Settlement Class Members and through Lead Counsel, and Defendants, by themselves or their duly authorized representatives and through counsel, have executed this Agreement as of the dates set forth below.

**FOR PLAINTIFFS:**

Dated: October 3, 2018                     Gibbs Law Group LLP

By_____
Andre M. Mura

Dated: October 3, 2018                     Cotchett, Pitre & McCarthy, LLP

By_____
Adam J. Zapala

**FOR DEFENDANTS**

Dated: October 3, 2018                     AKIN GUMP STRAUSS HAUER &
FELD LLP

By_____
Hyongsoon Kim

23

# EXHIBIT A

## Purchased a VIZIO Smart TV Connected to the Internet Between February 1, 2014 and February 6, 2017? You Could Get Money From a Class Action Settlement

Estimated **$XX** - **$XX** per television.  No receipt needed.

To receive money You **must** submit a valid Claim Form by XX/XX/XXXX.

## www.VizioTVsettlement.com

- The class action alleges that, between February 1, 2014 and February 6, 2017, VIZIO violated privacy and consumer laws by collecting viewing data from certain Smart TVs for sale to advertisers without sufficient disclosures.  VIZIO denies these allegations.  The court has not decided who is right.

- To exclude yourself or object, mail the Settlement Administrator a letter postmarked by DATE. Opt-outs can't receive money from and have rights under the Settlement or be bound by judgments but will keep any right to sue VIZIO on these claims at your expense.

- You don't need to appear in court or hire a lawyer but can appear with or without a lawyer at your expense.

**Settlement Details at www.VizioTVsettlement.com**

Message displays twice more unless you select

**DISMISS**

# EXHIBIT B

**From:**       Eric Schachter
**To:**         Eric Schachter
**Subject:**    Notice of Class Action Settlement
**Date:**       Wednesday, October 3, 2018 6:31:44 PM

---

Purchased a VIZIO Smart TV Connected to the Internet
Between February 1, 2014 and February 6, 2017?
You Could Get Money From a Class Action Settlement

Estimated $XX - $XXX per television. No receipt needed.

To receive money You **must** submit a valid Claim Form by
XX/XX/XXXX.

# www.VizioTVSettlement.com

- The class action alleges that, between February 1, 2014 and February 6, 2017, VIZIO violated privacy and consumer laws by collecting viewing data from certain Smart TVs for sale to advertisers without sufficient disclosures. VIZIO denies these allegations. The court has not decided who is right.

- To exclude yourself or object, mail the Settlement Administrator a letter postmarked by DATE. Opt-outs can't receive money from and have rights under the Settlement or be bound by judgments but will keep any right to sue VIZIO on these claims at your expense.

- You don't need to appear in court or hire a lawyer but can appear with or without a lawyer at your expense.

Settlement Details at www.VizioTVSettlement.com

**Please note your Notification Identification PIN is XXXXXXXX. If you choose to file a Claim at the Settlement website you will be requested to provide your PIN, which will be used to expedite the validation of your Claim submission.**

# EXHIBIT C

<u>NOTICE OF PROPOSED CLASS ACTION SETTLEMENT</u>

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

*A court authorized this notice. This is not a solicitation from a lawyer.*

**If You Purchased a VIZIO Smart TV that was connected to the Internet between February 1, 2014 to February 6, 2017, You Could Be Eligible for a Payment from a Class Action Settlement**

- You could receive money from a $17 million class action Settlement.

- Estimated monetary compensation is between $XX and $XX per television. You could receive more or less depending in part on how many class members submit eligible claims.

- The lawsuit alleges VIZIO violated privacy laws and consumer-protection laws by collecting sensitive information about what was displayed on certain VIZIO Smart TVs during the time period above for sale to advertisers. The lawsuit also alleges VIZIO did this without the consent or knowledge of persons who bought these TVs. VIZIO denies these allegations.

- Visit www.VizioTVsettlement.com to make a claim. You can also opt out of, comment on, or object to the Settlement.

- Please read this notice carefully. Your legal rights will be affected, and you have a choice to make now.

| SUMMARY OF YOUR LEGAL RIGHTS AND OPTIONS | | DEADLINE |
|---|---|---|
| **SUBMIT A CLAIM FORM FOR PAYMENT** | You must submit a valid claim in order to receive compensation under this Settlement. For instructions on how to submit a claim, see Question 11. | [Deadline] |
| **EXCLUDE YOURSELF** | You can exclude yourself from the Settlement by mailing a letter to the Settlement Administrator saying you want to opt out. This is the only option that allows you to keep your legal right to sue VIZIO for claims related to this case.<br><br>If you exclude yourself, you will <u>not</u> be eligible to receive compensation from this Settlement. | [Deadline] |
| **OBJECT TO THE SETTLEMENT AND/OR ATTEND A HEARING** | You can write the Court about why you like or do not like the Settlement or object to Court approval, but you can't ask the Court to order a larger settlement. You can also ask to speak to the Court at the hearing on [Date] about the fairness of the Settlement, with or without your own attorney. | [Deadline] |
| **DO NOTHING** | If you take no action, you get no payment and you give up your legal right to continue to sue VIZIO for claims related to this case. | No Deadline |

| WHAT THIS NOTICE CONTAINS |
|---|

BASIC INFORMATION ......................................................................................................3
1.    Why is there a notice? ...............................................................................................3
2.    What is this lawsuit about? .......................................................................................3
3.    Who are the Defendants in the lawsuit? ...................................................................3
4.    Why is this a class action? ........................................................................................3
5.    Why is there a Settlement? .......................................................................................4
SETTLEMENT CLASS MEMBERSHIP ..........................................................................4
6.    How do I know if I am part of the Settlement? .........................................................4
THE SETTLEMENT BENEFITS .....................................................................................4
7.    What does the Settlement provide? ...........................................................................4
8.    How much money can I get from the Settlement? ......................................................5
9.    Will the Settlement change VIZIO's Viewing Data collection and privacy disclosure
practices? .........................................................................................................................5
10.   Will VIZIO delete the Viewing Data it collected during the class period? ...................5
HOW TO GET A PAYMENT—MAKING A CLAIM ......................................................6
11.   How can I get a payment? ..........................................................................................6
12.   What is the deadline for submitting a claim form? ...................................................6
13.   When and how will I get my payment? ......................................................................6
14.   What happens if my contact information changes after I submit a claim? ...................7
15.   What happens if some of the money from this Settlement is not claimed? ..................7
LEGAL RIGHTS RESOLVED THROUGH THE SETTLEMENT ...................................7
16.   What am I giving up if I stay in the Settlement Class? ..............................................7
THE LAWYERS REPRESENTING YOU .........................................................................8
17.   Do I have a lawyer in the case? .................................................................................8
18.   Should I get my own lawyer? ....................................................................................8
19.   How will the lawyers be paid? ...................................................................................8
EXCLUDING YOURSELF FROM THE SETTLEMENT ................................................8
20.   How do I exclude myself from the Settlement? .........................................................8
21.   If I don't exclude myself, can I sue VIZIO for the same thing later? ........................9
22.   What happens if I exclude myself? ...........................................................................9
23.   If I exclude myself, am I still represented by Class Counsel? ...................................10
COMMENTING ON OR OBJECTING TO THE SETTLEMENT ..................................10
24.   How do I tell the Court that I like the Settlement, or that I don't like the Settlement? .......10
25.   What's the difference between excluding yourself and objecting? ...........................11
DOING NOTHING ..........................................................................................................11
26.   What happens if I do nothing at all? ........................................................................11
THE COURT'S FAIRNESS HEARING ..........................................................................11
27.   When and where will the Court decide whether to approve the Settlement? .............11
28.   Do I have to come to the Fairness Hearing? ............................................................12
29.   May I speak at the hearing? .....................................................................................12
GETTING MORE INFORMATION ...............................................................................12
30.   How do I get more information? ...............................................................................12

## BASIC INFORMATION

### 1. Why is there a notice?

A Court authorized this notice because you have a right to know how the proposed Settlement may affect your rights. This notice explains the nature of the litigation, the general terms of the proposed Settlement and what it may mean to you. This notice also explains the ways you may participate in, or exclude yourself from, the Settlement.

**To learn if you qualify, see the answer to Question 6.**

### 2. What is this lawsuit about?

VIZIO is a company that makes and sells Smart Televisions. Certain individuals who purchased these TVs filed class action lawsuits. These individuals—or Plaintiffs—allege VIZIO violated privacy laws and consumer-protection laws by collecting information about what was displayed on certain VIZIO Smart TVs from February 1, 2014 and February 6, 2017 for sale to advertisers. This information is called Viewing Data.

VIZIO denies these allegations.

### 3. Who are the Defendants in the lawsuit?

The Defendants are VIZIO, Inc., VIZIO Holdings, Inc., VIZIO Services, LLC (formerly known as "VIZIO Inscape Services, LLC"), and Inscape Data, Inc. (formerly known as "VIZIO Inscape Technologies, LLC"). This notice refers to all four Defendants collectively as "VIZIO."

### 4. Why is this a class action?

Even if you have not filed your own lawsuit against VIZIO regarding the allegedly unauthorized collection of Viewing Data, you can obtain the benefits provided by this Settlement because the litigation is proceeding as a class action.

In a class action, one or more people file a lawsuit to assert legal claims on behalf of themselves and other persons who have experienced the same or similar circumstances. Here, six persons who purchased VIZIO Smart TVs that were then connected to the Internet during the class period are named as Plaintiffs in a consolidated class action complaint against VIZIO. They serve as Settlement Class Representatives to represent their personal interests and the interests of all the Settlement Class members.

Judge Josephine L. Staton of the United States District Court for the Central District of California presides over this litigation. The case is *In re VIZIO, Inc., Consumer Privacy Litigation*, No. 8:16-ml-02693-JLS (KESx).

| 5. Why is there a Settlement? |
| --- |

Settlements avoid the costs and uncertainty of a trial and related appeals, while providing benefits to Settlement Class Members when the Settlement becomes final. The Court has not decided in favor of Plaintiffs or Defendants. The Settlement Class Representatives and Class Counsel think the settlement is in the best interests of everyone affected.

### SETTLEMENT CLASS MEMBERSHIP

| 6. How do I know if I am part of the Settlement? |
| --- |

You are a Settlement Class member, and you are affected by this Settlement, if you are:

- an individual in the United States who purchased a VIZIO Smart Television for personal or household use, and not for resale, that was subsequently connected to the Internet at any time between February 1, 2014 and February 6, 2017.

Only one purchaser per Smart TV per household may qualify. Anyone who purchased more than one qualifying Smart TV (see bullet point above) may submit a claim for each TV.

If you are not sure whether you are included in the class, you can ask for free help by calling the Settlement Administrator at 877-252-4685 for more information.

### THE SETTLEMENT BENEFITS

| 7. What does the Settlement provide? |
| --- |

VIZIO will pay $17,000,000 into a Settlement Fund. After deductions for attorneys' fees, litigation costs, and other expenses (Question 19), the Fund will be distributed to class members who submit valid claims.

After this lawsuit was filed, and substantially because of it, VIZIO changed its disclosures to VIZIO Smart TV consumers regarding its Viewing Data collection and sharing practices. As part of this change, VIZIO provided notice of Viewing Data collection and asked for affirmative express consent. Under this Settlement, VIZIO will make additional changes to its Viewing Data disclosures. To read more about these developments, see Question 9.

VIZIO will delete all Viewing Data it collected during the class period. To read more about this, see Question 10.

## 8. How much money can I get from the Settlement?

You must file a timely, valid claim in order to receive monetary compensation. Estimated monetary compensation is between $XX and $XX per purchase of a single eligible VIZIO Smart TV per household. You could receive more or less depending on how many class members submit eligible claims, and on how much the Court awards in fees, costs, and expenses.

For information on how to make claim, see Question 11 and www.VizioTVsettlement.com.

## 9. Will the Settlement change VIZIO's Viewing Data collection and privacy disclosure practices?

Beginning in December 2016, VIZIO changed its disclosures to VIZIO Smart TV consumers regarding its Viewing Data collection and sharing practices. This lawsuit was a substantial cause of this change. Following this change, VIZIO collects Viewing Data only upon providing a TV-screen notice and seeking affirmative express consent. No Viewing Data is collected from a TV that is unable to display this request.

As part of the Settlement, VIZIO will modify its on-screen disclosure, in order to include an explicit "Accept" and "Decline" option, and to communicate that declining Viewing Data collection will not affect the functionality of the TV. The disclosure will be displayed to new customers during the set-up process. You can see the new disclosures at [link].

VIZIO will also provide information about Viewing Data collection in a "quick-start" guide that will be included in new Smart TVs that are capable of collecting Viewing Data.

Even if you do not file a claim for monetary compensation, VIZIO will implement the changes described above after the Settlement becomes effective with court approval. Remember, however, the only way for you to obtain monetary compensation is to file a timely, valid claim.

## 10. Will VIZIO delete the Viewing Data it collected during the class period?

As part of the Settlement, VIZIO will delete all Viewing Data it collected during the class period. An independent third party will confirm that Viewing Data has been successfully deleted.

Even if you do not file a claim for monetary compensation, VIZIO will delete all such Viewing Data. Remember, however, the only way for you to obtain monetary compensation is to file a timely, valid claim.

## HOW TO GET A PAYMENT—MAKING A CLAIM

### 11. How can I get a payment?

To receive money from this Settlement, you must complete a Claim Form that asks you to state under oath that you personally bought an eligible VIZIO Smart TV. You are not required to provide a receipt.

You can fill out a Claim Form online at www.VizioTVsettlement.com.

If you prefer a paper claim form, you can ask for one by contacting the Settlement Administrator by telephone at 877-252-4685 or by email at info@VizioTVsettlement.com, or by U.S. mail at VIZIO TV Settlement, P.O. Box 170500, Milwaukee, WI 53217.

### 12. What is the deadline for submitting a claim form?

To be eligible for payment, claim forms must be submitted electronically or postmarked no later than [DATE].

### 13. When and how will I get my payment?

The Court will hold a hearing on [HEARING DATE], to decide whether to approve the Settlement. If the Court approves the Settlement, there may be an appeal of that decision. It is hard to estimate how long it might take for any appeals to be resolved. If the Settlement is approved and no appeals are filed, the Settlement Administrator anticipates that payments will be sent out within 3 months.

Settlement payments will be digitally sent to you via email. Please ensure you provide a current, valid email address on the Claim Form. When you receive the email notifying you of your Settlement payment, you will be provided with a number of digital payment options such as PayPal, Venmo, Apple Pay, Amazon, or direct deposit. For many, this is the easiest and quickest option to receive your money.

You will also have the opportunity to request that a check be mailed to you by the Settlement Administrator.

Updates regarding the Settlement and when payments will be made will be posted on the Settlement website, www.VizioTVsettlement.com.

## 14. What happens if my contact information changes after I submit a claim?

If, after you submit a claim form, you change your mailing address or email address, it is your responsibility to inform the Settlement Administrator of your updated information. Notify the Settlement Administrator of any changes to your mailing address or email address by writing:

VIZIO TV Settlement
P.O. Box 170500
Milwaukee, WI 53217

## 15. What happens if some of the money from this Settlement is not claimed?

VIZIO is not entitled to retain any part of the Settlement Amount that is not paid out or distributed as part of the administration of the Settlement for any reason. To the extent, if any, that an unpaid or undistributed part of the Settlement Amount is held by the Settlement Administrator at the completion of the administration of the Settlement, such remaining funds will be directed to a court-approved "next best" recipient.

The Court has approved Electronic Privacy Information Center, Privacy Rights Clearinghouse, and World Privacy Forum as the "next best" recipients because they have committed to using such funds, if any, to benefit the class or substantial portions of it and to address issues related to the basis of the lawsuit.

### LEGAL RIGHTS RESOLVED THROUGH THE SETTLEMENT

## 16. What am I giving up if I stay in the Settlement Class?

If you make a claim, or if you do nothing, you will be releasing all of your legal claims relating to VIZIO's collection and sale of Viewing Data. The VIZIO released parties are (i) Defendants (see Question 3) and (ii) each of their respective owners, shareholders, parents, affiliates, subsidiaries, divisions, predecessors, successors, assigns, insurers, employees, administrators, agents, hardware suppliers, officers, directors, principals, law firms, and legal representatives, as well as the past and present heirs, personal representatives, executors, administrators, predecessors, successors, and assigns of each of the foregoing.

This notice provides only a summary of the claims being released. The specific details of the claims being released by Settlement Class Members who do not exclude themselves from the Settlement are set forth in Section I, Paragraph 40 and Section XVII of the Settlement Agreement, which may be viewed at www.VizioTVsettlement.com.

## The Lawyers Representing You

### 17. Do I have a lawyer in the case?

Yes. The Court appointed Eric H. Gibbs and Andre M. Mura of Gibbs Law Group LLP and Joseph W. Cotchett and Adam J. Zapala of Cotchett, Pitre & McCarthy LLP to represent you and the other Settlement Class Members. These attorneys are called Class Counsel. You will not be charged for their services.

### 18. Should I get my own lawyer?

You do not need to hire your own lawyer because Class Counsel is working on your behalf. If you want your own lawyer, you may hire one, but you will be responsible for any payment for that lawyer's services. For example, you can ask your own lawyer to appear in Court for you if you want someone other than Class Counsel to speak for you. You may also appear for yourself without a lawyer.

### 19. How will the lawyers be paid?

You do not have to pay Class Counsel. Class Counsel have not been paid for their services since this case began. They will seek an award of attorneys' fees out of the Settlement Fund, as well as reimbursement for litigation costs they advanced in pursuing the claims. The fees will compensate Class Counsel for investigating the facts, litigating the case, and negotiating and administering the Settlement. Class Counsel's attorneys' fee request will not exceed 33 percent of the Settlement Amount of $17,000,000. Additionally, Class Counsel will seek reimbursement of their out-of-pocket litigation expenses, not to exceed $300,000 to be paid out of the Settlement Fund.

Class Counsel will also ask the Court to approve service award payments of $5,000 to each of the individual class representatives, who are Dieisha Hodges, Rory Zufolo, John Walsh, Chris Rizzitello, Linda Thomson, and Mark Queenan.

The costs of providing this notice and administering the Settlement are being paid from the Settlement Fund.

## Excluding Yourself from the Settlement

If you don't want monetary compensation from the Settlement, and you want to keep your right, if any, to sue VIZIO on your own about the legal issues in this case, then you must take steps to get out of the Settlement. This is called excluding yourself—or "opting out" of—the class.

### 20. How do I exclude myself from the Settlement?

If you want to keep the right to sue or continue to sue VIZIO based on claims this Settlement resolves (see Question 16 for discussion of released claims), you must take steps to exclude yourself from the

Settlement Class. This is sometimes called "opting out." If you exclude yourself, however, you will not be eligible to receive a monetary payment.

You may opt out of the Settlement by mailing a letter to the Settlement Administrator with the following information:

- Your full name and mailing address, telephone number, and/or email address;
- The statement, "I wish to exclude myself from the Settlement Class and do not wish to participate in the settlement in In re VIZIO, Inc., Consumer Privacy Litigation, No. 8:16-ml-02693," or substantially similar clear and unambiguous language.
- Your handwritten or electronically imaged written (e.g., "DocuSign") signature. An attorney's signature, or a typed signature, is not sufficient.

Your letter must be sent First Class mail, postmarked by DATE, to:

VIZIO TV Settlement
ATTN: EXCLUSIONS
P.O. Box 173001
Milwaukee, WI 53217

Your exclusion letter must be signed by you, personally, and not your lawyer or anyone else acting on your behalf. "Mass" or "class" opt-outs made on behalf of multiple persons or classes of persons will be deemed invalid.

You cannot exclude yourself by mailing a notification to any other location or after [DATE]. You cannot exclude yourself by telephone or by email.

If you submit a Claim Form and also a Request for Exclusion, the Request for Exclusion will be deemed invalid.

## 21. If I don't exclude myself, can I sue VIZIO for the same thing later?

No. Unless you opt out, you give up the right to sue VIZIO for the claims the Settlement resolves. You must exclude yourself from the class if you want to try to pursue your own lawsuit.

## 22. What happens if I exclude myself?

If you exclude yourself, you will not have any rights as a member of the Settlement Class under the Settlement; you will not receive any payment as part of the Settlement; you will not be bound by any further orders or judgments in this case; and you will keep the right, if any, to sue on the claims alleged in the case at your own expense.

## 23. If I exclude myself, am I still represented by Class Counsel?

No. Class Counsel represents the members of the Settlement Class. If you exclude yourself from the Settlement Class, you are not represented by Class Counsel.

### COMMENTING ON OR OBJECTING TO THE SETTLEMENT

## 24. How do I tell the Court that I like or don't like the Settlement?

If you're a class member and do not opt out of the Settlement, you can comment on or object to the Settlement, including to tell the Court that you like or don't like the Settlement. By filing an objection, however, you are asking the Court to <u>deny</u> approval of the Settlement. You can't ask the Court to order a larger settlement; the Court can only approve or deny the Settlement.

If the Court denies approval, no settlement payments will be sent out, VIZIO will be under no obligation to make the change to its disclosures and to destroy viewing data as negotiated by the parties, and the lawsuit will continue. If that is what you want to happen, you must object.

To comment on or object to the Settlement, you must mail a letter containing the following information:

- The name and case number of this lawsuit, In re VIZIO, Inc., Consumer Privacy Litigation, No. 8:16-ml-02693;
- Your full name and mailing address, and email address or telephone number;
- An explanation of why you believe you are a Settlement Class Member;
- If you are objecting, a statement whether the objection applies only to the objector, or to a specific subset of the Class, or to the entire Class;
- All reasons for your objection or comment, stated with specificity;
- A statement identifying the number of class action settlements you have objected to or commented on in the last five years;
- Whether you intend to personally appear and/or testify at the Final Approval Hearing;
- The name and contact information of any and all attorneys representing, advising, or assisting you, including any counsel who may be entitled to compensation for any reason related to your objection or comment;
- Whether any attorney will appear on your behalf at the Final Approval Hearing, and if so the identity of that attorney;
- The identity of any persons who wish to be called to testify at the Final Approval Hearing; and
- Your handwritten or electronically imaged written (e.g. "DocuSign") signature. An attorney's signature, or a typed signature, is not sufficient.

To be considered by the Court, your objection must be mailed, postmarked no later than [DATE], to the following recipient at this address:

VIZIO TV Settlement
ATTN: OBJECTIONS
P.O. Box 173001
Milwaukee, WI 53217

## 25. What's the difference between excluding yourself and objecting?

Excluding yourself from the Settlement Class means that you are no longer a Settlement Class Member and don't want the Settlement to apply to you. Once you are excluded, you lose any right to receive any benefits from the Settlement or to object to any aspect of the Settlement because the case no longer affects you.

You object to the Settlement when you disagree with some aspect of the Settlement and think the Court should not give Final Approval to the Settlement. An objection, like a comment, allows your views to be heard in Court.

### DOING NOTHING

## 26. What happens if I do nothing at all?

If you do nothing and the Court grants Final Approval, you'll be a member of the Settlement Class, you'll get no money from this Settlement, and you won't be able to sue VIZIO for the conduct alleged in this case. VIZIO, however, will change its disclosures and will delete all viewing data it collected during the class period even if you do nothing.

### THE COURT'S FAIRNESS HEARING

## 27. When and where will the Court decide whether to approve the Settlement?

The Court will hold a Fairness Hearing at XX:XX p.m. on [HEARING DATE], at Ronald Reagan Federal Building and United States Courthouse, 411 W. Fourth St., Santa Ana, CA, 92701, Courtroom 10A, 10th Floor.

At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them. The Court will listen to people who have asked to speak at the hearing.

The Court may also decide how much to pay to Class Counsel in fees and expense reimbursements. After the hearing, the Court will decide whether to approve the Settlement.

The Court may reschedule the Fairness Hearing or change any of the deadlines described in this notice. The date of the Fairness Hearing may change without further notice to the class members. Be sure to check the website, www.VizioTVsettlement.com, for news of any such changes. You can also access

the case docket via the Court's Public Access to Court Electronic Records (PACER) system at
https://ecf.cand.uscourts.gov.

## 28. Do I have to come to the Fairness Hearing?

No. Class Counsel will answer any questions the Court may have. You may attend at your own expense
if you wish. If you send an objection, you do not have to come to Court to talk about it. As long as
you mailed your written objection on time, the Court will consider it. You may also pay your own
lawyer to attend, but it is not necessary.

## 29. May I speak at the hearing?

You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must include
a statement in your written objection (discussed above at Question 24) that you intend to appear at
the hearing. Be sure to include your name, address, and signature as well.

You cannot speak at the hearing if you exclude yourself from the class.

### GETTING MORE INFORMATION

## 30. How do I get more information?

This notice summarizes the proposed Settlement—more details are in the Settlement Agreement and
other important case documents. You can get a copy of the Settlement Agreement, view other case
documents, and get additional information and updates by visiting www.VizioTVsettlement.com.

All of the case documents that have been filed publicly in this case are also available online through
the Court's Public Access to Court Electronic Records (PACER) system at
https://ecf.cand.uscourts.gov. This case is called *In re VIZIO, Inc., Consumer Privacy Litigation*, and the
case number is No. 8:16-ml-02693-JLS (KESx). You may also obtain case documents by visiting the
office of the Clerk of the Court for the United States District Court for the Central District of
California, Southern Division (Santa Ana), 411 West 4th Street, Room 1053 Santa Ana, CA 92701-
4516, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding court-observed holidays.

You can get additional information or request a copy of the Settlement Agreement by calling toll-free
877-252-4685 or writing to the Settlement Administrator by email at info@VizioTVsettlement.com
or mail to VIZIO TV Settlement, P.O. Box 170500, Milwaukee, WI 53217.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO
INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIMS PROCESS.

# EXHIBIT D

# PLEASE REVIEW:

This unit is equipped with Automated Content Recognition ("ACR") Technology also known as Smart Interactivity.

## WHAT DATA DO WE COLLECT?



VIZIO collects Viewing Data, which includes information about what is playing on this internet-connected TV/display. Viewing Data includes broadcast television, advertisements and other content. We also collect unique identifiers about this TV/display, including the IP address. Declining Viewing Data collection will not change the functionality of your device.

## HOW DO WE ENHANCE THE DATA?



VIZIO Viewing Data is sometimes enhanced with household demographic data and data about digital actions (e.g. digital purchases and other consumer behavior taken by devices associated with the IP Address we collect). VIZIO and its authorized data partners use the information to generate summary analysis and reports of how users engage with content on their TVs and other devices.

## WHO DO WE SHARE DATA WITH?



Unless you turn off ACR collection in the Settings menu, we may share Viewing Data with authorized data partners, including analytics companies, media companies and advertisers.

## WHAT DOES DATA SHARING MEAN FOR YOU



Viewing Data will be used to help improve the design of our products, software and services. It also enables our authorized data partners to deliver advertising relevant to your profile that you might find useful both on the VIZIO TV/display and other devices sharing your IP Address. Viewing Data is also used to help content publishers, broadcasters or content distribution services create or recommend more relevant entertainment based on summary insights.

By clicking "ACCEPT" you are agreeing to the data practices summarized above.

DECLINE        ACCEPT

? Learn More

# EXHIBIT E

# VIZIO

**Quick Start Guide | Guide de Démarrage Rapide**



**Inside the box**
*Dans la boîte*

**Smart TV**
*Smart TV*

**TV Stands**
*Supports de TV*

**Remote with Batteries**
*Télécommande avec piles*

**4x Screws for TV Stands**
*4x Vis Pour supports de TV*

**Power Cable**
*Câble d'alimentation*



**3** Plug the tv power cord into a wall outlet. For more information on connecting your devices refer to the User Manual.
*Branchez le cordon d'alimentation de la tv dans une prise murale. Référez-vous au manuel d'utilisation pour plus d'information sur le branchement de vos appareils.*



Adapters may be required. Not included.
*Des adaptateurs peuvent être requis. Non inclus.*

**4** Follow on-screen instructions to complete setup.
*Suivez les instructions à l'écran pour effectuer l'installation.*





**For more information including the product's full User manual, visit VIZIO.com.**

*Pour plus d'informations, y compris manuel complet de l'utilisateur du produit, Visitez VIZIO.com.*

This unit is equipped with Automated Content Recognition ("ACR") Technology which (when enabled) is able to use video data to recognize what is playing on the TV and send information back to VIZIO about what is showing ("Viewing Data"). Declining Viewing Data collection will not change the functionality of your device. To learn more, please see VIZIO's Privacy Policy at www.vizio.com/privacy.

*Cet appareil est équipé de la technologie de reconnaissance automatique de contenu ("ACR") qui (lorsqu'elle est activée) peut utiliser les données vidéo pour reconnaître ce qui est lu sur le téléviseur et renvoyer les informations à VIZIO ("Affichage des données"). Refuser l'affichage La collecte de données ne changera pas la fonctionnalité de votre appareil. Pour en savoir plus, consultez la politique de confidentialité de VIZIO sur www.vizio.com/privacy.*

# EXHIBIT 2

# COTCHETT, PITRE & McCARTHY, LLP

## ATTORNEYS AT LAW

SAN FRANCISCO BAY AREA | LOS ANGELES | NEW YORK

WWW.CPMLEGAL.COM

# ADVOCATES FOR JUSTICE



*"The attorneys ... displayed truly exceptional levels of skill and tenacity."*
*- Judge of the U.S. District Court*

# OUR FIRM

Cotchett, Pitre & McCarthy, LLP based on the San Francisco Peninsula for over 45 years, engages exclusively in litigation and trials. The firm's dedication to prosecuting or defending socially just actions has earned it a national reputation. With offices in Burlingame, Los Angeles and New York, the core of the firm is its people and their dedication to principles of law, their work ethic and commitment to justice.

Most clients are referred by other lawyers, who know of the firm's abilities and reputation in the legal community. We are trial lawyers dedicated to achieving justice.






*"The Cotchett firm has few peers that equal their ability in litigation.*
*Their commitment to the cause of justice and their ethical standards stand apart.*
*They are people who give back to the community and give lawyers a good name."*
— Judge of the Superior Court (Retired)

2

# **PRACTICE AREAS**

CPM represents Plaintiffs and Defendants in a wide range of areas, including:

- Antitrust & Global Competition

- Aviation / Helicopter Accidents

- Commercial Litigation

- Consumer Protection Litigation

- Defective Products / Mass Torts

- Elder Abuse

- Employment Law

- Environmental Litigation

- False Claims / Whistleblower Law

- First Amendment Defense

- Intellectual Property

- Municipal & Public Entity Litigation

- Personal Injury & Wrongful Death

- Pharmaceutical Litigation

- Securities / Financial Fraud

- Shareholder Rights / Corporate Governance

*"This court has had the distinct pleasure of having the parties in this case represented by some of the finest attorneys not only in this state but in the country." Cotchett, Pitre & McCarthy has "well reputed experience in [consumer fraud] litigation."*
*- Judge of the U.S. District Court*

3

# LOCATIONS

**SAN FRANCISCO
BAY AREA**

San Francisco Airport Office
840 Malcolm Road, Suite 200
Burlingame, CA 94010

T: 650.697.6000
F: 650.697.0577

**LOS ANGELES**

2716 Ocean Park Blvd.
Suite 3088
Santa Monica, CA 90405

T: 310.392.2008
F: 310.392.0111

**NEW YORK**

40 Worth Street
10th Floor
New York, NY 10013

T: 212.201.6820
F: 646.219-6678



4

# ANTITRUST & CONSUMER PROTECTION CASES

### *In re Auto Parts Antitrust Litigation*
### USDC, Eastern District of Michigan

CPM is co-lead counsel on behalf of consumers against suppliers of automotive parts, alleging that defendants engaged in a conspiracy that lasted over a decade to fix the prices of various automotive parts sold to automobile manufacturers, such as Toyota, Honda, and Nissan. The case involves one of the largest conspiracies in history.

CPM has heavily litigated and prevailed on many motions filed by Defendants. CPM manages discovery and document review which entails millions of pages of documents. CPM has also dedicated a significant amount of time and resources to depositions, interviews, proffers, negotiations, and mediations which has led to settlements with several Defendants.

*To date, CPM and its two co-lead counsel have secured settlements on behalf of the class in excess of $1.1 billion.*

### *In re Domestic Airline Travel Antitrust Litigation*
### USDC, District of Columbia

CPM and Adam J. Zapala have been appointed Co-Lead Counsel on behalf of Plaintiffs against Defendants American Airlines, Inc., Delta Airlines, Inc., Southwest Airlines Co., and United Airlines, Inc., who are alleged to have conspired to fix, raise, maintain, and/or stabilize prices for air passenger transportation services within the United States, its territories and the District of Columbia in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3), by, inter alia, colluding to limit capacity on their respective airlines.

*To date, CPM and its co-counsel have secured settlements on behalf of the class in excess of $60 million.*

### *In re Capacitors Antitrust Litigation*
### USDC, Northern District of California

CPM is Lead Counsel and represents indirect purchasers of capacitors against Defendants, the leading manufacturers of capacitors sold in the United States, for allegedly engaging in two massive and separate conspiracies to unlawfully inflate, fix, raise, maintain or artificially stabilize the prices of electrolytic and film capacitors, respectively.

CPM has extensively engaged in discovery, propounding and responding to numerous written discovery requests. CPM has also developed and implemented intricate document review procedures for purposes of defeating motions to dismiss and contesting summary judgment motions on limited time.

*To date, CPM has secured settlements with several Defendants on behalf of the class, totaling over $70 million.*

### *In re Resistors Antitrust Litigation*
### <u>USDC, Northern District of California</u>

The Court appointed CPM as sole Lead Counsel on behalf of a class of indirect purchaser plaintiffs of resistors purchased from defendants who allegedly conspired to unlawfully inflate, fix, raise, maintain or artificially stabilize prices.

### *In re Lithium Batteries Antitrust Litigation*
### <u>USDC, Northern District of California</u>

The Court appointed CPM as Co-Lead Counsel on behalf of indirect purchasers of lithium-ion rechargeable batteries who allege that defendants conspired to fix the price of those products. CPM has been extensively involved in the review of millions of pages of documents, the production of Plaintiffs' documents, propounding and responding to discovery, and depositions.

*To date, CPM and its co-counsel have secured $64.45 million in settlements on behalf of the class.*

### *In re Generic Pharmaceuticals Pricing Antitrust Litigation*
### <u>USDC, Eastern District of Pennsylvania</u>

CPM and Adam J. Zapala have been appointed as a steering committee member in a case brought by indirect purchasers of generic drugs to recoup overcharges that resulted from Defendants' alleged price-fixing conspiracy. On January 9, 2017, two executives of a manufacturer of generic doxycycline pled guilty in federal court in the Eastern District of Pennsylvania to criminal price-fixing, thereby confirming the existence of a conspiracy among manufacturers to fix prices.

### *In re Broiler Chicken Antitrust Litigation*
### <u>USDC, Northern District of Illinois</u>

CPM is Co-Lead Counsel and represents commercial and institutional indirect purchasers who allege Defendants implemented and executed a conspiracy to fix, raise, maintain, and stabilize the price of Broilers by coordinating their output and limiting production with the intent and expected result of increasing prices of Broilers in the United States. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and closely-guarded non-public information about prices, capacity, sales volume, and demand, including through third party co-conspirator Agri Stats.

### *In re Transpacific Passenger Air Transportation Antitrust Litigation*
### <u>USDC, Northern District of California</u>

CPM is Co-Lead counsel for a proposed class of purchasers who allege that they paid fuel surcharges illegally charged by Defendants on long-haul passenger flights for transpacific routes. Throughout the course of this heavily litigated case, Plaintiffs filed a comprehensive consolidated amended complaint detailing Defendants' alleged violations. CPM defended and, on the whole, prevailed after extensive rounds of hard-fought motions to dismiss and for

6

summary judgment, with arguments covering such complex regulatory areas as the filed-rate doctrine, the act of state doctrine, the state action doctrine, implied preclusion, federal preemption and the sufficiency of the conspiracy allegations under *Twombly* and *Iqbal*, amongst several other attacks on the pleadings.  Class Certification was granted.

### *In re Qualcomm Antitrust Litigation*
### USDC, Northern District of California

CPM and Joseph W. Cotchett have been appointed Co-Lead counsel for plaintiffs' who allege that Qualcomm monopolized the market and engaged in other anticompetitive conduct in the market for cellular devices and modem chips.  Class certification was granted.

### *In re Cathode Ray Tube (CRT) Antitrust Litigation*
### USDC, Northern District of California

CPM is an Executive Committee Member and represents a class of direct purchaser plaintiffs against manufacturers of cathode ray terminals ("CRT") who allege that the prices were artificially raised, maintained or stabilized at a supra-competitive level by Defendants and their co-conspirators.

### *In re Optical Disk Drive (ODD) Antitrust Litigation*
### USDC, Northern District of California

CPM is a member of the executive committee in this multidistrict litigation alleging a conspiracy that manufacturers of optical disk drives ("ODD") fixed prices of ODDs sold directly to Plaintiffs in the United States.

*Plaintiffs reached $74,750,000 in settlements.*

### *In re Static Random Access Memory (SRAM) Antitrust Litigation*
### USDC, Northern District of California

The Court appointed CPM as sole Lead Counsel for direct purchaser plaintiffs of Static Random Access Memory ("SRAM") chips.  Important legal rulings were reached on cutting edge issues such as standing of class representatives and the proper showing for class certification.  (Settled, 2011).

*CPM successfully secured a $77 million settlement on behalf of plaintiffs.*

### *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*
### USDC, Northern District of California

CPM served as chair of the Discovery Committee in a multidistrict litigation arising from the alleged price-fixing of DRAM, a form of computer memory.  Shortly before the scheduled trial, class counsel reached settlements with the last remaining defendants, bringing the total value of the *class settlements to over $325 million*.

7

## *In re Parking Heaters Antitrust Litigation*
## USDC, Eastern District of New York

CPM serves as Liaison Counsel for indirect purchaser plaintiffs who purchased air and coolant parking heaters aftermarket for commercial vehicles from Defendants.

## *Freight Forwarders Antitrust Litigation*
## USDC, Eastern District of New York

CPM is Co-Lead Counsel for purchasers of Freight Forwarding services in the United States and filed a complaint alleging that the major providers of Freight Forwarding conspired to fix the prices of such services in violation of U.S. federal antitrust law (15 U.S.C. § 1).

*CPM was instrumental in securing approximately $450 million in settlements with defendants for the benefit of the class.*

## *In re International Air Transportation Surcharge Antitrust Litigation*
## USDC, Northern District of California

CPM served as Co-Lead Counsel for a class of purchasers who alleged that they paid fuel surcharges illegally charged by Defendants on long-haul passenger flights for transatlantic routes.  (Settled, 2009).

*Plaintiffs secured settlements on behalf of the class with Defendants Virgin Atlantic Airways, LTD and British Airways Plc worth approximately $204 million.*

## *Air Cargo Shipping Services Antitrust Litigation*
## USDC, Eastern District of New York

CPM, along with co-counsel, was the court-appointed lead counsel for a proposed class of U.S. indirect purchasers of international air freight services.  The case alleged that the providers of international air freight services conspired to fix the prices of such services, including fuel surcharges.  The case named almost forty international air freight carriers as Defendants.  The claims of the United States indirect purchasers were brought under the antitrust laws and consumer protection laws of various U.S. states.  The Court granted approval to a settlement with Defendants Deutsche Lufthansa AG, Lufthansa Cargo AG, and Swiss International Air Lines, Ltd.  (Settled, 2009).

## *In re: Plasma Derivative Protein Therapies Antitrust Litigation*
## USDC, Northern District of California

CPM was lead counsel for indirect purchasers in this antitrust class action alleging price-fixing in the market for the life-saving blood products albumin and immunoglobulin.

### *Webkinz Litigation, Nuts for Candy v. Ganz Inc., et al.*
### USDC, Northern District of California

CPM was lead counsel representing a proposed class of persons or entities in the United States who ordered Webkinz from Ganz Inc. on the condition that they also order products from Ganz's "core line" of products. The complaint alleged that Ganz conditioned the purchase of its popular Webkinz plush line toy with a minimum $1,000 purchase of non-Webkinz "core" line products in violation of federal antitrust laws. On September 17, 2012, Hon. Richard Seeborg of the Northern District of California approved a class action settlement on behalf of a class of small business retailers against Ganz Inc. for alleged antitrust violations where customers were required to purchase unwanted products as a condition to purchasing Ganz's popular Webkinz Toy. (Settled, 2012).

### *Municipal Derivative Investment Antitrust Litigation*
### USDC, Southern District of New York

Along with co-counsel, CPM represents Los Angeles and numerous public entities who purchased Guaranteed Investment Contracts ("GICs") and other derivative investments. GICs and derivative investments are purchased from financial institutions, insurance companies, and others through a competitive bidding process overseen by brokers. They are purchased when public entities issue tax-exempt municipal bonds to raise funds to finance public works projects and have funds that are not immediately needed for the project. CPM's investigation has uncovered, and the complaints allege, that the competitive bidding process is a sham as securities sellers and brokers in the derivative investment market have engaged in a conspiracy to allocate the market and rig the bidding process in violation of antitrust law and common law.

### *Toyota Motor Sales USA, Inc.*
### *Livingston v. Toyota Motor Sales USA, Inc.*
### USDC, Northern District of California

CPM filed an antitrust class action under Sherman Act by purchasers of Toyota vehicles for secret rebates. (Settled, 1997).

### *Hip and Knee Implant Marketing Litigation*
### USDC, Northern District of California

CPM, with co-counsel, filed two complaints on behalf of a proposed classes of persons who underwent hip or knee implant surgery. The complaints allege that the major manufacturers of hip and knee implants have engaged in a pervasive kickback scheme, using phony consulting agreements with orthopedic surgeons, to improperly funnel money to doctors and hospitals in return for choosing the manufacturer's device during surgeries. This scheme artificially raised the costs of hip or knee implants paid for by members of the proposed class in violation of state antitrust and consumer protection laws.

9

### *In re Commercial Tissue Products Public Entity*
### *Indirect Purchaser Antitrust Litigation*
### *County of San Mateo v. Kimberly-Clark Corp.*
### San Francisco County Superior Court

CPM filed an antitrust class action on behalf of class of public entity consumers of commercial sanitary paper products against alleged price-fixing conspiracy among producers.  (Appointed co-lead counsel for public entity class, 1998).

### *Dry Creek Corporation v. El Paso Corporation*
### San Diego County Superior Court

CPM filed an antitrust action against El Paso for allegedly withholding natural gas from California in order to drive up prices, which was successfully resolved on behalf of the Plaintiff.

### *In re Hydrogen Peroxide Antitrust Litigation*
### USDC, Eastern District of Pennsylvania

CPM filed an antitrust class action for conspiracy to fix prices of hydrogen peroxide manufactured and sold by Defendants who were engaged in an alleged price-fixing conspiracy.

### *Kopies, Inc., et al. v. Eastman Kodak Co.*
### USDC, Northern District of California

CPM was appointed Co-Lead counsel, and successfully prosecuted an antitrust class action on behalf of copier service firms against parts manufacturers for alleged illegal tying of products and services.

*CPM successfully reached a $45 million settlement with Kodak on behalf of plaintiffs.*

### *E&J Gallo Winery v. EnCana Energy Services, et al.*
### USDC, Eastern District of California

CPM successfully represented E. & J. Gallo Winery in an antitrust action against natural gas companies for allegedly manipulating energy prices, which led to the 2000-2001 California energy crisis, in which energy companies not only gouged the State of California and its residents of billions of dollars but caused rolling blackouts throughout California.  E. & J. Gallo Winery is one of the largest natural gas users in the State of California and it suffered millions of dollars in losses.  CPM's aggressive prosecution of this case resulted in the case settling on the eve of.  CPM's efforts led to the landmark Ninth Circuit opinion on the filed rate doctrine. *E. & J. Gallo Winery v. EnCana Corporation*, 503 F.3d 1027 (9th Cir. 2007).

10

### *National Gas Anti-Trust Cases I, II, III, & IV*
### San Diego Superior Court

CPM represented eleven public entities and others for the alleged reporting of false information by non-core natural gas retailers to published price indices to manipulate the natural gas market during the California energy crisis.

*CPM successfully prosecuted this case, concluding in approximately $124 Million in settlements.*

### *Bathroom Fittings Cases*
### USDC, Northern District of California

CPM was a member of the Executive Committee in an antitrust class action alleging a conspiracy to fix prices of Bathroom Fittings manufactured by Defendants participating in an alleged price-fixing conspiracy.

### *Magazine Paper*
### San Francisco County Superior Court

CPM filed an antitrust class action alleging a price-fixing conspiracy against magazine paper products International Paper Co., MeadWestvaco Corporation, Norse Skog, Stora Enso, Sappi Limited, S.D. Warren Company and others.

### *Foundry Resins*
### USDC, Southern District of Ohio

CPM filed an antitrust class action alleging a conspiracy to fix prices of resins manufactured by Ashland Inc., Ashland Specialty Chemical Company, Borden Chemical Inc., Delta HA, Inc., HA International LLC.

### *In re Automotive Refinishing Paint Cases*
### Alameda County Superior Court

CPM was appointed Co-Liaison Counsel in an antitrust class action for conspiracy to fix the price of auto paint by manufacturers engaged in an alleged price-fixing conspiracy. The class was certified in 2004.

### *In re Methionine Antitrust Litigation*
### USDC, Northern District of California

CPM was appointed Co-Lead Counsel in this antitrust class action against several methionine manufacturers involved in an alleged conspiracy to fix the prices of and allocate the markets for methionine.

*This case settled for $107 million.*

11

### *In re Citric Acid Antitrust Litigation*
### <u>USDC, Northern District of California</u>

CPM served as Co-Lead Counsel in an antitrust class action against the five largest sellers of citric acid in the United States, who are alleged to have conspired to raise and fix the price of citric acid at artificially high levels.  Co -Lead counsel successfully certified the class in October 1996. *Co-Lead Counsel also reached approximately $86.5 million in combined settlements with defendants* Archer Daniels Midland Co., Hoffmann-La Roche Inc., Jungbunzlauer, Inc., Haarmann & Reimer Corp., and Cerestar Bioproducts B.V.

### *In re Beer Antitrust Litigation*
### <u>USDC, Northern District of California</u>

CPM was appointed Co-Lead counsel in an antitrust class action on behalf of specialty beer brewers against Anheuser-Busch, Inc. for allegedly attempting to monopolize the U.S. beer industry by denying access to distribution channels.

### *In re Sodium Gluconate Antitrust Litigation*
### <u>USDC, Northern District of California</u>

CPM served as Lead Counsel in an antitrust class action against Defendants who allegedly price fixed sodium gluconate, and industrial cleaning agent.

*CPM successfully certified the class, and reached a settlement on behalf class plaintiffs in the amount of $4,801,600.*

12

# OUR PEOPLE
### ANTITRUST ATTORNEYS AT CPM

# PARTNERS

## JOSEPH W. COTCHETT



**ADMISSIONS**
- California
- New York
- District of Columbia
- United States Supreme Court
- California Court of Appeals
- 9th Circuit Court of Appeals
- 3rd Circuit Court of Appeals
- 5th Circuit Court of Appeals

**EDUCATION**
- Hastings College of Law at the University of California, J.D.

- California State Polytechnic University, B.S. in Engineering

As stated by the National Law Journal, Joseph W. Cotchett is considered by plaintiffs and defense attorneys alike to be one of the foremost trial lawyers in the country. He has been named one of the 100 most influential lawyers in the nation for the past 15 years.

As reported in the *San Francisco / Los Angeles Daily Journal*, he is "considered one of the best trial strategists in the state" who built a career out of representing the underdog against powerful interests. He is a fearless litigator and once tried two cases at the same time (one in the morning and one in the afternoon) and won them both in San Diego Superior Court in 1984. His clients range from corporate giants to groups like Consumers Union of United States, Inc.  In 2003, the *San Francisco Chronicle* said "*[t]he Burlingame attorney has had a star career that's not only talked about in legal circles but has made headlines around the country. Known mostly as a plaintiffs' lawyer, many of his cases are filed on behalf of fraud victims, and have a widows-and-orphan flavor to them*."  Cotchett consistently has been named one of the most

13

influential lawyers in California, and has been named by the legal press as one of the top 10 trial attorneys in the state and has been listed in every edition of Best Lawyers in America since its inception.

During his 45-plus year legal career, he has tried more than 100 cases to verdict, and settled hundreds more, winning numerous jury verdicts, ranging from multi-million dollar malicious prosecution jury verdicts to several defense verdicts in complex civil cases. He successfully negotiated a multi-million dollar settlement in a qui tam suit on behalf of the University of California and hundreds of millions of dollars in antitrust, securities and major fraud cases.

In the 1980s, Cotchett won mammoth judgments and settlements for investors in white-collar fraud cases, with jury verdicts of more than $200 million arising out of the collapse of the Technical Equities Corp. in San Jose. He is known nationally as the lead trial lawyer for 23,000 plaintiffs in the Lincoln Savings & Loan Association/American Continental Corp. downfall in 1990 involving Charles Keating and others. He won one of the then largest jury verdicts, $3.3 billion. He obtained nearly $300 million in settlements from lawyers, accountants and other professionals caught up in the scandal in a jury trial in Tucson, Arizona.

He has represented both the National Football League and teams since the early 1980s in various legal actions. As counsel for E. & J. Gallo Winery, he won a defense jury verdict in a celebrated trade dress infringement case involving a wine produced by Gallo and the firm regularly represents Gallo in numerous matters.

In recent years, Cotchett has taken on major corporate entities and Wall Street. He and the firm were involved in litigation resulting from nearly every major corporate scandal including Enron, Worldcom, Global Crossing, Homestore.com, Qwest, Montana Power Company, Lehman, Bank of America, Goldman Sachs, Lehman Brothers and numerous others on behalf of private investors and public pensions. The firm has represented the California Public Employees' Retirement System, California State Teachers' Retirement System, and the University Of California Board Of Regents, along with numerous political subdivisions of the state, such as counties, cities and districts.

In 2000, he served as trial counsel for Consumers Union, successfully defending the watchdog consumer group in a product disparagement and defamation suit. Isuzu Motors of Japan had sued Consumers Union for disparagement of the 1995-96 Trooper, claiming millions in damages. Following an eight-week trial, a jury ruled in favor of Consumers Union. Trial Lawyers for Public Justice honored Cotchett as "Trial Lawyer of the Year Finalist" in 2000 in honor of his "outstanding contribution to the public interest" through his work for Consumers Union. Also in 2000, Consumer Attorneys of California gave Cotchett its "Presidential Award of Merit"

In 2002, Cotchett successfully represented the Chief Justice of the California Supreme Court and the individual judges and members of the Judicial Council, in litigation brought

14

against them by the New York Stock Exchange and the National Association of Securities Dealers. The two Wall Street forces had filed suit against the Judicial Council challenging the State of California for establishing guidelines for arbitrators who hear complaints from investors in the state.

Cotchett received his B.S. in Engineering from California State Polytechnic University, San Luis Obispo in June 1960, being named an Outstanding Graduate, and his J.D. from Hastings College of Law at the University of California in June 1964. In June 2002, Cotchett received an Honorary Doctor of Laws from Cal Poly and The California State University Board of Trustees. In May 2006, Cotchett received an Honorary Doctor of Letters from Notre Dame de Namur University.  In May 2011, Cotchett received an Honorary Doctor of Letters from the University of San Francisco. In each case, he was the graduation speaker honored by the universities.

Following California Polytech, he served in the U.S. Army Intelligence Corps, followed by years as a Special Forces paratrooper and JAG Corps officer, in the active reserves, and retired in 1991 with the rank of Colonel. He is a member of many veteran and airborne associations having served on active duty 1960-1961. From 2001 to 2005, he served on the board of the Army War College Foundation in Carlisle, Pennsylvania. The Foundation supports the prestigious Army War College at Carlisle Barracks, the graduate school for the senior commanders of all branches of the service, including officers from foreign allies.

He has been an active member of national, state and local bar associations, including the California, New York and District of Columbia bars. He is a Fellow of the prestigious American College of Trial Lawyers and The International Society of Barristers and an Advocate in the American Board of Trial Advocates. He also is a Fellow and former board member of The International Academy of Trial Lawyers. A former Master of the American Inns of Court, he serves on various advisory boards for professional organizations.

He also has served on the Advisory Board of the Witkin Institute, the mission of which is to further B.E. Witkin's commitment to advancing the understanding of California law and improving the administration of justice.

He is the author of numerous articles and a contributing author to numerous magazines. His books include California Products Liability Actions, Matthew Bender; California Courtroom Evidence, LexisNexis; Federal Courtroom Evidence, LexisNexis; Persuasive Opening Statements and Closing Arguments, California Continuing Education of the Bar (1988); The Ethics Gap, Parker & Son Publications (1991); California Courtroom Evidence Foundations, Parker Publications (1993); and numerous law review articles. He is a prolific author of op-ed pieces and articles on public policy, environmental issues and public integrity. In 2002, he co-authored and published the book The Coast Time Forgot, a historic guide to the San Mateo County coast.

15

Cotchett serves on the Federal Judicial Advisory Committee that submits and reviews federal judicial nominations in California to President Obama. The committee was authorized by the Obama Administration and California's two Democratic senators, Dianne Feinstein and Barbara Boxer. Cotchett is Chair of the Boxer Committee for the Central District of California (Los Angeles) and advises statewide.  Cotchett also serves on a Judicial Advisory Committee to Governor Jerry Brown on state judicial appointments.

Cotchett has lectured at numerous law schools including Harvard Law School, the University of Southern California, Georgetown Law Center, Stanford, Boalt, and his alma mater U.C. Hastings. His subjects include complex cases, evidence, trial practice and professional ethics. He also is a keynote public speaker and lecturer on contemporary subjects of law.

He has been honored by the State Bar of California by serving on the Board of Governors from 1972 to 1975. Cotchett served on the California Judicial Council from 1976 to 1980; the Board of Directors, Hastings College of Law, University of California for twelve years; California Commission on the Future of the Courts; the California Select Committee on Judicial Retirement, the California Blue Ribbon Commission on Children in Foster Care, the latter three appointed by the Chief Justice of California.

His civic work includes past memberships on the board of directors of the San Mateo County Heart Association; San Mateo Boys & Girls Club (Past President); Peninsula Association of Retarded Children and Adults; Bay Meadows Foundation; Disability Rights Advocates; and numerous Bay Area organizations. He formerly served as a member of the board of Public Citizen in Washington, D.C. and served on the board of Earth Justice.

In 1996, he was awarded the Anti-Defamation League's Distinguished Jurisprudence Award. The award was established to recognize individuals in the legal community who have exhibited humanitarian concerns, and whose everyday actions exemplify the principals on which the Anti-Defamation League was founded.

In 1999, Cotchett was inducted by the State Bar of California to the Litigation Trial Lawyers Hall of Fame. This award is given to professionals who have excelled as trial lawyers and whose careers exemplify the highest values and professional accomplishment.

In 2000, the University of California Hastings College of Law opened the Cotchett Center for Advocacy recognizing Cotchett as one of its outstanding graduates. Chief Justice Ronald M. George of the California Supreme Court and Associate Justice Anthony Kennedy of the U.S. Supreme Court honored Cotchett as speakers at the Founder's Day dedication of the center. In November of 2006, Notre Dame de Namur University in Belmont, California dedicated the Joseph W. Cotchett Business Lab for students.

In March of 2000, Cotchett was named to the California State Parks Commission by Governor Gray Davis. The commission establishes general policies for the guidance of the Parks

16

Department in the administration, protection and development of the 260 state parks in the system. He served as Chairperson in 2002-2003.

In 2003, Cotchett was honored by Disability Rights Advocates for his nearly 40 years of civil rights work. At a San Francisco dinner in October attended by lawyers, judges and community leaders, this was how Cotchett was described:

> *Joe Cotchett has been a champion for justice since his college days. As an engineering student in North Carolina, Joe challenged segregation by drinking from segregated water fountains and riding in the back of buses. Later, as a student at Cal Poly, in 1958 Joe successfully established the first integrated fraternity, which prompted the other fraternities on campus to follow suit. Joe's legal career has involved representing the underdog and doing extensive pro bono work. His civil rights commitment has been leveraged over and over by his financial support of legal fellowships. He has given a 'kick-start' to the public interest careers of the new law graduates at Trial Lawyers for Public Justice, Public Citizen, Southern Poverty Law Center and Disability Rights Advocates. Through these fellowships, Joe has helped to ensure social change through law. Joe guided DRA as a board and litigation committee member from its infancy years into the defender of disability rights it has become today.*

In 2004, continuing a distinguished history of community and civic involvement, Cotchett endowed a $7 million fund to support science and mathematics teacher education at California State Polytechnic University to serve inner city and rural minority children. To honor Cotchett, the university renamed its landmark Clock Tower building the "Cotchett Education Building." The gift supports science and mathematics teacher education initiatives at Cal Poly through the University Center of Teacher Education and the College of Science and Mathematics.

In 2011, Cotchett was inducted into the prestigious American Trial Lawyer Hall of Fame for his work nationwide in civil rights, and litigation on behalf of the under-privileged in our society. In 2011, he received the Distinguished Service Award from the Judicial Council of California and was named the Antitrust Lawyer of the Year by the State Bar. In April of 2011, he was honored by the California League of Conservation Voters with the Environmental Leadership Award and honored by the Consumer Watchdog with the Lifetime Achievement Award.

Cotchett and his family members are active in numerous Bay Area charitable organizations involving animals, children, women and minorities. They established the Cotchett Family Foundation that aids individuals and groups in need of assistance.

17

# NIALL P. McCARTHY



**ADMISSIONS**
- California
- All Federal Courts in California
- United States Supreme Court
- 9th Circuit Court of Appeals
- 7th Circuit Court of Appeals

**EDUCATION**
- Santa Clara University School of Law, J.D.

- University of California at Davis, B.A.

Niall P. McCarthy is one the top leading trial lawyers in the country. He has repeatedly been selected as one of the top plaintiff attorneys in California and the United States by multiple publications, including the Daily Journal, the National Law Journal, Lawdragon Magazine and Super Lawyers Magazine. He has received a California Lawyer Magazine Attorney of the Year (CLAY) Award. McCarthy has been named a Top 100 attorney in California multiple times by the Daily Journal and Super Lawyers Magazine. He has the highest possible rating, AV, from Martindale-Hubbell. McCarthy was awarded the Trial Lawyer of the Year Award by the San Mateo County Trial Lawyers Association. In 2016 and 2017, he was selected as one of the Top 50 Plaintiff lawyers in California by the Daily Journal.

McCarthy has also been elected to the American Board of Trial Advocates (ABOTA), the International Society of Barristers and the International Academy of Trial Lawyers.

McCarthy has represented qui tam Relators in False Claims Act cases in state and federal courts. McCarthy handled the *Hunter Laboratories Litigation* in which he negotiated the then largest False Claims recovery in California history, $301 million. In the mid-1990s, he was the lead attorney in a groundbreaking case brought under the California False Claims Act on behalf of the University of California San Francisco with respect to direct and overhead costs to the university. In 2015, he was the lead attorney for the whistleblower in a Qui Tam case resulting in a $75.5 million settlement with technology industry giant, VMware. In 2018, McCarthy resolved a Qui Tam action against British Petroleum for $117 million. McCarthy has extensive experience pursuing false claims cases arising out of fraud and other industries against the government. He coauthored the articles "Qui Tam Litigation, A Primer for the General Litigator," "Answering the Call: Attacking Healthcare Fraud with the False Claims Act," "Recent Developments in False Claims and Healthcare Litigation," and "False Claims Act

18

Fundamentals." He has worked with the Department of Justice and Attorneys General offices throughout the United States on False Claims cases.

McCarthy has handled many consumer fraud class actions. He has acted as Co-Lead National Class Counsel in actions against some of the largest banks and credit card companies in the country, which returned hundreds of millions of dollars to consumers. He is the author of "Home Equity Loss in California Through Predatory Lending," "Combating Predatory Lending in California," and has spoken in many forums on consumer fraud.

McCarthy also has practiced extensively in the area of elder abuse, including obtaining multi-million dollar recoveries on behalf of senior citizens in actions involving reverse mortgages. He has been retained by San Mateo County, Santa Clara County, Alameda County and Santa Cruz County to prosecute financial elder abuse cases. In addition, he has handled many notable cases against nursing homes, including well-publicized actions for the families of three victims who died at a San Mateo County nursing home during a heat wave, and an action on behalf of a developmentally disabled person who was severely burned while left unattended in a nursing home shower.

He authored "The Elder Abuse Statute: California's Underutilized Law," "Elder Abuse: Recent Legal and Legislative Developments," "Financial Elder Abuse in Real Estate Transactions Under the 2000 Revisions to the Elder Abuse Act" and "Elder Abuse Claims Not Subject to MICRA." He is a frequent speaker on elder abuse and has been featured in California Lawyer with respect to his work for seniors.

McCarthy has received many legal service awards including the Marvin Lewis Award for the Consumer Attorneys of California for guidance, loyalty and dedication, the William Nagle, Jr. Memorial Award from the San Mateo County Bar Association for innovations in the law and for professionalism, the Community Service Award from Santa Clara University School of Law for his work on behalf of consumers, the Bar Association of San Francisco's Award of Merit, the Access to Justice Award from the Lawyer's Club of San Francisco, the California Supreme Court Chief Justice's Award for Exemplary Service and Leadership, the Stanley Mosk Defender of Justice Award and the State Bar of California Presidential Award for Access to Justice.

McCarthy's other notable cases include compelling an insurance company to pay for a lifesaving bone marrow transplant for a cancer patient, and obtaining a punitive damage jury verdict in another case which unveiled a multi-state health insurance fraud. McCarthy obtained a defense award on a multi-million dollar fraud claim against his clients, and obtained a million-dollar recovery for the same clients on a cross-complaint in a year-long arbitration arising out of a failed healthcare industry merger. He served as lead class counsel obtaining a $15 million dollar verdict against Old Republic Title Co. after a trial in San Francisco Superior Court. He also obtained a substantial verdict against the federal government in a high profile FTCA case after a trial in federal court. He obtained a punitive damage jury verdict after trying an elder abuse case against a nursing home. He won a unanimous jury verdict in a hotly contested financial elder abuse trial involving the misappropriation of a senior citizen's life savings.

19

McCarthy also won a multi-million jury verdict for a MLB pitcher whose career was prematurely ended.  McCarthy has tried a variety of cases in state and federal court, including class actions.

McCarthy is a past president of the Consumer Attorneys of California and the San Mateo County Trial Lawyers.  He was chairman of the Business Litigation Section of the San Mateo County Bar Association.  He has been elected to the Irish 100, the top 100 Irish lawyers in the United States and Litigation Counsel of America.  McCarthy is a three-time finalist for the Consumer Attorneys of California Attorney of the Year Award.  He is currently a co-chair of the Open Courts Coalition, a diverse group of attorneys from all practice areas in California whose goal is to restore court funding.  McCarthy has been an MCLE panelist on many topics including courtroom conduct, complex litigation, financial fraud, financial and physical elder abuse, the fundamentals of business litigation, Business and Professions Code 17200, predatory lending, qui tam actions, discovery for trial, witness examinations, trial of class actions, the Consumer Legal Remedies Act, Settlement Techniques, Legal Ethics and taking effective depositions. He also is active in various Peninsula community activities, including having served as chairman of the Board of Directors of Community Gatepath, a nonprofit organization which benefits children and adults with disabilities.  McCarthy received ABC 7/KGO TV's "Profiles of Excellence" Award for his work on behalf of Community Gatepath.

20

# ADAM J. ZAPALA



**ADMISSIONS**
- California
- Michigan
- United States Supreme Court
- 9th Circuit Court of Appeals

**EDUCATION**
- University of California, Hastings College of the Law, J.D.

- Stanford University, B.A.

**HONORS & AWARDS**
- Northern California Super Lawyer (2017-2018)

- Northern California Super Lawyers, Rising Stars List (2014 – 2016)

Adam J. Zapala focuses his practice on antitrust, false claims act litigation, consumer protection and class actions. Mr. Zapala received a B.A. from Stanford University and his J.D. from University of California, Hastings College of the Law. While at Hastings, Mr. Zapala received awards for best moot court brief, the Pro Bono Publico award, most outstanding student in Group Advocacy and Systemic Reform, and Excellence for the Future Award in Pre-trial Practice.

While at CPM, Mr. Zapala has served in leadership positions on the following major antitrust and complex matters, among others:

- *Precision Associates et al. v. Panalpina World Transport et. al.*, No. 08-CV-00042-JG-VVP (E.D. N.Y.) (recovering over $400 million on behalf of plaintiffs' class);

- *In re Automotive Parts Antitrust Litigation*, No. 12-md-02311 (E.D. Mich.) (to date, recovering over $600 million on behalf of indirect purchasers);

- *In re Transpacific Air Passenger Transportation Antitrust Litigation*, No. 07-CV-5634-CRB, MDL 1913 (N.D. Cal.) (ongoing case recovering over $40 million on behalf of plaintiffs' class);

- *In re Capacitors Antitrust Litigation*, Case No. 3:14-cv-03264 (N.D. Cal.) (ongoing case where indirect purchasers have recovered over $30 million to date);

21

- *In re Resistors Antitrust Litigation*, No. 15-cv-03820-JD (N.D. Cal.) (ongoing case);

- *In re Vizio, Inc. Consumer Privacy Litigation*, No. 16-md-02693-JLS (C.D. Cal.) (cutting edge privacy litigation on behalf of plaintiffs' class).

Previously, Mr. Zapala worked at a prominent San Francisco firm, where he represented labor unions, Taft-Hartley Pension and Health & Welfare funds, employees and consumers in complex litigation, arbitration and NLRB proceedings. While at this firm, Mr. Zapala served as trial counsel in countless matters on behalf of labor unions and employee benefit funds. He has argued cases before the California First, Third, and Sixth District Court of Appeal. Mr. Zapala also previously served as a staff attorney with Bay Area Legal Aid, where he focused on representing indigent clients in a wide variety of civil litigation matters. While there, Mr. Zapala developed expertise in Medi-Cal, Medicare and other publicly-financed healthcare systems. While in law school, Mr. Zapala also worked for the public interest law firms of Public Advocates, Inc. and Public Justice, focusing on civil rights class action litigation.

Mr. Zapala also has legislative and policy experience, working on Capitol Hill as a policy aide for Senator Ron Wyden (D-Oregon) in Washington D.C. Mr. Zapala has deep ties to the Bay Area. He grew up in San Jose, California and attended Bellarmine College Preparatory. While at Stanford University, Mr. Zapala became a four-time Academic All-American, a four-time All-American, and Captain of the Stanford Men's Soccer Team. In 2001, he was drafted in the Major League Soccer ("MLS") Super Draft by the Dallas Burn (now FC Dallas).

22

# *SENIOR ASSOCIATES*

## ALEXANDER E. BARNETT



**ADMISSIONS**
- New York
- District of Columbia
- Southern District Illinois
- 2nd Circuit Court of Appeals

**EDUCATION**
- St. John's University School of Law, J.D.

- University of Pennsylvania, B.A.

Alex Barnett specializes in class actions involving antitrust law violations, securities law violations, consumer fraud, negligent product design and manufacture, wage and overtime disputes, civil rights violations, and violation of environmental laws. He also handles mass tort litigation.

Mr. Barnett has represented individuals injured by pharmaceutical products such as Redux and Pondimin, Baycol, Serzone, and Vioxx. In addition, Mr. Barnett served as counsel for the cities of Boston, Los Angeles, Philadelphia and San Francisco against the handgun industry and as counsel for the City of Milwaukee in a case against the lead pigment industry. Mr. Barnett has served as a lecturer on class actions, serving as a Panel speaker at the First Annual National Class Actions Symposium (Osgoode Hall Law School, Toronto, Canada) and the Third Annual Class Actions for Non-Class-Action Lawyers - Growing Your Business by Understanding the Basics and Recognizing Opportunities.

Prior to entering private practice, Mr. Barnett served as the Executive Director of the International Association of Jewish Lawyers and Jurists ("IAJLJ"), American Section, an organization dedicated to promoting human rights and the rule of law. Before his tenure at the IAJLJ, Mr. Barnett served as the Democratic Party nominee for the New York State Assembly in New York's 17th Assembly District.

23

# ELIZABETH T. CASTILLO



**ADMISSIONS**
- California
- Michigan
- 9th Circuit Court of Appeals
- 6th Circuit Court of Appeals

**EDUCATION**
- University of California Hastings College of the Law, J.D.

- Boston University, B.A., Economics and Political Science

**HONORS & AWARDS**
- American Antitrust Institute 2016 Outstanding Antitrust Litigation Achievement by a Young Lawyer Award

- Super Lawyers Northern California Rising Stars List (2015 - 2018)

Elizabeth (Tran) Castillo is a Senior Associate on the Antitrust & Global Competition Team. Her practice focuses on complex litigation—specifically, antitrust class actions against international cartels. Ms. Castillo is the lead associate at CPM on *In re Automotive Parts Antitrust Litigation (Auto Parts)*, which has become the largest indirect purchaser class action in terms of settlement value in history. Ms. Castillo received the American Antitrust Institute's 2016 Outstanding Antitrust Litigation Achievement by a Young Lawyer Award for her work in Auto Parts.

Ms. Castillo earned her J.D. from the University of California, Hastings College of the Law (UC Hastings) in 2011. At UC Hastings, she was a Super Regional Semifinalist in the Jessup International Law Moot Court Competition. She also received Honorable Mentions for both Best Brief and Best Oral Argument in Moot Court. Additionally, she served as a Judicial Extern to the Honorable A. James Robertson II in the Superior County of California, County of San Francisco, and as a Teaching Assistant for both Legal Writing & Research and Moot Court. Throughout law school, Ms. Castillo mentored underserved high school students on preparing for college.  Ms. Castillo received her B.A. in Economics and Political Science, with a concentration in Public Policy, from Boston University (BU) in 2008. At BU, she interned at an international law firm and business advocacy organization in London and Sydney, respectively, during her junior year. Ms. Castillo has national and state legislative experience. She interned for then-U.S. Representative Neil Abercrombie (D-Hawaii, 1991-2010; Governor of Hawaii, 2010-2014) in Washington, D.C. and State Representative Scott Nishimoto (D-Hawaii, 2003-present) in Honolulu.

24

# ADAM J. TROTT



**ADMISSIONS**
- California

**EDUCATION**

- U.C. Berkeley School of Law (Boalt Hall), J.D.

- University of California, Los Angeles, B.A

Mr. Trott received his J.D. from the U.C. Berkeley School of Law (Boalt Hall). While at Berkeley, he served as managing editor of the Berkeley Journal of International Law and published an article in Berkeley's legal journal dedicated to environmental law, Ecology Law Quarterly. During his final year, Mr. Trott interned at the U.S. Department of the Treasury's general counsel's office in Washington, D.C., where he provided advice on CFIUS enforcement and various international monetary and fiscal matters.

After receiving his J.D., Mr. Trott served as Legal and Policy Consultant for the United Nations Global Compact, the world's largest corporate social responsibility initiative, in New York City. While there, Mr. Trott spearheaded the creation of a new reporting framework encouraging businesses around the world to improve their own human and labor rights practices, and those of their supply chains, and worked directly with businesses in Eastern Europe, Africa and Central Asia facing local and cross-border corruption issues. Mr. Trott was a panelist at multiple seminars centered on these issues with business and political leaders and spoke at several related conferences in Europe and North America.

Mr. Trott then moved to San Francisco to join a large law firm, representing clients in antitrust, data privacy, and securities litigation, and Foreign Corrupt Practices Act matters. He also represented several pro bono clients seeking asylum in the United States. Prior to joining Cotchett, Pitre & McCarthy, Mr. Trott volunteered at and worked as an attorney for Disability Rights California, where he represented and provided advocacy services for its clients.

Mr. Trott received his B.A., summa cum laude with College Honors, in Classical Studies and History from the University of California, Los Angeles. While at UCLA, Mr. Trott was heavily involved with the school's music department and marching band, focusing on clarinet performance, and interned for then- and current U.S. Representative Brad Sherman.

25

# *ASSOCIATES*

## MARK F. RAM



**ADMISSIONS**
- California

**EDUCATION**
- University of California, Hastings College of the Law, J.D., magna cum laude

- Haverford College, B.A.

Mark Ram is an Associate at Cotchett, Pitre & McCarthy, LLP, where he focuses his practice on antitrust law and complex litigation.

Mr. Ram received his B.A. from Haverford College and his J.D. from the University of California, Hastings College of the Law. At Hastings, Mr. Ram served as an editor for the Hastings Law Journal and was a teaching assistant for legal writing and research. He received awards for best moot court oral argument and best performance in Complex Litigation.

Following law school, Mr. Ram had the unique opportunity to clerk for two judges in the San Francisco Superior Court's Complex Litigation Department, Hon. Mary E. Wiss and Hon. John E. Munter (Ret.).  Prior to joining Cotchett, Pitre & McCarthy, LLP, Mr. Ram practiced with a national firm in San Francisco focusing on class actions and products liability cases.

26

# <u>TAMARAH P. PREVOST</u>



**ADMISSIONS**
- California

**EDUCATION**
- Santa Clara University School of Law, J.D.

- Simon Fraser University, B.A.

Tamarah Prevost is an Associate at Cotchett, Pitre & McCarthy, LLP, practicing in a wide range of civil litigation areas including antitrust, consumer protection, employment law, elder abuse, false claims act litigation, and other complex civil matters.

Ms. Prevost received her J.D. from Santa Clara University School of Law. While at Santa Clara, Ms. Prevost was involved in a variety of extracurricular activities. She was named the Best Oral Advocate in the Semi Final Round of Santa Clara Law's Honors Moot Court Competition, and was published in the Santa Clara Journal of International Law. She received the CALI Award for her "Leadership for Lawyers" class and maintained a heavy involvement in the Women and Law Association, which included her planning a fundraiser to benefit victims of domestic violence. Ms. Prevost also served as a Judicial Extern for the Honorable Justice Nathan Mihara of the Sixth District Court of Appeal, California.

Prior to law school, Ms. Prevost lived in Vancouver, British Columbia, and while there, obtained her Bachelor of Arts degree with First Class Honors from Simon Fraser University. She took a semester off during this time to live in Puerto Viejo, Costa Rica and volunteer at a non-profit organization committed to alleviating poverty for the indigenous population. While living in Vancouver, Ms. Prevost was also actively involved in the Rotary Club of New Westminster.

Ms. Prevost is also involved in community activities, where she is Board of Directors – Director of Governance:  Digital Moose Lounge, a non-profit organization that serves as the first point of contact for Canadians new to the Bay Area.

# EXHIBIT 3

GIBBS LAW GROUP
L L P



ehg@classlawgroup.com

**Practice Emphasis**

Antitrust & Unfair Competition

Banking and Financial Fraud

Class Actions

Consumer Protection

Employment Law

Mass Personal Injury

Privacy

Whistleblower

**Education**

Seattle University School of
Law, J.D., 1995

San Francisco State
University, B.A., 1991

**Admissions**

California

**Awards & Honors**

*Consumer Protection MVP,*
Law 360, 2016

*Top 30 Plaintiff Lawyers in
California for 2016* by the
Daily Journal

*Best Lawyers in America for
Class Actions/ Mass Tort
Litigation* (2012-2018)

*AV Preeminent® Peer
Review Rated by Martindale-
Hubbell*

*Top 100 Super Lawyers in
Northern California* (2010 -
2018)

# Eric H. Gibbs | Partner

Eric Gibbs prosecutes antitrust, consumer protection, whistleblower, financial fraud and mass tort matters.  He has been appointed to leadership positions in dozens of contested, high profile class actions and coordinated proceedings, and currently serves in leadership positions *in In re Equifax, Inc. Customer Data Security Breach Litigation, In re: Wells Fargo Auto Insurance Marketing and Sales Practices Litigation, In re Risperdal and Invega Product Liability Cases, In re Hyundai Sonata Engine Litigation, In re Vizio, Inc., Consumer Privacy Litigation* and *In re Banner Health Data Breach Litigation.*  Eric has recovered nearly a billion dollars for the clients and classes he represents, and has negotiated groundbreaking settlements that resulted in meaningful reforms to business practices, and have favorably impacted plaintiffs' legal rights.

## Litigation Highlights

***In re Anthem, Inc. Data Breach Privacy Litigation*** – Served as a court-appointed member of the Plaintiffs' Steering Committee representing the interests of plaintiffs and putative class members following a massive data breach of approximately 80 million personal records.  The lawsuit settled in August 2018 for $115 million, the largest data breach settlement in history.

***In re Chase Bank U.S.A., N.A. "Check Loan" Contract Litigation*** – multidistrict litigation that alleged Chase Bank wronged consumers by offering long-term fixed-rate loans, only to later more-than-double the required loan payments.  Eric led negotiations in the case, which resulted in a $100 million settlement with Chase eight weeks prior to trial.

***In re Adobe Systems Inc. Privacy Litigation*** – As court-appointed lead counsel, Eric and his team reversed a long line of decisions adverse to consumers whose personal information was stolen in data breaches. Judge Koh issued a 41 page decision in plaintiffs' favor and Eric negotiated a comprehensive reform of Adobe's data security practices. The court's landmark decision on Article III standing in this case marked a sea change and has been cited favorably in over twenty cases since it was issued.

***In re Hyundai & Kia Fuel Econ. Litigation*** – As court-appointed liaison counsel, Eric reconciled the plaintiffs' interests and coordinated discovery and settlement negotiations. He helped finalize a settlement with an estimated value of up to $360 million.

***Skold v. Intel Corp.*** – After more than a decade of litigation, Eric as lead counsel achieved a nationwide class action settlement on behalf of approximately 5 million consumers of Intel Pentium 4 processors. The lawsuit changed Intel's benchmarking practices and Intel agreed to a cash settlement for the class, along with $4 million in charitable donations.

***Parkinson v. Hyundai Motor America*** – Eric served as class counsel in this lawsuit alleging that the flywheel and clutch system in certain Hyundai vehicles was defective. After achieving nationwide class certification, Hyundai agreed to a settlement that provided for 50-100% reimbursements to class members for their repairs and full reimbursement for rental vehicle expenses.

***De La Cruz v. Masco Retail Cabinet Group*** – Eric served as lead attorney litigating the collective claims of dozens of misclassified account representatives for overtime pay under the Fair Labor Standards Act (FLSA). Successfully certified a class of current and former Masco account representatives and personally arbitrated the case to judgment obtaining full recovery for the class.



amm@classlawgroup.com

**Practice Emphasis**

Class Actions

Consumer Protection

Constitutional Law

Employment Law

Mass Personal Injury

Privacy

**Education**

The George Washington University Law School, J.D., 2004

Williams College, B.A., 2000

**Admissions**

California

District of Columbia

**Awards & Honors**

*Top Cybersecurity & Privacy Attorneys Under 40,* Law360 *Rising Stars (2017)*

*Northern California Super Lawyers Rising Star (2016-2018)*

# Andre M. Mura | Partner

Andre M. Mura represents plaintiffs in class action and complex litigation concerning consumers' and workers' rights, products liability, drug and medical devices, federal jurisdiction, and constitutional law.

Prior to joining Gibbs Law Group LLP, Andre was senior litigation counsel at the Center for Constitutional Litigation PC, where he represented plaintiffs in high-stakes appeals and complex litigation in state supreme courts and federal appellate courts.

He is a Fellow of the American Bar Foundation Fellow, a member of the Lawyers Committee of the National Center for State Courts, a member of Public Justice's Class Action Preservation Project, an Ex-Officio Trustee of the Pound Civil Justice Institute, and Chair-Elect of the American Association for Justice's LGBT Caucus.

## Litigation Highlights

*In re: Taxotere (Docetaxel) Products Liability Litigation* - Andre was selected to chair the plaintiffs' law and briefing committee in this multi-district litigation on behalf of breast cancer survivors who suffered permanent, disfiguring hair loss after using the Taxotere chemotherapy drug.  The lawsuit is ongoing.

*De La Torre v. CashCall* - Andre played a key role in briefing before the California Supreme Court, which resulted in a unanimous decision in the plaintiffs' favor finding that an interest rate on a loan above $2,500 may be unconscionable.  The decision changed decades-old assumptions that lenders in California had a virtual "safe harbor" from unconscionability challenges to loan interest rate terms.

*In re: Lenovo Adware Litigation* - Andre successfully briefed and argued a motion to dismiss and motion to certify a nationwide litigation class for monetary damages. The parties moved for preliminary approval of a $7.3 million proposed class action settlement to resolve allegations that Lenovo preinstalled software on laptops that caused performance, privacy and security issues for consumers.

*Beaver et. al. v. Tarsadia Hotels, Inc. et. al.* - Andre contributed to briefing before the Ninth Circuit Court of Appeals resulting in a unanimous decision affirming the lower court's ruling that the UCL's four-year statute of limitations (and its accrual rule) applied in claims alleging violations of the Interstate Land Sales Full Disclosure Act (ILSA) even though ILSA has a shorter statute of limitations.

*Corber v. Xanodyne Pharmaceuticals* - Andre represented plaintiffs injured by propoxyphene, an ingredient found in Darvocet and Darvon pain relief drugs and generic pain relievers, before the U.S. Court of Appeals for the Ninth Circuit, sitting en banc.

*Watts v. Lester E. Cox Medical Centers*, 376 S.W.3d 633 (Mo. 2012) - Andre successfully argued that a state law limiting compensatory damages in medical malpractice cases violated his client's constitutional right to trial by jury.  In ruling in favor of Mr. Mura's client, the Missouri high court agreed to overturn a 20-year-old precedent.

*Texaco, Inc. & Chevron Corp. v. Simon* - Andre argued before the Mississippi Supreme Court in a case concerning Texaco's and Chevron's liability for pregnant women's exposure to leaded gas. The case settled favorably after oral argument but before decision.

## U.S. Supreme Court Advocacy

*J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011), Andre drafted merits briefing addressing whether personal jurisdiction exists over a foreign manufacturer.

*Mutual Pharmaceutical Co., Inc. v. Bartlett*, 133 S. Ct. 2466 (2013) - Andre was the lead author of an amicus curiae brief for the American Association for Justice and Public Justice in case examining whether federal drug safety law preempts state-law liability for defectively designed generic drugs.

# EXHIBIT 4

# epic.org

**Electronic Privacy Information Center**
1718 Connecticut Avenue NW, Suite 200
Washington, DC 20009, USA

📞 +1 202 483 1140
🖨 +1 202 483 1248
🐦 @EPICPrivacy
🌐 https://epic.org

October 1, 2018

Mr. Adam J. Zapala                     Mr. Andre Mura
Cotchett, Pitre & McCarthy, LLP        Gibbs Law Group
San Francisco Airport Office Center    505 14th St., Suite 1110
840 Malcolm Road                       Oakland, CA 94612
Burlingame, California 94010

Dear Mr. Zapala and Mr. Mura,

We are writing in response to your letter of September 24, 2018, regarding the cy pres award in *In re Vizio, Inc. Consumer Privacy Litigation*, No. 8:16-ml-02693-JLS.

The Electronic Privacy Information Center ("EPIC") is one of the leading consumer privacy organizations in the United States. Established in 1994 to focus public attention on emerging privacy issues, EPIC has led many campaigns to safeguard consumer privacy in the United States. EPIC also provides the most extensive online resources on privacy issues. EPIC publishes several books on privacy law. And EPIC works closely with a distinguished advisory board of experts in law, technology, and public policy

Courts have approved EPIC as a cy pres recipient in many consumer privacy cases.[1] Recently, in *Perkins v. LinkedIn Co*., No. 13- 4304, 2016 WL 613255 (N.D. Cal. Feb. 16, 2016), the court found that EPIC is a "well-established and respected organization within the field of internet privacy" and is thus "well-suited to be a cy pres recipient." The five most recent cases in which EPIC was a cy pres recipient were:

- Picchi v. Comenity Bank, No. 11-61797 (S.D. Fla. 2015)
- Perkins v. LinkedIn Corp., No. 13-4303 (N.D. Cal. 2016)
- Kensington Physical Therapy, Inc. v. Jackson Therapy Partners, LLC, No. 11-2467 (D. Md. 2015)
- Legg v. Laboratory Corp., No. 14-61543 (S.D. Fla. 2016)
- Ashley Madison Consumer Data Sec. Breach Litig., No. 15-MD-2669 (E.D. Mo. 2017)

EPIC will use cy pres funds to help protect the privacy rights of consumers. EPIC will inform consumers of emerging privacy risks. EPIC will advocate for consumers at the Federal Trade Commission, in courts, and in Congress. And EPIC will make useful information available at our website – epic.org (also privacy.org) – which is one of the top-rated privacy websites in the world.

---

[1] EPIC, *Cy Pres Awards – Consumer Privacy*, https://www.epic.org/cy-pres/

**Defend Privacy. Support EPIC.**

EPIC satisfies the two key requirements for a distribution of cy pres funds in a consumer privacy case: (1) EPIC is aligned with the interests of class members and (2) EPIC advances the aims of the underlying litigation. Regarding the specific issue before the Court, EPIC has advocated on behalf of consumers in several related matters. For example, in 2015 EPIC filed a complaint with the Federal Trade Commission, expressing concern that a Smart TV "routinely intercepts and records the private communications of consumers in their homes."[2] Subsequent to the filing of EPIC's complaint, Vizio agreed to settle charges with consumers.[3]

EPIC is also widely recognized for good management practices and effective use of funding received. EPIC receives top marks from the leading evaluators of non-profit practices, Charity Navigator ("Four Stars") and Network for Good ("Gold"), for accountability and transparency. And EPIC directs 88% of revenue to program activities.

EPIC is independent of the parties, their counsel, and the district court in *In re Vizio, Inc. Consumer Privacy Litigation*, No. 8:16-ml-02693-JLS.

Thank you for considering EPIC as a designated cy pres recipient. Please feel free to contact either of us if you would like any additional information. I can be reached at 202-415-6788.

Sincerely,

Marc Rotenberg
EPIC President

Alan Butler
EPIC Senior Counsel

---

[2] Complaint, Request for Investigation, Injunction, and Other Relief Submitted by EPIC to the Federal Trade Commission, *In re Samsung Electronics Co., Ltd.* (Feb. 24, 2015), https://epic.org/privacy/internet/ftc/Samsung/EPIC-FTC-Samsung.pdf.
[3] FTC, *VIZIO to Pay $2.2 Million to FTC, State of New Jersey to Settle Charges It Collected Viewing Histories on 11 Million Smart Televisions without Users' Consent* (Feb. 6, 2017), https://www.ftc.gov/news-events/press-releases/2017/02/vizio-pay-22-million-ftc-state-new-jersey-settle-charges-it



## Privacy Rights Clearinghouse

October 1, 2018

*Submitted via email.*

Adam J. Zapala
Cotchett, Pitre & McCarthy, LLP
azapala@cpmlegal.com

Andre Mura
Gibbs Law Group LLP
amm@classlawgroup.com

       Re: *In re Vizio, Inc. Consumer Privacy Litigation*, No. 8:16-ml-02693-JLS

Dear Mr. Zapala and Mr. Mura:

Thank you for inviting Privacy Rights Clearinghouse to submit an application for potential cy pres funds in the *In re Vizio, Inc. Consumer Privacy Litigation* settlement.  Our application below includes information about our organization and programs, cy pres funding we have been awarded over the past five years, and our commitment to use any funds we receive to benefit the class and address issues related to the basis of the lawsuit.  Please note that PRC is independent of the parties, their counsel, and the district court, and do not hesitate to contact me with any questions.

Sincerely,

Meghan Land
Executive Director
Privacy Rights Clearinghouse
meghan@privacyrights.org
(619) 610-9018

October 1, 2018
Page 2 of 5

# About Privacy Rights Clearinghouse

Privacy Rights Clearinghouse (PRC) is a 501(c)(3) nonprofit organization protecting privacy for all by empowering individuals and advocating for positive change.  Founded in 1992 and headquartered in San Diego, California, we serve individuals throughout the United States.

At PRC, we focus exclusively on consumer privacy rights and issues.  We provide clarity on complex topics by publishing extensive educational materials and answering questions from individuals. We help shape the dialogue around privacy by highlighting individual stories and championing strong consumer protections. Privacy is an issue that affects us all, and we believe everyone deserves the opportunity to be informed and be heard.

# Consumer Education Program & Services

<u>Publicly Available Resources</u>

PRC launched the first iteration of our website (privacyrights.org) in 1996, and have since used it as our primary means of delivering and updating our educational materials.  Each month we receive an average of roughly 100,000 unique visits to our website, and we have directly answered tens of thousands of individual questions over the years.

**Guides.** We have over 50 heavily-researched and regularly updated guides on privacy issues relating to:

- banking and finance,
- credit and credit reports,
- data breaches,
- health and medical information,
- ID theft and Social Security numbers,
- technology and privacy,
- people search sites and data brokers,
- privacy at home,
- safety and security,
- data and shopping,
- background checks and workplace privacy, and
- education data.

Find our guides and various other consumer education publications at privacyrights.org/learn.

**Chronology of Data Breaches.** We have tracked reported data breaches since 2005 to raise awareness of this common consequence of inadequate privacy and security practices, and recently added the 11,030,000,000[th] exposed record to our database. We are the only organization offering this comprehensive tool and the accompanying data available under an open Creative Commons license.

Find our Chronology of Data Breaches at privacyrights.org/data-breaches.

October 1, 2018
Page 3 of 5

**Blog.** We regularly blog to raise awareness of current issues, provide tips, and enumerate step-by-step strategies to help individuals protect their own privacy.

Find our blog at privacyrights.org/blog.

## One-to-One Assistance

PRC has provided one-to-one assistance to individuals with privacy questions since 1992. What began as a telephone hotline evolved into an online question center where staff may point individuals to additional resources or information about privacy issues they face. Please note that we do not provide legal advice or litigate on behalf of individuals.

Find our question center at privacyrights.org/ask-question.

## Outreach

PRC staff, board members, and volunteers are subject matter experts and regularly present to various community and professional groups, and act as an information source for journalists reporting on privacy- and technology-related issues. PRC also engages with individuals through social media outlets.

Find examples of PRC in the news at privacyrights.org/blog/prc-news-1.

# Consumer & Legislative Advocacy Program

## Complaint Center

In 1992, our founder (and current Executive Director Emeritus), Beth Givens, started documenting the stories PRC received through our telephone hotline. Because of this feedback loop, she was the first advocate to raise awareness of identity theft. We continue to invite individuals to share their privacy-related stories with us so that we may identify consumer privacy trends as well as gaps in law, education, and compliance. We use these stories in our advocacy work to give individuals a voice, and have documented trends across various sectors and issues ranging from data broker practices to Fair Credit Reporting Act noncompliance.

## California and Federal Advocacy

PRC advocates for privacy-protective legislation in California, and contributes public comments and analysis to federal and state policymakers and administrative agencies. We focus advocacy efforts in the California legislature because it has historically led the way in enacting strong privacy protections.

October 1, 2018
Page 4 of 5

# Cy Pres Funding 2013 to Date

## 2013

*Syran v. LexisNexis Group*, No. 05-cv-0909-LAB-KSC (U.S. Dist. Ct., S.D. Cal.)
Plaintiffs alleged that LexisNexis violated various federal (including Fair Credit Reporting Act) and California (including California's Information Practices Act) statutes and common law rights when information about plaintiffs and other consumers was obtained by unauthorized persons. PRC received $172,805.75.

*Kaye et. al. v. Aesthera Corp,* No. 3:09-cv-01947 (U.S. Dist. Ct., Conn.)
Plaintiffs alleged that Aesthera sent unsolicited facsimile advertisements in violation of the Telephone Consumer Protection Act. PRC received $5,012.44.

*Wang v. Asset Acceptance, et. al.*, No. 09-4797 (U.S. Dist. Ct., N.D. Cal.)
Plaintiffs alleged that Asset Acceptance violated the California Consumer Credit Report Agencies Act and the Fair Credit Reporting Act when it placed debts on plaintiffs' credit reports without reporting that the alleged debts were disputed. PRC received $130,025.39.

*Main et. al. v. Wal-Mart Stores, Inc.*, No.: 3:11-cv-01919-JSW (U.S. Dist. Ct., N.D. Cal.)
Plaintiffs alleged that Wal-Mart illegally requested and recorded California customers' ZIP codes when they used credit cards to make purchases.  PRC received $368,512.50.

## 2014

*In. re: Netflix Privacy Litigation*, No. 5:11-cv-00379 (U.S. Dist. Ct., N.D. Cal.)
Plaintiffs alleged that Netflix violated the Video Privacy Protection Act by storing the financial information and viewing history of former customers who had canceled their accounts. PRC received $175,558.50.

*Holmes v. NCO Financial Systems, Inc.*, No. 11-56969 (U.S. Ct. App., 9th Cir.)
Plaintiffs alleged that NCO Financial Systems violated the Fair Debt Collection Practices Act by contacting individuals whose debts were contested. PRC received $20,924.06.

## 2015

The Digital Trust Foundation (created from settlement funds in an action concerning Facebook's "Beacon" program) funded projects and initiatives to "promote the cause of online privacy, safety, and security." PRC submitted a proposal and was awarded $275,000.00.

*Nicolucci v. Sephora USA, Inc.*, No. CGC-11-508450 (Super. Ct. Cal., County of San Francisco)
Plaintiffs alleged that Sephora illegally collected customers' zip codes, putting consumers at risk of possible identity theft and fraud.  PRC received $105,330.00.

## 2016

*People of Calif. v. Wells Fargo Bank, N.A.*, No. BC611105 (Super. Ct. Cal., County of Los Angeles)
Wells Fargo settled claims brought by the California Attorney General and five other state regulators alleging that the bank failed to properly notify consumers that their phone calls were being recorded. PRC received $250,000.00.

*Stone v. Howard Johnson International Inc.*, No. 12-cv-01684 (U.S. Dist. Ct., C.D. Cal.)
Plaintiffs alleged that Howard Johnson illegally recorded telephone calls without the consent of the caller. PRC received $54,557.49.

*Doe v. Twitter*, No. CGC-10-503630 (Super. Ct. Cal., County of San Francisco)
Plaintiffs alleged that Twitter violated users' privacy rights by disclosing full names of users without warning,

October 1, 2018
Page 5 of 5

sharing users' public Tweets and public profile information with third parties without adequate disclosure, and failing to adequately warn or instruct users that their Tweets would be public by default. PRC received $302,914.26.

## 2018

*Robinson v. Paramount Equity Mortgage*, No. 2:14-cv-02359-TLN-CKD (U.S. Dist. Ct., E.D. Cal.)
Plaintiffs alleged that Paramount Equity called individuals for marketing purposes without prior express written consent and called individuals registered on the Do Not Call Registry without prior consent. PRC received $411,014.67.

*Mount v. Wells Fargo Bank, N.A.*, No. BC395959 (Super. Ct. Cal., County of Los Angeles)
Plaintiffs alleged that Wells Fargo illegally recorded customer service phone calls. PRC received $46,665.26.

# Use of Funds to Benefit the Class

If PRC receives a cy pres award from the *In re Vizio, Inc. Consumer Privacy Litigation* settlement, we commit to use funds to benefit the class or substantial portions of it and address issues related to the basis of the lawsuit. Our core work focuses on educating individuals about technology's impacts on society, and informing them of rights and strategies to protect their information.

Plaintiffs alleged that VIZIO smart TVs collected consumer viewing histories and sold that information, and other highly specific information about them, to third parties without knowledge or consent.  As people and all things around them become increasingly internet connected, companies collect, share, and often misuse massive amounts of personal data.  PRC's current services and future goals address these evolving privacy issues.

We consistently strive to improve our educational materials.  The public accesses and consumes content differently than it did when PRC began writing our text-heavy guides.  We are currently editing and redesigning the bulk of our existing website content to enhance the user experience and streamline our one-to-one assistance.

For this class, relevant content might include detailed information in a blog about a smart TV privacy settings, connected device privacy in general, or an overview of the Video Privacy Protection Act.  Our attorneys on staff and expert volunteers research these issues, and our communications manager translates and designs materials with consumers in mind. In the mid-term we plan to expand our staff capacity to directly answer individuals' privacy questions, create consumer-focused multimedia content, and execute strategies to effectively expand our outreach to community partners and underserved populations.



12625 SW 62nd Ave
Portland, OR 97219
www.worldprivacyforum.org
760-712-4281

October 1, 2018

*Via E-Mail*

Adam J. Zapala
Law Offices Cotchett, Pitre & McCarthy, LLP
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
azapala@cpmlegal.com

Andre Mura
Gibbs Law Group LLP
505 14th Street
Suite 1110
Oakland, CA 94612
mm@classlawgroup.com

**Re: In re Vizio, Inc. Consumer Privacy Litigation**, No. 8:16-ml-02693-JLS

Dear Mr. Zapala and Mr. Mura:

Thank you for your invitation to apply for *cy pres* restitution funds *In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1212–13 (C.D. Cal. 2017). I am writing to you as the Founder and Executive Director of the World Privacy Forum, a 501(c)(3) nonprofit whose mission is to protect and promote privacy for consumers and workers in the United States and abroad. I specifically want to tell you how WPF's work in the field of data protection and consumer education qualifies it for a *cy pres* award in the class-action settlement with Vizio, Inc. and request that WPF be considered for an award.

After you read this letter, I would be happy to talk with you to explain more about WPF's work for consumers and their privacy. WPF has had a dynamic effect on consumers'

privacy knowledge and rights since its founding in 2002. Today, WPF is the only organization linking independent, factual research and consumer privacy education, training, and support. WPF works tirelessly to document meaningful, emerging privacy issues, to protect consumers from online fraudsters and identity thieves, and to ensure that consumers have access to factually correct tips and tools to help inform their privacy choices. When new privacy risks emerge, we work to document those risks and assist consumers in tackling them. We directly assist consumers with online and phone support for consumer privacy questions.

*Cy pres* grants are an important part of the fundraising strategy that makes WPF's work possible. The organization is a particularly suitable recipient for *cy pres* grants related to consumer data privacy cases, including the Vizio case. For more than 18 years, WPF has been a leading voice on behalf of consumers affected by the unconsented collection and sharing of consumer data, online and offline fraud, health privacy, and technical privacy topics such as privacy related to Internet of Things (including connected TVs).

The World Privacy Forum's mission and purpose is focused on consumer education and research around privacy, particularly as it intersects with technology. Regarding our reach to class members, the World Privacy Forum works nationally, and we assist consumers from all economic strata. In addition to supporting a broad cross-section of consumers nationally, we have a long record of assisting consumers who are economically disadvantaged, as well as working directly with vulnerable groups of consumers such as the elderly and victims of domestic violence and crime with online and offline privacy questions and needs. We train other non-profits working with vulnerable consumers and provide expertise and information regarding how to assist vulnerable consumers in understanding privacy options and risks.

The World Privacy Forum is a leading consumer privacy organization nationally and globally, and is widely viewed as the most significant repository of data broker and privacy expertise. WPF is regularly asked to speak and testify regarding consumer privacy issues at high-level events nationally and globally. WPF has been invited to testify before Congress multiple times regarding consumer privacy and second and third party data flows. Just in the past year, WPF has been invited to be an expert advisor on privacy and AI to the OECD, to speak on data privacy and ethics at the global data protection commissioners conference in Hong Kong (2017) and Brussels (2018), to teach a daylong seminar on EU and US data protection in Brussels with Europe's Data Protection Supervisor, to train hundreds of US workers in domestic violence shelters on privacy, data brokers, and technology, to testify at the FTC Data Harms hearing (Dec. 2017), to speak on consumer trust and identity in the digital ecosystem (KNOW), and to testify at the FTC AI hearings (2019). WPF is also a member of the American Law Institute's Data Privacy Project, and a member of the Transatlantic Consumer Dialogue. I have attached an additional brief organizational resume at the end of this letter.

All of this activity has generated significant media coverage for WPF in the highest profile media outlets in the world, including *New York Times, The Washington Post, Consumer Reports, The Economist, CBS News, ABC News, NPR, The Guardian, The*

*Wall Street Journal*, and many others. I have attached a link to our *World Privacy Forum in the News* page at the end of this letter. WPF is aware that any funds remaining after disbursement of the Vizio, Inc. settlement to class members will be donated to organizations agreed upon by the parties. I hope you consider WPF as an organization that meets the court's definition of a worthy *cy pres* recipient.

Regarding our use of the funds, a *cy pres* grant from this case would support WPF's ongoing efforts to help consumers who are victims of privacy breaches and other privacy challenges and data leakage through our consumer education and advocacy work. WPF efforts will benefit the national class directly, including vulnerable class members. WPF has two significant and long-running projects that directly address the issues forming the basis of the Vizio lawsuit regarding the company having collected consumers' viewing histories and then selling that information—along with "highly specific" information about consumers' digital identities—to third parties, without consumers' knowledge or consent. WPF is committed to use the funds to address issues specifically related to the basis of the lawsuit.

Specifically, a grant would support:

- WPF's consumer data privacy education campaign, which provides consumers with objective, plain English advice on how to reduce their risk of privacy-related problems stemming from data breaches and data leaks to third parties. This includes the costs of providing direct counseling and support to victims of privacy breaches and the issue of sharing of information with third parties online, and over the phone.
- WPF's consumer technical privacy literacy campaign to provide direct consumer support and tips specifically for online and offline technical privacy challenges, including challenges with "Internet of Things" and connected devices such as connected televisions.
- WPF's ongoing and groundbreaking research and best practices work on consumer data privacy issues addressing the collection of personally identifiable information and subsequent unconsented sale and sharing of that consumer data with third parties. WPF has written extensive and groundbreaking research in this area of privacy, and we have testified before Congress on these issues multiple times. WPF would also be able to provide additional guidance and best practices for industry by participating in multi-stakeholder dialogues through bodies that set standards and federal agencies like the National Institute of Standards and Technology.

Depending on the size of the grant, WPF could potentially:

- Expand our consumer education activities by, for example, increasing the reach of our consumer education materials through more promoting online, launching a privacy-related podcast, conducting additional research and education on third party data sharing, tips, and issues, and expanding our technology and privacy training curriculum with related content.

- Strengthen our consumer privacy education efforts around data shared with third parties by doing more earned media, adding interns or staff focused on this topic, holding press events and strengthening our presence at the state level.
- Strengthen and expand our existing training to vulnerable consumers regarding data sharing with third parties, in particular, WPF consistently works with victims of domestic violence, for whom third party data sharing can be a safety issue, to assist them directly in securing their data and in reading policies.

The World Privacy Forum is independent of all parties to the litigation, their counsel, and the district court. Attached at the bottom of this letter, please find a list of *cy pres* awards WPF has been granted by the courts during the past five years, please also find a list of links to our work mentioned in this letter. I have also included a brief bio outlining my most current work with the organization and in privacy.

Please advise me if you need any more information or if you would like to speak with me or any of WPF's staff directly involved with providing service to consumers. I do believe that WPF uniquely fits the ideal profile of a *cy pres* grant awardee from this case. Thank you for your consideration.

Regards,

Pam Dixon

Pam Dixon


**I. WPF court-approved *cy pres* distributions from 2014-2018:**

*Perkins v. LinkedIn* Corp. *Cy Pres* distribution 2016
LinkedIn was accused of accessing users' email accounts without their permission and using their names to send email invitations to people in their address books. The court found that although LinkedIn members consented to importing their contacts and sending LinkedIn connection requests, they did not consent to the two additional "reminder emails" that LinkedIn at that time sent about those requests.

*Kristin Mantia v. Bactes Imaging Solutions, Inc*., *Cy Pres* distribution 2015
This class action was regarding fees for copies of medical records. The defendant, Bactes Imaging Solutions, Inc., fulfills medical records requests under HIPAA Business Associate contracts with hospitals and other medical providers. The plaintiffs, having requested records and paid the fees set forth in Bactes's invoices, claim that the fees Bactes charged exceed those permitted under G.L. c. 111, § 70. World Privacy Forum was named as a recipient based on our extensive health privacy work.

*Chavez v. Netflix, Inc*., *Cy Pres* distribution 2014
The Netflix class action suit alleged Netflix violated the VPPA by disclosing subscribers'

personal information and keeping former customers' personal information and video rental history past the statutorily allowed time period of one year. Specifically, the plaintiffs alleged that Netflix kept their viewing histories, credit card numbers, and billing and contact information. World Privacy Forum was named as a cy pres recipient based on our extensive and ongoing work on identity theft, data brokers, and consumer privacy online.

*Gaos et al v. Google*, *In re Google Referrer Header Privacy Litigation*, *Cy pres* distribution still pending
The Google Referrer Header settlement was based on data spills from the Google Safari browser, via referrer headers that were configured in a way that did not match the Google privacy policy at the time. WPF was added as a cy pres recipient based on our extensive work in online consumer privacy research and direct support. The Google *cy pres* settlement has been subject to a challenge by a third party and is pending review at the US Supreme Court.

## II. World Privacy Forum Brief Background

A brief selection of our present and past activities includes:

- WPF is a leading researcher about privacy and data analytics, including big data, predictive analytics, consumer scoring, and the data broker industry. We have published major reports about the issue, and have testified before Congress about privacy and data brokers now three times. Our reports include *The Scoring of America (2014)*, and *Data Brokers and the Federal Government (2013)*. The reports have been frequently cited, including in the White House Big Data report. WPF is representing civil society at the OECD as a member of the AI Expert Group.

- WPF is a leading researcher about health privacy, including the subareas of genomic and pharmacogenomic privacy, electronic health records, digital health data flows, sensor-driven biometric data, medical privacy regulation, the Common Rule and human subject research, and other emerging health data flows, issues, and practices. The Executive Director of WPF currently serves as an expert advisor to the OECD on a health privacy advisory group. Previously, WPF has served as an appointee or board member on US national and state-level health privacy boards.

- WPF conducted extensive biometric field research in India regarding it's Aadhaar digital ID, which is the world's largest biometric ID ecosystem. WPF's India work formed the basis of a peer-reviewed scholarly article on India's Aadhaar which was published in 2017. Specifically, *A Failure to Do No Harm* was published in a special issue of Springer-Nature and co-published in the Harvard-based Journal of Technology Science.

- The World Privacy Forum researched and published the first major report on medical identity theft and brought this crime to the attention of the public for the first time. The World Privacy Forum coined the term "medical identity theft" in its

report on the topic. The Forum also has published the only detailed consumer education and victim materials on this crime. California passed a new law that went into effect in 2008 based on the recommendations in the WPF medical identity theft report, which later became part of HIPAA. The World Privacy Forum's continuing activities in this area have made a substantial impact in the awareness and understanding of this crime for both victims and health care providers.

- Consensus and multistakeholder work:

  - WPF is participating in a multinational consensus effort to develop governance for AI systems (IRGC, Zurich, Switzerland) in 2018. WPF is also participating as a civil society delegate to the OECD for the AI Expert Group.

  - WPF's Pam Dixon was named as an expert advisor on health data uses to the OECD, where she has worked with global stakeholders on health privacy and health data protection.

  - WPF was the lead drafter of the US Department of Commerce NTIA Multistakeholder Process short form privacy notice during 2012-2013. The process finished with a completed short form notice to be used by mobile apps. The notice is now being tested and implemented. This notice provides important and innovative privacy improvements. Among the most important is that consumers receive notification when their information is being sent off of their mobile devices to data brokers. This is the first notice to allow for this transparency.

  - In 2011, WPF led the nation's leading civil society groups in developing the Civil Society Multistakeholder Principles for the White House/US Department of Commerce Privacy process.

  - The World Privacy Forum led a consensus group of non-profits in 2007 meeting that culminated in the now well-known Do Not Track proposal presented to the Federal Trade Commission. Do Not Track is an idea that is now known globally and has been implemented to some degree.

- WPF broke new ground in publishing the first report on privacy in digital signage networks and mobile device tracking in retail spaces in the *One Way Mirror Society* report. The report was easily three or more years ahead of trends.

- For more, please see World Privacy Forum's About Us page: https://www.worldprivacyforum.org/about-us/.


### III. WPF Executive Director Brief Bio

Pam Dixon is the founder and executive director of the World Privacy Forum, a public interest research group known and respected for its consumer and data privacy research.

An author and a researcher, Dixon has written groundbreaking studies in the area of privacy, including *The Scoring of America*, a substantive report on predictive analytics and privacy written with Bob Gellman. She has also written well-known reports on Medical Identity Theft, the *One Way Mirror Society* report on digital signage networks and retail privacy, and a series of reports on data brokers, among others. Dixon has conducted substantive biometrics research in India, which formed the basis of a scholarly article on India's Aadhaar, biometrics, and EU-US policy which was published in a special issue of Springer-Nature and co-published in Harvard-based Journal of Technology Science in 2017. Her work on privacy and Aadhaar was directly included in the landmark September 2018 Indian Supreme Court ruling on privacy.

Dixon has testified before the US Congress, including the Senate Judiciary Committee, as well as the US Federal Trade Commission and other agencies on prominent consumer privacy issues, including issues related to data brokers, identity, health privacy, genetic privacy, the Common Rule, facial recognition, digital advertising, and other privacy issues. Dixon is an expert advisor to OECD on Artificial Intelligence, and was an advisor on OECD's health data uses guidance. She is a member of the Biometric Institute, where she serves on the privacy committee. Dixon serves on the editorial board of Harvard's Journal of Technology Science. Formerly, she was a research fellow with the Privacy Foundation at Denver University's Sturm School of Law. She has written 8 books, including titles for Random House / Times Books, among other major publishers. She wrote Online Privacy with Bob Gellman (2011); her most recent book, *Surveillance in America,* was published in 2016 by ABC-CLIO books. Her next book on privacy is set to be published by ABC CLIO in 2019.

**IV. Related Links**:

- **World Privacy Forum**: https://www.worldprivacyforum.org
- **World Privacy Forum in the News**: https://www.worldprivacyforum.org/news-and-press-room/
- **The Scoring of America**: https://www.worldprivacyforum.org/2014/04/wpf-report-the-scoring-of-america-how-secret-consumer-scores-threaten-your-privacy-and-your-future/
- **Key WPF reports**: https://www.worldprivacyforum.org/category/reports/
- **WPF Congressional Testimony**: https://www.worldprivacyforum.org/category/congressional-testimony/
- **Consumers Top Ten Opt Out Tips**: https://www.worldprivacyforum.org/2015/08/consumer-tips-top-ten-opt-outs/
- **Data Broker Opt Out List**: https://www.worldprivacyforum.org/2013/12/data-brokers-opt-out/
- **Consumer Tips**: https://www.worldprivacyforum.org/category/consumer-tips/