1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10
11

CASE NO. 8:16-ml-02693-JLS-KES

12
13
**In Re: Vizio, Inc., Consumer Privacy Litigation**
14

**ORDER (1) GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT (Doc. 311) AND (2) GRANTING PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE INCENTIVE AWARDS (Doc. 310)**

15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

Before the Court are two Motions filed by Plaintiffs Dieisha Hodges, Rory Zufolo, John Walsh, Chris Rizzitello, Linda Thomson, and Mark Queenan: one seeking final approval of the class action settlement and one seeking approval of the requested attorneys' fees, costs, and class representative incentive awards.  (Fin. Appr. Mot., Doc. 311; Fee Mot., Doc. 310.)  Defendants Vizio Inc., Vizio Holdings, Inc., Vizio Inscape Services, LLC, and Vizio Inscape Technologies, Inc. (collectively, "Vizio") filed a Notice of Non-Opposition as to both Motions.  (Non-Opp., Doc. 316.)  Plaintiffs filed a single reply brief in support of both Motions.  (Reply, Doc. 320.)  Having reviewed the papers, held a Final Fairness Hearing on May 31, 2019, and taken the matter under submission, the Court GRANTS the Motion for Final Approval of the Class Action Settlement and GRANTS the Motion for Attorneys' Fees, Costs, and Class Representative Incentive Awards.

I.   **BACKGROUND**

A.   **Procedural History**

Plaintiffs are consumer-purchasers of Vizio "Smart TVs" who allege that Vizio exploited the internet connectivity of its Smart TVs to wrongfully collect and distribute certain consumer viewing data.  Plaintiffs filed their initial Consolidated Complaint on August 15, 2016.[1]  (Cons. Compl., Doc. 108.)  The initial Consolidated Complaint brought various privacy- and misrepresentation-based claims under both federal and state law.  Under federal law, Plaintiffs alleged claims under the Video Privacy Protection Act (VPPA) and the Wiretap Act.  (*Id.* ¶¶ 111-32.)  Under state law, Plaintiffs brought common law fraud and negligent misrepresentation claims, as well as consumer protection

---

[1] This action is a multi-district litigation including 30 member cases (notwithstanding prior Orders that incorrectly identified only 29 member cases).  The instant Motions relate to a global settlement encompassing all member cases.  (*See* Order re Prelim. Appr., Doc. 297 at 2.)

claims under California's Consumers Legal Remedies Act, California's Unfair Competition Law, California's False Advertising Law, Florida's Deceptive and Unfair Trade Practices Act, New York's General Business Law §§ 349-350, Massachusetts's Chapter 93A, and Washington's Consumer Protection Act.  (*Id.* ¶¶ 150-241, 250-53, 263-87, 301-17.)  Plaintiffs' state-law privacy claims included allegations of intrusion upon seclusion as well as causes of action under the California Constitution, California's Invasion of Privacy Act, the Massachusetts Privacy Act, and state video privacy statutes. (*Id.* ¶¶ 133-49, 242-49, 254-62, 294-300.)  Plaintiffs also brought common law claims for unjust enrichment.  (*Id.* ¶¶ 288-93.)

On March 2, 2017, the Court granted in part and denied in part Vizio's first motion to dismiss.  (Order re First MTD, Doc. 130.)  In its Order, the Court dismissed Plaintiffs' Wiretap Act, state-law video privacy, negligent misrepresentation, affirmative fraud, and California False Advertising Law claims with leave to amend.  (*Id.* at 38-39.)  Vizio's motion was denied as to Plaintiffs' VPPA, fraudulent omission, state-law privacy, and unjust enrichment claims.  (*Id.*)

On March 23, 2017, Plaintiffs filed their Second Consolidated Complaint, which dropped all dismissed causes of action except Plaintiffs' Wiretap Act claims.  (Second Cons. Compl., Doc. 136.)  Vizio filed a second motion to dismiss soon thereafter, seeking to dismiss Plaintiffs' Wiretap Act claims and claims for injunctive relief.  (Second MTD, Doc. 145.)  Vizio argued that Plaintiffs' claims for injunctive relief were mooted by a consent decree then-recently entered by a district court in New Jersey regarding a settlement between Vizio and the Federal Trade Commission.  (*Id.* at 2.)  The Court, however, denied Vizio's second motion to dismiss in its entirety.  (Order re Second MTD, Doc. 199.)

The parties reached a settlement on October 3, 2018.  (*See* Settlement Agreement, Ex. 1 to Joint Zapala & Mura Decl. re Fin. Appr., Doc. 311-3.)  On January 4, 2019, the Court granted Plaintiffs' unopposed motion for preliminary approval of the Settlement Agreement, finding that the amount offered therein was fair, adequate, and reasonable.

1  (*See* Order re Prelim. Appr. at 13-23.)  The Court also approved A.B. Data, Ltd. as the

2  Settlement Administrator and approved the proposed method of distribution of the Class

3  Notice, but the Court required the parties to make certain changes to the proposed Class

4  Notice.  (*Id.* at 23-27.)  After the parties made the required revisions, the Court approved

5  the Class Notice and ordered it to be disseminated in accordance with the approved notice

6  plan.  (*See* Order Approving Revised Class Notice, Doc. 300; Class Notice, Doc. 298-1.)

7

8  **B.    The Settlement**

9      As discussed in the Court's Preliminary Approval Order, the Settlement Agreement

10  provides a non-reversionary Settlement Fund of $17,000,000.  (Settlement Agreement §

11  X.1.)  The Settlement Agreement defines the Settlement Class as:

12

13  All individuals in the United States who purchased a VIZIO Smart
    Television for personal or household use, and not for resale, that was

14  subsequently connected to the Internet at any time between February 1, 2014
    and February 6, 2017.

15

16  (*Id.* § I.32.)  Tracking the nationwide class definition pleaded in the Second Consolidated

17  Complaint, this definition covers an estimated 16 million individuals and corresponds with

18  when Vizio first implemented automatic content recognition technology (February 1,

19  2014), and when Vizio stopped collecting viewing data through this software from Smart

20  TVs without affirmative consent (February 6, 2017).  (*See* Order re Prelim. Appr. at 4-5.)

21  The Settlement Fund covers payments for attorneys' fees and expenses to Class Counsel,

22  administration costs incurred by the Settlement Administrator, and incentive awards to the

23  Class Representatives.  (Settlement Agreement. § X.2.)  The residual sum will be

24  distributed proportionally to members of the Settlement Class ("Class Members") who

25  submit valid claims.  (*Id.* § XI.1.)  Any part of the fund that cannot feasibly be distributed

26  to Class Members will be reallocated to *cy pres* recipients.  (*Id.* § X.2.)  The Court

27  approved Electronic Privacy Information Center, Privacy Rights Clearinghouse, and World

28  Privacy Forum as *cy pres* recipients.  (Order re Prelim Appr. at 24.)

1    In addition to the monetary fund, the Settlement Agreement requires that Vizio

2    make certain business practice changes, including prominent on-screen disclosures and

3    opt-out forms regarding data collection.  (Settlement Agreement § XII.1.)  Additionally,

4    Vizio must delete viewing data collected during the class period still in its possession and

5    provide third-party verification of such deletion.  (*Id.*)

6    In return for their individual settlement payments, Plaintiffs and any Class Members

7    who do not opt-out of the settlement will release all claims against Vizio "that arise out of

8    or relate directly or indirectly in any manner whatsoever to facts alleged or that could have

9    been alleged or asserted" in this action.  (*Id.* § XVII.1.)

10    Finally, the Settlement Agreement restricts Vizio from opposing applications made

11    by the Class Representatives for incentive awards up to $5,000, or by Class Counsel for

12    attorneys' fees up to 33.3% of the monetary fund.  (Settlement Agreement §§ XIII.1,

13    XIV.1.)

14

15    **C.    Notice and Response**

16    Notice was sent to class members in form and method compliant with the Court's

17    Orders.  (Fin. Appr. Mem., Doc. 311-1 at 11-13.)  Specifically, Vizio displayed an

18    abbreviated notice to Class Members via over 5 million internet-connected Vizio Smart

19    TVs.[2]  (Schachter Decl. ¶ 6.)  Abbreviated notice was also emailed to the 7,828,308 Class

20    Members for whom Vizio has email addresses, and 5,538,973 of said emails were

21    successfully delivered.[3]  (Schachter Decl. ¶ 5.)  Between April 16 and 18, 2019, a

---

23    [2] At preliminary approval, the parties anticipated that approximately 6 million Vizio Smart TVs

24    would be capable of displaying the abbreviated notice.  (*See* Order re Prelim. Appr. at 25.)  At the
Final Fairness Hearing, the parties clarified that they were able to confirm display on at least 5

25    million Smart TVs and notice was sent to an additional 700,000 to 800,000 Smart TVs for which
the parties were unable to confirm display due to technical impediments, but they have no reason

26    to suspect that such notices were not successfully displayed.  Hence, the total number of Smart TV
notices likely approaches the parties' original estimate.  (*See* Schacter Decl., Doc. 311-4 ¶ 6.)

27    [3] At preliminary approval, the parties estimated that Vizio had approximately 9 million Class
Members' email addresses.  (*See* Order re Prelim. Appr. at 25.)  The parties represent that the

28        (footnote continued)

reminder notice was sent to the 5,386,176 Class Members who had received the first email but not yet submitted a claim.  (Supp. Schachter Decl., Doc. 320-1 ¶ 4.)  The Settlement Administrator also ran a digital media campaign of banner ads resulting in over 177 million impressions across the internet and yielding 87,920 click-throughs.  (*Id.* ¶ 5.) Additionally, the Settlement Administrator disseminated via PR Newswire a nationwide press release, in both English and Spanish, announcing the settlement.  (Schachter Decl. ¶ 9.)  Each of these abbreviated notices included a link or otherwise directed Class Members to a website hosted by the Settlement Administrator that displayed the longform Class Notice and pertinent case documents.  (*Id.* ¶ 10; TV Notice, Doc. 299; Email Notice, Ex. A to Schachter Decl.; Reminder Email Notice, Ex. A to Supp. Schachter Decl.; Banner Ads, Ex. B to Schachter Decl.; Press Release, Ex. C to Schachter Decl.)  The Settlement Administrator calculates that the notice program reached approximately 74% of Class Members.  (Supp. Schachter Decl. ¶ 12.)

As discussed in the Court's prior Orders, the Class Notice included all information required by Rule 23(c)(2)(B) and otherwise fully informed Class Members of the nature of this action, the terms of the Settlement Agreement, and Class Members' rights thereunder, including advising them regarding:  (1) the amount and makeup of the Settlement Fund; (2) the plan of allocation; (3) that Class Counsel will apply for attorneys' fees and costs, and Class Representatives will seek incentive awards; (4) Class Members' right to receive a settlement payment; (5) their right to object to the Settlement Agreement and to appear at the Final Fairness Hearing; (6) their right to request exclusion from the Settlement Agreement; (7) the manner and timing for doing any of these acts; and (8) the date and time set for the Final Fairness Hearing.  (*See* Class Notice; Order re Prelim. Appr. at 26-

---

discrepancy is the result of the initial estimate being based on a list containing many duplicate addresses and that, after de-duplication, the total estimated number of Class Members receiving direct abbreviated notice by email, Smart TV, or both remains at approximately 11 million. (Status Report re Notice at 4-5.)  At the Final Fairness Hearing, the parties confirmed that the de-duplication of emails did not affect the number of individual Class Members receiving some form of direct notice.

1  27; Order Approving Revised Class Notice.)  The Class Notice also included the

2  Settlement Administrator's toll-free telephone number and address, as well as Class

3  Counsel's address.  (*See* Class Notice.)

4  Ultimately, the Settlement Administrator received 511,537 claims accounting for

5  655,161 Vizio Smart TVs.  (Supp. Schachter Decl. ¶ 8.)  This represents a claims rate of

6  4.1% of the 16 million qualifying Smart TVs sold and will result in an estimated settlement

7  payment of $16.50 per claimed Smart TV.[4]  (*Id.*; Reply at 1.)  The Settlement

8  Administrator also received 115 valid exclusions and two timely objections.  (Supp.

9  Schachter Decl. ¶¶ 9-10.)

10

11  **II.    CONDITIONAL CERTIFICATION OF THE CLASS**

12

13  In its Preliminary Approval Order, the Court discussed the propriety of conditional

14  class certification for the purposes of settlement.  (Order re Prelim. Appr. At 5-13.)  The

15  Court also previously discussed Plaintiffs' adequacy as Class Representatives and

16  adequacy of Eric H. Gibbs, Andre M. Mura, Joseph W. Cotchett, and Adam J. Zapala as

17  Class Counsel.  (*Id.* at 9-11.)  The Court sees no reason to depart from its previous

18  conclusions regarding the existence of a proper settlement class, appointment of Plaintiffs

19  as Class Representatives, or appointment of Class Counsel.  The Court therefore

20  incorporates its class certification analysis from the Preliminary Approval Order into the

21  instant Order.

22  Accordingly, the Court GRANTS the Motion for Final Approval as to conditional

23  class certification for the purposes of settlement.

24

25  _____

26  [4] At the time of the Final Fairness Hearing, the Settlement Administrator was in the process of
     auditing the submitted claims for validity.  Based on the preliminary results of such audit,

27  Plaintiffs represented that the claims rate and estimated payment amount would not materially
     differ from those relied on herein.

28

1

2   **III.    FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

3

4        **A.    Legal Standard**

5        Before approving a class-action settlement, Federal Rule of Civil Procedure 23

6   requires the Court to determine whether the settlement is fair, reasonable, and adequate.

7   Fed. R. Civ. P. 23(e)(2).  "To determine whether a settlement agreement meets these

8   standards, a district court must consider a number of factors, including: (1) the strength of

9   plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation;

10  (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in

11  settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the

12  experience and views of counsel; (7) the presence of a governmental participant;[5] and (8)

13  the reaction of the class members to the proposed settlement."  *Staton v. Boeing Co.*, 327

14  F.3d 938, 959 (9th Cir. 2003) (internal quotation marks and citation omitted).  "The relative

15  degree of importance to be attached to any particular factor will depend upon and be

16  dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique

17  facts and circumstances presented by each individual case."  *Officers for Justice v. Civil*

18  *Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).  "It is the settlement taken as a whole,

19  rather than the individual component parts, that must be examined for overall fairness, and

20  the settlement must stand or fall in its entirety."  *Staton*, 327 F.3d at 960 (quoting *Hanlon*

21  *v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

22

23       **B.    Discussion**

24       In its Preliminary Approval Order, the Court evaluated each of the factors identified

25

26  _____

27  [5] As noted in the Court's Preliminary Approval Order, although the FTC obtained a consent
    decree covering the same subject matter at issue in this case, this factor does not directly apply

28  here.  (Order re Prelim. Appr. at 14 n.1.)

above to determine whether the Settlement Agreement is fair, reasonable, and adequate under Rule 23.  (Order re Prelim. Appr. at 13-22.)  The Court determined that the following factors weighed in favor of approval: (1) the strength of Plaintiffs' case; (2) the risk, complexity, and likely duration of further litigation; (3) the risk of maintaining class certification; (4) the amount offered in settlement; (5) the stage of the proceedings and extent of discovery completed; and (6) the experience and views of Class Counsel.  (*Id.* at 15-20.)  The Court was also satisfied that there was not collusion between the parties. [6] (Order re Prelim. Appr. at 21-22.)  The Court sees no reason to depart from its previous conclusions as to these factors.  The Court therefore incorporates its analysis from the Preliminary Approval Order into the instant Order.

At the time of preliminary approval, however, Plaintiffs provided only limited evidence regarding the reactions of Class Members to the proposed settlement: specifically, declarations from the named Plaintiffs themselves supporting the Settlement Agreement.  (*See id.* at 20-21; Plaintiff Decls., Docs. 282-3 to 282-8.)  The Court noted that "these are hardly a representative sample" of Class Member reactions and reserved reaching a conclusion as to this factor until after Class Members had received notice and had the opportunity to object or otherwise be heard at the Final Fairness Hearing.  (Order re Prelim. Appr. at 20-21.)  Now, after notice and opportunity to object, the Court concludes that Class Members' reactions to the Settlement Agreement are largely positive and favor approval.  First, as noted above, 511,537 Class Members—accounting for 4.1% of eligible televisions—availed themselves of the Settlement Agreement, whereas only 115 Class Members chose to exclude themselves from its terms.  (Supp. Schachter Decl. ¶¶ 8-

---

[6] To the extent the Court expressed any concerns in its Preliminary Approval Order regarding signs of collusion—*e.g.*, the amount of attorneys' fees requested and inclusion of a clear sailing provision—such concerns are allayed by the testimony of Judge Vaughn R. Walker (Ret.), who served as the parties' mediator and describes how settlement discussions were marked by vigorous negotiation and reasoned consideration of the parties' respective strengths and weaknesses, as well as how the monetary terms of the Settlement Agreement are largely the product of a "mediator's proposal" that was certainly non-collusive.  (*See* Walker, J. Decl., Doc. 311-5.)

9.)  Second, only two Class Members filed objections.  (*Id.* ¶ 10.; Gibson Obj., Ex. C to Supp. Schachter Decl. at 5-7; Weber Obj., Ex. C to Supp. Schachter Decl. at 8-10.)  A small number of objections and opt-outs at the time of the fairness hearing may raise a presumption that the settlement is favorable to the class.  *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008); s*ee also Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862, at *5 (N.D. Cal. Jan. 26, 2007) (approving a settlement where the opt-out rate was 2%), *aff'd*, 331 F. App'x 452 (9th Cir. 2009). Moreover, while each objection laments that the Settlement Agreement does not provide further monetary and injunctive relief for Class Members, neither objection raises persuasive reasons to disturb the Court's reasoned conclusion that the amount offered in settlement is consistent with settlement recoveries in similar class actions, proportional to the claims released by Class Members, informed by the actual value of the data at issue, and otherwise fair and reasonable.  (*Compare* Gibson Obj. at 5 *and* Weber Obj. at 8, *with* Order re Prelim. Appr. at 17-19.)  Indeed,  the common fund is of greater value than the revenue Vizio received through licensing the allegedly wrongfully-obtained data.  (*See* Fee Mem. at 1.)  Moreover, neither objector appeared at the Final Fairness Hearing to provide further argument in support of their objections.

Considering all relevant factors, the Court concludes that the Settlement Agreement is fair, reasonable, and adequate.  Accordingly, the Court GRANTS Plaintiffs' Motion for Final Approval of the Class Action Settlement.

## IV.   ADMINISTRATION EXPENSES

The Settlement Agreement provides that the Settlement Administrator's services will be paid out of the Settlement Fund.  (Settlement Agreement § X.2.)  Plaintiffs request reimbursement to Class Counsel for $122,830.65 charged by the Settlement Administrator for such services.  (Fee Mem., Doc. 323 at 14.)  The Court finds these expenses to be reasonable and adequately documented.  (*See* Schacter Costs Decl., Doc. 328 ¶ 5.)

1    Accordingly, the Court GRANTS the Motion as to the costs of administration.

2    **V.    ATTORNEYS' FEES**

3

4    Plaintiffs seek an attorneys' fee award of $5,610,000, which is 33% percent of the

5    Settlement Fund.  (Fee Mem. at 1.)  For the following reasons, the Court finds the

6    requested award to be appropriate and grants the request.

7    Rule 23 permits a court to award "reasonable attorneys' fees . . . that are authorized

8    by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  "[C]ourts have an

9    independent obligation to ensure that the award, like the settlement itself, is reasonable,

10   even if the parties have already agreed to an amount."  *In re Bluetooth Headset Prod. Liab.*

11   *Litig.*, 654 F.3d 935, 941 (9th Cir. 2011).  In the Ninth Circuit, the benchmark for a fee

12   award in common fund cases is 25% of the recovery obtained.  *Id*. at 942.  Courts must

13   "justify any increase or decrease from this amount based on circumstances in the record."

14   *Monterrubio v. Best Buy Stores, L.P*., 291 F.R.D. 443, 455 (E.D. Cal. 2013) (citing *Six (6)*

15   *Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)).  The

16   Ninth Circuit has identified factors the Court may consider in assessing whether an award

17   is reasonable, including: (1) the results achieved, (2) the risk of litigation, (3) the skill

18   required and quality of work, and (4) the contingent nature of the fee and the financial

19   burden carried by the plaintiffs.  *See Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1048-50

20   (9th Cir. 2002).  Counsel's lodestar may also "provide a useful perspective on the

21   reasonableness of a given percentage award."  *Id*. at 1050.

22   The Court evaluates each factor in turn to determine whether an upward departure

23   from the 25% benchmark is justified.

24

25   **A.    Results Achieved**

26   Here, Class Counsel achieved a monetary settlement of $17,000,000, which

27   represents approximately 22% of Vizio's maximum potential liability.  (*See* Prelim. Appr.

28   Order at 17-18.)  As discussed in the Court's Preliminary Approval Order, this amount and

1    percentage of recovery is consistent with settlements approved in other consumer and user

2    privacy class actions.  (*Id.* at 17-19 (collecting cases).)  On its face, the Court finds this

3    monetary result substantial—to be sure, as noted above, the common fund is more than

4    Vizio's revenues from licensing the allegedly wrongfully-obtained data—but not so

5    "exceptional" as to alone warrant upward departure from the 25% benchmark.  *Vizcaino*,

6    290 F.3d at 1048.

7         Beyond substantial monetary relief, however, the Settlement Agreement provides

8    significant injunctive relief to the Settlement Class.  (Settlement Agreement § XII.1.)  In

9    its Preliminary Approval Order, the Court declined to evaluate such injunctive relief in

10   monetary terms because there appeared to be considerable overlap between the injunctive

11   relief provided by the Settlement Agreement and relief already obtained through the

12   consent decree between Vizio and the FTC.  (Order re Prelim. Appr. at 18, 22.)  Plaintiffs

13   now argue that at least *some* of the injunctive relief here can be specifically traced to Class

14   Counsel's efforts, *to wit*, deletion of Class Members' data collected between March 2016

15   and February 2017, deletion of pre-consent data collected from Class Members who later

16   agreed to have their data collected, and Vizio's December 2016 implementation of

17   prominent on-screen disclosures and opt-out forms regarding data collection.  (Fee Mem.

18   at 11-12.)  Plaintiffs submit persuasive expert testimony demonstrating that the injunctive

19   relief secured by the Settlement Agreement has substantial value and benefit to Class

20   Members, even when limiting such evaluation to relief directly traceable to this action.

21   (*See* Egelman Report, Doc. 324.)  Although the Court declines to adopt Plaintiffs' expert's

22   calculations wholesale, and remains hesitant to ascribe a precise value to the injunctive

23   relief secured by Class Counsel, there is little doubt that such relief is of substantial value

24   and counsels in favor of a greater fee award than if Class Counsel had obtained only naked

25   monetary relief.[7]  Injunctive relief is especially valuable in privacy cases, such as this one,

26   _____

27   [7] Plaintiffs argue that the value of traceable injunctive relief should be included in the value of the
     common fund for purposes of assessing Plaintiffs' fee request against the 25% benchmark.  (Fee
28              (footnote continued)

1   where the harm of having one's personal information surreptitiously collected is largely

2   psychological and difficult to monetarily quantify.  The aim of consumer privacy statutes

3   is not to ensure fair compensation for data collection; it is to prevent nonconsensual

4   intrusions into consumers' private affairs.  The injunctive relief here achieves that goal.

5       Accordingly, the Court concludes that the combined monetary and injunctive results

6   achieved weigh in favor of an upward departure from the 25% benchmark.

7

8       **B.    Risk of Litigation**

9       The risks presented by this litigation strongly support an enhanced fee award.  As

10   noted in the Court's Preliminary Approval Order, the Ninth Circuit's recent decision in

11   *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 981 (9th Cir. 2017) threatens to undermine

12   Plaintiffs' theory of VPPA liability, and Plaintiffs' Wiretap Act claim raises an issue of

13   first impression in the Ninth Circuit.  (Order re Prelim. Appr. at 15-16.)  Moreover, despite

14   Plaintiffs' arguments that injunctive relief provided by the Settlement Agreement is

15   distinct from injunctive relief secured by the consent decree in a separate action, Vizio

16   maintains that Plaintiffs' claims for injunctive relief are largely mooted by that decree, and

17   Vizio would press that point at summary judgment or trial.  (*Id.* at 16.)  Vizio has also

18   _____

19

20   Mem. at 4-8.)  Such calculation would place Plaintiffs' request well under the benchmark.  (*Id.*)
     "[B]ecause the value of injunctive relief is difficult to quantify," however, the Ninth Circuit

21   cautions that "its value is also easily manipulable by overreaching lawyers seeking to increase the
     value assigned to a common fund" and requires "that only in the unusual instance where the value

22   to individual class members of benefits deriving from injunctive relief can be accurately
     ascertained may courts include such relief as part of the value of a common fund for purposes of

23   applying the percentage method of determining fees."  *Staton*, 327 F.3d at 974.  When
     mathematical precision is impracticable, "courts should [instead] consider the value of the

24   injunctive relief obtained as a 'relevant circumstance' in determining what percentage of the
     common fund class counsel should receive as attorneys' fees, rather than as part of the fund

25   itself."  *Id.* (citing *Vizcaino,* 290 F.3d at 1049).  Because the Court finds that Plaintiffs' fee request

26   is justified even treating the injunctive relief obtained here merely as a "relevant circumstance"
     rather than as part of the common fund itself, the Court need not decide whether the value of

27   injunctive relief here is "accurately ascertainable" or otherwise sufficiently calculable to warrant
     inclusion in the common settlement fund for fee award purposes.

28

1    indicated its intent to compel arbitration pursuant to certain class arbitration agreements

2    should the Court ultimately certify a class in this action.  (*Id.*)  Beyond these legal risks,

3    significant questions of fact persist regarding the extent and disclosure of Vizio's data

4    collection practices.  (*Id.*)  Finally, even if they prevail on liability as to all counts,

5    Plaintiffs' ultimate recovery would be largely dependent on discretionary statutory

6    damages, which the Court could wholly or partially decline to award.  (*Id.*)  In sum, "[t]he

7    enormous risk posed by this case, and [Class Counsel's] committed perseverance even in

8    the face of this risk, deserves recognition."  *In re Optical Disk Drive Prod. Antitrust Litig.*,

9    No. 3:10-MD-2143 RS, 2016 WL 7364803, at *7 (N.D. Cal. Dec. 19, 2016).  Thus, this

10   factor supports an upward departure.

11

12        **C.    Skill Required and Quality of Work**

13        Class Counsel also demonstrated exceptional skill in litigating this case.  Over more

14   than three years of litigation, Class Counsel has astutely navigated a technically complex,

15   procedurally fraught, and legally uncertain course to achieve a superior result.  The parties

16   engaged in vigorous motion practice, including Class Counsel's successful defense against

17   two motions to dismiss and Vizio's attempt to compel arbitration.  The record reflects

18   Class Counsel undertook extensive fact and expert discovery, and the technological

19   complexities at the heart of the action, vast scope of claims and issues, and 16 million-

20   member Settlement Class speak for themselves.

21        At the consolidation of this multi-district litigation, "[t]he Court was impressed by

22   the overwhelming quality of applicants" who applied for the role of Co-Lead Counsel.

23   (Order re Appointment of Counsel, Doc. 85 at 1.)  Ultimately, the Court selected Class

24   Counsel for this role.  (*Id.* at 2.)  The Court has not been disappointed by this selection.

25   Throughout this litigation, Class Counsel has consistently demonstrated superb candor,

26   diligence, organization, and aptitude.  Indeed, at the preliminary approval hearing the

27   Court specifically commended Class Counsel for the clarity, organization, and

28   thoroughness of their briefing.  (Prelim. Appr. Hrg. Tr., Doc. 295 at 3:11-23.)  Despite the

1  complexities of this action, the Court has rarely required supplemental briefing or other

2  submissions to clarify the issues or facts under review.  Where such supplements have

3  been required, Class Counsel has provided thorough responses.  Moreover, Class Counsel

4  has conscientiously kept the court apprised of developments throughout the settlement and

5  notice processes.

6      Accordingly, the Court finds that this factor weighs in favor of an upward

7  departure.

8

9      **D.**    **Contingent Nature of the Fee**

10      Finally, Class Counsel took this case on a contingent basis, incurring a total of

11  $181,808.59 in out of pocket expenses and billing over 9,229 collective hours.[8]  (Fee

12  Mem. at 12.)  Class Counsel have received no compensation for their efforts during the

13  litigation, and they undertook representation despite substantial risk that none of their

14  expenses on behalf of the Class would be recouped.  (Joint Zapala & Mura Decl. re Fees ¶

15  48.)  "Courts have long recognized that the attorneys' contingent risk is an important factor

16  in determining the fee award and may justify awarding a premium over an attorney's

17  normal hourly rates."  *Monterrubio*, 291 F.R.D. at 457 (citing *In re Wash. Pub. Power*

18  *Supply Sys. Sec. Litig*., 19 F.3d 1291, 1299 (9th Cir. 1994)).  This is especially true where,

19  as here, the litigation extended over many years and entailed a significant financial burden.

20  _____

21  [8] This figure includes hours billed by supporting counsel related to joint prosecution of the action
22  after appointment of Co-Lead Counsel (now Class Counsel); Class Counsel and their respective
   firms are responsible for the bulk of this work—over 7,183 hours.  (Joint Zapala & Mura Decl. re
23  Fees, Doc. 308 ¶¶ 55, 57, 59.)  Class Counsel attests that any delegation of work to supporting
   counsel was done in accordance with the Court's Order Appointing Co-Lead Counsel and
24  accompanied by efforts to ensure that supporting counsel adhered to the Court's reporting
   requirements and did not duplicate the efforts of Class Counsel.  (*Id.* ¶¶ 53-54.)  Thus, the Court
25  sees no reason to treat delegated work differently than work performed directly by Class Counsel.
26  *Cf. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 914 F.3d 623,
   643-45 (9th Cir. 2019) (affirming district court's denial of fees to non-Class Counsel attorneys for
27  work not authorized by Lead Counsel).

28

1  *See Vizcaino*, 290 F.3d at 1050.  Moreover, because of the time, resources, and effort

2  required to engage in such intensive litigation, Class Counsel states that "they have

3  foregone other legal work for which they would have been compensated."  (Joint Zapala &

4  Mura Decl. re Fees. ¶ 48.)  This adds to Class Counsel's contingent risk.  *See In re Online*

5  *DVD-Rental Antitrust Litig.*, 779 F.3d 934, 955 (9th Cir. 2015) (taking into consideration

6  "the burdens class counsel experienced while litigating the case (e.g., cost, duration,

7  foregoing other work)").

8        Accordingly, this factor weighs in favor of an upward departure.

9

10      **E.**    **Lodestar Cross-Check**

11        To determine the reasonableness of a fee award, courts may compare the percentage

12  of the common fund with counsel's lodestar calculations.  *Vizcaino*, 290 F.3d at 1050-51.

13  "The benchmark percentage should be adjusted, or replaced by a lodestar calculation,

14  when special circumstances indicate that the percentage recovery would be either too small

15  or too large in light of the hours devoted to the case or other relevant factors."  *Six (6)*

16  *Mexican Workers*, 904 F.2d at 1311.  Such adjustment is especially appropriate where a

17  strict percentage approach would create a "windfall" for counsel by a fee award that "'has

18  no direct relationship to the efforts of counsel.'"  *In re Bluetooth Headset Prods.*, 654 F.3d

19  at 942-43 (quoting *In re Prudential Insurance Co. of America Sales Practice Litigation*

20  *Agent Actions*, 148 F.3d 283, 339 (3d Cir.1998)).  As noted above, Class Counsel assert

21  that they and supporting counsel spent a total of 9,229 hours litigating this case.  (Fee

22  Mem. at 12; Ex. 2 to Joint Zapala & Mura Decl. re Fees, Doc. 308-2.)  Plaintiffs provide

23  declarations from Class Counsel and counsel at each supporting firm describing their

24  respective hours worked and hourly rates, which range from $340 to $950 for attorneys,

25  and from $200 to $325 for non-attorney staff.  (Exs. 9 to 19 to Joint Zapala & Mura Decl.

26  re Fees, Docs. 308-9 to 308-19.)  Class Counsel calculates the total lodestar for direct and

27  delegated work to be $5,148,343.50.  (Joint Zapala & Mura Decl. re Fees ¶ 59; Ex. 2 to

28  Joint Zapala & Mura Decl. re Fees.)

The lodestar cross-check first requires the Court to determine whether the hourly rates sought by counsel are reasonable.  "[T]he district court must determine a reasonable hourly rate considering the experience, skill, and reputation of the attorney requesting fees." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986).  This determination "is not made by reference to rates actually charged [by] the prevailing party." *Id*.  The fee applicant bears the burden of showing that "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Camacho v. Bridgeport Fin., Inc*., 523 F.3d 973, 980 (9th Cir. 2008) (citation omitted).  The Court is satisfied that Class Counsel's rates are reasonable in light of Class Counsel's experience, exceptional work, and the complex nature of this lawsuit.  Indeed, the Court relied on evidence of such skill and experience to appoint Co-Lead Counsel and then appoint the same attorneys and their colleagues as Class Counsel.  (Order re Appointment of Counsel; Order re Prelim. Appr. at 10-11.)  As noted above, Class Counsel's own work comprises the bulk of claimed hours. Although the Court has not as heavily scrutinized the various claimed rates and supporting qualifications of counsel who undertook the remainder of work, Plaintiffs' asserted lodestar reveals a blended hourly rate of $558 for all attorneys and staff across all firms. This is consistent with other blended rates approved in complex multi-district litigations and suggests a reasonable allocation of labor among partners, associates, and staff of different reasonable rates. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (approving blended hourly rate of $529).

The Court next determines whether Class Counsel and supporting counsel's expenditure of 9,229 hours was *generally* reasonable. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005) ("The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.")  All counsel claiming hours submitted detailed contemporaneous time records accounting for the number of hours expended by attorneys and staff on each task. (Exs. 5, 7 & 9 to 19 to Joint Zapala & Mura Decl. re

Fees, Docs. 308-5, 308-7 & 308-9 to 308-19.)  Review of these time records confirms Class Counsel's attestations that little work was duplicated and Plaintiffs' lodestar calculations are not inflated.  (*Id.*; Joint Zapala & Mura Decl. re Fees ¶¶ 53-54.)

The requested fees of $5,610,000 represent a multiplier of 1.09 of Class Counsel's lodestar.  Thus, considering all the circumstances of this case and the quality of the representation, the lodestar comparison supports the reasonableness of the requested fee award, which is hardly a "windfall" for Class Counsel.

Therefore, considering the relevant factors set forth by the Ninth Circuit as well as the lodestar cross-check, the Court finds that an award of 33% of the Settlement Fund is appropriate and reasonable in this action.  Accordingly, the Court GRANTS the Motion as to attorneys' fees and awards $5,610,000 to Class Counsel.

## VI.    LITIGATION COSTS

Plaintiffs request that the Court approve the reimbursement of $181,808.59 in litigation expenses and costs. [9]  (Fee Mem. at 14.)  "Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters."  *In re Omnivision*, 559 F. Supp. 2d at 1048.  Class Counsel and supporting counsel have documented their expenses incurred in court filing fees, depositions, travel, expert fees, mediation fees, and other proper expenses.  (*See* Exs. 3, 4, 6, 8 & 9 to 19 to Joint Zapala & Mura Decl. re Fees, Docs. 308-3, 303-4, 308-6, 308-8 & 308-9 to 308-19.) The Court finds the various expenses adequately documented and reasonable.

Accordingly, the Court GRANTS Plaintiffs' request for litigation costs of $181,808.59.

---

[9] This amount is exclusive of the $122,830.65 in reimbursement of administration costs discussed above.

1

## VII.   <u>CLASS REPRESENTATIVE INCENTIVE AWARDS</u>

2

3

4        Plaintiffs each seek an incentive award of $5,000 for their roles as Class

5   Representatives.  (Fee Mem. at 14-15.)  Incentive awards are "discretionary . . . and are

6   intended to compensate class representatives for work done on behalf of the class, to make

7   up for financial or reputational risk undertaken in bringing the action, and, sometimes, to

8   recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g*

9   *Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009) (citing *In re Mego Fin. Corp. Sec. Litig.*, 213

10  F.3d 454, 463 (9th Cir. 2000)).  "To [further] assess whether an incentive payment is

11  excessive, district courts balance 'the number of named plaintiffs receiving incentive

12  payments, the proportion of the payments relative to the settlement amount, and the size of

13  each payment.'" *Monterrubio*, 291 F.R.D. at 462 (quoting *Staton*, 327 F.3d at 977).

14  Courts "must 'evaluate [such] awards individually' to detect 'excessive payments to

15  named class members' that may indicate 'the agreement was reached through fraud or

16  collusion.'" *Id.* (quoting *Staton*, 327 F.3d at 975, 977).

17        Here, Plaintiffs attest that they devoted significant time and effort to this litigation;

18  each was deposed, subject to document discovery, assisted Class Counsel with drafting

19  pleadings, and otherwise actively participated in the litigation.  (Plaintiff Decls., Docs. 309

20  to 309-5.)  Each Plaintiff spent between 28 and 40 hours assisting with prosecution of this

21  action.  (*Id.*)  Each payment represents less than .03% of the Settlement Fund, and

22  Plaintiffs expended significant effort in assisting with the prosecution of this litigation.

23  *See, e.g.*, *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act*

24  *(FACTA) Litig.*, 295 F.R.D. 438, 471 (C.D. Cal. 2014) (approving incentive awards of

25  $5,000 per plaintiff where the plaintiffs were subjected to intrusive discovery,

26  communicated with class counsel over a period of several years, and participated

27  significantly in finalizing the settlement terms); *Wren v. RGIS Inventory Specialists*, No.

28  C-06-05778 JCS, 2011 WL 1230826, at *37 (N.D. Cal. Apr. 1, 2011) (approving incentive

1    payments comprising 0.45% of the total settlement amount).  Moreover, as noted above,

2    the Court is confident that the Settlement Agreement was not the product of collusion.

3          The Court therefore finds that the requested incentive awards are reasonable and

4    appropriate under the circumstances.

5       Accordingly, Plaintiffs Hodges, Zufolo, Walsh, Rizzitello, Thomson, and Queenan are

6    each awarded an incentive payment of $5,000.

7

8    **VIII.   <u>CONCLUSION</u>**

9

10         Finding the Settlement to be fair, adequate, and reasonable, the Court GRANTS

11   Plaintiffs' Motion for Final Approval of the Class Action Settlement.  The Court also

12   GRANTS Plaintiffs' Motion for Attorneys' Fees, Costs, and Class Representative

13   Incentive Awards.  The Court awards Class Counsel $5,610,000 in attorneys' fees, based

14   on an award of 33% of the Settlement Fund, and $181,808.59 in litigation costs.  The

15   Court also awards Class Representative incentive awards of $5,000 each to Plaintiffs

16   Hodges, Zufolo, Walsh, Rizzitello, Thomson, and Queenan.  Finally, the Court awards

17   Class Counsel $122,830.65 in reimbursement for the costs of settlement administration.

18   Distribution of the Settlement Fund to Class Members shall be made in accordance with

19   the method outlined in the Settlement Agreement.  Class Counsel is ORDERED to file a

20   proposed final judgment no later than five (5) days from the date of this Order.

21

22

23

24   DATED: July 31, 2019

25                                                    _____

26                                                    HON. JOSEPHINE L. STATON
                                                      UNITED STATES DISTRICT JUDGE
27

28